```
                                         VOLUME: 3 of 4
                                         PAGES: 450-694

                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA              )    CRIMINAL ACTION NO.
                                      )    2:18-cr-12
          vs.                         )
                                      )
RANDY SHELTRA,                        )
             Defendant.               )



                           JURY TRIAL
                  Thursday, December 10, 2020
                     Burlington, Vermont



                           WITNESSES: Randy W. Sheltra
                                      Frank J. Thornton, Jr.



BEFORE:

     THE HONORABLE CHRISTINA C. REISS,
     District Judge




APPEARANCES:

BARBARA A. MASTERSON, ESQ., and ANDREW C. GILMAN, ESQ., U.S.
     Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
     570, Burlington, VT 05402-0570, Counsel for the Government

MARK A. KAPLAN, ESQ., Kaplan and Kaplan, 95 St. Paul Street,
     Suite 405, Burlington, VT 05402-0405, Counsel for the
     Defendant

The Defendant appearing in person



                    Johanna Massé, RMR, CRR
                     Official Court Reporter
                        P. O. Box 5852
                     Burlington, VT 05402
             802-951-8102 | 802transcripts@gmail.com
```

INDEX TO EXAMINATIONS

WITNESS                                                          PAGE

RANDY W. SHELTRA
      Cross (Continued) by Ms. Masterson                          462
      Redirect by Mr. Kaplan                                      508
      Recross by Ms. Masterson                                    519

FRANCIS J. THORNTON, JR. - REBUTTAL
      Direct by Ms. Masterson                                     526
      Voir Dire by Mr. Kaplan Re Exhibit 41                       528
      Direct (Continued) by Ms. Masterson                         536
      Voir Dire by Mr. Kaplan Re Exhibit 41                       539
      Cross by Mr. Kaplan                                         542

INDEX TO EXHIBITS

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 41 | Two Photographs | 527 | 540 |
| 59 | Stipulation re 13 VSA §§ 2602, 3252(c), and 3251(1) | | 455 |

DEFENDANT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| C1 | 6/24/17-8/30/17 Text Messages, Bates 2391, 2395, 2410,2462-463, 2473, and 2605 | 511 | 518 |

MISCELLANEOUS

                                                                PAGE
Defense Rests                                                    526

Government's Rebuttal Evidence                                   526

Government Rests                                                 542

INDEX
(Continued)


MISCELLANEOUS

|                                             | PAGE |
|---------------------------------------------|------|
| Pro Se Motion for Mistrial                  | 544  |
| Rule 29 Motion                              | 553  |
| Government's Closing Argument               | 556  |
| Defendant's Closing Argument                | 631  |
| Government's Rebuttal Closing Argument      | 651  |
| Jury Retires to Deliberate                  | 690  |

1 Thursday, December 10, 2020

2      (The following was held in open court without the jury

3 present at 9:02 AM.)

4         COURTROOM DEPUTY:  Your Honor, the matter before the

5 Court is criminal case number 18-CR-12-1, United States of

6 America vs. Randy Sheltra.  Present for the Government are

7 Barbara -- Assistant United States Attorneys Barbara Masterson

8 and Andrew Gilman, Mark Kaplan is present for the defendant,

9 and we are here for a jury trial.

10         THE COURT:  Good morning.  I have a few housekeeping

11 things to raise with you.  First, I'm going to reswear the

12 jurors unless there's any objection, because we've had a

13 significant break in time.

14      Pursuant to our discussion, I am going to tell them, "I

15 want to remind you what the attorneys say is not evidence, so

16 to the extent you overheard part of our conversation while the

17 husher was on, I ask you -- I instruct you to disregard it

18 entirely."

19      I'm going to tell them that one of the jurors is not here

20 because he believes he may have had a COVID exposure after the

21 trial, not during the trial.

22      Any objection to that?

23         MR. KAPLAN:  No, your Honor.

24         MS. MASTERSON:  No, your Honor.

25         THE COURT:  And so I'm sure, Mr. Sheltra, Mr. Kaplan

1 told you about this last night. We talked about this matter.

2 He told me that you waived your appearance at the telephone

3 hearing we had -- Zoom hearing, and one of our jurors is

4 awaiting test results and thinks that he may be a source of

5 COVID-19. I made the decision to excuse that person.

6          Were you aware of all of that?

7               THE DEFENDANT: Yes, your Honor.

8               THE COURT: All right. Then the other thing I want to

9 bring to your attention is I gave you a redraft of the jury

10 instructions on Monday. If you have issues, we'll carve out

11 some time for that, but you should be ready to go, because the

12 goal is to see if we can get the case in today. No rush about

13 that, obviously. And I was planning on honoring the 6:00 PM

14 deliberation but also ask the jury if they want to go longer,

15 and we'll take that up as it comes.

16          My final housekeeping matter is there is an "other acts"

17 curative instruction in the jury instructions. If Ms.

18 Masterson persisted in asking about the other two images or one

19 image of child pornography allegedly found on Mr. Sheltra's

20 phone, I planned on giving it. Ms. Masterson suggested she is

21 not going to be pursuing that line of inquiry. I'm not going

22 to hold her to it.

23          Mr. Kaplan, if you decide you want to redirect on that

24 issue, would you like me to give that curative instruction?

25               MR. KAPLAN: Yes, your Honor.

1          THE COURT:  Okay.  I will do so.

2      All right.  That's what I had to bring to your attention.

3  Anything to bring to my attention?

4          MS. MASTERSON:  Your Honor, the Government has two

5  matters.  First, it was left as an open question, I believe,

6  last time - I was going to say last week, but last month - as

7  to whether the exhibit that contains the stipulation as to the

8  statutes that are at issue would go back to the jury, and I

9  don't believe that was finally resolved.  And the Government

10 believes strongly that that should go back.  It's -- it was --

11         THE COURT:  It's cumulative.  It's in the jury

12 instructions.  Let me just see before you make an argument.

13     Is there any objection to it going back to the jury, Mr.

14 Kaplan?

15         MR. KAPLAN:  I don't think it's necessary, Judge.

16         THE COURT:  You don't think it's necessary.  So we do

17 have a dispute.  I am going to send it back with the jury.

18 It's in the jury instructions.  It doesn't really have any

19 prejudicial impact.  I reference the instruction in the

20 judicial notice section or the stipulation of fact, and so I

21 will have it go back to the jury.

22         MS. MASTERSON:  Thank you.  Second, I do have -- the

23 Court wanted to see the images.  May I approach?

24         THE COURT:  Yes.  I'm going to have you give it to Ms.

25 Ruddy, and I'm going to remind you what we do in terms of what

1  it looks like is just as important as what we do for -- in

2  actuality.  So I want you to keep the six-feet distances; I

3  want you to wear the mask.  You don't have to wear a mask

4  behind the plexiglass.  I'll be putting on my mask more often

5  than I typically do.  So let's do whatever we can to keep a

6  safe environment going.

7          COURTROOM DEPUTY:  So, Ms. Masterson, I believe you

8  should put on gloves to hand that to me.

9          MS. MASTERSON:  Oh.

10          THE COURT:  You can put on one glove.  I've learned to

11  do that.

12      Anything else that the Government has to bring to my

13  attention?

14          MS. MASTERSON:  Yes, your Honor.  Yesterday the

15  defense emailed to us what they propose is Defense Exhibit C1,

16  and we -- and Mr. Kaplan indicated that he had intended to ask

17  his client about it on direct, but he neglected to do so, which

18  means I assume he wants to ask about it on redirect.

19      We object to this for a number of reasons.  The first is

20  it was not provided to the Government pretrial, in violation of

21  the Court's pretrial order relating to the exchanging of

22  exhibits.  We don't believe that it's relevant because it is --

23  the exhibit consists of a series of text messages from the

24  forensic report involving -- from Mr. Sheltra to and with a

25  number of other people.  It's outside of the time period.  It

1 ends -- it begins in June of 2017.

2      This excerpt ends the day before the offense conduct began

3 with the 15-year-old ER, so it's irrelevant.  It -- it's the

4 defendant's own statement in there, so it's inadmissible

5 hearsay when offered by him.  It's confusing because it is a

6 multiple -- multiple conversations with other people in this

7 single document.

8      And we also believe under Rule 403 that it's a waste of

9 time given the factors that I've just outlined.

10          THE COURT:  Let me ask you, if Mr. Kaplan

11 cross-examined Mr. Thornton on that after Mr. Thornton talked

12 about other things found in the phone, would you agree with me

13 that that may be within the scope?

14          MS. MASTERSON:  No.  Because Mr. Thornton's testimony

15 is going to be exclusively relating to the finding of the

16 images that the Court has just seen.  This is the shortest

17 direct examination I will ever do in my life because of the

18 limited nature of it, and so to go through -- and there's

19 nothing to complete.  The rule of completeness will absolutely

20 not apply here because there's no --

21          THE COURT:  So I wasn't thinking about the rule of

22 completeness.  And one thing, remember, if you need to talk to

23 me, we do it before we have the jury waiting.

24      So what I'm thinking of is you are going to be eliciting

25 testimony from Mr. Thornton about images that are not the

subject of the charges to allegedly demonstrate Mr. Sheltra's

interest in -- sexual interest in minors, and you are going to

be talking about other things found on the phone.  I agree with

you that I don't see how Mr. Sheltra's own messages are

admissible if they are not a continuation of some other

conversation, but I await to hear from Mr. Kaplan as to why

they should be admissible, why they weren't provided sooner.

I'll take care of that on that end.

To shortcut it, if Mr. Thornton's talking about other

things on the phone and Mr. Kaplan asks him, "Would you agree

with me that there are quite a few other things that were found

on the phone, including text messages between Mr. Sheltra and

other individuals indicating" - I don't know what they are.  I

haven't seen them.  I don't have them - "sexual interest in

adults," something like that - I have to await the offer of

proof - would you agree with me that's within the scope, or you

say no?

MS. MASTERSON:  I still think no.

THE COURT:  Okay.  Let me hear from Mr. Kaplan on this

issue.

MR. KAPLAN:  Judge, I do think that this

conversation's a little premature.  It depends on how my client

testifies, what he says in response to the Government's answers

*[sic]*, and whether or not I pursue it will depend on that, so

maybe we should address it at that point.

1          THE COURT:  Well, plan on telling me why it was

2   disclosed late, and also plan on giving me an offer of proof as

3   to how it's relevant and admissible.  But if you're telling me

4   the conversation's premature, I don't need to be having it

5   right now.

6          MR. KAPLAN:  Thank you, Judge.

7          THE COURT:  Okay.  Anything else to bring to my

8   attention before we bring back the jurors?

9          MS. MASTERSON:  No.  But may I get the images back,

10  your Honor?

11         THE COURT:  You may.

12         MS. MASTERSON:  Thank you.

13         THE COURT:  All right.  Let's bring back the jurors.

14  Thank you.

15     (The following was held in open court with the jury

16  present at 9:13 AM.)

17         COURTROOM DEPUTY:  Your Honor, the matter before the

18  Court is criminal case number 18-CR-12-1, United States of

19  America vs. Randy Sheltra.  Representing the Government are

20  Assistant United States Attorneys Barbara Masterson and Andrew

21  Gilman, present with the defendant is Attorney Mark Kaplan, and

22  we are here for a jury trial.

23         THE COURT:  Good morning, ladies and gentlemen of the

24  jury.  Because we've had a break in our proceeding, I'm going

25  to have you resworn, and then I have some questions for you.

1          COURTROOM DEPUTY:  Please stand and raise your right

2  hand.

3      (The jury was sworn.)

4          THE COURT:  The first question I have for you is, Did

5  anybody acquire any outside information, perform any research,

6  talk to anybody about the case, have anybody talk to them about

7  the case, read any media reports, acquire any outside

8  information that did not come from the courtroom?  If so,

9  please raise your hand.  I am seeing no hands raised.

10      You will note that one of your fellow jurors is missing.

11  This juror a few days ago believes he may have had a COVID

12  exposure and is awaiting test results.  It did not happen in

13  the course of the trial, and I decided rather than take a

14  chance with your well-being I would excuse that person.  So

15  that person is not going to be here.

16      When we -- I reminded you in orientation that anything

17  that the attorneys say is not evidence.  To the extent you

18  overheard part of my conversation with the attorneys when the

19  husher was on, that is not evidence, and I instruct you to

20  disregard it entirely.  We'll be more careful with the husher.

21  You did exactly what I want you to do.  If you hear something

22  that you know you shouldn't be hearing, put your hand in the

23  air and we can fix the situation.

24      I have some COVID questions to ask you.  You've been asked

25  them before.  And we'll just go through them, and then we will

1  resume our trial.

2      Have you or a member of your household been exposed to

3  COVID-19 or someone who has tested positive for COVID-19?  No

4  hands raised.

5      Have you experienced any cold or flu-like symptoms in the

6  last 14 days, including fever, chills, cough, sore throat, new

7  loss of sense of taste or smell, muscle pain, respiratory

8  illness, shortness of breath, or difficulty breathing?  Seeing

9  no hands raised.

10     Have you or a member of your household been told to

11  quarantine?  No hands raised.

12     And those are all the questions I'm going to ask you.

13     Thank you on behalf of the Court and the parties for being

14  here today and making your schedule clear.  It was an

15  encouraging sign for civic duty to have all of you, all of you,

16  tell me that, yes, I'm going to be here and I'm going to do

17  what I need to to keep each other safe.  So thank you for that.

18     The Government is in the cross-examination of Mr. Sheltra,

19  so we'll have Mr. Sheltra resworn, and he will take the witness

20  stand.

21     And, Ms. Masterson, you may proceed.

22          THE REPORTER:  I think the juror needs a test with his

23  hearing device.

24          THE COURT:  Okay.  Can you hear me?  No, you cannot.

25  Can you hear me now?  You can hear me now?  Yes?  Can you hear

 1 me?  No.  Can you hear me now?  Yes?  No?

 2          JUROR MARLOW:  It's in and out.

 3          THE COURT:  Okay.  We need to have it completely in.

 4 Make sure you get your mask up.  I'll get mine on.

 5      How about now?  Loud and clear.  Okay.  Great.  Thank you.

 6      Ms. Ruddy, you're going to swear in Mr. Sheltra.

 7          COURTROOM DEPUTY:  Please raise your right hand and

 8 state your full name for the record.

 9          THE WITNESS:  Randy Sheltra.

10                    RANDY W. SHELTRA,

11      having been first duly sworn by the courtroom deputy,

12          was examined and further testified as follows:

13          THE WITNESS:  It's okay to take this off while I have

14 this on?

15          THE COURT:  Yes.

16          THE WITNESS:  Okay.

17                CROSS-EXAMINATION (Continued)

18 BY MS. MASTERSON:

19 Q    Could you please move the microphone down a little bit so

20 I can see your mouth?  Thank you, sir.

21      Mr. Sheltra, when -- you wrote all of the texts and emails

22 in the Government's exhibits that were attributed to you;

23 that's correct, right?

24 A    Yes.

25 Q    All right.  And when you wrote the words "I'm hard" in

1  those texts and emails, you were telling the person that you

2  were communicating with that your penis was erect and that you

3  were sexually aroused, right?

4  A     That's what I indicated, yes.

5  Q     Let's see if there's a couple more things that we can

6  agree upon.  You believed that Maddie, the undercover's

7  daughter, you believed that she was 10 years old; is that

8  right?

9  A     That's what the undercover cop had said.

10  Q     Is that what you believed?

11  A     Yes.

12  Q     And what about ER, the 15 -- the girl that you were

13  communicating with?  You believed that she was 15 when you were

14  communicating with her and when you met her; is that right?

15  A     Yes.

16  Q     The labia is a portion of the female genitalia, correct?

17  A     Yes.

18  Q     And you mentioned on direct that that's a body part that

19  you were intrigued by; is that right?

20  A     Yup.

21  Q     You're sexually aroused by labias, correct?

22  A     I find them intriguing.

23  Q     You're sexually aroused by them; is that right?

24  A     Not all the time, but that's -- that's a reasonable

25  statement.

1  Q    That you agree with?

2  A    Yes.

3        MS. MASTERSON:  Can we go to slide number 1, please.

4  Q    What we're about to have -- this is an email -- this is an

5  email that you wrote to who we call fake Alisha; is that right?

6  I'm circling the name Alisha with an A.

7  A    Yes.

8  Q    Does that help you understand that that's --

9  A    Yes.  Yes.

10 Q    All right.  And here on this, you wrote, "I have a real

11 thing for beautiful labias."

12 A    Yes.

13 Q    You wrote that, correct?

14 A    Yup.

15        MS. MASTERSON:  Can we go to the next slide, please.

16 Q    This also is an email that you sent to fake Alisha?

17        THE COURT:  So let's have a reference to exhibit

18 numbers for the record, please.

19        MS. MASTERSON:  This is -- these two exhibits -- or

20 these two are from Defense Exhibit C1, the communications -- C,

21 the communications between Mr. Sheltra and Alisha with an A.

22 Q    So again, this is another email that you sent to Alisha

23 with an A; is that correct?

24 A    Yes.  I'm a little bit confused by the term "fake Alisha."

25 Q    Well, there's Elisha with an E.

1  A     Yup.

2  Q     That's the 15-year-old, correct?

3  A     Yes.  That's right.

4  Q     And this is a person that you communicated with, also

5  known as Alisha with an A.  So is it easier for you if I refer

6  to this person as Alisha with an A?

7  A     I'm just -- this is the only person that I reference with

8  an A, Alisha, so I just -- the term "fake Alisha" just is a

9  little bit -- it throws me a little bit.

10  Q     All right.  I'll use "Alisha with an A."

11       So this is an email you wrote to Alisha with an A; is that

12  correct?

13  A     Yes, ma'am.

14  Q     And in this email you indicated that you wanted this

15  Alisha with an A to send you a pic of the both of you naked.

16  Is that right?

17  A     Yes.

18  Q     And in this, "the both of you" is Alisha with an A and her

19  9-year-old daughter, right?

20  A     That is what the document stated, because she had --

21  Q     It's a yes-or-no question, Mr. Sheltra.

22  A     Yes.

23  Q     And you asked for her to send this because you were

24  sexually aroused and you wished to reach orgasm, which is why

25  you wrote "since I need to cum again."  That's why you were

1  asking for the picture of the two of them naked; is that right?

2  A    That is what I -- what I stated.

3            MS. MASTERSON:  Can we go to the next slide, please.

4        This is from -- for the record, your Honor, this is from

5  Government's Exhibit 27.

6  Q    This is -- Mr. Sheltra, this is a text that you wrote to

7  Elisha with an E, correct?

8  A    I'm just reading the -- I'm just reading the email, okay?

9  Or the text message.

10 Q    Well, here.  We'll read it to the jury.  "Home after

11 working all night, laying here wishing you were here.

12 Imagining ... can I see a picture of your labia hun?  I wanna

13 feel it engulf me.  Mmmmmm."

14      You wrote that, correct?

15 A    So --

16 Q    It's a yes-or-no question, Mr. Sheltra.

17           THE COURT:  So if he needs to complete his answer, I'm

18 going to ask that you let him do it.  And to the extent it's

19 nonresponsive, you can ask me to strike it.  But sometimes

20 questions cannot be answered simply yes or no.  You can ask him

21 if he wrote it, and then when you ask him what it means, he may

22 need to elaborate.

23 Q    You wrote this text message, correct, Mr. Sheltra?

24 A    Yes, ma'am.

25 Q    And you wrote this when you -- you had come home from work

1 and you were lying in bed after working all night; is that

2 right?

3 A    That is correct.  All night.

4 Q    And you were hoping to fall asleep?

5 A    Yes, ma'am.

6 Q    And you are sexually aroused by labias; is that right?

7 A    Yes, ma'am.

8 Q    And you were interested in masturbating so that you could

9 get to sleep; is that right?

10 A    I can't say at that particular time whether I was

11 interested in masturbating or not.

12 Q    You asked for the picture from the 15-year-old Elisha so

13 that you could masturbate to it; is that right?

14 A    The -- so here's where -- the reason I was going to

15 elaborate on the thing.  And so when Elisha with an E had

16 emailed me -- or texted me that she had had anal sex with her

17 boyfriend or they had tried anal sex, that was completely

18 uncharacteristic of any of the conversations I had with Elisha,

19 and so I have a habit of reading my text messages while I'm

20 driving or after I've worked all night 12 hours plus, and so I

21 misconstrued that -- that message because it had no context

22 with Elisha.  But it does have context with another woman that

23 I have a physical relationship with.  And so I confused those

24 two.

25     Now, I'm -- I don't have the whole list in front of me,

1  and I'm not sure this is exactly the place, but I believe that

2  is the case, because I -- I did not intentionally ask Elisha

3  for a picture of her labia.  That's just the nature of the

4  whole situation was when the conversation turned to anal sex,

5  it reminded me much more of Treena, who is another girl that I

6  have a physical relationship with, and that's how this got

7  confusing for me.

8          MS. MASTERSON:  And, your Honor, I move to strike that

9  answer as nonresponsive.

10          MR. KAPLAN:  Your Honor --

11          THE COURT:  I'm going to allow it.

12      Mr. Kaplan, did you want to be heard?

13          MR. KAPLAN:  I mean, it clearly is responsive.

14          THE COURT:  I'm going to allow it.

15  Q    So the fact that Elisha with an E shared with you that she

16  was engaged in anal sex with her boyfriend caused you to send

17  her an email that asked for a picture of her labia?

18  A    It caused me to send an email thinking it was someone

19  else, and that's why the confusion.

20  Q    So when you testified last time that you wrote this text

21  and that you are the person who wrote all the texts in Exhibit

22  27 -- you testified to that, right?

23  A    Yes.

24  Q    And that -- and in particular you testified that you wrote

25  the text to the 15-year-old girl asking for a picture of her

1  labia.  That was your prior testimony, correct?

2  A    And what I -- and my answer, ma'am, was that is what you

3  would see, because we had omitted this inadvertently from my

4  direct/cross -- or direct examination with Mr. Kaplan, and so

5  as -- anybody looking at this is going to see that I wrote that

6  email -- or I wrote that text messages -- that text message,

7  and so all I did was -- I said that is what it would appear or

8  that is what you would see when you looked at this is that it

9  went to Elisha.  It was to the wrong person, but I wasn't

10 comfortable presenting that information, ma'am, under

11 cross-examination.

12      This is my first time in a -- in a situation -- courtroom,

13 so this gets a little bit confusing for me.  But it was because

14 I was looking at Mr. Kaplan.  I'm going, "I thought we were

15 going to bring this -- this to light," because that's what

16 happened.

17 Q    Right.  And the date on this is August 25th, correct?

18 August 25th, 2017?

19 A    Yes, ma'am.

20 Q    And isn't it true that the messages that you were going to

21 talk to -- with your lawyer about on direct, they concluded on

22 August 20th, 2017, five days earlier; isn't that correct?

23 A    Yes, ma'am.  I'm sure it is.  But --

24 Q    That's all the question is.

25 A    Okay.

```
 1  Q    In your communications with Alisha with an A, you
 2  discussed a number of taboos; isn't that correct?
 3  A    That's correct.
 4  Q    The taboos included sex with horses, correct?
 5  A    Yes.
 6  Q    Dogs?
 7  A    Yes.
 8  Q    Soda bottles?
 9  A    Yes.
10  Q    Bowling pins?
11  A    Sure.
12  Q    Children?
13  A    Yes.
14  Q    Fire extinguishers?
15  A    Yup.
16  Q    There's a whole lot -- urination?
17  A    A full gamut.
18  Q    Right.  And so there were a number of those.
19       MS. MASTERSON:  And can we go to the next slide,
20  please.  This is Government's Exhibit, I believe, 1.
21  Q    Mr. Sheltra, this is the initial -- initial Craigslist
22  post "Looking for Alisha"; is that right?
23  A    Yes.
24  Q    In this you wrote, "we share a very specific kind of taboo
25  kink."  Isn't that correct?
```

```
 1  A     Yup.

 2  Q     That's singular, meaning one.  Correct?  Correct?

 3  A     It's interpreted by you as being singular.  Taboo in my

 4  opinion is multiple -- has multiple meanings, right?

 5  Q     Right.  And so when -- when the undercover responded and

 6  brought up children -- or not brought up children.

 7        When she responded and mentioned that she had a

 8  10-year-old daughter, you then wrote -- you didn't say, "Wait a

 9  minute, this is not the right taboo that I want to talk about."

10  Isn't that correct?

11  A     That is correct.

12  Q     You didn't say, "Nope, I'm into horses" or "I'm into

13  dogs," right?

14  A     That is correct.

15  Q     You pursued the notion -- you pursued the taboo kink of

16  sex involving a child, correct?

17  A     I left it open.  I didn't qualify in any way.

18  Q     Mr. Sheltra --

19        MR. KAPLAN:  Objection, your Honor.  She asked a

20  question.  I think my client should be allowed to answer it.

21        THE COURT:  Let's not have it be argumentative.  Let's

22  have him complete his answer, and then I will rule on whether

23  it's responsive.

24        But it is by question and answer.  So if there is a

25  yes-and-no answer to a yes-and-no question, you should be
```

```
 1  providing it.  Mr. Kaplan will have an opportunity to ask you
 2  further questions.  Sometimes you can answer yes and no, and
 3  when you can, you should do so.  If you can't, we'll give you
 4  an opportunity to complete your answer.
 5       Go forward, please.
 6            MS. MASTERSON:  Yes.
 7  Q    So in these -- in the communications with the undercover,
 8  there's nowhere where you suggest that there's any other type
 9  of taboo kink that you want to discuss with her.  The only one
10  that you discussed with her was children.  Isn't that correct?
11  A    The only one she discussed with me, ma'am, was children.
12  Q    You testified on direct that the undercover was not as
13  forthcoming as you would have liked.  Isn't that true?
14  A    Yes.
15  Q    You said generally she had hinted about certain things in
16  communications but she had never really been forthright.  Isn't
17  that right?
18  A    Yes.
19  Q    You also said that "I understood that it could be -- take
20  a little bit of time before she could be comfortable sharing,
21  so I was just trying to get it out of her."  You said words to
22  that effect; isn't that right?
23  A    Yes.
24            MS. MASTERSON:  May we have the next slide, please.
25  Q    This is from Government's Exhibit 2.  And in this, Mr.
```

1 Sheltra, you wrote, "I believe I'm beginning to see what you're

2 seeking."  Isn't that right?

3 A    Yup.

4 Q    And that's consistent with the fact that she was not being

5 as forthcoming or obvious in the discussions that you would

6 have preferred; is that right?

7 A    That is correct.

8 Q    And it was frustrating to you that she wasn't sharing the

9 way that you would have liked, that you were having to, like,

10 kind of move things along on your own; is that right?

11 A    No, ma'am.  I wasn't frustrated at all.  I -- I was very

12 curious.  Like I stated to the -- to the jury, that human

13 sexuality is a big part of everything that we do, and so I

14 wanted to understand what her fantasies were, what -- what

15 drove her motivations to be approaching me with this request,

16 and so it was -- it was very inquisitive of me on my part, but

17 it wasn't --

18 Q    Is it your testimony --

19 A    I'm sorry?

20 Q    -- that the UC approached you with a request?

21 A    Yes.

22 Q    Have you read the exchanges lately?

23 A    I was part of them originally, ma'am.

24 Q    Right.  She responded to your looking for Alisha, correct?

25 A    That is correct.

1  Q     That Craigslist post, correct?

2  A     Yup.

3  Q     She mentioned she had a 10-year-old daughter, correct?

4  A     Yes.

5  Q     She mentioned that she might -- that there may be a taboo

6  kink, correct, that's shared with Alisha with an A?

7  A     Yes.

8  Q     And during those conversations, you then took it and

9  suggested that sex among the three of you was something that

10 you were interested in.  Correct?

11 A     I can see why you would say that.  I -- I was approached

12 by this woman who wanted me to have sex with her daughter.

13 Q     That's your testimony?

14 A     I believe that to be true.

15 Q     Okay.  So you -- back to the fact that the undercover was

16 not forthcoming in the communications as you testified.  With

17 me there?

18 A     Yup.

19 Q     All right.  You were present here when the undercover

20 testified about the training that she received in engaging in

21 communications with individuals when she's acting in an

22 undercover capacity, correct?

23 A     Yes, ma'am.

24 Q     And that she was directed to be -- not -- to be restrained

25 and to let the target control the conversation; is that right?

1  A     Yes.

2  Q     Don't volunteer and follow the lead, the target's lead; is

3  that right?

4  A     Yup.

5  Q     So by what you testified to, it sounds like she did a

6  pretty good job of following the instructions that she was

7  given on how to conduct an effective and legal --

8           MR. KAPLAN:  Objection, your Honor.

9           THE COURT:  Sustained.

10          MR. KAPLAN:  I don't think that's for this witness to

11 determine.

12          THE COURT:  Sustained.

13 Q     You testified last time that you tell everybody that

14 you're interested in having sex with that you've had a

15 vasectomy; isn't that right?

16 A     I make that statement quite frequently when I'm in a

17 conversation that could lead to sex, yes.

18 Q     Can you lower the mic again, please?  I'm sorry.  I'm

19 having a hard time seeing your mouth.

20 A     Sorry.

21 Q     Thank you.  But you told -- when you're -- if it's

22 somebody that you're interested in having sex with, you told

23 them that you had had a vasectomy, correct?

24 A     Yes.

25          MS. MASTERSON:  Can we go to the next slide, please.

1 This is from Defense Exhibit C, the communications with Alisha

2 with an A.

3 Q    And here on June 17th of 2016, you said, "I've had a

4 vasectomy."

5 A    Yes, ma'am.

6 Q    And you told her that because you were interested in

7 having sex with Alisha with an A, correct?

8 A    Yes.

9         MS. MASTERSON:  Could we go to the next slide, please,

10 which is from Government's Exhibit 2.

11 Q    This is a communication that you had with the undercover,

12 correct?

13 A    Yes, ma'am.

14 Q    And in this you said, "I've had a vasectomy," correct?

15 A    Yes, ma'am.

16 Q    And that's because you were interested in having sex with

17 the undercover?

18 A    Yes.

19         MS. MASTERSON:  Can we go to the next slide, please.

20 Q    This is a communication that you had with the -- with

21 Elisha with an E, correct?  And there's --

22 A    Yes.

23 Q    And in this you wrote, "By the way, I've had a vasectomy."

24 Right?  You wrote that?

25 A    Yes.

1         THE COURT:  So let's have a date just so that if we

2    need to refer to what the slide is, we'll have some kind of

3    reference to it.

4         MS. MASTERSON:  All right.  This is entry 14 with the

5    date of August 21st, 2017.

6    Q    Do you agree, Mr. Sheltra?

7    A    I do.

8    Q    All right.  And again, you wrote to Elisha with an E,

9    "I've had a vasectomy," correct?

10   A    That's correct.

11   Q    Because that's something that you told people that you

12   were interested in having sex with, correct?

13   A    Yes.

14   Q    At the time of the communications with Elisha and the

15   undercover, you lived in Alburgh, Vermont, correct?

16   A    That is correct.

17   Q    And you Googled how to get to -- get directions to an

18   address in Orange because that was where Elisha with an E told

19   you that she lived, correct?

20   A    The address she gave me, yes.

21   Q    And it took about two hours, give or take - call it two

22   hours - to get from your home to --

23   A    It was less than two.

24   Q    All right.  But it was more than an hour and a half?

25   A    I -- I would say probably close to an hour and a half.

1  Around an hour and a half.  Maybe a little more.

2  Q    All right.  And the first night that you were

3  communicating with Elisha with an E, you left your house in the

4  middle of the night to go meet up with her; is that right?

5  A    I didn't actually leave.  I just said I was leaving, but I

6  didn't.  I just -- it was midnight on -- on a -- I believe it

7  was a Sunday night, and I was -- I took a shower to get ready

8  for bed and I was like, well, if it happens, it happens, you

9  know, but the girl was distraught when she contacted me, and I

10  think the emails reflect that very closely, and if she was

11  going to push the issue, I would have driven to -- I would have

12  driven.  I would have, yes.

13  Q    So when you -- in Government's Exhibit 27, when you wrote

14  to her, "Hi hun.  I just left my house a couple of minutes

15  ago," were you not being truthful with her?

16  A    So you'd have to understand my house.  And so I -- my

17  house is three -- it's a three-level with a garage underneath,

18  and so I had gone down and I had actually checked on -- I

19  locked my car door.  I had checked on the garage, made sure

20  everything was locked up and everything, and I was getting

21  ready for bed, and I was just leaving that option open just to

22  make sure that -- but I didn't actually physically leave my

23  house that night.  No, I did not.  I had no -- I had just had a

24  gut feel.  Call it what you want.  I just had a gut feel that

25  she was going to -- it was midnight.  It was after midnight,

1 and I just had a feel she wasn't going to go through with

2 meeting that night.

3 Q    So in -- when you were emailing with her before you

4 apparently didn't leave to go meet up with her --

5 A    Um-hum.

6 Q    -- in the middle of the night, you were having -- there

7 was communications with her about sex, right?

8 A    There was -- there was tones of a sexual nature, yes,

9 ma'am.

10 Q    And where she told you, "I never use condoms and I'm on

11 birth control so even if you hadn't had one," referring to the

12 vasectomy, "it would be ok."  Correct?

13 A    Yes.

14        THE COURT:  So again, let's make sure we have enough

15 references so we have -- either date, time, entry number,

16 something that reflects where you're reading from, please.

17        MS. MASTERSON:  This is from Government's Exhibit 26,

18 entry 20, date August 21st, 2017.

19 Q    But when you were talking with her, you said also in this

20 same exhibit, "I love to cuddle.  But it would have to be in

21 the back of my suv.

22        "Not exactly how I'd like to treat you, hun."  Isn't that

23 right?

24 A    Yes.

25 Q    And when she asked you, "Will you please come?" you wrote,

1  "Are you gonna still be awake?

2      "Is there a place we can go park?  I'm not familiar with

3  your area at all, hun.  I don't want cops finding us."

4      You wrote that, didn't you?

5  A    Yes.

6           MS. MASTERSON:  Can we go to the next slide, please.

7  This is from -- an excerpt from Government's Exhibit 27.

8  Q    The next morning, you communicated with Elisha with an E

9  and you agreed to go meet with her; isn't that correct?

10 A    Yes, ma'am.

11 Q    Right.  And what's on here, I'm sorry, is the bit that I

12 read to you, which is "I don't want the cops finding us."  This

13 is entry 28 from the emails from Government's Exhibit 26,

14 right?

15 A    Yes, ma'am.

16 Q    All right.  And actually, as we look at this, so she

17 said -- after you -- I mean, this is all -- let me reorient us.

18     This communication was sent on the night that you two were

19 first communicating; isn't that right?

20 A    Yes, ma'am.

21 Q    Because here's the time.  It's 20, which means it's about

22 12:20 at night, correct?

23 A    Yes, ma'am.

24 Q    All right.  And you made -- you're talking, "Is there a

25 place that we can go park?"  And she wrote, "Please?"  Correct?

```
 1  A    Yes.

 2  Q    And you then wrote, "Ok, I'll jump in the shower."  Right?

 3  A    Yup.

 4  Q    You ended up not meeting up with her that night, but you

 5  did meet up with her the next day; is that right?

 6  A    Yes, ma'am.

 7            MS. MASTERSON:  Can we go to the next slide, please.

 8  Q    And you agreed to leave at about 10:48.

 9            MS. MASTERSON:  Again, your Honor, this is from

10  Government's Exhibit 27.

11  Q    You texted her at about 10:48, "K."  This is all --

12            THE COURT:  So is it 27 or is it 26?

13            MS. MASTERSON:  It's --

14            THE COURT:  Exhibit --

15            MS. MASTERSON:  27.

16            THE COURT:  Okay.  A new exhibit, then?

17            MS. MASTERSON:  Pardon me?

18            THE COURT:  A new exhibit?  Okay.

19            MS. MASTERSON:  Yes.  This is Exhibit 27.

20  Q    And this is -- was written when you were getting ready to

21  go meet with the 15-year-old, correct?

22  A    Yes, ma'am.

23  Q    And again, you wrote, "K.  I'll jump in the shower."

24  A    Yup.

25  Q    I'm sorry?
```

1  A     Yes.

2          MS. MASTERSON:  If we could go to the next slide,

3  please.

4  Q    On the morning -- this is from Government's Exhibit 2.

5  This entry.  And it's dated September 10th at 2:06 PM.  This

6  email was written to the undercover, correct, Mr. Sheltra?

7  A     Yes.

8  Q    And it is written shortly before you left your house to go

9  to the Whales' Tails to meet with the undercover and her

10  daughter; isn't that correct?

11  A     Yes, ma'am.

12  Q    And in that you wrote, "I just got out of the shower."

13  Correct?

14  A     Yes.

15  Q    You take a shower before leaving your house when you're

16  going to go have sex, right?

17  A     I take a shower before leaving my house to go just about

18  everywhere except the mailbox, maybe.

19  Q    And in particular when you're going to go have sex with

20  somebody --

21  A     No, ma'am.  Just -- I try to be hygienically clean.

22  Q    Well, you were -- when you were communicating with the

23  undercover about the meeting, you had told her -- you wrote an

24  email --

25          MS. MASTERSON:  I'm going to use the -- can I use the

1  ELMO, please?

2  Q    You wrote her an email - this again is from Government's

3  Exhibit 2 - at 5:08 AM, which was before the whole shower one.

4  It's when you got home from work.  You wrote her an email.  Do

5  you recall that?

6  A    I don't -- I just see a blank screen, ma'am.

7  Q    Oh, I'm sorry.  That was me.

8       So do you recognize this email sent on September 10th to

9  momma.mego, who's the undercover?

10 A    Yes, ma'am.

11 Q    All right.  And in this email you were explaining that you

12 were going to -- you were coming home from work -- or you were

13 on your way home from work -- or that -- I'm sorry.

14      At some point you were going to be home from work, right?

15 A    Yeah.  This was before I got -- I got out.  My shift

16 schedule would be after 7 o'clock in the morning.  It would be

17 7:30 or something like that would be when I normally would

18 leave work.

19 Q    So you wrote this email at 5:00 AM about having sex with a

20 mother and her 10-year-old when you were at work?

21 A    I was probably on break -- my last break before I ended my

22 shift.

23 Q    And in this email you mentioned that you have "gotten off

24 several times thinking about the 3 of us playing together."

25 Right?  You wrote that, correct?

1  A    Yes, I did.

2  Q    Indicating that that notion was sexually exciting to you,

3  correct?

4  A    Indicating to her that it was -- that I was sexually

5  excited about it, yes.

6  Q    And you also wrote, "I'm not going to jerk off when I get

7  home though - I want to save it."  Correct?

8  A    Yes.

9  Q    Meaning you didn't want to -- you wanted to wait for

10 sexual activity until you were with the undercover and her

11 daughter, correct?

12 A    With the undercover, yes, ma'am.

13        MS. MASTERSON:  Can we go to that, please.  Thank you.

14 Q    Now, when you testified --

15        MS. MASTERSON:  Okay.  Can we take this off, please.

16 Q    When you testified on direct that you -- or let me -- I'm

17 not asking any specifics, all right?  But between the end of

18 the trial on November 13th and today, you've talked to your

19 lawyer, correct?

20 A    He's notified me about -- yes.

21 Q    I'm -- I don't want to know any -- any details.  But

22 you've -- you've communicated with your lawyer, correct?

23 A    Yes.

24 Q    And you communicated with him about your testimony,

25 correct?

```
 1          THE COURT:  So -- so I don't want to have this
 2  questioning in front of the jury.  It's perfectly permissible
 3  and it would be expected for Mr. Sheltra to communicate with
 4  his attorney.  So if you asked -- ask him about the subject
 5  matter of his conversations about his testimony, we can have
 6  that conversation, but not in front of the jury at this point
 7  in time.
 8          MS. MASTERSON:  All right.
 9  Q    So you testified on direct that the -- you felt that the
10  undercover slipped when she wrote that -- that she knew that
11  you were in -- that you lived in Alburgh because you were
12  careful in not disclosing where you lived; is that right?
13  A    That is correct.
14  Q    And that you made a point of just saying that you lived
15  in -- I think it's Grand Isle County?
16  A    Yes, ma'am.
17  Q    All right.  And when you meet -- when you were chatting
18  with any person through Craigslist or anything, you would take
19  steps, though, to investigate a little bit about them, see what
20  you could find out about them; isn't that right?
21  A    It would depend on the situation, ma'am.
22  Q    Well, you did that with Elisha with an E; isn't that
23  right?
24  A    I took steps, ma'am?
25  Q    To -- to find out a little bit more about her.  Isn't that
```

1  correct?

2  A    It could very well be.  I communicate with a lot of people

3  on -- from Craigslist, ma'am.  I wouldn't want to -- I wouldn't

4  want to lie on -- under oath, so if I did, I -- maybe I did

5  check her Facebook page.  If I had enough information to -- to

6  look, you know, because her name was unique, I may have done

7  that.  Most cases, though, on Craigslist, you can't find out

8  enough to where you could actually track somebody down.  That's

9  all.

10 Q    Well, when you began talking with Elisha with an E, the

11 15-year-old, in the -- in her initial text -- or email, and

12 this is Government's Exhibit 26, entry 1, she wrote, "Hello, My

13 name is Elisha."  She didn't give you her last name.  Isn't

14 that right?

15 A    That is correct.

16 Q    Okay.  Then --

17        MS. MASTERSON:  Can we go to the next slide, please.

18 I'm not seeing anything.

19        MR. GILMAN:  I think you might have to turn on the

20 screen.

21        COURTROOM DEPUTY:  The screen is on here.  Barb -- Ms.

22 Masterson, try hitting doc cam, even though that should not --

23      (Pause in the proceedings to address audiovisual issues.)

24        THE COURT:  He just has to walk into the room, so

25 we're not going to let him leave.

```
 1            MS. MASTERSON:  Thank you.
 2   Q    BY MS. MASTERSON:  All right.  Mr. Sheltra --
 3            MS. MASTERSON:  Your Honor, this is from Government's
 4   Exhibit 26.
 5   Q    Mr. Sheltra, this is an email that you wrote to Elisha
 6   with an E, correct?
 7   A    Yes, ma'am.
 8   Q    And this is the third email in the exchange, correct?
 9   A    Okay.
10   Q    And in that you wrote, "I just looked at your Facebook
11   pics ... if I have the right girl, you are adorable," with a
12   smiley face symbol.  Is that correct?
13   A    That is correct.  So like -- like I had said earlier, I
14   didn't remember doing that, but that's -- obviously I did.
15   Q    All right.  And we're talking about your testimony that
16   you were -- that you thought it was something odd that the
17   undercover used "Alburgh," that that tipped you off that there
18   might be something.  Correct?
19   A    Well, because I had never mentioned Alburgh.
20   Q    Right.  But you did research into the person that you were
21   communicating with as seen in what you did right here with
22   Elisha with an E, correct?
23   A    Yes, ma'am.
24   Q    Isn't it reasonable that someone might do that with you?
25   Correct?
```

```
 1          MR. KAPLAN:  Objection, your Honor.
 2  A    It's certainly possible.
 3          THE COURT:  Sustained.  It's argumentative.
 4  Q    It's possible that --
 5          MR. KAPLAN:  Objection.
 6          THE COURT:  Sustained.  Let's have a new question.
 7          MS. MASTERSON:  Can we go to the next exhibit, please.
 8  Q    Now, this is your Facebook page, correct?
 9  A    Yes, ma'am.
10  Q    And this was a publicly available page.  It wasn't locked
11  down.  Information about you was available to the public,
12  correct?
13  A    Yes, ma'am.
14  Q    And in this --
15          MR. KAPLAN:  Judge, has this been introduced into
16  evidence?  I don't recall.
17          THE COURT:  Let's see if we have this.  I think it may
18  have been.
19      But, Ms. Ruddy, will you check?
20          COURTROOM DEPUTY:  What number is it, Ms. Masterson?
21          THE COURT:  Let's take it down until we have this
22  resolved.
23          MS. MASTERSON:  Exhibit 4.
24          COURTROOM DEPUTY:  Yes.
25          MS. MASTERSON:  It was admitted?
```

1          COURTROOM DEPUTY:  It was admitted.

2          MS. MASTERSON:  That's what I thought.

3          MR. KAPLAN:  Thank you, Judge.

4          MS. MASTERSON:  All right.  Can you put it back on the

5  screen, Liza.

6  Q    Your Facebook page indicated that you live in Alburgh,

7  right?

8  A    Yes.

9  Q    So the fact that your home address -- or your home city

10  was public -- it was publicly available, correct?

11  A    Yes.

12          MS. MASTERSON:  Can we go to the next slide, please.

13      This is -- for the record, this is from Defense Exhibit C.

14  Q    This is an email that you wrote to Alisha with an A,

15  correct?

16  A    Yes.

17  Q    And in this email, you wrote, "How do I know you're not a

18  cop and this isn't a sting??"  Correct?

19  A    Yes.

20  Q    You also asked the undercover if she was a cop, correct?

21  A    Yes.

22          MS. MASTERSON:  Let's go to the next slide, please.

23  Q    This is from Government's Exhibit 2, and in this you

24  wrote, "are you affiliated with law enforcement in any way?"

25  You wrote this, correct?

1  A    Yes.

2  Q    And you knew who you sent this to, right?

3  A    Yes, ma'am.

4        MS. MASTERSON:  Can we go to the next slide, please.

5  Q    Again, this is from Government's Exhibit 2.  This is,

6  again, an email that you sent to Meg, the undercover, right?

7  A    Yes.

8  Q    And in it you assured her that you were not a cop, and you

9  indicated that you had concerns because you didn't want to say

10  anything that might incriminate you.  Correct?

11  A    That is correct.

12        MS. MASTERSON:  Can we go to the next slide, please.

13  Q    This is from Government's Exhibit 26.  This is an email

14  that you sent to Elisha with an E, correct?

15  A    Yes.

16  Q    And you also asked her, "You are in no way a police

17  officer, or working with police, or affiliated in any way with

18  law enforcement, are you?"  You wrote that?

19  A    Yes.

20  Q    And you knew that you were writing that to Elisha, the

21  15-year-old, correct?

22  A    Yes, ma'am.

23  Q    Well, let's talk about Elisha, the real 15-year-old.  You

24  described her as a troubled and emotionally distraught woman --

25  young woman -- young girl, actually.

1  A    Yes.

2  Q    Isn't that right?

3  A    Um-hum.  Yes, ma'am.  Sorry.

4  Q    And that you were there to provide emotional support and

5  counseling?

6  A    I was just there because she asked me to be.

7  Q    Now, in an early email with Elisha, the 15-year-old, you

8  Googled the meaning of "pedophile" to be sure that you used it

9  correctly, right?

10 A    I'm sure I did.  If it was on my phone, I did.

11 Q    Well, we -- in one of the Government's exhibits, you -- we

12 showed that you Googled the definition of "pedophile."  Do you

13 recall that?

14 A    Yes, I do.

15 Q    All right.

16        MS. MASTERSON:  Can we go to the next slide, please.

17 Q    And this is from Government's Exhibit 26.  And this is the

18 email where you -- and you sent it to Elisha with an E,

19 correct?

20 A    Yes, ma'am.

21 Q    And you knew you were writing to her, a 15-year-old,

22 right?

23 A    Yes.

24 Q    And you wrote, "we live in such a controlling society that

25 if anybody finds out, I'm labeled a perv, a stalker, and

1 pedophile."  Isn't that correct?

2 A    Yes.

3 Q    And "perv" means pervert, right?

4 A    Yes.

5 Q    And during the conversations that you had with Elisha with

6 an E, the 15-year-old, you did talk to her using graphic

7 language about sex with her, right?

8 A    Yes.

9 Q    And you told her about the vasectomy?

10 A    Yeah.

11 Q    Which is what you tell people that you want to have sex

12 with?

13 A    The -- the timing of what -- when I responded -- yes,

14 ma'am.  But the timing of why I did that, that was an oversight

15 on my part.  It was midnight on a night after I had just worked

16 for three or four days, 12-hour nights, 15-hour nights by the

17 time I get home, and I regret that I did that, but yes, I did

18 that.

19           MS. MASTERSON:  Your Honor, I move to strike that

20 answer.  It's completely nonresponsive.

21           THE COURT:  I'll allow it.

22           MS. MASTERSON:  I didn't hear the Court's ruling.

23           THE COURT:  I'll allow it.

24 Q    Well, some of the language that you used -- or --

25           MS. MASTERSON:  Actually, can we just go to the next

1 slide, please.

2 Q    This is from Government's Exhibit 27 where -- which is --

3 this is the text messages with Elisha, correct?

4 A    Yes.

5 Q    And in that, she told you, "No.  He wont cum in me."  And

6 the "he" was her boyfriend, correct?

7 A    Yes.

8 Q    So she's sharing this information with you, correct?

9 A    Yes.

10 Q    And she said, "He did once," meaning that he ejaculated in

11 her vagina.  Is that -- was that your understanding?

12 A    Yes, it was.

13 Q    "And it took a lot of persuading."  And -- is that

14 correct?

15 A    Yes.

16 Q    "And it took a lot of persuading."  Did you understand

17 that as she convinced him to do it?

18 A    Yes, ma'am.

19 Q    And then you wrote "Fuck, I'd love to pump you full!!"

20 You wrote that, right?

21 A    Yes.

22 Q    And you wrote that to -- you knew that you were writing

23 that to the 15-year-old?

24 A    Yes.

25 Q    And --

1  A    Well, I say that, but this is -- this is right after she
2  had introduced the -- the anal sex thing.  As I recall, like, a
3  couple up from that was when she said that, and that's where I
4  was confused with it being Treena, and so that -- that's an
5  unfortunate situation, ma'am.  I -- I can't sit here and
6  definitively say that I was sure it was Elisha at that point
7  just because it was a text or two before that where I got
8  confused about whether I was talking to Treena or whether I was
9  talking to Elisha.
10 Q    Do you regularly confuse text messages with a third --
11 A    No, ma'am --
12 Q    No.  Let me finish my question, please.
13      Do you regularly confuse communications between a person
14 that occur five days earlier with the one that you're having
15 right then?
16 A    The --
17 Q    It's a yes-or-no question.
18      MR. KAPLAN:  Well, I don't -- I don't think it is a
19 yes-or-no question.
20      THE COURT:  It may or may not.  It's slightly
21 argumentative.
22      I will direct the witness to answer it if you can.
23      MR. KAPLAN:  Judge, I think -- I think that we should
24 maybe talk for a second before we --
25      THE COURT:  All right.  Let's -- this time let's not

1  use the husher and save the jurors' ears and we'll have counsel

2  go into the room behind us.

3       (The following was held out of the presence of the jury

4  and the defendant.)

5            THE COURT:  Mr. Kaplan?

6            MR. KAPLAN:  So, Judge, here's my concern.  I've had a

7  running discussion with my client.  He was going to ask to be

8  able to file a *pro se* motion to dismiss based on the fact that

9  because of his stroke -- I researched the issue of whether or

10 not his stroke would affect him psychologically, and I wasn't

11 able to make a connection.

12           THE COURT:  And we also had him evaluated.

13           MR. KAPLAN:  A few times.  But the issue for him is

14 his stroke has caused him to be confused about things.  Like,

15 he might be text- -- his position might be he might be texting

16 with Elisha but see someone else's name there, like Treena's

17 name, and so if the Government goes down this road, he's going

18 to say, "Yes, and this is why."

19           THE COURT:  He can say whatever he wants to say, and

20 the Government can cross-examine him about --

21           MR. KAPLAN:  Okay.

22           THE COURT:  -- you know, "Did Treena also say that she

23 was having anal sex with her boyfriend?"  So --

24           MR. KAPLAN:  But he'll mention the stroke.

25           THE COURT:  He'll mention the stroke?  He can mention

1  the stroke if he wants and say he was confused.  This is a

2  credibility contest.

3       And you can ask him questions.  I would direct you to be

4  careful not to be argumentative.  So if it is "Wouldn't you

5  agree with me that the undercover cop did a good job of

6  following her directions," that was kind of borderline, and

7  some of the questions cannot be answered yes or no, and he's

8  elaborating, and you are entitled to follow up.  If he

9  discloses he had a stroke and this is why, you know -- you

10 know, we'll see what happens.  But --

11      MR. KAPLAN:  And can he do that on redirect?

12      THE COURT:  I don't think there is any expert that's

13 agreed with it, and so it would be permissible for Ms.

14 Masterson to say, "You've been evaluated by experts about this

15 and no expert has found that your stroke is the reason why, you

16 know, any of this happened, correct?"  So it opens the door.

17      Anything that the Government wants to say about this?

18      MS. MASTERSON:  Well, it widely opens up the door to

19 other allegations that --

20      MR. KAPLAN:  Pardon me?

21      MS. MASTERSON:  -- were -- other allegations that were

22 made against him over the years.  The niece then becomes

23 relevant.

24      MR. KAPLAN:  You know, you can do whatever you want.

25 I was just alerting you to the fact that if you want to talk

1  about the stroke, you're headed in that direction.  It doesn't

2  matter to me.

3          THE COURT:  But she's got a good point in that the

4  problem with the stroke is then the niece's testimony becomes

5  more relevant, because that was prestroke, and that's why -- as

6  long as we weren't going to have "this is because of a

7  disability that occurred on this date," it was irrelevant what

8  happened earlier to his state of mind at this point in time.

9  Once he says "this is all because of my stroke," then it

10 becomes permissible to introduce, "Wait a minute.  This stuff

11 was going on well before your stroke."  We'll see how it plays

12 out and go from there.

13         MS. MASTERSON:  Well, may I be heard?  Because --

14         THE COURT:  Yes.

15         MS. MASTERSON:  He is an incredibly hostile witness

16 right now.  He is not responding to anything.  The Court is

17 giving him a gift, and -- that I object to, candidly, your

18 Honor, because I am very carefully asking him yes-or-no

19 questions.

20         THE COURT:  Sometimes you are.  But sometimes you're

21 not.  And when you're not and you cut him off in his response,

22 I have a duty to intervene.  So some -- "You thought you were

23 telling Elisha that you were going to pump her full."  "Yes,

24 but I have to explain that at the time I had worked a million

25 days and I thought I was talking to Treena at the time."  That

1  is responsive.  It is self-serving, but it is responsive.  It's

2  "yes, but."  And that's what he's doing.

3       You know, that's what happens on cross-examination.  And

4  you're well equipped to ask the follow-up questions, which

5  you've been doing, is, "How does this have anything to do with

6  what happened five days -- or conversations that happened five

7  days earlier?" and we can go from there.  But I let him finish

8  the question when I think it's permissible, and I've already

9  instructed him if it is a yes-no question, you need to answer

10 it yes-no if you can.  All right?

11          MS. MASTERSON:  All right.  Thank you.

12          THE COURT:  Let's go back.

13     (The following was held in open court.)

14          THE COURT:  We are back on the record in United States

15 of America vs. Randy Sheltra.

16     Mr. Sheltra is still on the witness stand.  He is under

17 oath.  We are in the Government's cross-examination.

18     You may proceed.

19          MS. MASTERSON:  Thank you, your Honor.

20 Q   BY MS. MASTERSON:  All right.  Mr. Sheltra, this statement

21 "Fuck, I'd love to pump you full," was that part of the

22 emotional support and counseling that you were hoping to

23 provide to the child?

24 A   I responded to Ms. -- to Elisha's comment with that

25 comment, yes.

1  Q    All right.  Let's go to the first night that you were

2  communicating with Elisha.  You wrote, "I don't want the cops

3  finding us."  Correct?

4  A    Yes.

5  Q    That night, though, you didn't ultimately meet, and you

6  asked her for more -- to send more pics.  Isn't that correct?

7  A    Yes.

8  Q    Which she did?

9  A    Yes.

10 Q    And the next morning, you did drive to Orange to meet with

11 her; isn't that correct?

12 A    Yes.

13 Q    And you confirmed that no one else was -- or that you

14 didn't want anyone else to be home, correct?

15 A    It came up in the conversation.

16        MS. MASTERSON:  May we have the next slide, please.

17 Q    This is from Government's Exhibit 27.

18 A    Yes, ma'am.

19 Q    This is a text that you sent to Elisha with an E, correct?

20 A    Yes.

21 Q    And you wrote, "There's no chance that he's going to come

22 home early is there?"  You wrote that?

23 A    Yes.

24 Q    And the "he" is Elisha's dad, right?

25 A    Yes.

```
 1              MS. MASTERSON:  Can we have the next slide, please.
 2  Again, this is from Government's Exhibit 27.
 3  Q    This is a text you wrote to Elisha with an E, correct?
 4  A    Yes.
 5  Q    And you wrote, "He probably wouldn't appreciate it if he
 6  came home and found me there though."  Correct?
 7  A    Yes.
 8  Q    Again, the "he" is Elisha's dad?
 9  A    Yes.
10  Q    You met with Elisha that afternoon for about two and a
11  half hours; isn't that right?
12  A    Yes, ma'am.
13  Q    And you testified on direct that you never touched her,
14  you just talked.  Right?
15  A    Yes.
16  Q    While you were communicating --
17              MS. MASTERSON:  Can you take that slide off, please.
18  Q    While you were communicating with Elisha with an E, you
19  were also communicating with a person in Plattsburgh, correct?
20  A    Yes.
21  Q    That I'll call Person 1.  All right?
22  A    Okay.
23  Q    Okay.  And in Government's Exhibit 24, there were a series
24  of three emails that you exchanged with Person 1; is that
25  correct?
```

1   A    That is correct.

2   Q    You wrote those emails to Person 1?

3   A    Yes.

4   Q    All right.  Could we go to the next slide, please.

5        And this is Government's Exhibit 24.  And this is an email

6   from you sent on August 20th at 2317, which is about 11:17 at

7   night, correct?

8   A    Yes.

9   Q    And this is to Person 1, correct?

10  A    Yes.

11  Q    And you wrote, "I just got an email from a 15 year old

12  responding to a craigslist ad I posted looking for a younger

13  woman ... I immediately thought of you."  You wrote that,

14  correct?

15  A    Yes, ma'am.

16  Q    Everything you wrote in this email, that you got the email

17  from a 15-year-old responding to Craigslist, that was true and

18  correct, right?

19  A    Yes, ma'am.

20       MS. MASTERSON:  Can we go to the next slide, please.

21  Q    And then after you -- again, this is Government's Exhibit

22  24.  And it's an email that you wrote, correct?

23  A    Yes.

24  Q    At August 21st at 2:10 in the morning, correct?

25  A    Yes.

1  Q    And this is after you didn't meet with Elisha but you're

2  back at home, right?

3  A    Yes, ma'am.

4  Q    And you -- and this is after you got pictures from Elisha,

5  correct?

6  A    That is correct.

7  Q    And when you were communicating with Person 1, you're

8  referring to Elisha, the 15-year-old who lived in Orange,

9  right?

10 A    Yes.

11 Q    And in this email to her, you wrote, "Mmmmmm.  She's

12 adorable.  And wants to meet.  She likes to kiss and cuddle.

13 She sent me some pics ... all of them sexy, but she is shy

14 about being totally nude.  One is a nipple shot though ... cute

15 little tits.  Nice little curvy ass.  I bet she is going to

16 taste incredible.  Mmmmmmmmm."

17      You wrote that, didn't you?

18 A    Yes, ma'am.

19 Q    About Elisha, the 15-year-old?

20 A    Yes.

21 Q    Everything in this email was true and correct, right?

22 A    Yes.

23         MS. MASTERSON:  Can we go to the next slide, please.

24 Q    And this again is Government's Exhibit 24.  Mr. Sheltra,

25 this is an email that -- or this is the date and time --

1  because there were three emails, right, that were in Exhibit

2  24, right?

3  A    Okay.

4  Q    Okay.  And this one was sent on August 21st, 2017, at

5  1516, meaning 3:16 in the afternoon; is that right?

6  A    Yes.

7  Q    Okay.  And sent to Person 1?

8  A    Yes.

9  Q    All right.  Now, when you sent that, you were actually in

10  Orange having just met with Elisha --

11  A    Yes.

12  Q    -- right?

13        MS. MASTERSON:  Can we have the next slide, please.

14  Q    This is from Government's Exhibit 27.  And this is the

15  series of texts that you exchanged with Elisha, the

16  15-year-old, right, Mr. Sheltra?

17  A    Yes.

18  Q    Where at 1516 she sent you a text saying "I'm going

19  swimming at the swimming hole," correct?

20  A    That is correct.

21  Q    And that was the same time that you were sending that

22  email to Person 1, right?

23  A    Yup.

24  Q    Okay.  And you then wrote "Mmmmm" in response to hearing

25  that she was going swimming.  Right?

1  A    Um-hum.

2  Q    Is that a "yes"?

3        THE COURT:  Yes?

4  A    Yes.

5  Q    And she invited you to come watch.  Correct?

6  A    Yes.

7  Q    You said "K," correct?

8  A    Yup.

9  Q    And then at 1518, two minutes later, you wrote, "Someone

10 else just got here."  Correct?

11 A    Yes.

12 Q    And you left at that point; is that right?

13 A    I didn't leave immediately, but I left shortly thereafter.

14 Q    Okay.

15       MS. MASTERSON:  Can we go to the next slide, please.

16 Q    And this is the third email that you sent to -- from

17 Government's Exhibit 24.  This is the third email that you sent

18 to Elisha because -- I'm sorry, to Person 1 on August 21st at

19 3:16 PM, correct?

20 A    Yes.

21 Q    And in that you wrote, "I met her.  She's got an amazing

22 little body.  I'm not sure if we will end up fucking but we

23 made out and did some heavy petting ... she has small tits but

24 they have a great shape, and these little pink nipples that are

25 really sensitive.  She loves to have her neck kissed.  And she

1  gets really wet, but it was just a little while ago so the
2  middle of the day and we were just sitting in the car so there
3  was no way we could fuck."

4      Correct?  You wrote that?

5  A    I did write that.

6  Q    All right.

7  A    It's not true, but I wrote it.

8  Q    So you wrote "these little pink nipples."  You describe a

9  color, meaning you saw Elisha's nipples, correct?

10 A    That's what it's indicating, yes, ma'am.

11 Q    Can you say that again?

12 A    That is what this email is indicating.  This -- this is

13 all fabrication, ma'am.  This is an extrapolation of what

14 Elisha had sent me, and I was -- I was trying to meet the girl

15 from Plattsburgh.

16     MS. MASTERSON:  Your Honor, move to strike.  There was

17 no question pending.

18     THE COURT:  So let's see.  "So you wrote 'these little

19 pink nipples.'  You describe a color, meaning you saw Elisha's

20 nipples, correct?

21     "That's what this is indicating, yes.

22     "Can you say that again?

23     "That's what this email is indicating."

24     And then he went on with his answer.  So I am going to

25 strike everything after "That's what this email is indicating"

```
 1  and tell the jury to disregard it.
 2  Q    You also wrote, "She loves to have her neck kissed."
 3  Correct?
 4  A    Yup.
 5  Q    Because you did that to her, correct?
 6  A    No.
 7  Q    And you wrote, "And she gets really wet."  And the term
 8  "really wet" means that she had vaginal secretions, correct?
 9  Is that what you meant by that?
10  A    That -- because I --
11  Q    I --
12  A    Yes, ma'am.
13  Q    And you knew that because you felt her vagina --
14  A    No.
15  Q    -- correct?
16  A    I knew that because she emailed me the night before saying
17  that she had been wet for several days, so I extrapolated it
18  into this conversation.
19  Q    You wrote, "it was just a little while ago," correct?
20  A    Yes.
21  Q    That's true?
22  A    Absolutely.
23  Q    And "the middle of the day."  That's true, correct?
24  A    Yup.
25  Q    And "we were just sitting in the car."  That's true?
```

1  A      Yup.

2  Q      And "there was no way we could fuck."  That's true?

3  A      It wasn't an option -- it wasn't even a consideration, but

4  yes, that's true.

5  Q      And "She's got an amazing little body."  That's true,

6  right?

7  A      Yeah.  She was adorable.

8  Q      And "she has small tits."  That's true?

9  A      Sure.

10  Q      And "they have a great shape."  That's true, correct?

11  A      Yes.  From -- from the pictures she sent me, ma'am.  This

12  is all extrapolated from those pictures that she sent me the

13  night before.  I --

14          MS. MASTERSON:  Objection.  Move to strike.  There was

15  no question pending.

16          MR. KAPLAN:  Your Honor, it's clearly responsive.

17          THE COURT:  You asked about the shape, and he

18  responded, and I'll allow it.

19      But I do direct you if it is a yes-no question and you can

20  answer it yes-no, you need to do so, and Mr. Kaplan can ask you

21  follow-up questions on redirect.

22          THE WITNESS:  I apologize, your Honor.

23  Q    Mr. Sheltra, everything you wrote in this email was true

24  and correct, wasn't it?

25  A      No.

```
 1            MS. MASTERSON:  May I have a moment with counsel, your
 2   Honor?
 3            THE COURT:  You may.
 4        (Pause in the proceedings.)
 5            MS. MASTERSON:  Your Honor, I have nothing further.
 6            THE COURT:  Mr. Kaplan, any redirect?
 7            MR. KAPLAN:  Yes, your Honor.
 8                        REDIRECT EXAMINATION
 9   BY MR. KAPLAN:
10   Q    Mr. Sheltra, as you sit here in court today, do you know
11   why the prosecutor called Alisha "fake Alisha"?
12            MS. MASTERSON:  Objection.  Relevance.
13            THE COURT:  Sustained.  He can't see into the
14   prosecutor's mind, so --
15   A    Oh, I asked her about it -- okay.  Sorry.
16   Q    Are you aware of any child pornography that might be on
17   your phone?
18   A    No.
19   Q    Did you have any interest in having a sexual relationship
20   with ER?
21   A    No.
22   Q    As part of Government's Exhibit 26, did you on several
23   occasions say to ER that nothing would happen because she was a
24   minor?
25   A    Yes.
```

```
 1  Q    Okay.  And that's in the text messages and emails?

 2  A    Yes.

 3  Q    And did you tell her that on more than one occasion?

 4  A    Yes, I did.

 5  Q    And why did you send that text to the individual in

 6  Plattsburgh?

 7  A    The --

 8            MS. MASTERSON:  Objection.  Misstates the evidence.

 9  It was an email.

10            THE COURT:  I think it is an email.

11            MR. KAPLAN:  Okay.

12            THE COURT:  But the same question pertaining to the

13  email is permissible.

14  A    I sent the email to the -- to the woman in Plattsburgh

15  because she had expressed interest in underage -- in prepuberty

16  children, and I was -- I was really interested and intrigued by

17  what she had told me, and I wanted to meet her.  I really

18  wanted to meet her.  I was fascinated by what was driving her.

19  She had been molested as a child, and so after the Alisha

20  conversation that we introduced as evidence, the Alisha with an

21  A, I -- I was really -- really curious to find out more.

22  Q    Could you tell the jury, please, why at the age of 55 you

23  were looking up the term "pedophile"?  Did you not know what

24  that meant?

25  A    I had heard the term.  I look up everything.  I -- if it's
```

1 something that somebody is asking me about who -- I'm

2 approached with a conversation that is -- that is sensitive and

3 they are asking me to do something that may be illegal, I want

4 to be able to articulate it back to them.

5 Q   So you testified that you thought you were sending a

6 text -- or email to Treena?

7 A   Yes, sir.

8 Q   Who is Treena?

9 A   Treena is a woman who lives in Burlington and that we --

10 we were engaged in a physical relationship.  She has a

11 boyfriend, but it had been an ongoing relationship that we had

12 had sex multiple times.

13 Q   And would you have text messages back and forth with her?

14 A   Yes.

15 Q   Did you do that around the time that you were talking with

16 ER?

17 A   Absolutely.  The -- the relationship was -- she has a

18 boyfriend.  It's just an open relationship that she's in.  And

19 so I would get a text from her every few days, and that's why

20 the timing of it was -- was such that it was consistent with

21 what I would see from her.  She would go maybe a week, I

22 wouldn't hear from her, maybe two weeks, and then I would get a

23 text message from her saying, "Hey, can you stop over,"

24 something to that effect.

25 Q   And that's who you thought you were sending that text

1 message?

2 A    Exactly.

3         MR. KAPLAN:  Judge, I'd like to approach and show my

4 client Exhibit C1, which we had a previous discussion about,

5 and ask him if he can identify it.

6         THE COURT:  I'll allow him to identify it.  You may do

7 so.  We'll give you some gloves and Mr. Sheltra some gloves as

8 well.

9     Mr. Kaplan, here's yours.

10    And, Mr. Sheltra, there's a box right there.  Good.

11        THE WITNESS:  I found them, your Honor.

12        MR. KAPLAN:  Are you waiting for me?

13        THE COURT:  Yes.

14 Q    Mr. Sheltra, without telling us what's in that document,

15 just tell me, please, if you recognize it.

16 A    I do.

17 Q    And are those text messages that you had with Treena and

18 others?

19 A    Yes.

20 Q    Okay.  And even though that has an end date, did that go

21 on beyond that period of time?

22 A    I -- I would assume yes.

23 Q    Okay.

24 A    Up until the time that I was arrested.

25 Q    Okay.

1          MR. KAPLAN:  Judge, I would move to introduce

2     Defendant's Exhibit C1.

3          THE COURT:  So this is a great time for us to take our

4     midmorning break, and I can look at the exhibit myself and rule

5     on it, and then I'll come back and advise the jury of my

6     ruling.

7          So it's -- we're going to take about a 10- to 15-minute

8     break.  Don't talk about the case.  Don't let anybody talk to

9     you about the case.

10         We'll excuse the jury, and we'll have the attorneys remain

11    in the courtroom.

12         (The jury exited the courtroom, after which the following

13    was held in open court at 10:27 PM.)

14         THE COURT:  With regard to these text messages - let

15    me get a glove on - it is possible that they are not offered

16    for their truth.  It's possible that they're offered for the

17    fact that Mr. Sheltra is communicating with a number of other

18    people about other subjects.  But let me hear an offer of proof

19    from Mr. Kaplan as to what it is relevant to and how it is

20    admissible, because it's not the statement of a party opponent.

21    It's your own client's statements.

22         MR. KAPLAN:  It's not being -- first of all, I believe

23    the statements are irrelevant.  It's being introduced for the

24    limited purpose of confirming his testimony that in fact he did

25    have a correspondence with Treena.  It's not being introduced

1  for any other reason.  I think I was careful not to include any

2  text messages that might have shed some kind of light on the

3  case or something other than the fact that he was communicating

4  with Treena.

5          THE COURT:  All right.  So the contents of the

6  messages are irrelevant.  They're not offered for proof of what

7  took place therein, but it's to place his testimony about

8  communications with other people in context?  Is that what I --

9          MR. KAPLAN:  With Treena.

10          THE COURT:  With Treena.

11          MR. KAPLAN:  Yes.

12          THE COURT:  All right.  Let's hear --

13          MR. KAPLAN:  The other person happens to be his

14  daughter, I think, but the jury wouldn't know that.

15          THE COURT:  Okay.

16          MS. MASTERSON:  Well, your Honor, we object because it

17  is incomplete, to begin, because Mr. Sheltra is saying he

18  assumes that there were subsequent ones.  It's the Government's

19  position that if it is complete, which is, I believe, the

20  representation, I'm sure that counsel prepared this and pulled

21  all of the text messages between Treena and Mr. Sheltra that

22  were in there, and they conclude on August 19th, before his

23  communications with ER, and so it's either -- either it's

24  complete and then I'm less troubled by it because it will be --

25  it's inconsistent with Mr. Sheltra's testimony because it's

 1  not -- and we -- it's inconsistent as being incomplete --

 2      Or if it's complete, it's inconsistent with his testimony.

 3  If it's incomplete, then the best evidence rule must apply and

 4  it should be -- we should have the entire -- the entire series

 5  of text messages, and this is why it is wrong that it could be

 6  admitted when it was not disclosed pretrial, because we would

 7  have understood that and would have been prepared.  Now we are

 8  being sandbagged by a late disclosure of a document that's

 9  intended to bolster the defendant's testimony that we don't

10  have an opportunity to check and see whether it is complete.

11          THE COURT:  Why was this not previously disclosed, Mr.

12  Kaplan?

13          MR. KAPLAN:  Judge, in trial preparation, this subject

14  came up, and so I prepared the exhibit, and I -- for some

15  reason I didn't send it to the Government prior to my client

16  taking the stand.

17          THE COURT:  When did you send it to the Government?

18          MR. KAPLAN:  Pardon me?

19          THE COURT:  When did you send it to the Government?

20          MR. KAPLAN:  Yesterday.

21          THE COURT:  Yesterday?  Could it have been sent

22  sooner?

23          MR. KAPLAN:  Could it have been what?

24          THE COURT:  Sent sooner.

25          MR. KAPLAN:  Of course.  Yes.

1          THE COURT:  Okay.  So --

2          MR. KAPLAN:  But I do have -- I originally -- not to

3   interrupt, but I originally had prepared a longer exhibit that

4   goes to August 30th, and what I sent the Government was a

5   reduced version because I thought it would be less complicated

6   if I just only had two or three pages and didn't get into all

7   of the language for, like, 10 pages of his text messages

8   with -- this all came from -- by the way, from Thornton's

9   extraction from my client's cell phone, so the Government's had

10  access to this.

11         THE COURT:  So this is part of the Thornton

12  extraction?

13         MR. KAPLAN:  Yes.  Yes.

14         THE COURT:  Okay.  Here's -- we're going to take our

15  own break, and here's what I'm interested in:  prejudice to the

16  Government.  If the entire extraction is there, then I'm a

17  little bit less concerned about prior disclosure.  It would --

18  it is not clear to me whether this is an excerpt or this is all

19  of it.  If it is in fact an excerpt, the Government under the

20  completion doctrine has the right to provide the rest of it to

21  the jury as well.  It should have been provided previously so

22  that we aren't wasting time during the trial with this.

23      I have not read it closely, but it strikes the Court as

24  not offered for the truth of the matters asserted therein but

25  the fact that the communications took place.  It does place his

1  testimony in context, and it, therefore, has some relevance.

2  I'm not seeing under 403, but I haven't looked at this

3  carefully, the prejudicial impact of these messages.

4      So we'll come back and I'll hear those arguments, and that

5  is going to keep our break a little bit shorter.

6      Anything to bring to my attention, and do you need me to

7  carve out some time for an additional charge conference?

8          MR. KAPLAN:  I don't -- I don't feel that I need any

9  additional time, Judge.

10         MS. MASTERSON:  I don't think so, your Honor.

11         THE COURT:  Okay.  All right.  We'll come back at,

12 say, 20 of 11:00, and I will hear your responses to why this

13 should or should not come in.

14     (A recess was taken, after which the following was held in

15 open court without the jury present at 10:48 AM.)

16         THE COURT:  We are back on the record in United States

17 of America vs. Randy Sheltra.

18     We're talking about Defendant's Exhibit C1.  I'll hear

19 from the Government first.

20         MS. MASTERSON:  Well, your Honor, we maintain our

21 objection to the C1 that was presented that consisted of three

22 pages and was -- ends on August 19th.  We have a longer C1 that

23 finishes on August 30th.  We're less troubled by that.

24     We are troubled and object to the inclusion of the

25 commentary -- or the content of the text messages.  I think

1  that Mr. Kaplan is interested in getting in just the fact of

2  the text messages that were exchanged with Treena without

3  getting into the content, and if there's a way to redact out

4  the other parties from this exhibit and the content of the

5  communications, then we don't object to it with that proviso.

6          THE COURT:  All right.  So, Mr. Kaplan, any objection

7  to using the full exhibit?

8          MR. KAPLAN:  Pardon me, Judge?

9          THE COURT:  Any objection to using the full exhibit?

10         MR. KAPLAN:  No.

11         THE COURT:  All right.  So that will be done.

12     Then how about producing a document, which does not need

13 to happen right now, where the contents are redacted?

14         MR. KAPLAN:  This particular document we're talking

15 about?

16         THE COURT:  Yes.

17         MR. KAPLAN:  Yes.  I don't have a problem with that.

18         THE COURT:  Okay.

19         MR. KAPLAN:  I'm not sure how I'm going to do it, but

20 I guess just take a black Magic Marker and mark everything out?

21         THE COURT:  Yes.  Or white.  And what I do, not that

22 I'm the redaction queen, is then you photocopy it so that you

23 can't see underneath it.  So we can figure out a way to do that

24 and provide you with supplies from chambers if you need it,

25 so --

1          MR. KAPLAN:  Okay.

2          THE COURT:  Okay.

3          MS. MASTERSON:  So not only the content, though, but

4   all other parties that Mr. -- no?

5          THE COURT:  It doesn't matter the other parties.  It

6   doesn't -- it's more complete to say this is -- you were having

7   conversations with other people and that included this Treena

8   and these are the text messages and these were found on your

9   phone.  The fact that there might be emails in there with other

10  people is not particularly troubling.  I can't see the purpose

11  of taking them out.  They might raise more questions than it

12  answers.

13         MR. KAPLAN:  So what I'm marking out is just the

14  content of the text messages?

15         THE COURT:  Yes.  Okay?

16         MR. KAPLAN:  So with that, Judge, is C1 admitted?

17         THE COURT:  It is.

18     (Defendant's Exhibit C1 was received in evidence.)

19         THE COURT:  All right.  And we're going to bring back

20  the jury.  Anything else to bring to my attention?

21         MR. KAPLAN:  No, your Honor.

22         MS. MASTERSON:  No, your Honor.

23         THE COURT:  Let's do that.

24     (The following was held in open court with the jury

25  present at 10:52 AM.)

```
 1          THE COURT:  We are back on the record in United States
 2  of America vs. Randy Sheltra.
 3          The Court has ruled that Defendant's Exhibit C1 is
 4  admissible and is admitted.  We're going to get a more
 5  complete -- all of the pages in the document, so you may not
 6  see it right this minute, but I am admitting it into evidence.
 7          We are in the process of Mr. Kaplan's redirect of Mr.
 8  Sheltra.  Mr. Sheltra is on the witness stand.  He is still
 9  under oath.
10          And you may proceed.
11          MR. KAPLAN:  I have nothing further, your Honor.
12          THE COURT:  All right.  Any recross?
13          MS. MASTERSON:  Yes, your Honor.
14                     RECROSS-EXAMINATION
15  BY MS. MASTERSON:
16  Q    All right.  Mr. Sheltra, you testified on redirect that
17  you engaged in communications with this Treena person, correct?
18  A    Yes.
19  Q    And you referenced -- and Defense Exhibit C1 is --
20  contains those communications with Treena?
21  A    Yes.
22  Q    All right.  Are you aware that in this document there were
23  no communications with Treena between August 20th and August
24  30th?
25  A    That certainly fits the relationship.
```

1 Q    And when you were communicating with Elisha, the

2 15-year-old, about and asking her for pictures of her labia and

3 her pussy lips, those communications happened on August 25th,

4 correct?

5         MR. KAPLAN:  Objection, your Honor.  That wasn't --

6 that wasn't the witness' testimony.  He said he thought he was

7 sending that to someone else.

8         THE COURT:  All right.  Well, I don't remember that

9 particular question.  It is cross-examination, and let me just

10 look at the question again before I rule on it.

11     I'll allow it.  So the pending question, do you need it

12 read back?

13        MS. MASTERSON:  Yes, please.

14        THE COURT:  I'll have the court reporter do it.

15        (The record was read as follows:  "And when you were

16        communicating with Elisha, the 15-year-old, about and

17        asking her for pictures of her labia and her pussy

18        lips, those communications happened on August 25th,

19        correct?")

20        THE WITNESS:  Yes.  They happened on the 25th.  But it

21 was to the wrong person.  That's -- that's my point.

22 Q    BY MS. MASTERSON:  And that's your testimony, right?

23 A    Yes.

24        MS. MASTERSON:  All right.  May I have the ELMO on,

25 please.

```
 1        All right.  And for the record, this is from Government's
 2   Exhibit 27.
 3   Q    This is the communications between you and Elisha, the
 4   15-year-old, correct, Mr. Sheltra?
 5   A    Yes.
 6   Q    And here on August 25th, 2017, at 11:26, that's the
 7   conversation where she shared with you -- or that begins the
 8   conversation where she shared with you that she and her
 9   boyfriend had tried anal sex; is that correct?
10   A    Yes.
11   Q    And you responded, "Successfully hun?"  Correct?
12   A    Yes.
13   Q    And you continued to have this conversation and -- let me
14   go back.
15        And the first mention by Elisha of the anal sex is at
16   11:26, correct?
17   A    Yes.
18   Q    Your response was one minute later, at 11:27, correct?
19   A    Yup.
20   Q    She then wrote two texts at 11:28 about the -- what
21   happened when they were engaging in anal sex; is that correct?
22   A    Yes.
23   Q    Your response then was one minute later where you wrote,
24   "I'm sure.  Especially if he's really thick," with a smile face
25   symbol.  Correct?
```

1  A     Yes.

2         MR. KAPLAN:  Objection, your Honor.  I'm not sure

3  there's a question here.  The prosecutor is just reading from

4  the transcript.

5         THE COURT:  You should ask a question in connection

6  with it, like "Did you write that?" as opposed to just going

7  through the exhibit.  But it's permissible and I'll allow it.

8      Make sure that you stay within the scope of the direct as

9  well.

10 Q    Did you write this text to Elisha of "I'm sure.

11 Especially if he's really thick" at 11:29 as indicated on the

12 document?

13 A    I did write it.  It just was to the wrong person, ma'am.

14 Q    You wrote, "I'm sure.  Especially if he's really thick,"

15 to Elisha, the 15-year-old.

16 A    From the time that she said, "We tried anal" -- ma'am, I'm

17 sorry.  I just can't explain this with one word.  From the time

18 that -- when she responded to -- when she communicated to me

19 that "We tried anal yesterday," I transposed that to Treena

20 because of the relationship that Treena had with her boyfriend,

21 and so -- and our relationship.  It made much more sense in my

22 mind when I received -- When I got that, that was a Treena

23 message, and so from there down, the fact that it only took a

24 couple or three minutes here or several minutes as this

25 proceeded, I was thinking of the last conversation I had with

1 Treena and the conversations that -- that had presented itself,

2 and so that's -- that's why this is difficult for me to answer

3 in a yes-no format, because, yes, I responded to Treena -- or

4 to Elisha, but it was Treena that I was thinking.

5 Q    Okay.  And so it was the -- was it the -- "We tried anal

6 yesterday," you thought that was to Treena?  Was it this

7 communication that triggered you to think of Treena?

8 A    As I recall, yes.

9 Q    And so your -- it's your testimony that you were -- you

10 thought you were communicating with Treena when you wrote "I'd

11 still like to see those pussy lips hun," correct?

12 A    Yes.

13 Q    Okay.  Staying with Government's Exhibit 27 right here -

14 I've already circled it - there's a text number 183 that you

15 wrote at 8/25 at 10:03 AM; is that correct?

16        MR. KAPLAN:  Objection, your Honor.  I don't think

17 this is consistent with -- with my redirect.  It goes beyond

18 that.

19        THE COURT:  So why is this within the scope of the

20 redirect?

21        MS. MASTERSON:  Because -- the Court's asking me?

22        THE COURT:  Yes.

23        MS. MASTERSON:  Thank you.  Because this witness has

24 testified that -- that he was -- he thought that he was texting

25 with Treena because of the anal sex conversation.  This text

```
 1  communication about wanting -- asking for a pic of her labia
 2  was sent an hour and 20 minutes before Mr. Sheltra was
 3  triggered to think of Treena by the anal sex conversation.
 4          THE COURT:  I'll allow it.
 5  Q    So, Mr. Sheltra, you wrote this text communication at
 6  10:03, correct?
 7  A    Yes, I wrote that.
 8  Q    And --
 9  A    Could you put that up one more time, ma'am?  I'm sorry.
10  Could you just put it back up?
11  Q    No.
12          THE COURT:  We don't usually have the witness asking
13  the attorney to do something.  She does not need to put it back
14  up.
15          THE WITNESS:  I'm sorry.  I just -- you have to
16  understand this was --
17  Q    Mr. Sheltra, I haven't asked you a question, all right?
18      So I want to just be clear.  You communicated with the
19  undercover, Meg, and you discussed with her sex with her
20  daughter, correct?
21  A    Yes.
22  Q    But your testimony is that you really wanted to have sex
23  with her, correct?
24  A    Yes.
25  Q    All right.  And you also testified that you communicated
```

1  with Alisha with an A about sex with her daughter; is that

2  correct?

3          MR. KAPLAN:  Objection, your Honor.  I think this goes

4  beyond the scope of --

5          THE COURT:  It is going beyond the scope.  The

6  redirect was fairly limited, and so let's stay within the

7  confines of that.

8  Q    You testified that -- on redirect that Plattsburgh lady,

9  the woman that you --

10  A    Yes.

11  Q    -- exchanged, that you testified -- I'm sorry, that you

12  communicated with her about sex with kids; is that right?

13  A    She communicated with me about sex with kids.

14  Q    And you engaged in that conversation, though?

15  A    Yes.

16  Q    So you talked to three different people you met on the

17  Internet about sex with kids?

18  A    Yeah.

19          MS. MASTERSON:  I have nothing further.

20          THE COURT:  Any redirect?

21          MR. KAPLAN:  No, your Honor.  Thank you.

22          THE COURT:  Thank you, Mr. Sheltra.  You may step

23  down.

24      (The witness was excused.)

25          THE COURT:  Any further witnesses for the defendant?

```
 1         MR. KAPLAN:  No, your Honor.  The defense rests.
 2         THE COURT:  Any rebuttal witnesses for the Government?
 3         MS. MASTERSON:  Your Honor, the Government calls Frank
 4 Thornton.
 5         COURTROOM DEPUTY:  Ms. Masterson, I'm going to clean
 6 over here, so give me one second.
 7         THE COURT:  So, Mr. Thornton, I'm going to ask you
 8 stay -- stay there.  We'll clean up the witness stand, we'll
 9 have you sworn in, and we'll go from there.
10     (Pause in the proceedings.)
11         COURTROOM DEPUTY:  You can come forward.  Please raise
12 your right hand and state your full name for the record.
13         THE WITNESS:  Francis Joseph Thornton, Jr.
14                    FRANCIS J. THORNTON, JR.,
15  called as a rebuttal witness, having been first duly sworn by
16  the courtroom deputy, was examined and testified as follows:
17                    DIRECT EXAMINATION
18 BY MS. MASTERSON:
19 Q    Good morning, Mr. Thornton.
20 A    Good morning.
21 Q    Would you please remind the jury of where you work and
22 what type of work it is that you do.
23 A    I do digital forensics work on a contract basis, and much
24 of it is for the U.S. Attorney's Office.
25 Q    And would you remind the jury of the work that you did in
```

1 this case.

2 A    In this case primarily it was going over the acquisition

3 and contents of a telephone used by the defendant.

4 Q    Have you -- there's -- you have before you what has been

5 marked for identification as Government's Exhibit 41.  Can you

6 look at it and tell the jury if you recognize it.

7 A    Yes, I do.

8 Q    What is it?

9 A    It's a photograph that was found on the defendant's phone.

10          MR. KAPLAN:  Objection, your Honor.  I don't think the

11 witness at this point should indicate what it is.

12          THE COURT:  Provided he says it's a photograph and we

13 don't talk about the contents, it's permissible.

14 Q    Do you recognize it?

15 A    Yes.  It's a photograph that I found on the phone.

16 Q    The phone that you examined in this case; is that right?

17 A    Yes.

18 Q    Is it a complete image, or is it -- is what you have in

19 Exhibit 41 part of a larger image that was found?

20 A    Yes.  This -- part of this has been cropped out.

21 Q    What's the total number of images that were part of this

22 image?

23 A    On the original?

24 Q    Yeah.

25 A    There were four.

 1          MS. MASTERSON:  Your Honor, the Government offers
 2  Exhibit 41.
 3          MR. KAPLAN:  May I voir dire, Judge?
 4          THE COURT:  You may.
 5                  VOIR DIRE EXAMINATION
 6  BY MR. KAPLAN:
 7  Q    So your testimony is that you found those images on Mr.
 8  Sheltra's phone?
 9  A    Yes, sir.
10  Q    And when were they put on the phone?
11  A    I can't determine that, sir.
12  Q    Who put them on the phone?
13  A    I cannot determine that, sir.
14  Q    Do you know where they came from?
15  A    They were within the Google cache on the phone, which
16  would indicate they had come from some use of the browser
17  system on the phone.
18  Q    And when was that?
19  A    I can't tell, sir.
20  Q    And why -- why can't you tell?
21  A    There was little or no metadata associated with the file.
22  Q    And so you don't know who put them on the phone; you don't
23  know where they came from.  Do you know the date that the
24  picture was taken?
25  A    No, sir.

1  Q    Could it have been put on the phone accidentally?

2         MS. MASTERSON:  Objection.  Calls for speculation.

3         THE COURT:  I'll allow it.

4  A    Possibly.

5  Q    Okay.  And --

6         MR. KAPLAN:  Your Honor, based on that, I would object

7  to its admission.

8         THE COURT:  All right.  At this point we will go into

9  the back room and I will take the objection there, and we'll

10 have the jury stay here.

11      (The following was held out of the presence of the jury

12 and the defendant.)

13         THE COURT:  The Court has ruled that this evidence is

14 admissible on the issue of intent and sexual interest in

15 children under the *Brand* decision and has struck the 403

16 balancing test in favor of its admissibility in light of the

17 contested disputed issue of intent within the text messages.

18      Mr. Kaplan has elicited from Mr. Thornton that there's no

19 indication as to who put them on there, when they were placed

20 on there, and who saw them.  I see that going to weight as

21 opposed to admissibility in light of the date and time of

22 somebody's sexual interest does not strike the Court as

23 something that could be pinpointed like possession of a

24 firearm.

25      So if I saw a photograph of somebody who's holding a

1 firearm and it's a felon in possession of a firearm, I'd want

2 to know the date of the photograph.  I don't think sexual

3 interest in children varies so significantly that it waxes and

4 wanes, so I am seeing the objection as to weight as opposed to

5 admissibility.

6     But I will start with Mr. Kaplan's objection and then I'll

7 hear from the Government.

8         MR. KAPLAN:  You know, I do think, though, Judge, it

9 is relevant in terms of when the pictures went on the phone.

10 Like, if they went on 10 years before all of this took place, I

11 do think time in weighing a balance test, prejudice vers- --

12 prejudice with respect to the probative value of it, I think

13 when it went on is important in terms of how -- like, if it was

14 five or six years before any of these events took place, he

15 might be a very different person at this point, and we don't

16 know who put them on the phone.  We don't know where they came

17 from.  It could have been done accidentally.

18     I understand the weight argument, but it just seems to

19 me -- there's no metadata with respect to these pictures, and

20 it seems to me the Government should be required to prove

21 something with respect to when -- where these pictures came

22 from and/or when they were taken or when they were put on the

23 phone to make it relevant.

24         THE COURT:  So I'm surprised there's no browser date.

25 So no metadata strikes me as odd in light of these cases.  I

1  assume there's a date that the phone was purchased and the

2  first time data comes on the phone.  So there isn't -- there's

3  got to be something that establishes the earliest point when

4  this could be on the phone.

5          MR. KAPLAN:  The other thing, Judge, is it sounds like

6  they've been -- I mean, he said the pictures were -- as I

7  understood it, were altered, and that concerns me, because who

8  altered them; why were they altered?  When you're dealing with

9  electronic retrieval of pictures and other evidence, it's

10  important to be specific.

11          THE COURT:  So I heard that as well, and that

12  surprised me, and I didn't hear anybody ask whether or not

13  Mr. Thornton cropped them, which would be more problematic, or

14  if they were in cropped form on the phone.  So we do need to

15  establish that.  If he altered the photos in some way, it's

16  less likely that I'm going to admit them.

17      So let's hear an offer of proof on that issue and then

18  let's hear your response to Mr. Kaplan.

19          MS. MASTERSON:  Right.  First off with respect to the

20  substance of the image, it's a single image, and there are four

21  images.  We actually have -- can you go get the full thing?

22          MR. GILMAN:  The original?  Where is it?

23          THE COURT:  I take your representation at this point.

24          MS. MASTERSON:  Okay.  The image is a single image

25  with four subimages.  Two depict child pornography.  One -- or

1  the sexually explicit images involving children.  One of the

2  four images depicts just a picture of a child.  And the fourth

3  image depicts bestiality involving where a dog is raping a

4  woman who is performing oral sex on an adult male.  So I -- we

5  caused that to be done.

6      Mr. Thornton knows the original, and he knows of how the

7  change was made, and we didn't alter these photos depicting the

8  children.  We simply removed the bestiality because -- I mean,

9  I'll put it back, but I don't think you want that in.

10          THE COURT:  So let me ask you.  So they're coming up

11  in the cache as four pieces of the same image?

12          MS. MASTERSON:  It's a single image with four pieces.

13          THE COURT:  Okay.

14          MS. MASTERSON:  And so, I mean, we did that to avoid a

15  403 objection and just --

16          THE COURT:  Okay.  So -- all right.  And that's

17  consistent with the Court's ruling, so I'm less concerned about

18  that.  You probably need to clear it up with Mr. Thornton that

19  the cropping was consistent with the Court's ruling as to what

20  may be admissible.

21      Let's hear about Mr. Kaplan's relevance challenge, 403,

22  more prejudicial if we don't know when it went on the phone.

23  Who it went on the phone, that's a question of weight, because

24  this is Mr. Sheltra's phone, or at least there's substantial

25  evidence that it's his phone, but what about the date -- dating

1 issue?

2          MS. MASTERSON:  Well, we don't -- I mean, we don't

3 have any metadata with it.  We don't know exactly when.  Given

4 where it was found, in an Internet browser cache, I expect that

5 Mr. Thornton would testify that it went on recently, but he

6 can't tell for sure when it went on, because we know that the

7 Internet caches get overwritten more regularly than items that

8 have been saved to a hard drive.  Since it was in an Internet

9 cache, it could have been put on within the last two months

10 before it was seized.

11          THE COURT:  Okay.  So that foundation has not been

12 laid.  There must be a beginning date when data starts coming

13 on this phone by -- there has to be.  So there's -- if you look

14 at -- I'm sure he knows when this phone came online.  Does he?

15 The phone --

16          MS. MASTERSON:  I don't know.  He may need to review

17 his full report.

18          THE COURT:  Okay.  I'm not going to admit it at this

19 time.  You need to lay more foundation.  If, for example, Mr.

20 Sheltra has had this phone for 20 years, 15 years, even 10

21 years, I'm less likely to admit it.  If he's had the phone for

22 the past five years, I would want to hear why somebody's sexual

23 interest in children would be as variable as some other

24 interests.

25          You know, this witness is not capable of testifying to

1  that, but that's for the jury to decide as to whether or not

2  somebody becomes interested in children and then is no longer

3  interested in children, and to the extent the argument's made,

4  it can open the door, as you understand, to prior interests in

5  children as well.

6        MS. MASTERSON:  Well, but, your Honor, all of Mr.

7  Kaplan's arguments do go to weight, not admissibility.  We

8  don't know when it went on there.  I mean, it should be

9  admitted and he can argue we don't -- know nothing about this,

10 we don't -- he can explore on cross-examination with Mr. --

11       THE COURT:  His arguments do do that, but you have an

12 obligation to set a foundation that shows relevance and some

13 determination, which I -- I assume can be made, of when this

14 phone became operational.  I mean, I'm sure you did a Verizon

15 or Google search and they can tell you when -- I mean, I'm sure

16 Mr. Thornton knows when the earliest date of information came

17 on this phone.  I'm sure he does.  But you need to lay the

18 foundation, and you need to establish relevance in the first

19 instance, and then I agree many of the arguments raised at this

20 point go to weight as opposed to admissibility.

21     Do you want to be heard further on the cropping?

22       MR. KAPLAN:  No, Judge.

23       THE COURT:  Okay.

24       MS. MASTERSON:  I'm not sure that Mr. Thornton has

25 that -- he can look it up, but I don't believe he will be able

1  to -- as he's sitting there right now, to talk about these

2  questions that the Court is asking.

3          THE COURT:  I'm not asking any questions.

4          MS. MASTERSON:  No.

5          THE COURT:  I'm sure you can refresh his recollection

6  as to "When is the first data that you saw" -- "When is the

7  earliest email you saw on this phone?"  If he can't answer it,

8  he can't answer it, and I'll decide weight versus

9  admissibility.  I'm not going to tell you the questions I think

10  you need to elicit, but there has been a challenge to how old

11  this data is, and -- and it's a viable challenge at this point,

12  and you need to set the foundation.

13          MS. MASTERSON:  I don't know that -- I mean, Mr. -- I

14  don't have in court with me right now the materials that

15  will -- I mean, what he needs is his full forensic report.  We

16  have it on a disc, but we don't have the means by which we can

17  open it up.

18          THE COURT:  You don't have it with you here?

19          MS. MASTERSON:  The 12,000-page report?

20          THE COURT:  Well, I'm sure there's excerpt of it.  He

21  might have it in his own file.

22          MS. MASTERSON:  I don't -- I don't know that we have

23  the hard copy.  We can run downstairs --

24          THE COURT:  You can ask him the questions you told me

25  that you were going to ask him about what shows up in the

Internet cache, how it gets written over, what you would expect
to find in there, and see where we're at. I have not ruled out
the fact that an undated photograph is inadmissible. I'm just
saying that's where we're at right now. So you need to set a
better foundation, and we'll go from there.

Anything further before we go back on the record?

MR. KAPLAN:  No, your Honor.

MS. MASTERSON:  No.

(The following was held in open court.)

THE COURT:  We are back on the record in United States
of America vs. Randy Sheltra.

Mr. Kaplan, have you completed your voir dire?

MR. KAPLAN:  Yes, your Honor.

THE COURT:  All right. And, Ms. Masterson, you may
question the witness further.

DIRECT EXAMINATION (Continued)

BY MS. MASTERSON:

Q    Mr. Thornton, you mentioned that the -- that the images
were found in the Google cache. Can you explain what the
Google cache is for the jury.

A    Sure. Most electronic devices that have got some sort of
browser have got a cache area. It's a holding area for things
like images and files to be held in temporarily. When the
browser's being used and you go to a website, for instance, the
pictures will get stored into that cache area.

```
 1  Q    How long typically do items remain in the Google cache?
 2            MR. KAPLAN:  Objection, your Honor.
 3            THE COURT:  I'll allow it.
 4  A    Typically -- it really varies according to the usage of
 5  the phone, the size of the files, if they have to be
 6  overwritten by different other files.  It varies all over the
 7  place.
 8  Q    For the images that were found in Exhibit 41 that were
 9  found in the Google cache, given the size of those files, do
10  you have an understanding of how -- how long they may have
11  resided on the phone?
12            MR. KAPLAN:  Objection, your Honor.  Speculative based
13  on his previous answer.
14            THE COURT:  If it is speculation, I expect Mr.
15  Thornton will tell us if he doesn't have an opinion on that
16  issue or if he does.
17  A    Again, it would be hard to say.  It would be basically
18  speculative for me to go into any kind of timeline on it.
19  Q    Well, Mr. Sheltra had a Samsung phone, correct?
20  A    Yes.
21  Q    And you're familiar with cache storage on those phones?
22  A    Yes.
23  Q    What is, based on your training and experience, the usual
24  life-span of items that will reside in an Internet cache?
25            MR. KAPLAN:  Objection.
```

1           THE COURT:  I'll allow it.

2  A    Typically caches will be several months to just several

3  days.

4           MS. MASTERSON:  May I have a moment, your Honor?

5           THE COURT:  Yes.

6  Q    Mr. Thornton, do you have gloves up there?

7           THE COURT:  There's a box right there.

8  A    Yes.

9           COURTROOM DEPUTY:  Ms. Visser, is that you?

10           JUROR VISSER:  Yeah.

11           THE COURT:  What's the matter?

12           JUROR VISSER:  I can see pictures.  He has these big

13  printed-out pictures.  I assume they were evidence.

14           THE COURT:  Oh, you can see them from Mr. Gilman?

15           JUROR VISSER:  Yes.

16           THE COURT:  Yes.  Thank you for telling me.

17       Mr. Gilman, put those pictures down.

18           MR. GILMAN:  Yes, your Honor.

19           THE COURT:  And go ahead, Ms. Masterson.

20           MS. MASTERSON:  May I approach, your Honor?

21           THE COURT:  You may.  I have to say that I didn't know

22  where that voice was coming from, and I'm like, "Is it from the

23  audio system?"

24  Q    Do you have gloves on, Mr. Thornton?  Can you look at the

25  items that I just handed to you, and do you recognize what --

1 what it is?

2 A    Yes.

3 Q    What is it?

4 A    This is the original from -- that image Exhibit 41 was

5 derived from.

6 Q    All right.  And that's the original.  And then what, if

7 anything -- how, if at all, does Exhibit 41 differ from the

8 original image that you found?

9          MR. KAPLAN:  We're not going to object to the fact

10 that there was something --

11          THE COURT:  All right.  So it's permissible in

12 accordance with the Court's ruling for you to offer a cropped

13 version of this image.  Mr. Kaplan does not object.

14          MS. MASTERSON:  All right.  Your Honor, the Government

15 offers Exhibit 41.

16          THE COURT:  Any objection other than those previously

17 stated?

18          MR. KAPLAN:  Yes, your Honor.  If I could ask voir

19 dire again?

20          THE COURT:  You may.

21                      VOIR DIRE EXAMINATION

22 BY MR. KAPLAN:

23 Q    Mr. Thornton, could you explain what you meant by how long

24 certain images last on Google cache?

25 A    Yes, sir.  Typically what happens is as you are doing --

1  browsing on a web device or web program, pictures will come in,

2  and if the cache area is empty, they just get left there.  If

3  it starts filling up, it will overwrite older pictures with

4  newer ones.  Again, it's highly dependent upon how big the

5  pictures are or the other files.  There can be other files

6  other than pictures.  But it depends on how big they are, how

7  long they've been in there, how often those pages are

8  refreshed.  It -- there's a lot of factors that vary into how

9  long a file will stay in the cache area.

10  Q     So in this case you don't know?

11  A     No, sir.

12  Q     Okay.

13          MR. KAPLAN:  I would object, your Honor.

14          THE COURT:  All right.  Subject to the Court's rulings

15  in our bench conference, Exhibit 41 is admissible.

16       (Government's Exhibit 41 was received in evidence.)

17          MS. MASTERSON:  Permission to publish, your Honor?

18          THE COURT:  You may.

19          MS. MASTERSON:  May I ask the monitors to the gallery

20  be turned off, please.  And is the ELMO working?

21          COURTROOM DEPUTY:  It should be.  Give it one sec.

22  Okay.  It should be on.

23          MS. MASTERSON:  Ready with the ELMO?

24          COURTROOM DEPUTY:  Um-hum.

25          MS. MASTERSON:  Okay.  I'm publishing Government's

1    Exhibit 41.

2         THE COURT:  Ladies and gentlemen of the jury, I'm

3    going to give you what's called a curative instruction.

4         The Government has offered evidence intending to show that

5    on different occasions the defendant engaged in other acts than

6    the crimes charged.  So these photographs that you just saw are

7    not the subject of charges pending in this case at this time.

8    The defendant is not on trial for that conduct.  He's only on

9    trial for the crimes with which he has been charged.

10        Accordingly, you may not consider evidence of other acts

11   as a substitute for evidence that the defendant committed the

12   crimes charged.  Nor may you consider evidence of other acts as

13   evidence that the defendant has a criminal personality,

14   criminal propensity, or a bad character.

15        The evidence of other acts was admitted for a limited

16   purpose, and you may consider it only for that limited purpose.

17   You may consider it in assessing motive, opportunity, intent,

18   preparation, plan, absence of mistake, or lack of accident.

19   Evidence of other acts may not be considered by you for any

20   other purpose.

21        Ms. Masterson, any further questions for this witness?

22             MS. MASTERSON:  No, your Honor.

23             THE COURT:  Any cross-examination, Mr. Kaplan?

24             MR. KAPLAN:  Yes, your Honor.

25                            CROSS-EXAMINATION

BY MR. KAPLAN:

Q    Mr. Thornton, how does something get into Google cache?

A    Typically it -- if you go to a web page and that page has
the item, the file, or photograph, it will then be put into the
cache.

Q    Could it be something that someone sent you?

A    Typically that doesn't go into the cache *per se*.  That's
usually sent as an attachment if you're talking about something
like email.

Q    So if it goes into the cache, does that mean you
downloaded it?

A    Essentially, yes.

          MR. KAPLAN:  I have nothing further, your Honor.

          THE COURT:  Any redirect?

          MS. MASTERSON:  No, your Honor.

          THE COURT:  Thank you, sir.  You may step down.

          THE WITNESS:  Thank you, your Honor.

     (The witness was excused.)

          THE COURT:  Any further rebuttal witnesses for the
Government?

          MS. MASTERSON:  No, your Honor.

          THE COURT:  Does the Government rest?

          MS. MASTERSON:  It does.

          THE COURT:  All right.  At this point we are going to
close the evidence.  That does not mean that you are going to

1  deliberate, but what it does mean is we're going to take an

2  early lunch hour.  When we come back, we will have closing

3  arguments and jury instructions.  So I will see you back here

4  at 12:30.

5       Don't talk about the case.  Don't let anybody talk to you

6  about the case.  Don't take in any outside information.  I wish

7  you a good lunch.

8       I'll have the attorneys remain in the courtroom.

9       (The jury exited the courtroom, after which the following

10 was held in open court at 11:28 AM.)

11       THE COURT:  Any motions at this time?  Anything to

12 bring to my attention?

13       MR. KAPLAN:  Judge, before I make my Rule 29 motion,

14 my client has a *pro se* motion for a mistrial he would like to

15 make if the Court's willing.

16       THE COURT:  All right.  Any objection, Ms. Masterson?

17       MS. MASTERSON:  Yes.  He is -- Mr. Sheltra is

18 represented by more than capable counsel.  There should only be

19 one voice on the defense team.

20       THE COURT:  All right.  There is -- I did not allow

21 any hybrid representation here.  I did not appoint standby

22 counsel.  I asked you if you wanted to represent yourself.  You

23 said you did not want to do so, and I accepted that.

24       For the sake of the record, to preserve the issue for an

25 appeal, I will let you make this motion at this time just so

1  that if the case does get appealed, the appellate court will

2  know what you wanted to say.  So it's a preservation as opposed

3  to any recognition that you have a right to hybrid

4  representation.

5      Mr. Sheltra?

6          THE DEFENDANT:  Thank you, your Honor.

7      So when Mr. Kaplan called, the last time we were talking

8  before the hearing last week and he had talked about the fact

9  that with the COVID stall that we had, that there was an

10 opportunity at that point or a chance that if the jury didn't

11 want to come back, that it would -- it would result in a

12 mistrial and a further court date would be scheduled out in the

13 spring, and that got me thinking in a different format than --

14 than just the trial itself, and so throughout this process,

15 your Honor, I have -- there has been so many times where I have

16 struggled with the issues that are -- I can only attribute to

17 the stroke.

18     And we had a -- we had a psychologist lined up before

19 COVID hit, and I was going to go into it in that respect

20 thinking that that would solution it, but again, it was just me

21 not being able to articulate what was really happening in my

22 mind mentally with what was going on with me, and I couldn't do

23 that, and it's been unfair to Mr. Kaplan.  I haven't been able

24 to help him to the degree where I -- I feel like we have been

25 able to create a defense that is justified here with the

1 information.

2      But as -- as I was thinking psychologist, I was also

3 thinking that what I need is I need a medical evaluation.  I

4 now have had several different circumstances where what I see

5 with my own eyes, that the communication between my eyes and my

6 brain is absolutely false, and that scares the hell out of me.

7 Pardon my French, ma'am, but it really does, and it's something

8 that I never had any history of this before.

9      And so as I was talking with Ms. Masterson about the whole

10 Treena thing, when the thought comes into my mind, I see --

11 there is opportunity for me to see that, not what is real, and

12 that's very concerning for me, but I'm learning to deal with

13 it.

14      There's evidence of it with the evaluation that I had in

15 Massachusetts when I went down and did the -- the other

16 evaluation.  I was very pleased when I got that result back

17 that said, you know, I was coherent, and if you look at the

18 results, there's a place where it lists my IQ as 124, and then

19 it lists several other applications associated with an IQ test,

20 and they're all quite high, something that -- you know, that's

21 lower than the IQ test that I had had previous to the stroke.

22 The only one that I had on record was in the 130s.  And so that

23 was my reference, and I'm like, "Well, at least I didn't lose

24 much."

25      But then when you look at the processing of information,

1  I'm average.  And that's because I try to do the best I can

2  with whatever information I see.  And so I'm doing that by

3  triple-checking every -- because I can't believe what I'm

4  actually seeing, and so that's a -- that's a scary thing.  And

5  I don't expect anybody in here, unless you've had this

6  experience, to be able to really understand what it means, but

7  I have taken pills -- and as you know, I've been incarcerated.

8  In the morning I take my pills.  And the last -- this -- I'm

9  giving you this as the last example of this.

10      I took back the pills, I looked in the thing, and I -- I

11  assumed in my mind that all the pills had been taken.  I looked

12  and I saw an empty -- an empty container, a little plastic

13  thing.  I picked up the water.  The officer who was there to

14  watch me do that said, "You missed one."  I had just looked at

15  it and saw that the container was absolutely empty.  It's a

16  clear -- it's a clear plastic container.  I looked again, and

17  the biggest pill out of that, my statin that I take, was

18  sitting there.  And I'm like -- it blows your mind when that

19  starts to happen.

20      It's happened on multiple occasions.  It's happened with

21  the date on the television that -- I went for information

22  because -- I can just give you these specific instances.  On

23  January 2nd -- it was right after the first of the year -- of

24  this last year.  I clicked on the information because I knew it

25  was either the 2nd or the 3rd, and I look up and I see 2/3.

1   I'm like, no.  It gave me both dates.  Because in my mind I was

2   thinking whether it was the 2nd or the 3rd.

3        It's really scary to have something like this happen, so I

4   double-check, I triple-check everything that I have to do, and

5   on -- on the stand earlier when I asked her to put the thing

6   back up, it was because I wanted to see the dates.  I'm

7   terrible with dates now, and this is very difficult for me to

8   sit and look at a list of text messages and be able to

9   correlate from the top of it to the bottom of it.  I'm not

10  helping Mr. Kaplan in many ways with this.

11       And the other thing is -- about this whole getting ready

12  for this jury -- this trial, if I bring this information back

13  to actually go over it in detail, as Mr. Kaplan can attest, I

14  am going to get beat the hell out of, if -- even -- if not

15  worse, ma'am, by where I am, and this is -- it's impossible for

16  me to prepare with the few minutes or the hour or two hours

17  that we have to actually meet together to go through this data.

18       There are times with the Alisha evidence, I know exactly

19  when it triggered, and my heart stopped, and I was like -- my

20  hands got all tingly.  I knew when she was referring to her

21  daughter for me to have sex with her daughter.  I know exactly

22  where that is.  That would be great information for us to be

23  able to prevent -- to present as a defense.  I couldn't do that

24  because of the fact that I can't take this information back and

25  circle it for Mr. Kaplan.  There's just no time when you're

1 looking at hundreds of rows of data.

2     That's confusing in its own, but it's just so compounded

3 because of the fact that -- and all I can attribute it to, your

4 Honor, is the strokes.  It's the first time I've ever had this.

5 And if anybody -- if we had brought in anybody that has known

6 me for the last 25 years, they would tell you that it's -- it's

7 not my intelligence, it's my quickness, and that is completely

8 gone for me now because I can't afford to -- to be quick and

9 sharp-witted.  I can't do that anymore because I can't trust

10 what I see.

11          THE COURT:  When did you have your stroke?

12          THE DEFENDANT:  In December of 2016.

13          THE COURT:  All right.  And were you hospitalized

14 thereafter?

15          THE DEFENDANT:  I was hospitalized when I had the

16 stroke, ma'am.

17          THE COURT:  Okay.  For how long?

18          THE DEFENDANT:  Just overnight.  And -- and so I went

19 back -- but these are things that --

20          THE COURT:  And are you currently seeing a

21 neurologist?

22          THE DEFENDANT:  No.

23          THE COURT:  Have you seen --

24          THE DEFENDANT:  I've been incarcerated.

25          THE COURT:  Have you seen a neurologist consistently

1 after the stroke?

2          THE DEFENDANT:  I -- I went for the first couple of

3 appointments, and -- but it's not -- the trouble is because of

4 the fact that you -- you constantly try to correct.  If -- you

5 know, everything that you do, you try to do the best you can

6 with communications especially, and so if I walk into a

7 neurologist, which I have done, and I say I'm feeling okay,

8 they want to know if I can balance on one foot and if -- you

9 know, if I can focus, and it's like -- it's the details behind

10 this.

11      It's mind-boggling to me that I can actually look at

12 something and it's not true anymore, you know?  It scares the

13 hell out of you.  And -- but these are all things that have

14 occurred since I've been incarcerated, and it's really, really

15 difficult for me to get any -- I can't -- I can go talk to

16 mental health at the -- at the correction facility, and they're

17 just going to take notes and it's not going to go anywhere.

18 What I need is somebody that can really evaluate me medically.

19      And I was -- when I -- when we had the psychologist lined

20 up, it was a criminal psychologist, somebody who was

21 supposed -- I was automatically thinking that, okay, well, that

22 will lead to this, you know?  I just -- I wasn't conveying it

23 well with Mr. Kaplan.  I had never -- we never talked about it.

24      And when I approached him with this a couple of weeks ago,

25 he's like, "Well, I don't have any -- we don't have anything

1  that points to it," and that's my fault.  That's my fault,

2  because I haven't been able to communicate it well.  That's my

3  fault because of the same problems, and it's really

4  frustrating.

5           THE COURT:  All right.  Mr. Kaplan, do you want to say

6  anything further on this issue?

7           MR. KAPLAN:  No, your Honor, other than to confirm

8  that he did raise the issue with me.  We met quite a bit in

9  preparation for trial, both here in the federal building and up

10  at Northwest.  It came up in one of those conversations.

11           THE COURT:  And the Court continued the matter several

12  times so that you could have an evaluation undertaken, correct?

13           MR. KAPLAN:  Yes.

14           THE COURT:  All right.

15           THE DEFENDANT:  It just never took place, ma'am.

16  That's --

17           MR. KAPLAN:  Well, no, the evaluation did -- did take

18  place, but I think it was done not in person but -- I think

19  there's a report, so --

20           THE DEFENDANT:  We're talking about the Massachusetts

21  one, not the follow-up one, which, after I came back, we wanted

22  to do an unbiased one.  I'm sorry for interrupting, your Honor,

23  but we wanted to do an unbiased one because it was a government

24  one that took place in Massachusetts in that facility.

25           THE COURT:  It wasn't a government one.  It was one

1  the Court ordered with regard to competency.  So I allowed time

2  for an additional evaluation conducted by somebody chosen by

3  the defense, and Mr. Kaplan's telling me that that did take

4  place?

5          THE DEFENDANT:  No.

6          MR. KAPLAN:  Well, it did take place, my understanding

7  is, but it wasn't in person.  It was done over the phone.

8          THE DEFENDANT:  Never did I talk to anybody.  I'm -- I

9  apologize, your Honor, but no, I did not talk to that -- that

10 other psychologist.

11         THE COURT:  Because I remember talking to you about

12 it, Mr. Sheltra, and you told me that you didn't want to do it

13 over the phone, you needed to do it in person, and I explained

14 to you that in light of the pandemic you might want to do it by

15 phone.

16     But -- but that being said, let me ask if Ms. Masterson

17 wants to say anything before we move on.

18         MS. MASTERSON:  Well, your Honor, this issue of Mr.

19 Sheltra's competence has been fully vetted by the Court.  The

20 Court sent him out almost two years ago for an evaluation by

21 Dr. Channell at Fort Devens.  I raised the issue of competence

22 when I read his *pro se* motions dealing with the sovereign

23 citizen issue.  That was not -- you know, I just flagged it for

24 the Court that I thought there might be something going on.

25     There was absolutely no indication pretrial to the Court

1  or the Government by the defendant or his counsel that there

2  might be an issue of competence, and to the extent that the

3  stroke issue was addressed by Mr. Kaplan and discarded, that is

4  a strategic decision, but I don't believe that there's any --

5  we're not in a position where this should have any traction.

6  Mr. Sheltra's competence has been -- has been established, and

7  so we should just move on to closing arguments.

8        THE COURT:  All right.  The Court's going to deny the

9  *pro se* motion for a mistrial.  The Court engaged the Bureau of

10  Prisons to perform a competency evaluation.  The Bureau of

11  Prisons determined that Mr. Sheltra was competent to stand

12  trial, was able to effectively participate in his defense.

13  He's been very active in this case.  He has been coherent.

14  We took up the issue of the sovereign citizen.  That is

15  not the first time that issue has come up in court.  It had to

16  do with whether or not the Court had Mr. Sheltra's property,

17  and the Court inquired of counsel as to whether there was any

18  concern about Mr. Sheltra's competency.  It was not indicated

19  by either Mr. Sheltra or Mr. Kaplan that Mr. Sheltra was having

20  any difficulty understanding what was transpiring or

21  participating in his defense.

22  The reason why the stroke is problematic is because of the

23  date of the stroke.  If the argument is "I had a stroke and I

24  didn't know what I was doing in this particular case," that

25  opens the door to the Government seeking to introduce evidence

1 that there was sexual misconduct with a minor prior to the

2 stroke, and the Court has ruled on that issue and said, "Yes,

3 that would open the door to what was your state of mind prior

4 to that."

5     I haven't seen any confusion whatsoever with regard to

6 dates or times.  Yes, you've asked to see an email again, but

7 you certainly have been able to respond to it, to provide

8 answers, and I've been allowing you to provide a complete

9 answer even when some of the questions could be answered more

10 briefly.

11     So the Court sees no evidence that there is a competence

12 issue in this case that either prevents Mr. Sheltra from

13 understanding the charges against him, a rational and factual

14 understanding of those charges and his potential defenses, and

15 no evidence that he is unable to communicate with counsel and

16 assist in his defense, and no evidence that counsel has ignored

17 Mr. Sheltra's issues with regard to whether or not the stroke

18 had an impact on his ability to form the requisite intent in

19 this case.

20     So on that basis, the motion for a mistrial is denied.

21     Let's hear any Rule 29 motions.

22     MR. KAPLAN:  Your Honor, I would move pursuant to

23 Rule 29 for the same reason that I did at the conclusion of the

24 Government's case, articulating the same issues I articulated

25 then.

1          THE COURT:  And any response from Ms. Masterson?

2          MS. MASTERSON:  We would incorporate our response

3    given at the earlier proceeding.

4          THE COURT:  All right.  The Court's rulings also

5    remain the same as there's no new arguments being raised.

6      Since the Court ruled and denied the Rule 29 motion,

7    there's been the following additional evidence:

8      Mr. Sheltra has testified that he believed that Maddie,

9    the undercover agent's daughter, was 10 years old;

10     he understood that ER was 15;

11     he agreed that Ms. Masterson's statement that he was

12   aroused by the depiction of a labia was a reasonable statement;

13     he told people that he was interested in -- with whom he

14   was interested in having sex that he had a vasectomy;

15     he made the same statement to ER;

16     he made several statements about not wanting police to

17   find them, not wanting ER's father to be home.

18     A rational jury could determine that that was

19   consciousness of guilt.

20     He told ER that he would like to "pump her full," and he

21   did so after she explained that her boyfriend did not want to

22   do it.

23     The Government has introduced evidence that the --

24   although Mr. Sheltra has said he was triggered by ER's

25   statements with regard to anal sex, the timing does not work

1  out in terms of previous statements to ER asking for pictures

2  of labia and pussy lips.

3      And finally, there is a series of emails to Person 1 from

4  Mr. Sheltra stating, which he claims was untruthful but the

5  Government has established that other aspects of the messages

6  were truthful, that he engaged in heavy petting with ER and

7  that ER was wet, which he perceived to be a reference to her

8  vaginal secretions in response to arousal.

9      And on that basis, the Court finds that a rational jury

10  could find for the Government beyond a reasonable doubt on each

11  element of the charged offenses, and the motion for judgment as

12  a matter of acquittal is denied.

13      We will come back for closing arguments at 12:30.

14  Anything to bring to my attention after we do so?

15          MS. MASTERSON:  No, your Honor.  Thank you.

16          MR. KAPLAN:  No, your Honor.  Thank you.

17          THE COURT:  All right.

18      (A lunch recess was taken, after which the following was

19  held in open court without the jury present at 12:45 PM.)

20          THE COURT:  We are back on the record in United States

21  of America vs. Randy Sheltra.

22      Anything to bring to my attention before we bring back the

23  jury?

24          MS. MASTERSON:  No.  I just want to apologize to the

25  Court for the delay.  Technical difficulties.  Your Honor's

1  always so gracious in these unfortunate moments, and we do

2  appreciate it.

3          THE COURT:  Don't worry.  They think I can't tell

4  time, so it's all on me.

5      Anything from you, Mr. Kaplan?

6          MR. KAPLAN:  No, your Honor.

7          THE COURT:  All right.  Let's bring back the jury.

8  Thank you, Jamie.

9      (The following was held in open court with the jury

10  present at 12:47 PM.)

11          THE COURT:  Good afternoon, ladies and gentlemen of

12  the jury.  We are back on the record in United States of

13  America vs. Randy Sheltra.

14      We are at the stage in the trial when we have closing

15  arguments.  As always, we begin with the Government.

16          MS. MASTERSON:  Thank you, your Honor.

17      May it please the Court.

18      Counsel.

19      Members of the jury, Randy Sheltra looked up the term

20  "pedophile" on the Internet to make sure that he correctly

21  described himself if he were to have met -- or describe himself

22  when he was to meet with ER, the real 15-year-old girl, for

23  sex.  He wrote, "we live in such a controlling society that if

24  anyone finds out, I'm labeled a perv, a stalker, and pedophile

25  whether our acts are consensual or not."

1      That label that Mr. Sheltra came up with explains a lot.

2  It explains why he chatted over a four-day period with an

3  undercover officer about having sex with her and her

4  10-year-old daughter.  It explains why he showed up to meet

5  with the undercover and the 10-year-old daughter.  It explains

6  why he chatted with Elisha with an E, the real 15-year-old

7  child.  And it explains why he met with her for sex.  It also

8  explains why he asked Elisha, the 15-year-old, for pictures of

9  her genitalia.

10      Ladies and gentlemen, Randy Sheltra is guilty of two

11  counts of attempting to persuade or entice a minor to engage in

12  unlawful sexual contact and attempted receipt of child

13  pornography.

14      Members of the jury, the work of the lawyers is now nearly

15  done except for giving these closing arguments.  Your work as

16  jurors is entering its final stage.  It is where you will find

17  the facts from the evidence presented here in court.  You will

18  apply the law exactly as Judge Reiss will instruct you, and you

19  will then render a verdict of guilty or not guilty without

20  sympathy or prejudice to either side.

21      And this summation is my opportunity, the Government's

22  opportunity, to explain to you and, frankly, to remind you,

23  because a month has gone by, of the evidence that was presented

24  in this case and to show you how that evidence fits within the

25  elements that apply to the offenses that Mr. Sheltra is charged

1 with, and it will show you, this summation, that the Government

2 has met its burden of proof beyond a reasonable doubt as to

3 each and every crime with which he is charged.

4     And I'm going to begin by talking about what are the

5 elements, the things that the Government has to prove to secure

6 convictions on Counts 1 and 2, which is the attempted

7 enticement or persuasion of the minor to engage in unlawful

8 sexual conduct.  Remember, Count 1 relates to the undercover;

9 Count 2 relates to Elisha with an E.  The count -- the elements

10 are the same for both, so I'm going to go over them right now.

11     May I ask to begin?

12     The elements for Counts 1 and 2, the first element is the

13 Government must prove that the defendant knowingly attempted to

14 persuade, induce, entice, or coerce a person to engage in

15 sexual activity, that the person did so; and, element two,

16 using a facility or means of interstate or foreign commerce.

17     Liza.

18     The third element is that the defendant believed that the

19 person he was attempting to induce or persuade to have sex was

20 less than 18 years old, and the last element is that the sexual

21 activity that they would have engaged in would have been a

22 criminal offense.

23     And let's review the evidence relating to the first

24 element of Count 1, the one involving the undercover.

25     In this, as we just heard, we have to prove that the

1  defendant knowingly attempted to persuade, induce, entice, or

2  coerce a person to engage in sexual activity, and we have to

3  prove the individual, the defendant, had the specific intent to

4  persuade.  The Court is going to instruct you that the law

5  criminalizes when an individual talks to someone in a position

6  of authority or control over the minor.  The communications

7  don't have to always be directly with the minor the way they

8  were with Elisha.  The law criminalizes when you go -- when

9  someone in the defendant's shoes talks to the mother about

10 getting the child into having this unlawful sexual activity.

11      Now, the big question is -- really the issue in the case

12 is, What was Mr. Sheltra's intent?  How did he go about

13 attempting to persuade the minor?  And it's an attempt because

14 it never could have happened.  The -- there was no 10-year-old.

15 Maddie, the 10-year-old, doesn't exist.  So it's an attempt

16 because it was never -- it could not have been completed.  And

17 we'll talk later about the meaning of "attempt" in this

18 context.

19      But the question is, How did Mr. Sheltra go about

20 persuading the undercover, Meg, to get her daughter to have sex

21 with him?  And he did what I'm going to call grooming behavior.

22 Grooming behavior is where an individual tries to convince

23 someone to do what they want them to.  They are trying to --

24 Mr. Sheltra -- I mean, he worked hard with Meg.  He -- he

25 presented as a trusted confidant:  Tell me all of your deepest,

darkest secrets.  You can trust me.  We're on a shared journey

together.  We're in this together.  It's all about Maddie.

She's going to have orgasms.  It's going to be pleasurable.

It's going to be fine.  You know, you need to help me.  We're

doing this all for Maddie.  Help me not get in trouble.  Make

sure she knows that whatever she's taught in school doesn't

apply here.  This is actually okay.  The other stuff's bad.

He was trying very hard to persuade her that this was okay

and to get her on board, and you'll see -- we're going to go

through the evidence fairly detailed where you will see exactly

what I call the grooming behavior that he employed.  And it was

in -- it was in the emails, really.

And Mr. Sheltra was quite deliberative and calculating in

how he went about it.

Next email -- next slide.

In the very first email, this is the one where the

undercover responded to the "Looking for Alisha" Craigslist

post, and she wrote simply, "Did you find Alisha?  I'm not her,

but you've peaked my interest.  Alisha and I might have

something in common."  Because remember the Craigslist post

talked about a "specific taboo kink."  But keep in mind she

didn't say, "Ooh, my taboo kink is kids."  She just said we

"might have something in common."

Next slide, please.

Mr. Sheltra's response was quite something.  He wrote, "I

haven't found her, but you have definitely spurred my interest
and have my total attention."  He's telling her with that
language, You are important.  I want to talk to you.  You are
something special, and I -- I mean, he even said, you know,
"Please tell me about you and your situation."  He's trying to
pull her out.  He's interested, and he wants to know more.
And, of course, in this, you know, Mr. Sheltra mentioned that
he was D&D free, drug and disease free, which he told you
that's what it means, he's a nonsmoker, and he has had a
vasectomy because, you know, that's what he told everybody he
wanted to have sex with.

In the next email from the undercover, she wrote, "Well, I
have a ten year old daughter, so that sounds pretty similar to
Alisha."  And she also mentioned that she has some taboo
interests herself.  And that's it.  All right?  So remember
when -- the questions about the frustration about, you know,
what is a good undercover supposed to do?  She's not giving him
anything to work with.  It's "I have a daughter."  "Oh, you've
got a daughter."  "You know, I have a taboo interest."  It's
going to develop where he's going to take her agreement and
he's going to layer on to it.  And all she said here was, "I
have some taboo interests myself."

In the next email from Mr. Sheltra, the next email, guess
what.  "I'm hard as I write this."  He's already sexually
aroused, and he's defining in that email this is all about sex.

1  While she's important and I want to know about you and I want

2  to hear about you, no.  He's got an erection.  He's hard.  This

3  is all about sex, and he's announcing that right off the bat.

4      He's also then taking time to tell her about Alisha.

5  "Alisha had been very open *[sic]* with men, and other things for

6  that matter, about her daughter."  Then he said -- I did clear

7  it.  Then he wrote at the bottom, "And let me just put it this

8  way, if there were no laws and no public judgment, what would

9  be your wildest fantasy?"

10      In this statement Mr. Sheltra's presenting himself as a

11  trusted confidant.  You can tell me what it is and -- because

12  I'm interested.  Remember, he's already said you're important,

13  and I want -- and we're having a conversation about sex, and I

14  want to know what's your wildest fantasy.  Let me know all --

15  it's a good place for us to begin.  All bets are off, just

16  bring it and it will be fine.  That's what he's telling her

17  there.  He's grooming her there.

18      And here's another incredibly important point:  There will

19  be no public judgment.  He's saying that this is -- this is a

20  safe place.  If your taboo kinks are really, like, off the

21  chart -- I mean, we know a lot of this stuff about Alisha with

22  an A, that was pretty interesting, and -- but no judgments.

23  This is a judgment-free zone, so tell me what it is you want to

24  do.

25      The next email that the undercover wrote was simply this:

"Alisha is much further along in this type of situation than I
am.  My daughter has seen some things."  And "The perception of
public judgment is strong though and difficult to get past."

She's not giving him much.  She hooked on to the word
about public judgments in his email and puts it back in as
something that's a concern but doesn't expand on it.  This is
good training.  Good -- good undercover work, because she's
not -- she's taking his lead and just adding to it a little
bit.

Things are starting to get interesting now, because in
this email from Mr. Sheltra -- remember, this is all still on
the first night that they began talking.  Mr. Sheltra wrote
that "Alisha herself had been sexually active since she was 9."
And he shared that because he's okay with that, and he's
telling her we're okay with that.  You know, there's no
judgment.  Not like, "Oh, my God, that poor kid was getting
raped at 9."  He's saying she was "sexually active at 9."  No
big deal.

Then another part is he said, "So Alisha had been raised
in very much the same way that she was choosing to raise her
daughter."  So Alisha, sex at 9; Alisha's daughter, sex at 9,
he's okay.  And this use of the word "choosing" is critical
here, because he's presenting that as if it's an okay choice.
I mean, the law criminalizes sex with minors, and he's saying
that it's actually a legit choice.  Don't worry about it.  It's

1  okay.

2      What he's doing with referring to sex with a minor as an

3  okay choice is he's normalizing that behavior also.  It's okay

4  to -- sex at 9, it may be deviant, but it's okay with me.  It's

5  okay.

6      He also wrote, "We happen to live in a very judgemental

7  society right now."  Society is the problem.  What we're doing

8  is fine; society is the problem.  Again, normalizing this

9  deviant behavior.

10      He was curious if Meg's daughter had questions about

11  things, because remember Meg had said that her daughter was

12  kind of aware of things, she had been introduced, and so

13  he's -- Mr. Sheltra's asking, "So, your daughter has seen some

14  things ... how did she react?  Did she comment or ask questions

15  about it?  I'm hard again, thinking about it ..."  He's

16  sexually aroused thinking about the fact that a 10-year-old

17  girl would be having an informed dialogue with her mother about

18  sex?  Like seriously?

19      The big question here comes here -- in this email comes

20  here:  "Where would you like to take this - how far would you

21  like to go?  Ultimately, do you see the 3 of us all sharing or

22  participating?"  He's proposing that the three of them get

23  together for sex.  He's taken it all the way through.  And

24  remember, Meg is not going there.  She didn't introduce this.

25  This is the first time that sex with the three of them is

1 brought up, and it's Mr. Sheltra who did it, and he's hard as

2 he's writing this.  He's visualizing this, and he's okay with

3 that.

4      He also wrote at the bottom, "And I understand the guts it

5 took to reply to my post."

6      Again, he's presenting as the trusted confidant.  I know

7 you may be nervous about this, but you can trust me.  I -- I

8 understand that this might be hard, but you're okay -- it's

9 okay to share.  We're in this thing together.  "I understand

10 the fluttering in your breath, and probably the wetness you

11 were feeling at the thought of knowing where it might lead.

12 Fuck, it's hot."  He's excited by this, and he's telling her

13 I'm with you.  We're -- we're partners on this; it's okay.

14      And think back for just a moment to the testimony that Mr.

15 Sheltra gave in this trial where he did say that he wanted to

16 present himself as a trusted confidant to the undercover in

17 their communications, and that's consistent with what he was

18 doing here when he was grooming her -- grooming the mother so

19 that he could have sex with the daughter.

20      Here's another email from Mr. Sheltra, but this one is --

21 now he's -- when we are at this point, now it's 2:37 in the

22 afternoon on Friday, the second day that they're communicating,

23 and now he asks, Ooh, are you a cop?  He's concerned about that

24 where he said, "Are you a police officer?  Are you affiliated

25 with law enforcement in any way?  I just need to know your

answers to these specific questions ...  I'll reply once you

answer truthfully."  Because he wants to make sure that he's

not going to get in trouble for this conduct.

     This is called consciousness of guilt.  He knows he's

doing something illegal.  He's worried that he's talking to a

cop, and he wants to make sure that he won't get in trouble,

because if you're not a cop, then I'm not going to get in

trouble if this happens.  I'm not going to get arrested or --

or anything.

     And think also that this is actually a theme with Mr.

Sheltra during all the communications that you -- that you

read.  He asked everybody.  He asked Alisha with an A are you a

cop, and she said no, and he asked her if she was a cop when he

was in the middle of talking to her about sex with her and her

9-year-old daughter.

     He asked Elisha R., ER, the real 15-year-old, if she was a

cop because he knows -- and he actually -- in their emails he

said that he knew about the age of consent.  There was that

email about that.  But he wants to know if she's a cop, because

if she's not a cop, we can keep going, but if she's a cop,

things might not work out well for me; I won't do this.  This

is consciousness of guilt.

     Everybody denied being a cop.  Alisha with an A said no,

I'm not a cop.  Off they go.  And then he kept on looking for

Alisha with an A for over a year and led to the Craigslist

1  post.

2       The undercover said she's not a cop because that is

3  appropriate law enforcement activity when conducting an

4  undercover operation like this.

5       Elisha R., the 15-year-old, she's not a cop.  She's 15.

6  Really 15.

7       Then the next -- 12 minutes after Mr. Sheltra emailed the

8  undercover and asked her if she was a cop, he then wrote to her

9  and said, "I'm not a cop, hun.  I just don't want to say or

10 express myself in a way that might incriminate myself if you

11 are a member of law enforcement.  I hope you understand.

12 Randy."

13      When he -- I mean, here's the question:  Why did he tell

14 her he's not a cop?  Because he wanted her to trust him.  You,

15 Meg, the undercover, are not going to get in trouble if you

16 talk to me.  I'm safe, so let's keep going.  Trusted confidant.

17 They're on this journey together.  It's deviant but normal.

18 Society's the problem, and he's not a cop; she's safe with him.

19      That's, again, more evidence of the consciousness of guilt

20 that Mr. Sheltra displayed during the course of these

21 communications.  He knew someone could get in trouble, could

22 get arrested, for what they were doing, and he was assuring the

23 undercover you're not going to get in trouble because of me and

24 probably hoped against hope that she wasn't law enforcement.

25      After the undercover assured him that she was not a cop,

he wrote this: "I want this to go exactly how you, and after considerable interaction, you and your daughter want it to go, hun." In this sentence, he's empowering the undercover. He's saying to the mom, You're in charge.

There's a whole lot of chatter in this. You know, "I will never take the lead with her." You, mom, are in charge. She has control over what I do with the daughter. If she has control and he's given it to her, then -- and she can trust him, then he's going to get to do what he wants, all right? So he's empowering her. He's grooming her, persuading her to get access to her 10-year-old daughter for sex by telling her that she's in control, she's in charge.

But let's look at this also: "after considerable interaction, where you and your daughter want it to go," like a 10-year-old should have a voice about sex at all, much less her own sexual activity with a 55-year-old man? A 10-year-old gets that power? Ten-year-olds don't even get to go home after school without supervision, and now it's okay, she gets to have a voice in her sexual activity? But that's all about Meg has power, and he's also presenting the illusion that the 10-year-old has power also over him so that he's going to do what they say.

Now, Meg sent him a picture and he wrote, "Thank you. You're adorable." When he's telling her "you're adorable," that's more grooming. Oh, you're adorable. I am interested in

you.  I'm attracted to you, and it's all catering to her,
wanting to ingratiate himself into -- with her, get into her
good graces.  It's all part of this grooming process in telling
her "You're adorable."  Here he said, "you're very attractive,
and I look forward to getting to know you.  At great length.
That we also share an incredibly intimate connection is an
amazing bonus."

        That statement, again, is we're in this thing together,
people.  You and I, Meg, we share this taboo kink, you've got
the daughter, and you can trust me.  This is more ways of him
wanting to cozy up to Meg so that she will trust him and let
him at her daughter.

        Lastly, he wrote, "Wanna meet soon?"  That's the first
time that a meeting was suggested.  Mr. Sheltra introduced that
concept.  It wasn't the undercover.  The undercover was sitting
back and waiting to see what he did, keeping the conversation
going to see where it would lead.  Whatever path it was that he
was going to take them on, he was in charge, and he said,
"Wanna meet soon," actually.  He was very interested.

        And, you know, here's another one.  Here's the -- right
there is the smiley face symbol.  Oh, kind of cute.  We're
using that.  But he's interested, and here's something else
compelling:  "XOXO."  Hugs and kisses.  Now we're taking this
to a different emotional level.  Now there's -- not only is
there a shared taboo but now he's feeling -- he's got feelings

1 for her too.  This is insidious and persistent and so

2 multifaceted what he was doing there, adding all of these

3 things.  Now there's love and emotional connection when really

4 he just wanted the 10-year-old.

5      The undercover sent him a -- an email after that last one

6 and wrote, "I just want you to be in control of the situation."

7 That's good undercover work.  Remember, she's not supposed to

8 be the aggressor, the initiator.  She wants him to be in

9 control, and he was fine with that.  He did that.  She wrote,

10 "I'm glad that me (and mostly Maddie)" - it's mostly Maddie;

11 she was absolutely correct about that - "are what you're

12 looking for!"  And "I do want to meet."

13      Now that he's proposed a meeting, she can agree.  He

14 started it.  She followed up saying okay, we can meet.  She's

15 law enforcement.  Let's see where this is going to go.  Sure,

16 we'll meet.  That's what's happening in this email.

17      Here's another one from Mr. Sheltra sent on Friday,

18 September 8th, at 5:43, where he wrote, "I want to be clear, it

19 is you that is the underlying force of my attention *[sic]*."

20 He's grooming her.  Meg is the important one.  She's the one

21 that is the focus of his attention, and she is doing what he

22 wants.

23      But, ladies and gentlemen, that's not the case.  That's

24 not him announcing forever like, Oh, no, it's really -- I was

25 interested in Meg always and I had no interest whatsoever in

1  the daughter.  That's not what this says.  This is him grooming

2  her and trying to persuade her to make -- to trust him and give

3  him what he wants.  She's in control, and he wants her

4  daughter.  And so by saying that, "you are the underlying force

5  of my attraction," it's all part of his persistent effort to

6  convince the mom to let the daughter be -- have sex with him.

7      Again, he mentioned "our very unique connection."  Again,

8  we're on this journey together.  You and me, we got a special

9  bond, a secret bond.  Don't tell anybody about it.  We'll get

10  to that later when he talks about that.  But there's a "very

11  unique connection."  He's repeating that theme from earlier.

12      And here's another bit:  "Coaching her to tell me what she

13  likes and what feels best for her."  He's putting Meg in

14  charge.  Again, you are telling her how to respond here.  But

15  again, let's not forget, that's a 10-year-old.  A 10-year-old.

16  What does she want when she's having sex with a 55-year-old

17  person?  But he's putting Meg in charge of this.

18      And again, here's more:  "In doing so, you will be

19  teaching her how to take control of her own pleasure when she

20  is with a man."  So Meg now is -- not only is she the loving

21  mother; she's now the teacher of her daughter, and we'll see

22  that again, but she's going to teach her how to respond and how

23  to react in these moments.

24      This does begin where Mr. Sheltra gets explicit about the

25  sexual acts that he wants to perform on the undercover but,

1   more importantly, on Maddie, the 10-year-old.  And he wrote, "I
2   like that you're aroused at the thought of my mouth on her.  I
3   am hard thinking about kissing you while a taste of her is on
4   my lips.  Mmmmmm.  Amazing.  Delicious."  Now we're going into
5   some sex talk.  It will get -- well, you heard it.  It will get
6   a lot more pronounced later on, but it's going to -- it's going
7   to expand, but it's all -- right now it's still tethered with
8   the mother, and, you know, the mom is in charge.

9        This email is from the undercover where she, again, like a
10  good undercover, is repeating what it is.  She wrote, "The
11  things you said, bringing her pleasure with your mouth while I
12  hold her, is that what you hope to do when we meet?  I can't
13  think of a better teacher for my Maddie" than you.

14       She used the words from Mr. Sheltra.  It's like here's an
15  expression, and then she repeated it in the email to keep the
16  conversation going, just like she was trained.  Continuing that
17  discussion to see where it would lead.

18       This is an email from Mr. Sheltra to the undercover where
19  now we're focusing in on what is going to happen to Maddie when
20  this happens.  Because, I mean, Meg's agreed to meet, thinking
21  that we're going to meet, and now we're talking about teaching,
22  and now Mr. Sheltra's starting to talk about what's the
23  experience that the child is going to have when they are
24  engaged in this sexual activity.

25       And so he's starting to work on this:  We need to ensure

1  that "from the outset we act in a way that will be completely

2  beneficial to Maddie and you, without causing consequences that

3  are currently unforeseen and unintended."  We are not going to

4  hurt Maddie.  This is what he's telling her.  We're not going

5  to hurt Maddie.  We want to make sure that she's going to stay

6  fine with this and it's going to be beneficial to her.  That's

7  the focus of that.

8      Now, here he talks about "You are the head of your

9  household."  Meg is in charge.  Not me.  Not Mr. Sheltra.  Meg.

10 "You are the head of your household.  You are an attractive

11 young woman."  Again, talking to her about how he feels about

12 her and how he views her and how she is sexually attractive to

13 him.  He's working hard here, ladies and gentlemen.  "Household

14 rules must stay intact and consistent.  This is for the well

15 being of Maddie and you.  Maddie relies on these rules being in

16 place, for her security and stability.  This is her moral

17 reference in life."  Morals?  Okay.  I'll just leave it there.

18 "Her moral reference in life.  We need to be sensitive to this

19 fact."

20     Again, it's all about Maddie.  Maddie's going to be okay,

21 because we're going to make sure she's fine, even though if a

22 55-year-old man has sex with a 10-year-old, that's a criminal

23 act.  That's a violation of -- of state law, as you will hear

24 in a little bit.

25     Again, there was more in here:  "We need to do this for

the well being of you, Maddie, and your family unit."  And when
he's talking about this, it is -- not only is Maddie going to
be okay, because we're not going to hurt her, we're not going
to do anything bad that might harm her, he's normalizing this
sex.  It's like, oh, yeah, no, Maddie, we'll just have sex with
Maddie.  Normalizing this deviant behavior, this criminal
behavior, he's making it okay for the mom so she'll be okay and
give her daughter to him, even if she's there holding her hand,
as he wrote.

Here he wrote, "We need to maintain the safety of her home
for her."  Again, it's all about Maddie.  It's going to be
okay.  She needs to see, and he wrote, "This is not someone
taking advantage of someone, or making someone do something
that they don't want to do.  This is just part of growing up
with a very loving and caring mom, who wants what's best for
her daughter."  Meg is in charge.  She loves her.  This is a
good thing.  It's a good thing to introduce your 10-year-old
daughter to sex with a 55-year-old man.  It's okay.

Normalizing the deviant behavior, grooming Maddie,
encouraging her to -- I'm sorry, grooming Meg to get at Maddie.
It's all -- see, this is all consistent with the pattern that
we discussed at the outset.

Now, on this one, this email from Mr. Sheltra, again he
wrote up here at the top, "And I'm so glad we will be taking
this journey together."  A shared secret, a shared journey

1  among the two of them.

2       And he's starting in this email -- or he's continuing in

3  this email his efforts on how to explain to Maddie and get her

4  on board, because this is a pretty big thing.  I mean, let's

5  remember that he references the fact that she's learned about

6  stuff in school.  School is already teaching her about good

7  touch/bad touch and all that.  That's already started.  So he's

8  aware, like ooh, I've got some -- there's some barriers built

9  up that are societally driven, externally driven, through

10 school and then Meg, so he's worked on breaking down Meg's

11 resistance, to the extent she had any, to involving her child

12 in this sexual activity, and he has to deal with school later,

13 and he will.

14      And so here he writes, "How do you feel about increasing

15 your discussions with her regarding sexual intimacy? ... we

16 need to bridge this to the point that she is aware that what

17 we're doing is good for her, and a natural part of growing up."

18 Then here's the school bit.  "That when programs at school

19 discuss sexual abuse, this is not what they're referring to."

20 No.  This is not.  "We want her to recognize a dangerous

21 situation."

22      Because let's remember, I mean, remember, he cares about

23 Maddie, we're going to be okay, and he's saying no, there are

24 dangerous situations out there.  We've got to make sure she

25 knows when to recognize what those are, but guess what, this

isn't, okay, because, you know, I'm a good guy and I care about you and Maddie and all that other stuff, so he's starting -- he has to address the external factors, forces, that condemn this behavior, and school is one of them.

We want her to realize the difference between a dangerous situation and ours, and ours is okay. "I don't want anything to interrupt your family environment." And then here's the kicker: "and I also don't want anyone to try to put me in jail." Because this is, again, consciousness of guilt. He knows, uh-oh, I could get in trouble for this, so he still needs to work on Meg to make sure that she doesn't -- even though she's not a cop, that she holds his confidence. He's working so hard on that. But he knows, uh-oh, I could still go to jail for this. And then here's a kicker: "I assume that together, with your guidance this will not be an issue."

He's telling her in that, You need to talk to Maddie right away, because once we get started down this path, we have to -- you have to -- as the mother, you have to give her the guidance so that she accepts this as acceptable behavior and doesn't tell anybody at school or other- -- somehow otherwise get him in trouble. So he's now involving Meg in the cover-up of what it is they're doing to make sure that Maddie, a 10-year-old kid, doesn't accidentally spill the beans about what's happening to her.

He also goes on to say, "We'll answer any questions she

1  has," because we're concerned and we want to take care of her,

2  and so, you know, she's got a voice - she's 10, but she's got a

3  voice - we'll listen to that, and we'll "explain what all this

4  means for her and her young body."

5      Here comes the sex talk:  "I'll then proceed slowly to

6  position her so that I can tongue her young labia and stimulate

7  her clit with my lips and tongue.  I am so looking forward to"

8  it.  He also wrote, "I am so looking forward to you being there

9  as I do this.  As we urge her to describe what she likes" - a

10 10-year-old? - "and work with me to increase the pleasure she's

11 feeling."

12     Because remember, this is not rape.  This is enjoyable.

13 She's going to have an orgasm.  Remember, later you'll see

14 where he Googled at what age can a kid -- or can a girl orgasm,

15 because he wanted -- you know, this is all part -- like, it's

16 not going to be a nightmare for her because she's going to

17 experience the physical pleasure by this sex act.  So he wants

18 "to feel her cum in my mouth Babe.  I want to suck on her

19 beautiful little pussy as she quivers in the pleasure of

20 orgasm.  Mmmmmmm."

21     Now, let's just remember one thing.  When he talks about

22 tonguing her young labia, that's not for Maddie.  He may write

23 it in a form that it's for Maddie.  That's not for Maddie.

24 That's for Mr. Sheltra.  That's his favorite body part, his

25 favorite action.  That's for him.  He wants to do that under

1 the guise of pretending like it's for Maddie and her physical

2 pleasure.  No.  That's not -- I submit to you that is not the

3 case.  And all of this focuses in on pleasure to the child, the

4 physical pleasure that she will experience by having sex with

5 Maddie -- I'm sorry, with Mr. Sheltra.

6      And here's something else:  "In the interest of honesty,

7 how are you going to react if she wants to go further?  If she

8 wants to feel me inside her?"  There's not a peep in that about

9 having an adult male penis in the vagina of a 10-year-old, how

10 that's not going to be pleasurable.  I submit to you that that

11 is going to be painful.  So he doesn't talk about the pain.

12 He's still focusing in on the pleasure that Maddie is going to

13 experience by the sex act.  There's nothing in there about that

14 pain that she would feel if she were being penetrated by his

15 penis.

16      And here, "Babe.  I will follow your lead here.  If you

17 don't want penetration, it won't happen.  You know her, and

18 probably know what to expect from her.  What we don't want is

19 for her to gain experience to go seek penetration somewhere

20 else."

21      This is actually consistent with everything else that Mr.

22 Sheltra has -- a lot of what he did here is he said, "Something

23 else for us to discuss" about the vaginal penetration, and then

24 he said, "I think I've told you I've had a vasectomy, so that's

25 not a worry either way Hun," with a heart emoji -- or a heart

1 symbol.  Because remember, he told people that he had a

2 vasectomy when he was interested in having sex with them.

3         And so what is also interesting about this is, I mean,

4 he's contemplating by this that he is going to have sex --

5 have -- he's going to use his penis and vaginally penetrate a

6 10-year-old and he's going to ejaculate inside that child, but

7 don't worry, I won't hurt her by getting her pregnant if she

8 could.  That's what's happening there.  Again, it's okay for

9 the child, but, I mean, he's contemplating that in this.

10 That's the end game that he's working so hard toward with all

11 of the grooming language that he's using.

12         "I'll follow your lead here."  Again, Meg is in charge.

13         And here's one last bit:  "Lovingly, Randy" is how he

14 signed this email.  Again, now we're introducing an emotional

15 connection.  We had "XOXO."  Now we've got "Lovingly."  So

16 there's the physical, all of this stuff, and again, now I'm

17 lovingly feeling towards you, and this is two days after they

18 met, but he thinks that she's going to let him have sex with

19 her daughter, so he writes "Lovingly" to encourage her down

20 that path.

21         In this next email from Mr. Sheltra, he was still

22 concerned about getting caught, where he wrote, and again, this

23 is the consciousness of guilt, "I would say that, like you" --

24 what is the part that I find most challenging?  "I would say

25 that, like you, its the exposure.  If we were to fail at

1  keeping this private and contained, the consequences would be

2  extreme for something that is in no way, bad or unhealthy."

3      Consciousness of guilt.  Uh-oh.  So he doesn't want -- he

4  doesn't want their dirty little secret to be revealed because

5  the consequences would be extreme.  He could get prosecuted for

6  that.  And he's normalizing the behavior.  This sex with a

7  minor is something that is in no way bad or unhealthy.  He's

8  making this behavior okay for her.

9      And he needs -- again, he needs Meg's help to keep Maddie

10  on board:  "We need to ensure Maddie knows this is okay.  And

11  that it is different from the things discussed in school,"

12  because we've got -- again, there's bad guys out there, but I'm

13  not one of them.  She's got to learn the difference.  And he

14  needs Meg's help to convince Maddie that it's okay.

15      And he goes back to -- to Meg again where he writes --

16  well, and here, you know, "That is the most challenging part.

17  The next challenge is reading you."  Good work by the

18  undercover, right?  He can't figure her out because she's just

19  taking what he gives her and keeping the conversation going.

20  But "I want to fulfill your desires on multiple levels.  I want

21  to be something better than you are accustomed to personally,

22  and I want to be what you are seeking (and more) for Maddie."

23      He recognized or assumed that there was a void in Meg's

24  life that needed to be filled where he's writing, "I want to

25  fulfill your desires and I want to be something better than you

are accustomed to."  He wants to be that good guy.  Not only

now can you trust me and it's all going to be fine and Maddie's

not going to be hurt or anything like that; now it's, oh, and,

Meg, I'm going to be there for you.  Yeah.  It's all part of

the grooming process.  Because he wanted to have sex with

Maddie.

     Another thing is he wrote, "the situation is such that you

understandably have found it difficult to share what you are

feeling."  Again, good work by the undercover, right?  She's

not giving him much, so this is good work by the undercover.

She was being reserved, as she should have been.  He controlled

the direction and the content of their dialogue.

     He responded to an email from Meg and wrote -- and this is

all when they're starting to think about setting up the

meeting.  And Meg had proposed something, and he's like,

"Mmmmmmm.  Sounds good to me.  Public first is fine."  And

then, "I'm sure it will take a little time for Maddie to warm

up to me, and we want things to unfold casually and naturally,"

with a heart symbol, because apparently he's telling her sex

with an adult man, 55-year-old man, and a 10-year-old is

natural.  That's what he's writing there.

     And here he starts talking about -- this dialogue talks

about -- now we're talking about the sex that he wants to have.

"With clothes 90 to 100 percent off, we begin with group

snuggling and touching/exploring.  Then, we get a little more

1  focused on Maddie.  I will make myself completely accessible to

2  her and see where her curiosities take us."  A 10-year-old's

3  sexual curiosities.  "She will be getting the majority of my

4  attention at that point, as I caress her and stimulate

5  (licking/sucking) her nipples, along with her labia" - there's

6  that word again - "and other erogenous zones.  Though much

7  focus will be on her, you will be a constant reference for her,

8  and I will also spend time on your nipples and labia.  If she's

9  comfortable touching and exploring me, we'll give that priority

10  as well," because that totally inures to his benefit, and

11  "along with lots of discussion throughout.  I'm thinking her

12  interest in me may come once I've given her lots of focus and

13  hopefully we've brought her to orgasm at least once.  She may

14  be curious about my anatomy at that point.  Has she ever

15  orgasmed that you know?"

16      So in this email, he's now talking about actual sex,

17  what's going to happen when the three of them are in that

18  bedroom, and he's presenting it in a way that would make it

19  appear to the mother that it's going to be fine; Maddie's going

20  to enjoy herself; she's going to reach orgasm; I'm not going to

21  forget about you, Mom.  He's normalizing this situation and

22  making it seem as attractive and appealing as possible.  He's

23  doing -- describing this about sex with a 10-year-old.

24  Emphasizing the pleasure to the child.

25      He cautioned, though, that if Maddie had not orgasmed --

1  or if she has not orgasmed before, "it will likely take a lot
2  of focus and both oral and manual stimulation."  But he's just
3  the guy to take care of that for her.  "That will be a big
4  win."  We'll all celebrate when Maddie reaches orgasm at the
5  age of 10 having sex with a 55-year-old.  "Mmmmmm."  And "If
6  we're struggling to get her off, then maybe we shift focus to
7  you, and show her how it's done ... Mmmmmm.  I love the thought
8  of both of you cumming for me."
9        Now, here -- so this, again, it's all pleasurable
10 experience for her.  He wrote here, "Options to this (in my
11 mind) include bath time for her ... before or after.  I'm sure
12 she's sanitary to begin with."
13       Mr. Shel- -- I asked Mr. Sheltra this afternoon about him
14 taking showers before he met with anybody.  Remember he took a
15 shower before he left to meet with Elisha, the 15-year-old, at,
16 what was it, like 1 o'clock -- 12:30, 1 o'clock in the morning,
17 before he's going to drive two hours to go meet up with a
18 15-year-old; he showered again before he left to go meet with
19 the actual 15-year-old; and he showered before he left to meet
20 Meg and Maddie at the Whales' Tails.  Bathing and cleanliness
21 and sex and Mr. Sheltra go together.  I submit to you that -- I
22 mean, here we see it again:  Maddie needs to take a bath
23 because when he wants to have sex with somebody, he wants
24 people to be clean.
25       This is not -- wanting her to take a bath, again, isn't --

1  that isn't about Maddie, and that's not about Meg.  That's

2  about what he wants, and so let's not forget that what he wants

3  runs all the way through this.  It's actually everything to

4  this, about what he wants, and he wants this girl to be clean

5  before he has sex with her.  His needs need to be met, and he's

6  pretty skilled at not articulating them in a way that make it

7  seem like he is -- it's all about -- this whole dialogue is all

8  about what he wants, which is why -- you know, while I'm

9  attempting to get Maddie to orgasm by tonguing her labia,

10  that's not about Maddie.  That's his need.  That's what he

11  wants.  And again, we see it here with the bath.  It's what he

12  wants.

13      In this email from Mr. Sheltra, again, there's a lot of

14  things going on.  The "fluttering in the chest" thing, this

15  is -- you know, this is kind of a forbidden thing, and so when

16  he says it's "becoming the norm for me," the fluttering in the

17  chest, like, there's a lot of excitement going on and there's a

18  lot of uh-oh, this is illegal, but it's okay, it's going to

19  happen, this is great, and then he writes, "I'm curious if you

20  have masturbated imagining the 3 of us playing together.  It is

21  so exciting to me, I have gotten off several times thinking

22  about it."

23      So he's telling Meg and you, ladies and gentlemen, that he

24  is sexually excited by the thought of the sex with the mother

25  and her child.  In fact, he's masturbated to orgasm or

1  masturbated to ejaculation several times thinking about just

2  that.  And interestingly, he also wrote, "I'm not going to jerk

3  off when I get home though - I want to save it."

4       And look at this.  This email was sent on September 10th

5  at 5:08 AM.  That's the day of the meet.  He had to work all

6  night, and apparently he was still at work.  He told us that on

7  cross that he was at work when he writes this email about sex

8  with a 10-year-old.  But he said, "I'm not going to jerk off

9  when I get home ...  I'm going to save it."  He wanted to save

10  it for Maddie.  He wanted to save his ability to have that sex

11  for when it mattered.  He wasn't going to waste it by just

12  masturbating.

13       And here's where the -- again, the question about can a

14  minor have an orgasm, and he helpfully Googled it, and he told

15  Meg, "and I googled it to make sure, but girls can orgasm at

16  any age."  Which is helpful because we're not going to waste

17  our time, Maddie should be able to have an orgasm by all the

18  beautiful and loving things that we're going to do to her, so

19  we're good.  Let's -- you know, it's okay.

20       And remember, you saw in, I think it was, Exhibit --

21  Exhibit 34, 35, or 36 that there's the Google search where he

22  looked up the definition of a "pedophile" -- or, I'm sorry,

23  that was a different one, but he looked at -- he Googled on the

24  night of September 10th "when can girls orgasm."  You've got

25  that in front of you.  So this is true.  He did that because he

1  wanted to make sure that he was accurate when he was working

2  the mother to get to the daughter so the daughter could have

3  this pleasurable experience having sex with him.

4        It's Exhibit 35 in my note.  It's the Google search for

5  when it's -- as to when a girl can orgasm.

6        Oh, can you go back a slide, please.

7        Look how he signed this one too:  "Lots of Love, Randy,"

8  with a heart symbol.  So he's really laying on thick the

9  emotional connection that he's -- the deep feelings that he's

10 feeling for her as we're getting closer to the meet.

11       This is one of the final emails from Mr. Sheltra:  "Good

12 morning, my love.  I'm home, and getting ready to sleep for a

13 while.  I can't begin to tell you how much you're on my

14 mind ...

15       "I hope you have a great morning, and you want to see me

16 half as much as I want to see you," with a heart symbol -- a

17 heart emoji.

18       "This afternoon can't come soon enough for me Babe.

19 Mmmmmm.  Love, Randy."

20       He's laying on the emotional connection as part of the

21 persuasion to get Meg to make Maddie available to him for sex.

22       Now, after -- or just stop.  Can you take that off,

23 please.

24       After this email, we know that Mr. Sheltra took a nap --

25 or slept, he got up, he showered, he got in the car, and he

1  drove to South Burlington to the Whales' Tails to meet Maddie

2  and Meg.  The Government has proven beyond a reasonable doubt,

3  as we just saw, Element 1 of Count 1 of the indictment, the one

4  that involves the undercover, that Mr. Sheltra intended to

5  induce, persuade -- or persuade a person to have a minor engage

6  in illegal sexual activity.  We're all done with that one.

7       Now, the second -- now we're going to turn our attention

8  to the same analysis as what steps did Mr. Sheltra take to --

9  to persuade, induce, entice, and groom Elisha R., ER, the real

10 15-year-old.  And again, the element here, just for a quick

11 repeat, is that he knowingly attempted to persuade, induce,

12 entice, coerce a person to engage in sexual activity, and

13 again, he had the specific intent to persuade ER.

14      And one side note about the instructions.  To the extent

15 that anything you understand from me -- not conflict, but the

16 words that Judge Reiss will use when she instructs you control

17 the law.  I've copied this from the jury instructions, but

18 never forget that the judge's instructions as to the law are

19 what applies, and that is what you need to follow.

20      So what steps did Mr. Sheltra take to persuade ER to

21 engage in sexual activity?  And again, let's go right to the

22 communications.  This is the initial email from Elisha to Mr.

23 Sheltra where she writes, "My name is Elisha.  I am going to

24 soon be 16 ...  I also have a very high libido."  She also

25 loves animals, art, and children.

1    Mr. Sheltra responded, and the words he used are quite
2  deliberate:  "You sound like a very independent young lady, and
3  I'm sure you're quite amazing."  He's catering to her.  He's
4  talking to her in a way that would lead her to believe that he
5  thinks well of her, that he's impressed by her, and that she is
6  quite amazing, like she could be fabulous, and he's telling her
7  that because he wants to have this communication.  Remember,
8  he's, you know, looking for a younger person.  We know from the
9  communications with Alisha with an A and the undercover that he
10 is interested in sex with minors.
11    So he gets a flirty little text from a 15-year-old.  He
12 doesn't say, "You should get some help.  What are you doing?"
13 He did say, I don't know, "why are you cruising a site like
14 Craigslist?"  He should have said "cruising a site like the
15 personals section of Craigslist," because Craigslist has a
16 whole lot of other different means.  But he doesn't say that.
17 Or "Go to bed" because it was 11 o'clock at night.  He says,
18 "You're a very independent young lady and you sound quite
19 amazing."  So he's trying to engage her and coming at her with
20 positive feelings that she's somebody that he's interested in.
21 He's attracted to her, and he's flattering her.
22    And then look at this:  "I just looked at your Facebook
23 pics ... if I have the right girl, you are adorable."  So now
24 not only is she amazing and an independent young lady; she's
25 adorable.  So he's continuing to tell her about how he's

1  attracted to her and flattering her to continue the -- or to

2  get things started.

3      And after an email from -- from ER about the age of

4  consent, she sent a picture to Mr. Sheltra where she was

5  crying, and --

6      Can you go to the next one, please.

7      "I do know about the age of consent" - here we go - "but

8  we live in such a controlling society that if anybody finds

9  out, I'm labeled a perv, a stalker, a pedophile whether our

10 acts are consensual or not.  That said, I'm replying, aren't

11 I?"

12     So he knows that this is problematic behavior, but he

13 doesn't want the communication to stop.  He wants to keep it

14 going.  I know all about it; thanks for the clarification; I

15 don't want to be labeled something bad, but I'm still in the

16 game; I'm still talking to you.  And here, "That pic you sent

17 is really f'ing hot...  Mmmmmmmm.  Delicious.  So what are you

18 looking for?  Ask me anything you like."  He's opening things

19 wide up, presenting himself, again, as he did with -- with Meg,

20 I'm somebody that -- I'm here for you.  "Ask me anything you

21 like."

22     And with respect to "we live in a controlling society,"

23 we're not the problem.  Society is the problem.  What you and I

24 want to do is fine.  It's the controlling society that will

25 condemn us, will label me as a pedophile or a pervert, which he

1  defined for us, or a stalker.  Even if you and I agree, society

2  is the problem; what we're doing is fine.

3      He's -- by saying society is the problem, also, again,

4  he's normalizing the behavior.  Normalizing that their

5  consensual conduct could not be wrong and that he is still

6  sexually attracted to her.

7      Here again he's continuing.  First off, now, "Why were you

8  crying hun?"  Oh, he's concerned about her.  He wants to know

9  what's the problem; why were you crying?  And he's showing he's

10 attentive and concerned about her.  Then, in the same line,

11 "please send me any pics you think I will like of your gorgeous

12 little body," with a winky smiley face.  Because not only is he

13 concerned, but he's attracted to her.

14     Here also is the consciousness of guilt:  "I have to ask.

15 You are in no way a police officer, or working with police, or

16 affiliated in any way with law enforcement, are you?"  Because

17 he could get in trouble for this.  So he wants to confirm that

18 he's not talking to a cop.

19     But he said -- asked this and then one minute later,

20 though, even though -- because asking somebody if you're a cop

21 could be off-putting, so what does Mr. Sheltra do because he

22 wants to keep things going?  "It would be nice to cuddle and

23 hold each other.  Mmmmmmm."  And he used the words that ER had

24 put in her emails about what she wanted to do.  She wanted to

25 cuddle and kiss and snuggle with someone, and so he's using

1  what she said.  But it will change in a minute.  And the

2  "gorgeous little body," he's continuing the flattery.

3      Here's another email.  He got pics from her.  "You look

4  incredible.  I'd love your body to, if I was you."  So she's

5  cute, but now we're going to take it to a sexual level:  "Your

6  nipples make my mouth water ... you're amazing.  I would so

7  love to be inside you.  BTW, I've had a vasectomy," with a

8  smiley face.

9      So he's flattering her about her body, but now he's

10  introducing sex.  I want to be inside you; I want my penis

11  inside your vagina.  "Your nipples make my mouth water ...

12  you're amazing."  And "I've had a vasectomy," which we know and

13  he told us in his testimony, he tells people that he wants to

14  have sex with that he's had a vasectomy so pregnancy isn't an

15  issue.

16      Then here, just below that, he wrote, "You decide hun.

17  I'll make the drive if you want."  Like what he did with Meg,

18  he's doing it here.  You decide.  You're in charge.  He's

19  putting ER in charge of what's going to happen that night, and

20  he's telling her that.  He's empowering her.  He's trying to

21  persuade her.  But the empowering her is part of the

22  persuasion, part of the grooming that he was doing to get her

23  to do what he wanted her to do.

24      When she agrees, when they've agreed that night, that

25  first night -- remember, all this happened on that first night.

1  Check out the times.  They started talking at, like, 10:40, and

2  he's in the car heading down there in about two hours or so.  I

3  mean, this is a really short window, and remember, he's getting

4  in the car to drive from Alburgh to Orange, which is, according

5  to Mr. Sheltra, about an hour and a half long.  Still, getting

6  in the car after taking a shower to meet up with a 15-year-old

7  girl who's told you in her opening volley that she has a high

8  libido and you're doing all that stuff?  There's one reason why

9  you're putting in all that work to get to her, and it's so that

10 you can have sexual contact with her.

11     When they were talking about this, he asks, "Are you still

12 gonna be awake" if I do all this, because he doesn't want to

13 waste his time, ultimately, and then he says, "Is there a place

14 where we can go park?  I'm not familiar with your area at all,

15 hun.  I don't want cops finding us."  Consciousness of guilt.

16 If the cops find him, it's going to be a world of hurt for Mr.

17 Sheltra, because he should not be having sexual contact with a

18 15-year-old.  We'll go over the Vermont statute that

19 criminalizes exactly what he was intending to do.

20     Elisha wrote, "Please?" after that.  And the next email

21 from Mr. Sheltra was, "Ok.  I'll jump in the shower," with a

22 smile face symbol, because he showers before he leaves the

23 house to go have sex.

24     He did ultimately turn around.  No meeting happened that

25 night.  But they had more communications.

1    When she canceled and said that she was actually exhausted

2  and wanted to go to sleep, because here it's almost 1 o'clock

3  in the morning, he wrote, "That's okay.  I'm glad to know now

4  when I'm only 10 minutes away from my house."  Which isn't

5  actually what he testified to, and we'll talk about how you can

6  consider the testimony of the defendant and what motive that he

7  may have, what incentives might affect his testimony, because

8  he certainly has an interest in the outcome of this case.

9    But he goes back and he says, "Could you maybe send me a

10  couple of more pics Before you go to sleep?  I would love to

11  see as much of that naughty little body as you want to show me

12  hun."  Again, now he wants to see -- or he wants to keep the

13  sexual chatter going.  He is sexually attracted to her.  He's

14  keeping it going and telling her that she is sexually

15  attractive to him as a way of continuing the conversation.

16    She had mentioned that she was -- in a different email,

17  she had talked I think about, you know, do I like to be naked

18  or not, and Mr. Sheltra invited her to his house.  And he

19  wrote, "Me too hun.  I would love to get you to my place.  It's

20  very private and secluded, you could spend all the time you

21  want here naked."  Who's -- who's going to benefit most from

22  that?  I think it's Mr. Sheltra.  "Indoors and out.  I'd love

23  for you to be here."

24    He is so interested in her.  She said that she was

25  interested -- you know, enjoyed being naked, and in addition to

wanting to get there and what's his interest, he is now telling
her you can have what you want.  You can be naked.  It's fine.
You want that?  I'll make it happen.  So he's giving her what
he wants.  She's going to have some freedom.  He's going to try
and meet her needs, wishes, and desires.  That's what he's
doing there.  But let's not forget that sex is a fundamental
part of this.  Mr. Sheltra wrote, "Mmmmmm.  I'd love to feel
your body on mine."

     "I'm hard."  He has an erection.  He's sexually aroused.
He's writing that to a 15-year-old.

     "Oh, ok.  But why" -- she had said in a text that she had
been wet for seven hours, meaning -- and he said, "why have you
been wet for so long?  I'd love to be sucking on your pussy
right now."  He is telling her he is sexually attracted to her,
he wants to have sex with her.  She told him she had a high
libido.  He's telling her you can have what you want.  And, you
know, taking her to his house also, where she could be naked,
not only is he giving her what she wants; he is saying, And you
can trust me.  It is a safe place for you.  You can be naked
there.  It's going to be fine.  So again, he's trying to
persuade her that things are going to be okay with him.

     And not only is he going to -- is sex going to be a big
part of this; he wants to give her sexual pleasure.  I mean,
he's hard.  He's sexually aroused.  But he's offering to be
sucking on her pussy right now.  So he wants to bring her

1  sexual pleasure.

2      He wrote this:  "I'll let you get some sleep.  Know that

3  I'm here for you - whatever you need."  I'm an older -- you

4  know, I'm older than you are, and you can count on me.  "I'm

5  here for you - whatever you need."  You can rely on me.

6      "I hope that you feel comfortable naked around me soon.  I

7  would love to see you naked hun."  Again, there's the -- giving

8  her what she wants.  I want you to be comfortable because I'm a

9  safe place.  You don't have to worry about it.

10      "You are really adorable."  More of the flattery.

11      "And there is nothing better than holding someone tight

12  with nothing in the way."  And that's the discussion where she

13  had wanted to cuddle and feel that somebody actually cared

14  about her, and so now he's saying I will hold you tight with

15  nothing in the way.  I'll take care of you.

16      This is a text from ER, from Elisha, where she said --

17  because remember, when -- when they were talking before he left

18  to go meet the first time, he had said, wait, what, you're not

19  16, then there's not going to be any sex, and he still then was

20  going to leave and left and turned around and came back, and ER

21  wrote, "Even though you said no sex I bet there would have been

22  sex."  And this -- remember, this is all after he's come home,

23  afterwards.  "Even though you said there would have been no sex

24  I bet there would have been sex.  For some reason no guy can

25  resist me when I'm naked or mostly naked cuddled up to them."

1    And how does Mr. Sheltra respond?  "Yes, I agree.  There

2  would have been sex.  And I love the thought of your cute

3  little butt against me.  Mmmmmm."

4    Now, Mr. Sheltra continued the grooming process before

5  they met, because here - if you go to the next slide, please -

6  he's doing a lot of different things here.  There's the overt

7  sexuality, but now he's saying -- you know, referring to her

8  body.  "It's adorable, hun."  You have a nice body.  And then

9  "You're a woman."  She's 15.  But "You're a woman.  You have

10  curves in all the right places."  So she's an attractive woman.

11  He's elevating her in her own mind that, yes, I am a woman.

12  Maybe I am in charge of my sexuality even though I'm 15 and

13  shouldn't be doing that.

14    And then, "You too hun.  XOXO."  There's that emotional

15  connection.  Hugs and kisses.  Now I'm -- he's expressing that

16  there's some -- an emotional connection.  And now after she

17  complained that she wished that her breasts were larger, he

18  wrote, "They're perfect the way they are hun.  Mmmmmm."  He's

19  complimenting her body.  He's flattering her.  He's flattering

20  her physical -- her physical body and just -- and flattering

21  the physical body always has a sexual component also.  She's

22  got nice breasts.  That's a sex object for him.

23    Now, the next morning ER did invite him -- oh, can you

24  take that off, please.  Sorry.

25    The next morning ER did invite him.  You read the text

1 exchange where she invited him to come over, and he did.

2 Ladies and gentlemen, when she invited him, let's remember

3 this:  ER was a 15-year-old child.  She was legally incapable

4 of consenting to sexual activity with a man of Mr. Sheltra's

5 age.  She is the legal equivalent of Maddie, the 10-year-old

6 daughter of the undercover.  She's not capable of consenting

7 because he is so much older than she is.

8      Ladies and gentlemen, ER in that moment, when she's

9 inviting Mr. Sheltra over, she didn't need a lover.  She didn't

10 need a boyfriend.  She needed a grown-up.  And instead she got

11 Randy Sheltra, a 55-year-old man who drove over two hours to

12 have sexual contact with a child.

13      During the drive over from Alburgh to Orange, Mr. Sheltra

14 continued the sweet-talking of ER.  He wrote, You're very sexy

15 anyway but the thought of you rolling out of bed wearing not

16 much, is really really sexy."  This is all about sex.  Sex is

17 the order of business.

18      "But it's definitely okay for you to take a shower."

19 There's that coupling of sex and showers that is what is so

20 prevalent with Mr. Sheltra's communications.

21      And interestingly, the response from ER about him asking

22 her to take a shower, she said I took one yesterday, and if I

23 take a shower here, you'll join me, and to that request, how

24 did Mr. Sheltra respond?  "If you would like me to hun I would

25 definitely join you."  She's in charge.  He will not join her

unless she invites him.  She's in charge.  She's in control.
He is just following what it is and I'll do it because I care
about you.  That's the grooming behavior.  That's the
persuading, the enticement, and the coercion that Mr. Sheltra
was engaging in towards ER, a real 15-year-old.

    He is concerned, though, about getting caught, and so
again he wrote, "There's no chance he is going to come home
early is there?"  Referring to Elisha's dad, because she's a
kid and she still lives at home and he's worried that Dad might
come home and catch him, and that worry led him to write the
next text, which is, "He probably wouldn't appreciate it if he
came home and found me there though."  That would be an
understatement.

    And, you know, it's interesting because let's think about
what Mr. Sheltra said about his purpose in engaging in the
communications with ER, that she was a troubled youth and that
she needed some adult guidance and he was just responding to
her and he just really wanted to help her, it wasn't about sex
at all, it was that he wanted to help her.  If you're there
just to be a support and a positive influence for this troubled
youth, then why do you care if her dad's going to come home,
right?  You don't care, because you're not doing anything
wrong.  These questions about what about Dad, is he going to be
there, he wouldn't like it, because he knows.  That is
consciousness of guilt, again, as he knows for sure that this

1 is problem- -- this is bad behavior, and he doesn't want to get

2 caught.

3      He arrived, you'll see in the texts, because you see and

4 we read where he arrived at about 12:42 on August 21st, and

5 then there's a gap of about two and a half hours, because he

6 resumed texting at 3:16, and he left at about 3:24.  And what

7 happened during that two-and-a-half-hour gap?  Mr. Sheltra

8 testified that nothing happened.  Ladies and gentlemen, you

9 know exactly what happened, because Mr. Sheltra told you one

10 thing, but in the moment, when he was there sitting in ER's

11 driveway after having this contact with her, he's on his phone

12 emailing to the person in Plattsburgh, and he's telling her

13 exactly what happened.

14      He wrote, "I met her.  She's got an amazing little body.

15 I'm not sure if we will end up fucking but we made out and did

16 some heavy petting ... she has small tits but they have a great

17 shape, and these little pink nipples that are really sensitive.

18 She loves to have her neck kissed.  And she gets really wet,

19 but it was just a little while ago so the middle of the day and

20 we were just sitting in the car so there was no way we could

21 fuck."

22      He sent that email to Person 1, the Plattsburgh lady, at

23 the same time when he was -- when Elisha was texting him to say

24 do you want to go swimming or I'm going to go swimming, and he

25 says -- when she said do you want -- I'm going to go swimming,

he goes, "Mmmmm."  And then she says, Do you want to join me?

And then, though, tellingly, when some other car drove up,

guess who bailed and hightailed it out of there.  Well, that

would be Mr. Sheltra, because again, consistent with he doesn't

want Dad to find him, he doesn't know who just -- who it is

that just drove up.  He knew that he had to get out of there

because he had just had the contact that he told Person 1 with

ER.  He had -- that had just happened.

    And he -- think also about Mr. Sheltra's testimony.  There

were three emails that he sent to Person 1 about his

communications with ER.  The first email referenced "I got an

email from a 15 year old."  Check, that happened.  And he

admitted on cross that everything in that email was true and

correct.

    The second email described the pics that he got from ER,

and -- including one that showed her exposed nipple.  And --

well, you saw the pictures that were sent by ER that were

extracted by Mr. Thornton of ER, and one of them shows her

exposed nipple, and Mr. Sheltra on cross admitted, check,

everything in that email was true.

    But he refused to say that everything in this email was

true, though he selectively agreed that parts of it were true.

And I submit to you, ladies and gentlemen, that absolutely

everything in the email that I just read to you, this one that

is on the screen, the third email, everything in there is true,

1 and you know why?  Because Mr. Sheltra was so excited when he

2 had just met this 15-year-old kid and he had just had this

3 contact, he was so excited, he had to tell somebody.  He

4 couldn't even wait to get home.

5      So he's sending his email to Person 1 from the car.  And

6 he was so forthright with the first email about the

7 interactions with ER to this Person 1 that it was true, and he

8 was forthright and candid with everything to Person 1 that --

9 and admitted that it was all true, and there's no reason why he

10 would suddenly stop being truthful with her.  Because again,

11 think about the motive in testifying.  Does it help Mr. Sheltra

12 or hurt him if this is true?  Oh, it hurts him.  Because we

13 know that not only all of the stuff that he was doing when he

14 was communicating with ER about your cute little body and I'm

15 here for you and all that stuff, all of that led to this moment

16 where he had that sexual activity with her.  It's a problem,

17 but it's absolutely the truth.  And he hadn't embellished at

18 all with Person 1 in any of his other emails.  Why would he

19 start now?

20      Now, this meeting with ER didn't stop their interactions.

21 It was the last time that they met, but Mr. Sheltra continued

22 to communicate with her and to try and keep the relationship

23 going.  It's like he was a backward undercover because he

24 wanted to keep the communications going, but he had an

25 objective in wanting to keep the conversations going, and that

1 objective was to get back and have more sexual activity with

2 her.

3        And he tried different tactics in his communications with

4 her for how it was that he was going to convince her to -- to

5 stay in contact with her and maybe have sex with him.

6        Whoops.  Can you go to the next one, please.

7        Here he is being concerned and encouraging.  "You are far

8 too attractive to be unhappy, hun."

9        "No need to thank me hun, as I said I only want you to be

10 happy."

11        "And you know how to contact me if anything changes with

12 him or if you need anything hun," with a kiss -- kissy face

13 emoji.  And remember, this is -- "changes with him," that was

14 the boyfriend, because there were other texts in there where

15 Mr. Sheltra said that if you -- you know, ER and her boyfriend,

16 it was kind of off and on.  It sounded like they fought a lot.

17 And he was waiting in the wings and texted her a couple times,

18 like if anything happens -- like right here, if anything

19 happens with him, you've got me, because he wanted to be that

20 person with her.  He wanted to be in a position to have sex

21 with ER.

22        And here at the bottom, "Trust me hun.  I wouldn't lie to

23 you.  And, if you need anything lmk," let me know, "k?"  With a

24 kissy face emoji.  Now he's -- in these texts, he's being

25 encouraging and concerned.

1    He also was trying to help her with some school problems
2  that she had, because remember there were the -- I call them
3  the mean girls at school where, you know, they were just, like,
4  girls that were mean.  That was -- and he was trying to help
5  her resolve these personal differences that she was having with
6  the other cliques and girls at school where he wrote -- and
7  it's encouraging and sexual at the same time.  He wrote, And
8  "you'll be one of the hottest chicks there!!  Most desired
9  too!!  Have fun hun," kissy face emoji.
10    "It is.  I promise you.  That's the big irony about high
11  school.  Everything reverses by the time you're in your 20s.
12  I've seen it happen and guys talk about it all the time!  But
13  there'll already be guys watching your cute little ass as you
14  walk by," with a smile face symbol.
15    And then smile face symbol in the last one:  "You're time
16  is still coming babe.  You will put all those snobby bitches to
17  shame!!"  So he's trying to help her with her personal
18  relationships.
19    He also engaged in flirty and sexy chatter.  "Yes my
20  dear ... And if you disagree with me again I will have to spank
21  you," with a kissy face emoji.
22    "Hey there, naughty girl - how's it going?"  Naughty girl.
23    "Not bad - about to get ready for work.  Was just thinking
24  about your cute little butt."
25    And then last one:  "I bet!  That cute little ass being

1  stretched to the max!  I'm hard thinking about it!"

2      So we've got flirty and here I'm erect, I'm sexually

3  aroused, I'm hard; I want to have sex with you, you are still

4  sexually appealing to me, attractive to me.  That's what he's

5  saying there.

6      And then there's also the openly sexual things where he

7  wants to give her what she wants sexually, and it is seen most

8  clearly in this one where there's a lot of chatter.  This

9  morning you heard about the anal sex communication between ER

10 and her boyfriend and how that was shared with Mr. Sheltra, but

11 the question just above this one, Mr. Sheltra had asked, Did

12 your boyfriend ever cum inside you?  Did he ejaculate inside

13 your vagina?  And ER responded, "No.  He won't cum in me.  He

14 did it once and it took a lot of persuading."

15     And Mr. Sheltra told you this morning that he interpreted

16 that as meaning that it was an act that ER wanted the boyfriend

17 to ejaculate inside her.  She had already told us that she was

18 on the pill so she wouldn't get pregnant, but that's what she

19 wanted.  Well, here's Mr. Sheltra to the rescue where he

20 writes, "Fuck, I'd love to pump you full!!"

21     That is actually not consistent with wanting to provide

22 somebody with counseling and emotional support, all right?  No.

23 That's "I want to have sex with you, and I want to give you the

24 sex act that your boyfriend won't."

25     And now is where he's also asking her for sexually

1  explicit photos of herself.  Where he wrote, "home after

2  working all night, laying here wishing you were here.

3  Imagining ... can I see a pic of your labia hun?  I wanna feel

4  it engulf me.  Mmmmmm."

5       And then, But "I'd still like to see those pussy lips hun.

6  I hope you will send me a pic of them at some point."

7       Sex is why Mr. Sheltra was involved with ER.  It was --

8  that was it.  That was why he was in this.  He wanted to have

9  sex with her.  He wanted to get back with her.  And remember,

10  here's another way that you know crystal clear that he

11  associated ER with sex.  Put aside everything else.  Let's go

12  right to a quick little Google search that he did, because

13  you've got it.

14       Next one, please.

15       Because here, 73 Reservoir Road in Orange, Vermont, that's

16  ER's address.  That was -- that Google search, Google Chrome,

17  was done at 9:10, and then six minutes later he's Googling

18  "Amateur Young with older sex videos."  Six minutes apart.  So

19  he was thinking about ER when he did that Google search for

20  porn involving young and old:  ER 15, Mr. Sheltra 55.

21       He worked -- Mr. Sheltra worked very hard to keep the

22  contact up with ER about school, about asking her so many

23  questions about school and how are things with your boyfriend.

24  It was just a consistent effort, and then finally ER told him

25  to leave her alone, and he did.  But it kept on going until she

said stop.  All of that were his efforts to persuade or induce

and entice her to have sex with him.  The Government has proven

Element 1 of Count 2 beyond a reasonable doubt.

Element 2 of Counts 1 and 2 is that Mr. Sheltra used a

facility or means of interstate commerce when attempting to

persuade or entice the individual.  And Exhibit 60 is the

document that you will have where Judge Reiss took judicial

notice of two facts.  The first fact is that the Internet

itself is a facility of interstate and foreign commerce and

that a cell phone is a facility of interstate and foreign

commerce.

Judge Reiss will instruct you as well that you should

accept those facts as true.  You are the sole judges of the

facts, but you should accept those facts as true.

Mr. Sheltra used the Internet to communicate with both ER

and the undercover because they went through -- well, they used

the Internet, and specifically Craigslist was where it all

began, which is a website, and they used a Craigslist portal

for their email communications before they ever went to texts

like he did with ER or when he went to personal email like he

did with the undercover.  That's the use of the Internet.

He used his cell phone, and we know he did because we

found all of those emails between him and ER and the undercover

on his phone in the extraction that Mr. Thornton testified

about, and they also used -- he also used a cell phone to text

1 with ER and the undercover.

2      The Government has proven Element 2 of Counts 1 and 2

3 beyond a reasonable doubt.

4      Element 3 is that Mr. Sheltra believed that the person he

5 was trying to induce or entice to have sex with him -- unlawful

6 sexual contact with him, he believed that that person was under

7 18.  And you heard it straight out of Mr. Sheltra's lips this

8 morning that he believed that Maddie was 10.  He believed that.

9 You don't have to rely just on that statement, though, because

10 there's other evidence that proves it, such as here's the

11 opening email from the undercover:  "Well, I have a ten year

12 old daughter."

13      Another email sent by the undercover at 10:31 on September

14 7th, "She's only ten."

15      And then another email sent on Friday, the 8th, at 2:25,

16 "I think I already told you she is ten years old" and

17 "obviously goes to elementary school."

18      He came by his belief -- Mr. Sheltra came by his belief

19 that Maddie was 10 honestly because the undercover told him

20 explicitly three times.  So that element has been proven.

21 Element 3 of Count 1 involving the undercover has been proven

22 beyond a reasonable doubt through the evidence and his

23 admissions.

24      With respect to ER, again, Mr. Sheltra admitted that he

25 knew that he believed that she was 15, and he even met her in

1  person, so he -- his admission to you that he believed that she

2  was 15 is solid evidence.  But again, we can look at other

3  things.

4      Elisha told him in the opening email, "I am going to soon

5  be 16."  He asked, "Wait - you're not 16?"  And she wrote, "I

6  turn 16 in 2 months and 9 days."  And we know -- just as an

7  aside, we know that that's true, because the date that she

8  wrote that and the birth date on the certified copy of the

9  birth certificate matches.  It matches.  So you know that she

10 wasn't lying about how old she was.

11     In any event, I mean, he believed it, so you don't --

12 that's not -- we don't have to prove that she actually was, but

13 she wasn't lying.  She really was 15 when she was communicating

14 with him.

15     And again, next email, there was also -- let's go back to

16 those emails with Person 1.  And the first one that Mr. Sheltra

17 admitted was true and correct:  "I just got an email from a 15

18 year old girl."  And he admitted, again, that all those emails

19 with Person 1, Plattsburgh person, were about ER.

20     There's -- the Government has proven Element 3 of Count 2

21 involving ER, the real 15-year-old.  The Government has proven

22 that element beyond a reasonable doubt.

23     And the fourth element of Counts 1 and 2 is that the

24 sexual activity that would have occurred would have been a

25 criminal offense.  And you -- a stipulation among the parties

1  was read to you which outlines what are the criminal offenses -
2  it's Exhibit 59 - what are the Vermont state statutes that
3  would have been violated if the sexual conduct that Mr. Sheltra
4  desired had happened.  And the first one is -- you'll have the
5  stipulation, so this is not a quiz.  You'll have the
6  stipulation, so you can look at it.

7       But Section 2602 provides, "No person shall willfully or
8  lewdly commit any lewd or lascivious act upon or with the body,
9  or any part or member thereof, of a child under the age of 16,
10 with the intent of arousing, appealing to, or gratifying the
11 lust, passions, or sexual desires of such person or such
12 child."

13      That's the first statute.  And it does have here -- which
14 is why I said that the sexual activity between Mr. Sheltra and
15 ER would have been criminal, because he was so much older than
16 she was, because he's not 19.  That's an exception in the rule.
17 But it's not before you, but I want to clear that up in case
18 you think about that.

19      The next statute that you heard about is Section 3252(c),
20 which provides, "No person shall engage in a sexual act with a
21 child who is under the age of 16," period, with "sexual act"
22 being defined as "conduct between persons consisting of contact
23 between the penis and the vulva, the penis and the anus, the
24 mouth and the penis, the mouth and the vulva, or any intrusion,
25 however slight, by any part of any person's body or any object

into the genital or anal openings of another."

So looking at Count 1 involving the undercover, what are the acts that Mr. Sheltra described that he wanted to do that would have violated these statutes?  Well, in the email that he sent at 12:24 AM on September 9th, "I'll then proceed slowly to position her and I so I can tongue her young labia and stimulate her clit with my lips and tongue."  That is oral-genital, prohibited contact.

And then in the email sent at 10:08 PM on September 9th, "She will be getting the majority of my attention at that point, as I caress her and stimulate (licking/sucking) her nipples, along with her labia, and other erogenous zones."  Oral-genital.

If these acts that Mr. Sheltra wrote, helpfully, had happened, it would have violated Vermont state law.

Let's look at the acts done -- or that Mr. Sheltra wanted to do to ER.  In this text sent at 1:15 on August 21st, "I'd love to be sucking on your pussy right now," referring to her genitalia.

"Yes, I agree there would have been sex."  Sexual intercourse.

"Fuck, I'd love to pump you full!!"  He'd like to ejaculate in her vagina.  Both of the Vermont statutes would have been violated if this conduct had happened.

Element 4 has been proved beyond a reasonable doubt as to

1 both Counts 1 and 2 of the indictment.

2      Now, Mr. Sheltra is also charged with attempt, and there's

3 a couple of other points that I need to talk about with respect

4 to this.  The elements of attempt are that the defendant

5 intended to commit a crime -- the crime of persuading, coercing

6 a minor to engage in unlawful sexual activity and that he took

7 a substantial step toward committing that crime.

8      The first attempt element as to Count 1, the one involving

9 the undercover, did -- the question to ask is, Did Mr. Sheltra

10 intend to commit the crime of persuading, enticing the minor to

11 engage in unlawful sexual activity?  And everything that we

12 reviewed at the beginning of this summation shows his specific

13 intent to commit that crime.  The grooming behavior, the

14 flattery, the normalization of the deviant behavior, the

15 encouraging comments, all of that commentary shows that he

16 absolutely had the intent to do this -- to engage in sexual

17 activity with 10-year-old Maddie.  The sweet talk, the shared

18 taboo, the "we're on this journey together," all of that was

19 the work, the hard, hard work, that he did to make that happen.

20 He had the clear intent to have Meg, the undercover, have her

21 daughter get involved in sex with him, unlawful sexual

22 activity.  The Government has proved this element beyond a

23 reasonable doubt.

24      The second attempt element is, Was there a substantial

25 step?  And you know -- and the substantial step is we want to

1  know is this all in his head, all right?  Is this just fantasy,
2  or did he do something substantial -- do something that shows
3  that he intended to do this, that this is what he wanted?  And
4  I submit to you that every time he hit "send" on an email, that
5  was a substantial step.  It was part of the criminal conduct,
6  but it was -- his persistent efforts were that it was -- that
7  it was all a substantial step so that we know what his intent
8  is.

9      But equally importantly, he showed up at the Whales'
10 Tails.  He showed up to meet Meg and Maddie.  He didn't -- he
11 didn't masturbate that morning because he wanted to save up so
12 that he would be able to have sex with them that afternoon
13 after he showed up.  That's the -- that is another way where
14 you can be confident that he absolutely -- that he had the
15 intent to do this and he took a substantial step towards making
16 it happen.  This wasn't a game.  This was very real for Mr.
17 Sheltra.

18      He took a shower.  That could be a substantial step,
19 because we know he showers before he takes off to go have sex
20 with somebody.

21      We know what his intent was by what he wrote, and we know
22 his intent by what he did.  The Government has proven beyond a
23 reasonable doubt all of the elements as to Count 1 of the
24 indictment that charges Mr. Sheltra with enticing -- attempting
25 to entice a minor to engage in unlawful sexual activity.  It's

1  the count involving the undercover.  We will ask you to return

2  a verdict of guilty as to that count.

3      As to the communications -- or as to the conduct at issue

4  in Count 2, the one involving ER, the same questions are asked:

5  What was his intent to persuade -- did he have specific intent

6  to commit the crime of persuading ER?  Absolutely, he did.

7  Every text he wrote, everything he did shows that that most

8  definitely was his intent.  He groomed her; he flattered her;

9  he was sexy with her; he was supportive with her; he was

10 concerned; he was a resource.

11     He was doing everything he could so that he could get back

12 to her -- get to her at the beginning to have sex with her, and

13 then that conduct continued after they met because he kept on

14 trying to get back to her.  All of that shows that he most

15 definitely had the intent to -- to induce this child, this

16 child, to have sex with him, which would have been a violation

17 of law.

18     And what's the substantial step that we know?  How do we

19 know that he did?  What's the substantial step?  He showed up

20 and met with her, and he told you what happened when he wrote

21 the email to Person 1, the third email, that described what

22 happened.  He actually showed up.  That's the substantial step.

23 He had sexual contact with her.

24     And after that sexual contact where he was trying still to

25 get into -- get back to her, every kind text, every sexy text,

1  every flirty text was another communication designed to

2  continue this -- to continue to persuade her to have sex with

3  him.

4      The Government has proved this element beyond a reasonable

5  doubt that Mr. Sheltra attempted to entice and persuade and

6  coerce ER, the 15-year-old, to engage in unlawful sexual

7  activity with him.  The Government has proven every element of

8  this offense beyond a reasonable doubt, and we will ask you to

9  return a verdict of guilty as to this count as well.

10      Count 3 of the indictment charges Mr. Sheltra with

11 attempted receipt of child pornography, and the elements of

12 this that the Court will instruct you on are the following:

13 The first is that he knowingly received or attempted to receive

14 a visual depiction; the visual depiction was transported in or

15 affecting interstate or foreign commerce or had been produced

16 using materials that had been transported in or affecting

17 interstate or foreign commerce; the production of the visual

18 depiction involved the use of a minor engaging in sexually

19 explicit conduct; and, four, the defendant knew that the visual

20 depiction portrayed the minor engaged in sexually explicit

21 conduct.

22      The first element is that he knowingly attempted to

23 receive -- knowingly received or attempted to receive a visual

24 depiction, and Mr. Sheltra admitted in his testimony that he

25 sent every single text that was attributed to him in Exhibit

1 27, which are the texts.  He admitted that he sent -- that he

2 was the author of the texts that asked for a picture of her

3 labia.

4     Actually, can we go to the next one.

5     He admitted that he wrote this text where he said, "can I

6 see a pic of your labia hun?  I wanna feel it engulf me.

7 Mmmmmm."  He admitted he wrote that one.

8     And he admitted that he wrote, "I'd like to see those

9 pussy lips hun.  I hope you will send me a pic of them at some

10 point."

11     Now, with this one, in his testimony this morning, he

12 suggested that he made a mistake and thought that he was

13 meeting with somebody named -- or texting with somebody named

14 Treena and that he didn't mean to send this to -- only the

15 second one to Treena -- I'm sorry, to ER.  He thought he was

16 having a chat with Treena, and I submit to you that that is

17 not -- that those are not the facts.  The facts are, as you

18 saw, that in the exhibit that Mr. Sheltra went through, C1, the

19 Defense C1, you will see that there were texts involving Treena

20 and some other people, but there was a text on August 20th, and

21 then the next one was on August 30th.  So when this text

22 happened on August 25th, he hadn't talked to Treena for five

23 days.  So it makes no sense that he would be texting with one

24 person and think that it's somebody else when he hasn't talked

25 to that person in five days.  That just -- it's not a

1 reasonable -- it's not reasonable to accept that as true.

2        Also, he mentioned that he was triggered in the

3 communications with ER where she was sharing the anal sex

4 experience that she had had with her boyfriend and that Mr.

5 Sheltra thought that was -- he was triggered by that because he

6 thought, Oh, this is the sort of thing that I would normally

7 talk to Treena about, and so that was what caused him to think

8 that he was texting with Treena.  That doesn't -- maybe that

9 will excuse the sending of the pussy lips text.  It does not

10 affect the other text that was made an hour and 20 minutes

11 before the anal sex commentary -- or conversation where he

12 asked for a pic of her labia from ER.  Treena was nowhere near

13 this.  So I submit to you that the whole Treena thing is --

14 it's a smoke screen.  It's an attempt to deflect attention.

15        But it's a really lame one because he only takes out one

16 of the requests for a sexually explicit photo.  He doesn't take

17 out this first one.  He has no excuse for that, no explanation

18 for how that could be an accident.  There's no evidence of that

19 before you.  Therefore, he -- and he admitted that he knowingly

20 sent that text.  Actually both of these texts.

21        Also, to show that this was not an accident, he asked ER

22 twice for a pic of the same body part.  Yes, it was separated

23 by an hour and a half in time, but he was persistent in this,

24 and it wasn't an accident.  It wasn't -- actually, when he was

25 lying in bed looking to masturbate, asking for some porn to be

1  sent to him, this was not an accident.  This was a deliberate,

2  concerted effort to get sexually explicit photos of ER's

3  genitalia.

4      And remember, he also testified that asking people for

5  sexually explicit photos of their genitalia was something that

6  he did.  He didn't do it with the undercover, but he did it

7  with Alisha with an A where he asked her in this text, "In the

8  meantime, since I need to cum again, can you send me a pic of

9  both of you naked?"  So you know that he asked for these images

10  because it helps him to masturbate.  He likes to masturbate to

11  porn, so this is something that he does.

12      The Government has proven beyond a reasonable doubt that

13  Mr. Sheltra knowingly attempted to receive child pornography --

14  a visual depiction, and that first element has been proven

15  beyond a reasonable doubt.

16      The second element is that the visual depiction was

17  transported in or affecting interstate or foreign commerce, or

18  was produced using materials that had been transported in or

19  affecting interstate or foreign commerce.

20      Judge Reiss is going to give you an instruction that says

21  that if you find that a cell phone -- that the cell phone was

22  manufactured outside the state of Vermont, that element has

23  been proven.  And I will direct your attention to Exhibits 37

24  and 38.  This is a picture of the battery -- Mr. Sheltra's

25  phone, and here it says "Made in China."  So the phone, which

1  is what he used to ask for the photos, was made in China.

2  Because it was found in Vermont, that phone traveled in

3  interstate or foreign commerce.  So you can find that element

4  has been satisfied beyond a reasonable doubt.

5      Can you go to the next slide, please.

6      Here's the battery.  "Cell from Korea" and "Manufactured

7  in China."  Again, this element is satisfied.  You may have

8  been wondering why you were getting pictures of these batteries

9  and stuff.  This is exactly why.  Because we have to prove that

10  the phone traveled in interstate and foreign commerce.  It did.

11  It wasn't made in Vermont.

12      Element 2 of Count 3 has been proven beyond a reasonable

13  doubt.

14      The third element, again, is the production of the visual

15  depiction involved the use of a minor engaging in sexually

16  explicit conduct.  And we need to break this one down a little

17  bit, because there's a lot going on here.  First off, the

18  visual depiction is the photo that Mr. Sheltra requested when

19  he asked for a pic of the pussy lips or a pic of the labia.

20  That's the photo.

21      The visual depiction is that photo that he's looking for,

22  asking for it from a minor.  ER is 15, which he knew.  So it's

23  use of a minor.  It involves ER.  And then the question is, Is

24  a pic, a pic of the labia, sexually explicit conduct?  And

25  that's a question that is answered by further look -- further

1 exploration of the instructions that you will receive where

2 "sexually explicit conduct" is defined.  It is defined as

3 "sexual intercourse, bestiality, masturbation, sadomasochistic

4 abuse, or lascivious exhibition of the genitals or pubic area."

5      What's relevant here is, Is this a lascivious exhibition

6 of the genitals?  And for that we go to the definition of

7 "lascivious exhibition," which is in the instructions.  And it

8 is defined as an image that displays or brings to view "to

9 attract notice to the genitals or pubic area in order to excite

10 lustfulness or sexual stimulation in the viewer."

11      We don't have the picture of ER's genitalia, thankfully,

12 because she said no, she didn't do that.  And since we don't

13 have it, again, that's why it's charged as an attempt, because

14 he tried, but it didn't come to him.

15      We know what he wanted, though, because his request was

16 quite specific.  It was a photo of his favorite body part, the

17 labia.  He also called that area the pussy lips, and this

18 request was -- well, and let's think about the nature of their

19 relationship, if you can call it a relationship.  It was all

20 about sex.  It began with her opening email saying that she has

21 a very high libido, and it just kept on layering on where sex

22 was such a huge -- was really the foundation of their entire

23 interchanges.

24      And let's think about the context for when it is that he

25 asked for these images.  The first request, the one that

1  doesn't get knocked out by the Treena stuff, this is the one

2  where he asked an hour and -- more than an hour before the

3  whole anal sex discussion where he said I'm "Home after working

4  all night, laying here wishing you were here.  Imagining ...

5  can I see a pic of your labia hun?  I wanna feel it engulf me.

6  Mmmmmm."

7         He asked ER for that photo because he was home, he was

8  interested in masturbating, and he wanted a picture of it, so

9  he texted her and asked her for it.  That is sexually explicit

10 conduct because he knew what he wanted, he was sexually

11 aroused, admitted that he's sexually aroused by labias, and a

12 picture of it would be sexually arousing to him.  So that is --

13 that picture is a lascivious exhibition of the genitalia,

14 because it is a picture of the labia.

15        That's it.  That's all he was asking for.  Not like a

16 picture of you and maybe have your legs spread and put it at

17 six feet out.  No.  He just wanted the labia, all right?  So

18 it's the focus picture that is sexually arousing to him.  It is

19 a lascivious exhibition of her genitalia.  Wasn't asking about

20 art.  It was a sexual shot.

21        Also the second request where he asked for a pic of her

22 pussy lips, he wrote that when -- during the conversation where

23 she was relaying stories about sex with her boyfriend, and he

24 wrote, "I'd still like to see those pussy lips hun.  I hope you

25 will send me a pic of them at some point," with a smiley face.

1    And then he followed up that text four minutes later with a

2    question about sex and ER's boyfriend, and he referenced this

3    later text that he was hard just thinking about it.

4          There can be no question that the -- that the images that

5    he was requesting depicted -- of ER's labia were child

6    pornography as that term is defined in the statute, a

7    lascivious exhibition of the genitalia of a minor.

8          The Government has proven that element, the third element

9    of Count 3, beyond a reasonable doubt.

10         Element 4 is that the defendant knew that the visual

11   depiction portrayed a minor engaged in sexually explicit

12   conduct.  There is no ambiguity here.  Mr. Sheltra asked for a

13   photo of ER.  He asked for a photo of her labia.  He knew that

14   she was 15.  He had met her in person.  He mentioned her age in

15   the emails to Person 1.  He asked for the specific body part,

16   his favorite body part, that is arousing to him, and he asked

17   for that image twice.  He attempted to receive -- he knew that,

18   see, if he got that visual depiction, it would be exactly what

19   he asked for, the genital area of a person he knew to be 15.

20         That's Element 4 of Count 3.  It has been proven beyond a

21   reasonable doubt.

22         Again, Mr. Sheltra, we are -- because he never got the

23   image, it is charged as an attempt, and so we need to -- to

24   circle home to the attempt element and that Mr. Sheltra

25   intended to commit the crime of receipt of child pornography

1  and he took a substantial step toward committing that crime.

2  And did he intend to commit that crime?  Absolutely.  No

3  question.  He repeated the request.  He asked for it twice.

4  Ninety minutes and multiple texts later, he asked for it.  He

5  knew what he wanted, and he asked for it twice.  He had the

6  specific intent to obtain that sexually explicit image.

7       Did he take a substantial step towards getting that image?

8  And he sent a text -- he typed out a text twice and sent it to

9  the same girl asking for the same body part.  This was not an

10 accident.  There was no mistake.  There was no mistake on who

11 it was he was sending the text to.  It was ER.  It was the

12 15-year-old that he met.  It was a specific, deliberate attempt

13 to get those pictures, and he took a substantial step towards

14 doing it.

15      The Government has proven all of the elements of Count 3,

16 which is the attempted receipt of child pornography by Mr.

17 Sheltra.

18      Now, we had the experience of the testimony from the

19 defendant.  Mr. Sheltra chose to testify.  He -- you will get

20 an instruction from the judge that -- I think we're done with

21 the slides.

22      Judge Reiss is going to instruct you that he has the

23 absolute right not to testify.  Absolutely.  No question.

24 There's -- he has the right.  He chose not -- I'm sorry, he

25 chose to testify.  And Judge Reiss will also instruct you that

1  you should examine his testimony the way you would any other

2  witness and evaluate his credibility as you would any other

3  witness.  And you will get an instruction on how do we evaluate

4  the credibility of witnesses.  And you will be instructed that

5  you will -- that you can look at -- and it's not -- it's not

6  everything as to why, but these are guides to help you as you

7  evaluate the credibility of someone, where you can look at

8  their manner of testimony, their candor, their bias, the

9  evidence to which other -- I'm sorry, the extent to which other

10 evidence contradicts that testimony, the reasonableness of that

11 testimony, and whether that witness has an interest in the

12 outcome of the case.

13      You will get another -- there's an instruction for just

14 about everything, but you will get an instruction about the

15 interest in the outcome, and that instruction will tell you

16 that you can take into account how a witness may benefit in

17 some way from the outcome of the case and may that interest in

18 the outcome create a motive to testify falsely; will that

19 interest in the outcome sway the witness to testify in a way

20 that advances his own interests?  Right?  So that's -- those

21 are kind of the guideposts to look at how you can look at Mr.

22 Sheltra's testimony.

23      And he admitted to so much.  He admitted that he knew that

24 Maddie was 10, he knew ER was 15; he wrote all the texts and

25 the emails that were exchanged; he admitted he was in Vermont

the whole time; he admitted that he was sexually aroused by the
labia; he admitted that he wrote the questions that went to ER
where he requested the pornographic pictures of her genitalia;
he admitted that he told the people that he was interested in
having sex with that he had a vasectomy and that's what he told
the undercover and he told ER, and he told you that he told
that to anybody that he was interested in having sex with.

He told you that he asked for pictures of other people --
of people's genitals, and he did that when it was a
relationship that might turn to sex or that he was interested
in having sex with.  He -- he said if it was somebody I was
having -- I was planning on having a sexual relationship with,
I would.  And he admitted that he wrote -- sent the texts that
asked ER for pictures of her genitalia.

The thing that Mr. Sheltra was not interested in admitting
was that he has a sexual interest in children, and he claimed
that he chatted up Alisha with an A and the undercover because
he wanted to have sex with them and he just was going along
with what the daughter said -- I'm sorry, whatever they said to
keep the conversation going.  And I submit to you that that is
nonsense.  Nonsense.

Because the communications that he had -- and we're going
to focus in on only the charged conduct, but the communications
that he had with the undercover were not about, Oh, I want to
have sex with you, I want to have sex with you, Meg.  She was

1  the afterthought.  All of the sexual chatter, all of the

2  activity, all of the work that he did was to get Maddie, to

3  have sex with Maddie.  That's where he was.

4      To suggest that he was just saying that to go along with

5  it is ridiculous, because he's the one who brought up for the

6  first time in the conversations with the undercover the idea of

7  sex with Maddie.  The undercover didn't do it.  Remember, we

8  talked about this.  I mean, she actually was -- it was good

9  work because he had to add to whatever it was that she was

10 giving.  She just would go to where he was, and then he would

11 take it to a different level.  She was not the driving force.

12 He was.  And the driving force was because he has a sexual

13 interest in children and he wanted to have sex with Maddie.

14     And let's step back for just a second, because something

15 interesting came out during his redirect this morning where --

16 or maybe on cross.  I don't know what.  But it came out this

17 morning in his testimony where he chatted with three different

18 people on the Internet about how to -- about having sex with

19 minors.  He chatted with the undercover about having sex with

20 her daughter; he chatted with Alisha with an A about having sex

21 with her daughter; and then he mentioned that he was chatting

22 with Person 1, Plattsburgh lady, about having sex with a minor

23 with her.

24     If it was just one person, one grown-up chatting about

25 the -- having sex with a minor, that might be an accident.

1  That could just be an accident.  If you're chatting with two

2  people about having sex with a minor, that could be a

3  coincidence, all right?  Could happen.  Kind of farfetched.

4  But it -- that could be explained as a coincidence.  When

5  you're chatting with three different people about this very

6  specific deviant sexual conduct of having sex with a minor, a

7  10-year-old or a 9-year-old, that's not an accident.  That's

8  not a coincidence.  That's intent.  That's deliberate.

9      He found his people, ladies and gentlemen.  He found his

10  like-minded friends who shared his sexual interest in minors,

11  and the difference is Alisha with an A, she disappeared to

12  Atlanta.  That's -- that ended.  But remember, he was so

13  desperate to keep that thing alive.  For Person 1, not so sure

14  about what's going to happen there.  But with the undercover,

15  he showed up after taking a shower to have -- not masturbated,

16  to have sex with the undercover.  But more importantly, to have

17  sex with her 10-year-old daughter.

18      And let's also think about the taboo kink that he shared

19  that was in the posting.  The taboo kink -- I mean, he

20  explained it as there was a whole lot of weird stuff that he

21  talked about with Alisha with an A about:  you know, sex with

22  horses and dogs and fire extinguishers and kids.  That's a

23  weird -- those are all taboo kinks, right?  There was only one

24  taboo kink that he talked about with the undercover, and that's

25  sex with children, and remember, during that, he did not ever

1  say, "No, no, look, I'm into dogs, okay?  That's not the taboo

2  kink that I shared."  "I'm into horses or I'm into" whatever

3  stuff he was interested in.  He never said any of that.

4      He found out that the undercover had a child and she was

5  like -- thinking, "I might have some taboo kinks," and jumped

6  on that and he ran with it, because that was his interest.

7  That was the taboo kink that he wrote about in the Craigslist

8  post.  And remember, it was just one.  It's a singular thing.

9  We have "a very specific taboo kink."  It wasn't "We talked

10  about a lot of weird stuff and let me know what -- you know,

11  we'll find something that we can have sexual chatter about."

12  No.  One.  And it was sex with children.  And he absolutely

13  could come up with the most graphic sexual activity that he

14  wanted to do with the minor.

15      And remember the text -- or the email that he wrote to the

16  undercover where he wrote, Do you masturbate to the thoughts

17  about the 3 of us?  I know I do several times, and I, you know,

18  orgasm every single time.  That was sexually exciting to him.

19  He has a sexual interest in children.  And he groomed the

20  mother to get to the child.  And when he -- He wasn't grooming

21  the child -- when he was grooming the undercover, remember, he

22  was normalizing the deviant behavior.  He was grooming the

23  mother to convince her to make her child available to him for

24  sex, get her help convincing the child to do this, we've got to

25  deal with the school problem, so that was all deliberate, and

1  then he showed up to have sex with her.

2      And he admitted to the sexual contact with Elisha, ER, who

3  was 15, and he knew it.  And he wanted more.  He told you what

4  happened, and he kept at it until she finally told him to go

5  away because she was tired of it and he was bugging her.  But

6  he was doing -- pulling out all the stops to try and get back

7  in, into her life, into her good graces, and into her bed.

8      Now, you received an instruction from the judge during the

9  trial about how certain evidence ought to be -- ought to be

10  considered by you in your deliberations.  That such evidence,

11  when given the instruction, is to be -- is to be considered by

12  you not as substantive evidence of guilt but as evidence to

13  show his intent.  And how do you know, like, what's his intent

14  when something happens?

15      And the final exhibit that you received this afternoon --

16  or this morning shows most clearly that Mr. Sheltra has a

17  sexual interest in children and that he absolutely intended to

18  have sex with Maddie, that he was doing all the grooming and

19  intended to entice that child -- that mother to make her have

20  the child available to him for sex, and he has a sexual

21  interest in ER, and that all the work that he did to groom her

22  so that he could have sex with her is because he has a sexual

23  interest in children.

24      And his intent when he kept on asking -- and he asked ER

25  twice to victimize herself and send him a picture of her

1  genitalia, another blare victimization he was asking of her,

2  but to send to him what constitutes child pornography.

3      And you know that he had that intent because of the final

4  exhibit, which was the pictures of those two little girls

5  engaging in sexually explicit conduct.  They were performing

6  oral sex on adult male penises.  That image -- those images

7  were found on Mr. Sheltra's phone.  That's how you know what

8  his intent was.  Because it's no accident.  Again, it's no

9  accident that somebody who has worked so hard as he did to have

10  sex with the undercover and her daughter and ER, that he would

11  have child pornography on his phone, those sexually explicit

12  images?  That was no accident.  And that helps you to

13  understand exactly what his intentions were.

14      And you can reject that part of his testimony where he

15  denied having a sexual interest in children, and I invite you

16  to do so, because it is not supported by the evidence.  It is

17  contrary to everything else introduced in this case that shows

18  you who the real Randy Sheltra is.

19      Ladies and gentlemen, the Government has met its burden of

20  proving beyond a reasonable doubt all of the elements of all

21  three offenses that are in the indictment against Mr. Sheltra.

22  I will get an opportunity to address you at the end of -- after

23  Mr. Kaplan does his summation, and at that time the Government

24  will ask you to return a verdict of guilty.

25      Thank you.

1          THE COURT:  At this point in time we're going to take
2    our afternoon break.  It's a little bit postponed.
3    Approximately 10 minutes.  It's really a facility break.
4        Don't talk about the case.  Don't let anyone talk to you
5    about the case.  We'll come back for the defendant's closing
6    arguments.
7        Let's excuse the jury and have the attorneys remain in the
8    courtroom.
9        (The jury exited the courtroom, after which the following
10   was held in open court at 3:06 PM.)
11         THE COURT:  Anything to bring to my attention before
12   we take our own break?
13         MR. KAPLAN:  No, your Honor.
14         MS. MASTERSON:  No, your Honor.  Thank you.
15         THE COURT:  All right.  Let's come back in 10 to 15.
16   Thank you.
17       (A recess was taken, after which the following was held in
18   open court without the jury present at 3:20 PM.)
19         THE COURT:  Are we ready to bring back the jurors?
20         MR. KAPLAN:  Yes, your Honor.
21         THE COURT:  Yes and yes?  Yes to that?
22       Thank you.
23       (The following was held in open court with the jury
24   present at 3:22 PM.)
25         THE COURT:  We are back on the record in United States

1  of America vs. Randy Sheltra.

2      And we are here for the defendant's closing argument.

3          MR. KAPLAN:  Good afternoon, ladies and gentlemen.

4      I'm sure that we can all agree, after having had the

5  opportunity to observe all of you during the course of this

6  trial, that you are taking your obligation -- your role as

7  jurors seriously, and I can't really stress to you enough just

8  how important that is for our criminal -- system of criminal

9  justice.  Because, after all, that is the system that was

10 envisioned by our forefathers.  They were not interested in

11 having someone who had been charged with a criminal offense to

12 be judged by a king or a potentate.  They wanted that

13 individual to be judged by a jury of their peers.  And so you

14 have accepted an awesome responsibility to sit in judgment of

15 another fellow citizen.  But as I said, I trust that he will

16 receive a fair trial at your hands.

17     You may recall in my opening statement I indicated to you

18 that when I had an opportunity to speak with you again, as I am

19 now, that I probably would not ask you to either agree or

20 disagree that my client is eligible for the good citizenship

21 award.  I wouldn't ask you to even agree or disagree with some

22 of the things he said or did.  But I did caution you and I

23 would caution you to be careful not to criminalize free speech,

24 no matter how disturbing the speech might be, as long as the

25 speech is legal, and that's for your consideration.  But there

1  is a fine line there, and I would suggest there's a

2  particularly fine line there in this case.

3      I would like to read to you just a small section of the

4  charge that the Court will give to you after I finish speaking.

5  And it reads like this:  "The statute does not criminalize

6  merely talking to a minor, asking about sex, or asking about an

7  individual's interest in sex."  And so that's what I'm

8  referring to when I'm cautioning you about not criminalizing

9  free speech.

10     I would also point out to you that it doesn't really

11 matter if you like or dislike my client, if you agree with him

12 or disagree with him on the kind of person he is or the things

13 he said or does.  That's irrelevant.  What's relevant is what

14 you hear for evidence in this case, and you're required to base

15 your decision on evidence that's been introduced and not on any

16 other factors.

17     And there has been a fair amount of evidence introduced in

18 this case even though it's been a fairly short case.  In

19 particular, we have the correspondence between my client and

20 the undercover police officer and the correspondence between my

21 client and ER, which you had the opportunity today during the

22 prosecutor's closing to see in detail.

23     Now, I would submit to you that if you listen to what the

24 prosecutor was really saying to you in her closing, it really

25 is, What you should do is just look at what it is that Mr.

1  Sheltra wrote, and what he wrote and what he said from her
2  standpoint is what he intended to do.  And it makes your jobs
3  fairly simple.  If he said he was going to do something, that
4  meant he was going to do it, and as a result he's guilty of the
5  counts that he's been charged with.
6      But I would submit to you that that's a far too simplistic
7  approach, that there were a number of instances in this case
8  where Mr. Sheltra said he was going to do things that made
9  absolutely no sense, that he had no intention of doing, and
10  that it made sense that he had no intention of doing it.
11      The prosecutor spoke to you several times about the fact
12  that there was a discussion between my client and Alisha about
13  having sex with a horse, with a fire extinguisher, with other
14  objects, and I would submit to you that's a perfect example of
15  my client engaging in fantasy, engaging in sexual banter with
16  someone, but having no intention of ever becoming involved with
17  someone having sex with a horse or with a dog or with anything
18  else along those lines.  In fact, Mr. Sheltra testified to the
19  effect that he didn't intend to do that and, as far as that
20  goes, he didn't even believe that Alisha -- or the fake Alisha,
21  as the prosecutor referred to her, was doing anything along
22  those lines.
23      So the question is, Why was he having these conversations?
24  Why would he say almost anything that he felt like when he was
25  involved in these correspondence?  Fortunately, to assist you

1  in deliberations, the defense has presented three different

2  kinds of evidence.

3        First, obviously Mr. Sheltra testified.  And as you've

4  been told, he didn't need to, but he did.  He wanted you to

5  hear his story, and so you have now the opportunity to assess

6  his credibility.  And that's something that jurors don't always

7  have in these cases, but you do in this case, and you can use

8  your assessment of his credibility and what he said he intended

9  to do in this situation during the course of your

10  deliberations.

11       Secondly, the defense introduced the correspondence

12  between Mr. Sheltra and Alisha.  And we did that because the

13  thinking was that if you can understand what Mr. Sheltra's

14  relationship was with Alisha and what was going on and what his

15  intentions were, then you would be in a far better position to

16  try and understand what his relationship was and what his

17  intentions were with respect to the undercover police officer

18  and with ER.

19       And the third piece of evidence that both the prosecution

20  and the defense introduced were examples of Craigslist postings

21  that Mr. Sheltra had used.  And you may recall when you look

22  at -- or when you view them during your deliberations, if you

23  do, that he never once insinuated in any way that he was

24  interested in having a relationship with a minor.  He always

25  spoke in terms of someone in their 20s or older.

1       Now, I said to you that the Alisha emails could be of

2  great assistance to you in determining what's going on in this

3  case, and I would submit to you that there are three relevant

4  factors in that respect.

5       First, that if you look carefully at the Alisha emails, I

6  submit that you would be able to determine that he had no

7  interest in having any kind of a sexual relationship with

8  Alisha's daughter, but it was Alisha that he was interested in.

9       Secondly, the Alisha correspondence clearly points out

10 that Mr. -- points out Mr. Sheltra's overriding interest in

11 engaging in fantasy.  I would submit to you that the closest

12 analogy I can come up with is we all understand what it means

13 to be a voyeur, someone who probably enjoys watching other

14 people engaged in sexual activities.  I would submit to you

15 that sort of akin to that is Mr. Sheltra's interest in sort of

16 looking into the window of people's mind, determining or

17 hearing about what their sexual interests were, and fantasizing

18 about it and engaging in discussions about what it is he saw

19 when he was looking in the windows of people's minds.

20      And finally, the third aspect of the Alisha emails, I

21 would submit, has to do with his eagerness and I suppose unique

22 ability to engage in sexual dialogue.  If you look at the

23 dialogue between Mr. Sheltra and, for example, the undercover

24 police officer, who apparently was just as adept at engaging in

25 that kind of conversation, you will see that the conversation

1 just flowed back and forth, and both of them said things that

2 most people wouldn't be able to come up with. But the issue

3 is, What was the intention?

4     Mr. Sheltra first came into contact with Alisha in June of

5 2016, and he did that when he responded to an ad that Alisha

6 had posted saying -- at least a person calling themselves

7 Alisha saying that Alisha wanted to go out on a date on

8 Saturday night, was anyone interested. And Mr. Sheltra

9 responded and said that he was interested. The ad said nothing

10 about -- made no reference to minors, and it wasn't -- wasn't a

11 factor at that point.

12     And it wasn't long after Mr. Sheltra responded to that

13 email -- or that Craigslist ad that they began talking about

14 having sex and making arrangements to meet so that they could

15 engage in a sexual relationship. And as they got closer and

16 closer to when they were planning on meeting, Alisha said to

17 Mr. Sheltra in the emails that you will have that, by the way,

18 she has a minor daughter -- or a young daughter but that they

19 could fool around in the front seat of the car while the

20 daughter was in the back seat.

21     And you will see, in looking at those emails, or maybe you

22 recall it from the prosecutor having read them to you, that

23 that was not something that was acceptable to Mr. Sheltra. And

24 his counterproposal was that he would be willing to pay for a

25 hotel room that had two beds so when Alisha's young daughter

1  fell asleep in one bed, they could then fool around in the

2  other bed.  It was at that point that Alisha said to Mr.

3  Sheltra -- I'm sorry.

4      It was at that point that Mr. Sheltra said to Alisha, "By

5  the way, how old is your daughter?"  And when Alisha responded

6  that she was 9 or 10, you will see from the correspondence that

7  Mr. Sheltra was not happy with that, he was surprised by that.

8  He said, "I thought your daughter was younger."  And again you

9  will see a reasonable interpretation of the conversation that

10  he was not willing to engage in a sexual relationship in the

11  same room that Alisha's daughter was present in, and so what he

12  did was he said, you know, "I have a daughter ... and I would

13  be willing to pay for a baby-sitter so you can leave your

14  daughter at home and we can then engage in a sexual

15  relationship."

16      So I would submit to you that at that point there's no

17  evidence that Mr. Sheltra was ever interested in a sexual

18  relationship with Alisha's daughter or anyone else's daughter

19  at that point.  And not only is there no evidence, but there's

20  clear evidence that he was opposed to it and that he kept

21  suggesting alternatives so that that wouldn't -- that

22  wouldn't -- it wouldn't take place that way.

23      At that point Alisha started talking to Mr. Sheltra about

24  the fact that she was in Atlanta, Georgia, she was having sex

25  with a lot of different guys, which of course got Mr. Sheltra

1  excited.  He wanted to hear all about it.  And then Alisha

2  said, "And also my daughter's having sex with a lot of

3  different people."  And again Mr. Sheltra acted surprised, and

4  at some point when Alisha convinced Mr. Sheltra that they could

5  have sex in the same room that the daughter was in, he said to

6  Alisha -- I would submit to you this is further proof that he

7  had no interest in the daughter.  He said to her, "All right,

8  if you insist, but I want you to know I'm only going to be

9  looking at you.  I'm not going to be looking at anyone else."

10       This went on for a while.  And then Mr. Sheltra -- Mr.

11  Sheltra testified during his time that he testified in this

12  case that the only reason after that he began to express some

13  interest in the minor child participating was because he

14  understood that if he didn't do that and that was what Alisha

15  wanted, that he would lose her, he wouldn't be able to find

16  her, and he wouldn't be able to have a sexual relationship with

17  her, and he testified that if he met her, he had no intention

18  of doing anything with the child, which I submit to you is

19  consistent with how his relationship with Alisha started.

20       The other aspect of his relationship with Alisha that I

21  submit to you is important is Mr. Sheltra's emphasis or

22  interest in engaging in fantasy.  There shouldn't be any

23  question if you read the emails and the correspondence between

24  him and Alisha that for him everything was about fantasy, as I

25  said to you earlier.  He engaged in extensive conversation with

1 Alisha about having sex with a horse, about having sex with a
2 dog, with animals, with using a fire extinguisher, when he
3 knew, I submit to you, that none of that had taken place or was
4 going to take place, but it was a discussion that he enjoyed
5 having; it was a discussion that he enjoyed thinking about.  He
6 would ask Alisha about her personal desires, what she wanted
7 and what she enjoyed doing, because he enjoyed thinking about
8 that and fantasizing about it.

9        And along with that went his willingness, as I said
10 earlier, to engage in sexual banter.  He really wasn't the one,
11 contrary to what the prosecutor has said to you, who initiated
12 these conversations.  He simply responded to them, and he
13 responded in kind.  Whatever they said, he said the same thing
14 in kind and added some more on to it.

15        So I submit to you that if you do understand Mr. Sheltra's
16 relationship with Alisha, it could be a help to you in deciding
17 what his intentions were with respect to the undercover police
18 officer.  Was he really only interested in her, or did he have
19 an interest in the daughter?  Was he interested in fantasy when
20 it comes to the undercover police officer, and did he engage in
21 sexual banter with her?

22        The first question of whether or not he had the intent of
23 involving the undercover police officer's fake daughter in a
24 sexual relationship, according to the prosecutors, is easy for
25 you to determine, because she went through every single

1  correspondence between them and essentially said to you, "You

2  need to accept what he said as true," that just the

3  correspondence themselves represent the fact that he intended

4  to have a sexual relationship with her daughter.

5       But fortunately, the prosecutor's own witness, the

6  undercover police officer, can assist you in deciding whether

7  or not just looking at the correspondence between Mr. Sheltra

8  and the undercover police officer is sufficient for you to find

9  that he intended to have a sexual relationship with the

10 daughter, and I'll just read to you a portion of that.

11          "QUESTION:  How do you actually know -- when all this

12          is said and done and you've heard all of the detailed

13          explanations of what you said and what his response

14          is, how do you know he actually intended to do

15          something?"

16          Which is the case.

17          "ANSWER:  He said in the emails what he intended and

18          then he arranged to meet and showed up at the meeting

19          location.

20          "QUESTION:  So is it your testimony that the fact that

21          he arranged to meet with you is fairly detailed?

22          "ANSWER:  Yes.

23          "QUESTION:  And that's important because it shows his

24          intent?

25          "ANSWER:  Yes.

1          "QUESTION:  And it's important because if he didn't do

2          that, just looking at the emails themselves wouldn't

3          be enough to show that he intended to do anything?

4          "ANSWER:  Correct."

5          So what -- what is it that you just heard that the

6  undercover police officer testified?  Because the prosecutor

7  has gone over and over again, emphasized over and over again

8  just how experienced this undercover police officer is, that

9  she's doing everything by the book, she knew what she was

10 doing, that she's essentially an expert in this field, and what

11 she said on cross-examination is that if you look at all those

12 emails, the same ones that the prosecutor went through every

13 single one with you, if you look at all those emails, that's

14 not enough to find that -- at least from her expert opinion,

15 that's not enough to find that Mr. Sheltra intended to engage

16 in a sexual relationship with -- with a child.

17      What her point was, and the prosecutor actually said this

18 to you in her closing, what's important is the fact that he was

19 driving down to South Burlington to meet with the undercover

20 police officer.  Without that, essentially what -- at least I

21 would submit to you, what she was saying on cross-examination

22 is that there's not enough there to convict him.

23      So I would submit to you that if you look at this -- this

24 dialogue between the undercover police officer and my questions

25 of her, how are you able really to determine if someone really

1  intends to do what they want to do or if it's just fantasy and

2  they're just engaging in getting -- getting off on hearing

3  about other people's sexual desires and what it is they like to

4  do when they go to bed at night?  And again, fortunately, we

5  have the prosecution's own witness, the undercover police

6  officer, to answer that question, and I'll read you a portion

7  of what she said.

8          "QUESTION:  Okay.  And are you taught in your training

9          and from your experience that when you get involved in

10         an area like this, that there are people that just

11         fantasize about what's going on, enjoy that kind of

12         sexual dialogue with others?

13         "ANSWER:  Yes.

14         "QUESTION:  Okay.  And so you're aware of that issue?

15         "ANSWER:  Yes.

16         "QUESTION:  And when you look at the graphic

17         descriptions that Mr. Sheltra said about what could

18         happen with you and with your daughter, doesn't that

19         strike you as being a little extreme?

20         "ANSWER:  What do you mean by 'a little extreme'?

21         "QUESTION:  Well, in terms of going into as much

22         detail as he did, explaining how everything's supposed

23         to be done step by step.  Doesn't it sound to you like

24         someone that's more interested in fantasizing about it

25         and thinking about it than actually doing it?

1          "MR. GILMAN:  Objection.  Calls for speculation.

2          "THE COURT:  I'll allow it.

3          "ANSWER:  Not necessarily, no.

4          "QUESTION:  Okay.  So when you say 'not necessarily,'

5          it's certainly a possibility?

6          "ANSWER:  Based on just the conversations alone, yes.

7          People who are interested just in fantasizing and in

8          talking don't usually suggest meeting or make

9          arrangements to actually meet."

10         So again, what the undercover police officer testified

11    to, and it will be up to you to decide whether or not you agree

12    with that, is that you can't tell from the emails that the

13    prosecutor spent an hour on going over with you whether or not

14    Mr. Sheltra actually intended to involve a child in a sexual

15    relationship, and you can't tell if it's just fantasy or not,

16    because she testified there are people that just engage in

17    fantasy.  They say all kinds of things but don't intend to do

18    any of them.  And so how do we know in this case what the issue

19    is?  How do we know what his intention was if there are people

20    that just fantasize and don't intend to do anything and if you

21    can't just tell from his emails, according to the expert in

22    this case?

23         Apparently the answer is because he made arrangements to

24    meet the undercover police officer in South Burlington.  But I

25    would submit to you that that's -- that's not sufficient,

1  because if you take a close look at his correspondence with --

2  with the undercover police officer, and the prosecutor didn't

3  review this section with you, but when he was making

4  arrangements to go down and meet her, he said to her, "We can

5  go to a restaurant.  It doesn't matter to me.  And your

6  daughter's perfectly willing *[sic]* to be there."

7       So I would submit to you that a reasonable interpretation

8  is that he was coming down to meet the undercover police

9  officer no matter what.  It didn't matter to him if the

10  daughter was there or not, but if she wanted to be there, she

11  was invited.  So does that strike you as someone who's

12  traveling to South Burlington to have sex -- involving a minor

13  child in sex if it didn't matter to him whether she was there

14  or not?

15       The prosecutor in her closing made a point over and over

16  again that the undercover police officer acted appropriately,

17  didn't lead him, didn't encourage him, that my client did

18  everything, and that's just not true.  If you take a look at

19  that, she encouraged him every step of the way, and she -- she

20  was the first one that said "my daughter's heard things and

21  seen things" and was trying to get him interested that way, and

22  when he didn't become more interested, she told him more

23  graphic things about what her daughter knew or saw, and she was

24  right with him every step of the way.

25       As I indicated to you, this is a perfect example of Mr.

1  Sheltra engaging in sexual banter.  She would say something and

2  he would respond.  And it is true that it was layer on layer,

3  but it wasn't just my client putting all the layers on.  It was

4  the undercover police officer -- I mean, if anyone

5  independently read those transcripts, you would not think that

6  my client was initiating -- I submit to you, was initiating

7  these conversations, that he was in them alone.  I submit that

8  you would think, if you go back and look at those, that both

9  parties would appear to be equally interested in what was

10 taking place.

11      And we know that Mr. Sheltra engaged in an awful lot of

12 fantasy with the undercover police officer.  He was asking her

13 constantly about what her sexual desires were, what her

14 interests were, what she thought about when she went to sleep

15 at night, what her deepest thoughts were, and he would say, "I

16 like to know all that, I like to think about it when I'm going

17 to sleep and pleasuring myself, so tell me everything there

18 is," and there wasn't anything that he wouldn't talk -- talk to

19 her about, and there wasn't anything that she didn't respond to

20 in kind.

21      So I guess my question to you is, If it is true, as the

22 undercover police officer said, that you can't determine just

23 from the emails if Mr. Sheltra intended to do anything with a

24 minor child, and if it's true, as the undercover police officer

25 said, that the emails with the undercover police officer could

be just fantasy, can you really find that the prosecutor in
this case has proven her case beyond a reasonable doubt just
because Mr. Sheltra agreed to drive to South Burlington when I
just indicated to you that you will see in the correspondence,
which the prosecutor did not point out to you, that he
responded by saying, "Sure, I'll come down and meet, but -- and
your daughter's welcome if she wants to be there," but he
wasn't -- he wasn't -- if the undercover police officer had
said "my daughter won't be there," it should be clear to you
that he was coming down anyway, because the person he really
wanted to have sex with was the undercover police officer, not
the daughter, just like with Alisha.

     And think about it.  If he was really interested in minor
children, do you think there would only be, like, one or two
pornographic pictures on his cell phone?  Which he indicated he
didn't know where they came from, but wouldn't you expect to
see a lot more than one or two?  And you heard Mr. Thornton
testify that pictures like that can end up on someone's cell
phone by accident.

     I said to you on several occasions that if you understand
what took place between my client and Alisha, it can help you
understand what took place also with ER.

     And I've got to go back and point out one thing, that when
my client was driving down to South Burlington, the undercover
police officer mentioned that he was coming from Alburgh.  And

1 you heard the undercover police officer say on

2 cross-examination that she realized that he had never said that

3 to her and that might have alerted him to the fact that

4 something was up, and you heard Mr. Sheltra testify that when

5 he heard that, he realized that she probably wasn't who she

6 said she was or maybe she was in trouble, but he didn't think

7 he had anything to worry about, so he was going to go down and

8 try and meet her, whoever it was, anyway.

9      So looking at his correspondence with ER, it's extremely,

10 I would submit to you, similar to his correspondence with

11 Alisha and his correspondence with the undercover police

12 officer.  There's an awful lot of fantasy, awful lot of

13 discussion about sexual activity.  Probably inappropriately in

14 that who talks to a 15-year-old among those terms?  But she was

15 talking about it, and he was responding in kind.  He was

16 offering his own opinion.  And there's a lot of sexual banter.

17 But that doesn't mean that he intended to engage in any sexual

18 kind of activity with her.

19      Keep in mind that in Count -- in Count 2, he's charged

20 with attempting to do something and not actually having done

21 something, and so I would encourage you, rather than just rely

22 upon what the prosecution said to you in her -- in her closing,

23 to go back and actually look at the email correspondence

24 between Mr. Sheltra and ER and see if you can point

25 specifically to where he wanted to induce or coerce or

1  encourage her to engage in a sexual relationship, or was it

2  just banter, just discussion?

3       And don't you think that if they had met and something had

4  taken place, given Mr. Sheltra's penchant for saying everything

5  that came into his mind and given ER's, apparently, eagerness

6  to tell him anything sexual that she thought about, that there

7  would have been some reference in the email correspondence

8  between my client and ER that would have suggested at least

9  something took place when they talked for a couple hours in the

10 car?  And yet there's nothing there, and there's no indication

11 that anything like that ever took place.

12      Again, the prosecutor said to you it's important that he

13 agreed to meet her, but it was ER who initially contacted my

14 client, just like it was the undercover police officer who

15 initially contacted my client, and on both occasions my client

16 wasn't smart enough not to engage with them, but it was ER who

17 suggested that they meet.  It was ER that encouraged them to

18 meet.  My client testified that he didn't leave at midnight, he

19 never left the house that night, but he did go the next

20 morning.

21      And so I'll read to you just one more time because I think

22 it's particularly relevant here the portion of the judge's

23 charge that you will hear.  "The statute does not criminalize

24 merely talking to a minor, asking about sex, or asking about an

25 individual's interest in sex."  And I submit to you that's what

1  we have here with respect to ER, lots of conversations about

2  sex, lots of fantasizing, lots of expressing an interest in

3  what other people's sexual activities were, but I don't -- I

4  think you'd have trouble distinguishing if in fact it's true -

5  you can't tell from the emails with the undercover police

6  officer, just from the emails themselves - that Mr. Sheltra

7  intended to do anything.

8          How can you tell just from the emails -- or the

9  correspondence with ER that he intended to engage in sexual

10 activity with her?  Don't you think that if you asked the

11 undercover police officer about the correspondence with ER she

12 would say the same thing that she said about the correspondence

13 with herself?

14         Count 3 is just something you'll have to decide, I

15 believe, based on what you think about the credibility of Mr.

16 Sheltra.  He said that he sent the text accidentally to ER

17 asking for a picture.  There is a certain logic to that,

18 because if you look at his other request to her for pictures,

19 he never was specific.  He said just "send me a picture,

20 anything that you'd like, I'd love to see you," but he didn't

21 ask for anything specific, so this is really out of character

22 for that particular correspondence.

23         And I think it's probably public knowledge that everyone

24 on occasion will send a text message to someone they didn't

25 intend to, sometimes with worse consequences than others.  But

1  it's not something that, as the prosecutor said, is not

2  believable.  Of course it's believable.  People make mistakes

3  all the time.

4       And it doesn't follow the conversation.  If you go back

5  and look at the conversation that was taking place between ER

6  and my client, that request is sort of out of context.  It just

7  doesn't follow along with -- with the conversation.

8       So I'd like to leave you with a few thoughts:

9       The testimony is that my client is a 58-year-old

10  individual who in 2017 was 55 years old.

11      He had gone through a divorce in 2012 that he didn't want.

12      He worked for IBM and then GlobalFoundries for over 30

13  years.  He was a supervisor for most of that time, supervising

14  between five and 30 individuals.

15      He testified that he had not participated in Craigslist or

16  going out on the Internet, along those lines, prior to his

17  divorce, that he didn't drink and he didn't go to bars, and so

18  that was -- that was his incentive for engaging in the conduct

19  that's been put in front of you today.

20      I submit to you that there's no question that he was

21  desperate, he was lonely, he wanted to meet women, and this was

22  the only way that he felt was a reasonable way to do it.

23      It should be clear to you that at the time that he was 55

24  years old, he was targeted by the Government through -- through

25  the undercover police officer.  And ER responded to him --

1  responded to his ad.  He didn't go out looking for ER.  And --

2  so he would have these conversations with whoever it was that

3  would contact him.

4      So I think when it's all said and done, maybe it's just

5  not possible to determine what his intentions were.  Did he

6  intend to engage -- have a minor engage in a sexual

7  relationship?  Was it just fantasy?  Did he drive down to South

8  Burlington to have sex with a minor, or did it not matter to

9  him?

10      And I would submit to you that if you can't tell -- and

11 when I say "you can't tell," the prosecutor has to prove this

12 to you beyond a reasonable doubt.  And if you can't determine

13 beyond a reasonable doubt that this wasn't just fantasy, it

14 wasn't just sexual banter, talk back and forth, then I would

15 recommend to you that you come back with a verdict of not

16 guilty.

17      Thank you.

18          THE COURT:  Any rebuttal argument from the Government?

19          MS. MASTERSON:  Yes, your Honor.  Thank you.

20      Okay.  So defense counsel has raised a lot of points, and

21 I'm not going to go through and rebut everything.  I think you

22 guys have heard enough out of me today, and I trust your

23 ability to go to the evidence, because the evidence is all

24 before you, and it was all explained to you in opening -- in

25 the closing argument that I did, and it establishes beyond a

1  reasonable doubt that this wasn't a fantasy.  It was real.  It
2  was something that Mr. Sheltra wanted, and it was what he went
3  after.
4        There are a couple of points, though, I do want to -- I do
5  want to address.
6        First off, with respect to the Craigslist posts that
7  were -- that the defense raised about how they were not overtly
8  sexual towards minors, and let's remember that on
9  cross-examination Mr. Sheltra agreed and admitted that
10 Craigslist will block such posts if they -- they have user
11 terms and conditions, and he signed them, and he knew that if
12 he were to overtly say that he wanted to have sex with a minor,
13 that would be a problem.  It would violate the conditions and
14 it's not allowed and it would be blocked, so he's not going to
15 get any action at all if he sends that post.
16       With respect to whether the Alisha exchanges - Alisha with
17 an A - were all fantasy, that's not consistent with what the
18 evidence is.  The evidence showed that -- and let's remember,
19 this isn't charged conduct, but the defense wants you to use
20 this to kind of layer on the lack of intent on that to his
21 engagement with the UC and with ER.  But the Alisha with an A
22 communications, that wasn't fantasy, because look at how far he
23 went to keep it going.  He was desperate.  He lost her, and he
24 didn't want to lose the UC -- the undercover the way that he
25 lost ER *[sic]*.

1        Remember, he said he kind of -- he testified that he

2    accelerated the meet time because he had dawdled in getting a

3    meeting with Alisha with an A, and so that was why he

4    accelerated that and moved to have the meeting with the

5    undercover sooner rather than later.

6        His efforts to -- or all of his communications after

7    Alisha with an A stopped talking to him are so revealing,

8    because he says -- and you're going to have that before you

9    because it's Defense Exhibit C.  It was admitted.  You heard

10   it.  And there were so many emails.  She stopped talking to him

11   and ghosted him on July 4th, but he kept asking, emailing her,

12   emailing her every day, every week, every three weeks, until

13   finally it drifted off and he got the attachment that the

14   account has been closed, but all those emails are "where are

15   you?  I want it all.  I want to have sex with the both of you,

16   you and your daughter."

17       He kept going.  That's not fantasy.  If it's just fantasy,

18   then you're going to give up and move on to the next person.

19   No, he wasn't willing to give up because he was that interested

20   in fulfilling that desire, not fantasy, making it really

21   happen.

22       In fact, he also posted on Craigslist "Looking for

23   Alisha," and that's how it all got started, and she had been

24   gone for 13 months.  She had ghosted him 13 months earlier.

25   That wasn't fantasy.  That was absolutely what he wanted.

1    With respect to whether the undercover -- you know, what
2  is her position on whether -- you know, was it sufficient or
3  not, I submit to you, ladies and gentlemen, the beauty of our
4  system is you are the triers of fact.  You are the ones who get
5  to decide whether or not there's sufficient evidence to prove
6  beyond a reasonable doubt that Mr. Sheltra had the requisite
7  intent to engage in the sexual activity with Maddie, the
8  10-year-old.  You get to do that.  And so the undercover is
9  responsible for gathering the evidence, and she did a nice job
10 of it, but you figure it out.  That's your job.  That's the
11 beauty of our system.
12    With respect to traveling to South Burlington, was that
13 part of the fantasy?  Instead the defense said that we didn't
14 bring up the fact that he suggested that they go to a
15 restaurant.  Well, right.  But the same characterization of
16 those communications count with the other communications.  I'll
17 take you to a restaurant, your choice, what does Maddie want;
18 I'll pay.  That's what that text says.  He's still grooming.
19 That's more of the grooming material that he wants because
20 he's -- now he's generous, and he's financially going to give
21 them a nice evening out.  So he's still grooming with that.
22    And when he traveled to South Burlington also, let's not
23 forget, he didn't masturbate that morning because he wanted to
24 save it, and he showered.  He wants -- he went down there to
25 have sex.  And the restaurant was just more of him trying to

1  cozy up to the undercover so that she will give him access to

2  her daughter, which he worked so hard for.

3       And let's break down this Alburgh thing just a little bit,

4  how Mr. Sheltra testified that he got a little, you know,

5  curious about whether or not it was the police that was going

6  to show up at the Whales' Tails instead of the undercover, and

7  let's not forget that he investigated Elisha, the 15-year-old.

8  He went to her Facebook page and looked at her.  And so of

9  course somebody else could look him up, because his Facebook

10 page was a publicly available -- the undercover testified that

11 that's how she got it.

12      And interestingly, he said, So, you know, no problem if

13 it's the police; I didn't do anything wrong.  Okay.  So if that

14 is in fact the case, then why in the world would he have asked

15 every single person that he's having sex-with-children chatter

16 with if they're the police?  He's not going to just show up and

17 be like, Oh, no problem if it's the police.  He's going to

18 hightail it out of there.  He's not going to go anywhere near

19 it because he's been doing a very bad thing, and he knows it.

20 It's all that consciousness of guilt evidence that I talked to

21 you about.

22      And let's also -- you saw the video.  This is a very

23 discrete, concrete moment that I want you to focus in on.  You

24 saw the video of the arrest, and when Mr. Sheltra was arrested,

25 he had one question for law enforcement:  What are you going to

1  do about my car?  That was it.

2      With respect to whether sexual activity happened with ER,

3  counsel just said that -- you know, that nothing happened,

4  that -- that they didn't do anything, and that's why it's

5  charged as an attempt.  That's not correct.  You know that

6  something did happen because of the third email to Person 1.

7  That's where he described what it was.  And the question for

8  you as jurors is, Does that sexual activity where he touched

9  her nipples and kissed her neck and did all that stuff, does

10 that contact constitute a crime under Vermont law?

11      And I submit to you that reading and accepting what he

12 wrote as true means that that activity didn't, which is why

13 it's charged as an attempt.  That's all they got to do, because

14 remember what he said:  It was in my car, it was in the middle

15 of the afternoon, there was no way we could -- he used the

16 word.  I'll say "have sex."  All right?  He couldn't do it

17 because they were sitting in the car.  It was an attempt.  He

18 got out there, and that was all the things that he did.

19      And talking about Elisha, the 15-year-old, and suggesting

20 that she was the mover and shaker, she's the one who suggested

21 she wanted him to come out and she wanted to do everything, we

22 can't excuse what her conduct was, but we shouldn't shame her

23 as the victim here, and remember what I said in closing.  She

24 didn't need a boyfriend.  She didn't need Mr. Sheltra as her

25 personal counselor.  She needed a grown-up.  She didn't need

1  Mr. Sheltra.

2           MR. KAPLAN:  Objection, your Honor.

3           THE COURT:  I'll allow it.

4           MS. MASTERSON:  She needed a grown-up, not him.

5       And with respect to whether the texts asking ER for the

6  sexually explicit photos of herself, talking about -- and Mr.

7  Kaplan is right, defense is right, that in the very early

8  stages of their communications, they did talk and he would say,

9  "Would you send me more sexy pics or pics of your cute little

10 butt?" or whatever his language.  Remember, the evidence will

11 be before you, but he did -- wasn't specific.  But in saying

12 that the text was an accident, remember, that's anchored to

13 this Treena problem and that -- his testimony that he was

14 triggered by the anal sex conversation, that he thought he was

15 communicating with Treena, which is why he then asked for it,

16 and that ignores the -- he didn't ask for it from ER, but that

17 ignores the fact that an hour and 20 minutes before that Mr.

18 Sheltra asked ER for a pic of her labia.

19      And in fact, it's not like this came out of the blue also.

20 The second one said, Will you send me a pic of your pussy lips;

21 I'd still like to see them.  He had already requested and now

22 he's asking a second time.  So I submit to you you can reject

23 this whole Treena thing.  This wasn't an accident.  It was

24 absolutely intentional.

25      The question remains is, What were his intentions?  And

1  you know what his intention was:  His intention was to have sex

2  with the -- or his intention was to entice the undercover, the

3  mom, to have sex -- so that he could have sex -- or unlawful

4  sexual conduct with a 10-year-old; Mr. Sheltra's intention was

5  to entice, persuade, and groom the 15-year-old so that he could

6  have sex with her; and his intention was to get the sexually

7  explicit photos of ER because he wanted it so that he could

8  masturbate to it.  That's Randy Sheltra.

9       He is guilty of each of the counts that have been brought

10 forward for your consideration.  The Government has proved

11 beyond a reasonable doubt each and every element of each and

12 every charge.  There is only one verdict that is consistent

13 with the evidence that you have heard in this case, and that is

14 guilty on all counts, and I thank you so much for your time and

15 careful attention in this case.

16           THE COURT:  At this point in time, the courtroom

17 deputy will hand out jury instructions to the jurors.

18       You can read along with me; you can listen to me read.

19 However you take in information best.  You'll have a copy of

20 these jury instructions to take back with you for your

21 deliberations.

22       Members of the jury, now that you have heard the evidence

23 and the arguments, it's my duty to instruct you on the law.  It

24 is your duty to accept these instructions of law and apply them

25 to the facts as you determine them.

1          This case is a criminal prosecution brought by the United

2   States of America against Defendant Randy Sheltra.   The

3   indictment charges Randy Sheltra with three counts.   The

4   indictment reads as follows:

5          "Count One:

6          "From on or about September 7, 2017, through on or about

7   September 10, 2017, in the District of Vermont, the defendant,

8   Randy Sheltra, using any facility and means of interstate and

9   foreign commerce, did knowingly attempt to persuade, induce,

10   entice, and coerce an individual who had not attained the age

11   of 18 years to engage in sexual activity for which any person

12   can be charged with a criminal offense.

13          "Count Two:

14          "From on or about August 20, 2017, through on or about

15   August 31, 2017, in the District of Vermont, the defendant,

16   Randy Sheltra, using any facility and means of interstate and

17   foreign commerce, did knowingly attempt to persuade, induce,

18   entice, and coerce an individual, E.R., who has not attained

19   the age of 18 years, to engage in sexual activity for which any

20   person can be charged with a criminal offense.

21          "Count Three:

22          "On or about August 25, 2017, in the District of Vermont,

23   the defendant, Randy Sheltra, knowingly attempted to receive

24   any visual depiction using a means and facility of interstate

25   and foreign commerce that has been shipped or transported in or

1 affecting interstate or foreign commerce, by any means

2 including by computer, where the production of such visual

3 depiction involved the use of a minor engaging in sexually

4 explicit conduct and the visual depiction is of such conduct."

5                          ROLE OF THE INDICTMENT

6        At this time I would like to remind you of the function of

7 an indictment.  An indictment is merely a formal way to accuse

8 a defendant of a crime before trial.  An indictment is not

9 evidence.  An indictment does not create any presumptions of

10 guilt or permit an inference of guilt.  It should not influence

11 your verdict in any way other than to inform you of the charges

12 against the defendant.  The defendant has pleaded not guilty to

13 the counts in the indictment.  You have been chosen and sworn

14 as jurors in this case to determine the issues of fact that

15 have been raised by the allegations in the indictment and the

16 denial made by the not guilty plea of the defendant.  You are

17 to perform this duty without bias or prejudice against the

18 defendant or the Government.

19                           MULTIPLE COUNTS

20        A separate crime or offense is charged in each of the

21 three counts of the indictment.  Each charge against the

22 defendant and the evidence pertaining to each charge should be

23 considered separately.  You must return separate verdicts on

24 each count in which the defendant is charged.  Whether you find

25 the defendant not guilty or guilty as to one offense should not

1 affect your verdict as to any other offense charged.

2         REASONABLE DOUBT AND PRESUMPTION OF INNOCENCE

3     The Government must prove the defendant guilty beyond a

4 reasonable doubt.  The question is, What is a reasonable doubt?

5 The words almost define themselves.  It is a doubt based upon

6 reason and common sense.  Proof beyond a reasonable doubt must,

7 therefore, be proof of such a convincing character that a

8 reasonable person would not hesitate to rely and act upon it in

9 the most important of his or her own affairs.  A reasonable

10 doubt is not a whim, speculation, or suspicion.  However, a

11 reasonable doubt may arise from a lack of evidence.  It is not

12 an excuse to avoid the performance of an unpleasant duty, and

13 it is not sympathy.

14     In a criminal case, the burden is at all times upon the

15 Government to prove guilt beyond a reasonable doubt.  The law

16 does not require the Government to prove guilt beyond all

17 possible doubt.  Proof beyond a reasonable doubt is sufficient

18 to convict.  This burden never shifts to a defendant, which

19 means that it is always the Government's burden to prove each

20 element of the crime charged beyond a reasonable doubt.  The

21 law never imposes upon a defendant in a criminal case the

22 burden or duty of calling any witnesses or producing any

23 evidence.  A defendant is not even obligated to produce any

24 evidence by cross-examining the witnesses for the Government.

25     The law presumes the defendant is innocent of the charge

against him.  The presumption of innocence is a piece of
evidence that lasts throughout the trial and during your
deliberations.  The presumption of innocence ends only if you,
the jury, find beyond a reasonable doubt that the defendant is
guilty.  Should the Government fail to prove the guilt of the
defendant beyond a reasonable doubt, you must find the
defendant not guilty.

        If, after a fair and impartial consideration of all the
evidence against the defendant, you have a reasonable doubt,
then it is your duty to find the defendant not guilty.  On the
other hand, if, after a fair and impartial consideration of all
the evidence, you are satisfied of the defendant's guilt beyond
a reasonable doubt, you should vote to convict.

                              EVIDENCE

        You have seen and heard the evidence produced in this
trial, and it is the sole province of the jury to determine the
facts of this case.  The evidence consists of the sworn
testimony of the witnesses, any exhibits that have been
admitted into evidence, and all the facts that have been
admitted or stipulated.  I would now like to call your
attention to certain guidelines by which you are to evaluate
the evidence.

        There are two types of evidence that you may properly use
in reaching your verdict.  One type of evidence is direct
evidence.  Direct evidence is when a witness testifies about

something he or she knows by virtue of his or her own senses, something he or she has seen, felt, touched, or heard.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts.  You infer on the basis of reason, experience, and common sense from one established fact the existence or nonexistence of some other fact.  For example, if you were to see cow tracks in a pasture, that would be circumstantial evidence that there are or were cows in the pasture.

Circumstantial evidence is of no less value than direct evidence.  Circumstantial evidence alone may be sufficient evidence of guilt.

You should weigh all the evidence in the case.  After weighing all the evidence, if you are not convinced of the defendant's guilt beyond a reasonable doubt, then you must find him not guilty.  Your verdict must be based solely on the evidence introduced at trial, or the lack thereof.

### JUDICIAL NOTICE

I have taken judicial notice of certain facts that are not subject to reasonable dispute, and therefore no evidence to support them is required.  As a result, you should accept these facts as true.  However, you remain the sole judges of the facts.  The facts that I have taken judicial notice of in this case are as follows:  The Internet is a facility of interstate

1  and foreign commerce.  The use of a cellular telephone

2  constitutes a facility of interstate commerce.

3  STIPULATIONS OF FACT

4      A stipulation is an agreement among the parties that a

5  certain fact is true.  You should regard such agreed facts as

6  true.  However, I again remind you that you are the sole judges

7  of the facts.  In this case the parties' stipulation of facts

8  pertains to the two Vermont criminal statutes at issue in this

9  case which are set forth in Exhibit 59 and which will be

10 summarized in these instructions.

11 STRICKEN TESTIMONY, ATTORNEYS' STATEMENTS AND

12 OBJECTIONS, AND THE COURT'S RULINGS

13     I caution you that you should entirely disregard any

14 testimony or exhibit that has been excluded or stricken from

15 the record.  Likewise, the arguments of the attorneys and the

16 questions asked by the attorneys are not evidence in the case.

17     By the rulings the Court made in the course of the trial,

18 I did not intend to indicate to you any of my own preferences,

19 or to influence you in any manner regarding how you should

20 decide the case.  The attorneys have a duty to object to

21 evidence that they believe is not admissible.  You must not

22 hold it against either side if an attorney made an objection.

23 OTHER ACTS

24     The Government has offered evidence tending to show that

25 on different occasions the defendant engaged in other acts than

1 the crimes charged.

2      The defendant is not on trial for that conduct.  He is

3 only on trial for the crimes with which he has been charged.

4 Accordingly, you may not consider evidence of other acts as a

5 substitute for evidence that the defendant committed the crimes

6 charged.  Nor may you consider evidence of other acts as

7 evidence that the defendant has a criminal personality,

8 criminal propensity, or a bad character.

9      The evidence of other acts was admitted for a limited

10 purpose, and you may consider it only for this limited purpose.

11 You may consider it in assessing motive, opportunity, intent,

12 preparation, plan, absence of mistake, or lack of accident.

13 Evidence of other acts may not be considered by you for any

14 other purpose.

15                     UNDERCOVER INVESTIGATION

16      You have heard testimony from law enforcement that an

17 officer investigated the defendant on an undercover basis.

18      There is nothing improper or illegal with the Government

19 using these techniques, provided the defendant's constitutional

20 rights are not violated.

21                     CREDIBILITY OF WITNESSES

22      You, as jurors, are the sole judges of the credibility of

23 the witnesses and the weight of their testimony.  You do not

24 have to accept all the evidence presented in this case as true

25 or accurate.  Instead, it is your job to determine the

credibility or believability of each witness.  You do not have
to give the same weight to the testimony of each witness,
because you may accept or reject the testimony of any witness,
in whole or in part.

In weighing the testimony of the witnesses you have heard,
you should consider their interest, if any, in the outcome of
the case; their manner of testifying; their candor; their bias,
if any; their resentment or anger, if any, toward the
defendant; the extent to which other evidence in the case
supports or contradicts their testimony; and the reasonableness
of their testimony.  You may believe as much or as little of
the testimony of each witness as you think proper.  You may
accept all of it, some of it, or reject it altogether.

The weight of the evidence is not determined by the number
of witnesses testifying.  You may find the testimony of a small
number of witnesses or a single witness about a fact more
credible than the different testimony of a larger number of
witnesses.  The fact that one party called more witnesses and
introduced more evidence than the other does not mean that you
should necessarily find the facts in favor of the side offering
the most witnesses or the most evidence.  Remember, a defendant
in a criminal prosecution has no obligation to present any
evidence or call any witnesses.

Inconsistencies or discrepancies in the testimony of a
witness, or between the testimony of different witnesses, may

or may not cause you to discredit such testimony.  Two or more persons may hear or see things differently, or may have a different point of view regarding various occurrences.  It is for you to weigh the effect of any discrepancies in testimony, considering whether they pertain to matters of importance or unimportant details, and whether a discrepancy results from innocent error or intentional falsehood.  You should attempt to resolve inconsistencies if you can, but you also are free to believe or disbelieve any part of the testimony of any witness as you see fit.

                    INTEREST IN THE OUTCOME

     As a general matter, in evaluating the credibility of each witness, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case.  Such an interest may create a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interests.  Therefore, if you find that any witness whose testimony you are considering has an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it only with great care.

     This is not to suggest that any witness who has an interest in the outcome of a case will testify falsely.  It is for you to decide to what extent, if at all, the witness' interest has affected or colored his or her testimony.

EXPERT WITNESSES

1

2      You have heard evidence from witnesses who are known as

3 expert witnesses.  An expert witness is a person who has

4 special knowledge, experience, training, or education in his or

5 her profession or area of study.  Because of this expertise, an

6 expert witness may offer an opinion about one or more of the

7 issues in the case.

8      In evaluating an expert witness' testimony, you should

9 evaluate his or her credibility and statements just as you

10 would with any other witness.  You should also evaluate whether

11 the expert witness' opinion is supported by the facts that have

12 been proved, and whether the opinion is supported by the

13 witness' knowledge, experience, training, or education.  You

14 are not required to give the testimony of an expert witness any

15 greater weight than you believe it deserves just because the

16 witness has been referred to as an expert.

17                    LAW ENFORCEMENT WITNESSES

18      You have heard the testimony of law enforcement officials.

19 The fact that a witness may be employed by the federal, state,

20 or local government as a law enforcement official does not mean

21 that his or her testimony is deserving of more or less

22 consideration or greater or lesser weight than that of an

23 ordinary witness.

24      At the same time, it is proper for defense counsel to try

25 to attack the credibility of a law enforcement witness on the

1 grounds that his or her testimony may be colored by a personal

2 or professional interest in the outcome of the case.

3      It is your decision, after reviewing all the evidence,

4 whether to accept the testimony of a law enforcement witness

5 and to give that testimony whatever weight, if any, you find it

6 deserves.

7                    UNCALLED WITNESSES EQUALLY AVAILABLE

8      There are several persons whose names you have heard

9 during the course of the trial but who did not appear here to

10 testify, and one or more of the attorneys has referred to their

11 absence from the trial.  You should not draw any inferences or

12 reach any conclusions as to what they would have testified to

13 had they been called.  Their absence should not affect your

14 judgment in any way.

15     You should, however, remember my instruction that the law

16 does not impose on the defendant in a criminal case the burden

17 or duty of calling any witnesses or producing any evidence.

18                 PRIOR INCONSISTENT STATEMENTS OF A WITNESS

19     You have heard the testimony *[sic]* that a witness made a

20 statement on an earlier occasion which counsel agrees *[sic]* is

21 inconsistent with the witness' trial testimony.  Evidence of

22 the prior inconsistent statements was placed before you for the

23 more limited purpose of helping you decide whether to believe

24 the trial testimony of the witness who contradicted himself or

25 herself.  If you find that the witness made an earlier

1  statement that conflicts with his or her trial testimony, you

2  may consider that fact in deciding how much of his or her trial

3  testimony, if any, to believe.

4      It is your duty, based on all the evidence and your own

5  good judgment, to determine whether the prior statement was

6  inconsistent and, if so, how much weight, if any, to give to

7  the inconsistent statement in determining whether to believe

8  all or part of the witness' testimony.

9                    DEFENDANT TESTIFYING

10     In a criminal case, the defendant cannot be required to

11  testify and has a constitutional right not to testify.  If a

12  defendant chooses to testify, he is, of course, permitted to

13  take the witness stand on his own behalf.  In this case, the

14  defendant decided to testify.  You should examine and evaluate

15  his testimony just as you would the testimony of any other

16  witness.

17              JURORS' EXPERIENCE OR SPECIALIZED KNOWLEDGE

18     Anything you have seen or heard outside the courtroom is

19  not evidence and must be disregarded entirely.  It would be a

20  violation of your oath as jurors to consider anything outside

21  the courtroom in your deliberations.  But in your consideration

22  of the evidence, you do not leave behind your common sense and

23  life experiences.  In other words, you are not limited solely

24  to what you see and hear as the witnesses testify.  You are

25  permitted to draw from facts which you find have been proved

1 such reasonable inferences as you feel are justified in light

2 of the evidence.  However, if any juror has specialized

3 knowledge, expertise, or information with regard to the facts

4 and circumstances of this case, he or she may not rely upon it

5 in deliberations or communicate it to other jurors.

6                    JURORS' SYMPATHY, PASSION, OR PREJUDICE

7        In arriving at a verdict, you must not permit yourselves

8 to be influenced in the slightest degree by sympathy, passion,

9 or prejudice, or any other emotion in favor of or against

10 either party.  The law forbids you to be governed by mere

11 sentiment, conjecture, sympathy, passion, or prejudice.

12              RACE, RELIGION, NATIONAL ORIGIN, SEX, OR AGE

13       You may not consider the race, religion, national origin,

14 sex, or age of the defendant or any of the witnesses in your

15 deliberations over the verdict or in the weight given to any

16 evidence.

17          BIAS, PREJUDICE, AND EQUALITY BEFORE THE COURT

18       You are to perform the duty of finding the facts without

19 bias or prejudice towards any party.  You are to perform this

20 duty in an attitude of complete fairness and impartiality.  You

21 must not allow any of your personal feelings about the nature

22 of the crime charged to interfere with your deliberations or to

23 influence the weight given to any of the evidence.

24       This case is important to the parties and the Court.  You

25 must give it the fair and serious consideration that it

1  deserves.

2      The fact that the prosecution is brought in the name of

3  the United States of America entitles the Government to no

4  greater consideration than that accorded to any other party to

5  a case.  By the same token, it is entitled to no less

6  consideration.  All parties, whether government or individuals,

7  stand as equals before the Court.

8          INSTRUCTIONS ON THE SUBSTANTIVE LAW OF THE CASE

9      Having explained the general guidelines by which you will

10  evaluate the evidence in this case, I will now instruct you

11  with regard to the law that is applicable to your

12  determinations in this case.

13      It is your duty as jurors to follow the law as stated to

14  you in these instructions and to apply the rules of law to the

15  facts that you find from the evidence.  You will not be

16  faithful to your oath as jurors if you find a verdict that is

17  contrary to the law that I give to you.

18      However, it is the sole province of the jury to determine

19  the facts in this case.  I do not, by any instructions given to

20  you, intend to persuade you in any way as to any question of

21  fact.

22      The parties in this case have a right to expect that you

23  will carefully and impartially consider all the evidence in the

24  case, that you will follow the law as I state it to you, and

25  that you will reach a just verdict.

"ON OR ABOUT" EXPLAINED

The indictment charges that the offenses were committed on or about certain dates.  Although it is necessary for the Government to prove beyond a reasonable doubt that each offense was committed on dates reasonably near the dates alleged in the indictment, it is not necessary for the Government to prove that the offense was committed precisely on the dates charged.

THE INDICTMENT AND THE STATUTES

The indictment charges the defendant with two counts of violating Title 18 of the United States Code, Section 2422(b), and one count of violating Title 18 of the United States Code, Section 2252(a)(2).  The statute under which Counts 1 and 2 of the indictment are brought, Title 18, United States Code, Section 2422(b), provides in pertinent part that:

"Whoever, using ... any facility or means of interstate or foreign commerce, ... knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in ... any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, [commits a violation of this statute]."

The statute under which Count 3 of the indictment is brought, Title 18, United States Code, Section 2252(a)(2), provides in pertinent part that:

"Any person who ... knowingly receives ... any visual depiction using any means or facility of interstate or foreign

commerce or has been shipped or transported in or affecting
interstate or foreign commerce, or which contains materials
which have been mailed or so shipped or transported, by any
means including by computer, ... if --

"(A) the producing of such visual depiction involves the
use of a minor engaging in sexually explicit conduct; and

"(B) such visual depiction is of such conduct," violates
this statute.

THE ESSENTIAL ELEMENTS OF COUNTS 1 AND COUNT 2:

ATTEMPT TO PERSUADE, INDUCE, ENTICE, OR COERCE A

MINOR TO ENGAGE IN SEXUAL ACTIVITY

In order to convict the defendant of the charge of using a
facility of interstate commerce to knowingly attempt to
persuade, induce, entice, or coerce a minor to engage in
unlawful sexual activity, in violation of 2422(b), as charged
in Counts 1 and 2 of the indictment, the Government is required
to prove beyond a reasonable doubt the following four elements:

One, that on or about the dates charged, the defendant
knowingly attempted to persuade, induce, entice, or coerce a
person to engage in a sexual activity;

two, that he did so by using a facility or means of
interstate commerce;

three, that he believed that the person was less than 18
years old; and

four, that the sexual activity was or would have been a

1  criminal offense.

2              ELEMENT ONE:   KNOWINGLY ATTEMPTING TO

3                PERSUADE, INDUCE, OR COERCE *[sic]*

4       The first element requires that the Government prove

5  beyond a reasonable doubt that the defendant acted with

6  specific intent to persuade, induce, entice, or coerce an

7  individual to engage in a sexual activity.  The Government does

8  not need to prove that an individual was actually persuaded,

9  induced, enticed, or coerced, or the minor's state of mind.

10 The Government also does not need to prove that the defendant

11 intended to have sexual contact.

12      The statute does not, however, criminalize merely talking

13 to a minor, asking about sex, or asking about an individual's

14 interest in sex.  It is the defendant's specific intent to

15 persuade, induce, entice, or coerce an individual to engage in

16 a sexual activity that is important and which the Government

17 must prove beyond a reasonable doubt.

18      The defendant must have acted knowingly.  A person acts

19 knowingly if he or she acts intentionally and voluntarily, and

20 not because of ignorance, mistake, accident, or carelessness.

21 Whether or not the defendant acted knowingly may be proved by

22 his conduct and by all the facts and circumstances surrounding

23 the case.

24      The terms "persuade," "induce," "entice," and "coerce" are

25 words of common usage that have plain and ordinary meanings.

Because the statute in question uses the word "or," the
Government must prove beyond a reasonable doubt that only one
of these acts occurred; in other words, that the defendant
attempted to persuade, or induce, or entice, or coerce an
individual to engage in sexual activity.

The defendant need not communicate directly with the
minor.  The defendant can communicate with an adult
intermediary to persuade, induce, entice, or coerce a minor to
engage in illegal sexual activity.

ELEMENT TWO:  USE OF A FACILITY OF INTERSTATE COMMERCE

The second element that the Government must prove beyond a
reasonable doubt is that the defendant used a facility of
interstate commerce.

Transmission of communications by means of cellular
telephone or the Internet constitutes the use of a facility of
interstate commerce, regardless of whether the communication
actually crossed a state line.  However, you must find beyond a
reasonable doubt that the communication in question was
actually transmitted by means of a cellular telephone or the
Internet.

ELEMENT THREE:  AGE OF THE VICTIM

The third element that the Government must prove beyond a
reasonable doubt is that the defendant knew or believed that
the individual was less than 18 years old at the time.

ELEMENT FOUR:  CRIMINAL SEXUAL ACTIVITY

1    The fourth element that the Government must prove beyond a

2 reasonable doubt is that if the proposed sexual activity had

3 occurred, the defendant would have violated a criminal law.

4 There are two laws that the proposed sexual conduct in this

5 case may have violated.

6    Under Vermont law, 13 VSA, Section 2602, "Lewd or

7 Lascivious Conduct with a Child," it is a crime to "willfully

8 and lewdly commit any lewd or lascivious act upon or with the

9 body, or any part or member thereof, of a child under the age

10 of 16 years, with the intent of arousing, appealing to, or

11 gratifying the lust, passions, or sexual desires of such person

12 or of such child."

13    Under Vermont law, 13 VSA, Section 3252(c), "Sexual

14 Assault," it is a crime to "engage in a sexual act with a child

15 who is under the age of 16[.]"  The statute criminalizes sexual

16 acts, defined as oral, genital, or anal contact/penetration,

17 with a person under the age of 16 to whom the alleged offender

18 is not married.

19    The alleged consent of the child is irrelevant because a

20 child under 16 cannot consent to sexual contact as a matter of

21 Vermont law.

22    In order to find the defendant guilty, you must be

23 unanimous as to which criminal law the defendant would have

24 violated if the proposed sexual activity occurred.  In other

25 words, you must all agree that if the proposed sexual conduct

1  occurred, the defendant would have violated 13 VSA, Section

2  2602, or you must all agree that he would have violated 13 VSA,

3  Section 3252(c), or both.  If you are not unanimous that if the

4  proposed sexual activity occurred the defendant would have

5  violated one of these statutes, and if you are not unanimous as

6  to which statute would have been violated, you must return a

7  verdict of not guilty.

8                           ATTEMPT

9       Because the defendant is charged with attempting to

10  persuade, induce, entice, or coerce a minor, the Government

11  must also prove beyond a reasonable doubt that:

12      One, the defendant had the intent to commit the crime of

13  persuading, inducing, enticing, or coercing a person whom he

14  believed was under 18 years of age to engage in an illegal

15  sexual activity; and,

16      two, the defendant engaged in conduct that amounts to a

17  substantial step towards committing this crime.

18      A substantial step must be more than mere preparation.

19  Mere preparation is not an attempt, although some preparations

20  may amount to an attempt.  The step must be necessary to the

21  consummation of the crime and be of such a nature that a

22  reasonable observer, viewing it in context, could conclude

23  beyond a reasonable doubt that it was undertaken in accordance

24  with a design to commit the offense.  An initial plan, or

25  obscene speech alone, does not constitute a substantial step.

1 Thoughts or fantasizing about sex with children may be relevant

2 but, without more, are not illegal.

3                    THE ESSENTIAL ELEMENTS OF COUNT 3:

4                  ATTEMPTED RECEIPT OF CHILD PORNOGRAPHY

5      In order to prove the defendant guilty of attempting to

6 receive child pornography, the Government must prove each of

7 the following four elements beyond a reasonable doubt:

8      One, the defendant knowingly received or attempted to

9 receive a visual depiction;

10      two, the visual depiction was transported in or affecting

11 interstate or foreign commerce or was produced using materials

12 that had been transported in and affecting interstate or

13 foreign commerce;

14      three, the production of the visual depiction involved the

15 use of a minor engaging in sexually explicit conduct, and

16 portrayed that minor engaging in that conduct; and,

17      four, the defendant knew that the production of the visual

18 depiction involved the use of a minor engaging in sexually

19 explicit conduct and portrayed a minor engaged in that conduct.

20                  ELEMENT ONE:  ATTEMPTED RECEIPT

21      The first element the Government must prove beyond a

22 reasonable doubt is that the defendant knowingly attempted to

23 receive a visual depiction.

24      A visual depiction includes any photograph, film, video,

25 or picture, including undeveloped film and videotape, and data

1  stored on a computer disc or by electronic means that is

2  capable of conversion into a visual image.

3       To receive a visual depiction means to take possession of

4  it.  This includes the knowing acceptance of a depiction

5  previously requested.

6       The Government must prove that the defendant attempted to

7  receive the depiction knowingly.  An act is done knowingly when

8  it is done voluntarily and intentionally and not because of

9  accident, mistake, or some other innocent reason.

10                    ELEMENT TWO:  MATERIALS PREVIOUSLY

11                     MOVED IN INTERSTATE COMMERCE

12       The second element which the Government must prove beyond

13  a reasonable doubt is that the visual depiction was produced

14  using materials that had been transported in or affecting

15  interstate or foreign commerce.

16       Simply stated, the phrase "transported in or affecting

17  interstate or foreign commerce" means that the materials used

18  to produce the visual depiction had previously moved from one

19  state to another or between the United States and a foreign

20  country.

21       Here the Government alleges that the cellular telephone

22  used by the defendant was manufactured in another state or

23  country.  I instruct you that if you find that the cellular

24  telephone was manufactured outside of Vermont, that is

25  sufficient to satisfy this element.  The Government does not

1  have to prove that the defendant personally transported the

2  cellular telephone across a state line or that the defendant

3  knew that the cellular telephone had previously crossed a state

4  or international line.

5      ELEMENT 3:  VISUAL DEPICTION OF SEXUALLY EXPLICIT CONDUCT

6      The third element that the Government must prove beyond a

7  reasonable doubt is that the production of the visual depiction

8  involved the use of a minor engaging in sexually explicit

9  conduct, as I will explain that term to you, and portrays that

10 minor engaged in that conduct.

11     The visual depiction must be of a real person under the

12 age of 18 engaging in sexually explicit conduct.  The

13 Government does not need to have -- does not have to prove the

14 identity of the minor or the exact age of the minor.  You may

15 consider all of the evidence in determining whether the

16 depiction portrayed an actual person under the age of 18

17 engaging in sexually explicit conduct.

18                  SEXUALLY EXPLICIT CONDUCT DEFINED

19     The meaning of "sexually explicit conduct" means actual or

20 simulated:  (A) sexual intercourse, including genital-genital,

21 oral-genital, or oral-anal, whether between persons of the same

22 or opposite sex; bestiality; masturbation; sadistic or

23 masochistic abuse; or the lascivious exhibition of the genitals

24 or pubic area of any person to attract notice to the genitals

25 or pubic area of a minor's body in order to excite lustfulness

or sexual stimulation in the viewer.  Not every exposure of the genitals or pubic area constitutes lascivious exhibition.

In determining whether an exhibition of the genitals or pubic area of a minor is lascivious, you may consider the following factors:

Whether the focal point of the visual depiction is on the minor's genitals or pubic area;

whether the setting of the visual depiction makes it appear to be sexually suggestive; that is, in a place or pose generally associated with sexual activity;

whether the minor is depicted in an unnatural pose or in inappropriate attire, considering the age of the child;

whether the minor is fully or partially clothed, or nude, although nudity is not in and of itself lascivious;

whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and

whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

It is not required that a particular visual depiction include all of these factors to be a lascivious exhibition. Instead, you must determine whether the visual depiction is lascivious based on its overall content, taking into account the age of the minor.  The importance that you give to any one factor is up to you to decide.

ELEMENT FOUR:  DEFENDANT ACTED KNOWINGLY

1        The fourth element which the Government must prove beyond
2   a reasonable doubt is that the defendant knew both that the
3   production of the visual depiction involved the use of a minor
4   engaging in sexually explicit conduct and that it portrayed a
5   minor engaged in that conduct.
6        As I stated before, an act is done knowingly when it is
7   done voluntarily and intentionally and not because of accident,
8   mistake, or some other innocent reason.
9        In this case, the term "knowingly" refers to an awareness
10  of the sexually explicit nature of the material and to the
11  knowledge that the visual depiction was in fact of an actual
12  minor engaged in that sexually explicit conduct.
13       The Government must show that the defendant had knowledge
14  of the general nature of the contents of the material.  The
15  defendant need not have specific knowledge as to the identity
16  or actual age of the underage performer.  But the defendant
17  must have knowledge or an awareness that the material contained
18  a visual depiction of a minor engaging in sexually explicit
19  conduct.  Such knowledge may be shown by direct or
20  circumstantial evidence, or both.  Eyewitness testimony of the
21  defendant's viewing of the material is not necessary to prove
22  his awareness of its contents; the circumstances may warrant an
23  inference that he was aware of what the material depicts.
24  Furthermore, the defendant's belief as to the illegality of the
25  material is irrelevant.

1                          ATTEMPT
2      Because the defendant is charged in Count 3 with
3  attempting to receive child pornography, the Government must
4  also prove beyond a reasonable doubt that:
5      One, the defendant had the intent to commit the crime of
6  receiving child pornography; and,
7      two, the defendant engaged in conduct that amounts to a
8  substantial step towards committing this crime.
9      As I previously instructed you, a substantial step must be
10  more than mere preparation.  Mere preparation is not an
11  attempt, although some preparations may amount to an attempt.
12  The step must be necessary to the consummation of the crime and
13  be of such a nature that a reasonable observer, viewing it in
14  context, could conclude beyond a reasonable doubt that it was
15  undertaken in accordance with a design to commit the offense.
16  An initial plan, or obscene speech alone, does not constitute a
17  substantial step.  Thoughts or fantasizing about sex with
18  children may be relevant but, without more, is not illegal.
19                 UNANIMOUS VERDICT REQUIRED
20      To return a verdict, it is necessary that every juror
21  agree to the verdict.  In other words, your verdict must be
22  unanimous regarding each essential element of the crime
23  charged.
24                    JUROR NOTE-TAKING
25      During this trial, you have been provided with pencil and

paper, and some of you have taken notes.  As I explained at the

beginning of the trial, all jurors should be given equal

attention during the deliberations regardless of whether they

have taken notes.  Any notes you have taken may only be used to

refresh your memory during deliberations.  You may not use your

notes as authority to persuade your fellow jurors as to what a

witness did or did not say.  In your deliberations you must

rely upon your collective memory of the evidence in deciding

the facts of the case.  If there is any difference between your

memory of the evidence and your notes, you may ask that the

record of the proceedings be read back.  If a difference still

exists, the record must prevail over your notes.

RECOLLECTION OF EVIDENCE

Let me remind you that in deliberating upon your verdict,

you are to rely solely and entirely upon your own memory of the

testimony.

If, during your deliberations, you are unable to recall

with any degree of accuracy a particular part of the testimony,

or a part of these instructions, you may do the following:

One, write out your question and have the foreperson sign

it;

two, knock on the door of the jury room; and,

three, deliver your note to the court officer to give to

me.

After the attorneys have been consulted and the record has

1  been reviewed, I will decide what action to take, and I will

2  tell you my ruling.

3                              CONCLUSION

4       I caution you, members of the jury, that you are here to

5  determine whether the defendant before you today is not guilty

6  or guilty solely from the evidence in this case.  I remind you

7  that the mere fact that a defendant has been indicted is not

8  evidence against him.  Also, a defendant is not on trial for

9  any act or conduct or offense not alleged in the indictment.

10 Nor are you called upon to return a verdict as to the guilt or

11 innocence of any other person or persons not on trial as a

12 defendant in this case

13      You should not consider the consequences of a guilty or

14 not guilty determination.  The punishment provided by law for

15 the offense charged in the indictment is a matter exclusively

16 within the responsibility of the judge and should never be

17 considered by the jury in any way in arriving at an impartial

18 verdict.

19      It is your duty as jurors to consult with one another and

20 to deliberate.  Each of you must decide the case for yourself,

21 but only after an impartial consideration of the evidence in

22 the case with your fellow jurors.  Do not hesitate to reexamine

23 your own views and change your opinion if you think that you

24 were wrong.  Do not, however, surrender your honest convictions

25 about the case solely because of the opinion of your fellow

1  jurors or for the mere purpose of returning a verdict.

2      Upon retiring to the jury room, your foreperson will

3  preside over your deliberations and will be your spokesperson

4  here in court.  If a vote is to be taken, your foreperson will

5  ensure that it is done.  A verdict form has been prepared for

6  your conclusions.  If the verdict form varies in any way from

7  the instructions provided within this jury charge, I instruct

8  you that you are to follow the instructions provided within

9  this jury charge.

10      After you have reached an agreement, the foreperson will

11  record a verdict of guilty or not guilty.  Your foreperson will

12  then sign and date the verdict form and you will return to the

13  courtroom.  In all other respects, a foreperson is the same as

14  any other juror.  His or her vote does not count more than any

15  other member of the jury.

16      If during your deliberations you should desire to

17  communicate with the Court, please put your message or question

18  in writing signed by the foreperson and pass the note to the

19  court officer, who will bring it to my attention.  I will then

20  confer with the attorneys, and I will respond as promptly as

21  possible, either in writing or by having you return to the

22  courtroom so that I can speak with you.  I caution you,

23  however, with regard to any message or question you might send,

24  that you should never state or specify your numerical division

25  at the time.  You should also never communicate the subject

1  matter of your note or your deliberations to any member of the

2  Court's staff.

3          I appoint Constance Warren as your foreperson.

4          I'm now going to have the attorneys come with me into the

5  back room, and then we will return to the court.

6          (The following was held out of the presence of the jury

7  and the defendant.)

8              THE COURT:  Any objection from the Government to the

9  instructions as provided?

10             MS. MASTERSON:  Yes, your Honor.  On page 16,

11  underneath "Sexually Explicit Conduct Defined" and then under

12  subsection (E).

13             THE COURT:  Yes.

14             MS. MASTERSON:  The Court inadvertently omitted to

15  read, I think it was the first line of that paragraph.

16             THE COURT:  Of -- okay.  Give me it again.

17             MS. MASTERSON:  "The term 'lascivious exhibition'

18  means a depiction."  That's the line that the Court omitted to

19  read.

20             THE REPORTER:  It's true.

21             THE COURT:  I did?  Okay.  I will read that.

22             MS. MASTERSON:  Otherwise we're all set.

23             THE COURT:  Any from the defendant?

24             MR. KAPLAN:  No, your Honor.

25             THE COURT:  Mr. Kaplan, you raised an objection in

1  closing argument.  The reason why I allowed it is I believe the

2  objection was she didn't need a boyfriend, she didn't need Mr.

3  Sheltra as her personal counselor, she needed a grown-up.  She

4  didn't need Mr. Sheltra.  And I assumed that -- I guess I

5  should have taken your objection, but it was cumulative because

6  Ms. Masterson said the same thing without an objection in her

7  closing argument.

8          MR. KAPLAN:  No, I know.

9          THE COURT:  If you wanted to preserve it, here's the

10 time.

11         MR. KAPLAN:  That's fine.  I'll preserve it.

12         THE COURT:  Okay.  All right.  But your basis of your

13 objection was what?

14         MR. KAPLAN:  Well, I thought it was not -- she was

15 speaking about something that wasn't in the record, and she was

16 giving her opinion when it should have been -- she could have

17 even said "I submit to you that," you know, but she was giving

18 her opinion as to what this person needed, and there wasn't any

19 evidence to support that.

20         THE COURT:  Well, it was cumulative, it was unobjected

21 to, and it was a theme of the prosecution's that that was

22 grooming mechanisms, but had I heard it without having heard it

23 for the second time, I might have taken the objection, but by

24 that time it had been waived.

25          All right.  I will read this and then we will retire.

1          (The following was held in open court.)

2          THE COURT:  Ladies and gentlemen of the jury, if

3    you'll turn to page 16, the attorneys tell me that I forgot to

4    read a sentence.  Of course, I thought I said it, but the court

5    reporter assures me I did not.

6          So it's after paragraph (E).  The term "lascivious

7    exhibition" means a depiction which displays or brings to view

8    to attract notice to the genitals or pubic areas of a minor's

9    body in order to excite lustfulness or sexual stimulation in

10   the viewer.

11         Yes?  Yes.

12         All right.  Ladies and gentlemen of the jury, you may

13   retire for your deliberations and take the case.

14         (The jury retired to deliberate, after which the following

15   was held in open court at 4:57 PM.)

16         THE COURT:  The jurors are going into the grand jury

17   room so that they can deliberate and keep social distancing.

18         Ms. Ruddy and Ms. Carter will gather the evidence and

19   bring it back to them.  We will provide them with dinner.

20   We've got the 6 o'clock cutoff.  And how do you want me to

21   handle the 6 o'clock cutoff?

22         And let me start with the defendant this time.

23         MR. KAPLAN:  Judge, I think the jurors can be informed

24   that the Court's going to be closing at 6:00.  They've been

25   here since 9:00.  They listened to over three hours of closings

1  and then the charge in addition to the evidence that was

2  introduced today, and I just think it's too long a day to start

3  deliberating on a very important case that requires their full

4  attention.  I know I'm tired.  I mean, obviously I'd be okay,

5  but I'm just saying you do get tired at the end of the day like

6  this, and I just don't think it's -- I don't think it's

7  necessary to have them start after having been here since

8  9 o'clock in the morning.

9          THE COURT:  So my concern is to make sure that's

10  phrased appropriately that they don't rush to a verdict to be

11  done by 6:00.  That's why I'm asking you about it, because --

12  or both parties, because I see a risk in saying we're going to

13  close at 6:00 that is as great as the risk of saying you can go

14  as long as you want.  So --

15          MR. KAPLAN:  Maybe we should just wait until 6:00 and

16  then ask them then.  Is that the question that you want --

17          THE COURT:  Yeah.  I think if I say to them now we're

18  going to close at 6:00, there may be, "Let's get it done by

19  6:00."  I don't want to convey that message at all.

20          MR. KAPLAN:  Okay.

21          MS. MASTERSON:  We think that -- initially I had

22  joined the -- and supported cutting it off at 6 o'clock.  We're

23  lucky that we have 12 jurors today with COVID who are healthy

24  and ready to -- and available to deliberate.  Because of COVID,

25  I have now gone back to I think it's up to them when they wish

1 to -- when they wish to conclude.  They can either go at 6:00

2 or they can go as long as they need or desire, today or

3 tomorrow.  If they're too tired, then they'll certainly tell

4 us.

5        THE COURT:  I'm going to honor your agreement, and at

6 6 o'clockish I will bring them back in and remind them that we

7 have tomorrow and that it's been a long day and they do not

8 need to deliberate past 6:00.  We can resume tomorrow and have

9 them decide how they want to proceed.

10      Any problem with that approach?

11        MR. KAPLAN:  No, your Honor.

12        MS. MASTERSON:  No, your Honor.

13        THE COURT:  All right.  That's what we'll do.  Make

14 sure Ms. Ruddy has contact information for both of you.

15      (A recess was taken, after which the following was held in

16 open court without the jury present at 5:58 PM.)

17        THE COURT:  We are back on the record in United States

18 of America vs. Randy Sheltra.

19      When our jury coordinator offered the jurors menus, they

20 said they did not need them because they were told they were

21 going to be leaving at 6:00 today, so they remembered that.  So

22 that solves that problem.

23      This is what I propose to tell them:  Do not talk to

24 anybody about the case.  Don't look anything up.  You cannot

25 discuss with your family members what's happening.  You all

1  need to be here at 9:00 before any deliberations start.  In

2  fact, if somebody goes to the bathroom, you wait till that

3  person comes back before you resume.

4      You don't need to be here at 9:00.  You at least have a

5  safe harbor of 9:30 before anything happens.  So I would tell

6  them to come back and you just need to be available at some

7  reasonable time thereafter.

8      Any objections to having that conversation with the

9  jurors?

10          MS. MASTERSON:  No, your Honor.

11          MR. KAPLAN:  No, your Honor.

12          THE COURT:  All right.  Let's bring back the jurors.

13      (The following was held in open court with the jury

14  present at 6:04 PM.)

15          THE COURT:  Ladies and gentlemen of the jury, you are

16  in the midst of deliberations, so my instructions are the same,

17  but they have certain different components.  Don't talk to

18  anybody about the case or let anybody talk to you about the

19  case.  Keep your deliberations confidential.  Do not disclose

20  them in any way to your family members.  Don't do any research

21  or analysis.

22      When you come in tomorrow at 9:00, you'll go straight to

23  the room where you've been.  No deliberations until everybody's

24  there.  So we're going to be checking it off with the jury

25  coordinator but also the foreperson.

1        It goes so far as if somebody uses the facility, the

2   bathroom, you wait till that person comes back into the room to

3   resume your deliberations because, remember, everybody has to

4   be there for deliberations.

5        You won't come into the courtroom when you come.  You'll

6   go straight to that room and resume your deliberations, and

7   then you know what to do thereafter.

8        So I wish you a good evening, and I will see you at some

9   point tomorrow, but I will not be checking in with you in the

10  morning.  I will be here in the courthouse.

11       Let's excuse the jury.

12       (The jury exited the courtroom, after which the following

13  was held in open court at 6:06 PM.)

14            THE COURT:  Anything to bring to my attention?

15            MS. MASTERSON:  No, your Honor.

16            MR. KAPLAN:  No, your Honor.

17            THE COURT:  I wish you a good evening, and you, Mr.

18  Sheltra, as well.

19            THE DEFENDANT:  Thank you, ma'am.

20            MS. MASTERSON:  Thank you, your Honor.

21       (Court was in recess at 6:07 PM.)

22

23

24

25

1                    C E R T I F I C A T I O N

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5

6    January 25, 2021

Johanna Masse

Digitally signed by Johanna Masse
Date: 2021.01.25 11:43:11 -05'00'

_____

7                              Johanna Massé, RMR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'
'lascivious [1] - 688:17
'not [1] - 643:4
'these [1] - 505:18

# 1

1 [47] - 464:3, 470:20, 486:12,
500:21, 500:24, 501:2,
501:9, 502:7, 503:7,
503:22, 504:18, 555:3,
558:6, 558:8, 558:12,
558:24, 583:16, 587:3,
593:2, 599:22, 600:7,
600:10, 601:5, 601:7,
601:8, 601:18, 606:3,
606:4, 607:2, 607:21,
608:16, 608:19, 608:23,
610:2, 611:1, 611:8,
612:23, 613:21, 621:15,
625:22, 626:13, 656:6,
673:12, 674:9, 674:16
10 [17] - 453:1, 463:7, 512:7,
515:7, 530:10, 533:20,
554:9, 577:2, 583:5, 593:4,
607:8, 607:19, 623:24,
630:3, 630:15, 637:6, 659:7
10-year-old [31] - 471:8,
474:3, 483:20, 557:4,
557:5, 559:14, 559:15,
564:16, 568:11, 568:15,
568:16, 568:21, 570:4,
571:15, 572:1, 573:22,
574:17, 576:22, 577:10,
578:9, 579:6, 581:20,
582:23, 585:8, 597:5,
611:17, 626:7, 626:17,
648:6, 658:4
10-year-old's [1] - 582:2
100 [1] - 581:24
10:03 [2] - 523:15, 524:6
10:08 [1] - 610:9
10:27 [1] - 512:13
10:31 [1] - 607:13
10:40 [1] - 592:1
10:48 [3] - 481:8, 481:11,
516:15
10:52 [1] - 518:25
10th [4] - 482:5, 483:8, 585:4,
585:24
11 [1] - 588:17
11:00 [1] - 516:12
11:17 [1] - 501:6
11:26 [2] - 521:6, 521:16
11:27 [1] - 521:18
11:28 [2] - 521:20, 543:10
11:29 [1] - 522:11
12 [3] - 467:20, 567:7, 691:23
12,000-page [1] - 535:19
12-hour [1] - 492:16

124 [1] - 545:18
12:20 [1] - 480:22
12:24 [1] - 610:5
12:30 [3] - 543:4, 555:13,
583:16
12:42 [1] - 599:4
12:45 [1] - 555:19
12:47 [1] - 556:10
13 [6] - 653:24, 677:6, 677:13,
678:1, 678:2
130s [1] - 545:22
13th [1] - 484:18
14 [2] - 461:6, 477:4
15 [21] - 463:12, 463:13,
501:11, 533:20, 554:10,
567:5, 567:6, 596:9,
596:12, 600:12, 605:20,
607:25, 608:2, 608:13,
608:17, 618:22, 621:14,
621:19, 623:24, 628:3,
630:15
15-hour [1] - 492:16
15-minute [1] - 512:7
15-year-old [43] - 457:3,
465:2, 467:12, 468:25,
481:21, 486:11, 490:21,
490:23, 491:7, 491:21,
492:6, 493:23, 501:17,
502:8, 502:19, 503:16,
520:2, 520:16, 521:4,
522:15, 556:22, 557:6,
557:8, 566:16, 567:5,
583:15, 583:18, 583:19,
587:10, 588:11, 592:6,
592:18, 594:10, 597:3,
598:5, 601:2, 608:21,
614:6, 622:12, 647:14,
655:7, 656:19, 658:5
1516 [2] - 503:5, 503:18
1518 [1] - 504:9
16 [12] - 587:24, 595:19,
608:5, 608:6, 609:9,
609:21, 677:10, 677:17,
677:20, 688:10, 690:3
16[ [1] - 677:15
17th [1] - 476:3
18 [14] - 558:20, 607:7,
659:11, 659:19, 673:10,
673:11, 673:13, 673:17,
673:22, 674:23, 676:24,
678:14, 681:12, 681:16
18-CR-12-1 [2] - 453:5,
459:18
183 [1] - 523:14
19 [1] - 609:16
19th [2] - 513:22, 516:22
1:15 [1] - 610:17

# 2

2 [24] - 472:25, 476:10, 482:4,
483:3, 489:23, 490:5,
558:6, 558:9, 558:12,
606:3, 606:4, 607:2, 608:6,
608:20, 608:23, 611:1,
613:4, 618:12, 647:19,
673:12, 674:9, 674:16
2/3 [1] - 546:25
20 [8] - 479:18, 480:21,
516:12, 524:2, 533:20,
616:10, 657:17, 659:14
2012 [1] - 650:11
2016 [3] - 476:3, 548:12,
636:5
2017 [13] - 457:1, 469:18,
469:22, 477:5, 479:18,
503:4, 521:6, 650:10,
659:6, 659:7, 659:14,
659:15, 659:22
2020 [1] - 453:1
20s [2] - 603:11, 634:25
20th [4] - 469:22, 501:6,
519:23, 615:20
21st [7] - 477:5, 479:18,
501:24, 503:4, 504:18,
599:4, 610:17
2252(a)(2 [1] - 673:22
2252(a)(2) [1] - 673:12
2317 [1] - 501:6
24 [6] - 500:23, 501:5, 501:22,
502:24, 503:2, 504:17
2422(b [3] - 673:10, 673:14,
674:15
25 [2] - 548:6, 659:22
25th [7] - 469:17, 469:18,
520:3, 520:18, 520:20,
521:6, 615:22
26 [8] - 479:17, 480:13,
481:12, 486:12, 487:4,
490:13, 491:17, 508:22
2602 [3] - 609:7, 677:6, 678:2
27 [15] - 466:5, 468:22,
478:13, 480:7, 481:10,
481:12, 481:15, 481:19,
493:2, 499:17, 500:2,
503:14, 521:2, 523:13,
615:1
28 [1] - 480:13
29 [4] - 543:13, 553:21,
553:23, 554:6
2:06 [1] - 482:5
2:10 [1] - 501:24
2:25 [1] - 607:15
2:37 [1] - 565:21
2nd [3] - 546:23, 546:25,
547:2

# 3

3 [17] - 483:24, 564:21,
584:20, 607:4, 607:21,
608:20, 614:10, 618:12,
621:9, 621:20, 622:15,
627:17, 649:14, 673:21,
679:3, 681:5, 684:2
30 [2] - 650:12, 650:14
30th [4] - 515:4, 516:23,
519:24, 615:21
31 [1] - 659:15
3252(c [3] - 609:19, 677:13,
678:3
34 [1] - 585:21
35 [2] - 585:21, 586:4
36 [1] - 585:21
37 [1] - 617:23
38 [1] - 617:24
3:06 [1] - 630:10
3:16 [3] - 503:5, 504:19, 599:6
3:20 [1] - 630:18
3:22 [1] - 630:24
3:24 [1] - 599:6
3rd [2] - 546:25, 547:2

# 4

4 [4] - 488:23, 610:25, 621:10,
621:20
403 [5] - 457:8, 516:2, 529:15,
532:15, 532:21
41 [10] - 527:5, 527:19, 528:2,
537:8, 539:4, 539:7,
539:15, 540:15, 540:16,
541:1
4:57 [1] - 690:15
4th [1] - 653:11

# 5

55 [4] - 509:22, 605:20,
650:10, 650:23
55-year-old [7] - 568:16,
571:16, 573:22, 574:18,
581:20, 583:5, 597:11
58-year-old [1] - 650:9
59 [2] - 609:2, 664:9
5:00 [1] - 483:19
5:08 [2] - 483:3, 585:5
5:43 [1] - 570:18
5:58 [1] - 692:16

# 6

6 [4] - 690:20, 690:21, 691:22,
692:6
60 [1] - 606:6
6:00 [10] - 454:13, 690:24,
691:11, 691:13, 691:15,
691:18, 691:19, 692:1,
692:8, 692:21

**6:04** [1] - 693:14
**6:06** [1] - 694:13
**6:07** [1] - 694:21

## 7

**7** [2] - 483:16, 659:6
**73** [1] - 605:15
**7:30** [1] - 483:17
**7th** [1] - 607:14

## 8

**8/25** [1] - 523:15
**8th** [2] - 570:18, 607:15

## 9

**9** [9] - 563:13, 563:17, 563:21, 564:4, 608:6, 637:6, 691:8
**9-year-old** [3] - 465:19, 566:15, 626:7
**90** [1] - 581:24
**9:00** [4] - 690:25, 693:1, 693:4, 693:22
**9:02** [1] - 453:3
**9:10** [1] - 605:17
**9:13** [1] - 459:16
**9:30** [1] - 693:5
**9th** [2] - 610:5, 610:9

## A

**ability** [4] - 553:18, 585:10, 635:22, 651:23
**able** [20] - 495:8, 495:11, 510:4, 534:25, 544:21, 544:23, 544:25, 546:6, 547:8, 547:23, 550:2, 552:12, 553:7, 585:17, 612:12, 635:6, 636:2, 638:15, 638:16, 641:25
**ABOUT** [1] - 673:1
**about** [319] - 454:1, 454:12, 454:18, 456:17, 456:18, 457:12, 457:21, 457:25, 458:3, 458:9, 460:6, 462:5, 463:12, 464:4, 469:21, 471:9, 472:15, 474:20, 477:21, 479:7, 480:21, 481:8, 481:11, 482:17, 482:23, 483:19, 483:24, 484:5, 484:20, 484:24, 485:4, 485:5, 485:19, 485:20, 485:25, 487:15, 488:11, 490:23, 492:7, 492:9, 494:8, 495:14, 495:20, 496:14, 496:17, 497:1, 500:10, 501:6, 502:14, 502:19, 507:17, 508:15, 510:1, 511:4, 512:7, 512:8, 512:9,

512:18, 513:7, 515:17, 516:18, 517:12, 517:15, 520:2, 520:16, 521:20, 524:1, 525:1, 525:12, 525:13, 525:17, 527:13, 532:17, 532:21, 532:25, 534:9, 535:1, 535:25, 542:8, 543:5, 543:6, 544:8, 545:9, 547:11, 549:23, 550:20, 551:11, 552:18, 554:16, 557:3, 558:4, 559:9, 559:12, 559:17, 559:19, 560:2, 560:14, 560:21, 561:5, 561:16, 561:25, 562:1, 562:2, 562:3, 562:4, 562:6, 562:13, 562:21, 563:5, 563:25, 564:10, 564:15, 564:16, 564:17, 565:7, 565:23, 566:14, 566:18, 566:19, 568:15, 568:19, 570:11, 571:9, 571:10, 571:24, 572:3, 572:21, 572:22, 573:8, 573:11, 573:20, 574:2, 574:11, 575:5, 575:6, 575:14, 575:22, 576:1, 576:23, 577:21, 578:8, 578:11, 578:13, 578:23, 579:3, 579:22, 581:14, 581:22, 581:23, 582:14, 582:16, 582:21, 582:23, 583:13, 584:1, 584:2, 584:4, 584:7, 584:8, 584:10, 584:22, 585:1, 585:7, 585:13, 587:14, 588:25, 589:3, 589:7, 589:14, 590:8, 590:10, 590:24, 591:9, 592:2, 592:5, 592:11, 593:5, 593:17, 595:9, 595:14, 597:16, 597:21, 598:3, 598:6, 598:14, 598:15, 598:18, 598:23, 599:4, 599:5, 599:6, 600:9, 600:10, 601:6, 601:11, 601:14, 603:10, 603:12, 603:23, 603:24, 604:1, 604:9, 605:19, 605:22, 605:23, 606:25, 608:10, 608:19, 609:18, 609:19, 611:3, 616:7, 619:18, 619:20, 619:24, 620:19, 620:23, 621:2, 621:3, 623:14, 624:24, 625:8, 625:18, 625:19, 625:20, 625:22, 625:24, 626:2, 626:5, 626:14, 626:18, 626:21, 626:24, 627:7, 627:10, 627:11, 627:17, 628:9, 630:4, 630:5, 632:6, 632:8, 633:11, 633:12,

635:17, 635:18, 636:10, 636:13, 637:23, 638:1, 638:24, 639:1, 639:5, 639:6, 639:7, 639:8, 642:3, 642:11, 642:17, 642:24, 642:25, 644:23, 645:13, 645:14, 645:16, 645:19, 646:13, 647:7, 647:13, 647:15, 648:6, 648:24, 649:1, 649:11, 649:12, 649:15, 652:7, 655:5, 655:21, 656:1, 656:19, 657:6, 659:6, 659:14, 659:22, 662:25, 666:16, 668:6, 671:21, 673:3, 674:18, 675:13, 679:1, 684:17, 686:25, 689:15, 691:11, 692:24, 693:18
**above** [1] - 604:11
**absence** [4] - 541:18, 665:12, 669:11, 669:13
**absolute** [1] - 622:23
**absolutely** [19] - 457:19, 506:22, 510:17, 545:6, 546:15, 551:25, 570:11, 600:23, 601:17, 611:16, 612:14, 613:6, 622:2, 622:23, 627:12, 628:17, 633:9, 653:25, 657:24
**abuse** [3] - 575:19, 619:4, 681:23
**accelerated** [2] - 653:2, 653:4
**accept** [11] - 606:13, 606:14, 616:1, 640:2, 658:24, 663:22, 665:24, 666:3, 666:13, 667:21, 669:4
**acceptable** [2] - 576:19, 636:23
**acceptance** [1] - 680:4
**accepted** [2] - 543:23, 631:14
**accepting** [1] - 656:11
**accepts** [1] - 576:19
**access** [3] - 515:10, 568:11, 655:1
**accessible** [1] - 582:1
**accident** [19] - 541:18, 616:18, 616:21, 616:24, 617:1, 622:10, 625:25, 626:1, 626:7, 629:8, 629:9, 629:12, 646:19, 657:12, 657:23, 665:12, 675:20, 680:9, 683:7
**accidentally** [4] - 529:1, 530:17, 576:23, 649:16
**accordance** [3] - 539:12, 678:23, 684:15
**accorded** [1] - 672:4
**according** [4] - 537:4, 592:4, 639:24, 643:21
**accordingly** [2] - 541:10,

665:4
**account** [4] - 623:16, 653:14, 667:13, 682:22
**accuracy** [1] - 685:18
**accurate** [2] - 586:1, 665:25
**accuse** [1] - 660:7
**accustomed** [2] - 580:21, 581:1
**acquire** [2] - 460:5, 460:7
**acquisition** [1] - 527:2
**acquittal** [1] - 555:12
**across** [1] - 681:2
**act** [15] - 573:1, 573:23, 577:17, 578:13, 604:16, 604:24, 609:8, 609:20, 609:21, 661:8, 677:8, 677:14, 680:7, 683:6, 686:9
**acted** [5] - 638:3, 644:16, 675:5, 675:18, 675:21
**ACTED** [1] - 682:25
**acting** [1] - 474:21
**action** [3] - 577:25, 652:15, 686:1
**active** [3] - 552:13, 563:13, 563:17
**activities** [2] - 635:14, 649:3
**activity** [49] - 484:10, 558:15, 558:21, 559:2, 559:10, 567:3, 568:16, 568:19, 572:24, 575:12, 587:6, 587:12, 587:21, 597:4, 601:16, 602:1, 608:24, 609:14, 611:6, 611:11, 611:17, 611:22, 612:25, 614:7, 625:2, 627:13, 647:13, 647:18, 649:10, 654:7, 656:2, 656:8, 656:12, 659:11, 659:19, 673:18, 674:15, 674:20, 674:25, 675:7, 675:16, 676:5, 676:9, 677:2, 677:24, 678:4, 678:15, 682:10, 682:16
**ACTIVITY** [2] - 674:11, 676:25
**acts** [21] - 454:16, 541:5, 541:10, 541:12, 541:15, 541:19, 556:25, 571:25, 589:10, 610:3, 610:14, 610:16, 664:25, 665:4, 665:6, 665:9, 665:13, 675:18, 675:19, 676:3, 677:16
**ACTS** [1] - 664:23
**actual** [6] - 582:16, 583:19, 681:16, 681:19, 683:11, 683:16
**actuality** [1] - 456:2
**ad** [5] - 501:12, 636:5, 636:9, 636:13, 651:1
**add** [1] - 625:9

3

**added** [1] - 639:14
**adding** [2] - 563:8, 570:2
**addition** [2] - 593:25, 691:1
**additional** [4] - 516:7, 516:9, 551:2, 554:7
**address** [9] - 458:25, 477:18, 477:20, 486:23, 489:9, 576:3, 605:16, 629:22, 652:5
**addressed** [1] - 552:3
**adept** [1] - 635:24
**admissibility** [6] - 529:16, 529:21, 530:5, 534:7, 534:20, 535:9
**admissible** [9] - 458:5, 458:7, 459:3, 512:20, 519:4, 529:14, 532:20, 540:15, 664:21
**admission** [2] - 529:7, 608:1
**admissions** [1] - 607:23
**admit** [3] - 531:16, 533:18, 533:21
**admitted** [33] - 488:25, 489:1, 514:6, 518:16, 519:4, 534:9, 541:15, 600:13, 600:19, 601:9, 607:24, 608:17, 608:18, 614:24, 615:1, 615:5, 615:7, 615:8, 616:19, 620:11, 623:23, 623:25, 624:1, 624:2, 624:4, 624:13, 628:2, 652:9, 653:9, 662:19, 662:20, 665:9
**admitting** [2] - 519:6, 624:15
**adorable** [11] - 487:11, 502:12, 507:7, 568:24, 568:25, 569:4, 588:23, 588:25, 595:10, 596:8
**adult** [6] - 532:4, 578:9, 581:20, 598:17, 629:6, 676:7
**adults** [1] - 458:15
**advances** [2] - 623:20, 667:17
**advantage** [1] - 574:13
**advise** [1] - 512:5
**affairs** [1] - 661:9
**affect** [5] - 495:10, 593:7, 616:10, 661:1, 669:13
**affected** [1] - 667:25
**affecting** [10] - 614:15, 614:16, 617:17, 617:19, 660:1, 674:1, 679:10, 679:12, 680:14, 680:16
**affiliated** [4] - 489:24, 490:17, 565:24, 590:16
**afford** [1] - 548:8
**after** [68] - 453:20, 457:11, 466:10, 467:1, 467:20, 478:25, 480:17, 483:16, 492:15, 494:1, 501:21,

502:1, 502:4, 505:25, 509:19, 512:12, 516:14, 543:9, 546:23, 549:1, 550:21, 554:21, 555:14, 555:18, 567:7, 567:25, 568:1, 568:13, 568:17, 570:5, 579:17, 583:11, 586:22, 586:24, 589:3, 592:6, 592:20, 595:22, 596:16, 599:11, 605:1, 612:13, 613:13, 613:24, 620:3, 626:15, 629:22, 630:9, 630:17, 631:4, 631:9, 632:4, 636:12, 638:12, 652:3, 653:6, 662:8, 662:11, 663:14, 669:3, 685:25, 686:21, 687:10, 690:6, 690:14, 691:7, 692:15, 694:12
**afternoon** [11] - 500:10, 503:5, 556:11, 565:22, 583:13, 586:18, 612:12, 628:15, 630:2, 631:3, 656:15
**afterthought** [1] - 625:1
**afterwards** [1] - 595:23
**again** [93] - 464:22, 465:25, 475:18, 477:8, 479:14, 481:9, 481:23, 483:2, 490:5, 490:6, 500:2, 500:8, 501:21, 502:24, 505:11, 505:22, 520:10, 537:17, 539:19, 540:4, 544:20, 546:16, 553:6, 564:8, 564:15, 565:6, 567:19, 569:8, 571:7, 571:14, 571:15, 571:18, 571:22, 572:9, 573:11, 573:20, 573:25, 574:11, 574:23, 576:9, 579:8, 579:12, 579:14, 579:16, 579:22, 580:9, 580:12, 580:15, 581:9, 582:6, 583:9, 583:18, 583:22, 583:25, 584:11, 584:13, 585:13, 587:10, 587:13, 587:21, 589:19, 590:3, 590:7, 593:12, 594:20, 595:7, 598:7, 598:25, 600:4, 601:10, 603:20, 607:24, 608:2, 608:15, 608:18, 617:8, 618:7, 618:14, 619:13, 621:22, 629:8, 631:18, 637:8, 638:3, 641:7, 642:4, 643:10, 644:16, 648:12, 664:6, 688:16
**against** [14] - 496:22, 553:13, 567:24, 596:3, 629:21, 659:2, 660:12, 660:17,

660:21, 662:1, 662:9, 664:22, 671:9, 686:8
**AGE** [2] - 671:12, 676:21
**age** [25] - 509:22, 566:18, 577:14, 583:5, 585:16, 589:3, 589:7, 597:5, 609:9, 609:21, 621:14, 659:10, 659:19, 671:14, 673:17, 677:9, 677:15, 677:17, 678:14, 681:12, 681:14, 681:16, 682:12, 682:23, 683:16
**agent's** [1] - 554:9
**aggressor** [1] - 570:8
**ago** [7] - 460:11, 478:15, 505:1, 506:19, 549:24, 551:20, 599:19
**agree** [21] - 457:12, 458:3, 458:10, 458:16, 463:6, 464:1, 477:6, 496:5, 534:19, 570:13, 590:1, 596:1, 610:20, 631:4, 631:19, 631:21, 632:11, 643:11, 677:25, 678:2, 684:21
**agreed** [11] - 480:9, 481:8, 496:13, 554:11, 572:20, 591:24, 600:22, 646:3, 648:13, 652:9, 664:5
**agreement** [4] - 561:20, 664:4, 687:10, 692:5
**agrees** [2] - 591:24, 669:20
**ahead** [1] - 538:19
**air** [1] - 460:23
**akin** [1] - 635:15
**Alburgh** [9] - 477:15, 485:11, 487:17, 487:19, 489:6, 592:4, 597:13, 646:25, 655:3
**alerted** [1] - 647:3
**alerting** [1] - 496:25
**Alisha** [85] - 464:5, 464:6, 464:16, 464:21, 464:22, 464:24, 465:5, 465:6, 465:8, 465:10, 465:11, 465:15, 465:18, 470:1, 470:22, 473:24, 474:6, 476:1, 476:7, 489:14, 508:11, 509:19, 509:20, 525:1, 547:18, 560:17, 560:18, 560:19, 561:14, 562:4, 562:5, 562:21, 563:1, 563:13, 563:19, 563:21, 566:12, 566:23, 566:25, 588:9, 617:7, 624:17, 625:20, 626:11, 626:21, 633:12, 633:20, 634:12, 634:14, 635:1, 635:5, 635:8, 635:9, 635:20, 636:4, 636:5,

636:7, 636:16, 637:2, 637:4, 637:5, 637:23, 638:1, 638:4, 638:6, 638:14, 638:19, 638:20, 638:24, 639:1, 639:6, 639:16, 646:12, 646:21, 647:11, 652:16, 652:21, 653:3, 653:7, 653:23
**Alisha's** [5] - 563:21, 635:8, 636:25, 637:11, 637:18
**alive** [1] - 626:13
**allegations** [3] - 496:19, 496:21, 660:15
**alleged** [4] - 673:5, 677:17, 677:19, 686:9
**allegedly** [2] - 454:19, 458:1
**alleges** [1] - 680:21
**allow** [16] - 468:11, 468:14, 492:21, 492:23, 507:18, 511:6, 520:11, 522:7, 524:4, 529:3, 537:3, 538:1, 543:20, 643:2, 657:3, 671:21
**allowed** [4] - 471:20, 551:1, 652:14, 689:1
**allowing** [1] - 553:8
**almost** [4] - 551:20, 593:2, 633:24, 661:5
**alone** [6] - 605:25, 643:6, 645:7, 663:12, 678:25, 684:16
**alter** [1] - 532:7
**altered** [4] - 531:7, 531:8, 531:15
**alternatives** [1] - 637:21
**although** [5] - 554:24, 673:3, 678:19, 682:14, 684:11
**altogether** [1] - 666:13
**always** [8] - 556:1, 556:15, 559:7, 570:25, 596:21, 634:6, 634:24, 661:19
**AM** [10] - 453:3, 459:16, 483:3, 483:19, 516:15, 518:25, 523:15, 543:10, 585:5, 610:5
**Amateur** [1] - 605:18
**amazing** [11] - 504:21, 507:5, 569:7, 572:4, 588:3, 588:6, 588:19, 588:24, 591:6, 591:12, 599:14
**ambiguity** [1] - 621:12
**America** [12] - 453:6, 459:19, 498:15, 516:17, 519:2, 536:11, 555:21, 556:13, 631:1, 659:2, 672:3, 692:18
**among** [5] - 474:9, 575:1, 608:25, 647:14, 664:4
**amount** [3] - 632:17, 678:20, 684:11
**amounts** [2] - 678:16, 684:7

**anal** [23] - 467:16, 467:17, 468:4, 468:16, 494:2, 495:23, 521:9, 521:15, 521:21, 522:16, 522:19, 523:5, 523:25, 524:3, 554:25, 604:9, 610:1, 616:3, 616:11, 620:3, 657:14, 677:16, 681:21
**analogy** [1] - 635:12
**analysis** [2] - 587:8, 693:21
**anatomy** [1] - 582:14
**anchored** [1] - 657:12
**AND** [6] - 661:2, 664:11, 664:12, 671:17, 673:8, 674:9
**Andrew** [2] - 453:8, 459:20
**anger** [1] - 666:8
**animals** [2] - 587:25, 639:2
**announcing** [2] - 562:3, 570:24
**answer** [23] - 466:17, 468:9, 469:2, 471:20, 471:22, 471:24, 471:25, 472:2, 472:4, 492:20, 494:22, 498:9, 505:24, 507:20, 523:2, 535:7, 535:8, 537:13, 553:9, 566:2, 576:25, 642:6, 643:23
**ANSWER** [9] - 640:17, 640:22, 640:25, 641:4, 642:13, 642:15, 642:20, 643:3, 643:6
**answered** [4] - 466:20, 496:7, 553:9, 618:25
**answers** [4] - 458:23, 518:12, 553:8, 566:1
**anus** [1] - 609:23
**anyway** [3] - 597:15, 646:10, 647:8
**apart** [1] - 605:18
**apologize** [3] - 507:22, 551:9, 555:24
**appeal** [1] - 543:25
**appealed** [1] - 544:1
**appealing** [4] - 582:22, 604:4, 609:10, 677:10
**appear** [5] - 469:7, 582:19, 645:9, 669:9, 682:9
**appearance** [1] - 454:2
**appellate** [1] - 544:1
**applicable** [1] - 672:11
**applications** [1] - 545:19
**applies** [1] - 587:19
**apply** [7] - 457:20, 514:3, 557:18, 557:25, 560:7, 658:24, 672:14
**appoint** [2] - 543:21, 688:3
**appointments** [1] - 549:3
**appreciate** [3] - 500:5, 556:2, 598:11

**approach** [5] - 455:23, 511:3, 538:20, 633:7, 692:10
**approached** [4] - 473:20, 474:11, 510:2, 549:24
**approaching** [1] - 473:15
**appropriate** [1] - 567:3
**appropriately** [2] - 644:16, 691:10
**approximately** [1] - 630:3
**area** [18] - 480:3, 536:22, 536:25, 540:2, 540:9, 592:14, 619:4, 619:9, 619:17, 621:19, 642:10, 668:5, 681:24, 681:25, 682:2, 682:4, 682:7
**areas** [1] - 690:8
**argue** [1] - 534:9
**argument** [8] - 455:12, 530:18, 552:23, 631:2, 651:18, 651:25, 689:1, 689:7
**argument's** [1] - 534:3
**argumentative** [4] - 471:21, 488:3, 494:21, 496:4
**arguments** [13] - 516:4, 534:7, 534:11, 534:19, 543:3, 552:7, 554:5, 555:13, 556:15, 557:15, 630:6, 658:23, 664:15
**arise** [1] - 661:11
**arousal** [1] - 555:8
**aroused** [15] - 463:3, 463:21, 463:23, 465:24, 467:6, 554:12, 561:25, 564:16, 572:2, 594:9, 594:24, 604:3, 620:11, 624:1
**arousing** [5] - 609:10, 620:12, 620:18, 621:16, 677:10
**arranged** [2] - 640:18, 640:21
**arrangements** [4] - 636:14, 643:9, 643:23, 644:4
**arrest** [1] - 655:24
**arrested** [4] - 511:24, 566:8, 567:22, 655:24
**arrived** [2] - 599:3, 599:4
**arriving** [2] - 671:7, 686:17
**art** [2] - 587:25, 620:20
**articulate** [2] - 510:4, 544:21
**articulated** [1] - 553:24
**articulating** [2] - 553:24, 584:6
**aside** [2] - 605:11, 608:7
**asleep** [2] - 467:4, 637:1
**aspect** [2] - 635:20, 638:20
**aspects** [1] - 555:5
**ass** [3] - 502:15, 603:13, 603:25
**Assault** [1] - 677:14
**asserted** [1] - 515:24
**assess** [1] - 634:5

**assessing** [2] - 541:17, 665:11
**assessment** [1] - 634:8
**assist** [3] - 553:16, 633:25, 640:6
**assistance** [1] - 635:2
**Assistant** [2] - 453:7, 459:20
**associated** [4] - 528:21, 545:19, 605:11, 682:10
**assume** [6] - 456:18, 511:22, 531:1, 534:13, 538:13, 576:14
**assumed** [3] - 546:11, 580:23, 689:4
**assumes** [1] - 513:18
**assured** [2] - 490:8, 567:25
**assures** [1] - 690:5
**assuring** [1] - 567:22
**Atlanta** [2] - 626:12, 637:24
**attachment** [2] - 542:8, 653:13
**attack** [1] - 668:25
**attained** [3] - 659:10, 659:18, 673:17
**attempt** [23] - 559:13, 559:15, 559:17, 611:2, 611:4, 611:8, 611:24, 616:14, 619:13, 621:23, 621:24, 622:12, 656:5, 656:13, 656:17, 659:9, 659:17, 667:7, 674:13, 678:19, 678:20, 684:11
**ATTEMPT** [3] - 674:10, 678:8, 684:1
**attempted** [19] - 557:12, 558:6, 558:13, 559:1, 587:11, 614:5, 614:11, 614:13, 614:22, 614:23, 617:13, 621:17, 622:16, 659:23, 674:19, 676:4, 679:8, 679:22, 680:6
**ATTEMPTED** [2] - 679:4, 679:20
**attempting** [10] - 557:11, 558:19, 559:13, 584:9, 606:5, 612:24, 647:20, 678:9, 679:5, 684:3
**ATTEMPTING** [1] - 675:2
**attempts** [1] - 673:19
**attention** [25] - 454:9, 455:2, 455:3, 456:13, 459:8, 516:6, 518:20, 543:12, 555:14, 555:22, 561:2, 570:19, 570:21, 582:4, 587:7, 610:10, 616:14, 617:23, 630:11, 658:15, 662:21, 685:3, 687:19, 691:4, 694:14
**attentive** [1] - 590:10
**attest** [1] - 547:13

**attire** [1] - 682:12
**attitude** [1] - 671:20
**attorney** [3] - 485:4, 524:13, 664:22
**Attorney** [1] - 459:21
**Attorney's** [1] - 526:24
**Attorneys** [2] - 453:7, 459:20
**attorneys** [14] - 453:15, 460:17, 460:18, 512:10, 543:8, 630:7, 664:15, 664:16, 664:20, 669:10, 685:25, 687:20, 688:4, 690:3
**ATTORNEYS'** [1] - 664:11
**attract** [3] - 619:9, 681:24, 690:8
**attracted** [7] - 569:1, 588:21, 589:1, 590:6, 590:13, 593:13, 594:14
**attraction** [1] - 571:5
**attractive** [8] - 569:4, 573:10, 573:12, 582:22, 593:15, 596:10, 602:8, 604:4
**attribute** [2] - 544:16, 548:3
**attributed** [2] - 462:22, 614:25
**audio** [1] - 538:23
**audiovisual** [1] - 486:23
**August** [26] - 469:17, 469:18, 469:22, 477:5, 479:18, 501:6, 501:24, 503:4, 504:18, 513:22, 515:4, 516:22, 516:23, 519:23, 520:3, 520:18, 521:6, 599:4, 610:17, 615:20, 615:21, 615:22, 659:14, 659:15, 659:22
**author** [1] - 615:2
**authority** [2] - 559:6, 685:6
**automatically** [1] - 549:21
**AVAILABLE** [1] - 669:7
**available** [9] - 488:10, 488:11, 489:10, 586:21, 627:23, 628:20, 655:10, 691:24, 693:6
**average** [1] - 546:1
**avoid** [2] - 532:14, 661:12
**await** [2] - 458:6, 458:15
**awaiting** [2] - 454:4, 460:12
**awake** [2] - 480:1, 592:12
**award** [1] - 631:21
**aware** [8] - 454:6, 508:16, 519:22, 564:12, 575:8, 575:16, 642:14, 683:23
**awareness** [3] - 683:9, 683:17, 683:22
**awesome** [1] - 631:14
**awful** [3] - 645:11, 647:12

# B

babe [2] - 586:18, 603:16
Babe [2] - 577:18, 578:16
baby [1] - 637:13
baby-sitter [1] - 637:13
backward [1] - 601:23
bad [11] - 541:14, 560:7, 574:4, 580:2, 580:7, 580:12, 589:15, 599:1, 603:23, 655:19, 665:8
bailed [1] - 600:3
balance [2] - 530:11, 549:8
balancing [1] - 529:16
banter [7] - 633:15, 639:10, 639:21, 645:1, 647:16, 648:2, 651:14
Barb [1] - 486:21
Barbara [3] - 453:7, 459:20
barriers [1] - 575:8
bars [1] - 650:17
base [1] - 632:14
based [10] - 495:8, 529:6, 537:12, 537:23, 643:6, 649:15, 661:5, 663:17, 670:4, 682:22
basis [6] - 526:23, 553:20, 555:9, 663:5, 665:17, 689:12
bat [1] - 562:3
bath [4] - 583:11, 583:22, 583:25, 584:11
bathing [1] - 583:20
bathroom [2] - 693:2, 694:2
batteries [1] - 618:8
battery [2] - 617:24, 618:6
beans [1] - 576:23
bear [1] - 667:19
beat [1] - 547:14
beautiful [3] - 464:11, 577:19, 585:18
beauty [2] - 654:3, 654:11
became [1] - 534:14
become [1] - 644:22
becomes [4] - 496:22, 497:4, 497:10, 534:2
becoming [2] - 584:16, 633:16
bed [10] - 467:1, 478:8, 478:21, 588:17, 597:15, 616:25, 628:7, 637:1, 637:2, 642:4
bedroom [1] - 582:18
beds [1] - 636:25
BEFORE [1] - 671:17
began [7] - 457:2, 486:10, 563:12, 606:18, 619:20, 636:13, 638:12
begin [9] - 513:17, 556:15, 558:4, 558:11, 562:15,

571:24, 581:24, 583:12, 586:13
beginning [5] - 473:1, 533:12, 611:12, 613:12, 685:2
begins [2] - 457:1, 521:7
behalf [2] - 461:13, 670:13
behavior [19] - 559:21, 559:22, 560:11, 564:3, 564:9, 574:6, 574:7, 574:19, 576:4, 576:19, 580:6, 580:8, 589:12, 590:4, 598:3, 599:1, 611:13, 611:14, 627:22
behind [4] - 456:4, 495:2, 549:9, 670:22
belief [3] - 607:18, 683:24
believability [1] - 666:1
believable [2] - 650:2
believes [3] - 453:20, 455:10, 460:11
below [1] - 591:16
bench [1] - 540:15
beneficial [2] - 573:2, 573:6
benefit [4] - 582:10, 593:21, 623:16, 667:14
best [6] - 514:3, 546:1, 549:5, 571:13, 574:15, 658:19
bestiality [4] - 532:3, 532:8, 619:3, 681:22
bet [4] - 502:15, 595:21, 595:24, 603:25
bets [1] - 562:15
better [6] - 536:5, 572:13, 580:21, 580:25, 595:11, 634:15
between [32] - 458:12, 464:21, 484:17, 494:13, 513:21, 519:23, 521:3, 545:5, 576:5, 604:9, 606:23, 609:14, 609:22, 609:23, 632:19, 632:20, 633:12, 634:12, 635:23, 638:23, 640:1, 640:7, 641:24, 646:21, 647:24, 648:8, 650:5, 650:14, 666:25, 680:19, 681:21, 685:9
beyond [57] - 511:21, 523:17, 525:4, 525:5, 555:10, 558:2, 587:2, 606:3, 607:3, 607:22, 608:22, 610:25, 611:22, 612:22, 614:4, 614:8, 617:12, 617:15, 618:4, 618:12, 621:9, 621:20, 629:20, 646:2, 651:12, 651:13, 651:25, 654:6, 658:11, 661:3, 661:6, 661:15, 661:16, 661:17, 661:20, 662:4, 662:6, 662:12, 663:16,

673:4, 674:17, 675:5, 675:17, 676:2, 676:11, 676:17, 676:22, 677:1, 678:11, 678:23, 679:7, 679:21, 680:12, 681:6, 683:1, 684:4, 684:14
BIAS [1] - 671:17
bias [4] - 623:8, 660:17, 666:7, 671:19
big [11] - 473:13, 538:12, 540:4, 540:6, 559:11, 563:18, 564:19, 575:4, 583:3, 594:22, 603:10
biggest [1] - 546:17
birth [3] - 479:11, 608:8, 608:9
bit [20] - 462:19, 464:24, 465:9, 469:13, 472:20, 480:11, 485:19, 485:25, 515:17, 516:5, 550:8, 563:9, 571:12, 573:24, 575:18, 579:13, 618:17, 630:2, 655:3
bitches [1] - 603:16
black [1] - 517:20
blank [1] - 483:6
blare [1] - 629:1
block [1] - 652:10
blocked [1] - 652:14
blows [1] - 546:18
blue [1] - 657:19
board [3] - 560:9, 575:4, 580:10
body [28] - 463:18, 504:22, 507:5, 577:4, 577:24, 590:12, 591:2, 591:4, 591:9, 593:11, 594:8, 596:8, 596:19, 596:20, 596:21, 599:14, 601:14, 609:8, 609:25, 616:22, 619:16, 621:15, 621:16, 622:9, 677:9, 681:25, 690:9
boggling [1] - 549:11
bolster [1] - 514:9
bond [2] - 571:9
bonus [1] - 569:7
book [1] - 641:9
borderline [1] - 496:6
bottles [1] - 470:8
bottom [4] - 547:9, 562:7, 565:4, 602:22
bowling [1] - 470:10
box [2] - 511:10, 538:7
boyfriend [22] - 467:17, 468:16, 493:6, 495:23, 510:11, 510:18, 521:9, 522:20, 534:21, 597:10, 602:14, 602:15, 604:10, 604:12, 604:16, 604:24, 605:23, 616:4, 620:23,

621:2, 656:24, 689:2
brain [1] - 545:6
Brand [1] - 529:15
break [13] - 453:13, 459:24, 483:21, 512:4, 512:8, 515:15, 516:5, 618:16, 630:2, 630:3, 630:12, 655:3
breaking [1] - 575:10
breasts [2] - 596:17, 596:22
breath [2] - 461:8, 565:10
breathing [1] - 461:8
bridge [1] - 575:16
briefly [1] - 553:10
bring [27] - 454:9, 455:2, 455:3, 456:12, 459:7, 459:8, 459:13, 469:15, 516:6, 518:19, 518:20, 543:12, 547:12, 555:14, 555:22, 556:7, 562:16, 594:25, 630:11, 630:19, 654:14, 687:19, 690:19, 692:6, 693:12, 694:14
bringing [1] - 572:11
brings [2] - 619:8, 690:7
brought [11] - 471:6, 548:5, 565:1, 582:13, 625:5, 658:9, 659:1, 672:2, 673:13, 673:22
browser [4] - 528:16, 530:24, 533:4, 536:22
browser's [1] - 536:24
browsing [1] - 540:1
BTW [1] - 591:7
bugging [1] - 628:5
building [1] - 550:9
built [1] - 575:8
burden [7] - 558:2, 629:19, 661:14, 661:18, 661:19, 661:22, 669:16
Bureau [2] - 552:9, 552:10
Burlington [10] - 510:9, 587:1, 641:19, 643:24, 644:12, 646:3, 646:24, 651:8, 654:12, 654:22
business [1] - 597:17
butt [3] - 596:3, 603:24, 657:10
BY [11] - 462:18, 487:2, 498:20, 508:9, 519:15, 520:22, 526:18, 528:6, 536:17, 539:22, 542:1

# C

C1 [13] - 456:15, 464:20, 511:4, 512:2, 516:18, 516:21, 516:22, 518:16, 518:18, 519:3, 519:19, 615:18, 615:19
cache [20] - 528:15, 532:11,

6

533:4, 533:9, 536:1, 536:19, 536:20, 536:22, 536:25, 537:1, 537:9, 537:21, 537:24, 539:24, 540:2, 540:9, 542:2, 542:5, 542:7, 542:10

**caches** [2] - 533:7, 538:2

**calculating** [1] - 560:13

**cam** [1] - 486:22

**canceled** [1] - 593:1

**candid** [1] - 601:8

**candidly** [1] - 497:17

**candor** [2] - 623:8, 666:7

**cannot** [7] - 461:24, 466:20, 496:7, 528:13, 670:10, 677:20, 692:24

**capable** [4] - 533:25, 543:18, 597:6, 680:2

**capacity** [1] - 474:22

**car** [15] - 478:19, 505:2, 506:25, 586:25, 592:2, 592:4, 592:6, 599:20, 600:2, 601:5, 636:19, 648:10, 656:1, 656:14, 656:17

**care** [9] - 458:8, 576:1, 577:1, 583:3, 595:15, 598:2, 598:21, 598:22, 667:21

**cared** [1] - 595:13

**careful** [6] - 460:20, 485:12, 496:4, 513:1, 631:23, 658:15

**carefully** [4] - 497:18, 516:3, 635:5, 672:23

**carelessness** [1] - 675:20

**cares** [1] - 575:22

**caress** [2] - 582:4, 610:11

**caring** [1] - 574:15

**Carter** [1] - 690:18

**carve** [2] - 454:10, 516:7

**CASE** [1] - 672:8

**case** [92] - 453:5, 454:12, 459:18, 460:6, 460:7, 468:2, 512:8, 512:9, 513:3, 527:1, 527:2, 527:16, 540:10, 541:7, 543:5, 543:6, 544:1, 552:13, 552:24, 553:12, 553:19, 553:24, 557:24, 559:11, 570:23, 578:3, 593:8, 609:17, 623:12, 623:17, 629:17, 630:4, 630:5, 632:2, 632:14, 632:18, 633:7, 634:7, 635:3, 638:12, 640:16, 643:18, 643:22, 646:2, 655:14, 658:13, 658:15, 659:1, 660:14, 661:14, 661:21, 662:17, 663:14, 663:25, 664:7, 664:9, 664:16,

664:20, 665:24, 666:7, 666:9, 667:15, 667:23, 668:7, 669:2, 669:16, 670:10, 670:13, 671:4, 671:24, 672:5, 672:10, 672:12, 672:19, 672:22, 672:24, 675:23, 677:5, 683:9, 685:9, 686:6, 686:12, 686:20, 686:22, 686:25, 690:13, 691:3, 692:24, 693:18, 693:19

**cases** [3] - 486:7, 530:25, 634:7

**casually** [1] - 581:18

**catch** [1] - 598:10

**catering** [2] - 569:1, 588:3

**caught** [3] - 579:22, 598:6, 599:2

**caused** [5] - 468:16, 468:18, 495:14, 532:5, 616:7

**causing** [1] - 573:2

**caution** [5] - 631:22, 631:23, 664:13, 686:4, 687:22

**cautioned** [1] - 582:25

**cautioning** [1] - 632:8

**celebrate** [1] - 583:4

**cell** [9] - 515:9, 606:10, 606:22, 606:25, 617:21, 618:6, 646:15, 646:18

**cellular** [7] - 664:1, 676:14, 676:19, 680:21, 680:23, 681:2, 681:3

**certain** [9] - 472:15, 539:24, 628:9, 649:17, 662:21, 663:20, 664:5, 673:3, 693:17

**certainly** [6] - 488:2, 519:25, 553:7, 593:8, 643:5, 692:3

**certificate** [1] - 608:9

**certified** [1] - 608:8

**challenge** [1] - 532:21, 535:10, 535:11, 580:17

**challenging** [2] - 579:24, 580:16

**chambers** [1] - 517:24

**chance** [4] - 460:14, 499:21, 544:10, 598:7

**change** [3] - 532:7, 591:1, 686:23

**changes** [2] - 602:11, 602:13

**Channell** [1] - 551:21

**character** [4] - 541:14, 649:21, 661:7, 665:8

**characterization** [1] - 654:15

**charge** [26] - 516:7, 568:4, 568:6, 568:12, 569:18, 571:14, 571:17, 572:8, 573:9, 574:16, 579:12, 591:18, 591:19, 596:12, 597:25, 598:1, 632:4,

648:23, 658:12, 660:21, 660:22, 661:25, 674:12, 687:7, 687:9, 691:1

**charged** [34] - 541:6, 541:9, 541:12, 555:11, 557:25, 558:3, 611:2, 619:13, 621:23, 624:23, 631:11, 633:5, 647:19, 652:19, 656:5, 656:13, 659:12, 659:20, 660:20, 660:24, 661:1, 661:20, 665:1, 665:3, 665:6, 671:22, 673:7, 673:19, 674:15, 674:18, 678:9, 684:2, 684:23, 686:15

**charges** [10] - 458:1, 541:7, 553:13, 553:14, 612:24, 614:10, 659:3, 660:11, 673:2, 673:9

**chart** [1] - 562:21

**chat** [1] - 615:16

**chatted** [6] - 557:2, 557:6, 624:17, 625:17, 625:19, 625:20

**chatter** [7] - 568:5, 593:13, 603:19, 604:8, 625:1, 627:11, 655:15

**chatting** [5] - 485:17, 625:21, 625:24, 626:1, 626:5

**check** [8] - 486:5, 488:19, 514:10, 547:4, 592:1, 600:12, 600:19

**checked** [2] - 478:18, 478:19

**checking** [3] - 546:3, 693:24, 694:9

**chest** [2] - 584:14, 584:17

**chicks** [1] - 603:8

**Child** [1] - 677:7

**child** [53] - 454:19, 471:16, 498:23, 508:16, 509:19, 531:25, 532:2, 557:7, 557:12, 559:10, 572:23, 575:11, 578:3, 579:6, 579:9, 582:24, 584:25, 597:3, 597:12, 609:9, 609:12, 609:21, 613:15, 613:16, 614:11, 617:13, 621:5, 621:25, 622:16, 627:4, 627:20, 627:21, 627:23, 627:24, 628:19, 628:20, 629:2, 629:11, 638:13, 638:18, 641:16, 643:14, 644:13, 645:24, 677:9, 677:12, 677:14, 677:19, 677:20, 679:6, 682:12, 684:3, 684:6

**CHILD** [1] - 679:4

**children** [27] - 470:12, 471:6, 472:10, 472:11, 509:16, 529:15, 530:3, 532:1,

532:8, 533:23, 534:2, 534:3, 534:5, 587:25, 624:16, 625:13, 626:25, 627:12, 627:19, 628:17, 628:23, 629:15, 646:14, 655:15, 679:1, 684:18

**chills** [1] - 461:6

**China** [3] - 617:25, 618:1, 618:7

**choice** [4] - 563:23, 563:25, 564:3, 654:17

**chooses** [1] - 670:12

**choosing** [2] - 563:20, 563:22

**chose** [3] - 622:19, 622:24, 622:25

**chosen** [2] - 551:2, 660:13

**Chrome** [1] - 605:16

**circle** [2] - 547:25, 621:24

**circled** [1] - 523:14

**circling** [1] - 464:6

**circumstances** [4] - 545:4, 671:4, 675:22, 683:22

**circumstantial** [5] - 663:4, 663:9, 663:11, 663:12, 683:20

**citizen** [3] - 551:23, 552:14, 631:15

**citizenship** [1] - 631:20

**city** [1] - 489:9

**civic** [1] - 461:15

**claimed** [1] - 624:16

**claims** [1] - 555:4

**clarification** [1] - 589:14

**clean** [5] - 482:21, 526:5, 526:8, 583:24, 584:4

**cleanliness** [1] - 583:20

**clear** [15] - 461:14, 462:5, 515:18, 524:18, 532:18, 546:16, 562:6, 570:18, 605:10, 609:17, 611:20, 637:20, 646:9, 650:23

**clearly** [5] - 468:13, 507:16, 604:8, 628:16, 635:9

**clicked** [1] - 546:24

**client** [25] - 456:17, 458:22, 471:20, 495:7, 511:4, 514:15, 543:14, 631:20, 632:11, 632:19, 632:21, 633:12, 633:15, 644:17, 645:3, 645:6, 646:21, 646:24, 648:8, 648:14, 648:15, 648:18, 650:6, 650:9

**client's** [2] - 512:21, 515:9

**cliques** [1] - 603:6

**clit** [2] - 577:7, 610:7

**close** [5] - 477:25, 542:25, 644:1, 691:13, 691:18

**closed** [1] - 653:14

**closely** [2] - 478:10, 515:23

**closer** [3] - 586:10, 636:15, 636:16
**closest** [1] - 635:11
**closing** [17] - 543:2, 552:7, 555:13, 556:14, 557:15, 630:5, 631:2, 632:22, 632:24, 641:18, 644:15, 647:22, 651:25, 656:23, 689:1, 689:7, 690:24
**closings** [1] - 690:25
**clothed** [1] - 682:13
**clothes** [1] - 581:24
**coaching** [1] - 571:12
**Code** [4] - 673:10, 673:11, 673:13, 673:22
**coerce** [15] - 558:14, 559:2, 587:12, 614:6, 647:25, 659:10, 659:18, 674:14, 674:19, 675:6, 675:15, 675:24, 676:4, 676:8, 676:10
**COERCE** [2] - 674:10, 675:3
**coerced** [1] - 675:9
**coerces** [1] - 673:17
**coercing** [2] - 611:5, 678:13
**coercion** [1] - 598:4
**coherent** [2] - 545:17, 552:13
**coincidence** [3] - 626:3, 626:4, 626:8
**cold** [1] - 461:5
**collective** [1] - 685:8
**color** [2] - 505:9, 505:19
**colored** [2] - 667:25, 669:1
**comfortable** [5] - 469:10, 472:20, 582:9, 595:6, 595:8
**coming** [9] - 483:12, 532:10, 533:12, 538:22, 588:19, 603:16, 644:8, 646:10, 646:25
**comment** [3] - 498:24, 498:25, 564:14
**commentary** [3] - 516:25, 611:15, 616:11
**comments** [1] - 611:15
**commerce** [27] - 558:16, 606:5, 606:9, 606:11, 614:15, 614:17, 617:17, 617:19, 618:3, 618:10, 659:9, 659:17, 659:25, 660:1, 664:1, 664:2, 673:16, 674:1, 674:2, 674:13, 674:22, 676:13, 676:16, 679:11, 679:13, 680:15, 680:17
**COMMERCE** [2] - 676:10, 680:11
**commit** [12] - 609:8, 611:5, 611:10, 611:13, 613:6, 621:25, 622:2, 677:8, 678:12, 678:24, 684:5,

684:15
**commits** [1] - 673:20
**committed** [5] - 541:11, 665:5, 673:2, 673:5, 673:7
**committing** [4] - 611:7, 622:1, 678:17, 684:8
**common** [6] - 560:20, 560:23, 661:6, 663:6, 670:22, 675:25
**communicate** [11] - 485:3, 486:2, 550:2, 553:15, 601:22, 606:15, 671:5, 676:6, 676:7, 687:17, 687:25
**communicated** [9] - 465:4, 480:8, 484:22, 484:24, 522:18, 524:18, 524:25, 525:12, 525:13
**communicating** [21] - 463:2, 463:13, 463:14, 478:3, 480:19, 482:22, 487:21, 499:2, 500:16, 500:18, 500:19, 502:7, 512:17, 513:3, 520:1, 520:16, 523:10, 565:22, 601:14, 608:13, 657:15
**communication** [13] - 476:11, 476:20, 480:18, 523:7, 524:1, 524:5, 545:5, 588:7, 589:13, 604:9, 614:1, 676:16, 676:18
**communications** [45] - 464:20, 464:21, 470:1, 472:7, 472:16, 474:16, 474:21, 476:1, 477:14, 479:7, 494:13, 513:8, 513:23, 515:25, 517:5, 519:17, 519:20, 519:23, 520:3, 520:18, 521:3, 549:6, 559:6, 565:17, 566:11, 567:21, 587:22, 588:9, 592:25, 597:20, 598:16, 600:11, 601:24, 602:3, 606:19, 613:3, 616:3, 624:22, 624:23, 652:22, 653:6, 654:16, 657:8, 676:14
**compelling** [1] - 569:23
**competence** [5] - 551:19, 551:21, 552:2, 552:6, 553:11
**competency** [3] - 551:1, 552:10, 552:18
**competent** [1] - 552:11
**complained** [1] - 596:17
**complete** [13] - 457:19, 466:17, 471:22, 472:4, 513:19, 513:24, 514:2, 514:10, 518:6, 519:5, 527:18, 553:8, 671:20

**completed** [2] - 536:12, 559:16
**completely** [6] - 462:3, 467:17, 492:20, 548:7, 573:1, 582:1
**completeness** [2] - 457:19, 457:22
**completion** [1] - 515:20
**complicated** [1] - 515:5
**complimenting** [1] - 596:19
**component** [1] - 596:21
**components** [1] - 693:17
**compounded** [1] - 548:2
**computer** [3] - 660:2, 674:4, 680:1
**concept** [1] - 569:15
**concern** [4] - 495:6, 552:18, 563:6, 691:9
**concerned** [12] - 515:17, 532:17, 565:23, 577:1, 579:22, 590:8, 590:10, 590:13, 598:6, 602:7, 602:25, 613:10
**concerning** [1] - 545:12
**concerns** [2] - 490:9, 531:7
**concerted** [1] - 617:2
**conclude** [4] - 513:22, 678:22, 684:14, 692:1
**concluded** [1] - 469:21
**conclusion** [1] - 553:23
**CONCLUSION** [1] - 686:3
**conclusions** [2] - 669:12, 687:6
**concrete** [1] - 655:23
**condemn** [2] - 576:3, 589:25
**conditions** [2] - 652:11, 652:13
**condoms** [1] - 479:10
**CONDUCT** [2] - 681:5, 681:18
**conduct** [50] - 457:2, 475:7, 541:8, 558:8, 566:3, 590:5, 609:3, 609:22, 610:24, 612:5, 613:3, 613:13, 614:19, 614:21, 618:16, 618:24, 619:2, 620:10, 621:12, 624:23, 626:6, 629:5, 650:18, 652:19, 656:22, 658:4, 660:4, 665:2, 674:6, 674:7, 675:22, 677:4, 677:25, 678:16, 679:15, 679:16, 679:19, 681:9, 681:10, 681:12, 681:17, 681:19, 683:4, 683:5, 683:12, 683:19, 684:7, 686:9
**Conduct** [2] - 677:7, 688:11
**conducted** [1] - 551:2
**conducting** [1] - 567:3
**confer** [1] - 687:20
**conference** [2] - 516:7,

540:15
**confidant** [5] - 559:25, 562:11, 565:6, 565:16, 567:16
**confidence** [1] - 576:12
**confident** [1] - 612:14
**confidential** [1] - 693:19
**confines** [1] - 525:7
**confirm** [2] - 550:7, 590:17
**confirmed** [1] - 499:13
**confirming** [1] - 512:24
**conflict** [1] - 587:15
**conflicts** [1] - 670:1
**confuse** [2] - 494:10, 494:13
**confused** [6] - 464:24, 467:23, 494:4, 494:8, 495:14, 496:1
**confusing** [4] - 457:5, 468:7, 469:13, 548:2
**confusion** [2] - 468:19, 553:5
**conjecture** [1] - 671:11
**connection** [11] - 495:11, 522:5, 569:6, 570:3, 571:7, 571:11, 579:15, 586:9, 586:20, 596:15, 596:16
**consciousness** [11] - 554:19, 566:4, 566:22, 567:19, 576:9, 579:23, 580:3, 590:14, 592:15, 598:25, 655:20
**consensual** [3] - 556:25, 589:10, 590:5
**consent** [5] - 566:18, 589:4, 589:7, 677:19, 677:20
**consenting** [2] - 597:4, 597:6
**consequences** [5] - 573:2, 580:1, 580:5, 649:25, 686:13
**consider** [17] - 541:10, 541:12, 541:16, 541:17, 593:6, 665:4, 665:6, 665:10, 665:11, 666:6, 670:2, 670:20, 671:13, 672:23, 681:15, 682:4, 686:13
**considerable** [2] - 568:2, 568:13
**consideration** [11] - 507:3, 631:25, 658:10, 662:8, 662:11, 668:22, 670:21, 671:25, 672:4, 672:6, 686:21
**considered** [6] - 541:19, 628:10, 628:11, 660:23, 665:13, 686:17
**considering** [3] - 667:5, 667:18, 682:12
**consisted** [1] - 516:21
**consistent** [15] - 473:4, 510:20, 523:17, 532:17,

8

532:19, 565:17, 573:14,
574:21, 578:21, 600:4,
604:21, 605:24, 638:19,
652:17, 658:12
**consistently** [1] - 548:25
**consisting** [1] - 609:22
**consists** [2] - 456:23, 662:17
**Constance** [1] - 688:3
**constant** [1] - 582:7
**constantly** [2] - 549:4, 645:13
**constitute** [3] - 656:10,
678:25, 684:16
**constitutes** [4] - 629:2, 664:2,
676:15, 682:2
**constitutional** [2] - 665:19,
670:11
**consult** [1] - 686:19
**consulted** [1] - 685:25
**consummation** [2] - 678:21,
684:12
**contact** [22] - 557:12, 592:10,
592:17, 597:12, 599:11,
600:7, 601:3, 602:5,
602:11, 605:22, 607:6,
609:22, 610:8, 613:23,
613:24, 628:2, 636:4,
651:3, 656:10, 675:11,
677:20, 692:14
**contact/penetration** [1] -
677:16
**contacted** [3] - 478:9, 648:13,
648:15
**contained** [2] - 580:1, 683:17
**container** [3] - 546:12,
546:15, 546:16
**contains** [3] - 455:7, 519:20,
674:2
**contemplating** [2] - 579:4,
579:9
**content** [7] - 516:25, 517:3,
517:4, 518:3, 518:14,
581:12, 682:22
**contents** [6] - 513:5, 517:13,
527:3, 527:13, 683:14,
683:22
**contest** [1] - 496:2
**contested** [1] - 529:17
**context** [9] - 467:21, 467:22,
513:8, 516:1, 559:18,
619:24, 650:6, 678:22,
684:14
**continuation** [1] - 458:5
**continue** [3] - 589:1, 614:2
**Continued** [2] - 462:17,
536:16
**continued** [6] - 521:13,
550:11, 596:4, 597:14,
601:21, 613:13
**continuing** [6] - 572:16,
575:2, 588:25, 590:7,

591:2, 593:15
**contract** [1] - 526:23
**contradicted** [1] - 669:24
**contradicts** [2] - 623:10,
666:10
**contrary** [3] - 629:17, 639:11,
672:17
**control** [12] - 474:25, 479:11,
559:6, 568:7, 568:8,
568:12, 570:6, 570:9,
571:3, 571:19, 587:16,
598:1
**controlled** [1] - 581:11
**controlling** [5] - 491:24,
556:23, 589:8, 589:22,
589:24
**conversation** [35] - 453:16,
458:6, 460:18, 468:4,
474:25, 475:17, 485:6,
499:15, 506:18, 509:20,
510:2, 521:7, 521:8,
521:13, 522:25, 523:25,
524:3, 525:14, 562:13,
569:16, 572:16, 580:19,
593:15, 616:11, 620:22,
624:20, 635:25, 637:9,
638:25, 650:4, 650:5,
650:7, 657:14, 693:8
**conversation's** [2] - 458:22,
459:4
**conversations** [17] - 457:6,
467:18, 474:8, 485:5,
492:5, 498:6, 518:7, 523:1,
550:10, 601:25, 625:6,
633:23, 639:12, 643:6,
645:7, 649:1, 651:2
**conversion** [1] - 680:2
**convey** [1] - 691:19
**conveying** [1] - 549:22
**convict** [4] - 641:22, 661:18,
662:13, 674:12
**convictions** [2] - 558:6,
686:24
**convince** [5] - 559:22, 571:6,
580:14, 602:4, 627:23
**convinced** [3] - 493:17,
638:4, 663:15
**convincing** [2] - 627:24,
661:7
**coordinator** [2] - 692:19,
693:25
**cop** [26] - 463:9, 489:18,
489:20, 490:8, 496:5,
565:23, 566:6, 566:7,
566:13, 566:17, 566:19,
566:20, 566:23, 566:24,
567:2, 567:5, 567:8, 567:9,
567:14, 567:18, 567:25,
576:12, 590:18, 590:20
**copied** [1] - 587:17

**cops** [5] - 480:3, 480:12,
499:2, 592:15, 592:16
**copy** [3] - 535:23, 608:8,
658:19
**correct** [147] - 462:23,
463:16, 463:21, 464:13,
464:23, 465:2, 465:12,
466:7, 466:14, 466:23,
467:3, 469:1, 469:17,
469:22, 470:2, 470:3,
470:4, 470:25, 471:2,
471:10, 471:11, 471:14,
471:16, 472:10, 473:7,
473:24, 473:25, 474:1,
474:3, 474:6, 474:10,
474:22, 475:23, 476:7,
476:12, 476:14, 476:21,
477:9, 477:10, 477:12,
477:15, 477:16, 477:19,
479:12, 480:9, 480:22,
480:25, 481:21, 482:6,
482:10, 482:13, 483:25,
484:3, 484:7, 484:11,
484:19, 484:22, 484:25,
485:13, 486:1, 486:15,
487:6, 487:8, 487:12,
487:13, 487:18, 487:22,
487:25, 488:8, 488:12,
489:10, 489:15, 489:18,
489:20, 489:25, 490:10,
490:11, 490:14, 490:21,
491:19, 492:1, 493:3,
493:6, 493:8, 493:14,
496:16, 499:3, 499:6,
499:11, 499:14, 499:19,
500:3, 500:6, 500:19,
500:25, 501:1, 501:7,
501:9, 501:14, 501:18,
501:22, 501:24, 502:5,
502:6, 502:21, 503:19,
503:20, 504:5, 504:7,
504:10, 504:19, 505:4,
505:9, 505:20, 506:3,
506:5, 506:8, 506:15,
506:19, 506:23, 507:10,
507:24, 519:17, 520:4,
520:19, 521:4, 521:9,
521:11, 521:16, 521:18,
521:21, 521:25, 523:11,
523:15, 524:6, 524:20,
524:23, 525:2, 537:19,
549:4, 550:12, 570:11,
600:14, 608:17, 641:4,
656:5
**correction** [1] - 549:16
**correctly** [2] - 491:9, 556:20
**correlate** [1] - 547:9
**correspondence** [22] -
512:25, 632:19, 632:20,
633:25, 634:11, 635:9,

637:6, 638:23, 640:1,
640:3, 640:7, 644:1, 646:4,
647:9, 647:10, 647:11,
647:23, 648:7, 649:9,
649:11, 649:12, 649:22
**cough** [1] - 461:6
**Counsel** [1] - 556:18
**counsel** [13] - 495:1, 508:1,
513:20, 543:18, 543:22,
552:1, 552:17, 553:15,
553:16, 651:20, 656:3,
668:24, 669:20
**counseling** [3] - 491:5,
498:22, 604:22
**counselor** [2] - 656:25, 689:3
**Count** [21] - 558:8, 558:9,
558:24, 587:3, 606:3,
607:21, 608:20, 610:2,
611:8, 612:23, 613:4,
618:12, 621:9, 621:20,
622:15, 647:19, 649:14,
659:21, 673:21, 684:2
**COUNT** [2] - 674:9, 679:3
**count** [12] - 558:9, 595:4,
613:1, 613:2, 614:9,
614:10, 654:16, 659:5,
659:13, 660:24, 673:11,
687:14
**counterproposal** [1] - 636:24
**country** [2] - 680:20, 680:23
**Counts** [8] - 558:6, 558:12,
606:4, 607:2, 608:23,
611:1, 673:12, 674:16
**COUNTS** [2] - 660:19, 674:9
**counts** [8] - 557:11, 633:5,
658:9, 658:14, 659:3,
660:13, 660:21, 673:9
**County** [1] - 485:15
**couple** [11] - 463:5, 478:14,
494:3, 522:24, 549:2,
549:24, 593:10, 602:17,
611:3, 648:9, 652:4
**coupling** [1] - 597:19
**course** [13] - 460:13, 514:25,
561:7, 567:20, 631:5,
634:9, 637:25, 650:2,
655:9, 664:17, 669:9,
670:12, 690:4
**court** [30] - 453:2, 459:15,
498:13, 508:10, 512:13,
516:15, 518:24, 520:14,
535:14, 536:9, 543:10,
544:1, 544:12, 552:15,
555:19, 556:9, 557:17,
630:10, 630:18, 630:23,
685:23, 687:4, 687:19,
688:5, 690:1, 690:4,
690:15, 692:16, 693:13,
694:13
**Court** [36] - 453:5, 455:23,

457:16, 459:18, 461:13, 497:16, 515:23, 519:3, 529:13, 529:22, 535:2, 550:11, 551:1, 551:19, 551:20, 551:24, 551:25, 552:9, 552:16, 552:17, 553:2, 553:11, 554:6, 555:9, 555:25, 556:17, 559:4, 614:12, 632:4, 664:17, 671:24, 672:7, 687:17, 688:14, 688:18, 694:21
**COURT** [204] - 453:10, 453:25, 454:8, 455:1, 455:11, 455:16, 455:24, 456:10, 457:10, 457:21, 458:19, 459:1, 459:7, 459:11, 459:13, 459:23, 460:4, 461:24, 462:3, 462:15, 464:17, 466:17, 468:11, 468:14, 471:21, 475:9, 475:12, 477:1, 479:14, 481:12, 481:14, 481:16, 481:18, 485:1, 486:24, 488:3, 488:6, 488:17, 488:21, 492:21, 492:23, 494:20, 494:25, 495:5, 495:12, 495:19, 495:22, 495:25, 496:12, 497:3, 497:14, 497:20, 498:12, 498:14, 504:3, 505:18, 507:17, 508:3, 508:6, 508:13, 509:10, 509:12, 511:6, 511:13, 512:3, 512:14, 513:5, 513:10, 513:12, 513:15, 514:11, 514:17, 514:19, 514:21, 514:24, 515:1, 515:11, 515:14, 516:11, 516:16, 517:6, 517:9, 517:11, 517:16, 517:18, 517:21, 518:2, 518:5, 518:15, 518:17, 518:19, 518:23, 519:1, 519:12, 520:8, 520:14, 522:5, 523:19, 523:22, 524:4, 524:12, 525:5, 525:20, 525:22, 525:25, 526:2, 526:7, 527:12, 528:4, 529:3, 529:8, 529:13, 530:24, 531:11, 531:23, 532:10, 532:13, 532:16, 533:11, 533:18, 534:11, 534:23, 535:3, 535:5, 535:18, 535:20, 535:24, 536:10, 536:14, 537:3, 537:14, 538:1, 538:5, 538:7, 538:11, 538:14, 538:16, 538:19, 538:21, 539:11, 539:16, 539:20, 540:14, 540:18, 541:2,

541:23, 542:14, 542:16, 542:19, 542:22, 542:24, 543:11, 543:16, 543:20, 548:11, 548:13, 548:17, 548:20, 548:23, 548:25, 550:5, 550:11, 550:14, 550:25, 551:11, 552:8, 554:1, 554:4, 555:17, 555:20, 556:3, 556:7, 556:11, 630:1, 630:11, 630:15, 630:19, 630:21, 630:25, 643:2, 651:18, 657:3, 658:16, 671:17, 688:8, 688:13, 688:16, 688:21, 688:23, 688:25, 689:9, 689:12, 689:20, 690:2, 690:16, 691:9, 691:17, 692:5, 692:13, 692:17, 693:12, 693:15, 694:14, 694:17
**Court's** [12] - 456:21, 492:22, 523:21, 532:17, 532:19, 539:12, 540:14, 543:15, 552:8, 554:4, 688:2, 690:24
**COURT'S** [1] - 664:12
**courthouse** [1] - 694:10
**courtroom** [17] - 460:8, 462:11, 469:12, 512:11, 512:12, 526:16, 543:8, 543:9, 630:8, 630:9, 658:16, 670:18, 670:21, 687:13, 687:22, 694:5, 694:12
**COURTROOM** [14] - 453:4, 456:7, 459:17, 460:1, 462:7, 486:21, 488:20, 488:24, 489:1, 526:5, 526:11, 538:9, 540:21, 540:24
**cover** [1] - 576:21
**cover-up** [1] - 576:21
**COVID** [7] - 453:20, 460:11, 460:24, 544:9, 544:19, 691:23, 691:24
**COVID-19** [3] - 454:5, 461:3
**cow** [1] - 663:8
**cows** [1] - 663:9
**coyness** [1] - 682:15
**cozy** [2] - 569:11, 655:1
**craigslist** [1] - 501:12
**Craigslist** [21] - 470:21, 474:1, 485:18, 486:3, 486:7, 501:17, 560:17, 560:20, 566:25, 588:14, 588:15, 606:17, 606:18, 627:7, 634:20, 636:13, 650:15, 652:6, 652:10, 653:22
**create** [4] - 544:25, 623:18, 660:9, 667:15

**credibility** [13] - 496:2, 623:2, 623:4, 623:7, 634:6, 634:8, 649:15, 665:22, 666:1, 667:12, 667:20, 668:9, 668:25
**CREDIBILITY** [1] - 665:21
**credible** [1] - 666:17
**crime** [24] - 558:3, 611:5, 611:7, 611:10, 611:13, 613:6, 621:25, 622:1, 622:2, 656:10, 660:8, 660:20, 661:20, 671:22, 677:7, 677:14, 678:12, 678:17, 678:21, 684:5, 684:8, 684:12, 684:22
**crimes** [6] - 541:6, 541:9, 541:12, 665:1, 665:3, 665:5
**CRIMINAL** [1] - 676:25
**criminal** [30] - 453:5, 459:18, 541:13, 541:14, 549:20, 558:22, 573:22, 574:6, 608:25, 609:1, 609:15, 612:5, 631:8, 631:11, 659:1, 659:12, 659:20, 661:14, 661:21, 664:8, 665:7, 665:8, 666:22, 669:16, 670:10, 673:19, 675:1, 677:3, 677:23
**criminalize** [4] - 631:23, 632:5, 648:23, 675:12
**criminalizes** [5] - 559:5, 559:8, 563:24, 592:19, 677:15
**criminalizing** [1] - 632:8
**critical** [1] - 563:22
**cropped** [4] - 527:20, 531:13, 531:14, 539:12
**cropping** [2] - 532:19, 534:21
**cross** [18] - 457:11, 461:18, 469:11, 495:20, 498:3, 498:17, 520:9, 534:10, 541:23, 585:7, 600:13, 600:19, 625:16, 641:11, 641:21, 647:2, 652:9, 661:24
**CROSS** [2] - 462:17, 541:25
**cross-examination** [11] - 461:18, 469:11, 498:3, 498:17, 520:9, 534:10, 541:23, 641:11, 641:21, 647:2, 652:9
**CROSS-EXAMINATION** [2] - 462:17, 541:25
**cross-examine** [1] - 495:20
**cross-examined** [1] - 457:11
**cross-examining** [1] - 661:24
**crossed** [2] - 676:17, 681:3
**cruising** [2] - 588:13, 588:14
**crying** [3] - 589:5, 590:8, 590:9

**crystal** [1] - 605:10
**cuddle** [5] - 479:20, 502:12, 590:22, 590:25, 595:13
**cuddled** [1] - 595:25
**cum** [6] - 465:25, 493:5, 577:18, 604:12, 604:13, 617:8
**cumming** [1] - 583:8
**cumulative** [3] - 455:11, 689:5, 689:20
**curative** [3] - 454:17, 454:24, 541:3
**curiosities** [2] - 582:2, 582:3
**curious** [6] - 473:12, 509:21, 564:10, 582:14, 584:19, 655:5
**curves** [1] - 596:10
**curvy** [1] - 502:15
**cut** [1] - 497:21
**cute** [9] - 502:14, 569:21, 591:5, 596:2, 601:14, 603:13, 603:24, 603:25, 657:9
**cutoff** [2] - 690:20, 690:21
**cutting** [1] - 691:22

## D

**D&D** [1] - 561:8
**Dad** [3] - 598:9, 598:23, 600:5
**dad** [3] - 499:24, 500:8, 598:8
**dad's** [1] - 598:21
**dangerous** [3] - 575:20, 575:24, 576:5
**darkest** [1] - 560:1
**data** [7] - 531:2, 533:12, 535:6, 535:11, 547:17, 548:1, 679:25
**date** [23] - 469:17, 477:1, 477:5, 479:15, 479:18, 497:7, 502:25, 511:20, 528:23, 529:21, 530:2, 530:24, 531:1, 532:25, 533:12, 534:16, 544:12, 546:21, 552:23, 608:7, 608:8, 636:7, 687:12
**dated** [1] - 482:5
**dates** [9] - 547:1, 547:6, 547:7, 553:6, 673:3, 673:5, 673:7, 674:18
**dating** [1] - 532:25
**daughter** [77] - 463:7, 465:19, 471:8, 474:3, 474:12, 482:10, 484:11, 513:14, 524:20, 525:1, 547:21, 554:9, 557:4, 557:5, 559:20, 561:13, 561:18, 561:19, 562:6, 563:2, 563:21, 564:10, 564:11, 564:13, 565:19, 566:15,

568:2, 568:7, 568:11, 568:14, 569:10, 569:12, 571:1, 571:4, 571:6, 571:21, 574:8, 574:16, 574:18, 579:19, 586:2, 597:6, 607:12, 611:21, 624:19, 625:20, 625:21, 626:17, 629:10, 635:8, 636:18, 636:20, 636:25, 637:5, 637:8, 637:11, 637:12, 637:14, 637:18, 638:5, 638:7, 639:19, 639:23, 640:4, 640:10, 642:18, 644:10, 644:23, 646:9, 646:12, 653:16, 655:2

**daughter's** [4] - 638:2, 644:6, 644:20, 646:7
**dawdled** [1] - 653:2
**days** [15] - 460:11, 461:6, 469:22, 492:16, 494:14, 497:25, 498:6, 498:7, 506:17, 510:19, 538:3, 579:17, 608:6, 615:23, 615:25
**deal** [4] - 545:12, 563:18, 575:12, 627:25
**dealing** [2] - 531:8, 551:22
**dear** [1] - 603:20
**December** [2] - 453:1, 548:12
**decide** [15] - 454:23, 534:1, 535:8, 591:16, 591:18, 643:11, 649:14, 654:5, 664:20, 667:24, 669:23, 682:24, 686:1, 686:20, 692:9
**decided** [2] - 460:13, 670:14
**deciding** [4] - 639:16, 640:6, 670:2, 685:8
**decision** [5] - 454:5, 529:15, 552:4, 632:15, 669:3
**deep** [1] - 586:9
**deepest** [2] - 559:25, 645:15
**defendant** [95] - 453:8, 459:21, 495:4, 525:25, 527:3, 529:12, 541:5, 541:8, 541:11, 541:13, 552:1, 558:13, 558:18, 559:1, 559:3, 593:6, 611:4, 614:19, 621:10, 622:19, 659:7, 659:15, 659:23, 660:8, 660:12, 660:16, 660:18, 660:22, 660:24, 660:25, 661:3, 661:18, 661:21, 661:23, 661:25, 662:4, 662:6, 662:7, 662:9, 662:10, 664:25, 665:2, 665:5, 665:7, 665:17, 666:9, 666:21, 669:16, 670:10, 670:12, 670:14,

671:14, 673:9, 674:12, 674:18, 675:5, 675:10, 675:18, 675:21, 676:3, 676:6, 676:7, 676:12, 676:23, 677:3, 677:22, 677:23, 678:1, 678:4, 678:9, 678:12, 678:16, 679:5, 679:8, 679:17, 679:22, 680:6, 680:22, 681:1, 681:2, 683:2, 683:13, 683:15, 683:16, 684:2, 684:5, 684:7, 686:5, 686:7, 686:8, 686:12, 688:7, 688:23, 690:22
**Defendant** [1] - 659:2
**DEFENDANT** [15] - 454:7, 544:6, 548:12, 548:15, 548:18, 548:22, 548:24, 549:2, 550:15, 550:20, 551:5, 551:8, 670:9, 682:25, 694:19
**Defendant's** [4] - 512:2, 516:18, 518:18, 519:3
**defendant's** [12] - 457:4, 514:9, 527:9, 559:9, 630:5, 631:2, 662:12, 663:16, 665:19, 675:14, 683:21, 683:24
**defense** [19] - 456:15, 526:1, 543:19, 544:25, 547:23, 551:3, 552:12, 552:21, 553:16, 615:19, 634:1, 634:11, 634:20, 651:20, 652:7, 652:19, 654:13, 657:7, 668:24
**Defense** [6] - 456:15, 464:20, 476:1, 489:13, 519:19, 653:9
**defenses** [1] - 553:14
**define** [1] - 661:5
**DEFINED** [1] - 681:18
**Defined** [1] - 688:11
**defined** [7] - 590:1, 609:22, 619:2, 619:8, 621:6, 677:16
**defining** [1] - 561:25
**definitely** [5] - 561:1, 597:18, 597:25, 613:8, 613:15
**definition** [3] - 491:12, 585:22, 619:6
**definitively** [1] - 494:6
**deflect** [1] - 616:14
**degree** [3] - 544:24, 671:8, 685:18
**delay** [1] - 555:25
**deliberate** [11] - 543:1, 588:2, 617:1, 622:12, 626:8, 627:25, 686:20, 690:14, 690:17, 691:24, 692:8
**deliberating** [2] - 685:14, 691:3

**deliberation** [1] - 454:14
**deliberations** [25] - 628:10, 634:1, 634:10, 634:22, 658:21, 662:3, 670:21, 671:5, 671:15, 671:22, 685:3, 685:5, 685:7, 685:17, 687:3, 687:16, 688:1, 690:13, 693:1, 693:16, 693:19, 693:23, 694:3, 694:4, 694:6
**deliberative** [1] - 560:13
**delicious** [2] - 572:4, 589:17
**deliver** [1] - 685:23
**demonstrate** [1] - 458:1
**denial** [1] - 660:16
**denied** [5] - 553:20, 554:6, 555:12, 566:23, 629:15
**deny** [1] - 552:8
**dependent** [1] - 540:4
**depict** [1] - 531:25
**depicted** [2] - 621:5, 682:11
**depicting** [1] - 532:7
**depiction** [44] - 554:12, 614:14, 614:18, 614:20, 614:24, 617:14, 617:16, 618:15, 618:18, 618:21, 621:11, 621:18, 659:24, 660:3, 660:4, 673:25, 674:5, 674:7, 679:9, 679:10, 679:14, 679:18, 679:23, 679:24, 680:3, 680:4, 680:7, 680:13, 680:18, 681:7, 681:11, 681:16, 682:6, 682:8, 682:15, 682:17, 682:19, 682:21, 683:3, 683:11, 683:18, 688:18, 690:7
**DEPICTION** [1] - 681:5
**depicts** [3] - 532:2, 532:3, 683:23
**DEPUTY** [14] - 453:4, 456:7, 459:17, 460:1, 462:7, 486:21, 488:20, 488:24, 489:1, 526:5, 526:11, 538:9, 540:21, 540:24
**deputy** [3] - 462:11, 526:16, 658:17
**derived** [1] - 539:5
**describe** [4] - 505:8, 505:19, 556:21, 577:9
**described** [6] - 490:24, 556:21, 600:15, 610:3, 613:21, 656:7
**describing** [1] - 582:23
**descriptions** [1] - 642:17
**deserves** [3] - 668:15, 669:6, 672:1
**deserving** [1] - 668:21
**design** [2] - 678:24, 684:15
**designed** [2] - 614:1, 682:17

**desire** [3] - 653:20, 687:16, 692:2
**desired** [2] - 603:8, 609:4
**desires** [8] - 580:20, 580:25, 594:5, 609:11, 639:6, 642:3, 645:13, 677:11
**desperate** [3] - 626:13, 650:21, 652:23
**detail** [3] - 547:13, 632:22, 642:22
**detailed** [3] - 560:10, 640:12, 640:21
**details** [3] - 484:21, 549:9, 667:6
**determination** [2] - 534:13, 686:14
**determinations** [1] - 672:12
**determine** [18] - 475:11, 528:11, 528:13, 554:18, 635:6, 639:25, 641:25, 645:22, 651:5, 651:12, 658:25, 660:14, 662:16, 665:25, 670:5, 672:18, 682:21, 686:5
**determined** [2] - 552:11, 666:14
**determining** [5] - 635:2, 635:16, 670:7, 681:15, 682:3
**develop** [1] - 561:20
**Devens** [1] - 551:21
**deviant** [8] - 564:4, 564:9, 567:17, 574:6, 574:19, 611:14, 626:6, 627:22
**device** [2] - 461:23, 540:1
**devices** [1] - 536:21
**dialogue** [8] - 564:17, 581:12, 581:22, 584:7, 635:22, 635:23, 641:24, 642:12
**differ** [1] - 539:7
**difference** [5] - 576:5, 580:13, 626:11, 685:9, 685:11
**differences** [1] - 603:5
**different** [24] - 525:16, 530:15, 537:6, 541:5, 544:13, 545:4, 569:24, 580:11, 585:23, 588:16, 593:16, 596:6, 602:3, 625:11, 625:17, 626:5, 634:1, 637:25, 638:3, 664:25, 666:17, 666:25, 667:3, 693:17
**differently** [1] - 667:2
**difficult** [5] - 523:2, 547:7, 549:15, 563:3, 581:8
**difficulties** [1] - 555:25
**difficulty** [2] - 461:8, 552:20
**digital** [1] - 526:23
**dinner** [1] - 690:19
**dire** [3] - 528:3, 536:12,

539:19
**DIRE** [2] - 528:5, 539:21
**direct** [19] - 456:17, 457:17, 463:18, 469:4, 469:21, 472:12, 484:16, 485:9, 494:22, 496:3, 500:13, 507:19, 522:8, 617:23, 662:24, 662:25, 663:2, 663:11, 683:19
**DIRECT** [2] - 526:17, 536:16
**direct/cross** [1] - 469:4
**directed** [1] - 474:24
**direction** [2] - 497:1, 581:12
**directions** [2] - 477:17, 496:6
**directly** [2] - 559:7, 676:6
**dirty** [1] - 580:4
**disability** [1] - 497:7
**disagree** [4] - 603:20, 631:20, 631:21, 632:12
**disappeared** [1] - 626:11
**disbelieve** [1] - 667:9
**disc** [2] - 535:16, 680:1
**discarded** [1] - 552:3
**disclose** [1] - 693:19
**disclosed** [3] - 459:2, 514:6, 514:11
**discloses** [1] - 496:9
**disclosing** [1] - 485:12
**disclosure** [2] - 514:8, 515:17
**discredit** [1] - 667:1
**discrepancies** [2] - 666:24, 667:4
**discrepancy** [1] - 667:6
**discrete** [1] - 655:23
**discuss** [4] - 472:9, 575:19, 578:23, 692:25
**discussed** [6] - 470:2, 472:10, 472:11, 524:19, 574:22, 580:11
**discussion** [12] - 453:14, 495:7, 511:4, 572:17, 582:11, 595:12, 620:3, 633:12, 639:4, 639:5, 647:13, 648:2
**discussions** [3] - 473:5, 575:15, 635:18
**disease** [1] - 561:8
**dislike** [1] - 632:11
**dismiss** [1] - 495:8
**displayed** [1] - 567:20
**displays** [2] - 619:8, 690:7
**dispute** [2] - 455:17, 663:21
**disputed** [2] - 529:17, 663:5
**disregard** [4] - 453:17, 460:20, 506:1, 664:13
**disregarded** [1] - 670:19
**distances** [1] - 456:2
**distancing** [1] - 690:17
**distinguishing** [1] - 649:4

539:19
**distraught** [2] - 478:9, 490:24
**District** [3] - 659:7, 659:15, 659:22
**disturbing** [1] - 631:24
**division** [1] - 687:24
**divorce** [2] - 650:11, 650:17
**doc** [1] - 486:22
**doctrine** [1] - 515:20
**document** [10] - 457:7, 465:20, 511:14, 514:8, 517:12, 517:14, 519:5, 519:22, 522:12, 606:7
**dog** [3] - 532:3, 633:17, 639:2
**dogs** [4] - 470:6, 471:13, 626:22, 627:1
**done** [24] - 486:6, 517:11, 530:17, 532:5, 549:7, 550:18, 551:7, 557:15, 583:7, 587:6, 605:17, 610:16, 622:20, 640:12, 642:23, 647:20, 651:4, 680:7, 680:8, 683:6, 683:7, 687:5, 691:11, 691:18
**door** [7] - 478:19, 496:16, 496:18, 534:4, 552:25, 553:3, 685:22
**double** [1] - 547:4
**double-check** [1] - 547:4
**doubt** [58] - 555:10, 558:2, 587:2, 606:3, 607:3, 607:22, 608:22, 610:25, 611:23, 612:23, 614:5, 614:8, 617:12, 617:15, 618:4, 618:13, 621:9, 621:21, 629:20, 646:2, 651:12, 651:13, 652:1, 654:6, 658:11, 661:4, 661:5, 661:6, 661:10, 661:11, 661:15, 661:17, 661:20, 662:4, 662:6, 662:9, 662:13, 663:16, 673:4, 674:17, 675:5, 675:17, 676:2, 676:12, 676:18, 676:23, 677:2, 678:11, 678:23, 679:7, 679:22, 680:13, 681:7, 683:2, 684:4, 684:14
**DOUBT** [1] - 661:2
**down** [26] - 462:19, 478:18, 486:8, 488:11, 488:21, 495:17, 522:23, 525:23, 538:17, 542:16, 545:15, 575:10, 576:17, 579:19, 592:2, 618:16, 641:19, 644:4, 644:8, 646:6, 646:10, 646:24, 647:7, 651:7, 654:24, 655:3
**downloaded** [1] - 542:11
**downstairs** [1] - 535:23
**Dr** [1] - 551:21

**draw** [2] - 669:11, 670:25
**drifted** [1] - 653:13
**drink** [1] - 650:17
**drive** [8] - 499:10, 533:8, 583:17, 591:17, 592:4, 597:13, 646:3, 651:7
**driven** [4] - 478:11, 478:12, 575:9
**driveway** [1] - 599:11
**driving** [6] - 467:20, 509:18, 625:11, 625:12, 641:19, 646:24
**drove** [5] - 473:15, 587:1, 597:11, 600:2, 600:6
**drug** [1] - 561:8
**duly** [2] - 462:11, 526:15
**during** [24] - 453:21, 474:8, 492:5, 515:22, 566:11, 567:20, 597:13, 599:7, 620:22, 625:15, 626:25, 628:8, 631:5, 632:21, 634:9, 634:22, 638:11, 662:2, 669:9, 684:25, 685:3, 685:5, 685:17, 687:16
**duty** [15] - 461:15, 497:22, 658:23, 658:24, 660:17, 661:12, 661:22, 662:10, 664:20, 669:17, 670:4, 671:18, 671:20, 672:13, 686:19

# E

**E)** [2] - 688:12, 690:6
**E.R** [1] - 659:18
**eagerness** [2] - 635:21, 648:5
**earliest** [3] - 531:3, 534:16, 535:7
**early** [5] - 491:7, 499:22, 543:2, 598:8, 657:7
**ears** [1] - 495:1
**easier** [1] - 465:5
**easy** [1] - 639:24
**education** [2] - 668:4, 668:13
**effect** [4] - 472:22, 510:24, 633:19, 667:4
**effective** [1] - 475:7
**effectively** [1] - 552:12
**effort** [3] - 571:5, 605:24, 617:2
**efforts** [4] - 575:3, 606:1, 612:6, 653:6
**either** [13] - 479:15, 513:23, 546:25, 552:19, 553:12, 557:20, 578:25, 631:19, 664:22, 671:10, 687:21, 692:1
**ejaculate** [4] - 579:6, 604:12, 604:17, 610:23

**ejaculated** [1] - 493:10
**ejaculation** [1] - 585:1
**elaborate** [2] - 466:22, 467:15
**elaborating** [1] - 496:8
**electronic** [3] - 531:9, 536:21, 680:1
**ELEMENT** [8] - 675:2, 676:10, 676:21, 676:25, 679:20, 680:10, 681:5, 682:25
**element** [41] - 555:11, 558:12, 558:15, 558:18, 558:20, 558:24, 587:10, 606:4, 607:4, 607:20, 608:22, 608:23, 610:25, 611:8, 611:22, 611:24, 614:4, 614:7, 614:22, 617:14, 617:16, 617:22, 618:3, 618:7, 618:14, 621:8, 621:10, 621:24, 658:11, 661:20, 675:4, 676:11, 676:22, 677:1, 679:21, 680:12, 680:25, 681:6, 683:1, 684:22
**Element** [7] - 587:3, 606:3, 607:2, 607:21, 608:20, 618:12, 621:20
**elementary** [1] - 607:17
**ELEMENTS** [2] - 674:9, 679:3
**elements** [11] - 557:25, 558:5, 558:9, 558:12, 611:4, 612:23, 614:11, 622:15, 629:20, 674:17, 679:7
**elevating** [1] - 596:11
**elicit** [2] - 535:10, 682:18
**elicited** [1] - 529:18
**eliciting** [1] - 457:24
**eligible** [1] - 631:20
**Elisha** [68] - 464:25, 466:7, 467:12, 467:15, 467:18, 467:22, 468:2, 468:15, 469:9, 476:21, 477:8, 477:14, 477:18, 478:3, 480:8, 485:22, 486:10, 486:13, 487:5, 487:22, 490:14, 490:20, 490:23, 491:7, 491:18, 492:5, 493:3, 494:6, 494:9, 495:16, 497:23, 499:2, 499:19, 500:3, 500:10, 500:18, 502:1, 502:4, 502:8, 502:19, 503:10, 503:15, 504:18, 505:14, 520:1, 520:16, 521:3, 521:15, 522:10, 522:15, 523:4, 557:6, 557:8, 558:9, 559:8, 566:16, 567:5, 583:15, 587:9, 587:22, 587:23, 592:20, 595:16, 599:23, 608:4, 628:2,

655:7, 656:19
**Elisha's** [6] - 498:24, 499:24, 500:8, 505:9, 505:19, 598:8
**ELMO** [4] - 483:1, 520:24, 540:20, 540:23
**email** [113] - 464:4, 464:5, 464:16, 464:22, 465:11, 465:14, 466:8, 468:17, 468:18, 469:6, 482:6, 482:24, 483:2, 483:4, 483:8, 483:11, 483:19, 483:23, 486:11, 487:5, 487:8, 489:14, 489:17, 490:6, 490:13, 491:7, 491:18, 501:5, 501:11, 501:16, 501:22, 502:11, 502:21, 502:25, 503:22, 504:16, 504:17, 505:12, 505:23, 505:25, 507:23, 509:9, 509:10, 509:13, 509:14, 510:6, 535:7, 542:9, 553:6, 560:15, 560:16, 561:12, 561:23, 561:25, 562:25, 563:5, 563:11, 564:19, 565:20, 566:19, 570:5, 570:16, 572:9, 572:15, 572:18, 574:23, 575:2, 575:3, 579:14, 579:21, 581:13, 582:16, 584:13, 585:4, 585:7, 586:24, 587:22, 589:3, 591:3, 592:20, 593:16, 599:22, 600:11, 600:12, 600:13, 600:15, 600:20, 600:21, 600:24, 600:25, 601:5, 601:6, 606:19, 606:20, 607:11, 607:13, 607:15, 608:4, 608:15, 608:17, 610:4, 610:9, 612:4, 613:21, 619:20, 627:15, 636:13, 647:23, 648:7, 656:6
**emailed** [4] - 456:15, 467:16, 506:16, 567:7
**emailing** [4] - 479:3, 599:12, 653:11, 653:12
**emails** [40] - 462:21, 463:1, 478:10, 480:13, 500:24, 501:2, 503:1, 509:1, 518:9, 555:3, 560:12, 566:17, 586:11, 590:24, 600:10, 601:18, 606:23, 608:16, 608:18, 621:15, 623:25, 635:1, 635:5, 635:20, 636:17, 636:21, 638:23, 640:17, 641:2, 641:12, 641:13, 643:12, 643:21, 645:23, 645:25, 649:5, 649:6, 649:8, 653:10, 653:14

**embellished** [1] - 601:17
**emoji** [6] - 578:25, 586:17, 602:13, 602:24, 603:9, 603:21
**emotion** [1] - 671:9
**emotional** [10] - 491:4, 498:22, 569:24, 570:3, 579:14, 586:9, 586:20, 596:14, 596:16, 604:22
**emotionally** [1] - 490:24
**emphasis** [1] - 638:21
**emphasized** [1] - 641:7
**emphasizing** [1] - 582:24
**employed** [2] - 560:11, 668:19
**empowering** [4] - 568:3, 568:10, 591:20, 591:21
**empty** [4] - 540:2, 546:12, 546:15
**encourage** [4] - 579:19, 644:17, 647:21, 648:1
**encouraged** [2] - 644:19, 648:17
**encouraging** [6] - 461:15, 574:20, 602:7, 602:25, 603:7, 611:15
**end** [9] - 458:8, 484:17, 504:22, 511:20, 579:10, 599:15, 629:22, 646:18, 691:5
**ended** [3] - 481:4, 483:21, 626:12
**ends** [4] - 457:1, 457:2, 516:22, 662:3
**ENFORCEMENT** [1] - 668:17
**enforcement** [14] - 489:24, 490:18, 565:25, 567:3, 567:11, 567:24, 570:15, 590:16, 655:25, 665:16, 668:18, 668:20, 668:25, 669:4
**engage** [41] - 557:11, 558:7, 558:14, 559:2, 587:5, 587:12, 587:21, 588:19, 609:20, 611:6, 611:11, 611:16, 612:25, 614:6, 635:22, 636:15, 637:10, 637:14, 639:10, 639:20, 641:15, 643:16, 647:17, 648:1, 648:16, 649:9, 651:6, 654:7, 659:11, 659:19, 673:18, 674:14, 674:20, 675:7, 675:15, 676:5, 676:9, 677:14, 678:14, 682:16
**ENGAGE** [1] - 674:11
**engaged** [22] - 468:16, 510:10, 519:17, 525:14, 541:5, 552:9, 555:6, 558:21, 572:24, 603:19,

614:20, 621:11, 635:14, 638:25, 645:11, 664:25, 678:16, 679:19, 681:10, 683:5, 683:12, 684:7
**engagement** [1] - 652:21
**engaging** [26] - 474:20, 521:21, 598:5, 598:15, 614:18, 618:15, 629:5, 633:15, 635:11, 635:18, 635:24, 638:22, 642:2, 645:1, 650:18, 660:3, 674:6, 679:15, 679:16, 679:18, 681:8, 681:12, 681:17, 683:4, 683:18
**engulf** [4] - 466:13, 605:4, 615:6, 620:5
**enjoy** [2] - 582:20, 642:11
**enjoyable** [1] - 577:12
**enjoyed** [5] - 593:25, 639:4, 639:5, 639:7
**enjoys** [1] - 635:13
**ensure** [3] - 572:25, 580:10, 687:5
**entering** [1] - 557:16
**ENTICE** [1] - 674:10
**entice** [23] - 557:11, 558:14, 559:1, 587:9, 587:12, 606:2, 606:6, 607:5, 612:25, 614:5, 628:19, 658:2, 658:5, 659:10, 659:18, 674:14, 674:19, 675:6, 675:15, 675:24, 676:4, 676:8, 678:10
**enticed** [1] - 675:9
**enticement** [2] - 558:7, 598:4
**entices** [1] - 673:16
**enticing** [3] - 611:10, 612:24, 678:13
**entire** [4] - 514:4, 515:16, 619:22
**entirely** [5] - 453:18, 460:20, 664:13, 670:19, 685:15
**entitled** [2] - 496:8, 672:5
**entitles** [1] - 672:3
**entry** [6] - 477:4, 479:15, 479:18, 480:13, 482:5, 486:12
**environment** [2] - 456:6, 576:7
**envisioned** [1] - 631:10
**equal** [1] - 685:2
**EQUALITY** [1] - 671:17
**equally** [2] - 612:9, 645:9
**EQUALLY** [1] - 669:7
**equals** [1] - 672:7
**equipped** [1] - 498:4
**equivalent** [1] - 597:5
**ER** [101] - 457:3, 463:12, 508:20, 508:23, 510:16, 513:23, 554:10, 554:15,

554:20, 555:1, 555:6, 555:7, 556:22, 566:16, 587:9, 587:13, 587:20, 589:3, 590:23, 591:19, 595:16, 595:20, 596:23, 596:25, 597:3, 597:8, 597:14, 597:21, 598:5, 598:16, 600:8, 600:11, 600:15, 600:17, 600:18, 601:7, 601:14, 601:20, 602:15, 602:21, 604:9, 604:13, 604:16, 605:7, 605:11, 605:19, 605:20, 605:22, 605:24, 606:15, 606:20, 606:23, 607:1, 607:24, 608:19, 608:21, 609:15, 610:17, 613:4, 613:6, 614:6, 615:15, 616:3, 616:12, 616:21, 618:22, 618:23, 620:7, 621:13, 622:11, 623:24, 624:2, 624:6, 624:14, 628:2, 628:21, 628:24, 629:10, 632:21, 634:18, 646:22, 647:9, 647:24, 648:8, 648:13, 648:16, 648:17, 649:1, 649:9, 649:11, 649:16, 650:5, 650:25, 651:1, 652:21, 652:25, 656:2, 657:5, 657:16, 657:18, 658:7
**ER's** [9] - 554:17, 554:24, 599:10, 605:16, 617:2, 619:11, 621:2, 621:5, 648:5
**erect** [2] - 463:2, 604:2
**erection** [2] - 562:2, 594:9
**erogenous** [2] - 582:6, 610:12
**error** [1] - 667:7
**especially** [4] - 521:24, 522:11, 522:14, 549:6
**ESSENTIAL** [2] - 674:9, 679:3
**essential** [1] - 684:22
**essentially** [4] - 542:12, 640:1, 641:10, 641:20
**establish** [2] - 531:15, 534:18
**established** [3] - 552:6, 555:5, 663:6
**establishes** [2] - 531:3, 651:25
**evaluate** [9] - 549:18, 623:2, 623:3, 623:7, 662:21, 668:9, 668:10, 670:14, 672:10
**evaluated** [2] - 495:12, 496:14
**evaluating** [3] - 667:12, 667:20, 668:8
**evaluation** [8] - 545:3, 545:14, 545:16, 550:12, 550:17, 551:2, 551:20,

552:10
**evening** [3] - 654:21, 694:8, 694:17
**event** [1] - 608:11
**events** [1] - 530:14
**everywhere** [1] - 482:18
**EVIDENCE** [2] - 662:14, 685:13
**evidence** [132] - 453:15, 460:17, 460:19, 488:16, 509:8, 509:20, 514:3, 518:18, 519:6, 529:13, 531:9, 532:25, 538:13, 540:16, 541:4, 541:10, 541:11, 541:12, 541:13, 541:15, 541:19, 542:25, 545:14, 547:18, 552:25, 553:11, 553:15, 553:16, 554:7, 554:23, 557:17, 557:23, 557:24, 558:23, 560:10, 567:19, 607:10, 607:22, 608:2, 616:18, 623:9, 623:10, 628:9, 628:10, 628:12, 629:16, 632:14, 632:15, 632:17, 634:2, 634:19, 637:17, 637:19, 637:20, 651:23, 652:18, 654:5, 654:9, 655:20, 657:10, 658:13, 658:22, 660:9, 660:22, 661:11, 661:23, 661:24, 662:2, 662:9, 662:12, 662:15, 662:17, 662:19, 662:22, 662:23, 662:24, 662:25, 663:3, 663:4, 663:9, 663:11, 663:12, 663:13, 663:14, 663:15, 663:18, 663:21, 664:16, 664:21, 664:24, 665:4, 665:5, 665:6, 665:7, 665:9, 665:13, 665:24, 666:9, 666:14, 666:19, 666:21, 666:23, 667:13, 668:2, 669:3, 669:17, 669:21, 670:4, 670:19, 670:22, 671:2, 671:16, 671:23, 672:10, 672:15, 672:23, 681:15, 683:20, 685:8, 685:10, 686:6, 686:8, 686:21, 689:19, 690:18, 691:1
**exact** [1] - 681:14
**exactly** [16] - 460:21, 468:1, 479:22, 511:2, 533:3, 547:18, 547:21, 557:18, 560:10, 568:1, 592:19, 599:9, 599:13, 618:9, 621:18, 629:13
**examination** [13] - 457:17, 461:18, 469:4, 469:11,

498:3, 498:17, 520:9, 534:10, 541:23, 641:11, 641:21, 647:2, 652:9
**EXAMINATION** [8] - 462:17, 508:8, 519:14, 526:17, 528:5, 536:16, 539:21, 541:25
**examine** [3] - 495:20, 623:1, 670:14
**examined** [4] - 457:11, 462:12, 526:16, 527:16
**examining** [1] - 661:24
**example** [6] - 533:19, 546:9, 633:14, 635:23, 644:25, 663:8
**examples** [1] - 634:20
**except** [2] - 482:18, 557:15
**exception** [1] - 609:16
**excerpt** [5] - 457:2, 480:7, 515:18, 515:19, 535:20
**exchange** [2] - 487:8, 597:1
**exchanged** [5] - 500:24, 503:15, 517:2, 525:11, 623:25
**exchanges** [2] - 473:22, 652:16
**exchanging** [1] - 456:21
**excite** [3] - 619:9, 681:25, 690:9
**excited** [6] - 484:5, 565:12, 584:24, 601:1, 601:3, 638:1
**excitement** [1] - 584:17
**exciting** [3] - 484:2, 584:21, 627:18
**excluded** [1] - 664:14
**exclusively** [2] - 457:15, 686:15
**excuse** [9] - 454:5, 460:14, 512:10, 616:9, 616:17, 630:7, 656:22, 661:12, 694:11
**excused** [2] - 525:24, 542:18
**exhausted** [1] - 593:1
**exhibit** [19] - 455:7, 456:23, 464:17, 479:20, 481:16, 481:18, 488:7, 512:4, 514:14, 515:3, 517:4, 517:7, 517:9, 522:7, 615:18, 628:15, 629:4, 663:3, 664:14
**Exhibit** [62] - 456:15, 464:20, 466:5, 468:21, 470:20, 472:25, 476:1, 476:10, 478:13, 479:17, 480:7, 480:13, 481:10, 481:14, 481:19, 482:4, 483:3, 486:12, 487:4, 488:23, 489:13, 489:23, 490:5, 490:13, 491:17, 493:2, 499:17, 500:2, 500:23,

501:5, 501:21, 502:24, 503:1, 503:14, 504:17, 508:22, 511:4, 512:2, 516:18, 518:18, 519:3, 519:19, 521:2, 523:13, 527:5, 527:19, 528:2, 537:8, 539:4, 539:7, 539:15, 540:15, 540:16, 541:1, 585:20, 585:21, 586:4, 606:6, 609:2, 614:25, 653:9, 664:9
**exhibition** [11] - 619:4, 619:5, 619:7, 620:13, 620:19, 621:7, 681:23, 682:2, 682:3, 682:20, 690:7
**exhibition'** [1] - 688:17
**exhibits** [5] - 456:22, 462:22, 464:19, 491:11, 662:18
**Exhibits** [1] - 617:23
**exist** [1] - 559:15
**existence** [1] - 663:7
**exists** [1] - 685:12
**exited** [4] - 512:12, 543:9, 630:9, 694:12
**expand** [2] - 563:6, 572:7
**expect** [7] - 533:4, 536:1, 537:14, 546:5, 578:18, 646:16, 672:22
**expected** [1] - 485:3
**experience** [15] - 537:23, 546:6, 572:23, 577:17, 578:4, 578:13, 578:19, 583:10, 586:3, 616:4, 622:18, 642:9, 663:6, 668:4, 668:13
**EXPERIENCE** [1] - 670:17
**experienced** [2] - 461:5, 641:8
**experiences** [1] - 670:23
**expert** [12] - 496:12, 496:15, 641:10, 641:14, 643:21, 668:3, 668:6, 668:8, 668:11, 668:14, 668:16
**EXPERT** [1] - 668:1
**expertise** [2] - 668:5, 671:3
**experts** [1] - 496:14
**explain** [8] - 497:24, 522:17, 536:19, 539:23, 557:22, 575:3, 577:3, 681:9
**explained** [7] - 551:13, 554:21, 626:4, 626:20, 651:24, 672:9, 685:1
**EXPLAINED** [1] - 673:1
**explaining** [2] - 483:11, 642:22
**explains** [6] - 557:1, 557:2, 557:4, 557:5, 557:7, 557:8
**explanation** [1] - 616:17
**explanations** [1] - 640:13
**Explicit** [1] - 688:11

**EXPLICIT** [2] - 681:5, 681:18
**explicit** [30] - 532:1, 571:24, 605:1, 614:19, 614:20, 616:16, 617:2, 617:5, 618:16, 618:24, 619:2, 620:9, 621:11, 622:6, 629:5, 629:11, 657:6, 658:7, 660:4, 674:6, 679:15, 679:19, 681:8, 681:12, 681:17, 681:19, 683:4, 683:10, 683:12, 683:18
**explicitly** [1] - 607:20
**exploration** [1] - 619:1
**explore** [1] - 534:10
**exploring** [1] - 582:9
**exposed** [3] - 461:2, 600:16, 600:19
**exposure** [4] - 453:20, 460:12, 579:25, 682:1
**express** [2] - 567:10, 638:12
**expressed** [1] - 509:15
**expressing** [2] - 596:15, 649:2
**expression** [1] - 572:15
**extensive** [1] - 638:25
**extent** [10] - 453:16, 460:17, 466:18, 534:3, 552:2, 575:11, 587:14, 623:9, 666:9, 667:24
**external** [1] - 576:3
**externally** [1] - 575:9
**extinguisher** [2] - 633:13, 639:2
**extinguishers** [2] - 470:14, 626:22
**extracted** [1] - 600:18
**extraction** [4] - 515:9, 515:12, 515:16, 606:24
**extrapolated** [2] - 506:17, 507:12
**extrapolation** [1] - 505:13
**extreme** [3] - 580:2, 580:5, 642:19
**extreme'** [1] - 642:20
**extremely** [1] - 647:9
**eyes** [2] - 545:5
**eyewitness** [1] - 683:20

**F**

**f'ing** [1] - 589:17
**fabrication** [1] - 505:13
**fabulous** [1] - 588:6
**face** [13] - 487:12, 521:24, 569:21, 590:12, 591:8, 592:22, 602:12, 602:24, 603:9, 603:14, 603:15, 603:21, 620:25
**Facebook** [7] - 486:5, 487:10,

488:8, 489:6, 588:22, 655:8, 655:9
**FACILITY** [1] - 676:10
**facility** [19] - 549:16, 550:24, 558:16, 606:5, 606:9, 606:10, 630:3, 659:8, 659:16, 659:24, 663:25, 664:2, 673:15, 673:25, 674:13, 674:21, 676:12, 676:15, 694:1
**FACT** [1] - 664:3
**fact** [54] - 455:20, 468:15, 473:4, 474:15, 489:9, 495:8, 496:25, 512:17, 512:24, 513:3, 515:19, 515:25, 517:1, 518:9, 522:23, 536:3, 539:9, 544:8, 547:24, 548:3, 549:4, 564:16, 573:19, 575:5, 584:25, 606:8, 633:11, 633:18, 637:24, 640:3, 640:20, 641:18, 647:3, 649:4, 653:22, 654:4, 654:14, 655:14, 657:17, 657:19, 660:14, 663:5, 663:7, 664:5, 666:16, 666:18, 668:19, 670:2, 672:2, 672:21, 683:11, 686:7, 693:2
**factor** [3] - 636:11, 667:19, 682:24
**factors** [7] - 457:9, 540:8, 576:3, 632:16, 635:4, 682:5, 682:20
**facts** [27] - 557:17, 606:8, 606:13, 606:14, 615:17, 658:25, 662:17, 662:19, 663:5, 663:20, 663:23, 663:24, 664:5, 664:7, 666:20, 668:11, 670:25, 671:3, 671:18, 672:15, 672:19, 675:22, 685:9
**factual** [1] - 553:13
**fail** [2] - 579:25, 662:5
**fair** [5] - 631:16, 632:17, 662:8, 662:11, 671:25
**fairly** [5] - 525:6, 560:10, 632:18, 633:3, 640:21
**fairness** [1] - 671:20
**faithful** [1] - 672:16
**fake** [7] - 464:5, 464:16, 464:24, 465:8, 508:11, 633:20, 639:23
**fall** [1] - 467:4
**false** [1] - 545:6
**falsehood** [1] - 667:7
**falsely** [3] - 623:18, 667:16, 667:23
**familiar** [3] - 480:2, 537:21, 592:14

**family** [4] - 574:1, 576:7, 692:25, 693:20
**fantasies** [1] - 473:14
**fantasize** [2] - 642:11, 643:20
**fantasizing** [7] - 635:17, 639:8, 642:24, 643:7, 649:2, 679:1, 684:17
**fantasy** [24] - 562:9, 562:14, 612:1, 633:15, 635:11, 638:22, 638:24, 639:19, 642:1, 643:15, 643:17, 645:12, 646:1, 647:12, 651:7, 651:13, 652:1, 652:17, 652:22, 653:17, 653:20, 653:25, 654:13
**far** [7] - 564:20, 602:7, 633:6, 633:19, 634:15, 652:22, 694:1
**farfetched** [1] - 626:3
**fascinated** [1] - 509:18
**father** [1] - 554:17
**fault** [3] - 550:1, 550:3
**favor** [3] - 529:16, 666:20, 671:9
**favorite** [4] - 577:24, 577:25, 619:16, 621:16
**federal** [2] - 550:9, 668:19
**feelings** [4] - 569:25, 586:9, 588:20, 671:21
**feet** [2] - 456:2, 620:17
**fell** [1] - 637:1
**fellow** [5] - 460:10, 631:15, 685:6, 686:22, 686:25
**felon** [1] - 530:1
**felt** [5] - 485:9, 506:13, 633:24, 650:22, 663:2
**female** [1] - 463:16
**fever** [1] - 461:6
**few** [5] - 453:10, 458:11, 460:11, 495:13, 510:19, 547:16, 650:8
**field** [1] - 641:10
**figure** [3] - 517:23, 580:18, 654:10
**file** [5] - 495:8, 528:21, 535:21, 540:9, 542:4
**files** [6] - 536:23, 537:5, 537:6, 537:9, 540:5
**filled** [1] - 580:24
**filling** [1] - 540:3
**film** [2] - 679:24, 679:25
**final** [5] - 454:16, 557:16, 586:11, 628:15, 629:3
**finally** [6] - 455:9, 555:3, 605:24, 628:4, 635:20, 653:13
**financially** [1] - 654:20
**fine** [6] - 560:4, 562:16, 564:8, 570:9, 573:6, 573:21, 581:2, 581:16,

582:19, 589:24, 590:2, 594:2, 594:20, 632:1, 632:2, 689:11
**finish** [3] - 494:12, 498:7, 632:4
**finishes** [1] - 516:23
**fire** [4] - 470:14, 626:22, 633:13, 639:2
**firearm** [3] - 529:24, 530:1
**first** [55] - 453:11, 455:5, 456:19, 460:4, 462:11, 469:12, 478:2, 480:19, 499:1, 512:22, 516:19, 521:15, 526:15, 531:2, 531:19, 534:18, 535:6, 546:23, 548:4, 549:2, 552:15, 558:12, 558:23, 560:16, 563:12, 564:25, 569:13, 581:16, 590:7, 591:25, 595:18, 600:11, 601:6, 606:8, 608:16, 609:4, 609:13, 611:8, 614:13, 614:22, 616:17, 617:14, 618:17, 619:25, 625:6, 634:3, 635:5, 636:4, 639:22, 644:20, 652:6, 675:4, 679:21, 688:15
**fit** [1] - 667:10
**fits** [2] - 519:25, 557:24
**five** [9] - 469:22, 494:14, 498:6, 530:14, 533:22, 615:22, 615:25, 650:14
**fix** [1] - 460:23
**flagged** [1] - 551:23
**flattered** [1] - 613:8
**flattering** [6] - 588:21, 589:1, 591:9, 596:19, 596:20
**flattery** [3] - 591:2, 595:10, 611:14
**flirty** [4] - 588:11, 603:19, 604:2, 614:1
**flowed** [1] - 636:1
**flu** [1] - 461:5
**flu-like** [1] - 461:5
**fluttering** [3] - 565:10, 584:14, 584:16
**focal** [1] - 682:6
**focus** [10] - 549:9, 570:21, 573:7, 582:7, 582:12, 583:2, 583:6, 620:18, 624:23, 655:23
**focused** [1] - 582:1
**focuses** [1] - 578:3
**focusing** [2] - 572:19, 578:12
**follow** [13] - 475:2, 496:8, 498:4, 507:21, 550:21, 578:16, 579:12, 587:19, 650:4, 650:7, 672:13, 672:24, 687:8
**follow-up** [3] - 498:4, 507:21,

550:21
**followed** [2] - 570:14, 621:1
**following** [30] - 453:2, 459:15, 475:6, 495:3, 496:6, 498:13, 512:12, 516:14, 518:24, 529:11, 536:9, 543:9, 554:7, 555:18, 556:9, 598:2, 614:12, 630:9, 630:17, 630:23, 674:17, 679:7, 682:5, 685:19, 688:6, 690:1, 690:14, 692:15, 693:13, 694:12
**follows** [5] - 462:12, 520:15, 526:16, 659:4, 663:25
**fool** [2] - 636:19, 637:1
**foot** [1] - 549:8
**forbidden** [1] - 584:15
**forbids** [1] - 671:10
**force** [4] - 570:19, 571:4, 625:11, 625:12
**forces** [1] - 576:3
**forefathers** [1] - 631:10
**foreign** [22] - 558:16, 606:9, 606:10, 614:15, 614:17, 617:17, 617:19, 618:3, 618:10, 659:9, 659:17, 659:25, 660:1, 664:1, 673:16, 673:25, 674:2, 679:11, 679:13, 680:15, 680:17, 680:19
**forensic** [2] - 456:24, 535:15
**forensics** [1] - 526:23
**foreperson** [9] - 685:20, 687:2, 687:4, 687:10, 687:11, 687:13, 687:18, 688:3, 693:25
**forever** [1] - 570:24
**forget** [7] - 571:15, 582:21, 584:2, 587:18, 594:6, 654:23, 655:7
**forgot** [1] - 690:3
**form** [7] - 531:14, 553:18, 577:23, 663:3, 687:5, 687:6, 687:12
**formal** [1] - 660:7
**format** [2] - 523:3, 544:13
**Fort** [1] - 551:21
**forth** [4] - 510:13, 636:1, 651:14, 664:9
**forthcoming** [3] - 472:13, 473:5, 474:16
**forthright** [3] - 472:16, 601:6, 601:8
**fortunately** [3] - 633:25, 640:5, 642:4
**forward** [6] - 472:5, 526:11, 569:5, 577:7, 577:8, 658:10
**fought** [1] - 602:16
**foundation** [7] - 533:11,

533:19, 534:12, 534:18, 535:12, 536:5, 619:22
**four** [14] - 492:16, 527:25, 531:20, 531:25, 532:2, 532:11, 532:12, 557:2, 614:19, 621:1, 674:17, 674:25, 679:7, 679:17
**FOUR** [2] - 676:25, 682:25
**four-day** [1] - 557:2
**fourth** [4] - 532:2, 608:23, 677:1, 683:1
**Francis** [1] - 526:13
**FRANCIS** [1] - 526:14
**Frank** [1] - 526:3
**frankly** [1] - 557:22
**free** [6] - 561:8, 562:23, 631:23, 632:9, 667:8
**freedom** [1] - 594:4
**French** [1] - 545:7
**frequently** [1] - 475:16
**Friday** [3] - 565:22, 570:17, 607:15
**friends** [1] - 626:10
**front** [6] - 467:25, 485:2, 485:6, 585:25, 636:19, 650:19
**frustrated** [1] - 473:11
**frustrating** [2] - 473:8, 550:4
**frustration** [1] - 561:16
**fuck** [6] - 505:3, 507:2, 565:12, 599:21, 604:20, 610:22
**Fuck** [2] - 493:19, 498:21
**fucking** [2] - 504:22, 599:15
**fulfill** [2] - 580:20, 580:25
**fulfilling** [1] - 653:20
**full** [15] - 462:8, 470:17, 493:19, 497:23, 498:21, 517:7, 517:9, 526:12, 531:21, 533:17, 535:15, 554:20, 604:20, 610:22, 691:3
**fully** [2] - 551:19, 682:13
**fun** [1] - 603:9
**function** [1] - 660:6
**fundamental** [1] - 594:6
**furthermore** [1] - 683:24

## G

**gain** [1] - 578:19
**gallery** [1] - 540:19
**game** [3] - 579:10, 589:16, 612:16
**gamut** [1] - 470:17
**gap** [2] - 599:5, 599:7
**garage** [2] - 478:17, 478:19
**gather** [1] - 690:18
**gathering** [1] - 654:9
**general** [3] - 667:12, 672:9,

683:14
**generally** [2] - 472:15, 682:10
**generous** [1] - 654:20
**genital** [8] - 610:1, 610:8, 610:13, 621:19, 677:16, 681:20, 681:21
**genital-genital** [1] - 681:20
**genitalia** [12] - 463:16, 557:9, 610:19, 617:3, 617:5, 619:11, 620:13, 620:19, 621:7, 624:3, 624:14, 629:1
**genitals** [10] - 619:4, 619:6, 619:9, 624:9, 681:23, 681:24, 682:2, 682:3, 682:7, 690:8
**gentlemen** [18] - 459:23, 541:2, 556:11, 557:10, 570:23, 573:13, 584:23, 597:2, 597:8, 599:8, 600:23, 626:9, 629:19, 631:3, 654:3, 690:2, 690:12, 693:15
**Georgia** [1] - 637:24
**ghosted** [2] - 653:11, 653:24
**gift** [1] - 497:17
**Gilman** [4] - 453:8, 459:21, 538:14, 538:17
**GILMAN** [4] - 486:19, 531:22, 538:18, 643:1
**girl** [18] - 463:12, 468:5, 468:25, 478:9, 487:11, 490:25, 505:14, 556:22, 564:17, 577:14, 584:4, 586:5, 588:23, 592:7, 603:22, 608:18, 622:9
**girls** [6] - 585:15, 585:24, 603:3, 603:4, 603:6, 629:4
**given** [14] - 457:9, 475:7, 533:3, 537:9, 554:3, 568:8, 582:12, 628:11, 648:4, 648:5, 671:15, 671:23, 672:19, 685:2
**glad** [3] - 570:10, 574:24, 593:3
**GlobalFoundries** [1] - 650:12
**glove** [2] - 456:10, 512:15
**gloves** [5] - 456:8, 511:7, 538:6, 538:24
**goal** [1] - 454:12
**God** [1] - 563:16
**gonna** [2] - 480:1, 592:12
**Google** [14] - 528:15, 534:15, 536:19, 536:20, 537:1, 537:9, 539:24, 542:2, 585:21, 586:4, 605:12, 605:16, 605:19
**googled** [1] - 585:15
**Googled** [6] - 477:17, 491:8, 491:12, 577:14, 585:14, 585:23

**Googling** [1] - 605:17
**gorgeous** [2] - 590:11, 591:2
**governed** [1] - 671:10
**government** [4] - 550:23, 550:25, 668:20, 672:6
**Government** [85] - 453:6, 455:4, 455:9, 456:12, 456:20, 459:19, 461:18, 495:17, 495:20, 496:17, 514:15, 514:17, 514:19, 515:4, 515:16, 515:19, 516:19, 526:2, 526:3, 528:1, 530:7, 530:20, 539:14, 541:4, 542:20, 542:22, 552:1, 552:25, 554:23, 555:5, 555:10, 556:15, 558:1, 558:5, 558:13, 587:2, 606:2, 607:2, 608:20, 608:21, 611:22, 612:22, 614:4, 614:7, 617:12, 621:8, 622:15, 629:19, 629:23, 650:24, 651:18, 658:10, 660:18, 661:3, 661:15, 661:16, 661:24, 662:5, 664:24, 665:18, 672:3, 673:4, 673:6, 674:16, 675:4, 675:7, 675:10, 675:16, 676:2, 676:11, 676:22, 677:1, 678:10, 679:6, 679:21, 680:6, 680:12, 680:21, 680:25, 681:6, 681:13, 683:1, 683:13, 684:3, 688:8
**Government's** [41] - 458:23, 462:22, 466:5, 470:20, 472:25, 476:10, 478:13, 479:17, 480:7, 480:13, 481:10, 482:4, 483:2, 486:12, 487:3, 489:23, 490:5, 490:13, 491:11, 491:17, 493:2, 498:17, 499:17, 500:2, 500:23, 501:5, 501:21, 502:24, 503:14, 504:17, 508:22, 513:18, 515:9, 521:1, 523:13, 527:5, 540:16, 540:25, 553:24, 557:21, 661:19
**graces** [2] - 569:3, 628:7
**gracious** [1] - 556:1
**Grand** [1] - 485:15
**grand** [1] - 690:16
**graphic** [4] - 492:6, 627:13, 642:16, 644:23
**gratifying** [2] - 609:10, 677:11
**great** [12] - 462:5, 504:24, 507:10, 512:3, 547:22, 569:5, 584:19, 586:15, 599:16, 635:2, 667:21,

691:13
**greater** [3] - 668:15, 668:22, 672:4
**groom** [3] - 587:9, 628:21, 658:5
**groomed** [2] - 613:8, 627:19
**grooming** [27] - 559:21, 559:22, 560:11, 562:17, 565:18, 568:10, 568:25, 569:3, 570:20, 571:1, 574:19, 574:20, 579:11, 581:5, 591:22, 596:4, 598:3, 611:13, 627:20, 627:21, 627:22, 628:18, 654:18, 654:19, 654:21, 689:22
**grounds** [1] - 669:1
**group** [1] - 581:24
**growing** [2] - 574:14, 575:17
**grown** [5] - 597:10, 625:24, 656:25, 657:4, 689:3
**grown-up** [5] - 597:10, 625:24, 656:25, 657:4, 689:3
**guess** [6] - 517:20, 561:23, 575:25, 600:3, 645:21, 689:4
**guidance** [2] - 576:15, 576:18, 598:17
**guidelines** [2] - 662:21, 672:9
**guideposts** [1] - 623:21
**guides** [1] - 623:6
**guilt** [21] - 554:19, 566:4, 566:22, 567:19, 576:9, 579:23, 580:3, 590:14, 592:15, 598:25, 628:12, 655:20, 660:10, 661:15, 661:16, 662:5, 662:12, 663:13, 663:16, 686:10
**guilty** [28] - 557:10, 557:19, 613:2, 614:9, 629:24, 633:4, 651:16, 658:9, 658:14, 660:12, 660:16, 660:25, 661:3, 662:5, 662:7, 662:10, 663:17, 677:22, 678:7, 679:5, 686:5, 686:6, 686:13, 686:14, 687:11
**guise** [1] - 578:1
**gut** [2] - 478:24
**guts** [1] - 565:4
**guy** [4] - 576:1, 581:1, 583:3, 595:24
**guys** [5] - 580:12, 603:12, 603:13, 637:25, 651:22

## H

**habit** [1] - 467:19
**half** [9] - 477:24, 477:25,

16

478:1, 500:11, 586:16,
592:5, 599:5, 599:7, 616:23
**hand** [9] - 456:8, 460:2,
460:9, 460:22, 462:7,
526:12, 574:8, 658:17,
662:11
**handed** [1] - 538:25
**handle** [1] - 690:21
**hands** [6] - 460:9, 461:4,
461:9, 461:11, 547:20,
631:16
**happy** [2] - 602:10, 637:7
**harbor** [1] - 693:5
**hard** [26] - 462:25, 475:19,
533:8, 535:23, 537:17,
559:24, 560:8, 561:24,
562:2, 564:15, 565:1,
565:8, 572:3, 573:13,
576:13, 579:10, 594:9,
594:24, 604:1, 604:3,
605:21, 611:19, 621:3,
629:9, 655:2
**harm** [1] - 574:4
**head** [3] - 573:8, 573:10,
612:1
**headed** [1] - 497:1
**heading** [1] - 592:2
**health** [1] - 549:16
**healthy** [1] - 691:23
**hear** [30] - 458:6, 458:19,
460:21, 461:24, 461:25,
462:1, 492:22, 510:22,
512:18, 513:12, 516:4,
516:12, 516:18, 530:7,
531:12, 531:17, 531:18,
532:21, 533:22, 553:21,
562:2, 573:23, 632:14,
634:5, 638:1, 648:23,
667:2, 670:24
**heard** [32] - 468:12, 497:13,
509:25, 531:11, 534:21,
558:25, 572:5, 604:9,
607:7, 609:19, 640:12,
641:5, 644:20, 646:17,
647:1, 647:4, 647:5,
651:22, 653:9, 658:13,
658:22, 662:15, 663:2,
665:16, 666:5, 668:2,
668:18, 669:8, 669:19,
670:18, 689:22
**hearing** [8] - 454:3, 460:22,
461:23, 503:24, 544:8,
635:17, 642:2
**hearsay** [1] - 457:5
**heart** [7] - 547:19, 578:25,
581:19, 586:8, 586:16,
586:17
**heavy** [3] - 504:23, 555:6,
599:16
**held** [22] - 453:2, 459:15,

495:3, 498:13, 512:13,
516:14, 518:24, 529:11,
536:9, 536:23, 543:10,
555:19, 556:9, 630:10,
630:17, 630:23, 688:6,
690:1, 690:15, 692:15,
693:13, 694:13
**hell** [3] - 545:6, 547:14,
549:13
**Hello** [1] - 486:12
**help** [17] - 464:8, 544:24,
560:4, 560:5, 580:9,
580:14, 588:12, 598:18,
598:19, 601:11, 603:1,
603:4, 603:17, 623:6,
627:24, 639:16, 646:21
**helpful** [1] - 585:16
**helpfully** [2] - 585:14, 610:14
**helping** [2] - 547:10, 669:23
**helps** [2] - 617:10, 629:12
**herself** [8] - 561:15, 563:13,
582:20, 605:1, 628:25,
649:13, 657:6, 669:25
**hesitate** [2] - 661:8, 686:22
**Hi** [1] - 478:14
**high** [6] - 545:20, 587:24,
592:7, 594:15, 603:10,
619:21
**highly** [1] - 540:4
**hightail** [1] - 655:18
**hightailed** [1] - 600:3
**himself** [7] - 556:21, 562:10,
565:16, 569:2, 589:19,
669:24
**hinted** [1] - 472:15
**history** [1] - 545:8
**hit** [2] - 544:19, 612:4
**hitting** [1] - 486:22
**hold** [5] - 454:22, 572:12,
590:23, 595:14, 664:22
**holding** [4] - 529:25, 536:22,
574:8, 595:11
**holds** [1] - 576:12
**hole** [1] - 503:19
**home** [32] - 466:10, 466:25,
477:22, 483:4, 483:12,
483:13, 483:14, 484:7,
489:9, 492:17, 499:14,
499:22, 500:6, 502:2,
554:17, 568:17, 574:10,
585:3, 585:9, 586:12,
595:22, 598:7, 598:9,
598:10, 598:12, 598:21,
601:4, 605:1, 620:7,
621:24, 637:14
**Home** [1] - 620:3
**honest** [1] - 686:24
**honestly** [1] - 607:19
**honesty** [1] - 578:6
**honor** [1] - 692:5

**Honor** [88] - 453:4, 453:23,
453:24, 454:7, 454:25,
455:4, 456:14, 459:10,
459:17, 466:4, 468:8,
468:10, 471:19, 475:8,
481:9, 487:3, 488:1,
492:19, 497:18, 498:19,
505:16, 507:16, 507:22,
508:2, 508:5, 508:7,
511:11, 513:16, 516:10,
516:20, 518:21, 518:22,
519:11, 519:13, 520:5,
522:2, 523:16, 525:3,
525:21, 526:1, 526:3,
527:10, 528:1, 529:6,
534:6, 536:7, 536:13,
537:2, 537:12, 538:4,
538:18, 538:20, 539:14,
539:18, 540:13, 540:17,
541:22, 541:24, 542:13,
542:15, 542:17, 542:21,
544:6, 544:15, 548:4,
550:7, 550:22, 551:9,
551:18, 553:22, 555:15,
555:16, 556:6, 556:16,
630:13, 630:14, 630:20,
651:19, 657:2, 688:10,
688:24, 692:11, 692:12,
693:10, 693:11, 694:15,
694:16, 694:20
**Honor's** [1] - 555:25
**honoring** [1] - 454:13
**hooked** [1] - 563:4
**hope** [8] - 567:11, 567:24,
572:12, 586:15, 595:6,
605:6, 615:9, 620:24
**hoped** [1] - 567:24
**hopefully** [1] - 582:13
**hoping** [2] - 467:4, 498:22
**horse** [3] - 633:13, 633:17,
639:1
**horses** [4] - 470:4, 471:12,
626:22, 627:2
**hospitalized** [2] - 548:13,
548:15
**hostile** [1] - 497:15
**hot** [1] - 565:12
**hot..** [1] - 589:17
**hotel** [1] - 636:25
**hottest** [1] - 603:8
**hour** [14] - 477:24, 477:25,
478:1, 524:2, 543:2,
547:16, 592:5, 599:7,
616:10, 616:23, 620:2,
643:13, 657:17
**hours** [12] - 467:20, 477:21,
477:22, 500:11, 547:16,
583:17, 592:2, 594:12,
597:11, 599:5, 648:9,
690:25

**house** [13] - 478:3, 478:14,
478:16, 478:17, 478:23,
482:8, 482:15, 482:17,
592:23, 593:4, 593:18,
594:17, 648:19
**household** [5] - 461:2,
461:10, 573:9, 573:10,
573:13
**housekeeping** [2] - 453:10,
454:16
**huge** [1] - 619:22
**hugs** [2] - 569:23, 596:15
**hum** [4] - 479:5, 491:3, 504:1,
540:24
**human** [1] - 473:12
**Hun** [1] - 578:25
**hun** [29] - 466:12, 478:14,
479:22, 480:3, 521:11,
523:11, 567:9, 568:3,
590:8, 591:16, 592:15,
593:12, 593:19, 595:7,
596:8, 596:14, 596:18,
597:24, 602:8, 602:9,
602:12, 602:22, 603:9,
605:3, 605:5, 615:6, 615:9,
620:5, 620:24
**hundreds** [1] - 548:1
**hurt** [7] - 573:4, 573:5, 574:3,
579:7, 581:3, 592:16,
601:12
**hurts** [1] - 601:12
**husher** [4] - 453:17, 460:19,
460:20, 495:1
**hybrid** [2] - 543:21, 544:3
**hygienically** [1] - 482:21

**I**

**IBM** [1] - 650:12
**idea** [1] - 625:6
**identification** [1] - 527:5
**identify** [2] - 511:5, 511:6
**identity** [2] - 681:14, 683:15
**ignorance** [1] - 675:20
**ignored** [1] - 553:16
**ignores** [2] - 657:16, 657:17
**illegal** [9] - 510:3, 566:5,
584:18, 587:6, 665:18,
676:9, 678:14, 679:2,
684:18
**illegality** [1] - 683:24
**illness** [1] - 461:8
**illusion** [1] - 568:20
**image** [21] - 454:19, 527:18,
527:19, 527:22, 531:20,
531:24, 532:3, 532:11,
532:12, 539:4, 539:8,
539:13, 619:8, 621:17,
621:23, 622:6, 622:7,
629:6, 680:2

**images** [19] - 454:18, 455:23, 457:16, 457:25, 459:9, 527:21, 528:7, 531:21, 532:1, 532:2, 536:18, 536:23, 537:8, 539:24, 617:9, 619:25, 621:4, 629:6, 629:12
**imagining** [4] - 466:12, 584:20, 605:3, 620:4
**immediately** [2] - 501:13, 504:13
**impact** [3] - 455:19, 516:3, 553:18
**impartial** [4] - 662:8, 662:11, 686:17, 686:21
**impartiality** [1] - 671:20
**impartially** [1] - 672:23
**importance** [2] - 667:5, 682:23
**important** [18] - 456:1, 530:13, 531:10, 561:3, 562:1, 562:12, 562:18, 570:20, 631:8, 638:21, 640:23, 641:1, 641:18, 648:12, 661:9, 671:24, 675:16, 691:3
**importantly** [3] - 572:1, 612:9, 626:16
**impose** [1] - 669:16
**imposes** [1] - 661:21
**impossible** [1] - 547:15
**impressed** [1] - 588:5
**improper** [1] - 665:18
**IN** [3] - 667:11, 674:11, 680:11
**inadmissible** [2] - 457:4, 536:3
**inadvertently** [2] - 469:3, 688:14
**inappropriate** [1] - 682:12
**inappropriately** [1] - 647:13
**incapable** [1] - 597:3
**incarcerated** [3] - 546:7, 548:24, 549:14
**incentive** [1] - 650:18
**incentives** [1] - 593:7
**include** [3] - 513:1, 583:11, 682:20
**included** [2] - 470:4, 518:7
**includes** [2] - 679:24, 680:4
**including** [7] - 458:12, 461:6, 600:16, 660:2, 674:4, 679:25, 681:20
**inclusion** [1] - 516:24
**incomplete** [3] - 513:17, 514:1, 514:3
**inconsistencies** [2] - 666:24, 667:8
**inconsistent** [7] - 513:25, 514:1, 514:2, 669:21,

669:22, 670:6, 670:7
**INCONSISTENT** [1] - 669:18
**incorporate** [1] - 554:2
**increase** [1] - 577:10
**increasing** [1] - 575:14
**incredible** [2] - 502:16, 591:4
**incredibly** [3] - 497:15, 562:18, 569:6
**incriminate** [2] - 490:10, 567:10
**independent** [3] - 588:2, 588:18, 588:24
**independently** [1] - 645:5
**indicate** [3] - 527:11, 528:16, 664:18
**indicated** [11] - 456:16, 463:4, 465:14, 489:6, 490:9, 522:11, 552:18, 631:17, 644:25, 646:4, 646:15
**indicating** [8] - 458:13, 484:2, 484:4, 505:10, 505:12, 505:21, 505:23, 505:25
**indication** [3] - 529:19, 551:25, 648:10
**indicted** [1] - 686:7
**INDICTMENT** [2] - 660:5, 673:8
**indictment** [22] - 587:3, 611:1, 612:24, 614:10, 629:21, 659:3, 659:4, 660:7, 660:8, 660:9, 660:13, 660:15, 660:21, 673:2, 673:6, 673:9, 673:13, 673:21, 674:16, 686:9, 686:15
**individual** [15] - 509:5, 559:3, 559:5, 559:22, 606:6, 631:13, 650:10, 659:10, 659:18, 673:17, 675:7, 675:8, 675:15, 676:5, 676:24
**individual's** [3] - 632:7, 648:25, 675:13
**individuals** [4] - 458:13, 474:21, 650:14, 672:6
**indoors** [1] - 593:22
**INDUCE** [2] - 674:10, 675:3
**induce** [20] - 558:14, 558:19, 559:1, 587:5, 587:9, 587:11, 606:1, 607:5, 613:15, 647:25, 659:9, 659:17, 674:14, 674:19, 675:6, 675:15, 675:24, 676:4, 676:8, 678:10
**induced** [1] - 675:9
**induces** [1] - 673:16
**inducing** [1] - 678:13
**infer** [1] - 663:5
**inference** [2] - 660:10, 683:23

**inferences** [2] - 669:11, 671:1
**influence** [4] - 598:20, 660:10, 664:19, 671:23
**influenced** [1] - 671:8
**inform** [1] - 660:11
**information** [19] - 460:5, 460:8, 469:10, 486:5, 488:11, 493:8, 534:16, 543:6, 545:1, 545:25, 546:2, 546:21, 546:24, 547:12, 547:22, 547:24, 658:19, 671:3, 692:14
**informed** [2] - 564:17, 690:23
**ingratiate** [1] - 569:2
**initial** [6] - 470:21, 486:11, 587:22, 678:24, 684:16
**initiated** [1] - 639:11
**initiating** [2] - 645:6
**initiator** [1] - 570:8
**INNOCENCE** [1] - 661:2
**innocence** [3] - 662:1, 662:3, 686:11
**innocent** [4] - 661:25, 667:7, 680:9, 683:8
**inquired** [1] - 552:17
**inquiry** [1] - 454:21
**inquisitive** [1] - 473:16
**inside** [8] - 578:8, 579:6, 591:7, 591:10, 591:11, 604:12, 604:17
**insidious** [1] - 570:1
**insinuated** [1] - 634:23
**insist** [1] - 638:8
**instance** [2] - 534:19, 536:24
**instances** [2] - 546:22, 633:7
**instead** [5] - 597:10, 654:13, 655:6, 665:25, 682:21
**instruct** [12] - 453:17, 460:19, 557:18, 559:4, 606:12, 614:12, 622:22, 622:25, 658:23, 672:10, 680:23, 687:7
**instructed** [3] - 498:9, 623:4, 684:9
**instruction** [13] - 454:17, 454:24, 455:19, 541:3, 617:20, 622:20, 623:3, 623:13, 623:14, 623:15, 628:8, 628:11, 669:15
**INSTRUCTIONS** [1] - 672:8
**instructions** [22] - 454:10, 454:17, 455:12, 455:18, 475:6, 543:3, 587:14, 587:17, 587:18, 619:1, 619:7, 658:17, 658:20, 658:24, 664:10, 672:14, 672:19, 685:19, 687:7, 687:8, 688:9, 693:16
**instructs** [1] - 587:16
**intact** [1] - 573:14

**intelligence** [1] - 548:7
**intend** [9] - 611:10, 622:2, 633:19, 643:17, 643:20, 649:25, 651:6, 664:18, 672:20
**intended** [23] - 456:16, 514:9, 587:4, 611:5, 612:3, 621:25, 628:17, 628:19, 633:2, 634:8, 640:3, 640:9, 640:14, 640:17, 641:3, 641:15, 643:14, 645:23, 647:17, 649:7, 649:9, 675:11, 682:17
**intending** [2] - 541:4, 592:19
**intends** [1] - 642:1
**intent** [36] - 529:14, 529:17, 541:17, 553:18, 559:3, 559:12, 587:13, 609:10, 611:13, 611:16, 611:20, 612:7, 612:15, 612:21, 612:22, 613:5, 613:8, 613:15, 622:6, 626:8, 628:13, 628:24, 629:3, 629:8, 639:22, 640:24, 652:20, 654:7, 665:11, 675:6, 675:14, 677:10, 678:12, 684:5
**intention** [11] - 633:9, 633:10, 633:16, 636:3, 638:17, 643:19, 658:1, 658:2, 658:4, 658:6
**intentional** [2] - 657:24, 667:7
**intentionally** [4] - 468:2, 675:19, 680:8, 683:7
**intentions** [6] - 629:13, 634:15, 634:17, 639:17, 651:5, 657:25
**interaction** [2] - 568:2, 568:14
**interactions** [2] - 601:7, 601:20
**interchanges** [1] - 619:23
**intercourse** [3] - 610:21, 619:3, 681:20
**interest** [47] - 458:2, 458:14, 508:19, 509:15, 529:14, 529:22, 530:3, 533:23, 560:19, 561:1, 561:19, 570:25, 578:6, 582:12, 593:8, 594:1, 623:11, 623:15, 623:17, 623:19, 624:16, 625:13, 626:10, 627:6, 627:19, 628:17, 628:21, 628:23, 629:15, 632:7, 635:7, 635:10, 635:15, 638:7, 638:13, 638:22, 639:19, 648:25, 649:2, 666:6, 667:15, 667:18, 667:23, 667:25, 669:2, 675:14
**INTEREST** [1] - 667:11

**interested** [47] - 467:8, 467:11, 474:10, 475:14, 475:22, 476:6, 476:16, 477:12, 509:16, 515:15, 517:1, 534:2, 534:3, 554:13, 554:14, 561:6, 562:12, 568:25, 569:19, 569:22, 570:25, 579:2, 588:10, 588:20, 593:24, 593:25, 620:8, 624:4, 624:7, 624:10, 624:15, 627:3, 631:10, 634:24, 635:8, 636:8, 636:9, 637:17, 639:18, 639:19, 642:24, 643:7, 644:21, 644:22, 645:9, 646:13, 653:19
**interesting** [5] - 562:22, 563:10, 579:3, 598:14, 625:15
**interestingly** [3] - 585:2, 597:21, 655:12
**interests** [8] - 533:24, 534:4, 561:15, 561:22, 623:20, 635:17, 645:14, 667:17
**interfere** [1] - 671:22
**intermediary** [1] - 676:8
**international** [1] - 681:4
**Internet** [16] - 525:17, 533:4, 533:7, 533:8, 536:1, 537:24, 556:20, 606:8, 606:15, 606:17, 606:21, 625:18, 650:16, 663:25, 676:15, 676:20
**interpretation** [2] - 637:9, 644:7
**interpreted** [2] - 471:3, 604:15
**interrupt** [2] - 515:3, 576:7
**interrupting** [1] - 550:22
**INTERSTATE** [2] - 676:10, 680:11
**interstate** [27] - 558:16, 606:5, 606:9, 606:10, 614:15, 614:17, 617:17, 617:19, 618:3, 618:10, 659:8, 659:16, 659:24, 660:1, 663:25, 664:2, 673:15, 673:25, 674:2, 674:13, 674:22, 676:13, 676:16, 679:11, 679:12, 680:15, 680:17
**intervene** [1] - 497:22
**intimacy** [1] - 575:15
**intimate** [1] - 569:6
**intrigued** [2] - 463:19, 509:16
**intriguing** [1] - 463:22
**introduce** [5] - 497:10, 512:1, 552:25, 564:24, 574:17
**introduced** [16] - 488:15,

494:2, 509:20, 512:23, 512:25, 554:23, 564:12, 569:14, 629:17, 632:15, 632:17, 634:11, 634:20, 663:18, 666:19, 691:2
**introducing** [2] - 579:14, 591:10
**intrusion** [1] - 609:24
**inures** [1] - 582:10
**investigate** [1] - 485:19
**investigated** [2] - 655:7, 665:17
**INVESTIGATION** [1] - 665:15
**invite** [3] - 596:23, 596:25, 629:15
**invited** [5] - 504:5, 593:18, 597:1, 597:2, 644:11
**invites** [1] - 598:1
**inviting** [1] - 597:9
**involve** [1] - 643:14
**involved** [12] - 605:7, 611:21, 614:18, 618:15, 633:16, 633:25, 642:9, 660:3, 679:14, 679:18, 681:8, 683:3
**involves** [3] - 587:4, 618:23, 674:5
**involving** [17] - 456:24, 471:16, 532:1, 532:3, 558:24, 575:11, 576:21, 605:20, 607:21, 608:21, 610:2, 611:8, 613:1, 613:4, 615:19, 639:23, 644:12
**IQ** [3] - 545:18, 545:19, 545:21
**irony** [1] - 603:10
**irrelevant** [7] - 457:3, 497:7, 512:23, 513:6, 632:13, 677:19, 683:25
**Isle** [1] - 485:15
**issue** [31] - 454:24, 455:8, 458:20, 478:11, 495:9, 495:13, 529:14, 529:17, 531:17, 533:1, 537:16, 543:24, 550:6, 550:8, 551:18, 551:21, 551:23, 552:2, 552:3, 552:14, 552:15, 553:2, 553:12, 559:11, 576:15, 591:15, 613:3, 636:2, 642:14, 643:18, 664:8
**issues** [7] - 454:10, 486:23, 544:16, 553:17, 553:24, 660:14, 668:7
**item** [1] - 542:4
**items** [4] - 533:7, 537:1, 537:24, 538:25
**itself** [4] - 523:1, 544:14, 606:9, 682:14

**J**

**jail** [2] - 576:9, 576:14
**Jamie** [1] - 556:8
**January** [1] - 546:23
**jerk** [3] - 484:6, 585:2, 585:8
**job** [5] - 475:6, 496:5, 654:9, 654:10, 665:25
**jobs** [1] - 633:2
**join** [4] - 597:23, 597:25, 600:1
**joined** [1] - 691:22
**Joseph** [1] - 526:13
**journey** [6] - 560:1, 567:17, 571:8, 574:25, 611:18
**Jr** [1] - 526:13
**JR** [1] - 526:14
**judge** [4] - 488:15, 622:20, 628:8, 686:16
**Judge** [25] - 455:15, 458:21, 459:6, 489:3, 494:23, 495:6, 511:3, 512:1, 514:13, 516:9, 517:8, 518:16, 528:3, 530:8, 531:5, 534:22, 543:13, 557:18, 587:16, 606:7, 606:12, 617:20, 622:22, 622:25, 690:23
**judge's** [2] - 587:18, 648:22
**judged** [2] - 631:12, 631:13
**judgemental** [1] - 564:6
**judges** [4] - 606:13, 663:23, 664:6, 665:22
**judgment** [9] - 555:11, 562:8, 562:19, 562:23, 563:3, 563:16, 631:14, 669:14, 670:5
**judgment-free** [1] - 562:23
**judgments** [2] - 562:22, 563:5
**judicial** [4] - 455:20, 606:7, 663:20, 663:24
**JUDICIAL** [1] - 663:19
**July** [1] - 653:11
**jump** [3] - 481:2, 481:23, 592:21
**jumped** [1] - 627:5
**June** [3] - 457:1, 476:3, 636:4
**juror** [5] - 460:11, 461:22, 671:2, 684:20, 687:14
**JUROR** [5] - 462:2, 538:10, 538:12, 538:15, 684:24
**jurors** [29] - 453:12, 453:19, 454:3, 459:8, 459:13, 460:10, 557:16, 630:19, 631:7, 634:6, 656:8, 658:17, 660:14, 665:22, 670:20, 671:5, 672:13, 672:16, 685:2, 685:6, 686:19, 686:22, 687:1, 690:16, 690:23, 691:23,

692:19, 693:9, 693:12
**JURORS'** [2] - 670:17, 671:6
**jurors'** [1] - 495:1
**jury** [83] - 453:2, 453:9, 454:9, 454:14, 454:17, 455:8, 455:11, 455:13, 455:17, 455:18, 455:21, 457:23, 459:15, 459:22, 459:24, 460:3, 466:10, 473:12, 485:2, 485:6, 495:3, 506:1, 509:22, 512:5, 512:10, 512:12, 513:14, 515:21, 516:15, 518:20, 518:24, 526:21, 526:25, 527:6, 529:10, 529:11, 534:1, 536:20, 541:2, 543:3, 543:9, 544:10, 547:12, 554:18, 555:9, 555:19, 555:23, 556:7, 556:9, 556:12, 556:19, 557:14, 587:17, 630:7, 630:9, 630:18, 630:23, 631:13, 658:17, 658:20, 658:22, 662:4, 662:16, 672:18, 685:22, 686:4, 686:17, 687:2, 687:7, 687:9, 687:15, 688:6, 690:2, 690:12, 690:14, 690:16, 692:16, 692:19, 693:13, 693:15, 693:24, 694:11, 694:12
**justice** [1] - 631:9
**justified** [2] - 544:25, 671:1

**K**

**KAPLAN** [99] - 453:23, 454:25, 455:15, 458:21, 459:6, 468:10, 468:13, 471:19, 475:8, 475:10, 488:1, 488:5, 488:15, 489:3, 494:18, 494:23, 495:6, 495:13, 495:21, 495:24, 496:11, 496:20, 496:24, 507:16, 508:7, 508:9, 509:11, 511:3, 511:12, 512:1, 512:22, 513:9, 513:11, 513:13, 514:13, 514:18, 514:20, 514:23, 514:25, 515:2, 515:13, 516:8, 517:8, 517:10, 517:14, 517:17, 517:19, 518:1, 518:13, 518:16, 518:21, 519:11, 520:5, 522:2, 523:16, 525:3, 525:21, 526:1, 527:10, 528:3, 528:6, 529:6, 530:8, 531:5, 534:22, 536:7, 536:13, 537:2, 537:12, 537:25, 539:9, 539:18, 539:22,

540:13, 541:24, 542:1, 542:13, 543:13, 550:7, 550:13, 550:17, 551:6, 553:22, 555:16, 556:6, 630:13, 630:20, 631:3, 657:2, 688:24, 689:8, 689:11, 689:14, 690:23, 691:15, 691:20, 692:11, 693:11, 694:16

**Kaplan** [40] - 453:8, 453:25, 454:23, 455:14, 456:16, 457:10, 458:6, 458:10, 458:19, 459:21, 468:12, 469:4, 469:14, 472:1, 495:5, 507:20, 508:6, 511:9, 512:19, 514:12, 517:1, 517:6, 529:18, 531:18, 536:12, 539:13, 541:23, 544:7, 544:23, 547:10, 547:13, 547:25, 549:23, 550:5, 552:3, 552:19, 556:5, 629:23, 657:7, 688:25

**Kaplan's** [5] - 519:7, 530:6, 532:21, 534:7, 551:3

**keep** [22] - 456:2, 456:5, 461:17, 516:5, 560:21, 566:20, 567:16, 572:15, 580:9, 589:13, 590:22, 593:12, 601:22, 601:24, 601:25, 605:21, 624:20, 626:13, 647:19, 652:23, 690:17, 693:19

**keeping** [4] - 569:16, 580:1, 580:19, 593:14

**kept** [9] - 566:24, 605:25, 613:13, 619:21, 628:4, 628:24, 637:20, 653:11, 653:17

**kicker** [2] - 576:8, 576:14

**kid** [5] - 563:16, 576:23, 577:14, 598:9, 601:2

**kids** [5] - 525:12, 525:13, 525:17, 560:22, 626:22

**kind** [24] - 470:24, 473:10, 477:2, 496:6, 513:2, 537:18, 564:12, 569:21, 584:15, 602:16, 613:25, 623:21, 626:3, 632:12, 635:7, 635:25, 639:13, 639:14, 642:11, 645:20, 647:15, 647:18, 652:20, 653:1

**kinds** [2] - 634:2, 643:17

**king** [1] - 631:12

**kink** [13] - 470:25, 471:15, 472:9, 474:6, 560:21, 560:22, 569:9, 626:18, 626:19, 626:24, 627:2, 627:7, 627:9

**kinks** [3] - 562:20, 626:23, 627:5

**kiss** [3] - 502:12, 590:25, 602:12

**kissed** [4] - 504:25, 506:2, 599:18, 656:9

**kisses** [2] - 569:23, 596:15

**kissing** [1] - 572:3

**kissy** [4] - 602:12, 602:24, 603:9, 603:21

**knock** [1] - 685:22

**knocked** [1] - 620:1

**knowing** [2] - 565:11, 680:4

**knowingly** [24] - 558:13, 559:1, 587:11, 614:13, 614:22, 614:23, 616:19, 617:13, 659:9, 659:17, 659:23, 673:16, 673:24, 674:13, 674:19, 675:18, 675:19, 675:21, 679:8, 679:22, 680:7, 683:6, 683:9

**KNOWINGLY** [2] - 675:2, 682:25

**knowledge** [9] - 649:23, 668:4, 668:13, 671:3, 683:11, 683:13, 683:15, 683:17, 683:19

**KNOWLEDGE** [1] - 670:17

**known** [3] - 465:5, 548:5, 668:2

**knows** [16] - 532:6, 533:14, 534:16, 560:6, 566:4, 566:17, 575:25, 576:10, 576:13, 580:10, 589:12, 598:24, 598:25, 655:19, 663:1

**Korea** [1] - 618:6

---

# L

**label** [2] - 557:1, 589:25

**labeled** [4] - 491:25, 556:24, 589:9, 589:15

**labia** [31] - 463:16, 466:12, 468:3, 468:17, 469:1, 520:2, 520:17, 524:1, 554:12, 555:2, 577:6, 577:22, 582:5, 582:8, 584:9, 605:3, 610:6, 610:12, 615:3, 615:6, 616:12, 618:19, 618:24, 619:17, 620:5, 620:14, 620:17, 621:5, 621:13, 624:2, 657:18

**labias** [4] - 463:21, 464:11, 467:6, 620:11

**lack** [5] - 541:18, 652:20, 661:11, 663:18, 665:12

**ladies** [18] - 459:23, 541:2, 556:11, 557:10, 570:23, 573:13, 584:23, 597:2,

598:8, 599:8, 600:23, 626:9, 629:19, 631:3, 654:3, 690:2, 690:12, 693:15

**lady** [6] - 525:8, 588:2, 588:18, 588:24, 599:22, 625:22

**laid** [1] - 533:12

**lame** [1] - 616:15

**language** [6] - 492:7, 492:24, 515:7, 561:3, 579:11, 657:10

**larger** [2] - 527:19, 596:17, 666:17

**Lascivious** [1] - 677:7

**lascivious** [15] - 609:8, 619:4, 619:5, 619:7, 620:13, 620:19, 621:7, 677:8, 681:23, 682:2, 682:4, 682:14, 682:20, 682:22, 690:6

**last** [24] - 454:1, 455:6, 461:6, 468:20, 475:13, 483:21, 486:13, 522:25, 533:9, 539:24, 544:7, 544:8, 546:8, 546:9, 546:24, 548:6, 558:20, 570:5, 579:13, 601:21, 603:15, 603:25

**lastly** [1] - 569:13

**lasts** [1] - 662:2

**late** [2] - 459:2, 514:8

**lately** [1] - 473:22

**LAW** [2] - 668:17, 672:8

**law** [42] - 489:24, 490:18, 557:18, 559:4, 559:8, 563:24, 565:25, 567:3, 567:11, 567:24, 570:15, 573:23, 587:17, 587:18, 590:16, 610:15, 613:17, 655:25, 656:10, 658:23, 658:24, 661:15, 661:21, 661:25, 665:16, 668:18, 668:20, 668:25, 669:4, 669:15, 671:10, 672:11, 672:13, 672:14, 672:17, 672:24, 677:3, 677:6, 677:13, 677:21, 677:23, 686:14

**laws** [2] - 562:8, 677:4

**lawyer** [3] - 469:21, 484:19, 484:22

**lawyers** [1] - 557:14

**lay** [2] - 533:19, 534:17

**layer** [4] - 561:21, 645:2, 652:20

**layering** [1] - 619:21

**layers** [1] - 645:3

**laying** [5] - 466:11, 586:8, 586:20, 605:2, 620:4

**lead** [13] - 475:2, 475:17, 549:22, 563:8, 565:11, 568:6, 569:17, 572:17, 578:16, 579:12, 588:4, 644:17

**learn** [1] - 580:13

**learned** [2] - 456:10, 575:5

**learning** [1] - 545:12

**least** [8] - 532:24, 545:23, 582:13, 636:6, 641:14, 641:20, 648:8, 693:4

**leave** [14] - 478:5, 478:22, 479:4, 481:8, 483:18, 486:25, 504:13, 573:17, 595:20, 605:25, 637:13, 648:18, 650:8, 670:22

**leaves** [1] - 592:22

**leaving** [5] - 478:5, 478:21, 482:15, 482:17, 692:21

**led** [3] - 566:25, 598:10, 601:15

**left** [15] - 455:5, 471:17, 478:3, 478:14, 482:8, 504:12, 504:13, 540:2, 583:15, 583:18, 583:19, 595:17, 595:20, 599:6, 648:19

**legal** [2] - 475:7, 597:5, 631:25

**legally** [1] - 597:3

**legit** [1] - 563:25

**legs** [1] - 620:16

**length** [1] - 569:5

**less** [15] - 477:23, 513:24, 515:5, 515:17, 516:23, 531:16, 532:17, 533:21, 558:20, 568:15, 663:11, 668:21, 672:5, 674:23, 676:24

**lesser** [1] - 668:22

**level** [4] - 478:17, 569:24, 591:5, 625:11

**levels** [1] - 580:20

**Lewd** [1] - 677:6

**lewd** [2] - 609:8, 677:8

**lewdly** [2] - 609:8, 677:8

**libido** [4] - 587:24, 592:8, 594:16, 619:21

**lie** [2] - 486:4, 602:22

**life** [7] - 457:17, 537:24, 573:17, 573:18, 580:24, 628:7, 670:23

**life-span** [1] - 537:24

**light** [7] - 469:15, 513:2, 529:16, 529:21, 530:25, 551:14, 671:1

**like-minded** [1] - 626:10

**likely** [3] - 531:16, 533:21,

583:1
**likewise** [1] - 664:15
**limited** [9] - 457:18, 512:24, 525:6, 541:15, 541:16, 665:9, 665:10, 669:23, 670:23
**line** [9] - 454:21, 590:10, 632:1, 632:2, 676:17, 681:2, 681:4, 688:15, 688:18
**lined** [2] - 544:18, 549:19
**lines** [3] - 633:18, 633:22, 650:16
**lips** [16] - 520:3, 520:18, 523:11, 555:2, 572:4, 577:7, 605:5, 607:7, 610:7, 615:9, 616:9, 618:19, 619:17, 620:22, 620:24, 657:20
**list** [2] - 467:25, 547:8
**listen** [3] - 577:3, 632:23, 658:18
**listened** [1] - 690:25
**lists** [2] - 545:18, 545:19
**live** [6] - 489:6, 491:24, 556:23, 564:6, 589:8, 589:22
**lived** [6] - 477:15, 477:19, 485:11, 485:12, 485:14, 502:8
**lives** [2] - 510:9, 598:9
**Liza** [2] - 489:5, 558:17
**lmk** [1] - 602:23
**local** [1] - 668:20
**location** [1] - 640:19
**locked** [3] - 478:19, 478:20, 488:10
**logic** [1] - 649:17
**lonely** [1] - 650:21
**look** [46] - 480:16, 486:6, 509:25, 512:4, 520:10, 527:6, 533:13, 534:25, 538:24, 545:17, 545:25, 546:25, 547:8, 549:11, 568:13, 569:5, 585:4, 586:7, 588:22, 591:3, 608:2, 609:6, 610:16, 618:25, 623:5, 623:7, 623:21, 627:1, 632:25, 634:21, 635:5, 635:22, 641:11, 641:13, 641:23, 642:16, 644:1, 644:18, 645:8, 647:23, 649:18, 650:5, 652:22, 655:9, 692:24
**looked** [12] - 469:8, 487:10, 516:2, 546:10, 546:11, 546:14, 546:16, 556:19, 585:22, 585:23, 588:22, 655:8

**Looking** [3] - 470:22, 560:17, 653:22
**looking** [24] - 469:5, 469:14, 473:24, 501:12, 509:23, 548:1, 566:24, 570:12, 577:7, 577:8, 588:8, 589:18, 610:2, 616:25, 618:21, 635:16, 635:19, 636:21, 638:9, 640:7, 641:2, 647:9, 651:1
**looks** [1] - 456:1
**lose** [3] - 545:23, 638:15, 652:24
**loss** [1] - 461:7
**lost** [2] - 652:23, 652:25
**loud** [1] - 462:5
**love** [21] - 479:20, 493:19, 498:21, 570:3, 583:7, 586:7, 586:12, 586:19, 591:4, 591:7, 593:10, 593:19, 593:22, 594:7, 594:13, 595:7, 596:2, 604:20, 610:18, 610:22, 649:20
**lover** [1] - 597:9
**loves** [5] - 504:25, 506:2, 574:16, 587:25, 599:18
**loving** [3] - 571:20, 574:15, 585:18
**lovingly** [2] - 579:13, 579:17
**Lovingly** [2] - 579:15, 579:19
**lower** [2] - 475:18, 545:21
**lucky** [1] - 691:23
**lunch** [3] - 543:2, 543:7, 555:18
**lust** [2] - 609:11, 677:11
**lustfulness** [3] - 619:10, 681:25, 690:9
**lying** [4] - 467:1, 608:10, 608:13, 616:25

# M

**ma'am** [61] - 465:13, 466:24, 467:5, 467:7, 469:2, 469:10, 469:19, 469:23, 472:11, 473:11, 473:23, 474:23, 476:5, 476:13, 476:15, 479:9, 480:10, 480:15, 480:20, 480:23, 481:6, 481:22, 482:11, 482:21, 483:6, 483:10, 484:12, 485:16, 485:21, 485:24, 486:3, 487:7, 487:23, 488:9, 488:13, 490:3, 490:22, 491:3, 491:20, 492:14, 493:18, 494:5, 494:11, 499:18, 500:12, 501:15, 501:19, 502:3, 502:18, 505:10, 505:13, 506:12, 507:11,

522:13, 522:16, 524:9, 545:7, 547:15, 548:16, 550:15, 694:19
**Maddie** [65] - 463:6, 554:8, 559:15, 560:2, 560:5, 570:10, 572:1, 572:13, 572:19, 573:2, 573:4, 573:5, 573:15, 573:20, 574:1, 574:2, 574:5, 574:6, 574:11, 574:19, 574:20, 575:3, 575:23, 576:2, 576:16, 576:22, 577:22, 577:23, 578:1, 578:5, 578:12, 580:9, 580:10, 580:14, 580:22, 581:6, 581:17, 582:1, 582:25, 583:4, 583:20, 583:22, 584:1, 584:9, 584:10, 585:10, 585:17, 586:21, 587:1, 597:5, 607:8, 607:19, 611:17, 612:10, 623:24, 625:2, 625:3, 625:7, 625:13, 628:18, 654:7, 654:17
**Maddie's** [3] - 573:20, 581:2, 582:19
**Magic** [1] - 517:20
**mailbox** [1] - 482:18
**mailed** [1] - 674:3
**maintain** [2] - 516:20, 574:10
**majority** [2] - 582:3, 610:10
**male** [3] - 532:4, 578:9, 629:6
**man** [8] - 568:16, 571:20, 573:22, 574:18, 581:20, 597:4, 597:11
**manner** [2] - 623:8, 664:19, 666:7
**manual** [1] - 583:2
**manufactured** [3] - 617:22, 680:22, 680:24
**Manufactured** [1] - 618:6
**mark** [1] - 517:20
**Mark** [2] - 453:8, 459:21
**marked** [1] - 527:5
**Marker** [1] - 517:20
**marking** [1] - 518:13
**MARLOW** [1] - 462:2
**married** [1] - 677:18
**mask** [4] - 456:3, 456:4, 462:4
**masochistic** [1] - 681:23
**Massachusetts** [3] - 545:15, 550:20, 550:24
**Masterson** [18] - 453:7, 454:18, 454:20, 456:7, 459:20, 461:21, 486:22, 488:20, 496:14, 526:5, 536:14, 538:19, 541:21, 543:16, 545:9, 551:16, 554:1, 689:6
**MASTERSON** [132] - 453:24,

455:4, 455:22, 456:9, 456:14, 457:14, 458:18, 459:9, 459:12, 462:18, 464:3, 464:15, 464:19, 466:3, 468:8, 470:19, 472:6, 472:24, 475:25, 476:9, 476:19, 477:4, 479:17, 480:6, 481:7, 481:9, 481:13, 481:15, 481:17, 481:19, 482:2, 482:25, 484:13, 484:15, 485:8, 486:17, 487:1, 487:2, 487:3, 488:7, 488:23, 488:25, 489:2, 489:4, 489:12, 489:22, 490:4, 490:12, 491:16, 492:19, 492:22, 492:25, 496:18, 496:21, 497:13, 497:15, 498:11, 498:19, 498:20, 499:16, 500:1, 500:17, 501:20, 502:23, 503:13, 504:15, 505:16, 507:14, 508:1, 508:5, 508:12, 509:8, 513:16, 516:10, 516:20, 518:3, 518:22, 519:13, 519:15, 520:13, 520:22, 520:24, 523:21, 523:23, 525:19, 526:3, 526:18, 528:1, 529:2, 531:19, 531:24, 532:12, 532:14, 533:2, 533:16, 534:6, 534:24, 535:4, 535:13, 535:19, 535:22, 536:8, 536:17, 538:4, 538:20, 539:14, 540:17, 540:19, 540:23, 540:25, 541:22, 542:15, 542:21, 542:23, 543:17, 551:18, 554:2, 555:15, 555:24, 556:16, 630:14, 651:19, 657:4, 688:10, 688:14, 688:17, 688:22, 691:21, 692:12, 693:10, 694:15, 694:20
**Masterson's** [1] - 554:11
**masturbate** [8] - 467:13, 612:11, 616:25, 617:10, 627:16, 654:23, 658:8
**masturbated** [4] - 584:20, 584:25, 585:1, 626:15
**masturbating** [4] - 467:8, 467:11, 585:12, 620:8
**masturbation** [2] - 619:3, 681:22
**matches** [2] - 608:9
**material** [7] - 654:19, 683:10, 683:14, 683:17, 683:21, 683:23, 683:25
**MATERIALS** [1] - 680:10
**materials** [7] - 535:14,

614:16, 617:18, 674:2, 679:11, 680:14, 680:17
**matter** [22] - 453:4, 454:1, 454:16, 459:17, 485:5, 497:2, 518:5, 538:11, 550:11, 555:12, 562:6, 631:24, 632:11, 644:5, 644:9, 644:13, 651:8, 667:12, 677:20, 686:15, 688:1
**mattered** [1] - 585:11
**matters** [3] - 455:5, 515:24, 667:5
**max** [1] - 604:1
**mean** [39] - 468:13, 480:17, 531:6, 532:8, 532:14, 533:2, 534:8, 534:14, 534:15, 535:13, 535:15, 542:10, 542:25, 543:1, 559:24, 561:4, 562:21, 563:24, 567:13, 572:20, 575:4, 575:22, 579:3, 579:9, 583:22, 592:3, 594:23, 603:3, 603:4, 608:11, 615:14, 625:8, 626:19, 642:20, 645:4, 647:17, 666:19, 668:20, 691:4
**meaning** [11] - 471:2, 484:9, 491:8, 493:10, 503:5, 505:9, 505:19, 559:17, 594:12, 604:16, 681:19
**meanings** [2] - 471:4, 675:25
**means** [31] - 456:18, 466:21, 480:21, 492:3, 506:8, 535:16, 546:6, 558:16, 561:9, 577:4, 588:16, 606:5, 635:12, 656:12, 659:8, 659:16, 659:24, 660:1, 661:19, 673:15, 673:25, 674:4, 674:21, 676:14, 676:19, 680:1, 680:3, 680:17, 681:19, 688:18, 690:7
**meant** [4] - 506:9, 509:24, 539:23, 633:4
**meantime** [1] - 617:8
**mechanisms** [1] - 689:22
**media** [1] - 460:7
**medical** [1] - 545:3
**medically** [1] - 549:18
**meet** [51] - 478:4, 479:4, 480:9, 481:5, 481:21, 482:9, 485:17, 499:5, 499:10, 502:1, 502:12, 505:14, 509:17, 509:18, 547:17, 556:22, 557:4, 569:13, 569:19, 570:12, 570:14, 570:16, 572:12, 572:20, 572:21, 583:15,

583:17, 583:18, 583:19, 585:5, 586:10, 587:1, 592:6, 594:5, 595:18, 612:10, 636:14, 640:18, 640:21, 641:19, 643:9, 643:24, 644:4, 644:8, 646:6, 647:8, 648:13, 648:17, 648:18, 650:21, 653:2
**meeting** [14] - 479:2, 481:4, 482:23, 569:14, 570:13, 581:15, 592:24, 601:20, 615:13, 636:16, 640:18, 643:8, 653:3, 653:4
**Meg** [39] - 490:6, 524:19, 559:20, 559:24, 564:11, 564:24, 567:15, 568:19, 568:23, 569:9, 569:11, 570:20, 570:25, 571:13, 571:17, 571:20, 573:9, 574:16, 574:20, 575:10, 576:11, 576:21, 579:12, 580:15, 581:4, 581:13, 581:15, 583:20, 584:1, 584:23, 585:15, 586:21, 587:2, 589:19, 591:17, 611:20, 612:10, 624:25
**Meg's** [6] - 564:10, 572:20, 575:10, 580:9, 580:14, 580:23
**member** [7] - 461:2, 461:10, 567:11, 609:9, 677:9, 687:15, 688:1
**members** [6] - 556:19, 557:14, 658:22, 686:4, 692:25, 693:20
**memory** [4] - 685:5, 685:8, 685:10, 685:15
**men** [1] - 562:5
**mental** [1] - 549:16
**mentally** [1] - 544:22
**mention** [4] - 495:24, 495:25, 521:15
**mentioned** [15] - 463:18, 471:7, 474:3, 474:5, 483:23, 487:19, 536:18, 561:7, 561:14, 571:7, 593:16, 616:2, 621:14, 625:21, 646:25
**menus** [1] - 692:19
**mere** [7] - 671:10, 678:18, 678:19, 684:10, 686:7, 687:1
**merely** [4] - 632:6, 648:24, 660:7, 675:12
**message** [11] - 466:9, 466:23, 467:21, 469:6, 510:23, 511:1, 522:23, 649:24, 687:17, 687:23, 691:19
**messages** [25] - 456:23,

458:4, 458:12, 467:19, 469:6, 469:20, 493:3, 494:10, 509:1, 510:13, 511:17, 512:14, 513:2, 513:6, 513:21, 514:5, 515:7, 516:3, 516:25, 517:2, 518:8, 518:14, 529:17, 547:8, 555:5
**met** [24] - 463:14, 500:10, 503:10, 504:21, 525:16, 550:8, 556:21, 557:7, 558:2, 579:18, 583:14, 584:5, 596:5, 599:14, 601:2, 601:21, 607:25, 613:13, 613:20, 621:14, 622:12, 629:19, 638:17, 648:3
**metadata** [4] - 528:21, 530:19, 530:25, 533:3
**mic** [1] - 475:18
**microphone** [1] - 462:19
**middle** [7] - 478:4, 479:6, 505:2, 506:23, 566:14, 599:19, 656:14
**midmorning** [1] - 512:4
**midnight** [5] - 478:6, 478:25, 492:15, 648:18
**midst** [1] - 693:16
**might** [33] - 474:5, 486:19, 487:18, 487:24, 490:10, 495:15, 508:16, 513:2, 518:9, 518:11, 530:15, 535:21, 551:14, 551:24, 552:2, 560:19, 560:23, 565:8, 565:11, 566:21, 567:10, 574:4, 593:7, 598:9, 624:10, 625:25, 627:5, 631:24, 647:3, 687:23, 689:23
**million** [1] - 497:24
**mind** [19] - 497:8, 508:14, 522:22, 544:22, 545:10, 546:11, 546:18, 547:1, 549:11, 553:3, 560:21, 583:11, 586:14, 596:11, 635:16, 647:19, 648:5, 667:20, 675:9
**mind-boggling** [1] - 549:11
**minded** [1] - 626:10
**minds** [1] - 635:19
**mine** [2] - 462:4, 594:8
**MINOR** [1] - 674:11
**minor** [60] - 508:24, 553:1, 557:11, 558:7, 559:6, 559:7, 559:13, 564:2, 580:7, 585:14, 587:5, 611:6, 611:10, 612:25, 614:18, 614:20, 618:15, 618:22, 618:23, 621:7, 621:11, 625:22, 625:25,

626:2, 626:6, 627:14, 632:6, 634:24, 636:18, 638:13, 644:12, 645:24, 646:13, 648:24, 651:6, 651:8, 652:12, 660:3, 674:6, 674:14, 675:13, 676:7, 676:8, 678:10, 679:15, 679:16, 679:18, 679:19, 681:8, 681:10, 681:14, 682:4, 682:11, 682:13, 682:23, 683:3, 683:5, 683:12, 683:18
**minor's** [4] - 675:9, 681:25, 682:7, 690:8
**minors** [7] - 458:2, 563:24, 588:10, 625:19, 626:10, 636:10, 652:8
**minute** [7] - 471:9, 497:10, 519:6, 521:18, 521:23, 590:19, 591:1
**minutes** [15] - 478:14, 504:9, 522:24, 524:2, 547:16, 567:7, 593:4, 605:17, 605:18, 616:10, 621:1, 622:4, 630:3, 657:17
**misconduct** [1] - 553:1
**misconstrued** [1] - 467:21
**missed** [1] - 546:14
**missing** [1] - 460:10
**misstates** [1] - 509:8
**mistake** [8] - 541:18, 615:12, 622:10, 665:12, 675:20, 680:9, 683:8
**mistakes** [1] - 650:2
**mistrial** [4] - 543:14, 544:12, 552:9, 553:20
**Mmmmm** [1] - 503:24
**mmmmm** [1] - 600:1
**Mmmmmm** [1] - 583:7
**mmmmmm** [11] - 466:13, 502:11, 572:4, 583:5, 586:19, 594:7, 596:3, 596:18, 605:4, 615:7, 620:6
**Mmmmmmm** [3] - 581:16, 589:17, 590:23
**mmmmmmm** [1] - 577:20
**mmmmmmmm** [1] - 502:16
**molested** [1] - 509:19
**mom** [7] - 568:4, 568:6, 571:6, 572:8, 574:7, 574:15, 658:3
**Mom** [1] - 582:21
**moment** [7] - 508:1, 538:4, 565:14, 597:8, 599:10, 601:15, 655:23
**moments** [2] - 556:1, 571:23
**momma.mego** [1] - 483:9
**Monday** [1] - 454:10
**monitors** [1] - 540:19
**month** [2] - 455:6, 557:23

**months** [5] - 533:9, 538:2, 608:6, 653:24

**moral** [2] - 573:16, 573:18

**morals** [1] - 573:17

**morning** [28] - 453:10, 459:23, 480:8, 482:4, 483:16, 499:10, 501:24, 526:19, 526:20, 546:8, 583:16, 586:12, 586:15, 593:3, 596:23, 596:25, 604:9, 604:15, 607:8, 612:11, 615:11, 625:15, 625:17, 628:16, 648:20, 654:23, 691:8, 694:10

**most** [16] - 486:7, 536:21, 579:24, 580:16, 593:21, 603:8, 604:7, 613:7, 613:14, 627:13, 628:16, 636:2, 650:13, 661:9, 666:21

**mostly** [3] - 570:10, 595:25

**mother** [13] - 483:20, 559:9, 564:17, 565:18, 571:21, 572:8, 576:18, 582:19, 584:24, 586:2, 627:20, 627:23, 628:19

**motion** [8] - 495:8, 543:13, 543:14, 543:25, 552:9, 553:20, 554:6, 555:11

**motions** [3] - 543:11, 551:22, 553:21

**motivations** [1] - 473:15

**motive** [6] - 541:17, 593:6, 601:11, 623:18, 665:11, 667:15

**mouth** [9] - 462:20, 475:19, 572:2, 572:11, 577:18, 591:6, 591:11, 609:24

**move** [11] - 462:19, 468:8, 473:10, 492:19, 505:16, 507:14, 512:1, 551:17, 552:7, 553:22, 653:18

**moved** [2] - 653:4, 680:18

**MOVED** [1] - 680:11

**mover** [1] - 656:20

**MR** [103] - 453:23, 454:25, 455:15, 458:21, 459:6, 468:10, 468:13, 471:19, 475:8, 475:10, 486:19, 488:1, 488:5, 488:15, 489:3, 494:18, 494:23, 495:6, 495:13, 495:21, 495:24, 496:11, 496:20, 496:24, 507:16, 508:7, 508:9, 509:11, 511:3, 511:12, 512:1, 512:22, 513:9, 513:11, 513:13, 514:13, 514:18, 514:20, 514:23, 514:25, 515:2, 515:13, 516:8, 517:8,

517:10, 517:14, 517:17, 517:19, 518:1, 518:13, 518:16, 518:21, 519:11, 520:5, 522:2, 523:16, 525:3, 525:21, 526:1, 527:10, 528:3, 528:6, 529:6, 530:8, 531:5, 531:22, 534:22, 536:7, 536:13, 537:2, 537:12, 537:25, 538:18, 539:9, 539:18, 539:22, 540:13, 541:24, 542:1, 542:13, 543:13, 550:7, 550:13, 550:17, 551:6, 553:22, 555:16, 556:6, 630:13, 630:20, 631:3, 643:1, 657:2, 688:24, 689:8, 689:11, 689:14, 690:23, 691:15, 691:20, 692:11, 693:11, 694:16

**MS** [132] - 453:24, 455:4, 455:22, 456:9, 456:14, 457:14, 458:18, 459:9, 459:12, 462:18, 464:3, 464:15, 464:19, 466:3, 468:8, 470:19, 472:6, 472:24, 475:25, 476:9, 476:19, 477:4, 479:17, 480:6, 481:7, 481:9, 481:13, 481:15, 481:17, 481:19, 482:2, 482:25, 484:13, 484:15, 485:8, 486:17, 487:1, 487:2, 487:3, 488:7, 488:23, 488:25, 489:2, 489:4, 489:12, 489:22, 490:4, 490:12, 491:16, 492:19, 492:22, 492:25, 496:18, 496:21, 497:13, 497:15, 498:11, 498:19, 498:20, 499:16, 500:1, 500:17, 501:20, 502:23, 503:13, 504:15, 505:16, 507:14, 508:1, 508:5, 508:12, 509:8, 513:16, 516:10, 516:20, 518:3, 518:22, 519:13, 519:15, 520:13, 520:22, 520:24, 523:21, 523:23, 525:19, 526:3, 526:18, 528:1, 529:2, 531:19, 531:24, 532:12, 532:14, 533:2, 533:16, 534:6, 534:24, 535:4, 535:13, 535:19, 535:22, 536:8, 536:17, 538:4, 538:20, 539:14, 540:17, 540:19, 540:23, 540:25, 541:22, 542:15, 542:21, 542:23, 543:17, 551:18, 554:2, 555:15, 555:24, 556:16, 630:14, 651:19,

657:4, 688:10, 688:14, 688:17, 688:22, 691:21, 692:12, 693:10, 694:15, 694:20

**multifaceted** [1] - 570:2

**MULTIPLE** [1] - 660:19

**multiple** [8] - 457:6, 471:4, 510:12, 546:20, 580:20, 622:4

**muscle** [1] - 461:7

**must** [46] - 514:3, 533:12, 558:13, 573:14, 660:23, 661:3, 661:6, 662:6, 663:16, 663:17, 664:21, 670:19, 671:7, 671:21, 671:25, 675:17, 675:18, 676:2, 676:11, 676:17, 676:22, 677:1, 677:22, 677:25, 678:2, 678:6, 678:11, 678:18, 678:20, 679:6, 679:21, 680:6, 680:12, 681:6, 681:11, 682:21, 683:1, 683:13, 683:17, 684:3, 684:9, 684:12, 684:21, 685:7, 685:12, 686:20

---

## N

**naked** [13] - 465:15, 466:1, 593:17, 593:21, 593:25, 594:2, 594:17, 594:19, 595:6, 595:7, 595:25, 617:9

**name** [10] - 462:8, 464:6, 486:6, 486:13, 495:16, 495:17, 526:12, 587:23, 672:2

**named** [2] - 615:13

**names** [1] - 669:8

**nap** [1] - 586:24

**national** [1] - 671:13

**NATIONAL** [1] - 671:12

**natural** [2] - 575:17, 581:21

**naturally** [1] - 581:18

**nature** [9] - 457:18, 468:3, 479:8, 619:18, 671:21, 678:21, 683:10, 683:14, 684:13

**naughty** [3] - 593:11, 603:22

**near** [3] - 616:12, 655:18, 673:5

**nearly** [1] - 557:14

**necessarily** [3] - 643:3, 643:4, 666:20

**necessary** [9] - 455:15, 455:16, 673:3, 673:6, 678:20, 683:21, 684:12, 684:20, 691:7

**neck** [4] - 504:25, 506:2, 599:18, 656:9

**need** [69] - 457:22, 459:4,

461:17, 462:3, 465:25, 466:22, 477:2, 498:9, 507:20, 516:6, 516:8, 517:12, 517:24, 520:11, 524:13, 531:14, 532:18, 533:16, 533:19, 534:17, 534:18, 535:10, 535:12, 536:4, 545:3, 549:18, 560:4, 565:25, 572:25, 573:18, 573:25, 574:10, 575:16, 576:16, 580:10, 584:5, 584:10, 587:19, 595:3, 595:5, 597:9, 597:10, 602:9, 602:12, 602:23, 611:3, 617:8, 618:16, 621:23, 634:4, 640:2, 656:24, 656:25, 675:8, 675:10, 676:6, 681:13, 683:15, 689:2, 689:4, 692:2, 692:8, 692:20, 693:1, 693:4, 693:6

**needed** [8] - 551:13, 580:24, 597:10, 598:17, 656:25, 657:4, 689:3, 689:18

**needs** [11] - 461:22, 466:17, 535:15, 574:12, 576:11, 580:9, 580:14, 583:22, 584:5, 594:5

**neglected** [1] - 456:17

**nervous** [1] - 565:7

**neurologist** [3] - 548:21, 548:25, 549:7

**never** [24] - 472:16, 479:10, 487:19, 500:13, 545:8, 549:23, 550:15, 551:8, 559:14, 559:16, 568:6, 587:18, 621:22, 627:3, 634:23, 647:2, 648:19, 649:19, 661:18, 661:21, 686:16, 687:24, 687:25

**new** [5] - 461:6, 481:16, 481:18, 488:6, 554:5

**newer** [1] - 540:4

**next** [53] - 464:15, 466:3, 470:19, 472:24, 475:25, 476:9, 476:19, 480:6, 480:8, 481:5, 481:7, 482:2, 486:17, 488:7, 489:12, 489:22, 490:4, 490:12, 491:16, 492:25, 499:10, 499:16, 500:1, 501:4, 501:20, 502:23, 503:13, 504:15, 560:15, 560:24, 561:12, 561:23, 562:25, 567:7, 579:21, 580:17, 589:6, 592:20, 596:5, 596:23, 596:25, 598:11, 602:6, 605:14, 608:15, 609:19, 615:4, 615:21, 618:5, 648:19, 653:18

nice [6] - 502:15, 590:22, 596:8, 596:22, 654:9, 654:21
niece [1] - 496:22
niece's [1] - 497:4
night [35] - 454:1, 466:11, 467:1, 467:3, 467:20, 478:2, 478:4, 478:7, 478:23, 479:2, 479:6, 480:18, 480:22, 481:4, 492:15, 499:1, 499:5, 501:7, 506:16, 507:13, 563:12, 585:6, 585:24, 588:17, 591:19, 591:24, 591:25, 592:25, 605:2, 620:4, 636:8, 642:4, 645:15, 648:19
nightmare [1] - 577:16
nights [2] - 492:16
ninety [1] - 622:4
nipple [3] - 502:14, 600:16, 600:19
nipples [12] - 504:24, 505:8, 505:9, 505:19, 505:20, 582:5, 582:8, 591:6, 591:11, 599:17, 610:12, 656:9
none [1] - 639:3
nonexistence [1] - 663:7
nonresponsive [3] - 466:19, 468:9, 492:20
nonsense [2] - 624:21
nonsmoker [1] - 561:9
norm [1] - 584:16
normal [1] - 567:17
normalization [1] - 611:14
normalizing [10] - 564:3, 564:8, 574:4, 574:6, 574:19, 580:6, 582:21, 590:4, 627:22
normally [2] - 483:17, 616:6
northwest [1] - 550:10
NOTE [1] - 684:24
note [6] - 460:10, 586:4, 587:14, 685:23, 687:18, 688:1
NOTE-TAKING [1] - 684:24
notes [7] - 549:17, 685:1, 685:4, 685:6, 685:10, 685:12
nothing [16] - 457:19, 508:5, 508:23, 519:11, 525:19, 534:9, 542:13, 578:13, 595:11, 595:12, 595:15, 599:8, 636:9, 648:10, 656:3, 665:18
NOTICE [1] - 663:19
notice [7] - 455:20, 606:8, 619:9, 663:20, 663:24, 681:24, 690:8

notified [1] - 484:20
notion [2] - 471:15, 484:2
November [1] - 484:18
nowhere [2] - 472:8, 616:12
nude [2] - 502:14, 682:13
nudity [1] - 682:14
number [16] - 453:5, 456:19, 456:25, 459:18, 464:3, 470:2, 470:18, 479:15, 488:20, 512:17, 523:14, 527:21, 633:7, 666:14, 666:16, 666:17
numbers [1] - 464:18
numerical [1] - 687:24

# O

o'clock [9] - 483:16, 583:16, 588:17, 593:2, 690:20, 690:21, 691:8, 691:22
o'clockish [1] - 692:6
oath [5] - 486:4, 498:17, 519:9, 670:20, 672:16
object [12] - 456:19, 497:17, 513:16, 516:24, 517:5, 529:6, 539:9, 539:13, 540:13, 596:22, 609:25, 664:20
objection [38] - 453:12, 453:22, 455:13, 471:19, 475:8, 488:1, 488:5, 507:14, 508:12, 509:8, 516:21, 517:6, 517:9, 520:5, 522:2, 523:16, 525:3, 527:10, 529:2, 529:9, 530:4, 530:6, 532:15, 537:2, 537:12, 537:25, 539:16, 543:16, 643:1, 657:2, 664:22, 688:8, 688:25, 689:2, 689:5, 689:6, 689:13, 689:23
objections [1] - 693:8
OBJECTIONS [1] - 664:12
objective [2] - 601:25, 602:1
objects [1] - 633:14
obligated [1] - 661:23
obligation [3] - 534:12, 631:6, 666:22
obscene [2] - 678:25, 684:16
observe [1] - 631:5
observer [2] - 678:22, 684:13
obtain [1] - 622:6
obvious [1] - 473:5
obviously [5] - 454:13, 487:14, 607:17, 634:3, 691:4
occasion [3] - 509:3, 649:24, 669:20
occasions [6] - 508:23,

541:5, 546:20, 646:20, 648:15, 664:25
occur [1] - 494:14
occurred [8] - 497:7, 549:14, 608:24, 676:3, 677:3, 677:24, 678:1, 678:4
occurrences [1] - 667:3
odd [2] - 487:16, 530:25
OF [14] - 660:5, 661:2, 664:3, 665:21, 669:18, 672:8, 674:9, 676:10, 676:21, 679:3, 679:4, 681:5, 685:13
off-putting [1] - 590:21
offender [1] - 677:17
offense [18] - 457:2, 558:22, 608:25, 614:8, 631:11, 659:12, 659:20, 660:20, 660:25, 661:1, 673:4, 673:7, 673:19, 675:1, 678:24, 684:15, 686:9, 686:15
offenses [5] - 555:11, 557:25, 609:1, 629:21, 673:2
offer [6] - 458:15, 459:2, 512:18, 531:17, 539:12, 668:6
offered [8] - 457:5, 512:15, 512:16, 513:6, 515:24, 541:4, 664:24, 692:19
offering [3] - 594:24, 647:16, 666:20
offers [2] - 528:1, 539:15
Office [1] - 526:24
officer [39] - 490:17, 546:13, 557:3, 565:24, 590:15, 632:20, 634:17, 635:24, 639:18, 639:20, 640:6, 640:8, 641:6, 641:8, 641:20, 641:24, 642:6, 643:10, 643:24, 644:2, 644:9, 644:16, 645:4, 645:12, 645:22, 645:24, 645:25, 646:8, 646:11, 646:25, 647:1, 647:12, 648:14, 649:6, 649:11, 650:25, 665:17, 685:23, 687:19
officer's [1] - 639:23
official [1] - 668:20
officials [1] - 668:18
often [2] - 456:4, 540:7
old [17] - 463:7, 501:11, 535:10, 554:9, 558:20, 561:13, 600:12, 605:20, 607:12, 607:16, 608:10, 608:18, 637:5, 650:10, 650:24, 674:24, 676:24
older [7] - 540:3, 595:3, 595:4, 597:7, 605:18, 609:15, 634:25

olds [1] - 568:17
omitted [3] - 469:3, 688:14, 688:18
ON [2] - 672:8, 673:1
once [8] - 493:10, 497:9, 566:1, 576:17, 582:12, 582:13, 604:14, 634:23
One [1] - 659:5
ONE [2] - 675:2, 679:20
one [122] - 453:19, 454:3, 454:18, 456:10, 457:22, 460:10, 471:2, 472:9, 472:11, 479:11, 483:3, 491:11, 494:14, 499:13, 502:14, 503:4, 509:3, 521:18, 521:23, 522:17, 524:9, 526:6, 531:25, 532:1, 540:21, 543:19, 545:22, 546:14, 549:8, 550:10, 550:21, 550:22, 550:23, 550:24, 550:25, 558:24, 560:16, 565:20, 569:20, 570:5, 570:17, 570:20, 574:23, 576:4, 577:21, 579:13, 580:13, 585:23, 586:7, 586:11, 587:3, 587:6, 587:14, 589:6, 590:19, 592:8, 597:22, 599:9, 600:16, 600:18, 600:24, 602:6, 603:8, 603:15, 603:25, 604:8, 604:11, 605:14, 608:16, 609:4, 611:8, 613:4, 615:4, 615:7, 615:11, 615:15, 615:21, 615:23, 616:15, 616:17, 618:16, 619:25, 620:1, 625:5, 625:24, 626:23, 627:8, 627:12, 637:1, 639:10, 641:13, 644:20, 646:14, 646:17, 646:23, 648:21, 655:25, 656:20, 657:20, 658:12, 660:25, 662:24, 663:6, 666:18, 668:6, 669:10, 673:11, 674:18, 676:2, 678:5, 678:12, 679:8, 680:18, 682:23, 684:5, 685:20, 686:19
ones [4] - 513:18, 540:4, 641:12, 654:4
ongoing [1] - 510:11
online [1] - 533:14
ooh [1] - 575:8
Ooh [2] - 560:22, 565:23
open [26] - 453:2, 455:5, 459:15, 471:17, 478:21, 498:13, 510:18, 512:13, 516:15, 518:24, 534:4, 535:17, 536:9, 543:10,

553:3, 555:19, 556:9, 562:5, 630:10, 630:18, 630:23, 690:1, 690:15, 692:16, 693:13, 694:13
**opening** [7] - 589:18, 592:7, 607:11, 608:4, 619:20, 631:17, 651:24
**openings** [1] - 610:1
**openly** [1] - 604:6
**opens** [3] - 496:16, 496:18, 552:25
**operation** [1] - 567:4
**operational** [1] - 534:14
**opinion** [11] - 471:4, 537:15, 641:14, 647:16, 668:6, 668:11, 668:12, 686:23, 686:25, 689:16, 689:18
**opponent** [1] - 512:20
**opportunity** [14] - 472:1, 472:4, 514:10, 541:17, 544:10, 545:11, 557:21, 557:22, 629:22, 631:5, 631:18, 632:21, 634:5, 665:11
**opposed** [6] - 522:6, 529:21, 530:4, 534:20, 544:2, 637:20
**opposite** [1] - 681:22
**option** [2] - 478:21, 507:3
**Options** [1] - 583:10
**OR** [6] - 670:17, 671:6, 671:12, 673:1, 674:10, 675:3
**oral** [8] - 532:4, 583:2, 610:8, 610:13, 629:6, 677:16, 681:21
**oral-anal** [1] - 681:21
**oral-genital** [2] - 610:8, 610:13, 681:21
**Orange** [7] - 477:18, 499:10, 502:8, 503:10, 592:4, 597:13, 605:15
**order** [8] - 456:21, 597:17, 619:9, 674:12, 677:22, 679:5, 681:25, 690:9
**ordered** [1] - 551:1
**ordinary** [2] - 668:23, 675:25
**orgasm** [15] - 465:24, 577:13, 577:14, 577:20, 582:13, 582:20, 583:4, 584:9, 584:25, 585:14, 585:15, 585:17, 585:24, 586:5, 627:18
**orgasmed** [3] - 582:15, 582:25, 583:1
**orgasms** [1] - 560:3
**orientation** [1] - 460:16
**ORIGIN** [1] - 671:12
**origin** [1] - 671:13
**original** [6] - 527:23, 531:22,

532:6, 539:4, 539:6, 539:8
**originally** [3] - 473:23, 515:2, 515:3
**OTHER** [1] - 664:23
**otherwise** [2] - 576:20, 688:22
**ought** [2] - 628:9
**OUTCOME** [1] - 667:11
**outcome** [11] - 593:8, 623:12, 623:15, 623:17, 623:18, 623:19, 666:6, 667:14, 667:19, 667:23, 669:2
**outlined** [1] - 457:9
**outlines** [1] - 609:1
**outset** [2] - 573:1, 574:22
**outside** [8] - 456:25, 460:5, 460:7, 543:6, 617:22, 670:18, 670:20, 680:24
**overall** [1] - 682:22
**overheard** [2] - 453:16, 460:18
**overnight** [1] - 548:18
**overriding** [1] - 635:10
**oversight** [1] - 492:14
**overt** [1] - 596:6
**overtly** [2] - 652:7, 652:12
**overwrite** [1] - 540:3
**overwritten** [2] - 533:7, 537:6
**own** [24] - 457:4, 458:4, 473:10, 512:21, 515:15, 535:21, 545:5, 548:2, 568:16, 571:19, 596:11, 623:20, 630:12, 640:5, 642:5, 647:16, 661:9, 663:1, 664:18, 667:17, 670:4, 670:13, 685:15, 686:23

## P

**page** [10] - 486:5, 488:8, 488:10, 489:6, 542:3, 655:8, 655:10, 688:10, 690:3
**pages** [5] - 515:6, 515:7, 516:22, 519:5, 540:7
**pain** [3] - 461:7, 578:11, 578:14
**painful** [1] - 578:11
**pandemic** [1] - 551:14
**paper** [1] - 685:1
**paragraph** [2] - 688:15, 690:6
**pardon** [5] - 481:17, 496:20, 514:18, 517:8, 545:7
**park** [3] - 480:2, 480:25, 592:14
**part** [46] - 453:16, 460:18, 463:18, 473:13, 473:16, 473:23, 492:15, 498:21, 508:22, 515:11, 527:19,

527:20, 527:21, 563:19, 569:3, 571:5, 574:14, 575:17, 577:15, 577:24, 579:24, 580:16, 581:4, 586:20, 591:21, 591:22, 594:7, 594:23, 609:9, 609:25, 612:5, 616:22, 619:16, 621:15, 621:16, 622:9, 629:14, 654:13, 666:4, 667:9, 670:8, 673:14, 673:23, 677:9, 685:18, 685:19
**partially** [1] - 682:13
**participate** [1] - 552:12
**participated** [1] - 650:15
**participating** [3] - 552:21, 564:22, 638:13
**particular** [10] - 467:10, 468:24, 482:19, 517:14, 520:9, 552:24, 632:19, 649:22, 682:19, 685:18
**particularly** [3] - 518:10, 632:2, 648:22
**parties** [11] - 461:13, 517:4, 518:4, 518:5, 608:25, 645:9, 664:4, 671:24, 672:6, 672:22, 691:12
**parties'** [1] - 664:7
**partners** [1] - 565:13
**parts** [1] - 600:22
**party** [5] - 512:20, 666:18, 671:10, 671:19, 672:4
**pass** [1] - 687:18
**PASSION** [1] - 671:6
**passion** [2] - 671:8, 671:11
**passions** [2] - 609:11, 677:11
**past** [3] - 533:22, 563:3, 692:8
**pasture** [2] - 663:8, 663:10
**path** [3] - 569:17, 576:17, 579:20
**pattern** [1] - 574:21
**Pause** [3] - 486:23, 508:4, 526:10
**pay** [3] - 636:24, 637:13, 654:18
**peaked** [1] - 560:19
**pedophile** [9] - 491:8, 491:12, 492:1, 509:23, 556:20, 556:24, 585:22, 589:9, 589:25
**peep** [1] - 578:8
**peers** [1] - 631:13
**penchant** [1] - 648:4
**pencil** [1] - 684:25
**pending** [4] - 505:17, 507:15, 520:11, 541:7
**penetrate** [1] - 579:5
**penetrated** [1] - 578:14
**penetration** [2] - 578:17, 578:19, 578:23

**penis** [8] - 463:2, 578:9, 578:15, 579:5, 591:10, 609:23, 609:24
**penises** [1] - 629:6
**people** [31] - 456:25, 457:6, 477:11, 486:2, 492:11, 512:18, 513:8, 518:7, 518:10, 525:16, 554:13, 569:9, 579:1, 583:24, 591:13, 615:20, 617:4, 624:4, 624:8, 625:18, 626:2, 626:5, 626:9, 635:14, 636:2, 638:3, 642:10, 643:7, 643:16, 643:19, 650:2
**people's** [5] - 624:9, 635:16, 635:19, 642:3, 649:3
**per** [1] - 542:7
**perceived** [1] - 555:7
**percent** [1] - 581:24
**perception** [1] - 563:2
**perfect** [3] - 596:18, 633:14, 644:25
**perfectly** [2] - 485:2, 644:6
**perform** [6] - 460:5, 552:10, 571:25, 660:17, 671:18, 671:19
**performance** [1] - 661:12
**performer** [1] - 683:16
**performing** [2] - 532:4, 629:5
**period** [4] - 456:25, 511:21, 557:2, 609:21
**permissible** [2] - 485:2, 496:13, 497:10, 498:8, 509:13, 522:7, 527:13, 539:11
**permission** [1] - 540:17
**permit** [2] - 660:10, 671:7
**permitted** [2] - 670:12, 670:25
**persisted** [1] - 454:18
**persistent** [4] - 570:1, 571:5, 612:6, 616:23
**Person** [23] - 500:21, 500:24, 501:2, 501:9, 502:7, 503:7, 503:22, 504:18, 555:3, 599:22, 600:7, 600:10, 601:5, 601:7, 601:8, 601:18, 608:16, 608:19, 613:21, 621:15, 625:22, 626:13, 656:6
**person** [67] - 454:5, 460:14, 460:15, 463:1, 465:4, 465:6, 465:7, 468:21, 469:9, 485:18, 487:20, 494:13, 500:19, 513:13, 519:17, 520:21, 522:13, 530:15, 550:18, 551:7, 551:13, 558:14, 558:15, 558:19, 559:2, 571:17, 587:5, 587:12, 588:8,

599:12, 602:20, 607:4,
607:6, 608:1, 608:19,
609:7, 609:11, 609:20,
615:24, 615:25, 621:14,
621:19, 625:24, 632:12,
636:6, 646:10, 653:18,
655:15, 659:11, 659:20,
661:8, 668:3, 673:19,
673:24, 674:20, 674:23,
675:18, 677:11, 677:17,
678:13, 681:11, 681:16,
681:24, 686:11, 689:18,
693:3, 694:2
**person's** [1] - 609:25
**personal** [8] - 603:5, 603:17,
606:20, 639:6, 656:25,
669:1, 671:21, 689:3
**personality** [2] - 541:13,
665:7
**personally** [2] - 580:21, 681:1
**personals** [1] - 588:15
**persons** [5] - 609:22, 667:2,
669:8, 681:21, 686:11
**persuade** [34] - 557:11,
558:14, 558:19, 559:1,
559:4, 559:13, 560:8,
571:2, 587:5, 587:9,
587:11, 587:13, 587:20,
591:21, 594:21, 606:1,
606:6, 613:5, 614:2, 614:5,
658:5, 659:9, 659:17,
672:20, 674:14, 674:19,
675:6, 675:15, 675:24,
676:4, 676:8, 678:10, 685:6
**PERSUADE** [2] - 674:10,
675:3
**persuaded** [1] - 675:8
**persuades** [1] - 673:16
**persuading** [10] - 493:13,
493:16, 559:20, 568:10,
598:4, 604:14, 611:5,
611:10, 613:6, 678:13
**persuasion** [3] - 558:7,
586:21, 591:22
**pertain** [1] - 667:5
**pertaining** [2] - 509:12,
660:22
**pertains** [1] - 664:8
**pertinent** [2] - 673:14, 673:23
**perv** [4] - 491:25, 492:3,
556:24, 589:9
**pervert** [2] - 492:3, 589:25
**petting** [3] - 504:23, 555:6,
599:16
**phone** [59] - 454:20, 457:12,
458:3, 458:10, 458:12,
491:10, 508:17, 515:9,
518:9, 527:9, 527:15,
527:16, 528:8, 528:10,
528:12, 528:15, 528:17,

528:22, 529:1, 530:9,
530:16, 530:23, 531:1,
531:2, 531:4, 531:14,
532:22, 532:23, 532:24,
532:25, 533:13, 533:14,
533:15, 533:20, 533:21,
534:14, 534:17, 535:7,
537:5, 537:11, 537:19,
551:7, 551:13, 551:15,
599:11, 606:10, 606:22,
606:24, 606:25, 617:21,
617:25, 618:2, 618:10,
629:7, 629:11, 646:15,
646:19
**phones** [1] - 537:21
**photo** [8] - 616:16, 618:18,
618:20, 618:21, 619:16,
620:7, 621:13
**photocopy** [1] - 517:22
**photograph** [8] - 527:9,
527:12, 527:15, 529:25,
530:2, 536:3, 542:4, 679:24
**photographs** [1] - 541:6
**photos** [8] - 531:15, 532:7,
605:1, 617:2, 617:5, 618:1,
657:6, 658:7
**phrase** [1] - 680:16
**phrased** [1] - 691:10
**physical** [10] - 467:23, 468:6,
510:10, 577:17, 578:1,
578:4, 579:16, 596:20,
596:21
**physically** [1] - 478:22
**pic** [19] - 465:15, 524:1,
589:16, 605:3, 605:6,
615:6, 615:9, 616:12,
616:22, 617:8, 618:19,
618:24, 620:5, 620:21,
620:25, 657:18, 657:20
**picked** [1] - 546:13
**pics** [10] - 487:11, 499:6,
502:13, 588:23, 590:11,
591:3, 593:10, 600:15,
657:9
**picture** [23] - 466:1, 466:12,
467:12, 468:3, 468:17,
468:25, 528:24, 532:2,
568:23, 589:4, 615:2,
617:24, 619:11, 620:8,
620:12, 620:13, 620:14,
620:16, 620:18, 628:25,
649:17, 649:19, 679:25
**pictures** [30] - 502:4, 507:11,
507:12, 520:2, 520:17,
530:9, 530:19, 530:21,
531:6, 531:9, 536:25,
538:12, 538:13, 538:17,
540:1, 540:3, 540:5, 540:6,
555:1, 557:8, 600:17,
618:8, 622:13, 624:3,

624:8, 624:14, 629:4,
646:15, 646:18, 649:18
**piece** [2] - 634:19, 662:1
**pieces** [2] - 532:11, 532:12
**pill** [2] - 546:17, 604:18
**pills** [4] - 546:7, 546:8,
546:10, 546:11
**pink** [4] - 504:24, 505:8,
505:19, 599:17
**pinpointed** [1] - 529:23
**pins** [1] - 470:10
**place** [34] - 468:1, 480:2,
480:25, 513:7, 515:25,
530:10, 530:14, 537:7,
545:18, 550:15, 550:18,
550:24, 551:4, 551:6,
562:15, 562:20, 573:16,
592:13, 593:19, 594:19,
595:9, 637:22, 639:3,
639:4, 645:10, 646:21,
646:22, 648:4, 648:9,
648:11, 650:5, 682:9
**placed** [2] - 529:19, 669:22
**places** [1] - 596:10
**plain** [1] - 675:25
**plan** [6] - 459:1, 459:2,
541:18, 665:12, 678:24,
684:16
**planned** [1] - 454:20
**planning** [3] - 454:13, 624:12,
636:16
**plastic** [2] - 546:12, 546:16
**Plattsburgh** [9] - 500:19,
505:15, 509:6, 509:14,
525:8, 599:12, 599:22,
608:19, 625:22
**playing** [2] - 483:24, 584:20
**plays** [1] - 497:11
**plea** [1] - 660:16
**pleaded** [1] - 660:12
**pleased** [1] - 545:16
**pleasurable** [4] - 560:3,
578:10, 583:9, 586:3
**pleasure** [12] - 571:19,
572:11, 577:10, 577:17,
577:19, 578:2, 578:3,
578:4, 578:12, 582:24,
594:23, 595:1
**pleasuring** [1] - 645:17
**plexiglass** [1] - 456:4
**plus** [1] - 467:20
**PM** [15] - 454:13, 482:5,
504:19, 512:13, 555:19,
556:10, 610:9, 630:10,
630:18, 630:24, 690:15,
692:16, 693:14, 694:13,
694:21
**point** [45] - 458:25, 483:14,
485:6, 485:14, 494:6,
497:3, 497:8, 504:12,

520:21, 527:11, 529:8,
530:15, 531:3, 531:23,
534:20, 535:11, 542:24,
544:10, 562:18, 565:21,
575:16, 582:4, 582:14,
605:6, 610:11, 615:10,
620:25, 630:1, 632:10,
636:11, 637:2, 637:4,
637:16, 637:19, 637:23,
638:4, 641:17, 644:15,
646:5, 646:23, 647:24,
658:16, 667:3, 682:6, 694:9
**points** [6] - 550:1, 611:3,
635:9, 635:10, 651:20,
652:4
**police** [42] - 490:16, 490:17,
554:16, 565:24, 590:15,
632:20, 634:17, 635:24,
639:17, 639:20, 639:23,
640:6, 640:8, 641:6, 641:8,
641:20, 641:24, 642:5,
643:10, 643:24, 644:2,
644:8, 644:16, 645:4,
645:12, 645:22, 645:24,
645:25, 646:8, 646:11,
646:25, 647:1, 647:11,
648:14, 649:5, 649:11,
650:25, 655:5, 655:13,
655:16, 655:17
**poor** [1] - 563:16
**porn** [3] - 605:20, 616:25,
617:11
**pornographic** [2] - 624:3,
646:15
**pornography** [14] - 454:19,
508:16, 531:25, 557:13,
614:11, 617:13, 621:6,
621:25, 622:16, 629:2,
629:11, 679:6, 684:3, 684:6
**PORNOGRAPHY** [1] - 679:4
**portal** [1] - 606:18
**portion** [4] - 463:16, 640:10,
642:6, 648:22
**portrayed** [6] - 614:20,
621:11, 679:16, 679:19,
681:16, 683:4
**portrays** [1] - 681:9
**pose** [2] - 682:9, 682:11
**position** [9] - 495:15, 513:19,
552:5, 559:5, 577:6,
602:20, 610:6, 634:15,
654:2
**positive** [3] - 461:3, 588:20,
598:20
**possession** [3] - 529:23,
530:1, 680:3
**possibility** [1] - 643:5
**possible** [8] - 488:2, 488:4,
512:15, 512:16, 582:22,
651:5, 661:17, 687:21

**possibly** [1] - 529:4
**post** [8] - 470:22, 474:1, 560:18, 560:20, 565:5, 567:1, 627:8, 652:15
**posted** [3] - 501:12, 636:6, 653:22
**posting** [1] - 626:19
**postings** [1] - 634:20
**postponed** [1] - 630:2
**posts** [2] - 652:6, 652:10
**potentate** [1] - 631:12
**potential** [1] - 553:14
**power** [3] - 568:17, 568:20, 568:21
**precisely** [1] - 673:7
**preferences** [1] - 664:18
**preferred** [1] - 473:6
**pregnancy** [1] - 591:14
**pregnant** [2] - 579:7, 604:18
**PREJUDICE** [2] - 671:6, 671:17
**prejudice** [8] - 515:15, 530:11, 530:12, 557:20, 660:17, 671:9, 671:11, 671:19
**prejudicial** [3] - 455:19, 516:3, 532:22
**premature** [2] - 458:22, 459:4
**preparation** [8] - 514:13, 541:18, 550:9, 665:12, 678:18, 678:19, 684:10
**preparations** [2] - 678:19, 684:11
**prepare** [1] - 547:16
**prepared** [5] - 513:20, 514:7, 514:14, 515:3, 687:5
**prepuberty** [1] - 509:15
**presence** [3] - 495:3, 529:11, 688:6
**present** [18] - 453:3, 453:6, 453:8, 459:16, 459:21, 474:19, 516:15, 518:25, 547:23, 555:19, 556:10, 565:16, 630:18, 630:24, 637:11, 666:22, 692:16, 693:14
**presented** [7] - 516:21, 523:1, 557:17, 557:23, 559:25, 634:1, 665:24
**presenting** [7] - 469:10, 562:10, 563:23, 565:6, 568:20, 582:18, 589:19
**preservation** [1] - 544:2
**preserve** [3] - 543:24, 689:9, 689:11
**preside** [1] - 687:3
**prestroke** [1] - 497:5
**presumes** [1] - 661:25
**PRESUMPTION** [1] - 661:2
**presumption** [2] - 662:1,

662:3
**presumptions** [1] - 660:9
**pretending** [1] - 578:1
**pretrial** [4] - 456:20, 456:21, 514:6, 551:25
**pretty** [5] - 475:6, 561:13, 562:22, 575:4, 584:6
**prevail** [1] - 685:12
**prevalent** [1] - 597:20
**prevent** [1] - 547:23
**prevents** [1] - 553:12
**previous** [4] - 511:4, 537:13, 545:21, 555:1
**previously** [7] - 514:11, 515:21, 539:16, 680:5, 680:18, 681:3, 684:9
**PREVIOUSLY** [1] - 680:10
**primarily** [1] - 527:2
**printed** [1] - 538:13
**printed-out** [1] - 538:13
**PRIOR** [1] - 669:18
**priority** [1] - 582:9
**Prisons** [2] - 552:10, 552:11
**private** [2] - 580:1, 593:20
**pro** [4] - 495:8, 543:14, 551:22, 552:9
**probative** [1] - 530:12
**problem** [19] - 497:4, 517:17, 564:7, 564:8, 567:18, 589:23, 590:2, 590:3, 590:9, 599:1, 601:16, 627:25, 652:13, 655:12, 655:17, 657:13, 692:10, 692:22
**problematic** [3] - 531:13, 552:22, 589:12
**problems** [2] - 550:3, 603:1
**proceed** [6] - 461:21, 498:18, 519:10, 577:5, 610:5, 692:9
**proceeded** [1] - 522:25
**proceeding** [2] - 459:24, 554:3
**proceedings** [4] - 486:23, 508:4, 526:10, 685:11
**process** [5] - 519:7, 544:14, 569:3, 581:5, 596:4
**processing** [1] - 545:25
**produce** [2] - 661:23, 680:18
**produced** [5] - 614:15, 617:18, 662:15, 679:11, 680:13
**producing** [4] - 517:12, 661:22, 669:17, 674:5
**production** [7] - 614:17, 618:14, 660:2, 679:14, 679:17, 681:7, 683:3
**profession** [1] - 668:5
**professional** [1] - 669:2
**program** [1] - 540:1
**programs** [1] - 575:18

**prohibited** [1] - 610:8
**promise** [1] - 603:10
**promptly** [1] - 687:20
**pronounced** [1] - 572:6
**proof** [11] - 458:16, 459:2, 512:18, 513:6, 531:17, 558:2, 638:6, 661:6, 661:7, 661:17, 663:5
**propensity** [2] - 541:14, 665:8
**proper** [2] - 666:12, 668:24
**properly** [1] - 662:23
**property** [1] - 552:16
**propose** [2] - 456:15, 692:23
**proposed** [7] - 570:13, 581:15, 677:2, 677:4, 677:24, 677:25, 678:4
**proposing** [1] - 564:22
**prosecuted** [1] - 580:5
**prosecution** [5] - 634:19, 647:22, 659:1, 666:22, 672:2
**prosecution's** [2] - 642:5, 689:21
**prosecutor** [18] - 508:11, 522:3, 632:24, 633:11, 633:21, 636:22, 639:11, 641:6, 641:12, 641:17, 643:13, 644:2, 644:15, 646:1, 646:5, 648:12, 650:1, 651:11
**prosecutor's** [3] - 508:14, 632:22, 640:5
**prosecutors** [1] - 639:24
**prove** [38] - 530:20, 558:5, 558:13, 558:25, 559:3, 608:12, 618:9, 651:11, 654:5, 661:3, 661:15, 661:16, 661:19, 662:5, 663:4, 673:4, 673:6, 674:17, 675:4, 675:8, 675:10, 675:17, 676:2, 676:11, 676:22, 677:1, 678:11, 679:5, 679:6, 679:21, 680:6, 680:12, 681:1, 681:6, 681:13, 683:1, 683:21, 684:4
**proved** [7] - 610:25, 611:22, 614:4, 658:10, 668:12, 670:25, 675:21
**proven** [17] - 587:2, 606:2, 607:2, 607:20, 607:21, 608:20, 608:21, 612:22, 614:7, 617:12, 617:14, 617:23, 618:12, 621:8, 621:20, 622:15, 646:2
**proves** [1] - 607:10
**provide** [8] - 491:4, 498:23, 515:20, 517:24, 553:7, 553:8, 604:21, 690:19
**provided** [10] - 456:20, 458:7,

515:21, 527:12, 665:19, 684:25, 686:14, 687:7, 687:8, 688:9
**provides** [4] - 609:7, 609:20, 673:14, 673:23
**providing** [1] - 472:1
**province** [2] - 662:16, 672:18
**proving** [1] - 629:20
**proviso** [1] - 517:5
**psychologically** [1] - 495:10
**psychologist** [5] - 544:18, 545:2, 549:19, 549:20, 551:10
**pubic** [8] - 619:4, 619:9, 681:24, 681:25, 682:2, 682:4, 682:7, 690:8
**public** [8] - 488:11, 489:10, 562:8, 562:19, 563:3, 563:5, 581:16, 649:23
**publicly** [3] - 488:10, 489:10, 655:10
**publish** [1] - 540:17
**publishing** [1] - 540:25
**pull** [1] - 561:6
**pulled** [1] - 513:20
**pulling** [1] - 628:6
**pump** [6] - 493:19, 497:23, 498:21, 554:20, 604:20, 610:22
**punishment** [1] - 686:14
**purchased** [1] - 531:1
**purpose** [11] - 512:24, 518:10, 541:16, 541:20, 598:15, 665:10, 665:14, 669:23, 687:1
**pursuant** [2] - 453:14, 553:22
**pursue** [1] - 458:24
**pursued** [2] - 471:15
**pursuing** [1] - 454:21
**push** [1] - 478:11
**pussy** [16] - 520:3, 520:17, 523:11, 555:2, 577:19, 594:13, 594:25, 605:5, 610:18, 615:9, 616:9, 618:19, 619:17, 620:22, 620:24, 657:20
**put** [27] - 456:8, 456:10, 460:22, 489:4, 524:9, 524:10, 524:13, 528:10, 528:12, 528:22, 529:1, 529:19, 530:16, 530:22, 532:9, 533:9, 538:17, 542:4, 547:5, 562:7, 576:8, 590:24, 603:16, 605:11, 620:16, 650:19, 687:17
**puts** [1] - 563:5
**putting** [7] - 456:4, 571:13, 571:17, 590:21, 591:19, 592:9, 645:3

## Q

**qualify** [1] - 471:17
**quarantine** [1] - 461:11
**queen** [1] - 517:22
**QUESTION** [9] - 640:11, 640:20, 640:23, 641:1, 642:8, 642:14, 642:16, 642:21, 643:4
**questioning** [1] - 485:2
**questions** [28] - 459:25, 460:24, 461:12, 466:20, 472:2, 496:3, 496:7, 497:19, 498:4, 507:21, 518:11, 535:2, 535:3, 535:9, 535:24, 541:21, 553:9, 561:16, 564:10, 564:14, 566:1, 576:25, 598:23, 605:23, 613:4, 624:2, 641:24, 664:16
**quick** [3] - 548:8, 587:10, 605:12
**quickness** [1] - 548:7
**quite** [11] - 458:11, 475:16, 545:20, 550:8, 560:13, 560:25, 588:1, 588:3, 588:6, 588:18, 619:16
**quivers** [1] - 577:19
**quiz** [1] - 609:5

## R

**RACE** [1] - 671:12
**race** [1] - 671:13
**raise** [8] - 453:11, 460:1, 460:9, 462:7, 518:11, 526:11, 550:8, 563:20
**raised** [12] - 460:9, 461:4, 461:9, 461:11, 534:19, 551:21, 554:5, 563:19, 651:20, 652:7, 660:15, 688:25
**ran** [1] - 627:6
**RANDY** [1] - 462:10
**Randy** [25] - 453:6, 459:19, 462:9, 498:15, 516:17, 519:2, 536:11, 555:21, 556:13, 556:19, 557:10, 567:12, 579:13, 586:7, 586:19, 597:11, 629:18, 631:1, 658:8, 659:2, 659:3, 659:8, 659:16, 659:23, 692:18
**rape** [1] - 577:12
**raped** [1] - 563:17
**raping** [1] - 532:3
**rather** [3] - 460:13, 647:21, 653:5
**rational** [3] - 553:13, 554:18, 555:9
**reach** [4] - 465:24, 582:20,
669:12, 672:25
**reached** [1] - 687:10
**reaches** [1] - 583:4
**reaching** [1] - 662:24
**react** [3] - 564:14, 571:23, 578:7
**read** [28] - 460:7, 466:10, 473:22, 480:12, 515:23, 520:12, 520:15, 551:22, 566:12, 596:25, 599:4, 600:24, 609:1, 632:3, 636:22, 638:23, 640:10, 642:6, 645:5, 648:21, 658:18, 685:11, 688:15, 688:19, 688:21, 689:25, 690:4
**reading** [7] - 466:8, 467:19, 479:16, 522:3, 580:17, 656:11
**reads** [2] - 632:5, 659:4
**ready** [10] - 454:11, 478:7, 478:21, 481:20, 540:23, 547:11, 586:12, 603:23, 630:19, 691:24
**real** [13] - 464:10, 490:23, 545:11, 556:22, 557:6, 566:16, 587:9, 598:5, 608:21, 612:16, 629:18, 652:1, 681:11
**realize** [1] - 576:5
**realized** [2] - 647:2, 647:5
**really** [55] - 455:18, 472:16, 504:25, 505:1, 506:7, 506:8, 509:16, 509:17, 509:21, 521:24, 522:11, 522:14, 524:22, 537:4, 544:21, 545:7, 546:6, 547:3, 549:14, 549:18, 550:3, 559:11, 560:12, 562:20, 567:6, 570:3, 570:24, 586:8, 589:17, 592:3, 595:10, 597:16, 598:18, 599:17, 599:18, 608:13, 616:15, 619:22, 630:3, 631:7, 632:10, 632:24, 639:10, 639:18, 641:25, 646:1, 646:10, 646:13, 649:21, 653:20
**reason** [15] - 467:14, 496:15, 513:1, 514:15, 552:22, 553:23, 592:8, 595:24, 601:9, 638:12, 661:6, 663:6, 680:9, 683:8, 689:1
**REASONABLE** [1] - 661:2
**reasonable** [70] - 463:24, 487:24, 554:12, 555:10, 558:2, 587:2, 606:3, 607:3, 607:22, 608:22, 610:25, 611:23, 612:23, 614:4, 614:8, 616:1, 617:12,
617:15, 618:4, 618:12, 621:9, 621:21, 629:20, 637:9, 644:7, 646:2, 650:22, 651:12, 651:13, 652:1, 654:6, 658:11, 661:4, 661:6, 661:8, 661:9, 661:11, 661:15, 661:17, 661:20, 662:4, 662:6, 662:9, 662:13, 663:16, 663:21, 671:1, 673:4, 674:17, 675:5, 675:17, 676:2, 676:12, 676:18, 676:23, 677:2, 678:11, 678:22, 678:23, 679:7, 679:22, 680:13, 681:7, 683:2, 684:4, 684:13, 684:14, 693:7
**reasonableness** [2] - 623:10, 666:10
**reasonably** [1] - 673:5
**reasons** [1] - 456:19
**rebut** [1] - 651:21
**rebuttal** [4] - 526:2, 526:15, 542:19, 651:18
**receipt** [4] - 557:12, 614:11, 621:25, 622:16
**RECEIPT** [2] - 679:4, 679:20
**receive** [24] - 614:13, 614:23, 617:13, 619:1, 621:17, 631:16, 659:23, 679:6, 679:9, 679:23, 680:3, 680:7, 684:3
**received** [9] - 474:20, 518:18, 522:22, 540:16, 614:13, 614:23, 628:8, 628:15, 679:8
**receives** [1] - 673:24
**receiving** [1] - 684:6
**recently** [1] - 533:5
**recess** [5] - 516:14, 555:18, 630:17, 692:15, 694:21
**recognition** [1] - 544:3
**recognize** [7] - 483:8, 511:15, 527:6, 527:14, 538:25, 575:20, 575:25
**recognized** [1] - 580:23
**recollection** [1] - 535:5
**RECOLLECTION** [1] - 685:13
**recommend** [1] - 651:15
**record** [24] - 462:8, 464:18, 466:4, 489:13, 498:14, 516:16, 519:1, 520:15, 521:1, 526:12, 536:6, 536:10, 543:24, 545:22, 555:20, 556:12, 630:25, 664:15, 685:11, 685:12, 685:25, 687:11, 689:15, 692:17
**recross** [1] - 519:12
**RECROSS** [1] - 519:14
**RECROSS-EXAMINATION** [1] - 519:14
**redact** [1] - 517:3
**redacted** [1] - 517:13
**redaction** [1] - 517:22
**redirect** [14] - 454:23, 456:18, 496:11, 507:21, 508:6, 519:7, 519:16, 523:17, 523:20, 525:6, 525:8, 525:20, 542:14, 625:15
**REDIRECT** [1] - 508:8
**redraft** [1] - 454:9
**reduced** [1] - 515:5
**reexamine** [1] - 686:22
**refer** [2] - 465:5, 477:2
**reference** [11] - 455:19, 464:17, 465:7, 477:3, 545:23, 555:7, 573:17, 573:18, 582:7, 636:10, 648:7
**referenced** [3] - 519:19, 600:11, 621:2
**references** [2] - 479:15, 575:5
**referred** [3] - 633:21, 668:16, 669:10
**referring** [9] - 479:11, 502:8, 547:20, 564:2, 575:19, 596:7, 598:8, 610:18, 632:8
**refers** [1] - 683:9
**reflect** [1] - 478:10
**reflects** [1] - 479:16
**refresh** [2] - 535:5, 685:5
**refreshed** [1] - 540:8
**refused** [1] - 600:21
**regard** [9] - 512:14, 551:1, 553:5, 553:17, 554:25, 664:5, 671:3, 672:11, 687:23
**regarding** [4] - 575:15, 664:19, 667:3, 684:22
**regardless** [2] - 676:16, 685:3
**regret** [1] - 492:17
**regularly** [3] - 494:10, 494:13, 533:7
**Reiss** [7] - 557:18, 587:16, 606:7, 606:12, 617:20, 622:22, 622:25
**reject** [4] - 629:14, 657:22, 666:3, 666:13
**relates** [2] - 558:8, 558:9
**relating** [3] - 456:21, 457:15, 558:23
**relationship** [34] - 467:23, 468:6, 508:19, 510:10, 510:11, 510:17, 510:18, 519:25, 522:20, 522:21, 601:22, 619:19, 624:10, 624:12, 634:14, 634:16, 634:24, 635:7, 636:15, 637:10, 637:15, 637:18,

638:16, 638:19, 638:20, 639:16, 639:24, 640:4, 640:9, 641:16, 643:15, 648:1, 651:7
**relationships** [1] - 603:18
**relaying** [1] - 620:23
**relevance** [5] - 508:12, 516:1, 532:21, 534:12, 534:18
**relevant** [13] - 456:22, 459:3, 496:23, 497:5, 512:19, 530:9, 530:23, 619:5, 632:13, 635:3, 648:22, 679:1, 684:18
**relies** [1] - 573:15
**religion** [1] - 671:13
**RELIGION** [1] - 671:12
**rely** [7] - 595:5, 607:9, 647:21, 661:8, 671:4, 685:8, 685:15
**remain** [6] - 512:10, 537:1, 543:8, 554:5, 630:7, 663:23
**remains** [1] - 657:25
**remember** [47] - 457:22, 487:14, 520:8, 551:11, 558:8, 560:20, 561:15, 562:12, 563:11, 564:11, 564:24, 570:7, 575:5, 575:22, 577:12, 577:13, 577:21, 579:1, 583:14, 585:20, 588:7, 591:25, 592:3, 595:17, 595:22, 597:2, 602:13, 603:2, 605:9, 617:4, 625:7, 626:12, 626:25, 627:8, 627:15, 627:21, 652:8, 652:18, 653:1, 656:14, 656:23, 657:10, 657:12, 666:21, 669:15, 694:3
**remembered** [1] - 692:21
**remind** [10] - 453:15, 455:25, 526:21, 526:25, 557:22, 660:6, 664:6, 685:14, 686:6, 692:6
**reminded** [2] - 460:16, 468:5
**removed** [1] - 532:8
**render** [1] - 557:19
**reorient** [1] - 480:17
**repeat** [1] - 587:11
**repeated** [2] - 572:15, 622:3
**repeating** [2] - 571:11, 572:10
**reply** [2] - 565:5, 566:1
**replying** [1] - 589:10
**report** [5] - 456:24, 533:17, 535:15, 535:19, 550:19
**REPORTER** [2] - 461:22, 688:20
**reporter** [2] - 520:14, 690:5
**reports** [1] - 460:7
**represent** [2] - 543:22, 640:3
**representation** [4] - 513:20, 531:23, 543:21, 544:4

**represented** [1] - 543:18
**representing** [1] - 459:19
**request** [10] - 473:15, 473:20, 597:23, 619:15, 619:18, 619:25, 620:21, 622:3, 649:18, 650:6
**requested** [4] - 618:18, 624:3, 657:21, 680:5
**requesting** [1] - 621:5
**requests** [1] - 616:16
**require** [1] - 661:16
**REQUIRED** [1] - 684:19
**required** [7] - 530:20, 632:14, 663:22, 668:14, 670:10, 674:16, 682:19
**requires** [2] - 675:4, 691:3
**requisite** [2] - 553:18, 654:6
**rescue** [1] - 604:19
**research** [3] - 460:5, 487:20, 693:20
**researched** [1] - 495:9
**resentment** [1] - 666:8
**reserved** [1] - 581:11
**Reservoir** [1] - 605:15
**reside** [1] - 537:24
**resided** [1] - 537:11
**resist** [1] - 595:25
**resistance** [1] - 575:11
**resolve** [2] - 603:5, 667:8
**resolved** [2] - 455:9, 488:22
**resource** [1] - 613:10
**respect** [18] - 530:12, 530:19, 530:21, 531:19, 544:19, 589:22, 607:24, 611:3, 634:17, 635:4, 639:17, 649:1, 652:6, 652:16, 654:1, 654:12, 656:2, 657:5
**respects** [1] - 687:13
**respiratory** [1] - 461:7
**respond** [8] - 553:7, 571:14, 571:22, 596:1, 597:24, 645:2, 645:19, 687:20
**responded** [22] - 471:5, 471:7, 473:24, 492:13, 498:24, 507:18, 521:11, 522:18, 523:3, 560:17, 581:13, 588:1, 604:13, 636:5, 636:9, 636:12, 637:5, 639:12, 639:13, 646:6, 650:25, 651:1
**responding** [5] - 497:16, 501:12, 501:17, 598:17, 647:15
**response** [13] - 458:23, 497:21, 503:24, 521:18, 521:23, 531:18, 554:1, 554:2, 555:8, 560:25, 597:21, 640:13, 682:18
**responses** [1] - 516:12
**responsibility** [2] - 631:14,

686:16
**responsible** [1] - 654:9
**responsive** [5] - 468:13, 471:23, 498:1, 507:16
**rest** [2] - 515:20, 542:22
**restaurant** [4] - 644:5, 654:15, 654:17, 654:25
**restrained** [1] - 474:24
**rests** [1] - 526:1
**result** [4] - 544:11, 545:16, 633:4, 663:22
**results** [4] - 454:4, 460:12, 545:18, 667:6
**resume** [5] - 461:1, 692:8, 693:3, 694:3, 694:6
**resumed** [1] - 599:6
**reswear** [1] - 453:11
**resworn** [2] - 459:25, 461:19
**retire** [2] - 689:25, 690:13
**retired** [1] - 690:14
**retiring** [1] - 687:2
**retrieval** [1] - 531:9
**return** [10] - 613:1, 614:9, 629:24, 660:23, 678:6, 684:20, 686:10, 687:12, 687:21, 688:5
**returning** [1] - 687:1
**revealed** [1] - 580:4
**revealing** [1] - 653:7
**reverses** [1] - 603:11
**review** [3] - 533:16, 558:23, 644:3
**reviewed** [2] - 611:12, 686:1
**reviewing** [1] - 669:3
**ridiculous** [1] - 625:5
**rights** [1] - 665:20
**risk** [2] - 691:12, 691:13
**Road** [1] - 605:15
**road** [1] - 495:17
**role** [1] - 631:6
**ROLE** [1] - 660:5
**rolling** [1] - 597:15
**room** [13] - 486:24, 495:2, 529:9, 636:25, 637:11, 638:5, 685:22, 687:2, 688:5, 690:17, 693:23, 694:2, 694:6
**rows** [1] - 548:1
**Ruddy** [5] - 455:25, 462:6, 488:19, 690:18, 692:14
**rule** [7] - 457:19, 457:21, 471:22, 512:4, 514:3, 520:10, 609:16
**Rule** [5] - 457:8, 543:13, 553:21, 553:23, 554:6
**ruled** [5] - 519:3, 529:13, 536:2, 553:2, 554:6
**rules** [3] - 573:14, 573:15, 672:14
**ruling** [6] - 492:22, 512:6,

532:17, 532:19, 539:12, 686:2
**RULINGS** [1] - 664:12
**rulings** [3] - 540:14, 554:4, 664:17
**run** [1] - 535:23
**running** [1] - 495:7
**runs** [1] - 584:3
**rush** [2] - 454:12, 691:10

### S

**sadistic** [1] - 681:22
**sadomasochistic** [1] - 619:3
**safe** [8] - 456:6, 461:17, 562:20, 567:16, 567:18, 594:19, 595:9, 693:5
**safety** [1] - 574:10
**sake** [1] - 543:24
**Samsung** [1] - 537:19
**sandbagged** [1] - 514:8
**sanitary** [1] - 583:12
**satisfied** [3] - 618:4, 618:7, 662:12
**satisfy** [1] - 680:25
**Saturday** [1] - 636:8
**save** [8] - 484:7, 495:1, 585:3, 585:9, 585:10, 612:11, 654:24
**saved** [1] - 533:8
**saw** [17] - 505:9, 505:19, 529:20, 529:25, 535:6, 535:7, 541:6, 546:12, 546:15, 585:20, 587:3, 600:17, 615:18, 635:18, 644:23, 655:22, 655:24
**scares** [2] - 545:6, 549:12
**scary** [2] - 546:4, 547:3
**schedule** [2] - 461:14, 483:16
**scheduled** [1] - 544:12
**school** [19] - 560:6, 568:18, 575:6, 575:10, 575:12, 575:18, 576:4, 576:20, 580:11, 603:1, 603:3, 603:6, 603:11, 605:22, 605:23, 607:17, 627:25
**scope** [6] - 457:13, 458:16, 522:8, 523:19, 525:4, 525:5
**screen** [6] - 483:6, 486:20, 486:21, 489:5, 600:25, 616:14
**se** [5] - 495:8, 542:7, 543:14, 551:22, 552:9
**search** [6] - 534:15, 585:21, 586:4, 605:12, 605:16, 605:19
**seat** [2] - 636:19, 636:20
**sec** [1] - 540:21
**secluded** [1] - 593:20
**second** [16] - 455:22, 494:24,

526:6, 565:22, 587:7, 600:15, 611:24, 615:15, 617:16, 620:21, 625:14, 657:20, 657:22, 676:11, 680:12, 689:23
**secondly** [2] - 634:11, 635:9
**secret** [3] - 571:9, 574:25, 580:4
**secretions** [2] - 506:8, 555:8
**secrets** [1] - 560:1
**Section** [10] - 609:7, 609:19, 673:10, 673:12, 673:14, 673:22, 677:6, 677:13, 678:1, 678:3
**section** [4] - 455:20, 588:15, 632:3, 644:3
**secure** [1] - 558:5
**security** [1] - 573:16
**see** [84] - 454:12, 455:12, 455:23, 458:4, 462:20, 463:5, 466:12, 469:3, 469:5, 469:8, 473:1, 474:11, 483:6, 485:19, 488:17, 495:16, 496:10, 497:11, 505:18, 508:13, 510:21, 514:10, 517:23, 518:10, 519:6, 523:11, 529:20, 536:2, 538:12, 538:14, 543:3, 545:4, 545:10, 545:11, 546:2, 546:25, 547:6, 548:10, 553:6, 560:9, 560:10, 564:21, 569:16, 569:17, 570:15, 571:21, 572:17, 574:12, 574:21, 577:13, 582:2, 583:22, 584:11, 586:15, 586:16, 593:11, 593:12, 595:7, 599:3, 605:3, 605:5, 615:6, 615:8, 615:19, 620:5, 620:24, 621:18, 632:22, 635:25, 636:21, 637:6, 637:9, 646:4, 646:17, 647:24, 649:20, 657:21, 663:8, 667:2, 667:10, 670:24, 691:12, 694:8
**seeing** [8] - 460:9, 461:8, 475:19, 486:18, 516:2, 530:4, 546:4, 548:20
**seek** [1] - 578:19
**seeking** [3] - 473:2, 552:25, 580:22
**seem** [2] - 582:22, 584:7
**sees** [1] - 553:11
**seized** [1] - 533:10
**selectively** [1] - 600:22
**self** [1] - 498:1
**self-serving** [1] - 498:1
**send** [25] - 455:17, 465:15, 465:23, 468:16, 468:18,

499:6, 509:5, 514:15, 514:17, 514:19, 590:11, 593:9, 605:6, 612:4, 615:9, 615:14, 617:8, 620:25, 628:25, 629:2, 649:19, 649:24, 657:9, 657:20, 687:23
**sending** [7] - 503:21, 510:5, 510:25, 520:7, 601:5, 616:9, 622:11
**sends** [1] - 652:15
**sense** [8] - 461:7, 522:21, 615:23, 633:9, 633:10, 661:6, 663:6, 670:22
**senses** [1] - 663:1
**sensitive** [4] - 504:25, 510:2, 573:18, 599:17
**sent** [50] - 464:16, 464:22, 480:18, 483:8, 490:2, 490:6, 490:14, 491:18, 499:19, 501:6, 502:13, 503:4, 503:7, 503:9, 503:18, 504:16, 504:17, 505:14, 507:11, 507:12, 509:14, 514:21, 514:24, 515:4, 524:2, 542:6, 542:8, 551:20, 568:23, 570:5, 570:17, 585:4, 589:4, 589:16, 599:22, 600:10, 600:17, 607:13, 607:15, 610:5, 610:9, 610:17, 614:25, 615:1, 616:20, 617:1, 622:8, 624:13, 649:16
**sentence** [2] - 568:3, 690:4
**sentiment** [1] - 671:11
**separate** [2] - 660:20, 660:23
**separated** [1] - 616:22
**separately** [1] - 660:23
**September** [10] - 482:5, 483:8, 570:18, 585:4, 585:24, 607:13, 610:5, 610:9, 659:6, 659:7
**series** [5] - 456:23, 500:23, 503:15, 514:4, 555:3
**serious** [1] - 671:25
**seriously** [2] - 564:18, 631:7
**serving** [1] - 498:1
**set** [5] - 534:12, 535:12, 536:4, 664:9, 688:22
**setting** [2] - 581:14, 682:8
**seven** [1] - 594:12
**several** [16] - 483:24, 506:17, 508:22, 522:24, 538:2, 545:4, 545:19, 550:11, 554:16, 584:21, 585:1, 627:17, 633:11, 646:20, 669:8
**sex** [194] - 467:16, 467:17, 468:4, 468:16, 470:4,

471:16, 474:9, 474:12, 475:14, 475:17, 475:22, 476:7, 476:16, 477:12, 479:7, 482:16, 482:19, 483:19, 492:7, 492:11, 494:2, 495:23, 510:12, 521:9, 521:15, 521:21, 523:25, 524:3, 524:19, 524:22, 525:1, 525:12, 525:13, 525:17, 532:4, 547:21, 554:14, 554:25, 556:23, 557:3, 557:7, 558:19, 559:20, 561:11, 561:25, 562:3, 562:13, 563:21, 563:24, 564:2, 564:4, 564:18, 564:23, 564:25, 565:19, 566:14, 568:11, 568:15, 571:6, 571:16, 572:5, 573:22, 574:5, 574:18, 577:5, 577:17, 578:4, 578:13, 579:2, 579:4, 579:18, 580:6, 581:5, 581:19, 581:23, 582:16, 582:23, 583:5, 583:21, 583:23, 584:5, 584:24, 585:7, 585:10, 586:3, 586:21, 588:10, 591:10, 591:14, 592:23, 594:6, 594:15, 594:22, 595:19, 595:21, 595:22, 595:23, 595:24, 596:2, 596:22, 597:16, 597:19, 598:18, 602:5, 602:20, 604:3, 604:9, 604:23, 604:24, 605:7, 605:9, 605:11, 605:18, 606:2, 607:5, 610:20, 611:21, 612:12, 612:19, 613:12, 613:16, 614:2, 616:3, 616:11, 619:20, 619:21, 620:3, 620:23, 621:2, 624:5, 624:7, 624:10, 624:11, 624:18, 624:25, 625:3, 625:7, 625:13, 625:18, 625:19, 625:20, 625:22, 625:25, 626:2, 626:6, 626:16, 626:17, 626:21, 626:25, 627:12, 627:24, 628:1, 628:18, 628:20, 628:22, 629:6, 629:10, 632:6, 632:7, 633:13, 633:17, 636:14, 637:24, 638:2, 638:5, 639:1, 644:12, 644:13, 646:11, 648:24, 648:25, 649:2, 651:8, 652:12, 653:15, 654:25, 655:15, 656:16, 657:14, 658:1, 658:3, 658:6, 671:14, 675:13, 675:14, 679:1, 681:22, 684:17

**SEX** [1] - 671:12
**sex-with-children** [1] - 655:15
**Sexual** [1] - 677:13
**sexual** [136] - 458:2, 458:14, 479:8, 484:10, 508:19, 529:14, 529:22, 530:2, 533:22, 553:1, 557:12, 558:8, 558:15, 558:20, 559:2, 559:10, 568:16, 568:19, 571:25, 572:24, 575:12, 575:15, 575:19, 582:3, 587:6, 587:12, 587:21, 591:5, 592:10, 592:17, 593:13, 594:23, 595:1, 596:21, 597:4, 597:12, 601:16, 602:1, 603:7, 604:6, 607:6, 608:24, 609:3, 609:11, 609:14, 609:20, 609:21, 610:20, 611:6, 611:11, 611:16, 611:21, 612:25, 613:23, 613:24, 614:6, 619:3, 619:10, 620:20, 624:12, 624:16, 625:1, 625:12, 626:6, 626:10, 627:11, 627:13, 627:19, 628:2, 628:17, 628:20, 628:22, 629:15, 633:15, 635:7, 635:14, 635:17, 635:22, 636:15, 637:10, 637:14, 637:17, 638:16, 639:10, 639:21, 639:24, 640:4, 640:9, 641:16, 642:3, 642:12, 643:14, 645:1, 645:13, 647:13, 647:16, 647:17, 648:1, 648:6, 649:3, 649:9, 651:6, 651:14, 652:8, 654:7, 656:2, 656:8, 658:4, 659:11, 659:19, 673:18, 674:15, 674:20, 674:25, 675:7, 675:11, 675:16, 676:5, 676:9, 677:2, 677:4, 677:11, 677:14, 677:15, 677:20, 677:24, 677:25, 678:4, 678:15, 681:20, 682:1, 682:10, 682:15, 682:16, 682:18, 690:9
**SEXUAL** [2] - 674:11, 676:25
**sexuality** [3] - 473:13, 596:7, 596:12
**SEXUALLY** [2] - 681:5, 681:18
**Sexually** [1] - 688:11
**sexually** [58] - 463:3, 463:21, 463:23, 465:24, 467:6, 484:2, 484:4, 532:1, 561:24, 563:13, 563:17, 564:16, 573:12, 584:24,

590:6, 593:13, 593:14, 594:9, 594:14, 594:24, 604:2, 604:4, 604:7, 604:25, 614:18, 614:20, 616:16, 617:2, 617:5, 618:15, 618:24, 619:2, 620:9, 620:10, 620:11, 620:12, 620:18, 621:11, 622:6, 624:1, 627:18, 629:5, 629:11, 657:6, 658:6, 660:3, 674:6, 679:15, 679:18, 681:8, 681:12, 681:17, 681:19, 682:9, 683:4, 683:10, 683:12, 683:18

**sexy** [7] - 502:13, 597:14, 597:16, 603:19, 613:9, 613:25, 657:9

**shaker** [1] - 656:20

**shall** [2] - 609:7, 609:20

**shame** [2] - 603:17, 656:22

**shape** [4] - 504:24, 507:10, 507:17, 599:17

**share** [5] - 470:24, 565:9, 569:6, 569:9, 581:8

**shared** [14] - 468:15, 474:6, 521:7, 521:8, 560:1, 563:14, 569:25, 574:25, 604:10, 611:17, 626:10, 626:18, 627:2

**sharing** [5] - 472:20, 473:8, 493:8, 564:21, 616:3

**sharp** [1] - 548:9

**sharp-witted** [1] - 548:9

**shed** [1] - 513:2

**shel** [1] - 583:13

**SHELTRA** [1] - 462:10

**Sheltra** [214] - 453:6, 453:25, 456:24, 458:12, 459:19, 461:18, 461:19, 462:6, 462:9, 462:21, 464:21, 465:21, 466:6, 466:16, 466:23, 470:21, 471:18, 473:1, 477:6, 482:6, 485:3, 487:2, 487:5, 498:15, 498:16, 498:20, 502:24, 503:16, 507:23, 508:10, 511:7, 511:10, 511:14, 512:17, 513:17, 513:21, 516:17, 519:2, 519:8, 519:16, 521:4, 524:2, 524:5, 524:17, 525:22, 533:20, 536:11, 537:19, 543:17, 544:5, 551:12, 552:11, 552:19, 553:12, 554:8, 554:24, 555:4, 555:21, 556:13, 556:19, 557:1, 557:10, 557:25, 559:19, 559:24, 560:13, 561:7, 561:23, 563:11,

563:12, 565:1, 565:15, 565:20, 566:11, 567:7, 567:20, 569:14, 570:17, 571:24, 572:14, 572:18, 573:9, 574:23, 577:24, 578:5, 578:22, 579:21, 583:13, 583:21, 584:13, 586:11, 586:24, 587:4, 587:8, 587:20, 587:23, 588:1, 589:4, 590:21, 592:5, 592:17, 592:21, 593:18, 593:22, 594:7, 596:1, 596:4, 597:9, 597:11, 597:13, 597:24, 598:4, 598:15, 599:7, 599:9, 600:4, 600:19, 601:1, 601:11, 601:21, 602:15, 604:10, 604:11, 604:15, 604:19, 605:7, 605:20, 605:21, 606:4, 606:15, 607:4, 607:18, 607:24, 608:16, 609:3, 609:14, 610:3, 610:14, 610:16, 611:2, 611:9, 612:17, 612:24, 614:5, 614:10, 614:24, 615:18, 616:5, 617:13, 618:18, 621:12, 621:22, 621:24, 622:17, 622:19, 624:15, 628:16, 629:18, 629:21, 631:1, 633:1, 633:8, 633:18, 634:3, 634:12, 634:21, 635:23, 636:4, 636:8, 636:12, 636:17, 636:23, 637:3, 637:4, 637:7, 637:17, 637:23, 637:25, 638:3, 638:4, 638:10, 638:11, 640:7, 641:15, 642:17, 643:14, 645:1, 645:11, 645:23, 646:3, 647:4, 647:24, 649:6, 649:16, 652:2, 652:9, 654:6, 655:4, 655:24, 656:24, 657:1, 657:18, 658:8, 659:2, 659:3, 659:8, 659:16, 659:23, 689:3, 689:4, 692:18, 694:18

**Sheltra's** [30] - 454:19, 458:1, 458:4, 513:25, 528:8, 532:24, 551:19, 552:6, 552:16, 552:18, 553:17, 559:12, 560:25, 562:10, 564:13, 572:22, 597:4, 597:20, 600:9, 607:7, 617:24, 623:22, 629:7, 634:13, 635:10, 635:15, 638:21, 639:15, 648:4, 658:4

**shift** [3] - 483:15, 483:22, 583:6

**shifts** [1] - 661:18

**shipped** [3] - 659:25, 674:1, 674:3

**shoes** [1] - 559:9

**short** [2] - 592:3, 632:18

**shortcut** [1] - 458:9

**shorter** [1] - 516:5

**shortest** [1] - 457:16

**shortly** [2] - 482:8, 504:13

**shortness** [1] - 461:8

**shot** [2] - 502:14, 620:20

**show** [13] - 511:3, 541:4, 557:24, 558:1, 583:7, 593:11, 616:21, 628:13, 641:3, 655:6, 655:16, 664:24, 683:13

**showed** [12] - 491:12, 557:4, 600:16, 612:9, 612:10, 612:13, 613:19, 613:22, 626:15, 628:1, 640:18, 652:18

**shower** [15] - 478:7, 481:2, 481:23, 482:12, 482:15, 482:17, 483:3, 583:15, 592:6, 592:21, 597:18, 597:22, 597:23, 612:18, 626:15

**showered** [4] - 583:18, 583:19, 586:25, 654:24

**showers** [4] - 583:14, 592:22, 597:19, 612:19

**showing** [1] - 590:9

**shown** [1] - 683:19

**shows** [11] - 534:12, 535:25, 600:18, 611:12, 611:15, 612:2, 613:7, 613:14, 628:16, 629:17, 640:23

**shy** [1] - 502:13

**sic** [6] - 458:24, 562:5, 644:6, 669:19, 669:20, 675:3

**sic]** [2] - 570:19, 652:25

**side** [4] - 557:20, 587:14, 664:22, 666:20

**sign** [3] - 461:15, 685:20, 687:12

**signed** [4] - 579:14, 586:7, 652:11, 687:18

**significant** [1] - 453:13

**significantly** [1] - 530:3

**similar** [2] - 561:13, 647:10

**simple** [1] - 633:3

**simplistic** [1] - 633:6

**simply** [6] - 466:20, 532:8, 560:18, 562:25, 639:12, 680:16

**simulated** [1] - 681:20

**single** [10] - 457:7, 531:20, 531:24, 532:12, 614:25, 627:18, 639:25, 641:13, 655:15, 666:16

**shifts** (continued...)

**singular** [3] - 471:2, 471:3, 627:8

**sit** [4] - 494:5, 508:10, 547:8, 631:14

**site** [2] - 588:13, 588:14

**sitter** [1] - 637:13

**sitting** [8] - 505:2, 506:25, 535:1, 546:18, 569:15, 599:10, 599:20, 656:17

**situation** [13] - 460:23, 468:4, 469:12, 485:21, 494:5, 561:5, 563:1, 570:6, 575:21, 576:6, 581:7, 582:21, 634:9

**situations** [1] - 575:24

**six** [5] - 456:2, 530:14, 605:17, 605:18, 620:17

**six-feet** [1] - 456:2

**size** [2] - 537:5, 537:9

**skilled** [1] - 584:6

**sleep** [7] - 467:9, 586:12, 593:2, 593:10, 595:2, 645:14, 645:17

**slept** [1] - 586:25

**slide** [32] - 464:3, 464:15, 466:3, 470:19, 472:24, 475:25, 476:9, 476:19, 477:2, 480:6, 481:7, 482:2, 486:17, 489:12, 489:22, 490:4, 490:12, 491:16, 493:1, 499:16, 500:1, 500:17, 501:4, 501:20, 502:23, 503:13, 504:15, 560:15, 560:24, 586:6, 596:5, 618:5

**slides** [1] - 622:21

**slight** [1] - 609:25

**slightest** [1] - 671:8

**slightly** [1] - 494:20

**slipped** [1] - 485:10

**slowly** [2] - 577:5, 610:5

**small** [5] - 504:23, 507:8, 599:16, 632:3, 666:15

**smart** [1] - 648:16

**smell** [1] - 461:7

**smile** [4] - 521:24, 592:22, 603:14, 603:15

**smiley** [5] - 487:12, 569:21, 590:12, 591:8, 620:25

**smoke** [1] - 616:14

**snobby** [1] - 603:16

**snuggle** [1] - 590:25

**snuggling** [1] - 581:25

**social** [1] - 690:17

**societally** [1] - 575:9

**society** [11] - 491:24, 556:23, 564:7, 564:8, 589:8, 589:22, 589:23, 589:24, 590:1, 590:3

**society's** [1] - 567:18

**soda** [1] - 470:8
**sole** [6] - 606:13, 662:16, 663:23, 664:6, 665:22, 672:18
**solely** [5] - 663:17, 670:23, 685:15, 686:6, 686:25
**solid** [1] - 608:2
**solution** [1] - 544:20
**solves** [1] - 692:22
**someone** [26] - 461:3, 468:18, 487:24, 495:16, 504:9, 520:7, 542:6, 559:5, 559:9, 559:23, 567:21, 574:12, 574:13, 590:25, 595:11, 623:7, 631:11, 633:16, 633:17, 634:25, 635:13, 641:25, 642:24, 644:11, 649:24
**sometimes** [5] - 466:19, 472:2, 497:20, 649:25
**somewhere** [1] - 578:19
**soon** [6] - 569:13, 569:19, 586:18, 587:24, 595:6, 608:4
**sooner** [4] - 458:7, 514:22, 514:24, 653:5
**sore** [1] - 461:6
**sorry** [24] - 473:19, 475:18, 475:20, 480:11, 481:25, 483:7, 483:13, 491:3, 504:18, 508:15, 522:17, 524:9, 524:15, 525:11, 550:22, 574:20, 578:5, 585:22, 596:24, 615:15, 622:24, 623:9, 624:19, 637:3
**sort** [5] - 536:21, 616:6, 635:15, 650:6
**sound** [3] - 588:2, 588:18, 642:23
**sounded** [1] - 602:16
**sounds** [4] - 475:5, 531:5, 561:13, 581:16
**source** [1] - 454:4
**South** [9] - 587:1, 641:19, 643:24, 644:12, 646:3, 646:24, 651:7, 654:12, 654:22
**sovereign** [2] - 551:22, 552:14
**span** [1] - 537:24
**spank** [1] - 603:20
**speaking** [2] - 632:4, 689:15
**special** [3] - 561:4, 571:8, 668:4
**SPECIALIZED** [1] - 670:17
**specialized** [1] - 671:2
**specific** [21] - 470:24, 531:10, 546:22, 559:3, 560:21, 566:1, 587:13, 611:12,

613:5, 619:16, 621:15, 622:6, 622:12, 626:6, 627:9, 649:19, 649:21, 657:11, 675:6, 675:14, 683:15
**specifically** [2] - 606:17, 647:25
**specifics** [1] - 484:17
**specify** [1] - 687:24
**speculation** [4] - 529:2, 537:14, 643:1, 661:10
**speculative** [2] - 537:12, 537:18
**speech** [6] - 631:23, 631:24, 631:25, 632:9, 678:25, 684:16
**spend** [2] - 582:8, 593:20
**spent** [1] - 643:13
**spill** [1] - 576:23
**spokesperson** [1] - 687:3
**spread** [1] - 620:16
**spring** [1] - 544:13
**spurred** [1] - 561:1
**stability** [1] - 573:16
**staff** [1] - 688:2
**stage** [2] - 556:14, 557:16
**stages** [1] - 657:8
**stalker** [4] - 491:25, 556:24, 589:9, 590:1
**stall** [1] - 544:9
**stand** [10] - 460:1, 461:20, 498:16, 514:16, 519:8, 526:8, 547:5, 552:11, 670:13, 672:7
**standby** [1] - 543:21
**standpoint** [1] - 633:2
**start** [4] - 530:6, 601:19, 690:22, 691:2, 691:7, 693:1
**started** [8] - 570:14, 575:7, 576:17, 589:2, 592:1, 637:23, 638:19, 653:23
**starting** [6] - 563:10, 572:22, 572:25, 575:2, 576:2, 581:14
**starts** [4] - 533:12, 540:3, 546:19, 581:22
**state** [17] - 462:8, 497:8, 526:12, 553:3, 573:23, 609:2, 610:15, 617:22, 668:19, 672:24, 675:9, 676:17, 680:19, 680:22, 681:2, 681:3, 687:24
**statement** [16] - 457:4, 463:25, 475:16, 498:20, 512:20, 554:11, 554:12, 554:15, 562:10, 569:8, 607:9, 631:17, 669:20, 670:1, 670:5, 670:7
**statements** [7] - 512:21, 512:23, 554:16, 554:25,

555:1, 668:9, 669:22
**STATEMENTS** [2] - 664:11, 669:18
**States** [19] - 453:5, 453:7, 459:18, 459:20, 498:14, 516:16, 519:1, 536:10, 555:20, 556:12, 630:25, 659:2, 672:3, 673:10, 673:11, 673:13, 673:22, 680:19, 692:17
**statin** [1] - 546:17
**stating** [1] - 555:4
**statute** [13] - 592:18, 609:13, 609:19, 621:6, 632:5, 648:23, 673:12, 673:21, 674:8, 675:12, 676:1, 677:15, 678:6
**statute]** [1] - 673:20
**statutes** [6] - 455:8, 609:2, 610:4, 610:23, 664:8, 678:5
**STATUTES** [1] - 673:8
**stay** [9] - 522:8, 525:6, 526:8, 529:10, 540:9, 573:5, 573:14, 602:5
**staying** [1] - 523:13
**step** [28] - 525:22, 542:16, 611:7, 611:25, 612:5, 612:7, 612:15, 612:18, 613:18, 613:19, 613:22, 622:1, 622:7, 622:13, 625:14, 642:23, 644:19, 644:24, 678:17, 678:18, 678:20, 678:25, 684:8, 684:9, 684:12, 684:17
**steps** [4] - 485:19, 485:24, 587:8, 587:20
**still** [28] - 458:18, 480:1, 498:16, 519:8, 523:11, 563:11, 572:7, 576:10, 576:13, 578:12, 579:21, 585:6, 589:15, 589:16, 590:5, 592:5, 592:11, 595:19, 598:9, 603:16, 604:3, 605:5, 613:24, 620:24, 654:18, 654:21, 657:21, 685:11
**stimulate** [4] - 577:6, 582:4, 610:7, 610:11
**stimulation** [4] - 583:2, 619:10, 682:1, 690:9
**sting** [1] - 489:18
**stipulated** [1] - 662:20
**stipulation** [7] - 455:7, 455:20, 608:25, 609:5, 609:6, 664:4, 664:7
**STIPULATIONS** [1] - 664:3
**stop** [6] - 510:23, 586:22, 589:13, 601:10, 601:20, 606:1
**stopped** [3] - 547:19, 653:7,

653:10
**stops** [1] - 628:6
**storage** [1] - 537:21
**stored** [2] - 536:25, 680:1
**stories** [1] - 620:23
**story** [1] - 634:5
**straight** [3] - 607:7, 693:22, 694:6
**strategic** [1] - 552:4
**stress** [1] - 631:7
**stretched** [1] - 604:1
**STRICKEN** [1] - 664:11
**stricken** [1] - 664:14
**strike** [9] - 466:19, 468:8, 492:19, 505:16, 505:25, 507:14, 529:22, 642:19, 644:11
**strikes** [2] - 515:23, 530:25
**stroke** [23] - 495:9, 495:10, 495:14, 495:24, 495:25, 496:1, 496:9, 496:15, 497:1, 497:4, 497:9, 497:11, 544:17, 545:21, 548:11, 548:16, 549:1, 552:3, 552:22, 552:23, 553:2, 553:17
**strokes** [1] - 548:4
**strong** [1] - 563:3
**strongly** [1] - 455:10
**struck** [1] - 529:15
**struggled** [1] - 544:16
**struggling** [1] - 583:6
**study** [1] - 668:5
**stuff** [14] - 497:10, 562:21, 575:6, 576:2, 579:16, 592:8, 601:13, 601:15, 618:9, 620:1, 626:20, 627:3, 627:10, 656:9
**stuff's** [1] - 560:7
**subimages** [1] - 531:25
**subject** [7] - 458:1, 485:4, 514:13, 540:14, 541:7, 663:21, 687:25
**subjects** [1] - 512:18
**submit** [36] - 578:2, 578:10, 583:21, 600:23, 612:4, 615:16, 616:13, 624:20, 632:23, 633:6, 633:14, 635:3, 635:6, 635:11, 635:14, 635:21, 637:16, 638:6, 638:18, 638:21, 639:3, 639:15, 641:21, 641:23, 643:25, 644:7, 645:6, 645:7, 647:10, 648:25, 650:20, 651:10, 654:3, 656:11, 657:22, 689:17
**subsection** [1] - 688:12
**subsequent** [1] - 513:18
**substance** [1] - 531:20

**substantial** [21] - 532:24, 611:7, 611:24, 611:25, 612:2, 612:5, 612:7, 612:15, 612:18, 613:18, 613:19, 613:22, 622:1, 622:7, 622:13, 678:17, 678:18, 678:25, 684:8, 684:9, 684:17
**substantive** [1] - 628:12
**SUBSTANTIVE** [1] - 672:8
**substitute** [2] - 541:11, 665:5
**Successfully** [1] - 521:11
**suck** [1] - 577:18
**sucking** [3] - 594:13, 594:25, 610:18
**suddenly** [1] - 601:10
**sufficient** [7] - 640:8, 643:25, 654:2, 654:5, 661:17, 663:12, 680:25
**suggest** [5] - 472:8, 625:4, 632:1, 643:8, 667:22
**suggested** [8] - 454:20, 474:9, 569:14, 615:12, 648:8, 648:17, 654:14, 656:20
**suggesting** [2] - 637:21, 656:19
**suggestive** [1] - 682:9
**suggests** [1] - 682:15
**summarized** [1] - 664:10
**summation** [4] - 557:21, 558:1, 611:12, 629:23
**Sunday** [1] - 478:7
**supervising** [1] - 650:13
**supervision** [1] - 568:18
**supervisor** [1] - 650:13
**supplies** [1] - 517:24
**support** [6] - 491:4, 498:22, 598:20, 604:22, 663:22, 689:19
**supported** [4] - 629:16, 668:11, 668:12, 691:22
**supportive** [1] - 613:9
**supports** [1] - 666:10
**suppose** [1] - 635:21
**supposed** [4] - 549:21, 561:17, 570:7, 642:22
**surprised** [4] - 530:24, 531:12, 637:7, 638:3
**surrender** [1] - 686:24
**surrounding** [1] - 675:22
**suspicion** [1] - 661:10
**sustained** [5] - 475:9, 475:12, 488:3, 488:6, 508:13
**suv** [1] - 479:21
**sway** [2] - 623:19, 667:16
**swear** [1] - 462:6
**sweet** [2] - 597:14, 611:17
**sweet-talking** [1] - 597:14
**swimming** [6] - 503:19,

503:25, 599:24, 599:25
**sworn** [6] - 460:3, 462:11, 526:9, 526:15, 660:13, 662:17
**symbol** [10] - 487:12, 521:25, 569:21, 579:1, 581:19, 586:8, 586:16, 592:22, 603:14, 603:15
**sympathy** [4] - 557:20, 661:13, 671:8, 671:11
**SYMPATHY** [1] - 671:6
**symptoms** [1] - 461:5
**system** [6] - 528:17, 538:23, 631:8, 631:9, 654:4, 654:11

# T

**taboo** [23] - 470:24, 471:3, 471:9, 471:15, 472:9, 474:5, 560:21, 560:22, 561:14, 561:19, 561:22, 562:20, 569:9, 569:25, 611:18, 626:18, 626:19, 626:23, 626:24, 627:1, 627:5, 627:7, 627:9
**taboos** [2] - 470:2, 470:4
**tactics** [1] - 602:3
**Tails** [5] - 482:9, 583:20, 587:1, 612:10, 655:6
**TAKING** [1] - 684:24
**talks** [7] - 559:5, 559:9, 571:10, 573:8, 577:21, 581:22, 647:14
**target** [1] - 474:25
**target's** [1] - 475:2
**targeted** [1] - 650:24
**taste** [3] - 461:7, 502:16, 572:3
**taught** [2] - 560:6, 642:8
**teach** [1] - 571:22
**teacher** [2] - 571:21, 572:13
**teaching** [3] - 571:19, 572:21, 575:6
**team** [1] - 543:19
**technical** [1] - 555:25
**techniques** [1] - 665:19
**telephone** [9] - 454:2, 527:3, 664:1, 676:15, 676:19, 680:21, 680:24, 681:2, 681:3
**television** [1] - 546:21
**tellingly** [1] - 600:2
**temporarily** [1] - 536:23
**ten** [5] - 561:13, 568:17, 607:11, 607:14, 607:16
**ten-year-olds** [1] - 568:17
**tending** [1] - 664:24
**tends** [1] - 663:4
**term** [11] - 464:24, 465:8, 506:7, 509:23, 509:25,

556:19, 621:6, 681:9, 683:9, 688:17, 690:6
**terms** [7] - 455:25, 530:9, 530:13, 555:1, 634:25, 642:21, 647:14, 652:11, 675:24
**terrible** [1] - 547:7
**test** [7] - 454:4, 460:12, 461:22, 529:16, 530:11, 545:19, 545:21
**tested** [1] - 461:3
**testified** [40] - 462:12, 468:20, 468:22, 468:24, 472:12, 474:16, 474:20, 475:5, 475:13, 484:14, 484:16, 485:9, 500:13, 510:5, 519:16, 523:24, 524:25, 525:8, 525:11, 526:16, 554:8, 593:5, 599:8, 606:24, 617:4, 633:18, 634:3, 638:11, 638:17, 641:6, 643:10, 643:16, 648:18, 650:15, 653:1, 655:4, 655:10, 667:14, 669:12
**testifies** [2] - 458:23, 662:25
**testify** [17] - 533:5, 622:19, 622:23, 622:25, 623:18, 623:19, 646:18, 647:4, 667:15, 667:16, 667:23, 669:10, 670:11, 670:12, 670:14, 670:24
**testifying** [4] - 533:25, 601:11, 666:7, 666:15
**TESTIFYING** [1] - 670:9
**TESTIMONY** [1] - 664:11
**testimony** [76] - 457:14, 457:25, 469:1, 473:18, 474:13, 484:24, 485:5, 487:15, 497:4, 512:24, 513:7, 513:25, 514:2, 514:9, 516:1, 520:6, 520:22, 523:9, 524:22, 528:7, 565:14, 591:13, 593:6, 593:7, 600:9, 614:24, 615:11, 622:18, 623:1, 623:8, 623:10, 623:11, 623:22, 625:17, 629:14, 640:20, 650:9, 657:13, 662:18, 664:14, 665:16, 665:23, 666:2, 666:3, 666:5, 666:10, 666:11, 666:12, 666:15, 666:17, 666:24, 666:25, 667:1, 667:4, 667:9, 667:18, 667:20, 667:25, 668:8, 668:14, 668:18, 668:21, 669:1, 669:4, 669:5, 669:19, 669:21, 669:24, 670:1, 670:3,

670:8, 670:15, 683:20, 685:16, 685:18
**tethered** [1] - 572:7
**text** [70] - 456:23, 458:12, 466:6, 466:9, 466:23, 467:19, 468:20, 468:25, 469:6, 486:11, 493:3, 494:7, 494:10, 495:15, 499:19, 500:3, 503:18, 509:1, 509:5, 510:6, 510:13, 510:19, 510:23, 510:25, 511:17, 512:14, 513:2, 513:21, 514:5, 515:7, 516:25, 517:2, 518:8, 518:14, 522:10, 523:14, 523:25, 524:5, 529:17, 547:8, 588:11, 594:11, 595:16, 596:25, 598:11, 606:25, 610:17, 613:7, 613:25, 614:1, 614:25, 615:5, 615:20, 615:21, 616:9, 616:10, 616:20, 617:7, 621:1, 621:3, 622:8, 622:11, 627:15, 649:16, 649:24, 654:18, 657:12
**texted** [4] - 467:16, 481:11, 602:17, 620:9
**texting** [7] - 495:15, 523:24, 599:6, 599:23, 615:13, 615:23, 616:8
**texts** [17] - 462:21, 463:1, 468:21, 503:15, 521:20, 599:3, 602:14, 602:24, 606:19, 615:1, 615:2, 615:19, 616:20, 622:4, 623:24, 624:13, 657:5
**thankfully** [1] - 619:11
**THE** [238] - 453:10, 453:25, 454:7, 454:8, 455:1, 455:11, 455:16, 455:24, 456:10, 457:10, 457:21, 458:19, 459:1, 459:7, 459:11, 459:13, 459:23, 460:4, 461:22, 461:24, 462:3, 462:9, 462:13, 462:15, 462:16, 464:17, 466:17, 468:11, 468:14, 471:21, 475:9, 475:12, 477:1, 479:14, 481:12, 481:14, 481:16, 481:18, 485:1, 486:24, 488:3, 488:6, 488:17, 488:21, 492:21, 492:23, 494:20, 494:25, 495:5, 495:12, 495:19, 495:22, 495:25, 496:12, 497:3, 497:14, 497:20, 498:12, 498:14, 504:3, 505:18, 507:17, 507:22, 508:3, 508:6,

508:13, 509:10, 509:12,
511:6, 511:11, 511:13,
512:3, 512:14, 513:5,
513:10, 513:12, 513:15,
514:11, 514:17, 514:19,
514:21, 514:24, 515:1,
515:11, 515:14, 516:11,
516:16, 517:6, 517:9,
517:11, 517:16, 517:18,
517:21, 518:2, 518:5,
518:15, 518:17, 518:19,
518:23, 519:1, 519:12,
520:8, 520:14, 520:20,
522:5, 523:19, 523:22,
524:4, 524:12, 524:15,
525:5, 525:20, 525:22,
525:25, 526:2, 526:7,
526:13, 527:12, 528:4,
529:3, 529:8, 529:13,
530:24, 531:11, 531:23,
532:10, 532:13, 532:16,
533:11, 533:18, 534:11,
534:23, 535:3, 535:5,
535:18, 535:20, 535:24,
536:10, 536:14, 537:3,
537:14, 538:1, 538:5,
538:7, 538:11, 538:14,
538:16, 538:19, 538:21,
539:11, 539:16, 539:20,
540:14, 540:18, 541:2,
541:23, 542:14, 542:16,
542:17, 542:19, 542:22,
542:24, 543:11, 543:16,
543:20, 544:6, 548:11,
548:12, 548:13, 548:15,
548:17, 548:18, 548:20,
548:22, 548:23, 548:24,
548:25, 549:2, 550:5,
550:11, 550:14, 550:15,
550:20, 550:25, 551:5,
551:8, 551:11, 552:8,
554:1, 554:4, 555:17,
555:20, 556:3, 556:7,
556:11, 630:1, 630:11,
630:15, 630:19, 630:21,
630:25, 643:2, 651:18,
657:3, 658:16, 660:5,
664:12, 667:11, 671:17,
672:8, 673:8, 674:9,
676:21, 679:3, 688:8,
688:13, 688:16, 688:20,
688:21, 688:23, 688:25,
689:9, 689:12, 689:20,
690:2, 690:16, 691:9,
691:17, 692:5, 692:13,
692:17, 693:12, 693:15,
694:14, 694:17, 694:19
**theme** [3] - 566:10, 571:11,
689:21
**themselves** [5] - 636:6,
640:3, 641:2, 649:6, 661:5

**there'll** [1] - 603:13
**thereafter** [4] - 504:13,
548:14, 693:7, 694:7
**therefore** [5] - 516:1, 616:19,
661:7, 663:21, 667:17
**therein** [2] - 513:7, 515:24
**thereof** [3] - 609:9, 663:18,
677:9
**they've** [4] - 531:6, 540:7,
591:24, 690:24
**thick** [4] - 521:24, 522:11,
522:14, 586:8
**thinking** [28] - 457:21,
457:24, 468:18, 483:24,
522:25, 523:4, 544:13,
544:20, 545:2, 545:3,
547:2, 549:21, 564:15,
564:16, 572:3, 572:20,
582:11, 584:21, 585:1,
603:23, 604:1, 605:19,
621:3, 627:5, 634:13,
639:5, 639:7, 642:25
**thinks** [3] - 454:4, 579:18,
588:5
**third** [14] - 487:8, 494:10,
504:16, 504:17, 558:18,
600:25, 613:21, 618:14,
621:8, 634:19, 635:20,
656:6, 676:22, 681:6
**Thornton** [24] - 457:11,
457:25, 515:11, 526:4,
526:7, 526:13, 526:19,
529:18, 531:13, 532:6,
532:18, 533:5, 534:16,
534:24, 536:18, 537:15,
538:6, 538:24, 539:23,
542:2, 600:18, 606:24,
646:17
**THORNTON** [1] - 526:14
**Thornton's** [3] - 457:14,
458:9, 515:8
**thoughts** [5] - 627:16, 645:15,
650:8, 679:1, 684:17
**three** [27] - 474:9, 478:17,
492:16, 500:24, 503:1,
515:6, 516:21, 522:24,
525:16, 564:22, 564:25,
582:17, 600:10, 607:20,
625:17, 626:5, 629:21,
634:1, 635:3, 653:12,
659:3, 660:21, 674:23,
679:14, 685:23, 690:25
**THREE** [1] - 676:21
**Three** [1] - 659:21
**three-level** [1] - 478:17
**throat** [1] - 461:6
**throughout** [3] - 544:14,
582:11, 662:2
**throws** [1] - 465:9
**Thursday** [1] - 453:1

**tight** [2] - 595:11, 595:14
**timeline** [1] - 537:18
**timing** [4] - 492:13, 492:14,
510:20, 554:25
**tingly** [1] - 547:20
**tipped** [1] - 487:17
**tired** [4] - 628:5, 691:4, 691:5,
692:3
**Title** [4] - 673:10, 673:11,
673:13, 673:22
**tits** [4] - 502:15, 504:23,
507:8, 599:16
**TO** [3] - 674:10, 674:11, 675:2
**today** [12] - 454:12, 461:14,
484:18, 508:10, 632:21,
650:19, 651:22, 686:5,
691:2, 691:23, 692:2,
692:21
**together** [14] - 483:24,
547:17, 560:2, 564:23,
565:9, 567:17, 569:8,
571:8, 574:25, 576:15,
583:21, 584:20, 611:18
**token** [1] - 672:5
**tomorrow** [5] - 692:3, 692:7,
692:8, 693:22, 694:9
**tones** [1] - 479:8
**tongue** [4] - 577:6, 577:7,
610:6, 610:7
**tonguing** [2] - 577:22, 584:9
**took** [30] - 474:8, 477:21,
478:7, 485:24, 493:13,
493:16, 513:7, 515:25,
522:23, 530:10, 530:14,
546:10, 550:15, 550:24,
552:14, 565:5, 583:14,
586:24, 597:22, 604:14,
606:7, 611:6, 612:15,
612:18, 622:1, 622:13,
646:21, 646:22, 648:9,
648:11
**top** [2] - 547:9, 574:24
**total** [2] - 527:21, 561:2
**totally** [2] - 502:14, 582:10
**touch** [1] - 575:7
**touch/bad** [1] - 575:7
**touched** [3] - 500:13, 656:8,
663:2
**touching** [1] - 582:9
**touching/exploring** [1] -
581:25
**toward** [4] - 579:10, 611:7,
622:1, 666:8
**towards** [9] - 579:17, 598:5,
612:15, 622:7, 622:13,
652:8, 671:19, 678:17,
684:8
**track** [1] - 486:8
**tracks** [1] - 663:8
**traction** [1] - 552:5

**trained** [1] - 572:16
**training** [6] - 474:20, 537:23,
563:7, 642:8, 668:4, 668:13
**transcript** [1] - 522:4
**transcripts** [1] - 645:5
**transmission** [1] - 676:14
**transmitted** [1] - 676:19
**transpiring** [1] - 552:20
**transported** [12] - 614:14,
614:16, 617:17, 617:18,
659:25, 674:1, 674:3,
679:10, 679:12, 680:14,
680:16, 681:1
**transposed** [1] - 522:19
**traveled** [3] - 618:2, 618:10,
654:22
**traveling** [2] - 644:12, 654:12
**treat** [1] - 479:22
**Treena** [44] - 468:5, 494:4,
494:8, 495:22, 497:25,
510:6, 510:8, 510:9,
511:17, 512:25, 513:4,
513:9, 513:10, 513:21,
517:2, 518:7, 519:17,
519:20, 519:23, 522:19,
522:20, 522:22, 523:1,
523:3, 523:4, 523:6, 523:7,
523:10, 523:25, 524:3,
545:10, 615:14, 615:15,
615:16, 615:19, 615:22,
616:7, 616:8, 616:12,
616:13, 620:1, 657:13,
657:15, 657:23
**Treena's** [1] - 495:16
**trial** [38] - 453:9, 453:21,
459:22, 460:13, 461:1,
484:18, 514:13, 515:22,
541:8, 541:9, 544:14,
547:12, 550:9, 552:12,
556:14, 565:15, 628:9,
631:6, 631:16, 660:8,
662:2, 662:16, 663:18,
664:17, 665:2, 665:3,
667:19, 669:9, 669:11,
669:21, 669:24, 670:1,
670:2, 684:25, 685:2,
686:8, 686:11
**tried** [7] - 467:17, 521:9,
522:16, 522:19, 523:5,
602:3, 619:14
**triers** [1] - 654:4
**tries** [1] - 559:22
**triggered** [7] - 523:7, 524:3,
547:19, 554:24, 616:2,
616:5, 657:14
**triple** [2] - 546:3, 547:4
**triple-check** [1] - 547:4
**triple-checking** [1] - 546:3
**trouble** [13] - 549:3, 560:5,
566:3, 566:6, 566:8,

567:15, 567:21, 567:23, 576:10, 576:21, 590:17, 647:6, 649:4
**troubled** [6] - 490:24, 513:24, 516:23, 516:24, 598:16, 598:20
**troubling** [1] - 518:10
**true** [42] - 469:20, 472:13, 474:14, 501:17, 502:21, 505:7, 506:21, 506:23, 506:25, 507:2, 507:4, 507:5, 507:8, 507:10, 507:23, 549:12, 585:25, 600:13, 600:20, 600:22, 600:25, 601:7, 601:9, 601:12, 606:13, 606:14, 608:7, 608:17, 616:1, 640:2, 644:18, 645:2, 645:21, 645:24, 649:4, 656:12, 663:23, 664:5, 664:6, 665:24, 688:20
**Trust** [1] - 602:22
**trust** [12] - 548:9, 560:1, 565:7, 567:14, 568:8, 569:10, 569:11, 571:2, 581:2, 594:19, 631:15, 651:22
**trusted** [5] - 559:25, 562:11, 565:6, 565:16, 567:16
**truth** [3] - 512:16, 515:24, 601:17
**truthful** [3] - 478:15, 555:6, 601:10
**truthfully** [1] - 566:2
**try** [12] - 482:21, 486:22, 546:1, 549:4, 549:5, 576:8, 594:4, 601:22, 628:6, 634:16, 647:8, 668:24
**trying** [17] - 472:21, 505:14, 559:23, 560:8, 561:5, 571:2, 588:19, 591:20, 594:20, 603:1, 603:4, 603:17, 607:5, 613:14, 613:24, 644:21, 654:25
**turn** [6] - 486:19, 587:7, 592:24, 608:6, 624:10, 690:3
**turned** [3] - 468:4, 540:20, 595:20
**twice** [6] - 616:22, 621:17, 622:3, 622:5, 622:8, 628:25
**Two** [1] - 659:13
**two** [45] - 454:18, 455:4, 464:19, 464:20, 466:1, 467:24, 477:21, 477:23, 480:18, 494:7, 500:10, 504:9, 510:22, 515:6, 521:20, 531:25, 533:9, 547:16, 551:20, 557:10, 558:15, 575:1, 579:17,

583:17, 592:2, 597:11, 599:5, 599:7, 606:8, 626:1, 629:4, 636:25, 646:14, 646:17, 662:23, 664:8, 667:1, 673:9, 674:21, 677:4, 678:16, 679:10, 684:7, 685:22
**TWO** [2] - 676:10, 680:10
**two-and-a-half-hour** [1] - 599:7
**type** [4] - 472:8, 526:22, 563:1, 662:24
**typed** [1] - 622:8
**types** [1] - 662:23
**typically** [7] - 456:5, 537:1, 537:4, 538:2, 539:25, 542:3, 542:7

---

## U

**U.S** [1] - 526:24
**UC** [3] - 473:20, 652:21, 652:24
**uh-oh** [4] - 576:10, 576:13, 580:3, 584:18
**ultimately** [4] - 499:5, 564:21, 592:13, 592:24
**unable** [2] - 553:15, 685:17
**unanimous** [4] - 677:23, 678:3, 678:5, 684:22
**UNANIMOUS** [1] - 684:19
**unbiased** [2] - 550:22, 550:23
**UNCALLED** [1] - 669:7
**uncharacteristic** [1] - 467:18
**undated** [1] - 536:3
**under** [25] - 457:8, 469:10, 486:4, 498:16, 515:19, 516:2, 519:9, 529:15, 577:25, 607:6, 609:9, 609:21, 656:10, 673:12, 673:21, 677:6, 677:9, 677:13, 677:15, 677:17, 677:20, 678:14, 681:11, 681:16, 688:11
**underage** [2] - 509:15, 683:16
**undercover** [123] - 463:9, 471:5, 472:7, 472:12, 474:15, 474:19, 474:22, 476:11, 476:17, 477:15, 482:6, 482:9, 482:23, 483:9, 484:10, 484:12, 485:10, 487:17, 489:20, 490:6, 496:5, 524:19, 554:9, 557:3, 557:5, 558:8, 558:24, 559:20, 560:17, 561:12, 561:17, 562:25, 563:7, 565:16, 567:2, 567:4, 567:8, 567:15, 567:23, 567:25, 568:3, 569:15, 570:5, 570:7, 571:25, 572:9, 572:10,

572:18, 580:18, 581:9, 581:10, 587:4, 588:9, 597:6, 601:23, 606:16, 606:21, 606:23, 607:1, 607:11, 607:13, 607:19, 607:21, 610:2, 611:9, 611:20, 613:1, 617:6, 624:6, 624:17, 624:24, 625:6, 625:7, 625:19, 626:14, 626:16, 626:24, 627:4, 627:16, 627:21, 629:10, 632:20, 634:17, 635:23, 639:17, 639:20, 639:23, 640:6, 640:8, 641:6, 641:8, 641:19, 641:24, 642:5, 643:10, 643:24, 644:2, 644:8, 645:16, 645:4, 645:12, 645:22, 645:24, 645:25, 646:8, 646:11, 646:24, 647:1, 647:11, 648:14, 649:5, 649:11, 650:25, 652:24, 653:5, 654:1, 654:8, 655:1, 655:6, 655:10, 658:2, 665:17
**UNDERCOVER** [1] - 665:15
**undercover's** [1] - 463:6
**underlying** [2] - 570:19, 571:4
**underneath** [3] - 478:17, 517:23, 688:11
**understandably** [1] - 581:8
**understatement** [1] - 598:13
**understood** [5] - 472:19, 514:7, 531:7, 554:10, 638:14
**undertaken** [3] - 550:12, 678:23, 684:15
**undeveloped** [1] - 679:25
**unfair** [1] - 544:23
**unfold** [1] - 581:18
**unforeseen** [1] - 573:3
**unfortunate** [2] - 494:5, 556:1
**unhappy** [1] - 602:8
**unhealthy** [2] - 580:2, 580:7
**unimportant** [1] - 667:6
**unintended** [1] - 573:3
**unique** [4] - 486:6, 571:7, 571:11, 635:21
**unit** [1] - 574:1
**United** [19] - 453:5, 453:7, 459:18, 459:20, 498:14, 516:16, 519:1, 536:10, 555:20, 556:12, 630:25, 659:1, 672:3, 673:10, 673:11, 673:13, 673:22, 680:19, 692:17
**unlawful** [11] - 557:12, 558:7, 559:10, 607:5, 611:6, 611:11, 611:21, 612:25, 614:6, 658:3, 674:15

**unless** [3] - 453:12, 546:5, 598:1
**unnatural** [1] - 682:11
**unobjected** [1] - 689:20
**unpleasant** [1] - 661:12
**untruthful** [1] - 555:4
**up** [99] - 454:15, 462:4, 471:6, 478:4, 478:20, 479:4, 481:4, 481:5, 494:3, 496:8, 496:18, 498:4, 499:15, 504:22, 507:21, 509:23, 509:25, 511:24, 514:14, 524:9, 524:10, 524:14, 526:8, 532:10, 532:18, 534:25, 535:17, 535:25, 538:6, 540:3, 544:18, 546:13, 546:25, 547:6, 549:20, 550:9, 550:10, 550:21, 552:14, 552:15, 556:19, 557:1, 557:4, 565:1, 569:11, 570:14, 574:14, 574:24, 575:9, 575:17, 576:21, 581:14, 581:18, 583:17, 585:22, 586:25, 589:19, 592:6, 595:25, 597:10, 599:15, 600:2, 600:6, 605:22, 609:17, 612:9, 612:10, 612:11, 612:13, 613:19, 613:22, 621:1, 624:17, 625:5, 625:24, 626:15, 627:13, 628:1, 635:12, 636:2, 640:18, 643:11, 646:18, 647:4, 653:18, 653:19, 654:14, 655:1, 655:6, 655:9, 655:16, 656:25, 657:4, 682:24, 689:3, 691:25, 692:24
**urge** [1] - 577:9
**urination** [1] - 470:16
**usage** [2] - 537:4, 675:25
**USE** [1] - 676:10
**user** [1] - 652:10
**uses** [2] - 676:1, 694:1
**usual** [1] - 537:23

---

## V

**vagina** [6] - 493:11, 506:13, 578:9, 591:11, 604:13, 610:23
**vaginal** [3] - 506:8, 555:8, 578:23
**vaginally** [1] - 579:5
**value** [2] - 530:12, 663:11
**variable** [1] - 533:23
**varies** [4] - 530:3, 537:4, 537:6, 687:6
**various** [1] - 667:3
**vary** [1] - 540:8
**vasectomy** [16] - 475:15,

*475:23, 476:4, 476:14, 476:23, 477:9, 479:12, 492:9, 554:14, 561:10, 578:24, 579:2, 591:7, 591:12, 591:14, 624:5*
**VERDICT** [1] - 684:19
**verdict** [27] - 557:19, 613:2, 614:9, 629:24, 651:15, 658:12, 660:11, 661:1, 662:24, 663:17, 671:7, 671:15, 672:16, 672:25, 678:7, 684:20, 684:21, 685:14, 686:10, 686:18, 687:1, 687:5, 687:6, 687:11, 687:12, 691:10
**verdicts** [1] - 660:23
**Verizon** [1] - 534:14
**Vermont** [19] - 477:15, 592:18, 605:15, 609:2, 610:15, 610:23, 617:22, 618:2, 618:11, 623:25, 656:10, 659:7, 659:15, 659:22, 664:8, 677:6, 677:13, 677:21, 680:24
**vers** [1] - 530:11
**version** [2] - 515:5, 539:13
**versus** [1] - 535:8
**vetted** [1] - 551:19
**viable** [1] - 535:11
**VICTIM** [1] - 676:21
**victim** [1] - 656:23
**victimization** [1] - 629:1
**victimize** [1] - 628:25
**video** [3] - 655:22, 655:24, 679:24
**videos** [1] - 605:18
**videotape** [1] - 679:25
**view** [4] - 619:8, 634:22, 667:3, 690:7
**viewer** [4] - 619:10, 682:1, 682:18, 690:10
**viewing** [3] - 678:22, 683:21, 684:13
**views** [2] - 573:12, 686:23
**violate** [1] - 652:13
**violated** [12] - 609:3, 610:4, 610:15, 610:24, 665:20, 677:3, 677:5, 677:24, 678:1, 678:2, 678:5, 678:6
**violates** [1] - 674:7
**violating** [2] - 673:10, 673:11
**violation** [6] - 456:20, 573:23, 613:16, 670:20, 673:20, 674:15
**virtue** [1] - 663:1
**Visser** [1] - 538:9
**VISSER** [3] - 538:10, 538:12, 538:15
**visual** [39] - 614:14, 614:17, 614:19, 614:23, 617:14,

*617:16, 618:14, 618:18, 618:21, 621:10, 621:18, 659:24, 660:2, 660:4, 673:24, 674:5, 674:7, 679:9, 679:10, 679:14, 679:17, 679:23, 679:24, 680:2, 680:3, 680:13, 680:18, 681:7, 681:11, 682:6, 682:8, 682:15, 682:17, 682:19, 682:21, 683:3, 683:11, 683:18*
**VISUAL** [1] - 681:5
**visualizing** [1] - 565:2
**voice** [6] - 538:22, 543:19, 568:15, 568:19, 577:2, 577:3
**void** [1] - 580:23
**voir** [3] - 528:3, 536:12, 539:18
**VOIR** [2] - 528:5, 539:21
**volley** [1] - 592:7
**voluntarily** [3] - 675:19, 680:8, 683:7
**volunteer** [1] - 475:2
**vote** [3] - 662:13, 687:4, 687:14
**voyeur** [1] - 635:13
**vs** [10] - 453:6, 459:19, 498:15, 516:17, 519:2, 536:11, 555:21, 556:13, 631:1, 692:18
**VSA** [4] - 677:6, 677:13, 678:1, 678:2
**vulva** [2] - 609:23, 609:24

## W

**wait** [6] - 484:9, 595:18, 601:4, 691:15, 693:2, 694:2
**Wait** [3] - 471:8, 497:10, 608:5
**waiting** [4] - 457:23, 511:12, 569:16, 602:17
**waived** [2] - 454:2, 689:24
**walk** [3] - 486:24, 549:6, 603:14
**wanes** [1] - 530:4
**wanna** [5] - 466:12, 569:19, 605:3, 615:6, 620:5
**Wanna** [1] - 569:13
**wants** [52] - 456:18, 495:19, 496:1, 496:17, 502:12, 551:17, 561:6, 566:2, 566:6, 566:19, 568:9, 570:8, 570:22, 571:3, 571:25, 574:15, 577:17, 577:25, 578:7, 578:8, 581:1, 581:23, 583:23, 584:2, 584:4, 584:8, 584:11, 584:12, 588:7,

*589:13, 590:8, 590:17, 590:22, 591:13, 593:12, 594:4, 594:15, 594:18, 594:23, 594:25, 595:8, 604:7, 646:7, 652:19, 654:19, 654:24*
**warm** [1] - 581:17
**warrant** [1] - 683:22
**Warren** [1] - 688:3
**waste** [4] - 457:8, 585:11, 585:16, 592:13
**wasting** [1] - 515:22
**watch** [2] - 504:5, 546:14
**watching** [2] - 603:13, 635:13
**water** [3] - 546:13, 591:6, 591:11
**waxes** [1] - 530:3
**ways** [2] - 547:10, 569:10
**wear** [2] - 456:3
**wearing** [1] - 597:15
**web** [3] - 540:1, 542:3
**website** [2] - 536:24, 606:18
**week** [4] - 455:6, 510:21, 544:8, 653:12
**weeks** [3] - 510:22, 549:24, 653:12
**weigh** [2] - 663:14, 667:4
**weighing** [3] - 530:11, 663:15, 666:5
**weight** [16] - 529:20, 530:4, 530:18, 532:23, 534:7, 534:20, 535:8, 665:23, 666:2, 666:14, 668:15, 668:22, 669:5, 670:6, 671:15, 671:23
**weird** [3] - 626:20, 626:23, 627:10
**welcome** [1] - 646:7
**well-being** [1] - 460:14
**wet** [8] - 505:1, 506:7, 506:8, 506:17, 555:7, 594:12, 594:13, 599:18
**wetness** [1] - 565:10
**Whales'** [5] - 482:9, 583:20, 587:1, 612:9, 655:6
**whatsoever** [2] - 553:5, 570:25
**whim** [1] - 661:10
**white** [1] - 517:21
**whole** [15] - 467:25, 468:4, 470:16, 483:3, 545:9, 547:11, 568:5, 584:7, 588:16, 616:13, 620:3, 624:1, 626:20, 657:23, 666:4
**whoops** [1] - 602:6
**wide** [1] - 589:19
**widely** [1] - 496:18
**wildest** [2] - 562:9, 562:14
**willfully** [2] - 609:7, 677:7

**willing** [6] - 543:15, 636:24, 637:10, 637:13, 644:6, 653:19
**willingness** [2] - 639:9, 682:16
**win** [1] - 583:4
**window** [2] - 592:3, 635:16
**windows** [1] - 635:19
**wings** [1] - 602:17
**winky** [1] - 590:12
**wish** [5] - 543:6, 691:25, 692:1, 694:8, 694:17
**wished** [2] - 465:24, 596:17
**wishes** [1] - 594:5
**wishing** [3] - 466:11, 605:2, 620:4
**witness** [51] - 461:19, 475:10, 494:22, 497:15, 498:16, 519:8, 523:23, 524:12, 525:24, 526:8, 526:15, 527:11, 533:25, 536:15, 541:21, 542:18, 623:2, 623:3, 623:11, 623:16, 623:19, 640:5, 642:5, 662:25, 666:1, 666:2, 666:3, 666:12, 666:16, 666:25, 667:9, 667:13, 667:14, 667:16, 667:18, 667:22, 668:3, 668:6, 668:10, 668:14, 668:16, 668:19, 668:23, 668:25, 669:4, 669:19, 669:24, 669:25, 670:13, 670:16, 685:7
**WITNESS** [10] - 462:9, 462:13, 462:16, 507:22, 511:11, 520:20, 524:15, 526:13, 542:17, 669:18
**witness'** [7] - 520:6, 667:24, 668:8, 668:11, 668:13, 669:21, 670:8
**WITNESSES** [4] - 665:21, 668:1, 668:17, 669:7
**witnesses** [21] - 525:25, 526:2, 542:19, 623:4, 661:22, 661:24, 662:18, 665:23, 666:5, 666:15, 666:16, 666:18, 666:21, 666:23, 666:25, 668:2, 668:3, 669:17, 670:24, 671:14
**witted** [1] - 548:9
**woman** [14] - 467:22, 474:12, 490:24, 490:25, 501:13, 509:14, 510:9, 525:9, 532:4, 573:11, 596:9, 596:10, 596:11
**women** [1] - 650:21
**wondering** [1] - 618:8
**word** [6] - 522:17, 563:4,

563:22, 582:6, 656:16,
676:1
**words** [12] - 462:25, 472:21,
572:14, 587:16, 588:1,
590:23, 661:5, 670:23,
675:25, 676:3, 677:25,
684:21
**world** [2] - 592:16, 655:14
**worried** [2] - 566:5, 598:9
**worry** [7] - 556:3, 563:25,
578:25, 579:7, 595:9,
598:10, 647:7
**worse** [2] - 547:15, 649:25
**write** [8] - 505:5, 522:6,
522:10, 522:13, 561:24,
577:22, 598:10, 685:20
**writes** [7] - 575:14, 579:19,
580:15, 584:19, 585:7,
587:23, 604:20
**writing** [9] - 490:20, 491:21,
493:22, 565:2, 580:24,
581:21, 594:10, 687:18,
687:21
**written** [4] - 481:20, 482:6,
482:8, 536:1
**wrote** [141] - 462:21, 462:25,
464:5, 464:10, 464:13,
465:11, 465:25, 466:6,
466:14, 466:21, 466:23,
466:25, 468:20, 468:21,
468:24, 469:5, 469:6,
470:24, 471:8, 473:1,
476:23, 476:24, 477:8,
478:13, 479:25, 480:4,
480:25, 481:2, 481:23,
482:12, 482:23, 483:2,
483:4, 483:19, 483:25,
484:6, 485:10, 486:12,
487:5, 487:10, 489:14,
489:17, 489:24, 489:25,
490:18, 491:24, 493:19,
493:20, 493:22, 499:2,
499:21, 499:22, 500:3,
500:5, 501:2, 501:11,
501:13, 501:16, 501:22,
502:11, 502:17, 503:24,
504:9, 504:21, 505:4,
505:7, 505:8, 505:18,
506:2, 506:7, 506:19,
507:23, 521:20, 521:23,
522:14, 523:10, 523:15,
524:5, 524:7, 556:23,
560:18, 560:25, 561:12,
562:7, 562:25, 563:12,
564:6, 565:4, 567:8, 568:1,
568:23, 569:13, 570:6,
570:9, 570:18, 572:1,
572:10, 574:9, 574:10,
574:12, 574:24, 577:8,
579:22, 581:7, 581:13,

583:10, 585:2, 591:16,
592:20, 593:3, 593:19,
594:7, 595:2, 595:21,
596:18, 597:14, 598:7,
599:14, 603:6, 603:7,
605:1, 608:5, 608:8,
610:14, 612:21, 613:7,
613:20, 615:5, 615:7,
615:8, 620:22, 620:24,
623:24, 624:2, 624:13,
627:7, 627:15, 627:16,
633:1, 656:12

**X**

**XOXO** [3] - 569:23, 579:15,
596:14

**Y**

**year** [9] - 501:11, 546:23,
546:24, 561:13, 566:25,
568:17, 600:12, 607:11,
608:18
**years** [23] - 463:7, 496:22,
530:10, 530:14, 533:20,
533:21, 533:22, 548:6,
551:20, 554:9, 558:20,
607:16, 650:10, 650:13,
650:24, 659:11, 659:19,
673:18, 674:24, 676:24,
677:10, 678:14
**yes-and-no** [2] - 471:25
**yes-no** [5] - 498:9, 498:10,
507:19, 507:20, 523:3
**yes-or-no** [5] - 465:21,
466:16, 494:17, 494:19,
497:18
**yesterday** [6] - 456:14,
514:20, 514:21, 522:19,
523:6, 597:22
**Young** [1] - 605:18
**young** [13] - 490:25, 573:11,
577:4, 577:6, 577:22,
588:2, 588:18, 588:24,
605:20, 610:6, 636:18,
636:25
**younger** [3] - 501:12, 588:8,
637:8
**yourself** [2] - 543:22, 686:20
**yourselves** [1] - 671:7
**youth** [2] - 598:16, 598:21
**yup** [17] - 463:20, 464:14,
465:1, 470:15, 471:1,
473:3, 474:2, 474:18,
475:4, 481:3, 481:24,
503:23, 504:8, 506:4,
506:24, 507:1, 521:19

**Z**

**zone** [1] - 562:23

**zones** [2] - 582:6, 610:12
**Zoom** [1] - 454:3