UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO. |
| | ) | 2:18-cr-12 |
| vs. | ) | |
| | ) | |
| RANDY SHELTRA, | ) | |
| Defendant. | ) | |

SENTENCING
Tuesday, November 23, 2021
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    District Judge

APPEARANCES:

BARBARA A. MASTERSON, ESQ., and ANDREW C. GILMAN, ESQ., U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the Government

MARK A. KAPLAN, ESQ., Kaplan and Kaplan, 95 St. Paul Street,
    Suite 405, Burlington, VT 05402-0405, Counsel for the
    Defendant

ALEXANDRE BONNEVILLE, U.S. PROBATION

RANDY SHELTRA, DEFENDANT (VIA VIDEOCONFERENCE)

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

1 Tuesday, November 23, 2021

2          (The following was held in open court at 1:31 PM.)

3              COURTROOM DEPUTY:  Your Honor, the matter before the

4 Court is criminal case number 18-CR-12-1, United States of

5 America vs. Randy Sheltra.  Representing the Government are

6 Assistant United States Attorneys Barbara Masterson and Andrew

7 Gilman; present for the defendant is his attorney, Mark Kaplan;

8 the defendant is present via videoconference; and we are here

9 for sentencing.

10             THE COURT:  Good afternoon.

11             MR. KAPLAN:  Good afternoon, your Honor.

12             THE COURT:  Mr. Sheltra, you have waived your

13 appearance here.  We had a telephone conference yesterday, and

14 your attorney advised me that you did not want to appear in

15 person and did not want to take a COVID test and that one of

16 the reasons would be that you would be in quarantine upon your

17 appearance here.

18     I want to make sure that you are in fact knowingly waiving

19 your appearance to be here at sentencing, because I told your

20 attorney I would not want to see this issue come up later that

21 you wanted to be present and we didn't accommodate that

22 request.

23     So if you told me that you wanted to be present in person,

24 I would simply continue the sentencing for another date.

25     Let's hear your preference on that.

1           THE DEFENDANT:  Well, my preference, your Honor, at
2  this point, we've had a number of people from the pod that I'm
3  in that had tested positive for COVID.  I've been vaccinated,
4  and, you know, I thought that was going to be enough, but I --
5  I experienced limited symptoms, and so I don't know whether I
6  am or not because I didn't want to take another test and be
7  quarantined.
8       So what Mr. Kaplan expressed to you is accurate.  We had
9  asked for a 60-day delay on this and it got denied.  If that
10 were the case and if that 60 days was put in place, I would
11 certainly prefer to be there, but that's -- that being said,
12 I'm not going to expose other people if I don't have to to
13 COVID.
14          THE COURT:  All right.  I would not give you a 60-day
15 continuance.  We would come back sometime next week, for
16 example, for sentencing so you could be here in person.
17          THE DEFENDANT:  Then --
18          THE COURT:  Pardon me?
19          THE DEFENDANT:  I see no reason to do that, your
20 Honor.  Let's just finish with it.
21          THE COURT:  All right.  I'm going to accept your
22 waiver of appearance.  I'm going to find that were we to
23 transport you to the District of Vermont, we would needlessly
24 expose you and others to potential infection from COVID-19.
25 You are currently incarcerated in a location which has had

COVID-19. Even when people are vaccinated, they can contract it, and that includes our marshal and other staff. The Court's going to find that videoconference is the best reasonably available technology at this time, and under the CARES Act, the Court's going to find it's in the interest of justice to proceed by videoconference.

I have read the presentence report; the sentencing memoranda; your supplemental exhibit in support of the sentencing memoranda; the victim impact statement.

And let me make sure you have read the presentence report as well, Mr. Sheltra.

THE DEFENDANT: I have.

THE COURT: And have you had an opportunity to review it with your attorney?

THE DEFENDANT: Yeah. I talked to Mr. Kaplan about it, and he put forth the -- what you're looking at as far as our response.

THE COURT: All right. Anything inadequate about that review?

THE DEFENDANT: Just a couple of date things. The time -- you know, minor things. But I think Mr. Kaplan did a very good job of assessing the current situation.

THE COURT: Okay. I know you are making certain objections to the presentence report. The primary factual objection from the Court's perspective is you are challenging

1 the statements of what the Government is calling Victim 1 in

2 paragraphs 24 through 31. This is the alleged statements from

3 your niece.

4          THE DEFENDANT: Yes.

5          THE COURT: Are there any -- yes.

6      Are there any other factual errors in the report from your

7 perspective?

8          MR. KAPLAN: Judge, I think --

9          THE DEFENDANT: Not -- not that I recall.

10          THE COURT: Not that you recall. And I'll turn to

11 your attorney in case he sees some.

12          THE DEFENDANT: Okay.

13          THE COURT: So, Mr. Kaplan, go ahead.

14          MR. KAPLAN: I would just indicate that we have a

15 general objection to all of the facts that might suggest he's

16 guilty of the -- of the charged conduct, and our assumption is

17 that the Court will make a decision on that based on what you

18 heard at trial and/or the transcript, so we're not asking for

19 an evidentiary hearing on that issue.

20          THE COURT: I did see you object to the presentence

21 report somewhat in its entirety. I didn't see a specific

22 objection to "This trial testimony is not accurate. That's not

23 what happened." Do I have that right?

24          MR. KAPLAN: Yes.

25          THE COURT: Okay. And other than the statements from

1  the interview of Victim 1, are there any other specific facts

2  that you contend are wrong in the presentence report?

3           MR. KAPLAN:  No, your Honor.

4           THE COURT:  How about from the Government's

5  perspective?  Any factual challenges to the presentence report?

6           MS. MASTERSON:  No, your Honor.

7           THE COURT:  All right.  I will hear arguments on the

8  inclusion of the interview of Victim 1, whether it should be in

9  the presentence report, what the Court should do with it.

10     There are a number of guideline challenges.  One is the

11  use-of-the-computer enhancement.  The other is obstruction of

12  justice.  And I raise for you *sua sponte* the issue of whether

13  or not Mr. Sheltra should be prevented from accessing adult

14  pornography when he's on supervised release.  The circuits are

15  addressing this condition with increasing focus.  Second

16  Circuit has not squarely ruled on that except that it seems to

17  be developing by a case-by-case method.

18     And so I was thinking that I would add "You must not view,

19  access, or possess images or videos depicting sexually explicit

20  conduct involving adults unless a psychosexual evaluation

21  determines that access to adult pornography will not threaten

22  treatment goals or the safety of the community."  It hasn't

23  specifically been challenged by Mr. Kaplan, but I anticipate

24  that we're going to get more case law on this.

25     Any objection to the Court's modifying of that condition

1  in that manner?

2      MR. KAPLAN:  No, your Honor.

3      THE COURT:  I can read it for you again if you'd like.

4      MS. MASTERSON:  Would the Court do so, please.

5      THE COURT:  Sure.  "You must not view, access, or

6  possess images or videos depicting sexually explicit conduct

7  involving adults unless a psychosexual evaluation determines

8  that access to adult pornography will not threaten treatment

9  goals or the safety of the community."

10      MS. MASTERSON:  I do know that there is a case in the

11 Second Circuit that has addressed the use of child -- I'm

12 sorry, adult pornography -- or maybe it's a district case,

13 because Judge Murtha ruled, and I didn't know that this was

14 going to be an issue, so if I had known, I would have accessed

15 that cite, but I do know that Judge Murtha has had -- addressed

16 this issue and found adult pornography would be detrimental and

17 therefore included it over a defendant's objection in the terms

18 and conditions of supervised release.

19      That said, it is an evolving legal issue, and I think that

20 the way the Court has written it is appropriate.  If there's

21 going to be a modification, the Court hit it.

22      THE COURT:  Mr. Kaplan?

23      MR. KAPLAN:  I agree, your Honor.  Thank you.

24      THE COURT:  Okay.  I think that lends it more to a

25 case-by-case approach, and that seems to be the developing

consensus that there needs to be a basis in this particular

case for denying access to adult pornography.

I'm going to tell you some of the things that I am

thinking about in this case, and I hope to hear them in your

sentencing arguments. But tell me what you want to tell me,

whether I've addressed it or not.

With regard to the obstruction of justice, the defendant's

testimony that he was not sexually interested in children has

an objective component and a subjective component, and I recall

that we saw I think at least one image of child pornography on

his phone as impeachment evidence. The graphic communications

certainly support that as well. But even if the Court said,

yeah, denying that you're sexually interested in children is

only a partial mistruth because you're also interested in a lot

of other things, we have the statement with the Treena. So the

testimony that "I thought I was talking with Treena" and the

chronology of that is that Mr. Sheltra asked for the images

from ER prior to the mention of anal sex, and it was the anal

sex mention that made him think he was talking to Treena. So

I'm interested in hearing your points of view on whether or not

we have an obstruction of justice in those circumstances,

whether we need both of them or if one is sufficient.

With regard to the computer enhancement, in a

straightforward child pornography case, the Court has not been

imposing the computer enhancement. For example, with

peer-to-peer sharing of child pornography, it's the means by
which the offense is committed.  There is no other way to do it
other than through a computer.  I have imposed it and I have
imposed it very recently when the person is using the computer
for actively soliciting child pornography, the person's in chat
rooms, the person is finding ways to access alleged victims or
child pornography or finding like-minded individuals.  This
case would certainly fall within that category.

    With regard to Victim 1's statements, as the parties will
recall, one of the issues in this case was whether or not Mr.
Sheltra was going to pursue a defense theory that after his
stroke his personality was changed and that this is
stroke-related behavior.  And the Government sought to rebut
that line of defense with his niece's testimony, and I believe
she was on the Government's witness list for that purpose.  So
she is in the case.

    On the other hand, there are, from the Court's
perspective, no sworn statements from her.  She never testified
before the grand jury.  And her testimony is -- or her
statements are quite inflammatory, and I was wondering whether
it made sense in terms of fairness to both parties, which I
assume both of you are going to dislike this, that I would keep
paragraph 24, 29, and 31, with 31 being modified to indicate
the "alleged" abuse, and the details of what Victim 1 is
claiming excluded from the presentence report.

1   And my thoughts are I certainly respect the Government's
2  position that it's not going to call Victim 1 as a witness,
3  that it would be damaging to her, but unless it's captured in a
4  sworn statement or grand jury testimony, I'm questioning
5  whether I can find it is reliable.  I think it's relevant that
6  after the case was filed, this woman on her own reached out to
7  law enforcement.  I think it's important for her statements to
8  indicate when she said the alleged abuse occurred and her
9  reason for not pursuing it further, and I think it's relevant
10 to hear how old Mr. Sheltra was when the victim says the abuse
11 started and when it ended.  The other details, I'm wondering
12 why the Government should not have to prove those up.  So I
13 want to hear your arguments on that.

14   Of course, I want to hear what you think is the
15 appropriate period of incarceration and supervision.  I am not
16 going to set aside the fact that we're in the middle of a
17 pandemic and that Mr. Sheltra has contracted COVID during his
18 incarceration and that programming and quarantining and
19 segregation, you know, remain kind of the rule of what is
20 happening during this pandemic.  And I should say lack of
21 programming.  So these are very different conditions of
22 incarceration, and at this point the Court does not know how
23 long that's going to last.

24   I'm going to start with you, Mr. Kaplan, on all points,
25 including 3553(a) factors; I'll ask Mr. Sheltra if he wants to

1  make a statement on his own behalf; I'll ask the Government for

2  its arguments; I'll give Mr. Kaplan the last word; I will rule

3  on the guideline challenges and the factual objection to the

4  presentence report; I'll do a guideline calculation, analyze

5  the 3553(a) factors, and notify the parties of their rights of

6  appeal.

7       So, Mr. Kaplan.

8       MR. KAPLAN:  Your Honor, I'll speak to the obstruction

9  issue first and just make a general comment.  The way I looked

10  at my client's testimony had more to do -- I think the Court

11  started off by saying there's objective and subjective issues

12  with respect to obstruction, and what I focused on was the fact

13  that my client testified consistently that he did not intend to

14  commit these crimes.

15      Now, I'll acknowledge that there was some conflict on

16  specific issues; in other words, whether or not, for example,

17  he had any physical contact with a 15-year-old in Count 2.  My

18  client said he didn't.  There was some evidence introduced that

19  he did.  But throughout the entire trial, he was consistent

20  with the fact that he didn't intend to have sexual contact with

21  a minor, and so that's what I think the focus should be on the

22  issue of obstruction.

23      In other words, even though the jury found him guilty of

24  these particular crimes, that doesn't mean that he intended to

25  obstruct justice, that he was flagrant in his -- with respect

1 to telling the truth or not telling the truth.

2       THE COURT:  Well, if it stayed on that, "I didn't
3 intend to do any of it," that would be one thing.  It went
4 further than that, though.  And there's -- it's not just some
5 vague intent.  If we take the messages to the third person
6 about what was going to happen with ER, he says, "We were going
7 to have sex.  We couldn't do it because we were out on some
8 country road, but, yeah, we were going to have sex."

9       MR. KAPLAN:  But he also gave an explanation as to why
10 he said that, and he said it was because of his intent with
11 respect to the third person, what he was trying to get her to
12 come out and talk about.  Now, that may not be something that
13 the Court believes to be true, necessarily.  But again, it all
14 goes back to, well, Mr. Sheltra said he said that for a
15 particular reason.  The jury may not have believed that, but it
16 doesn't necessarily mean that in his own mind it wasn't true
17 and that's what he was thinking.

18     I don't see a case here where, for example, there's a
19 yellow car going down the road, everyone knows it's yellow, my
20 client said "I saw it and it's red."  It's not clear like that,
21 because I think we're dealing all the way through the
22 conflicting statement with what Mr. Sheltra's intent was.  And
23 I think it would be unfortunate to give an obstruction
24 enhancement because there's a disagreement between what the
25 Government witness says and what my client says without any

1 actual proof other than statements being made.

2      THE COURT:  What if the Court takes him at his own

3 word, his own written communications?  What if the Court says,

4 "I've got it in black and white what your intent was"?  And

5 yes, of course you're entitled to testify and say that wasn't

6 my true intent and the jury can analyze it, but it's not just a

7 he said/she said.  There are written communications expressing

8 intent.

9      MR. KAPLAN:  Well, I mean, that's the crux of the

10 issue.  That's really this trial, this case, because he took

11 the stand and said, "Sure, I said all those things, but here's

12 why I said them.  And the reason I said them wasn't for the

13 purpose of having sex with a minor."  And the jury apparently

14 didn't believe that.  But was he lying when he said that?  I

15 mean, you can take him -- if you take him at face value, then

16 I -- which is what I'm assuming the jury did, although I don't

17 know, but if you do that, then you're taking the position that

18 he's lying on everything he says, and he's saying, "No, it's

19 not right to take it at face value.  That's what I meant when I

20 said that."

21     So, you know, I can understand why someone, particularly

22 in a case like this, might take it at face value, but I also

23 think you have to understand that he has an explanation for why

24 he said those things.  To me the explanation's credible.  He

25 says, "I said all these things for a particular purpose."  In

1  fact, I'll go back even further, which is the first set of

2  emails that was between him and someone who was posing as the

3  mother of a child.  He literally was extremely surprised when

4  that particular person raised the issue of having sex with a

5  minor, and so that's what kind of convinced me that there was

6  some truth in his statement that he never started out with the

7  intent of wanting to have sex with a minor.

8      And I know I pointed this out to the jury that he

9  genuinely was surprised by some of the responses he was getting

10 from the people he was dealing with; by the time he dealt with

11 the undercover agent, he no longer was surprised because he

12 knew that kind of thing was going on.  I don't see it as being

13 flagrant or with an intent to obstruct justice.

14      THE COURT:  Let's talk about what the Court thinks is

15 the most direct example, and that's the Treena where the

16 defendant testified that when he asked ER to send him pictures

17 of her genitalia, he thought he was communicating with Treena,

18 who was an adult woman with whom he was engaged in a sexual

19 relationship, and his relationship with her involved anal sex,

20 and that when ER mentioned engaging in anal sex with her

21 boyfriend, that's when he thought it was Treena but actually he

22 asked for the pictures before there was any mention of anal

23 sex.

24      MR. KAPLAN:  So there was -- there was a line of

25 emails between Mr. Sheltra and Katrina, and I think I marked it

as an exhibit.  I don't recall if I admitted it or not.  I think I did.  And that -- the time frame on those emails was pretty close in time to when he was -- when he was dealing with ER.  And so when I showed that to him, he said, "That's what I meant."  You know, it may be inconsistent, you know, in some respects, but it's not inconsistent with the fact that he was having these email conversations with Katrina, that they were similar in nature, and that's who he thought he was dealing with when he got the responses.

THE COURT:  You said Katrina, but I think you mean Treena?

MR. KAPLAN:  Yes.

THE COURT:  Yes.  Maybe that's her nickname.  I don't know.  Okay.

MR. KAPLAN:  I'm wondering if that's enough to find obstruction.  I mean, the thing that's always bothered me with regard to the Sentencing Guidelines with respect to acceptance of responsibility and obstruction is the defendant has to decide am I going to go to trial and take the risk of losing three levels for -- for acceptance of responsibility, so it's a real inhibitor for someone in a close case who thinks that they have a triable case.

And I also have to tell clients if you're going to try a case and you're going to testify, there's an excellent chance the Government's going to ask for obstruction, and so to me the

1  obstruction should be somewhat limited to major things in the

2  case, not discrepancies between some minor issues that really

3  don't go to the heart of the case.

4      Like, these pictures don't show, necessarily, that he was

5  interested in having a sexual relationship with a minor,

6  whether or not he asked for them, and so I think it's an

7  unfortunate prohibition -- on inhibition on people testifying.

8          THE COURT:  Well, the Court has not always denied

9  acceptance of responsibility or imposed an enhancement for

10  obstruction of justice for anybody who testifies at trial.  It

11  has to be a fairly -- it has to be a factual issue, and the

12  testimony has to be false.  And the Government and the

13  Probation Office has pointed out two things that they contend

14  are factually false:  sexual interest in children and the

15  belief that communications with ER were really with Treena.  So

16  those are things that could be proved or disproved, and so it's

17  not just:  You took the stand; you testified at trial; you

18  shouldn't have gone to trial; we're denying acceptance of

19  responsibility.  These are facts that could be proved true or

20  not true.

21          MR. KAPLAN:  But to me a sexual interest in children,

22  the only thing that I can see as what the Court's referring to

23  is that he asked for pictures, allegedly, as opposed to his

24  testimony that he wasn't interested, and he was consistent with

25  that throughout the -- his entire testimony.

1          THE COURT:  Well, the Court's pointing to child
2    pornography on his phone; statements about wanting to have sex
3    with children, very detailed statements, and not just one child
4    but both the person he thought he was communicating with before
5    the events and then the undercover officer after the events;
6    his statements to ER about what he wanted her to photograph.
7    So it isn't just kind of a vague "you like this or you don't
8    like this and you're interested in that."  I mean, there is
9    some objective evidence in Mr. Sheltra's own words about what
10   he likes and what he wants.
11         MR. KAPLAN:  That's if you take his words at face
12   value.
13         THE COURT:  Right.  And I understand what his
14   explanation was at trial.
15         MR. KAPLAN:  On the computer issue, I do understand
16   that the Court on occasion has not applied the two-level
17   enhancement, but as the Court just indicated, the Court may see
18   a distinction between just having pornography -- child
19   pornography on your computer and actually using your computer
20   to solicit illegal activity.  But from my perspective, I don't
21   know why it's different to email someone and talk about these
22   subjects than it would be to meet a person -- to meet, you
23   know, in person with someone and carry on the same
24   conversation.  I don't see a distinction between the two in
25   terms of the severity of it, why -- why there should be a

two-level enhancement for saying to someone on a computer "I'm
interested in some sexual activity with you or your daughter"
or sees the person and meets the person in person and makes --
you know, indicates the same sentiment.

THE COURT:  I think in the latter case, if they met in
person and indicated the same sentiment, there's probably an
enhancement for that as well.  It's not a computer enhancement,
but don't you think that would result in some form of guideline
focus on that behavior in addition to possessing child
pornography?  So if somebody is in possession of child
pornography and in addition to that they meet someone in person
and actively solicit the production of child pornography, I'm
confident that would find its way into a presentence report,
and I can't think off the top of my head what the enhancement
would be, but my guess is Mr. Bonneville could find it pretty
fast.

MR. KAPLAN:  Well, I wasn't necessarily referring to
manufacturing of child pornography or production.  I was
talking more along the lines of if my client -- if my client
uses a computer to solicit sexual activity with someone, I
don't see the difference between that and him talking to that
person at his home, for example, or on the street or some other
place and not through the use of a computer.  And I'm sure if
there's an enhancement for that, Alexandre will find it.  He's
usually found all of them in my cases.  So I don't see the

distinction.  And today computers are so common.  Everyone uses
computers for absolutely everything.  It just seems kind of
antiquated, I think, to give someone an enhancement for the use
of a computer.

THE COURT:  Would you agree with me that the Second
Circuit has approved the use of a computer enhancement in these
types of cases?

MR. KAPLAN:  Yes.

THE COURT:  Okay.

MR. KAPLAN:  But I'm also thinking in terms of -- and
I will make this argument later when you get to the 3553(a)
factors.  I think one of the things to look at is, okay, this
is what his guideline looks like, but if we don't apply these
certain enhancements, which I think may not be fair, then
you're looking at a more reasonable sentence than you would be
under the federal Sentencing Guidelines, and that's why I raise
that issue.

THE COURT:  So I agree, and I've said it before, that
the Court's not making new law.  The child pornography
guidelines have been criticized by lots of courts, including
the Second Circuit.

MR. KAPLAN:  The one that really bothers me is the
issue with the niece.  I don't see how an unsupported
allegation - I couldn't even do the math.  It's over 30 years
ago - where the police apparently investigated and decided not

1  to bring charges, no one ever hears anything about it again,

2  all of a sudden it shows up in this case and the Government

3  makes no effort whatsoever to prove it, I don't know why it's

4  okay for that to be in the presentence report, because the

5  obvious conclusion that anyone's going to draw from reading

6  that, if it's just one line, is that it's true and that my

7  client engaged in that type of conduct, and it's totally

8  unsubstantiated, and no one's had the opportunity to -- to

9  provide any evidence with -- I think the Government should have

10  been required to do that if it's going to stay in the

11  presentence report.

12  THE COURT:  Well, the Government can establish some

13  things, which is why I suggested that certain paragraphs could

14  remain in the presentence report, because they are uncontested

15  and uncontestable.  This person reached out after she heard

16  about Mr. Sheltra's case and made a report, that she explained

17  the dates when it occurred and the fact that she backed off

18  because her family was not supportive, and she provided a date

19  range which would show for some of it Mr. Sheltra was a minor

20  himself and other portions of it he was an adult.  And those

21  are things that she said, and it's the fact that a report was

22  made, not the truth of it, that was raised as an issue at

23  trial.

24  MR. KAPLAN:  Except, Judge -- were you finished?

25  THE COURT:  I was.

1        MR. KAPLAN:  Except that it carries more weight than
2   what the Court's implying, I would suggest.  I mean, even
3   Probation says, all right, we're going to give a five-level
4   enhancement because there are two offenses that occurred,
5   Count 1 and Count 2, but even if we didn't count one of those,
6   the five-level enhancement would still count because of the
7   conduct with his niece.
8        THE COURT:  But the Court doesn't even need the
9   conduct with the niece for the five-level enhancement, so I
10  wasn't planning on relying on it for that purpose.
11       MR. KAPLAN:  I wasn't objecting to the -- the way it's
12  being applied, but --
13       THE COURT:  So -- so let's drill down on this, because
14  it's an important issue, and I have concerns that we have only
15  reliable evidence at sentencing.  And if the Court winnows the
16  facts in the presentence report to a report was made; the woman
17  alleged abuse during these years; this is why it wasn't
18  pursued, according to her report; and these are the ages of the
19  alleged victim and Mr. Sheltra at the time, I think that should
20  be fair game because this person was on a witness list at
21  trial, and I believe she was on the witness list solely because
22  there was a potential that there was going to be a defense that
23  this behavior was caused by a stroke and the Government wanted
24  to establish that it predates the stroke.  So what should the
25  Court do with that?

1         MR. KAPLAN:  I don't think the Court should include

2 it.

3         THE COURT:  Okay.

4         MR. KAPLAN:  I mean, it's not fair to say that she

5 dropped it.  My understanding is that the police investigated

6 it, that they came, they did an investigation, and decided not

7 to bring charges.  That's my understanding.  And I don't think

8 just because someone is on the witness list and makes a

9 statement and the defense hasn't, you know, made an effort to

10 go find that person and speak with them or disprove it, my way

11 of thinking always was if you want something like that in the

12 presentence report, then whoever wants it in needs to prove it.

13         THE COURT:  So in paragraph 29, it says "V1 reported

14 the sexual abuse she suffered to the police sometime in the

15 1980s.  However, she ultimately did not go through with her

16 complaint due to backlash she faced from her family."  And

17 you're saying that's factually inaccurate and the law

18 enforcement actually investigated it and decided it wasn't

19 reliable?

20         MR. KAPLAN:  I didn't say law enforcement decided it

21 wasn't reliable.  My understanding was law enforcement

22 investigated it and didn't bring charges.  Now, I don't know if

23 maybe they didn't bring charges because she said, "I don't want

24 to pursue it."  That's a possibility.  But I just think there's

25 too many questions about this, and reliability hasn't been

established.  And, I mean, I guess it's somewhat esoteric in
the sense it's not affecting his guideline, I don't think.

THE COURT:  It isn't affecting the guideline, and the
Court is aware of the reliability of the details and has raised
that as a reason for taking it out of the presentence report.
So it isn't going to drive the sentence in this case, but it is
a fact that was part of the trial and not something that's
coming out for the first time in the presentence report where
somebody nobody knew about says, "Hey, I'm also a victim and I
want to be in the presentence report."  And I kind of want to
capture that trial evidence which wasn't presented but the
Government made an offer of proof that it was prepared to do
so.

MR. KAPLAN:  There is an argument that it really is
coming out for the first time, because even though this person
was on the Government's witness list and we had an idea of what
she was going to say because we had a police report, she didn't
testify.  It didn't come out.  There wasn't any testimony on
it.  And in most cases, that's the end of it.  It doesn't show
up in the presentence report.

THE COURT:  With the definition of "relevant conduct,"
do you agree that there's lots of things that don't come up at
trial?

MR. KAPLAN:  I think if we were going to try and
include -- yes, of course.  I think if we were going to try and

1  include this as relevant conduct, you'd really focus on the

2  length of time that's elapsed, and I don't think it would come

3  in as relevant conduct in that sense given how long it's been.

4          THE COURT:  Okay.

5          MR. KAPLAN:  I think -- were those your three issues?

6          THE COURT:  Yes, I believe that was.

7      Do you want to talk to me about the 3553(a) factors now in

8  your presentation and then I'll get the Government's full

9  presentation as well?

10          MR. KAPLAN:  So I can -- you want me to do everything,

11  then?

12          THE COURT:  Yes, please.

13          MR. KAPLAN:  I was going to say good afternoon, but I

14  think we're beyond that point.

15      So, Judge, clearly it is a difficult case, right?  It's

16  difficult because Mr. Sheltra went to trial; he was convicted.

17  He hasn't admitted guilt, and my understanding is that he has

18  no intention of doing that, which is his right.

19      I also think it's difficult because I'm assuming that the

20  Court, in fashioning a sentence, is going to think of him as an

21  untreated sex offender, which is a consideration, I suppose, in

22  a case like this, someone who's not willing to obtain -- or

23  isn't able to obtain counseling because they won't give it to

24  him since he hasn't admitted.

25      And finally, I think the nature of the offense is

disturbing. If you ask most people about it, they would probably suggest, you know, you lock him up and throw the key away because it does have that visceral reaction for people. And I don't think any of us are immune to that.

But at the same time, I do think a 10-year mandatory minimum sentence is appropriate. And I base that on a number of factors which I think, individually and in combination, support a 10-year sentence.

One is I pointed out in my sentencing memorandum four cases in Vermont which I felt represented serious conduct on the part of the defendant and sort of compared that conduct with my client's conduct. I know that's risky because it can be interpreted on occasion as, like, trying to justify or excuse his behavior. That's not the intent at all. But I do think, and I'll make this point later, that if you're going to be fair -- I mean, not to suggest the Court's not going to be, but I think to be fair in this case, you not only need to look at the crime that he was convicted of but you need to look at the harm that he caused, because, you know, two people can be convicted of the same crime and one is far more egregious than someone else.

I also --

THE COURT: So let me talk to you about the harm he caused, because that is a difficult subject in this particular case where you have an undercover officer pretending to be a

1  woman who's got a minor child.  It's less of an issue with ER,

2  but ER's photos that she sent to Mr. Sheltra were not the kind

3  of photos that we typically see in a child pornography case.

4  They weren't child pornography.  He asked for something far

5  more explicit, but -- but this is a case in which Mr. Sheltra

6  was not particularly successful in some of his endeavors.  That

7  doesn't mean that he wasn't doing everything he could to be

8  successful.

9       But I was thinking about it in terms of if we have people

10 who are driving while intoxicated and they have the same blood

11 alcohol and the same measure of driving, one of those people

12 may by chance kill somebody and the other person does not, and

13 the same thing with distribution of drugs.  One person may have

14 death resulting and the other person does not.  And we usually

15 do punish somebody more seriously if there is an actual harm to

16 somebody.

17      In this case there's kind of -- it's a split because we

18 have a live minor victim.

19           MR. KAPLAN:  So, Judge, it's interesting.  I was

20 actually going to make the same analogy, because when I was

21 looking at this, I remember something Judge Kupersmith said to

22 me, and I don't remember everything he's ever said, but a

23 client was being sentenced for DUI with death resulting, and

24 essentially what he said to my client was exactly what the

25 Court just said:  "You know, you didn't intend to go out and

kill someone, but you had the same level of alcohol in your
system, but you didn't have good luck.  You know, you went off
the road and your friend died."  And so he was -- so you do
look at the harm that someone causes as opposed to someone else
who may have caused less harm.

But with respect to these charges, I thought about that,
and it occurs to me there's certainly a harm to society, and I
think that might answer your question --

THE COURT:  But there's also an intended harm.  So
unlike the drunk driver where he didn't go out intending to
kill his friend, if I accept the jury's verdict, which I do,
and I see the messages, there was intent to commit very serious
acts.

MR. KAPLAN:  But does a person who intends to commit a
serious crime get the same sentence as someone who actually
committed it?  I mean, if someone attempted to shoot someone
but missed them, does he get the same sentence as someone who
actually shot someone and killed them?  That's -- usually in
most cases you don't end up with the same, but it's difficult
to compare cases.  So I agree.  I think there clearly was a
harm to society generally, if nothing else.

And the other thing I looked at was the federal sentencing
guideline statistics, which talk about what an average sentence
is.  Just looking briefly, your Honor, at the cases that I
mentioned, we've already had a discussion about my feeling that

it's important not only to look at the crime that someone's
been convicted of but also to look at the harm that they've
done or actually what it is that they actually did as opposed
to the crime they've been convicted of.

I think the Nicholas Rodimon case is really a helpful case
in determining what is an appropriate sentence. Nicholas was
someone who was in his late 20s, early 30s. I don't remember.
He had no criminal record. He paid a woman in Romania, a
mother, and had her videotape her having sex with her young
child. And he did that on several occasions over -- over
several months. And his guideline was a level 39, which is the
low end of 21 years. And in that case, I mean, he admitted
guilt. He pled guilty. But in that case the Government agreed
to 114 months.

So I draw a couple conclusions from that. One is clearly
a life sentence is not appropriate in this kind of a case if
Nicholas Rodimon -- if everyone agreed his sentence was a
reasonable sentence at 114 months. I also think it supports a
sentence of 10 years for the reasons that we just -- reasons
based on the conversation we just had, which is in Count 1,
there wasn't any harm that was done to anyone other than to
society. There was an intended harm, but it didn't occur.

Count 2, obviously, as the Court's indicated, that's more
problematic, but what that involved was the allegation that my
client asked for certain pictures, which he didn't receive, and

1  there was an --

2          THE COURT:  Is that not Count 3?

3          MR. KAPLAN:  Well, Count 3 was where he asked for

4  pictures.  That's right.

5          THE COURT:  Yup.

6          MR. KAPLAN:  But I think Count 2, there was an

7  allegation that he actually touched this young woman,

8  15-year-old girl, above her clothing on one occasion, and I

9  wouldn't begin to minimize that, and I wouldn't begin to

10  suggest that wouldn't have a long-term effect on a young

11  person.  But does it compare to what Nicholas Rodimon did?  I

12  don't think so.  And maybe it's not reasonable to compare harm

13  like that, but I do think -- I think the Court should spend

14  some time thinking about the actual harm that was done by Mr.

15  Sheltra.

16      The Brian Folks case is another one.  Brian was convicted

17  of a 10-year mandatory minimum in a drug conspiracy and

18  convicted of numerous sex trafficking charges.  There was some

19  very graphic testimony about a sexual assault that occurred,

20  about physical and mental abuse with a number of young women

21  over a three- or four-year period.  He had a criminal record.

22  He had served 14 years for manslaughter, and his -- and he went

23  to trial, hasn't admitted guilt, and his sentence was 22 years.

24  So I use that as an example to sort of point out why, at least

25  in the District of Vermont, I think a 10-year -- a life

sentence that the guideline recommends is not appropriate.  And
again, looking at the harm, seems to me that a 10-year sentence
in this case in comparison is not an unreasonable approach.

I also suggested that it would be appropriate to look at
the federal sentencing guideline statistics, and just to make a
long story short, those suggest to me that the average sentence
in these cases, sexual abuse cases, is between 15 and 16.7
years, and for people who are in a criminal history category I,
it's, you know, between 15 and 16 years.  It wasn't a huge
sample.  It was, like, over 800 individuals, I guess, whose
cases they looked at.  But I think you can draw certain
conclusions from that.  If the average sentence is 15 to 16
years, you have to assume there are some people whose
activities that they were convicted of were more serious than
what my client did and maybe some that were just as serious or
less serious.  But I would assume it ran the gamut.

And the question that I have is:  Why is Mr. Sheltra's
guideline so high compared to the average guideline, the
average sentence?  And what I have concluded is it's that
eight-level enhancement under 2G1.3(a)(3).  If you take away
that eight-level enhancement -- he was at a level 43.  You take
away eight levels for that enhancement, now he's at a level 35,
criminal history category I, and all of a sudden his low end of
the guideline is 14 years.

So that's why when I was talking to the Court earlier

1  about, well, it may be the guideline is accurate as applied,

2  but when you start looking at the 3553(a) factors, maybe that's

3  one consideration the Court might look at and say, "I don't

4  think it's appropriate to increase his guideline by eight."  I

5  mean, that's a huge increase.  I don't understand the rationale

6  for such a large increase.

7       It occurs to me that there very well could be someone who

8  was convicted in that 15-to-16-year range who maybe the victim

9  in their cases were 12 years old and there's others whose

10  victims were 11-1/2 years old and the difference between the

11  two would be an eight-year *[sic]* enhancement.  And it seems to

12  me that that's just not reasonable.  And particularly in a case

13  like this where -- I guess we're getting back to what the

14  intended harm was.

15       The only reason the alleged victim in this case was nine

16  years old is because that's what the undercover agent said.  If

17  the undercover agent had said she was 12, then he wouldn't be

18  getting that eight-level enhancement.  And if my client was

19  interested -- well, I'm not going to -- I'm just saying it

20  seems particularly unfair in this case since there really

21  wasn't a 9-year-old, and I know the Court's thinking about --

22  well, I'm not suggesting what the Court's thinking about, but

23  someone might think about the fact that he still intended to do

24  it.

25            THE COURT:  Knowing she was nine.

1      MR. KAPLAN:  Yes.  But, you know, if the Court starts
2  looking at the 3553(a) factors and takes away that eight
3  levels, all of a sudden we're down to what the average sentence
4  is, even a little bit below it.  So if you look at Nicholas
5  Rodimon at 11 years and the average at 15 to 16 years and if
6  you take away the eight-level enhancement, now we're at 14
7  years.  You're looking at a sentence someplace, I think,
8  between 11 and 15 years, which would be far more reasonable
9  than the life sentence that -- particularly given my client's
10  age.  You know, he's going to be 60 in the spring.  If he gets
11  a 15-year sentence, he'll be in -- most likely in his early 70s
12  before he's released.  So it seems to me that taking a look at
13  the average sentence in these cases should be a helpful
14  starting point.

15      I'm assuming that the issues that the Court's concerned
16  about in terms of sentence is punishment and maybe protecting
17  the public in a case like this where the defendant hasn't
18  admitted guilt.  I don't think -- I don't think a sentence of
19  10 years is a short sentence.  I don't think it's a slap on the
20  wrist for someone my client's age who's never been in jail
21  before and all of a sudden has been in jail now for over three
22  years.  He's been punished in a number of different ways.  He's
23  lost everything.  He had a wonderful reputation.  He had a
24  house.  He had a car.  He had a bank account.  Everything's
25  gone.  He has nothing left in that respect.  He's also lost the

1  respect of people that have known him.

2      When he's released eventually, if he makes it through,

3  he's going to essentially be -- I assume his daughter may help

4  him, but he'll have nothing.  I think that's all a significant

5  punishment.

6      And in terms of protecting the public, when he gets out,

7  he's going to be on supervised release, I assume for quite a

8  while, and Probation's going to have a lot of control over what

9  he does or doesn't do.  I think Probation has the ability to

10 protect the public from anything that my client might think

11 about doing, if he's still so inclined to do that, and so I

12 think a 10-year sentence does provide -- keeps him off the

13 street for 10 years, and then a long time on supervised release

14 also protects the public.

15     And I think if you use 14 or 15 years as the starting

16 point, it should be reduced a little bit by his history.  I

17 mean, he worked for over 30 years for IBM.  He was a

18 supervisor.  He was extremely well respected by the people that

19 worked with him.  He was very successful.  He made a good

20 living.  And so I think it's appropriate to give him some

21 consideration because of that.

22     Thank you, Judge.

23          THE COURT:  All right.  Thank you.

24     Mr. Sheltra, do you want to make a statement on your own

25 behalf?

1    THE DEFENDANT:  I certainly support what Mr. Kaplan

2  said, and I appreciate all the work he went through to do the

3  behind-the-scenes analysis of similar cases and all that.  That

4  was a very extensive endeavor on his part.

5    And I would like to thank the Court when my other attorney

6  had to -- had a conflict of interest.  I would like to thank

7  the judge for appointing Mr. Kaplan.  It took a couple years to

8  go over before I could actually get the evidence that was --

9  that I sought that seemed more relevant than anything else in

10  this case in front of him, and it definitely made the

11  difference for me.

12    This has been a very challenging time throughout this

13  whole thing.  As I said in the letter that turned into a motion

14  on August 10th of 2020, your Honor, that turned into that

15  motion that we had, my actions have been gravely misunderstood,

16  and that is still the case.

17    I understand the -- what I've been convicted of, but that

18  was not my intent.  This has been a long, challenging time for

19  me with Mr. Kaplan because there were so many months in that

20  time frame, just about two and a half years, actually, before I

21  could talk to him about what I was trying to convey to him, and

22  that makes it very difficult, especially in these

23  circumstances.

24    The sensitivity of this information is such that I can't

25  build a case where I am.  I can't sit and look over my

1 materials.  It would result in -- my life would be -- is in

2 danger every day because of my charges, and so there's just no

3 way to have that material on hand, and so that in itself has

4 been extremely difficult, and so Mr. Kaplan has been able to

5 sort through that, and the first time that he said, "I see now,

6 I don't think you're guilty," that was -- that was the most

7 relieving point in my life, in reality, and that happened in

8 October of this past -- this past year, just when we were

9 starting the whole trial thing, and I had somebody who finally

10 read the material enough to understand that you can commit

11 things via email.

12      And the thing that -- I don't want to go back and -- I've

13 been convicted, so I understand, and I'm not trying to waste

14 your time, your Honor, but the fact that I did not solicit

15 anything from an undercover person, this was information that I

16 received from someone else that I was reacting to, and I

17 understand that that doesn't make it right, and it doesn't make

18 it right, but when you combine that with me asking if they're

19 undercover, the other side of this whole thing is, yes, I

20 understand the prosecution's jumping on that and saying, "Well,

21 yeah, he just wanted to make sure he could get away with

22 something because he wanted to know if this was a law

23 enforcement individual that he was talking to."

24      I have 23 years of management experience where I'm dealing

25 with interactions with people all the time, your Honor, and so

when I asked that question, if they were undercover, then it allowed me to understand that, no, this is a troubled person. This is somebody who's react- -- who is presenting me with information or with an opportunity, and they're sincere about it, and I truly believed that if you asked someone that was undercover, I thought they had to tell you that. That's a naive thing, but I had never been in trouble.

So there are a couple things that are stupid like that, but if I was able to put everything into a chronology and look through my own computer records with -- with an attorney, we would have had a different case, and we just weren't able to do that. Everything that we had for evidence was presented by the prosecution, and so it was very reactionary and was never proactive, because everything about my philosophy in this situation changed when that information was presented to me, and if -- no one can sit and listen to somebody who is offering their child up for sexual activity and not -- not have some reaction, dramatic reaction, to that, and so that's where everything came from with the two charges.

I don't know anything about what happened other than -- with my niece 35 years ago or whenever it was, but I do know the state police came to my house and we had an interaction and I gave them input, and it basically went away from there, okay? So that aside, talking about the charges that are -- that I was accused of and that were deliberated on by the jury, those

cases, this -- this plays a key role in that.

       And so to wrap this up, which Mr. Kaplan likes me to do,
is that the -- what I've been convicted of was not my intent,
and it's the same thing that I said to you in that letter from
August 10th, your Honor.  My actions have been gravely
misunderstood, and I know the things that I did, and when I was
just listening to Mr. Kaplan talk about the person from
Plattsburgh that we were interacting with, nobody wants to talk
about the fact that, well, she had volunteered the information,
and I was trying to understand.  I was -- I was on an
information mission, and -- because that's just my personality.
If I don't know something about something, I want to go find
out about it.

       And I could have done things a whole lot different.  I
regret the way that things happened.  I sincerely regret the
fact that I mistook Treena and -- but that -- my stroke does
come into play with that, because as I read -- I read all the
time in my cell, your Honor, and I am struggling with that, and
it's going to be, I guess, that way for the rest of my life.
Because if I imagine something or if I -- something else pops
into my head, that's the word I see, and that's where the
Treena thing came from, and the fact that ER was talking about
anal, that was -- it was on my mind with -- about Treena, and
that's where it went, and I understand that there's a
discrepancy there, but the theme is the same.  The theme was,

you know, a sexual theme, and so that was something that Treena

and I had -- were engaging in on a regular basis, and it just

came into play that way.

    But thank you very much for appointing Mr. Kaplan. This

has been a very long and tenuous process, and I wouldn't wish

it on anyone with the circumstances that I'm in in this

environment. But he has made the best of it. Especially in

the last 6, 8, 10 months, 12 months, we've worked together

extremely well. I really appreciate that. As I said, the

things that I'm convicted of, that was not my intent.

        THE COURT: All right. Thank you.

        THE DEFENDANT: If I could just --

        THE COURT: Go ahead.

        THE DEFENDANT: -- add, I know that because I am

not -- I have an issue with that my only two options are to lie

to you and say that I'm guilty of these things, because that

was not my intent, and receive the treatment that would allow

me to have a better -- a better recovery from this nightmare or

tell you the truth and feel the brunt of everything, the wrath

of justice that is under -- you know, is now on me because I'm

not lying to you. Do you understand what I'm saying?

        THE COURT: I do understand.

        THE DEFENDANT: If I were to say -- I mean, I could

have came and said, "Hey, I really screwed up, I'm guilty as

hell and I'm terribly sorry for it." But that would have

1  been -- that would have been perjury, and I would not do that,

2  your Honor.

3        THE COURT:  Okay.  Thank you.

4    Let's hear from the prosecutor.

5        MS. MASTERSON:  Thank you, your Honor.

6    To begin, your Honor, it's startling to hear what Mr.

7  Sheltra had to say, because he obstructed justice again.  He's

8  holding on to the lie about Treena; he characterized the

9  undercover as being the aggressor, she was saying things and he

10  was responding; he was on an information mission.  That's not

11  true.

12    The Court heard all the communications between the

13  undercover and Mr. Sheltra.  The undercover was very restrained

14  in her actions.  "What do you mean?  Tell me about this."  It

15  started with her saying, "I have a 10-year-old daughter.  Maybe

16  we have something in common."  And he took it right down the

17  information superhighway to talking about sex with her child.

18  So that's Mr. Sheltra again.

19    And he asked when somebody's offering up their child for

20  sex, somebody's going to have a reaction.  I personally would

21  call the police.  He engaged in aggressive sexual chatter with

22  that mother about sex with a child because that's where his

23  interests lay.

24    His actions he says were gravely misconstrued.  Mr.

25  Sheltra got due process.  He got a trial.  He got to pick his

jury.  He got all the Government's discovery.  He had extremely
competent counsel, a fair judge, fair prosecutors, and the jury
that listened to every word and hung in there even during our
COVID vacation, and he got the verdict that the evidence
supported.  So this is a continuation -- his comments are a
continuation of the misrepresentations that he has engaged in
for a good long time.

I want to start my comments by talking -- responding to
the Court's specific inquiries.  With respect to Victim 1, we
agree that the way that the Court has proposed addressing her
disclosures in the PSR is appropriate.  We talked to her and
asked her if she wanted to come in to testify to provide the
Court with live testimony and subject to cross-examination, and
she declined and said, "It wouldn't be good for me," and we
said fine, we'll go without it, which is why we withdrew that
in support of the five-level enhancement under 4B1.5 and
chose -- in filing her written statement, we didn't file it in
support of the PSR.  We narrowed the Court's -- or asked the
Court to consider what she wrote in connection with Mr.
Sheltra's history and characteristics.  That is the nature of
the offer and why we are comfortable about having her here.  So
I think the way the Court has resolved to address all these
issues is appropriate.

With respect to the computer enhancement, we -- you and I
have had quite a long discussion over the years about child

1  pornography cases, and I understand the Court's thinking, and I

2  appreciate that the Court has drawn a very clear and purposeful

3  distinction when it applies.  There's a difference, I

4  recognize, between a person who's sitting at home and

5  downloading child pornography through a peer-to-peer network,

6  because that's generally how those people get it, but Mr.

7  Sheltra's conduct was way different than that.  He was actively

8  trolling for people on the Internet.  He launched a number of

9  Craigslist posts, and then he used the Internet to continue

10  communicating with those victims, and we've got three that he

11  was communicating with.

12        THE COURT:  What about Mr. Kaplan's point of, well,

13  why is it worse to do that online than in person?

14        MS. MASTERSON:  Because you can lie about who you are.

15  You don't get Randy Sheltra, bald 57 -- or now 59-year-old man.

16  I mean, yes, he did -- would send a picture every so often,

17  along with pictures of his penis, but he could maintain a level

18  of anonymity and a level of aggression that you can -- you can

19  continue to pursue when there's nobody there startling -- being

20  startled, being offended, or anything, you're just doing it by

21  yourself and nobody knows who you are.

22     And it's that level of anonymity, that level of easy

23  accessibility to the conduct that makes the use of a computer

24  particularly insidious.  Because when is he going to have an

25  opportunity?  How is it going to come up when you can start

talking to somebody about having sex with her 10-year-old
daughter?  That doesn't come up, at least in my experience, in
ordinary conversation.  But you can find that communication
when you're looking for it, and we know that's exactly what Mr.
Sheltra did.

And so that's why I think that the use of the computer
enhancement is appropriate in light of the Court's comments,
particularly when we realize that at the end of his sur cross
at trial, the last questions that I asked him were, "So you
engaged in sex talks with the undercover about her 10-year-old
daughter?"  He admitted to that.  He admitted to talking to
Alisha with an A about sex with her 9-year-old daughter,
admitted that, and then pointed out, which I was surprised
with, that he engaged in sex talk with the person in
Plattsburgh that he was bragging to about the communication
with the 15-year-old that he wanted -- he was involved in
sexual chatter with her about sex with a child as well.  He
found three people.  His use of the computer was -- there was
no good associated with that activity.  It was all bad.  And
so -- and he made -- the computer enabled him to do that with
abandon, so we agree that the computer enhancement needs to
apply.

With respect to obstruction, the Court sees the Treena
exchange the way that we do, that -- I mean, let's go to the
law on the obstruction enhancement.  It has to be -- sorry.

I've got good notes.  Let me get it.

      THE COURT:  It has to be willful --

      MS. MASTERSON:  Material.

      THE COURT:  -- material, commit perjury, which is the intentionally giving of false testimony as to a material matter.

      MS. MASTERSON:  Yes.  The Court has it.  And that is exactly what his statement with respect to the anal sex trigger with -- or the testimony that he was triggered by the 15-year-old's reference to anal sex with her boyfriend, because we know that the actual communication where he first asked the 15-year-old happened 90 minutes before that triggering event that he very carefully assented to during cross-examination. That was not true because it was objectively discounted by the raw fact of the time difference, that the triggering event happened after his first request.

So it was willful to try to avoid the implications of having made that request; it was false because it was -- it was discounted by what was written on the text; and it absolutely was material, because if the jury had believed that Mr. Sheltra thought he was asking somebody different for pictures of her genitalia, he would have been acquitted on Count 3.  So this was absolutely material to the jury's decision-making because, if believed, he would have been acquitted of Count 2.

Similarly, and this came up when I was studying the

defense's sentencing memo -- I'm sorry.  At the beginning of
the hearing, I didn't hear that the Court had -- when it went
through all of the materials that it has reviewed, I assume the
Court has read our paperwork as well.

THE COURT:  Oh, yes.

MS. MASTERSON:  Okay.  It just -- that wasn't in the
list.

THE COURT:  Oh, I thought I said I had reviewed your
sentencing memoranda, but if I didn't, I have.

MS. MASTERSON:  Of course.  I figured that.  But when
I was reviewing the defense, another material lie came up,
because Mr. Sheltra claimed that he did not meet with the
15-year-old for sex in the car when he drove the day after they
met.  The Court obviously remembers that he bragged about
meeting with the 15-year-old in the emails to Person 1.  The
15-year-old provided a statement that's in the PSR that
describes what actually happened, which refers to touching.  In
the defense sentencing memorandum, they admit it, that he
touched her in -- when they were in the car together.

At trial, in response to the question from Mr. Kaplan,
when they're talking about his communications with the
15-year-old, Mr. Kaplan said, "Okay.  Did you actually" -- and
this is on page 427 of the trial testimony that was given on
November 11th [sic].

"Okay.  Did you actually -- when you met, did you actually

have physical contact with her?

"I just met her in my car. We -- I never touched her."

That was false. If believed -- so that was false. It was willfully given while he's at trial trying to save himself, and it absolutely was material as well because, if believed, then that would have bolstered his other testimony that he didn't have a sexual interest in children because he's testifying "I had the opportunity with the 15-year-old and I never touched her," and that was a lie.

If it had been believed by the jury, it would have been material and it could have led to an acquittal on either Count 1 or Count 2 because it would have bolstered the overall representation that he didn't have a sexual interest in children.

So with respect to the obstruction-of-justice enhancement, we have two specific lies that were willful -- willful and material and false. So -- and that is in addition to the larger ones that we've talked about where he falsely testified that he didn't have a sexual interest in children. I would suggest that the safer way to -- if the Court is going to find that an obstruction-of-justice enhancement applies, then the better way is to link it to either or both, preferably both, of these material false statements, so I assume that a court will later review it and the court will know exactly what it is that the Court found, but there was obstruction. No question about

1  it.  I think I've answered -- addressed the Court's questions.

2     All right.  If I may, I have thoughts on other matters

3  before the Court that were raised by counsel.

4     To begin, Mr. Kaplan mentioned the four other cases.  I

5  submit to the Court that the only one that has any potential

6  relevance is the Nicholas Rodimon case, which, conveniently,

7  the three of us handled together.  In that case, the Court will

8  recall -- I mean, because, you know, Folks, Monroe, and

9  Caraballo all were dealing with drug offenses, violent crimes,

10 and adult victims, not children.  Rodimon had a child victim,

11 and so that's where he has relevance in this case, because

12 we're dealing with that genre of crime against -- or crime, not

13 the drug-motivated.  It has a completely different mind-set.

14    But Mr. Rodimon, I mean, as the Court knows, he pleaded

15 guilty, so he got acceptance of responsibility.  He didn't

16 provide any false testimony.  He got the same sentence that the

17 woman got in Romania.  This was recommended to the Court, and

18 the Court agreed.  And the Court will recall that Mr. Rodimon

19 thought that he was in an emotional relationship with that

20 woman, and she was involved in a money-making venture.  He

21 thought that there was something going on.  And so there was a

22 much different confluence of factors that led the Government to

23 believe that this was a more -- that this would be an

24 appropriate resolution.  Counsel agreed, and obviously the

25 Court agreed.

1    The difference here is Mr. Sheltra, he went to trial; he
2  provided false testimony; he continues to deny his guilt.  And
3  the sentence that counsel is asking for is a mere 6 months
4  greater than what Mr. Rodimon got under wildly different
5  circumstances.  We submit to the Court that this -- that it's
6  apples and oranges in trying to equate how Mr. Sheltra presents
7  to the Court and what -- how Nicholas Rodimon presented to the
8  Court.

9    Talking about the actual and intended harm that were
10 caused by the defendant, we dis- -- we agree that there was
11 harm to society by his conduct.  And with respect to whether
12 there was an actual victim in Count 1, thank God there wasn't,
13 but he showed up to have sex with who he thought and hoped was
14 a 10-year-old and her daughter *[sic]*, okay?  So but for the
15 grace of God, he's now a child physical rapist.  And let's not
16 forget as well that in his quest to have sex with Maddie, the
17 daughter of Momma.mego, or Meg, they came together because he
18 was looking for Alisha, the mother of a 9-year-old, and the
19 Court will recall his testimony when Mr. Sheltra testified that
20 he wasn't going to let Meg go.  He wasn't going to make the
21 same mistakes that he made with Alisha because Alisha with an A
22 left and he was -- still a year later, he was still desperate
23 to get together and make it all happen.

24    So now we've got two little, tiny girls, 9 and 10 years
25 old, that he is desperate to have sex with, all right?  So, you

1  know, but for the grace of God, that didn't happen.

2      And also, let's not forget that he was communicating with

3  the Plattsburgh woman about sex with a child.  So now we've got

4  three.

5      So there is no actual harm, but there's plenty of intended

6  harm.  And let's not forget the fact -- so he's talking to

7  these three people.  One we know is an undercover.  So she's

8  not going to be swayed by him.  When he's trying to normalize

9  this conduct, she's going to realize that this is crazy talk.

10  But he's normalizing that behavior, that deviant sexual

11  behavior, and making it okay for at least two other people that

12  we know of:  Plattsburgh lady and Alisha with an A.

13      So that's how this conduct happens is people get on the

14  Internet and they find their support group, they find their

15  tribe.  He found three other people to talk to about sex with

16  kids.  They find each other, and then they work and they talk

17  and they make it okay for each other to commit these crimes.

18  And so that is a particularly insidious harm caused by Mr.

19  Sheltra's conduct, because he's normalizing it, and now people

20  on the receiving end of that communication think, oh, good,

21  we've got a friend over here, and they will talk to other

22  people, continue to normalize it, because now they've been

23  bolstered, or they might act on it, and we don't know.  So

24  that's another horrible harm that was caused by Mr. Sheltra.

25      As to Count 2, that was a real kid.  He absolutely hurt

her.  He admitted in his sentencing memo that he did meet her
and touch her, though it was over the clothes.  Well, we know
what happened based on what was written in the email to
Plattsburgh lady and in ER's statement.  But let's remember how
the 15-year-old presented.  In the very first email, she
responds to Mr. Sheltra's Craigslist post that said "Older Man
Seeking Younger Woman."  She announces that she's into, like,
puppies or something like that and has a very high libido.
That's a gold mine for Mr. Sheltra.

Some people might think that a child who presents at 15
and announces she has a very high libido, that she's troubled,
there's something going on that is horrible with this child
that she is talking with men on the Internet about sex and
suggesting that they get together at midnight.  But that's not
how Mr. Sheltra responded.  He was ready to jump in his car and
drive an hour and a half to Orange to meet with her for sexual
activity.

And then -- so -- and then he did meet with her the next
day.  And remember how concerned he was:  "Is your dad going to
be around?"  He had asked her, "Are you a cop?"  And she's
like, "No, I'm a kid," because she was, and then he's like,
"Who's going to be home?  Is there a place where we can meet?
I don't want anybody to find us."  His intentions were obvious
when he went there, and then he acted on them.  He did go.  He
did meet with her.

1    And even though he testified falsely at trial that he
2  didn't touch her, he did.  That's absolutely true.  And what
3  does that do to a 15-year-old kid that a 55-year-old man is
4  willing to jump in the car and meet her for sexual activity?
5  And she had a boyfriend also, so that's kind of an uncool part
6  of it.  But still, he jumps in the car and makes his way over
7  there to sexually assault her.  He didn't rape her.  We don't
8  believe that he raped her based on the disclosures that were
9  made.  But he still did that, and it's a gross overstep.
10    And, you know, I said in my closing argument she didn't
11  need a boyfriend.  She didn't need a lover.  She needed a
12  grown-up.  And Randy Sheltra was none of that.  He was a sexual
13  predator taking advantage of a vulnerable person.  And he
14  even -- I asked him on cross, "So when you showed up for sex --
15  sexual activity with her, was that part of the mentoring and
16  comfort that you were going to provide to this troubled child?"
17  And he kind of hemmed and hawed, but, I mean, there's no
18  escaping that the reason why he was engaged in these
19  conversations, he didn't care about her.  He just wanted to
20  have had her sexually.  That's the truth about Randy Sheltra.
21  And that's the harm that he caused to her is that he was more
22  than happy and willing to use her like that.
23    Similarly, the Count 3, even asking the questions to the
24  child "Will you send me a picture of your pussy lips," "I want
25  to see a picture of your labia," he's asking -- first off, he's

victimizing her, right, by even asking her to send to him these intimate photos; he's asking her to sexually exploit herself to him, this random guy that she met on the Internet; and she's -- and he's teaching her by that that she's just a sex object.  I mean, to him she clearly was.  That's all -- that's how they started and finished the relationship.  And asking her those -- there's only one part of her body that he really cared about from her, and that was her labia because that was his thing, and those were the requests that he asked.

        And so the damage to her psyche by having that sort of aggressive, dehumanizing activity by this person who testified that he cared, but we know that was more falsehood, is -- it's upsetting.

        And there was also -- when he asked her for these pictures, there was no representation "And I won't give them to anybody."  We know that he was more than happy to brag about his conquest with her to people because he was bragging about her to the person in Plattsburgh.  So if he was able to get her to exploit herself and he gets these images, what's he going to do with them?  He's certainly going to tell Plattsburgh lady that he got these images:  This 15-year-old hot little kid sent me these things.  He wanted it to masturbate to it.  That's what he wanted.  She was just a sex object.  And that dehumanizing for a child in that circumstance is damaging.

        In the defense paper, their sentencing memo, they object

1 and ask for a sentence that's not a *de facto* life sentence

2 because of Mr. Sheltra's age because he'll turn 60 next March,

3 and we submit to the Court that the only relevance of Mr.

4 Sheltra's age is what -- how does it relate to the degree of

5 danger that he will pose when he gets released.  He poses the

6 same danger now that he did at the time of his arrest, because

7 he's still not being truthful about his conduct; he has no

8 insight into what he did; he has no remorse whatsoever.  He's

9 still talking about how the undercover was the aggressor, which

10 we know is nonsense.  He has no remorse, completely

11 unrepentant, and his sexual interest in children is obvious.

12 That's where his danger is so keen and acute.

13     And there was one moment in the trial that the Court

14 probably remembers where it just -- it came out, because he's

15 testifying, "Oh, I don't have this interest in children and,

16 you know, I was there to counsel the 15-year-old" and that sort

17 of thing, but when I was asking him to go through the emails

18 that he sent to Plattsburgh lady, you know, and I broke it up

19 individually and is this true, is this true, is this true, and

20 we got to the part where on the second email, he confirmed that

21 he wrote, "She's got an amazing little body."

22     And I said that "You wrote that and that was true, right?"

23 And he said, "Yeah," and added, on his own, "She was adorable."

24 That was amazing, because he couldn't keep it in.  It came out

25 no matter what.  He's testifying as a defendant while in

1  custody in a federal criminal trial, and that was the most

2  truthful thing he said in his testimony, because his sexual

3  interest, he couldn't even contain it at the moment when the

4  jury probably didn't need to hear that under these

5  circumstances he still thought she was adorable.  And that

6  exchange, in the Government's view, defines who Mr. Sheltra is.

7  It really -- that's really all we need to know about Mr.

8  Sheltra is that answer.  And that defines and exposes him for

9  the risk that he presents.

10      So we submit that the Court needs to -- and I know the

11  Court will, in fashioning the appropriate sentence, needs to

12  factor in that this is who he is, and he's not going to change.

13  And his age is not relevant to whether he's going to age out of

14  this conduct.  The Court knows certainly that these are not --

15  people don't age out of having a sexual interest in children.

16  It persists because it's not really sex.  I mean, it is -- it

17  is married with a sex act and a sexual release, but this is

18  power, control, domination, and the special one that Mr.

19  Sheltra added was manipulation, because he worked so hard to

20  groom his victims.

21      I mean, he was working Momma.mego, the undercover, and

22  telling her, like, things to do and "It's all going to be fine"

23  and "Don't worry; she's going to -- we'll get Maddie to orgasm,

24  and I Googled whether a 10-year-old can reach orgasm, and

25  she'll do it so it's going to be pleasurable."  So he's -- he's

1  manipulating.  This isn't going to go away.

2      And another -- and a big problem with this is he's not

3  interested in getting treatment.  He won't be receptive to

4  treatment because he's still denying that it all exists.

5  That's the problem.  Mr. Kaplan pointed out, you know,

6  untreated sex offender.  That's exactly what he is, and as he

7  presents right now, including what he just told the Court, he's

8  not going to change, and that is scary, because the risk that

9  he poses is horrible.

10     We already have him doing the offense conduct that he was

11  convicted of.  That has got to be something that -- that

12  factors in not because, oh, poor guy doesn't have a lot to

13  live.  No, he's got plenty of time to live, but what's he going

14  to do and where is he going to be for the rest of his life, and

15  how can we address -- how can the Court address the risk that

16  he poses and keep the community safe?  That's the question.

17  Because his age doesn't do anything -- or the Government

18  submits that it shouldn't be any reason for mitigation because

19  he just poses that risk.

20     With respect to the guideline statistics, there are so

21  many holes and unanswered questions with respect to that.  The

22  attachments that Mr. Kaplan brought forth, they -- we don't

23  really get much help with that because there's no information

24  in those raw statistics about, you know, what was the offense

25  conduct; did the person go to trial; did they commit perjury;

1  were there multiple victims; what were the charges?  It just

2  says child pornography.  Was it possession?  Receipt?

3  Distribution?  Production?  Any mandatory minimums?

4      I mean, there are so many unknowns that -- I appreciate

5  that they came forward, and, you know, frankly, 15 to 16-1/2

6  years, that's about -- or the Government's recommendation is a

7  sentence of at least 200 months, which is about in the middle,

8  but, you know, the more I've been thinking about it, the more I

9  think that that might be low, particularly after the comments

10 that he made today which solidify, in the Government's view,

11 that Mr. Sheltra is not going to take any steps -- not capable

12 of taking any steps to change his ways.

13     With respect to the objections that the defense raised to

14 the presentence report, first off, they objected to any fact

15 that suggested he's guilty.  Well, that's a problem, because

16 the jury found beyond a reasonable doubt that everything --

17 that he committed these crimes, so they pretty much come in.

18 And moreover, the Court was there when I cross-examined him,

19 and he agreed to just about everything except whether he had

20 the specific intent, so it's inappropriate, I think, to launch

21 a blanket objection like that when his client admitted to 90

22 percent of it, probably 95 percent of it.  And the 5 percent

23 that he didn't agree to the jury rejected in its verdict and in

24 finding him guilty, it rejected the Treena story, and it

25 rejected the lie that he never touched the 15-year-old.

I've already addressed the obstruction enhancement and also the issues with the niece, so I'll move on to the 3553(a) factors.

As to the offense conduct and the seriousness of the offense, I mean, the Court knows it is absolutely horrible conduct.  I mean, the man showed up to have sex with a 10-year-old, and then we found out that he had had sexual activity with a 15-year-old that he met on the Internet.  This is danger -- and was asking her for child pornography.  This is horrible, horrible victimization of children and manipulation of the -- of both of them.

I mean, in my closing argument, I detailed exhaustively and probably a little too much the grooming process that he engaged in in all of the -- in his communications.  I mean, it was like a textbook example of how to groom somebody, you know, kind of teasing a little bit and make sure that the person isn't -- isn't a cop and, you know, it's going to be okay; I mean, what I've just mentioned about, you know, Googling "orgasm" to tell Momma.mego that her daughter's rape would be potentially pleasurable if she could achieve orgasm under those circumstances.  I mean, this is dangerous behavior and horrible behavior.

Mr. Sheltra's history and characteristics.  You know, it's interesting.  He makes a point of articulating that he was a good employee with a good work history, 30 years, well

respected. Well, I have to wonder how it is that IBM and

GlobalFoundries would have responded if they knew, and the

Court will recall this testimony, that a lot of the

communications that he wrote with the undercover, he did it

while he was at work. So he's talking to somebody about sex

with a 10-year-old while he's at work? I imagine that he would

not have been an employee at those places if they knew the

truth about him. The truth was revealed when he was arrested

and through the course of this proceeding, but it's a big

question as to whether that is actually -- if they had known

the truth about him, would he be well respected.

As to the punishment, look, he altered the course of the

15-year-old's life. He altered the course of the lives of the

other people that he communicated with. Particularly, though,

I'll focus in on the 15-year-old. I mean, when he is having

these chats and victimizing her and asking her to exploit

herself and manipulating her and he manipulated the

undercover - thankfully she was an undercover, not a real

mother - I mean, this is bad stuff, and then to show up to have

sex with a 10-year-old? He needs to be punished for what he

did to the 15-year-old and what he would have done but for the

fact that it was an undercover. This is outrageous conduct and

deserving of a significant sentence.

Again, as to protecting the public, I've already mentioned

that he is untreated, unrepentant, unremorseful child sex

predator, and it's not a question of if he will reoffend.  It's
when.  Because he's not capable of accepting any treatment,
assuming the treatment even works.  But he's -- the public is
at great risk of him, and he doesn't appear interested or
willing to accept the truth about who he is and then take steps
to try and mitigate the harm that he presents.

Mr. Sheltra asked the Court to say, well, no, give him 10
years and it's okay because he'll be on supervised release.
Well, that is -- that's a horrible suggestion because he's not
the only person that the Probation Office will supervise, and
they have -- you know, they're outstanding in the Probation
Department, but he's not the only one, and these guys reoffend
constantly.  I mean, the Court and counsel, we're all well
aware that these guys come back, they find a phone, and then
they get arrested with a phone, and then we find bad things on
it.

It is -- it's just then a question of time, because if
it's easy -- on these things it's not like we can drug test him
and find out if he is, you know, using drugs or whatever.
There is the polygraph that is a tool that's used in connection
with sex offender treatment, but these guys violate, and even
if he is out, though, and appears to be not violating, it's
hard to know if he is or is not.  And if he is, the problem is
the danger that will happen if he does violate.

The issue of deterrence is one that is a big one, I think,

1 in this case, general and specific.  I mean, general because
2 you don't get to show up to have sex with a 10-year-old and get
3 away with it, that there's going to be a significant punishment
4 handed down for that sort of behavior.  You don't get to meet
5 with a 15-year-old when you're 40 years older than she is.  So
6 there has to be the general deterrence.

7 And specific deterrence, obviously we need to make sure
8 that Mr. Sheltra doesn't do it again.  And I submit to the
9 Court that giving a sentence of 120 months, a 10-year sentence,
10 is not -- would not provide adequate deterrence, because it
11 would not capture the other bad conduct that he did and the way
12 that it presented, because he committed perjury, he obstructed
13 justice, he doesn't get acceptance of responsibility, so then
14 there's no incentive to go -- to plead out if you can go to
15 trial and lie and then you still get the mandatory minimum.
16 There has to be a consequence for these other factors that --
17 that are presented by Mr. Sheltra.

18 Also, there has to be a factor -- an acknowledgment that
19 he got a five-level enhancement for being a repeat and
20 dangerous sex offender because of what he did with the two
21 discrete, separate enticement activities that he engaged in.
22 This is -- there has to be accountability for all of this
23 conduct to deter him and to ensure that others who might think
24 that "This is not such a bad deal.  I can do 10 years because
25 I'll get to have sex with a 10-year-old," we need to make sure

that they know, no, anybody who thinks that this is a good
idea, you're going to have a hefty consequence that you're
going to have to pay.

Making another sentencing factor is the need for rehab or
treatment. He's not interested in it. He's not there. If
he's continuing to lie today, that he didn't have -- that
everything was misconstrued and he doesn't have a sexual
interest in children, sex offender treatment is not going to
happen. He won't take it or it will just be wah, wah, wah.

Sorry.

It's -- it will just be gibberish to talk to him, because
he's not there. You have to have some understanding to go into
treatment successfully, and the Court knows. You have to be
willing to expose yourself and be challenged by what's being
presented to you, but you have to admit certain fundamental
truths about yourself, and a fundamental truth about Randy
Sheltra is that he has a sexual interest in children that is
persistent. It has lasted for a very long time. According to
Victim 1, it started when he was a teenager. It's existed his
entire life, and now he's sitting in jail because of that.

That is what he has to do for effective treatment to
happen, and instead Mr. Sheltra's saying it was all a giant
misunderstanding.

So yes, he absolutely needs treatment, but I don't know
that it would have any good if he is in a mind-set where he can

1  take advantage of it, and so then we will be back to the place

2  where, again, untreated, unrepentant sex offender let loose,

3  and his risk of harming the community would remain.

4  　　　　THE COURT:  Let me ask you one issue that is not on

5  this topic, but I just remembered that I forgot to ask you.

6  Mr. Sheltra says that the facts in paragraph 29 are not

7  accurate in that he was in fact investigated by the police.

8  Now, that may not be inconsistent with she ultimately did not

9  go through with her complaint due to backlash she faced from

10  her family, but what about his allegation and his counsel's

11  allegation, which we haven't seen evidence for, that there was

12  a police investigation?  What, if anything, do you know about

13  that?

14  　　　　MS. MASTERSON:  Well, I looked to the victim impact

15  statement that we filed with the Court from Victim 1, and in it

16  she wrote, "I was not able to trust anyone, especially family.

17  I was completely rejected by the entire family once I filed a

18  police report in the summer of 1989."  And then she wrote near

19  the end, "When my uncle was arrested, I knew I had to come

20  forward and try to make sure he would never be able to

21  victimize another young female.  Was it hard?  Yes.  It was

22  extremely hard and entirely scary, but I knew I had to do the

23  humane thing and correct what I had not been able to accomplish

24  back in 1989."  And now she went on to say that she's been

25  rejected by the family members.

1    So I believe she did go to the police.  My understanding

2  based on our conversations with her was that she got bad

3  family -- no family support, was essentially ostracized, and I

4  believe that she withdrew the report, though if I may peek in

5  the back.  The agent is nodding yes, so I believe that that's

6  what happened.  So he may have been questioned.  I don't know.

7  But I do believe that there was a police report and it did

8  not --

9         THE COURT:  Okay.  So from your perspective, and I

10  assume that's what the probation officer was relying on, it is

11  accurate that she reported it to the police and that she did

12  not go through with it?

13         MS. MASTERSON:  That I believe is correct.

14         THE COURT:  Okay.

15         MS. MASTERSON:  I have just a couple more comments,

16  your Honor.  I feel like I've gone on a long time.

17    With respect to the unfair and allegedly arbitrary

18  Sentencing Guidelines, I -- counsel argued that eight levels

19  because the minor was under 12 is unfair and it appears to be

20  arbitrary.  You know, I would actually think about this one

21  more if our victim in this case was 11-1/2 and there was a

22  shading on that.  Our victim was 10, all right?  Eight levels

23  up is fine for an individual who shows up.  That's not

24  arbitrary.  That is a clean break.  If you're going to have a

25  10-year-old, that's -- that is different.  She wasn't 11-1/2.

1 There's -- it's not like, well, why, it's only 6 months
2 because -- you know, I should get four because it was so close.
3 No.  She's two years away from the next level.  Eight months
4 *[sic]* is fine.

5 And why is five levels, is that something that's fine for
6 the repeat and dangerous sex offender?  Common sense answers
7 that one, your Honor.  We have two discrete instances that he
8 was convicted of where he was a sexual predator of children,
9 one 10, one 15.  Five levels for that repeated behavior is --
10 is entirely reasonable.

11 With respect to the sentence, as we stand -- as I stand
12 here before the Court, Mr. Sheltra is, as I've said before and
13 I just need to say it again, unrepentant, without remorse,
14 without insight, not interested or amenable to treatment.  He
15 denies everything, even today.  He lied under oath.  He showed
16 up for sex with a 10-year-old.  He met for sex with a
17 15-year-old.  He chased obsessively after the mother of a
18 9-year-old so that he could have sex with that 9-year-old, and
19 that obsession lasted a year.  He was trolling another person,
20 the Plattsburgh person, for sex with a minor that he told us
21 about.

22 The risk of harm presented by this individual to the
23 community is off the charts.  All of the Section 3553(a)
24 factors insist on a significant sentence.  The most important
25 one, as I've made clear, is the risk of future harm that he

1 presents.  The only way to keep the community safe from Mr.

2 Sheltra, because he's not going to get any better, is

3 incarceration.  It's why the guidelines have set life as where

4 he ought to be.

5      There are no mitigators here.  The only mitigator that was

6 advanced is that he was a good worker, but I've got to question

7 that given that he was texting with a mother about sex with her

8 10-year-old while he was on the job.  But there's no other

9 mitigators that are here, just it's a really long time.  And we

10 agree, it's a really long time.  But we don't see any reason

11 that has been presented to deviate or vary from the guideline

12 level of life.

13      But we recognize that it's life, right, and it is a

14 significant sentence, and other courts may or may not.  We're

15 in Vermont, where our court, your Honor, doesn't just follow

16 the guidelines blindly and say that's it, that's the way it's

17 got to be.  And frankly, that's one of the blessings about

18 being in Vermont, for the Government and for Mr. Sheltra, where

19 I know the Court is thinking about this, which is why we

20 offered an alternative where we think that given the totality

21 of the circumstances, the offense conduct, the perjury, the

22 multiple victims, that a sentence of at least 200 months --

23 though I'm going to up that.  I think 220.

24      After what happened today, he is nowhere near being

25 anywhere close to being able to be released.  Not with the

1 things that he said today. He presents way too much of a risk,

2 and we think that there has to be a significant sentence to

3 address the immediate harm that he presents and then a

4 significant period of supervision. I know the Court isn't a

5 fan of lifetime, but in the appropriate case it will do it, and

6 I know the Court has. I think lifetime here is appropriate

7 given that his lifetime has had sexual assaults against

8 children, hands-on sexual assaults against children, and no

9 insight.

10 So we ask the Court at least 220 months followed by a

11 lifetime period of supervision.

12 THE COURT: Thank you.

13 MS. MASTERSON: Thank you.

14 THE COURT: Mr. Kaplan, anything further from you?

15 MR. KAPLAN: Just briefly, Judge.

16 To clear up one thing, in my sentencing memorandum, I said

17 the following. This is on page 6: "In Count Two, certainly

18 Mr. Sheltra's conduct was more serious in that the evidence

19 introduced at trial was that on one occasion he touched a

20 13-year-old girl mostly above her clothing, in an inappropriate

21 manner." So it wasn't my intent to acknowledge that he

22 actually did that, but I assumed that the Court would listen to

23 what was said at trial and put some weight on that, and so I

24 think it was mischaracterized by the Government, probably

25 unintentionally, but that wasn't my intent.

1    I do think the charts are helpful.  They talk about sexual

2 abuse in addition to talking about child pornography.  I

3 referenced the one that deals with sexual abuse.  I think it is

4 interesting to know what the average is in these cases.

5 Obviously the Court will make any distinction it wants to.

6    I was somewhat surprised to hear the Government minimize

7 Rodimon's conduct.  To argue that, well, maybe it's okay

8 because he thought he had a relationship with the mother I

9 don't think in any way negates just how serious that conduct

10 was.  But I agree with the Government that case is closer in

11 terms of what took place to this case, and if that's the case,

12 I don't know why a 10-year sentence, at least a sentence in the

13 range of 10 to 14 years, is not appropriate.

14    And Folks, one other misstatement.  He was also convicted

15 of sex trafficking with a minor, which carried a mandatory

16 minimum of 10 years.

17        THE COURT:  All right.  Thank you.

18    The Court begins with the presentence report.  I am going

19 to strike paragraphs 25, 26, 27, 28, and 30 from the

20 presentence report.  I'm going to maintain 24, 29, and 31 with

21 the addition to 31 of the "alleged" abuse.  The Court thinks

22 this strikes the appropriate balance between ensuring that

23 inflammatory information that has not been proved up does not

24 remain in the presentence report but also reflecting that V1

25 was on the Government's witness list; she was going to be an

impeachment or rebuttal witness on the issue of whether or not any of the conduct predated Mr. Sheltra's stroke; and she did in fact reach out to law enforcement after his case became public and, unsolicited, made a report that indicated that she had been a previous victim and provided the dates, and the Court finds that that is important information not only for the context in which this occurred and to rebut the defense of a medical condition but also for supervision purposes.

So with that alteration, the Court adopts the presentence report as its findings of fact in this matter.

With regard to obstruction of justice, an enhancement for perjury under Section 3C1.1 requires a sentencing court to find that the defendant willfully and materially committed perjury, which is the intentional giving of false testimony as to a material matter, and the fact that a defendant testifies at trial and is disbelieved by the jury and convicted is not alone sufficient evidence of perjury to bring about the sentence enhancement and -- because you could have testified from inaccurate testimony due to confusion, mistake, or faulty memory.

In this particular case, the Court does find that there were two instances of material false statements made willfully, and one was Mr. Sheltra testified under oath that he had no sexual interest in children, and the other he testified that when he asked ER to send him pictures of her genitalia, he

thought he was communicating with a woman named Treena.  I'll
take the first issue first.

Mr. Sheltra thinks that he has been misunderstood.  I
think he has been partially misunderstood.  So I am confident
that he has an interest in sexual activity with people other
than children and that he was interested in the mothers of
these children, but it is not accurate that that is the only
area of his interest, and the evidence to the contrary is
compelling.  So prior to the counts of conviction, he had a
lengthy exchange with a woman -- or a purported woman with --
whose name was Alisha with a capital A:  "I really want to F
you, but I want both."

"I am so f'ing horny, about to cum thinking about f'ing
you both.  Please hurry home, Randy."

"That's really good because I'm so f'ing horny, and I
definitely can't wait to F you and her."

"God, I can't wait to F both of you.  I want to cum deep
inside you both."

"When are you guys coming home so I can F you both?"

"Still desperately wanting you both."

"Hi Alisha.  Wanting you two so badly.  I've been waiting
to hear from you.  I need you both now.  I want the both of you
so bad."

Then with the undercover agent who's got the daughter
Maddie, statements such as "When my mouth is bringing pleasure

to your daughter, it will be you that is holding her hand,
caressing her, and encouraging her."

"While my comments regarding bringing Maddie pleasure are
genuine, I look forward to being intimate with both you and
her."

"I'll then proceed slowly to position her and I -- so that
I can tongue her young labia and stimulate her clit with my
lips and tongue."

"I want to feel her cum in my mouth, babe.  I want to suck
on her beautiful little pussy as she quivers in the pleasure of
orgasm."  And it goes on and on.

The correspondence with ER is also graphic.  It indicates
a clear interest in children.  If that was not enough, the
Government showed images of child pornography on the
defendant's phone.

He didn't need to testify that he had no sexual interest
in children.  That was not something that -- he could have said
he had a wide range of sexual interests, and he did, but his
testimony was he was never interested in the children; he was
only interested in the mothers; the mothers seemed to be
offering up their children; to -- to ingratiate himself with
the mothers, he pretended to have an interest in their
children, and the evidence was very clearly to the contrary.

The other instance of obstruction of justice was the
testimony that he thought he was communicating with Treena when

he was soliciting imagery from ER, sexual child pornography from ER, and the problem with that testimony is that the chronology does not work out.  He asked for the images first, and it was only after he asked for the images that there was this mention of anal sex which he thought -- or he testified confused him as to who he was speaking with.

So the defendant's testimony that he had no sexual interest in children was contradicted by the evidence presented at trial, specifically the defendant's correspondence with the undercover officer in which he wrote to the undercover officer about how to groom the child to be willing to engage in sexual activity with him and her mother and what sexual acts he wished to perform on the child and her mother; the defendant's correspondence with ER in which he wrote about feeling her body, having ER naked at his residence, performing oral sex on ER, having sexual intercourse with ER, and asking for pictures of ER's genitalia; and then the images of child pornography on the phone.

With regard to Treena, the defendant testified that when he asked ER to send him pictures of her genitalia, he thought he was communicating with Treena, an adult woman with whom he was engaged in a sexual relationship.  The defendant testified that his interactions with Treena involved anal sex and thus when ER mentioned engaging in anal sex with her boyfriend, the defendant believed he was speaking with Treena.  This testimony

was false as the reference to anal sex was made after the
defendant's first request to ER that she send him a picture of
her genitalia.  The defendant's false testimony was related to
material facts, material in itself, and made with the intent to
purposely obstruct justice because, if credited, defendant's
testimony would negate his motive necessary for Count 1 and
Count 2 and would negate an essential element of Count 3 that
he requested child pornography from ER, and on that basis the
Court finds that the obstruction-of-justice enhancement should
apply.

     With regard to the computer enhancement, the Second
Circuit has endorsed the use of computer enhancement in child
pornography and child exploitation charges.  In the Sentencing
Guidelines, the guidelines indicate that the computer
enhancement should not apply if it is only incidental.  They
give an example of using the computer to buy tickets to take a
minor to some place, and that would be an incidental use.

     In the District of Vermont, because of the criticisms of
the child pornography guidelines, the Court has typically not
imposed the computer enhancement when it is an essential
element of the offense, it's the interstate commerce
connection, and the person has engaged in peer -to-peer
software, which is the only way you can access it is through
the computer.

     This is a very different case.  There's active

solicitation of sex on the Internet, finding people through it,
communicating with them, and I agree with the Government that
the computer allows a degree of anonymity, it allows the person
to take the activity far further than they could in person, and
it captures some element of the offense that allows for more
multiple victims, more graphic testimony -- or graphic
communications, and an ability to hide behind anonymity in the
event that the person is not a willing recipient.

So the Court is going to apply the computer enhancement in
this case as well.

With regard to the enhancement for a pattern of sexual
activity, as -- the defendant recognizes that we have two
separate occasions of prohibited sexual conduct.  We have the
conduct underlying Count 1 and the conduct underlying Count 2,
so the Court does not need to include any conduct with Victim 1
in order to support that enhancement.

The Court begins with a guideline calculation.

Pursuant to the decisions of the Supreme Court in *United
States vs. Booker* and *Gall vs. United States*, and the Second
Circuit Court of Appeals' decision in *United States vs. Crosby*,
in determining the following sentence, the Court has considered
the United States Sentencing Guidelines applicable in this
case, including all departure authority contained in the
guideline policy statements, as well as all the factors
enumerated in 18 USC, Section 3553(a).

1    The Court finds as follows:

2    The offense of Counts 1 and 2, attempted interstate

3 enticement of a minor to engage in sexual activity, in

4 violation of 18 USC, Section 2422(b), occurred on or about

5 September 7th, 2017, and from on or about August 20th to 31st

6 of 2017.   The offense of Count 3, attempted receipt of child

7 pornography, in violation of 18 USC, Section 2252(a)(2) and

8 2252(b)(1), occurred on or about August 25th, 2017.   Hence the

9 Sentencing Guidelines apply.

10   Counts 2 and 3 are grouped together as Count Group 2

11 pursuant to U.S. Sentencing Guidelines Section 3D1.2(b) because

12 these counts involved the same victim, ER, and two or more acts

13 or transactions connected by a common criminal objective or

14 constituting part of a common scheme or plan.   Pursuant to U.S.

15 Sentencing Guidelines Section 3D1.3(a), since Count 2 results

16 in the higher offense level, it will be the controlling

17 guideline calculation for Count Group 2.

18   The guideline for Count 1 is found in Section 2G1.3 of the

19 Guidelines Manual, November 1st, 2018, edition.   Pursuant to

20 Application Note 1 of that section, a "minor" includes

21 fictitious individuals who a law enforcement officer

22 represented had not attained the age of 18 years and could be

23 provided for the purpose of engaging in sexually explicit

24 conduct.   Therefore, the fictitious 10-year-old girl described

25 by the undercover officer will be used as the minor victim of

this offense for the purpose of the guideline calculation.

The defendant was convicted of violating 18 USC, Section 2422(b); therefore, the base offense level is 28 pursuant to U.S. Sentencing Guidelines Section 2G1.3(a)(3).

Specific offense characteristics apply:

The offense involved the use of a computer or an interactive computer service, Craigslist, to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor. The defendant engaged in emails with the undercover officer enticing and encouraging the "mother" of the minor on how to groom the child to be willing to engage in sexual activity with him and her mother and what sexual acts he wished to perform on the child. Therefore, the offense level is increased by two levels pursuant to U.S. Sentencing Guidelines Section 2G1.3(b)(3)(B).

U.S. Sentencing Guidelines Section 2G1.3(a)(3), applies and the offense involved a minor who had not attained the age of 12 years. Therefore, the offense level is increased by eight levels pursuant to U.S. Sentencing Guidelines Section 2G1.3(b)(5).

The Court makes the following findings by a preponderance of the evidence, pursuant to *United States vs. Dunnigan,* that the defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice when he provided false testimony at trial. Specifically, the Court

finds that the defendant testified under oath that he had no sexual interest in children; and the defendant testified under oath that when he asked ER to send him pictures of her genitalia, he thought he was communicating with Treena.

The defendant's false sworn testimony was related to material facts and made with the intent to purposefully obstruct justice because, if credited, defendant's testimony would negate his lack of motive for Counts 1 and 2 and would negate an essential element of Count 3, his request for child pornography from ER.  Therefore, the offense level is increased by two levels pursuant to U.S. Sentencing Guidelines Section 3C1.1.

The adjusted offense level for Count 1 is 40.

The guideline for Count Group 2 is found in Section 2G1.3 of the Guidelines Manual, November 1st, 2018, edition.

The defendant was convicted of violating 18 USC, Section 2422(b); therefore, the base offense level is 28 pursuant to U.S. Sentencing Guidelines Section 2G1.3(a)(3).

Specific offense characteristics apply:

The offense involved the use of a computer or an interactive computer service, Craigslist, to persuade, induce, and entice a minor to engage in prohibited sexual conduct.  The defendant engaged in online and text message communications with ER in attempts to have her engage in sexual conduct with him and successfully arranged for them to meet, where they did

engage in sexual conduct.  Therefore, the offense level is reduced -- increased by two levels pursuant to U.S. Sentencing Guidelines Section 2G1.3(b)(3)(A).

The offense involved the commission of sexual contact between the defendant and ER when they met in the defendant's car and he placed his hand on her breast, under her shirt but over her bra, and placed his hand on her vagina over her pants. Therefore, the offense level is increased by two levels pursuant to U.S. Sentencing Guidelines Section 2G1.3(b)(4)(A).

The Court makes the same findings of fact by a preponderance of the evidence for Count -- as it did previously for Count 1, that the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when he provided false testimony at trial. Therefore, the offense level is increased by two levels pursuant to U.S. Sentencing Guidelines Section 3C1.1.

The adjusted offense level for Count Group 2 is 34.

Units for the multiple-count adjustment are assigned pursuant to U.S. Sentencing Guidelines Section 3D1.4.  Count 1 is assigned one unit as it has the highest offense level. Count Group 2 is assigned one-half unit as it has an offense level that is five to eight levels less serious than Count 1. There are a total of 1.5 units; therefore, the offense level for Count 1 is increased by one level.

The combined offense level is 41.

The defendant qualifies as a repeat and dangerous sex offender against minors pursuant to U.S. Sentencing Guidelines Section 4B1.5(b)(1).  The Court makes the following findings:

The offense of conviction is a covered sex crime, neither Section 4B1.1 (career offender) nor subsection (a) of Section 4B1.5 applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct.

The defendant engaged in at least two separate occasions of prohibited sexual conduct:

One, the conduct underlying Count 1 of the second superseding indictment.  Specifically, the defendant's attempted enticement of a minor to engage in sexual activity which he communicated with the -- when he communicated with the undercover officer, whom he believed was the mother of a 10-year-old female child who was willing to make the child available for prohibited sexual conduct with the defendant.

This conduct qualifies as prohibited sexual conduct as it violates 18 USC, Section 2422(b).

The conduct underlying Count 2 of the second superseding indictment.  Specifically, the defendant's attempted enticement of a minor to engage in sexual activity when he communicated with ER to induce her to engage in prohibited sexual conduct. Additionally, when the defendant met with ER and did engage in sexual conduct with -- contact with the minor between the ages of 12 and 16.

1    This conduct qualifies as prohibited sexual conduct as it
2  violates 18 USC, Section 2422(b) and 2244(a)(3).

3    Therefore, the offense level is increased by five levels.

4    The enhanced offense level is 46.

5    The defendant entered a not guilty plea, proceeded to
6  trial, and was convicted; therefore, there is no reduction for
7  acceptance of responsibility.

8    Pursuant to Chapter Five, Part A, comment note 2, in those
9  instances where the offense level is calculated in excess of
10  43, the offense level will be treated as a level 43.
11  Therefore, the total offense level is 43.  The defendant has
12  zero criminal history points, resulting in a criminal history
13  category of I.  The guideline range of imprisonment for an
14  offense level of 43 and a criminal history category of I for
15  Counts 1 and 2 is life and for Count 3 is 240 months due to the
16  statutory maximum.

17    The guideline term of supervised release is five years to
18  life per count.  The defendant is ineligible for probation.

19    In addition to the Sentencing Guidelines, the Court
20  considers the factors set forth in 18 USC, Section 3553(a), in
21  an effort to impose a sentence that is sufficient, but not
22  greater than necessary.

23    In deciding what is a sufficient, but not greater than
24  necessary, sentence, the Court is directed to consider a number
25  of factors:  the nature and circumstances of the crime; your

history and characteristics; the need for the sentence imposed; the kind of sentences available; the need to avoid unwarranted sentencing disparities between defendants with similar criminal histories who've committed similar crimes, and that's why we're talking about what happens in other cases and what kind of sentences people received. The goal is to be fair to you and to be fair to them as well.

In deciding the need for the sentence imposed, the Court is directed to reflect the seriousness of the offenses; promote respect for the law; impose just punishment; protect the public from future crimes by you; impose what we call specific deterrence, say to you, "Mr. Sheltra, don't do this. It has consequences," and hopefully you'll be motivated, and also general deterrence, say to the community at large, "Children are our most vulnerable citizens. We have to protect them. We can't allow this type of activity to occur, either online or in person, because it victimizes them in a way that many, many years of therapy are not going to address." The Court also needs to make sure you get rehabilitation, mental health treatment, substance abuse treatment, vocational and educational opportunities, medical treatment in the most effective manner.

In this case, the conduct is serious by any measure. It is soliciting sexual contact of the most intimate kind with very young children and actually meeting up with someone who

1  you knew was not of the age of consent, and I do believe you
2  believe genuinely that you're just a person who's very curious,
3  you have a wide range of sexual interests; if somebody
4  introduces a topic, you're, you know, on board to discuss it
5  further, that's what you want to do.  But in this case you
6  actually showed up to meet the undercover officer, and you
7  actually had in-person conduct with ER, and the danger of your
8  fantasy world is acting on it, and it's a real danger, and it
9  seems incredible that there are a wealth of victims willing to
10 send people -- effectively make their own child pornography and
11 send it to complete strangers, but it happens every day.
12      I don't think you appreciate the danger to the child.  I
13 say that you do that genuinely.  I think that you think that
14 it's society's values that are doing this, but I can tell you
15 after having met many victims of sexual abuse, they don't --
16 they don't recover from it.  It's often a lifetime problem.  It
17 affects their relationships with other people, how they view
18 themselves, and that's because they're children, and they can't
19 process that, and they can't separate out whether they agreed
20 to it or they went along with it, why they didn't tell anybody,
21 why they didn't protect themselves.  It's a very, very damaging
22 thing to do, and it's almost impossible to repair the damage.
23 And that's something that you do need to appreciate.  Whether
24 you think that a wide array of sexual interests is okay, the
25 real harm to a victim is something that you do need to

1  appreciate, and I'm not convinced that you're at that point
2  now.

3      I'm not going to penalize you for going to trial.  That's
4  what we do.  I wouldn't expect you to plead guilty if you
5  didn't think you were guilty.  So I respect your right to go to
6  trial and present a defense, and you did so.

7      Nothing in your criminal history that I know about would
8  suggest that you would be here.  So you come to us with zero
9  criminal history points, long-term employment, responsible
10 employment in positions of management, as your attorney pointed
11 out.  We had one juror that said he couldn't sit on your case
12 because you had been an excellent manager.  I read the letter
13 from your daughter, and she had nice things to say about you.
14 But things got very far off track, and you could have stopped
15 yourself.  You knew enough that if that was in fact an
16 undercover cop, that you were going to be in trouble, and --
17 and you mistakenly believed that if you asked that question, an
18 undercover cop had to tell you the truth.  But you knew enough
19 and it's there in the communications that this was dangerous
20 territory that you were in and that you could go to jail.  And
21 in fact, you told that to ER, that, "Hey, we can't have sex if
22 you're not going to -- if you're not of the age of consent
23 because I'm going to go to jail," and then you told somebody
24 else, "Yeah, if we were in a different place, we certainly
25 would be having sex."

1    I think that a life sentence is way beyond what would be
2  imposed in this case, and I think the guidelines in that
3  respect are unreliable.  The incarceration of you for the rest
4  of your lifetime for these offenses would be an unjust
5  sentence.  That being said, the conduct is serious enough and
6  the danger to the public is serious enough that a lengthy
7  sentence is warranted.

8    In deciding what is an appropriate sentence, I have
9  considered other cases, but I've also considered that we're in
10 the midst of a pandemic and that you yourself have suffered.
11 You've been in quarantine more times than I can count.  You had
12 COVID, and you haven't been able to engage in any programming,
13 and there's no certainty that you will be able to anytime in
14 the future.  So the Court has factored that in.

15    I am effectively going to impose a sentence that you will
16 be under supervision for a lengthy period of time, either by
17 incarceration or supervision, but I've tried to counterbalance
18 the availability of supervised release with the incarcerative
19 sentence so that I might be imposing a slightly more lenient
20 incarcerative sentence and counterbalancing it with a longer
21 time of supervised release.  I do believe supervised release is
22 sufficient to protect the public, especially for our online
23 predators.  Ms. Masterson is right that people violate, but we
24 also catch them, and they go back to jail.  So in the event
25 that that's going to be something that you continue to do, you

will go back to jail.

For all of those reasons, the Court has determined that a total sentence of 180 months, with credit for time served, followed by a 30-year term of supervised release is a sufficient, but not greater than necessary, sentence.

It is the sentence of the Court that the defendant be committed to the custody of the Federal Bureau of Prisons for 180 months on Counts 1 and 2 and Count 3, all counts to be served concurrently, to be followed by a 30-year term of supervised release on each count, served concurrently.

The conditions of supervision are as follows:

You must not commit another federal, state, or local crime.

You must not unlawfully possess a controlled substance.

The Court finds that the defendant presents a low risk of substance abuse and, in accordance with 18 USC, Section 3583(d), 3563(a)(5), suspends the requirement that the defendant participate in drug testing while under supervision.

You must cooperate in the collection of DNA as directed by the probation officer.

You must comply with the requirements of the Sex Offender Registration and Notification Act, 42 USC, Section 16901, *et seq.*, as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were

convicted of a qualifying offense.

You must comply with the standard conditions of supervision adopted by this court. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the Court about, and bring about improvements in your conduct and condition.

You must participate in an approved program of sex offender evaluation and treatment, which may include polygraph examinations, as directed by the probation officer. Any refusal to submit to such assessment or tests as scheduled is a violation of the conditions of supervision. You will be required to pay the cost of treatment as directed by the probation officer. The Court authorizes the probation officer to release psychological reports and/or the presentence report to the treatment agency for continuity of treatment.

You must not use computer devices, as defined in 18 USC, Section 1030(e)(1); electronic devices capable of Internet access; or any media storage devices until a Computer Use Plan is developed and approved by your treatment provider and/or probation officer. Such plan, at a minimum, may require you to submit a record of Internet use, online screen names, encryption methods, and passwords utilized by you.

You must allow, at the direction of the probation officer

1  and at your expense, the installation of monitoring hardware or

2  software to monitor your use of a computer system,

3  Internet-capable devices, and/or similar electronic devices

4  under your control.

5      You must provide the probation officer with access to any

6  requested records, such as bills or invoices for credit cards,

7  telephone and wireless communication services, television

8  provider services, and Internet service providers.

9      You must provide the probation officer with a complete and

10  current inventory of the number of computers, as defined in 18

11  USC, Section 1030(e)(1); electronic devices capable of Internet

12  access; or any media storage devices used, possessed, or in

13  your control along with a monthly log of computer access.

14      You must not access any computer devices, as defined in 18

15  USC, Section 1030(e)(1); electronic devices capable of Internet

16  access; or any media storage devices that utilize any

17  encryption, anonymization, "cleaning" or "wiping" software

18  programs.

19      You must not view, access, or possess images or videos

20  depicting sexually explicit conduct involving adults, as

21  defined in 18 USC, Section 2256(2)(A), unless a psychosexual

22  evaluation determines that access to adult pornography will

23  not -- will not impair treatment goals or the safety of the

24  community; child pornography, as defined in 18 USC, Section

25  2256(8); or visual or text content involving minors which has

sexual, prurient, or violent interests as an inherent purpose.

You must not associate or have contact, directly or indirectly through a third party, with persons under the age of 18, except -- I should say directly or through a third party and strike "indirectly," except in the presence of a responsible adult who is aware of the nature of your background and who has been approved in advance by the probation officer. Such prohibited conduct shall include the use of electronic communication, telephone, or written correspondence.

You must avoid and are prohibited from being in any areas or locations where children are likely to congregate, such as schools, day-care facilities, playgrounds, theme parks, arcades, unless prior approval has been obtained by the Probation Office.

You must not have contact, directly or through a third party, with the victims in this case. Such prohibited conduct shall include the use of electronic communication, telephone, or written correspondence.

You must submit your person and any property, house, residence, vehicles, papers, computer, other electronic communication or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in

1 the lawful discharge of the officer's supervision functions.

2 Such searches may include the removal of such items for the

3 purpose of conducting a more thorough inspection.  You shall

4 inform other residents of this condition.  Failure to submit to

5 a search may be grounds for revocation of release.

6      The guideline fine range is from $50,000 to $500,000.  The

7 defendant has not demonstrated an inability to pay -- the

8 defendant has demonstrated an inability to pay a fine.  Hence

9 all fines are waived.

10      A special assessment of $300 is imposed, due immediately.

11      Both the defendant and the Government may have the right

12 to appeal this sentence.  In addition, the defendant has the

13 right to appeal his conviction and any pretrial rulings or any

14 trial rulings by the Court.  If the defendant is unable to pay

15 the costs of an appeal, he has the right to apply for leave to

16 appeal *in forma pauperis*, in which event we would waive the

17 cost of an appeal, and he may request the court to appoint

18 counsel for him.  If the defendant so requests, the clerk of

19 the court shall prepare and file forthwith a notice of appeal

20 on behalf of the defendant.  Notice of appeal by the defendant

21 must be filed within 14 days of the date judgment is entered on

22 the docket pursuant to Rule 4(b) of the Federal Rules of

23 Appellate Procedure.

24      Ms. Masterson, do you have anything to dismiss in this

25 case?

1          MS. MASTERSON:  We do not, your Honor.

2          THE COURT:  Mr. Kaplan, do you have any

3   recommendations as to where Mr. Sheltra serves his sentence?

4          MR. KAPLAN:  I would suggest where they provide the

5   counseling that Mr. Sheltra would benefit from if he decides to

6   do that.  I'm trying to remember where that is.

7          THE COURT:  Are you talking about sex offender

8   treatment and counseling?

9          MR. KAPLAN:  Yes.  Right.

10         THE COURT:  I know that Devens has it.  I can also

11  make a recommendation as close to Vermont in a low security

12  setting available.

13         MR. KAPLAN:  Actually, Fort Devens I think would be

14  appropriate.

15         THE COURT:  All right.  And you agree with that, Mr.

16  Sheltra?

17         THE DEFENDANT:  I do initially, your Honor, but I

18  would like to see the list just so that I can understand --

19  it's a major step, so I'd like to go over what my opportunities

20  are with Mr. Kaplan, if I could.

21         THE COURT:  Okay.  Well, we're going to get an amended

22  presentence report, so I'll make a recommendation to Fort

23  Devens and find that it is -- because it is close to Vermont in

24  the lowest security setting available to Mr. Sheltra.  I also

25  recommend that he receive sex offender treatment and

1  counseling, which is offered there.  I will give Mr. Kaplan and

2  Mr. Sheltra an opportunity to suggest other locations, say in

3  the next five business days.

4           MR. KAPLAN:  Thank you, Judge.

5           THE COURT:  Anything further in this matter?

6           MR. KAPLAN:  No, your Honor.

7           MS. MASTERSON:  Not from the Government.  Thank you,

8  your Honor.

9       (Court was in recess at 3:55 PM.)

10

11

12                    C E R T I F I C A T I O N

13     I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15

16

17  February 10, 2022             _____

18                                  Johanna Massé, RMR, CRR

19

20

21

22

23

24

25

## $

**$300** [1] - 87:10
**$50,000** [1] - 87:6
**$500,000** [1] - 87:6

## 1

**1** [28] - 5:1, 6:1, 6:8, 9:24, 10:2, 21:5, 28:20, 40:9, 44:15, 45:12, 47:12, 60:19, 61:15, 71:6, 72:14, 72:15, 73:2, 73:18, 73:20, 75:8, 75:13, 76:12, 76:19, 76:22, 76:24, 77:10, 78:15, 83:8
**1's** [1] - 9:9
**1.5** [1] - 76:23
**10** [12] - 28:19, 32:19, 33:13, 38:8, 47:24, 58:7, 59:24, 62:22, 63:9, 66:13, 66:16, 89:17
**10-year** [8] - 25:5, 25:8, 29:17, 29:25, 30:2, 33:12, 59:9, 66:12
**10-year-old** [15] - 39:15, 42:1, 42:10, 47:14, 53:24, 56:7, 57:6, 57:20, 59:2, 59:25, 62:25, 63:16, 64:8, 73:24, 77:15
**1030(e)(1** [3] - 84:19, 85:11, 85:15
**10th** [2] - 34:14, 37:5
**11** [2] - 32:5, 32:8
**11-1/2** [3] - 31:10, 62:21, 62:25
**114** [2] - 28:14, 28:18
**11th** [1] - 44:24
**12** [6] - 31:9, 31:17, 38:8, 62:19, 74:18, 77:25
**120** [1] - 59:9
**13-year-old** [1] - 65:20
**14** [6] - 29:22, 30:24, 32:6, 33:15, 66:13, 87:21
**15** [9] - 30:7, 30:9, 30:12, 32:5, 32:8, 33:15, 49:10, 55:5, 63:9
**15-to-16-year** [1] - 31:8
**15-year** [1] - 32:11
**15-year-old** [19] - 11:17, 29:8, 42:16, 43:12, 44:13, 44:15, 44:16, 44:22, 45:8, 49:5, 50:3, 51:21, 52:16, 55:25, 56:8, 57:15, 57:21, 59:5, 63:17
**15-year-old's** [2] - 43:10, 57:13
**16** [4] - 30:9, 30:12, 32:5, 77:25
**16-1/2** [1] - 55:5
**16.7** [1] - 30:7
**16901** [1] - 83:22

## 18

**18** [16] - 72:25, 73:4, 73:7, 73:22, 74:2, 75:16, 77:18, 78:2, 78:20, 83:16, 84:18, 85:10, 85:14, 85:21, 85:24, 86:4
**18-CR-12-1** [1] - 2:4
**180** [2] - 83:3, 83:8
**1980s** [1] - 22:15
**1989** [2] - 61:18, 61:24
**1:31** [1] - 2:2
**1st** [2] - 73:19, 75:15

## 2

**2** [22] - 11:17, 21:5, 28:23, 29:6, 43:24, 45:12, 48:25, 71:7, 72:14, 73:2, 73:10, 73:15, 73:17, 75:8, 75:14, 76:17, 76:21, 77:19, 78:8, 78:15, 83:8
**200** [2] - 55:7, 64:22
**2017** [3] - 73:5, 73:6, 73:8
**2018** [2] - 73:19, 75:15
**2020** [1] - 34:14
**2021** [1] - 2:1
**2022** [1] - 89:17
**20s** [1] - 28:7
**20th** [1] - 73:5
**21** [1] - 28:12
**22** [1] - 29:23
**220** [2] - 64:23, 65:10
**2244(a)(3)** [1] - 78:2
**2252(a)(2** [1] - 73:7
**2252(b)(1** [1] - 73:8
**2256(2)(A** [1] - 85:21
**2256(8** [1] - 85:25
**23** [2] - 2:1, 35:24
**24** [3] - 5:2, 9:23, 66:20
**240** [1] - 78:15
**2422(b** [4] - 73:4, 74:3, 75:17, 78:2
**2422(b)** [1] - 77:18
**25** [1] - 66:19
**25th** [1] - 73:8
**26** [1] - 66:19
**27** [1] - 66:19
**28** [3] - 66:19, 74:3, 75:17
**29** [4] - 9:23, 22:13, 61:6, 66:20
**2G1.3** [2] - 73:18, 75:14
**2G1.3(a)(3** [1] - 74:16
**2G1.3(a)(3** [3] - 30:20, 74:4, 75:18
**2G1.3(b)(3)(A** [1] - 76:3
**2G1.3(b)(3)(B** [1] - 74:15
**2G1.3(b)(4)(A** [1] - 76:9
**2G1.3(b)(5** [1] - 74:20

## 3

**3** [10] - 29:2, 29:3, 43:22, 50:23, 71:7, 73:6, 73:10, 75:9, 78:15, 83:8
**30** [4] - 19:24, 33:17, 56:25, 66:19
**30-year** [2] - 83:4, 83:9
**30s** [1] - 28:7
**31** [5] - 5:2, 9:23, 66:20, 66:21
**31st** [1] - 73:5
**34** [1] - 76:17
**35** [2] - 30:22, 36:21
**3553(a** [9] - 10:25, 11:5, 19:11, 24:7, 31:2, 32:2, 56:2, 63:23, 78:20
**3553(a)** [1] - 72:25
**3563(a)(5** [1] - 83:17
**3583(d** [1] - 83:17
**39** [1] - 28:11
**3:55** [1] - 89:9
**3C1.1** [3] - 67:12, 75:12, 76:16
**3D1.2(b** [1] - 73:11
**3D1.3(a** [1] - 73:15
**3D1.4** [1] - 76:19

## 4

**4(b** [1] - 87:22
**40** [2] - 59:5, 75:13
**41** [1] - 76:25
**42** [1] - 83:22
**427** [1] - 44:23
**43** [5] - 30:21, 78:10, 78:11, 78:14
**46** [1] - 78:4
**4B1.1** [1] - 77:5
**4B1.5** [2] - 40:16, 77:6
**4B1.5(b)(1)** [1] - 77:3

## 5

**5** [1] - 55:22
**55-year-old** [1] - 50:3
**57** [1] - 41:15
**59-year-old** [1] - 41:15

## 6

**6** [4] - 38:8, 47:3, 63:1, 65:17
**60** [3] - 3:10, 32:10, 52:2
**60-day** [2] - 3:9, 3:14

## 7

**70s** [1] - 32:11
**7th** [1] - 73:5

## 8

**8** [1] - 38:8

## 800

**800** [1] - 30:10

## 9

**9** [1] - 47:24
**9-year-old** [5] - 31:21, 42:12, 47:18, 63:18
**90** [2] - 43:12, 55:21
**95** [1] - 55:22

## A

**abandon** [1] - 42:21
**ability** [2] - 33:9, 72:7
**able** [11] - 24:23, 35:4, 36:9, 36:11, 51:18, 61:16, 61:20, 61:23, 64:25, 82:12, 82:13
**about** [107] - 4:15, 4:18, 6:4, 8:4, 12:6, 12:12, 14:14, 17:2, 17:6, 17:9, 17:21, 20:1, 20:16, 22:25, 23:9, 24:7, 25:1, 25:23, 26:9, 27:6, 27:23, 27:25, 29:14, 29:19, 29:20, 31:1, 31:21, 31:22, 31:23, 32:16, 33:11, 34:20, 34:21, 36:4, 36:14, 36:20, 36:24, 37:7, 37:9, 37:12, 37:13, 37:22, 37:23, 39:8, 39:14, 39:17, 39:22, 40:21, 40:25, 41:12, 41:14, 42:17, 44:14, 44:21, 45:18, 45:25, 47:9, 48:3, 48:15, 49:13, 50:19, 50:20, 51:7, 51:16, 51:17, 52:7, 52:9, 53:7, 54:24, 55:6, 55:7, 55:8, 55:19, 56:18, 57:5, 57:8, 57:11, 58:5, 60:16, 61:10, 61:12, 62:20, 63:21, 64:7, 64:17, 64:19, 66:1, 66:2, 67:17, 68:13, 70:11, 70:14, 73:4, 73:5, 73:8, 79:5, 81:7, 81:13, 84:7, 88:7
**above** [3] - 29:8, 65:20, 89:14
**above-entitled** [1] - 89:14
**absolutely** [8] - 19:2, 43:19, 43:23, 45:5, 48:25, 50:2, 56:5, 60:24
**abuse** [13] - 9:24, 10:8, 10:10, 21:17, 22:14, 29:20, 30:7, 66:2, 66:3, 66:21, 79:20, 80:15, 83:16
**accept** [3] - 3:21, 27:11, 58:5
**acceptance** [7] - 15:17, 15:20, 16:9, 16:18, 46:15, 59:13, 78:7
**accepting** [1] - 58:2
**access** [15] - 6:19, 6:21, 7:5, 7:8, 8:2, 9:6, 71:23, 84:20, 85:5, 85:12, 85:13, 85:14,

85:16, 85:19, 85:22
**accessed** [1] - 7:14
**accessibility** [1] - 41:23
**accessing** [1] - 6:13
**accommodate** [1] - 2:21
**accomplish** [1] - 61:23
**accordance** [1] - 83:16
**according** [2] - 21:18, 60:18
**account** [1] - 32:24
**accountability** [1] - 59:22
**accurate** [6] - 3:8, 5:22, 31:1, 61:7, 62:11, 68:7
**accused** [1] - 36:25
**achieve** [1] - 56:20
**acknowledge** [2] - 11:15, 65:21
**acknowledgment** [1] - 59:18
**acquittal** [1] - 45:11
**acquitted** [2] - 43:22, 43:24
**act** [2] - 48:23, 53:17
**Act** [2] - 4:4, 83:22
**acted** [1] - 49:24
**acting** [1] - 80:8
**actions** [4] - 34:15, 37:5, 39:14, 39:24
**active** [1] - 71:25
**actively** [3] - 9:5, 18:12, 41:7
**activities** [2] - 30:14, 59:21
**activity** [20] - 17:20, 18:2, 18:20, 36:17, 42:19, 49:17, 50:4, 50:15, 51:11, 56:8, 68:5, 70:12, 72:4, 72:12, 73:3, 74:12, 77:7, 77:12, 77:21, 79:16
**acts** [4] - 27:13, 70:12, 73:12, 74:12
**actual** [7] - 13:1, 26:15, 29:14, 43:11, 47:9, 47:12, 48:5
**acute** [1] - 52:12
**add** [2] - 6:18, 38:14
**added** [2] - 52:23, 53:19
**addition** [7] - 18:9, 18:11, 45:17, 66:2, 66:21, 78:19, 87:12
**additionally** [1] - 77:23
**address** [5] - 40:22, 54:15, 65:3, 79:18
**addressed** [5] - 7:11, 7:15, 8:6, 46:1, 56:1
**addressing** [2] - 6:15, 40:10
**adequate** [1] - 59:10
**adjusted** [2] - 75:13, 76:17
**adjustment** [1] - 76:18
**administration** [2] - 74:24, 76:13
**admit** [2] - 44:18, 60:15
**admitted** [11] - 15:1, 24:17, 24:24, 28:12, 29:23, 32:18, 42:11, 42:13, 49:1, 55:21

**adopted** [1] - 84:3
**adopts** [1] - 67:9
**adorable** [2] - 52:23, 53:5
**adult** [12] - 6:13, 6:21, 7:8, 7:12, 7:16, 8:2, 14:18, 20:20, 46:10, 70:21, 85:22, 86:6
**adults** [3] - 6:20, 7:7, 85:20
**advance** [1] - 86:7
**advanced** [1] - 64:6
**advantage** [2] - 50:13, 61:1
**advised** [1] - 2:14
**affecting** [2] - 23:2, 23:3
**affects** [1] - 80:17
**after** [13] - 9:11, 10:6, 17:5, 20:15, 43:16, 44:13, 55:9, 63:17, 64:24, 67:3, 70:4, 71:1, 80:15
**afternoon** [3] - 2:10, 2:11, 24:13
**again** [10] - 7:3, 12:13, 20:1, 30:2, 39:7, 39:18, 57:24, 59:8, 61:2, 63:13
**against** [4] - 46:12, 65:7, 65:8, 77:2
**age** [13] - 32:10, 32:20, 52:2, 52:4, 53:13, 53:15, 54:17, 73:22, 74:17, 80:1, 81:22, 86:3
**agency** [2] - 83:24, 84:17
**agent** [5] - 14:11, 31:16, 31:17, 62:5, 68:24
**ages** [2] - 21:18, 77:24
**aggression** [1] - 41:18
**aggressive** [2] - 39:21, 51:11
**aggressor** [2] - 39:9, 52:9
**ago** [2] - 19:25, 36:21
**agree** [13] - 7:23, 19:5, 19:18, 23:22, 27:20, 40:10, 42:21, 47:10, 55:23, 64:10, 66:10, 72:2, 88:15
**agreed** [7] - 28:13, 28:17, 46:18, 46:24, 46:25, 55:19, 80:19
**ahead** [2] - 5:13, 38:13
**alcohol** [2] - 26:11, 27:1
**Alexandre** [1] - 18:24
**Alisha** [7] - 42:12, 47:18, 47:21, 48:12, 68:11, 68:21
**allegation** [5] - 19:24, 28:24, 29:7, 61:10, 61:11
**alleged** [6] - 5:2, 9:6, 9:24, 10:8, 21:17, 21:19, 31:15, 66:21
**allegedly** [2] - 16:23, 62:17
**allow** [3] - 38:17, 79:16, 84:25
**allowed** [1] - 36:2
**allows** [3] - 72:3, 72:5
**almost** [1] - 80:22
**alone** [1] - 67:16

**alteration** [1] - 67:9
**altered** [2] - 57:12, 57:13
**alternative** [1] - 64:20
**although** [1] - 13:16
**always** [3] - 15:16, 16:8, 22:11
**amazing** [2] - 52:21, 52:24
**amenable** [1] - 63:14
**amended** [1] - 88:21
**America** [1] - 2:5
**anal** [12] - 8:18, 14:19, 14:20, 14:22, 37:23, 43:8, 43:10, 70:5, 70:23, 70:24, 71:1
**analogy** [1] - 26:20
**analysis** [1] - 34:3
**analyze** [2] - 11:4, 13:6
**Andrew** [1] - 2:6
**announces** [2] - 49:7, 49:11
**anonymity** [4] - 41:18, 41:22, 72:3, 72:7
**anonymization** [1] - 85:17
**answer** [2] - 27:8, 53:8
**answered** [1] - 46:1
**answers** [1] - 63:6
**anticipate** [1] - 6:23
**antiquated** [1] - 19:3
**anytime** [1] - 82:13
**appeal** [8] - 11:6, 87:12, 87:13, 87:15, 87:16, 87:17, 87:19, 87:20
**Appeals'** [1] - 72:20
**appear** [2] - 2:14, 58:4
**appearance** [4] - 2:13, 2:17, 2:19, 3:22
**Appellate** [1] - 87:23
**apples** [1] - 47:6
**applicable** [1] - 72:22
**Application** [1] - 73:20
**applied** [3] - 17:16, 21:12, 31:1
**applies** [4] - 41:3, 45:21, 74:16, 77:6
**apply** [9] - 19:13, 42:22, 71:10, 71:15, 72:9, 73:9, 74:5, 75:19, 87:15
**appoint** [1] - 87:17
**appointing** [2] - 34:7, 38:4
**appreciate** [7] - 34:2, 38:9, 41:2, 55:4, 80:12, 80:23, 81:1
**approach** [2] - 7:25, 30:3
**appropriate** [20] - 7:20, 10:15, 25:6, 28:6, 28:16, 30:1, 30:4, 31:4, 33:20, 40:11, 40:23, 42:7, 46:24, 53:11, 65:5, 65:6, 66:13, 66:22, 82:8, 88:14
**approval** [1] - 86:13
**approved** [4] - 19:6, 84:9,

84:21, 86:7
**arbitrary** [3] - 62:17, 62:20, 62:24
**arcades** [1] - 86:13
**area** [1] - 68:8
**areas** [1] - 86:10
**argue** [1] - 66:7
**argued** [1] - 62:18
**argument** [4] - 19:11, 23:14, 50:10, 56:12
**arguments** [4] - 6:7, 8:5, 10:13, 11:2
**arranged** [1] - 75:25
**array** [1] - 80:24
**arrest** [1] - 52:6
**arrested** [3] - 57:8, 58:15, 61:19
**articulating** [1] - 56:24
**aside** [2] - 10:16, 36:24
**assault** [2] - 29:19, 50:7
**assaults** [2] - 65:7, 65:8
**assented** [1] - 43:13
**assessing** [1] - 4:22
**assessment** [2] - 84:12, 87:10
**assigned** [3] - 76:18, 76:20, 76:21
**Assistant** [1] - 2:6
**associate** [1] - 86:2
**associated** [1] - 42:19
**assume** [8] - 9:22, 30:13, 30:16, 33:3, 33:7, 44:3, 45:23, 62:10
**assumed** [1] - 65:22
**assuming** [4] - 13:16, 24:19, 32:15, 58:3
**assumption** [1] - 5:16
**attachments** [1] - 54:22
**attained** [2] - 73:22, 74:17
**attempted** [7] - 27:16, 73:2, 73:6, 74:23, 76:13, 77:12, 77:20
**attempts** [1] - 75:24
**attorney** [8] - 2:7, 2:14, 2:20, 4:14, 5:11, 34:5, 36:10, 81:10
**Attorneys** [1] - 2:6
**August** [4] - 34:14, 37:5, 73:5, 73:8
**authority** [1] - 72:23
**authorizes** [1] - 84:9
**availability** [1] - 82:18
**available** [5] - 4:4, 77:16, 79:2, 88:12, 88:24
**average** [9] - 27:23, 30:6, 30:12, 30:18, 30:19, 32:3, 32:5, 32:13, 66:4
**avoid** [3] - 43:17, 79:2, 86:10
**aware** [3] - 23:4, 58:14, 86:6

# B

**babe** [1] - 69:9
**backed** [1] - 20:17
**background** [1] - 86:6
**backlash** [2] - 22:16, 61:9
**bad** [7] - 42:19, 57:19, 58:15, 59:11, 59:24, 62:2, 68:23
**badly** [1] - 68:21
**balance** [1] - 66:22
**bald** [1] - 41:15
**bank** [1] - 32:24
**Barbara** [1] - 2:6
**base** [3] - 25:6, 74:3, 75:17
**based** [5] - 5:17, 28:20, 49:3, 50:8, 62:2
**basic** [1] - 84:4
**basis** [3] - 8:1, 38:2, 71:8
**beautiful** [1] - 69:10
**became** [1] - 67:3
**begin** [4] - 29:9, 39:6, 46:4
**beginning** [1] - 44:1
**begins** [2] - 66:18, 72:17
**behalf** [3] - 11:1, 33:25, 87:20
**behavior** [11] - 9:13, 18:9, 21:23, 25:14, 48:10, 48:11, 56:21, 56:22, 59:4, 63:9, 84:5
**behind** [2] - 34:3, 72:7
**behind-the-scenes** [1] - 34:3
**belief** [1] - 16:15
**believes** [1] - 12:13
**below** [1] - 32:4
**benefit** [1] - 88:5
**best** [2] - 4:3, 38:7
**better** [4] - 38:18, 45:22, 64:2
**between** [17] - 12:24, 14:2, 14:25, 16:2, 17:18, 17:24, 18:21, 30:7, 30:9, 31:10, 32:8, 39:12, 41:4, 66:22, 76:5, 77:24, 79:3
**beyond** [3] - 24:14, 55:16, 82:1
**big** [3] - 54:2, 57:9, 58:25
**bills** [1] - 85:6
**bit** [3] - 32:4, 33:16, 56:16
**black** [1] - 13:4
**blanket** [1] - 55:21
**blessings** [1] - 64:17
**blindly** [1] - 64:16
**blood** [1] - 26:10
**board** [1] - 80:4
**body** [3] - 51:7, 52:21, 70:15
**bolstered** [3] - 45:6, 45:12, 48:23
**Bonneville** [1] - 18:15
**Booker** [1] - 72:19
**bothered** [1] - 15:16
**bothers** [1] - 19:22
**boyfriend** [5] - 14:21, 43:10,

50:5, 50:11, 70:24
**bra** [1] - 76:7
**brag** [1] - 51:16
**bragged** [1] - 44:14
**bragging** [2] - 42:15, 51:17
**break** [1] - 62:24
**breast** [1] - 76:6
**Brian** [2] - 29:16
**briefly** [2] - 27:24, 65:15
**bring** [6] - 20:1, 22:7, 22:22, 22:23, 67:17, 84:7
**bringing** [2] - 68:25, 69:3
**broke** [1] - 52:18
**brought** [1] - 54:22
**brunt** [1] - 38:19
**build** [1] - 34:25
**Bureau** [2] - 83:7, 83:23
**business** [1] - 89:3
**buy** [1] - 71:16

# C

**calculated** [1] - 78:9
**calculation** [4] - 11:4, 72:17, 73:17, 74:1
**capable** [6] - 55:11, 58:2, 84:19, 85:3, 85:11, 85:15
**capital** [1] - 68:11
**capture** [2] - 23:11, 59:11
**captured** [1] - 10:3
**captures** [1] - 72:5
**car** [9] - 12:19, 32:24, 44:13, 44:19, 45:2, 49:15, 50:4, 50:6, 76:6
**Caraballo** [1] - 46:9
**cards** [1] - 85:6
**care** [2] - 50:19, 86:12
**cared** [2] - 51:7, 51:12
**career** [1] - 77:5
**carefully** [1] - 43:13
**CARES** [1] - 4:4
**caressing** [1] - 69:2
**carried** [1] - 66:15
**carries** [1] - 21:1
**carry** [1] - 17:23
**case** [71] - 2:4, 3:10, 5:11, 6:17, 6:24, 7:10, 7:12, 7:25, 8:2, 8:4, 8:24, 9:8, 9:10, 9:16, 10:6, 12:18, 13:10, 13:22, 15:21, 15:22, 15:24, 16:2, 16:3, 18:5, 20:2, 20:16, 23:6, 24:15, 24:22, 25:17, 25:25, 26:3, 26:5, 26:17, 28:5, 28:12, 28:13, 28:16, 29:16, 30:3, 31:12, 31:15, 31:20, 32:17, 34:10, 34:16, 34:25, 36:11, 46:6, 46:7, 46:11, 59:1, 62:21, 65:5, 66:10, 66:11, 67:3, 67:21, 71:25, 72:10, 72:23,

79:23, 80:5, 81:11, 82:2, 86:16, 87:25
**case-by-case** [2] - 6:17, 7:25
**cases** [19] - 18:25, 19:7, 23:19, 25:10, 27:19, 27:20, 27:24, 30:7, 30:11, 31:9, 32:13, 34:3, 37:1, 41:1, 46:4, 66:4, 79:5, 82:9
**catch** [1] - 82:24
**category** [5] - 9:8, 30:8, 30:23, 78:13, 78:14
**caused** [8] - 21:23, 25:19, 25:24, 27:5, 47:10, 48:18, 48:24, 50:21
**causes** [1] - 27:4
**cell** [1] - 37:18
**certain** [6] - 4:23, 19:14, 20:13, 28:25, 30:11, 60:15
**certainly** [10] - 3:11, 8:12, 9:8, 10:1, 27:7, 34:1, 51:20, 53:14, 65:17, 81:24
**certainty** [1] - 82:13
**certify** [1] - 89:13
**challenged** [2] - 6:23, 60:14
**challenges** [3] - 6:5, 6:10, 11:3
**challenging** [3] - 4:25, 34:12, 34:18
**chance** [2] - 15:24, 26:12
**change** [3] - 53:12, 54:8, 55:12
**changed** [2] - 9:12, 36:15
**Chapter** [1] - 78:8
**characteristics** [5] - 40:20, 56:23, 74:5, 75:19, 79:1
**characterized** [1] - 39:8
**charged** [1] - 5:16
**charges** [11] - 20:1, 22:7, 22:22, 22:23, 27:6, 29:18, 35:2, 36:19, 36:24, 55:1, 71:13
**charts** [2] - 63:23, 66:1
**chased** [1] - 63:17
**chat** [1] - 9:5
**chats** [1] - 57:16
**chatter** [2] - 39:21, 42:17
**child** [56] - 7:11, 8:10, 8:24, 9:1, 9:5, 9:7, 14:3, 17:1, 17:3, 17:18, 18:9, 18:10, 18:12, 18:18, 19:19, 26:1, 26:3, 26:4, 28:10, 36:17, 39:17, 39:19, 39:22, 40:25, 41:5, 42:17, 46:10, 47:15, 48:3, 49:10, 49:12, 50:16, 50:24, 51:24, 55:2, 56:9, 57:25, 66:2, 69:14, 70:1, 70:11, 70:13, 70:17, 71:8, 71:12, 71:13, 71:19, 73:6, 74:11, 74:13, 75:9, 77:15, 80:10, 80:12, 85:24

**Children** [1] - 79:14
**children** [31] - 8:8, 8:13, 16:14, 16:21, 17:3, 45:7, 45:14, 45:19, 46:10, 52:11, 52:15, 53:15, 56:10, 60:8, 60:17, 63:8, 65:8, 67:24, 68:6, 68:7, 69:13, 69:17, 69:19, 69:21, 69:23, 70:8, 75:2, 79:25, 80:18, 86:11
**chose** [1] - 40:17
**chronology** [3] - 8:17, 36:9, 70:3
**Circuit** [6] - 6:16, 7:11, 19:6, 19:21, 71:12, 72:20
**circuits** [1] - 6:14
**circumstance** [1] - 51:24
**circumstances** [8] - 8:21, 34:23, 38:6, 47:5, 53:5, 56:21, 64:21, 78:25
**cite** [1] - 7:15
**citizens** [1] - 79:15
**claimed** [1] - 44:12
**claiming** [1] - 9:25
**clean** [1] - 62:24
**cleaning** [1] - 85:17
**clear** [5] - 12:20, 41:2, 63:25, 65:16, 69:13
**clearly** [5] - 24:15, 27:20, 28:15, 51:5, 69:23
**clerk** [1] - 87:18
**client** [14] - 11:13, 11:18, 12:20, 12:25, 18:19, 20:7, 26:23, 26:24, 28:25, 30:15, 31:18, 33:10, 55:21
**client's** [4] - 11:10, 25:12, 32:9, 32:20
**clients** [1] - 15:23
**clit** [1] - 69:7
**close** [6] - 15:3, 15:21, 63:2, 64:25, 88:11, 88:23
**closer** [1] - 66:10
**closing** [2] - 50:10, 56:12
**clothes** [1] - 49:2
**clothing** [2] - 29:8, 65:20
**collection** [1] - 83:19
**combination** [1] - 25:7
**combine** [1] - 35:18
**combined** [1] - 76:25
**comfort** [1] - 50:16
**comfortable** [1] - 40:21
**coming** [3] - 23:8, 23:15, 68:19
**comment** [2] - 11:9, 78:8
**comments** [6] - 40:5, 40:8, 42:7, 55:9, 62:15, 69:3
**commerce** [1] - 71:21
**commission** [1] - 76:4
**commit** [8] - 11:14, 27:12, 27:14, 35:10, 43:4, 48:17, 54:25, 83:12

**committed** [7] - 9:2, 27:16, 55:17, 59:12, 67:13, 79:4, 83:7
**common** [5] - 19:1, 39:16, 63:6, 73:13, 73:14
**communicated** [4] - 57:14, 77:13, 77:21
**communicating** [10] - 14:17, 17:4, 41:10, 41:11, 48:2, 68:1, 69:25, 70:21, 72:2, 75:4
**communication** [8] - 42:3, 42:15, 43:11, 48:20, 85:7, 86:9, 86:17, 86:21
**communications** [11] - 8:11, 13:3, 13:7, 16:15, 39:12, 44:21, 56:14, 57:4, 72:7, 75:23, 81:19
**community** [8] - 6:22, 7:9, 54:16, 61:3, 63:23, 64:1, 79:14, 85:24
**compare** [3] - 27:20, 29:11, 29:12
**compared** [2] - 25:11, 30:18
**comparison** [1] - 30:3
**compelling** [1] - 68:9
**competent** [1] - 40:2
**complaint** [2] - 22:16, 61:9
**complete** [2] - 80:11, 85:9
**completely** [3] - 46:13, 52:10, 61:17
**comply** [2] - 83:21, 84:2
**component** [1] - 8:9
**computer** [38] - 6:11, 8:23, 8:25, 9:3, 9:4, 17:15, 17:19, 18:1, 18:7, 18:20, 18:23, 19:4, 19:6, 36:10, 40:24, 41:23, 42:6, 42:18, 42:20, 42:21, 71:11, 71:12, 71:14, 71:16, 71:20, 71:24, 72:3, 72:9, 74:6, 74:7, 75:20, 75:21, 84:18, 85:2, 85:13, 85:14, 86:20
**Computer** [1] - 84:20
**computers** [3] - 19:1, 19:2, 85:10
**concerned** [2] - 32:15, 49:19
**concerning** [1] - 86:24
**concerns** [1] - 21:14
**concluded** [1] - 30:19
**conclusion** [1] - 20:5
**conclusions** [2] - 28:15, 30:12
**concurrently** [2] - 83:9, 83:10
**condition** [6] - 6:15, 6:25, 67:8, 84:8, 86:24, 87:4
**conditions** [6] - 7:18, 10:21, 83:11, 84:2, 84:3, 84:13
**conduct** [60] - 5:16, 6:20, 7:6, 20:7, 21:7, 21:9, 23:21,

24:1, 24:3, 25:10, 25:11, 25:12, 41:7, 41:23, 47:11, 48:9, 48:13, 48:19, 52:7, 53:14, 54:10, 54:25, 56:4, 56:6, 57:22, 59:11, 59:23, 64:21, 65:18, 66:7, 66:9, 67:2, 72:13, 72:14, 72:15, 73:24, 74:9, 75:22, 75:24, 76:1, 77:7, 77:9, 77:10, 77:16, 77:17, 77:19, 77:22, 77:24, 78:1, 79:23, 80:7, 82:5, 84:7, 85:20, 86:8, 86:16, 86:25
**conducting** [1] - 87:3
**conference** [1] - 2:13
**confident** [2] - 18:13, 68:4
**confirmed** [1] - 52:20
**conflict** [2] - 11:15, 34:6
**conflicting** [1] - 12:22
**confluence** [1] - 46:22
**confused** [1] - 70:6
**confusion** [1] - 67:19
**congregate** [1] - 86:11
**connected** [1] - 73:13
**connection** [3] - 40:19, 58:20, 71:22
**conquest** [1] - 51:17
**consensus** [1] - 8:1
**consent** [2] - 80:1, 81:22
**consequence** [2] - 59:16, 60:2
**consequences** [1] - 79:13
**consider** [2] - 40:19, 78:24
**consideration** [4] - 24:21, 31:3, 33:21
**considered** [3] - 72:21, 82:9
**considers** [1] - 78:20
**consistent** [2] - 11:19, 16:24
**consistently** [1] - 11:13
**conspiracy** [1] - 29:17
**constantly** [1] - 58:13
**constituting** [1] - 73:14
**contact** [8] - 11:17, 11:20, 45:1, 76:4, 77:24, 79:24, 86:2, 86:15
**contain** [1] - 53:3
**contained** [1] - 72:23
**contend** [2] - 6:2, 16:13
**content** [1] - 85:25
**context** [1] - 67:7
**continuance** [1] - 3:15
**continuation** [2] - 40:5, 40:6
**continue** [5] - 2:24, 41:9, 41:19, 48:22, 82:25
**continues** [1] - 47:2
**continuing** [1] - 60:6
**continuity** [1] - 84:17
**contract** [1] - 4:1
**contracted** [1] - 10:17

**contradicted** [1] - 70:8
**contrary** [2] - 68:8, 69:23
**control** [4] - 33:8, 53:18, 85:4, 85:13
**controlled** [1] - 83:14
**controlling** [1] - 73:16
**conveniently** [1] - 46:6
**conversation** [3] - 17:24, 28:20, 42:3
**conversations** [3] - 15:7, 50:19, 62:2
**convey** [1] - 34:21
**convicted** [21] - 24:16, 25:18, 25:20, 28:2, 28:4, 29:16, 29:18, 30:14, 31:8, 34:17, 35:13, 37:3, 38:10, 54:11, 63:8, 66:14, 67:16, 74:2, 75:16, 78:6, 84:1
**conviction** [3] - 68:9, 77:4, 87:13
**convinced** [2] - 14:5, 81:1
**cooperate** [1] - 83:19
**cop** [4] - 49:20, 56:17, 81:16, 81:18
**correct** [3] - 61:23, 62:13, 89:13
**correspondence** [5] - 69:12, 70:9, 70:14, 86:9, 86:18
**cost** [2] - 84:14, 87:17
**costs** [1] - 87:15
**counsel** [8] - 40:2, 46:3, 46:24, 47:3, 52:16, 58:13, 62:18, 87:18
**counsel's** [1] - 61:10
**counseling** [4] - 24:23, 88:5, 88:8, 89:1
**Count** [40] - 11:17, 21:5, 28:20, 28:23, 29:2, 29:3, 29:6, 43:22, 43:24, 45:12, 47:12, 48:25, 50:23, 65:17, 71:6, 71:7, 72:14, 73:6, 73:10, 73:15, 73:17, 73:18, 75:9, 75:13, 75:14, 76:11, 76:12, 76:17, 76:19, 76:21, 76:22, 76:24, 77:10, 77:19, 78:15, 83:8
**count** [6] - 21:5, 21:6, 76:18, 78:18, 82:11, 83:10
**counterbalance** [1] - 82:17
**counterbalancing** [1] - 82:20
**country** [1] - 12:8
**counts** [3] - 68:9, 73:12, 83:8
**Counts** [5] - 73:2, 73:10, 75:8, 78:15, 83:8
**couple** [5] - 4:20, 28:15, 34:7, 36:8, 62:15
**course** [7] - 10:14, 13:5, 23:25, 44:10, 57:9, 57:12, 57:13
**court** [8] - 2:2, 45:23, 45:24,

64:15, 67:12, 84:3, 87:17, 87:19
**Court** [107] - 2:4, 5:17, 6:9, 7:4, 7:20, 7:21, 8:12, 8:24, 10:22, 11:10, 12:13, 13:2, 13:3, 14:14, 16:8, 17:16, 17:17, 21:8, 21:15, 21:25, 22:1, 23:4, 24:20, 26:25, 29:13, 30:25, 31:3, 32:1, 34:5, 39:12, 40:10, 40:13, 40:19, 40:22, 41:2, 42:23, 43:7, 44:2, 44:4, 44:14, 45:20, 45:25, 46:3, 46:5, 46:7, 46:14, 46:17, 46:18, 46:25, 47:5, 47:7, 47:8, 47:19, 52:3, 52:13, 53:10, 53:11, 53:14, 54:7, 54:15, 55:18, 56:5, 57:3, 58:7, 58:13, 59:9, 60:13, 61:15, 63:12, 64:19, 65:4, 65:6, 65:10, 65:22, 66:5, 66:18, 66:21, 67:6, 67:9, 67:21, 71:9, 71:19, 72:9, 72:15, 72:17, 72:18, 72:20, 72:21, 73:1, 74:21, 74:25, 76:10, 77:3, 78:19, 78:24, 79:8, 79:18, 82:14, 83:2, 83:6, 83:15, 84:7, 84:15, 87:14, 89:9
**COURT** [69] - 2:10, 2:12, 3:14, 3:18, 3:21, 4:13, 4:18, 4:23, 5:5, 5:10, 5:13, 5:20, 5:25, 6:4, 6:7, 7:3, 7:5, 7:22, 7:24, 12:2, 13:2, 14:14, 15:10, 15:13, 16:8, 17:1, 17:13, 18:5, 19:5, 19:9, 19:18, 20:12, 20:25, 21:8, 21:13, 22:3, 22:13, 23:3, 23:21, 24:4, 24:6, 24:12, 25:23, 27:9, 29:2, 29:5, 31:25, 33:23, 38:11, 38:13, 38:22, 39:3, 41:12, 43:2, 43:4, 44:5, 44:8, 61:4, 62:9, 62:14, 65:12, 65:14, 66:17, 88:2, 88:7, 88:10, 88:15, 88:21, 89:5
**Court's** [19] - 4:2, 4:5, 4:25, 6:25, 9:17, 16:22, 17:1, 19:19, 21:2, 25:16, 28:23, 31:21, 31:22, 32:15, 40:9, 40:18, 41:1, 42:7, 46:1
**COURTROOM** [1] - 2:3
**courts** [2] - 19:20, 64:14
**covered** [1] - 77:4
**COVID** [6] - 2:15, 3:3, 3:13, 10:17, 40:4, 82:12
**COVID-19** [2] - 3:24, 4:1
**Craigslist** [4] - 41:9, 49:6, 74:7, 75:21
**crazy** [1] - 48:9

**credible** [1] - 13:24
**credit** [2] - 83:3, 85:6
**credited** [2] - 71:5, 75:7
**crime** [10] - 25:18, 25:20, 27:15, 28:1, 28:4, 46:12, 77:4, 78:25, 83:13
**crimes** [7] - 11:14, 11:24, 46:9, 48:17, 55:17, 79:4, 79:11
**criminal** [13] - 2:4, 28:8, 29:21, 30:8, 30:23, 53:1, 73:13, 78:12, 78:14, 79:3, 81:7, 81:9
**criticisms** [1] - 71:18
**criticized** [1] - 19:20
**Crosby** [1] - 72:20
**cross** [5] - 40:13, 42:8, 43:13, 50:14, 55:18
**cross-examination** [2] - 40:13, 43:13
**cross-examined** [1] - 55:18
**CRR** [1] - 89:17
**crux** [1] - 13:9
**cum** [3] - 68:13, 68:17, 69:9
**curious** [1] - 80:2
**current** [1] - 4:22, 85:10
**custody** [2] - 53:1, 83:7

### D

**dad** [1] - 49:19
**damage** [2] - 51:10, 80:22
**damaging** [3] - 10:3, 51:24, 80:21
**danger** [10] - 35:2, 52:5, 52:6, 52:12, 56:9, 58:24, 80:7, 80:8, 80:12, 82:6
**dangerous** [5] - 56:21, 59:20, 63:6, 77:1, 81:19
**data** [1] - 86:21
**date** [4] - 2:24, 4:20, 20:18, 87:21
**dates** [2] - 20:17, 67:5
**daughter** [11] - 18:2, 33:3, 39:15, 42:2, 42:11, 42:12, 47:14, 47:17, 68:24, 69:1, 81:13
**daughter's** [1] - 56:19
**day-care** [1] - 86:12
**days** [3] - 3:10, 87:21, 89:3
**de** [1] - 52:1
**deal** [1] - 59:24
**dealing** [7] - 12:21, 14:10, 15:3, 15:8, 35:24, 46:9, 46:12
**deals** [1] - 66:3
**dealt** [1] - 14:10
**death** [2] - 26:14, 26:23
**decide** [1] - 15:19
**decided** [4] - 19:25, 22:6,

22:18, 22:20
**decides** [1] - 88:5
**deciding** [3] - 78:23, 79:8, 82:8
**decision** [3] - 5:17, 43:23, 72:20
**decision-making** [1] - 43:23
**decisions** [1] - 72:18
**declined** [1] - 40:14
**deep** [1] - 68:17
**DEFENDANT** [14] - 3:1, 3:17, 3:19, 4:12, 4:15, 4:20, 5:4, 5:9, 5:12, 34:1, 38:12, 38:14, 38:23, 88:17
**defendant** [42] - 2:7, 2:8, 14:16, 15:18, 25:11, 32:17, 47:10, 52:25, 67:13, 67:15, 70:19, 70:22, 70:25, 72:12, 74:2, 74:9, 74:23, 75:1, 75:2, 75:16, 75:23, 76:5, 76:12, 77:1, 77:6, 77:8, 77:16, 77:23, 78:5, 78:11, 78:18, 83:6, 83:15, 83:18, 87:7, 87:8, 87:11, 87:12, 87:14, 87:18, 87:20
**defendant's** [14] - 7:17, 8:7, 69:15, 70:7, 70:9, 70:13, 71:2, 71:3, 71:5, 75:5, 75:7, 76:5, 77:11, 77:20
**defendants** [1] - 79:3
**defense** [10] - 9:11, 9:14, 21:22, 22:9, 44:11, 44:18, 51:25, 55:13, 67:7, 81:6
**defense's** [1] - 44:1
**defined** [5] - 84:18, 85:10, 85:14, 85:21, 85:24
**defines** [2] - 53:6, 53:8
**definitely** [2] - 34:10, 68:16
**definition** [1] - 23:21
**degree** [2] - 52:4, 72:3
**dehumanizing** [2] - 51:11, 51:24
**delay** [1] - 3:9
**deliberated** [1] - 36:25
**demonstrated** [2] - 87:7, 87:8
**denied** [2] - 3:9, 16:8
**denies** [1] - 63:15
**deny** [1] - 47:2
**denying** [4] - 8:2, 8:13, 16:18, 54:4
**Department** [1] - 58:12
**departure** [1] - 72:23
**depicting** [3] - 6:19, 7:6, 85:20
**DEPUTY** [1] - 2:3
**described** [1] - 73:24
**describes** [1] - 44:17
**deserving** [1] - 57:23
**desperate** [2] - 47:22, 47:25
**desperately** [1] - 68:20

**detailed** [2] - 17:3, 56:12
**details** [3] - 9:24, 10:11, 23:4
**deter** [1] - 59:23
**determined** [1] - 83:2
**determines** [3] - 6:21, 7:7, 85:22
**determining** [2] - 28:6, 72:21
**deterrence** [6] - 58:25, 59:6, 59:7, 59:10, 79:12, 79:14
**detrimental** [1] - 7:16
**developed** [1] - 84:21
**developing** [2] - 6:17, 7:25
**Devens** [3] - 88:10, 88:13, 88:23
**deviant** [1] - 48:10
**deviate** [1] - 64:11
**devices** [11] - 84:18, 84:19, 84:20, 85:3, 85:11, 85:12, 85:14, 85:15, 85:16, 86:21
**died** [1] - 27:3
**difference** [6] - 18:21, 31:10, 34:11, 41:3, 43:15, 47:1
**different** [13] - 10:21, 17:21, 32:22, 36:11, 37:14, 41:7, 43:21, 46:13, 46:22, 47:4, 62:25, 71:25, 81:24
**difficult** [7] - 24:15, 24:16, 24:19, 25:24, 27:19, 34:22, 35:4
**direct** [1] - 14:15
**directed** [6] - 78:24, 79:9, 83:19, 83:23, 84:11, 84:14
**direction** [1] - 84:25
**directly** [3] - 86:2, 86:4, 86:15
**dis** [1] - 47:10
**disagreement** [1] - 12:24
**disbelieved** [1] - 67:16
**discharge** [1] - 87:1
**disclosures** [2] - 40:11, 50:8
**discounted** [2] - 43:14, 43:19
**discovery** [1] - 40:1
**discrepancies** [1] - 16:2
**discrepancy** [1] - 37:25
**discrete** [2] - 59:21, 63:7
**discuss** [1] - 80:4
**discussion** [2] - 27:25, 40:25
**dislike** [1] - 9:22
**dismiss** [1] - 87:24
**disparities** [1] - 79:3
**disprove** [1] - 22:10
**disproved** [1] - 16:16
**distinction** [5] - 17:18, 17:24, 19:1, 41:3, 66:5
**distribution** [2] - 26:13, 55:3
**district** [1] - 7:12
**District** [3] - 3:23, 29:25, 71:18
**disturbing** [1] - 25:1
**DNA** [1] - 83:19

**docket** [1] - 87:22
**domination** [1] - 53:18
**done** [5] - 28:3, 28:21, 29:14, 37:14, 57:21
**doubt** [1] - 55:16
**down** [5] - 12:19, 21:13, 32:3, 39:16, 59:4
**downloading** [1] - 41:5
**dramatic** [1] - 36:18
**draw** [3] - 20:5, 28:15, 30:11
**drawn** [1] - 41:2
**drill** [1] - 21:13
**drive** [2] - 23:6, 49:16
**driver** [1] - 27:10
**driving** [2] - 26:10, 26:11
**dropped** [1] - 22:5
**drove** [1] - 44:13
**drug** [5] - 29:17, 46:9, 46:13, 58:18, 83:18
**drug-motivated** [1] - 46:13
**drugs** [2] - 26:13, 58:19
**drunk** [1] - 27:10
**due** [6] - 22:16, 39:25, 61:9, 67:19, 78:15, 87:10
**DUI** [1] - 26:23
**Dunnigan** [1] - 74:22
**during** [5] - 10:17, 10:20, 21:17, 40:3, 43:13

### E

**early** [2] - 28:7, 32:11
**easy** [2] - 41:22, 58:18
**edition** [2] - 73:19, 75:15
**educational** [1] - 79:21
**effect** [1] - 29:10
**effective** [2] - 60:21, 79:22
**effectively** [2] - 80:10, 82:15
**effects** [1] - 86:21
**effort** [3] - 20:3, 22:9, 78:21
**egregious** [1] - 25:20
**eight** [13] - 30:20, 30:21, 30:22, 31:4, 31:11, 31:18, 32:2, 32:6, 62:18, 62:22, 63:3, 74:19, 76:22
**eight-level** [4] - 30:20, 30:21, 31:18, 32:6
**eight-year** [1] - 31:11
**either** [4] - 45:11, 45:22, 79:16, 82:16
**elapsed** [1] - 24:2
**electronic** [7] - 84:19, 85:3, 85:11, 85:15, 86:8, 86:17, 86:20
**element** [4] - 71:7, 71:21, 72:5, 75:9
**email** [6] - 15:7, 17:21, 35:11, 49:3, 49:5, 52:20
**emails** [6] - 14:2, 14:25, 15:2, 44:15, 52:17, 74:9

**emotional** [1] - 46:19
**employee** [2] - 56:25, 57:7
**employment** [2] - 81:9, 81:10
**enabled** [1] - 42:20
**encourage** [1] - 74:7
**encouraging** [2] - 69:2, 74:10
**encryption** [2] - 84:24, 85:17
**end** [7] - 23:19, 27:19, 28:12, 30:23, 42:8, 48:20, 61:19
**endeavor** [1] - 34:4
**endeavors** [1] - 26:6
**ended** [1] - 10:11
**endorsed** [1] - 71:12
**enforcement** [8] - 10:7, 22:18, 22:20, 22:21, 35:23, 67:3, 73:21, 86:23
**engage** [12] - 70:11, 73:3, 74:8, 74:11, 75:22, 75:24, 76:1, 77:12, 77:21, 77:22, 77:23, 82:12
**engaged** [15] - 14:18, 20:7, 39:21, 40:6, 42:10, 42:14, 50:18, 56:14, 59:21, 70:22, 71:22, 74:9, 75:23, 77:6, 77:8
**engaging** [4] - 14:20, 38:2, 70:24, 73:23
**enhanced** [1] - 78:4
**enhancement** [41] - 6:11, 8:23, 8:25, 12:24, 16:9, 17:17, 18:1, 18:7, 18:14, 18:24, 19:3, 19:6, 21:4, 21:6, 21:9, 30:20, 30:21, 30:22, 31:11, 31:18, 32:6, 40:16, 40:24, 42:7, 42:21, 42:25, 45:15, 45:21, 56:1, 59:19, 67:11, 67:18, 71:9, 71:11, 71:12, 71:15, 71:20, 72:9, 72:11, 72:16
**enhancements** [1] - 19:14
**ensure** [1] - 59:23
**ensuring** [1] - 66:22
**entered** [2] - 78:5, 87:21
**entice** [2] - 74:7, 75:22
**enticement** [4] - 59:21, 73:3, 77:12, 77:20
**enticing** [1] - 74:10
**entire** [4] - 11:19, 16:25, 60:20, 61:17
**entirely** [2] - 61:22, 63:10
**entirety** [1] - 5:21
**entitled** [2] - 13:5, 89:14
**enumerated** [1] - 72:25
**environment** [1] - 38:7
**equate** [1] - 47:6
**ER** [30] - 8:18, 12:6, 14:16, 14:20, 15:4, 16:15, 17:6, 26:1, 37:22, 67:25, 69:12, 70:1, 70:2, 70:14, 70:15, 70:16, 70:20, 70:24, 71:2,

71:8, 73:12, 75:3, 75:10, 75:24, 76:5, 77:22, 77:23, 80:7, 81:21
**ER's** [3] - 26:2, 49:4, 70:17
**errors** [1] - 5:6
**escaping** [1] - 50:18
**esoteric** [1] - 23:1
**especially** [4] - 34:22, 38:7, 61:16, 82:22
**essential** [3] - 71:7, 71:20, 75:9
**essentially** [3] - 26:24, 33:3, 62:3
**establish** [3] - 20:12, 21:24, 84:4
**established** [1] - 23:1
**et** [1] - 83:23
**evaluation** [4] - 6:20, 7:7, 84:10, 85:22
**event** [5] - 43:12, 43:15, 72:8, 82:24, 87:16
**events** [2] - 17:5
**eventually** [1] - 33:2
**evidence** [17] - 8:11, 11:18, 17:9, 20:9, 21:15, 23:11, 34:8, 36:12, 40:4, 61:11, 65:18, 67:17, 68:8, 69:23, 70:8, 74:22, 76:11
**evidentiary** [1] - 5:19
**evolving** [1] - 7:19
**exactly** [5] - 26:24, 42:4, 43:8, 45:24, 54:6
**examination** [2] - 40:13, 43:13
**examinations** [1] - 84:11
**examined** [1] - 55:18
**example** [9] - 3:16, 8:25, 11:16, 12:18, 14:15, 18:22, 29:24, 56:15, 71:16
**excellent** [2] - 15:24, 81:12
**except** [6] - 6:16, 20:24, 21:1, 55:19, 86:4, 86:5
**excess** [1] - 78:9
**exchange** [2] - 42:24, 53:6, 68:10
**excluded** [1] - 9:25
**excuse** [1] - 25:14
**exhaustively** [1] - 56:12
**exhibit** [2] - 4:8, 15:1
**existed** [1] - 60:19
**exists** [1] - 54:4
**expect** [1] - 81:4
**expectations** [1] - 84:4
**expense** [1] - 85:1
**experience** [2] - 35:24, 42:2
**experienced** [1] - 3:5
**explained** [1] - 20:16
**explanation** [3] - 12:9, 13:23, 17:14
**explanation's** [1] - 13:24

**explicit** [5] - 6:19, 7:6, 26:5, 73:23, 85:20
**exploit** [3] - 51:2, 51:19, 57:16
**exploitation** [1] - 71:13
**expose** [3] - 3:12, 3:24, 60:14
**exposes** [1] - 53:8
**expressed** [1] - 3:8
**expressing** [1] - 13:7
**extensive** [1] - 34:4
**extremely** [6] - 14:3, 33:18, 35:4, 38:9, 40:1, 61:22

## F

**f'ing** [3] - 68:13, 68:15
**face** [4] - 13:15, 13:19, 13:22, 17:11
**faced** [2] - 22:16, 61:9
**facilities** [1] - 86:12
**fact** [25] - 2:18, 10:16, 11:12, 11:20, 14:1, 15:6, 20:17, 20:21, 23:7, 31:23, 35:14, 37:9, 37:16, 37:22, 43:15, 48:6, 55:14, 57:22, 61:7, 67:3, 67:10, 67:15, 76:10, 81:15, 81:21
**facto** [1] - 52:1
**factor** [3] - 53:12, 59:18, 60:4
**factored** [1] - 82:14
**factors** [15] - 10:25, 11:5, 19:12, 24:7, 25:7, 31:2, 32:2, 46:22, 54:12, 56:3, 59:16, 63:24, 72:24, 78:20, 78:25
**facts** [7] - 5:15, 6:1, 16:19, 21:16, 61:6, 71:4, 75:6
**factual** [5] - 4:24, 5:6, 6:5, 11:3, 16:11
**factually** [2] - 16:14, 22:17
**failure** [1] - 87:4
**fair** [9] - 19:14, 21:20, 22:4, 25:16, 25:17, 40:2, 79:6, 79:7
**fairly** [1] - 16:11
**fairness** [1] - 9:21
**fall** [1] - 9:8
**false** [17] - 16:12, 16:14, 43:5, 43:18, 45:3, 45:17, 45:23, 46:16, 47:2, 67:14, 67:22, 71:1, 71:3, 74:25, 75:5, 76:14
**falsehood** [1] - 51:12
**falsely** [2] - 45:18, 50:1
**family** [8] - 20:18, 22:16, 61:10, 61:16, 61:17, 61:25, 62:3
**fan** [1] - 65:5
**fantasy** [1] - 80:8
**far** [6] - 4:16, 25:20, 26:4,

32:8, 72:4, 81:14
**fashioning** [2] - 24:20, 53:11
**fast** [1] - 18:16
**faulty** [1] - 67:19
**February** [1] - 89:17
**Federal** [2] - 83:7, 87:22
**federal** [5] - 19:16, 27:22, 30:5, 53:1, 83:12
**felt** [1] - 25:10
**female** [2] - 61:21, 77:15
**fictitious** [2] - 73:21, 73:24
**figured** [1] - 44:10
**file** [2] - 40:17, 87:19
**filed** [4] - 10:6, 61:15, 61:17, 87:21
**filing** [1] - 40:17
**finally** [2] - 24:25, 35:9
**findings** [4] - 67:10, 74:21, 76:10, 77:3
**fine** [7] - 40:15, 53:22, 62:23, 63:4, 63:5, 87:6, 87:8
**fines** [1] - 87:9
**finish** [1] - 3:20
**finished** [2] - 20:24, 51:6
**first** [14] - 11:9, 14:1, 23:8, 23:15, 35:5, 43:11, 43:16, 49:5, 50:25, 55:14, 68:2, 70:3, 71:2
**Five** [1] - 78:8
**five** [11] - 21:3, 21:6, 21:9, 40:16, 59:19, 63:5, 63:9, 76:22, 78:3, 78:17, 89:3
**five-level** [5] - 21:3, 21:6, 21:9, 40:16, 59:19
**flagrant** [2] - 11:25, 14:13
**focus** [5] - 6:15, 11:21, 18:9, 24:1, 57:15
**focused** [1] - 11:12
**Folks** [1] - 29:16
**folks** [2] - 46:8, 66:14
**follow** [1] - 64:15
**followed** [3] - 65:10, 83:4, 83:9
**following** [5] - 2:2, 65:17, 72:21, 74:21, 77:3
**follows** [2] - 73:1, 83:11
**foregoing** [1] - 89:13
**forget** [3] - 47:16, 48:2, 48:6
**forgot** [1] - 61:5
**form** [1] - 18:8
**forma** [1] - 87:16
**Fort** [2] - 88:13, 88:22
**forth** [3] - 4:16, 54:22, 78:20
**forthwith** [1] - 87:19
**forward** [3] - 55:5, 61:20, 69:4
**four** [4] - 25:9, 29:21, 46:4, 63:2
**four-year** [1] - 29:21
**frame** [2] - 15:2, 34:20

**frankly** [2] - 55:5, 64:17
**friend** [3] - 27:3, 27:11, 48:21
**front** [1] - 34:10
**full** [1] - 24:8
**functions** [1] - 87:1
**fundamental** [2] - 60:15, 60:16
**future** [3] - 63:25, 79:11, 82:14

## G

**Gall** [1] - 72:19
**game** [1] - 21:20
**gamut** [1] - 30:16
**general** [6] - 5:15, 11:9, 59:1, 59:6, 79:14
**generally** [2] - 27:21, 41:6
**genitalia** [7] - 14:17, 43:22, 67:25, 70:17, 70:20, 71:3, 75:4
**genre** [1] - 46:12
**genuine** [1] - 69:4
**genuinely** [3] - 14:9, 80:2, 80:13
**giant** [1] - 60:22
**gibberish** [1] - 60:11
**Gilman** [1] - 2:7
**girl** [3] - 29:8, 65:20, 73:24
**girls** [1] - 47:24
**given** [7] - 24:3, 32:9, 44:23, 45:4, 64:7, 64:20, 65:7
**GlobalFoundries** [1] - 57:2
**goal** [1] - 79:6
**goals** [3] - 6:22, 7:9, 85:23
**God** [4] - 47:12, 47:15, 48:1, 68:17
**gold** [1] - 49:9
**Googled** [1] - 53:24
**Googling** [1] - 56:18
**Government** [23] - 2:5, 5:1, 9:13, 10:12, 11:1, 12:25, 16:12, 20:2, 20:9, 20:12, 21:23, 23:12, 28:13, 46:22, 54:17, 64:18, 65:24, 66:6, 66:10, 69:14, 72:2, 87:11, 89:7
**Government's** [11] - 6:4, 9:15, 10:1, 15:25, 23:16, 24:8, 40:1, 53:6, 55:6, 55:10, 66:25
**grace** [2] - 47:15, 48:1
**grand** [2] - 9:19, 10:4
**graphic** [5] - 8:11, 29:19, 69:12, 72:6
**gravely** [3] - 34:15, 37:5, 39:24
**great** [1] - 58:4
**greater** [4] - 47:4, 78:22, 78:23, 83:5

**groom** [4] - 53:20, 56:15, 70:11, 74:11
**grooming** [1] - 56:13
**gross** [1] - 50:9
**grounds** [1] - 87:5
**Group** [5] - 73:10, 73:17, 75:14, 76:17, 76:21
**group** [1] - 48:14
**grouped** [1] - 73:10
**grown** [1] - 50:12
**grown-up** [1] - 50:12
**guess** [5] - 18:15, 23:1, 30:10, 31:13, 37:19
**guideline** [27] - 6:10, 11:3, 11:4, 18:8, 19:13, 23:2, 23:3, 27:23, 28:11, 30:1, 30:5, 30:18, 30:24, 31:1, 31:4, 54:20, 64:11, 72:17, 72:24, 73:17, 73:18, 74:1, 75:14, 78:13, 78:17, 87:6
**Guidelines** [22] - 15:17, 19:16, 62:18, 71:14, 72:22, 73:9, 73:11, 73:15, 73:19, 74:4, 74:15, 74:16, 74:19, 75:11, 75:15, 75:18, 76:3, 76:9, 76:16, 76:19, 77:2, 78:19
**guidelines** [6] - 19:20, 64:3, 64:16, 71:14, 71:19, 82:2
**guilt** [5] - 24:17, 28:13, 29:23, 32:18, 47:2
**guilty** [12] - 5:16, 11:23, 28:13, 35:6, 38:16, 38:24, 46:15, 55:15, 55:24, 78:5, 81:4, 81:5
**guy** [2] - 51:3, 54:12
**guys** [4] - 58:12, 58:14, 58:21, 68:19

## H

**half** [3] - 34:20, 49:16, 76:21
**hand** [5] - 9:17, 35:3, 69:1, 76:6, 76:7
**handed** [1] - 59:4
**handled** [1] - 46:7
**hands** [1] - 65:8
**hands-on** [1] - 65:8
**happy** [2] - 50:22, 51:16
**hard** [4] - 53:19, 58:23, 61:21, 61:22
**hardware** [1] - 85:1
**harm** [27] - 25:19, 25:23, 26:15, 27:4, 27:5, 27:7, 27:9, 27:21, 28:2, 28:21, 28:22, 29:12, 29:14, 30:2, 31:14, 47:9, 47:11, 48:5, 48:6, 48:18, 48:24, 50:21, 58:6, 63:22, 63:25, 65:3, 80:25

**harming** [1] - 61:3
**hawed** [1] - 50:17
**head** [2] - 18:14, 37:21
**health** [1] - 79:19
**hear** [12] - 2:25, 6:7, 8:4, 10:10, 10:13, 10:14, 39:4, 39:6, 44:2, 53:4, 66:6, 68:22
**heard** [5] - 5:18, 20:15, 39:12
**hearing** [3] - 5:19, 8:20, 44:2
**hears** [1] - 20:1
**heart** [1] - 16:3
**hefty** [1] - 60:2
**held** [1] - 2:2
**hell** [1] - 38:25
**help** [2] - 33:3, 54:23
**helpful** [3] - 28:5, 32:13, 66:1
**hemmed** [1] - 50:17
**hence** [2] - 73:8, 87:8
**herself** [3] - 51:2, 51:19, 57:17
**hi** [1] - 68:21
**hide** [1] - 72:7
**high** [3] - 30:18, 49:8, 49:11
**higher** [1] - 73:16
**highest** [1] - 76:20
**himself** [3] - 20:20, 45:4, 69:21
**histories** [1] - 79:4
**history** [12] - 30:8, 30:23, 33:16, 40:20, 56:23, 56:25, 78:12, 78:14, 79:1, 81:7, 81:9
**hit** [1] - 7:21
**holding** [2] - 39:8, 69:1
**holes** [1] - 54:21
**home** [5] - 18:22, 41:4, 49:22, 68:14, 68:19
**Honor** [25] - 2:3, 2:11, 3:1, 3:20, 6:3, 6:6, 7:2, 7:23, 11:8, 27:24, 34:14, 35:14, 35:25, 37:5, 37:18, 39:2, 39:5, 39:6, 62:16, 63:7, 64:15, 88:1, 88:17, 89:6, 89:8
**hope** [1] - 8:4
**hoped** [1] - 47:13
**hopefully** [1] - 79:13
**horny** [2] - 68:13, 68:15
**horrible** [8] - 48:24, 49:12, 54:9, 56:5, 56:10, 56:21, 58:9
**hot** [1] - 51:21
**hour** [1] - 49:16
**house** [3] - 32:24, 36:22, 86:19
**huge** [2] - 30:9, 31:5
**humane** [1] - 61:23
**hung** [1] - 40:3

**hurry** [1] - 68:14
**hurt** [1] - 48:25

## I

**IBM** [2] - 33:17, 57:1
**idea** [2] - 23:16, 60:2
**identify** [1] - 84:5
**illegal** [1] - 17:20
**image** [1] - 8:10
**imagery** [1] - 70:1
**images** [10] - 6:19, 7:6, 8:17, 51:19, 51:21, 69:14, 70:3, 70:4, 70:17, 85:19
**imagine** [2] - 37:20, 57:6
**immediate** [1] - 65:3
**immediately** [1] - 87:10
**immune** [1] - 25:4
**impact** [2] - 4:9, 61:14
**impair** [1] - 85:23
**impeachment** [2] - 8:11, 67:1
**impede** [2] - 74:24, 76:13
**impeded** [2] - 74:23, 76:13
**implications** [1] - 43:17
**implying** [1] - 21:2
**important** [5] - 10:7, 21:14, 28:1, 63:24, 67:6
**impose** [4] - 78:21, 79:10, 79:11, 82:15
**imposed** [9] - 9:3, 9:4, 16:9, 71:20, 79:1, 79:8, 82:2, 84:4, 87:10
**imposing** [2] - 8:25, 82:19
**impossible** [1] - 80:22
**imprisonment** [1] - 78:13
**improvements** [1] - 84:7
**in-person** [1] - 80:7
**inability** [2] - 87:7, 87:8
**inaccurate** [2] - 22:17, 67:19
**inadequate** [1] - 4:18
**inappropriate** [2] - 55:20, 65:20
**incarcerated** [1] - 3:25
**incarceration** [6] - 10:15, 10:18, 10:22, 64:3, 82:3, 82:17
**incarcerative** [2] - 82:18, 82:20
**incentive** [1] - 59:14
**incidental** [2] - 71:15, 71:17
**inclined** [1] - 33:11
**include** [8] - 22:1, 23:25, 24:1, 72:15, 84:10, 86:8, 86:17, 87:2
**included** [1] - 7:17
**includes** [2] - 4:2, 73:20
**including** [4] - 10:25, 19:20, 54:7, 72:23
**inclusion** [1] - 6:8
**inconsistent** [3] - 15:5, 15:6,

61:8
**increase** [3] - 31:4, 31:5, 31:6
**increased** [8] - 74:14, 74:18, 75:10, 76:2, 76:8, 76:15, 76:24, 78:3
**increasing** [1] - 6:15
**incredible** [1] - 80:9
**indicate** [4] - 5:14, 9:23, 10:8, 71:14
**indicated** [4] - 17:17, 18:6, 28:23, 67:4
**indicates** [2] - 18:4, 69:12
**indictment** [2] - 77:11, 77:20
**indirectly** [2] - 86:3, 86:5
**individual** [3] - 35:23, 62:23, 63:22
**individually** [2] - 25:7, 52:19
**individuals** [3] - 9:7, 30:10, 73:21
**induce** [2] - 75:21, 77:22
**ineligible** [1] - 78:18
**infection** [1] - 3:24
**inflammatory** [2] - 9:20, 66:23
**inform** [1] - 87:4
**information** [11] - 34:24, 35:15, 36:4, 36:15, 37:9, 37:11, 39:10, 39:17, 54:23, 66:23, 67:6
**informed** [1] - 84:6
**ingratiate** [1] - 69:21
**inherent** [1] - 86:1
**inhibition** [1] - 16:7
**inhibitor** [1] - 15:21
**input** [1] - 36:23
**inquiries** [1] - 40:9
**inside** [1] - 68:18
**insidious** [2] - 41:24, 48:18
**insight** [3] - 52:8, 63:14, 65:9
**insist** [1] - 63:24
**inspection** [1] - 87:3
**installation** [1] - 85:1
**instance** [1] - 69:24
**instances** [3] - 63:7, 67:22, 78:9
**instead** [1] - 60:22
**intend** [4] - 11:13, 11:20, 12:3, 26:25
**intended** [7] - 11:24, 27:9, 28:22, 31:14, 31:23, 47:9, 48:5
**intending** [1] - 27:10
**intends** [1] - 27:14
**intent** [19] - 12:5, 12:10, 12:22, 13:4, 13:6, 13:8, 14:7, 14:13, 25:14, 27:12, 34:18, 37:3, 38:10, 38:17, 55:20, 65:21, 65:25, 71:4, 75:6
**intention** [1] - 24:18

**intentional** [1] - 67:14
**intentionally** [1] - 43:5
**intentions** [1] - 49:23
**interacting** [1] - 37:8
**interaction** [1] - 36:22
**interactions** [2] - 35:25, 70:23
**interactive** [1] - 74:7, 75:21
**intercourse** [1] - 70:16
**interest** [21] - 4:5, 16:14, 16:21, 34:6, 45:7, 45:13, 45:19, 52:11, 52:15, 53:3, 53:15, 60:8, 60:17, 67:24, 68:5, 68:8, 69:13, 69:16, 69:22, 70:8, 75:2
**interested** [16] - 8:8, 8:13, 8:14, 8:20, 16:5, 16:24, 17:8, 18:2, 31:19, 54:3, 58:4, 60:5, 63:14, 68:6, 69:19, 69:20
**interesting** [3] - 26:19, 56:24, 66:4
**interests** [5] - 39:23, 69:18, 80:3, 80:24, 86:1
**Internet** [13] - 41:8, 41:9, 48:14, 49:13, 51:3, 56:8, 72:1, 84:19, 84:23, 85:3, 85:8, 85:11, 85:15
**Internet-capable** [1] - 85:3
**interpreted** [1] - 25:13
**interstate** [2] - 71:21, 73:2
**interview** [2] - 6:1, 6:8
**intimate** [3] - 51:2, 69:4, 79:24
**intoxicated** [1] - 26:10
**introduced** [2] - 11:18, 65:19
**introduces** [1] - 80:4
**inventory** [1] - 85:10
**investigated** [5] - 19:25, 22:5, 22:18, 22:22, 61:7
**investigation** [2] - 22:6, 61:12
**invoices** [1] - 85:6
**involved** [10] - 14:19, 28:24, 42:16, 46:20, 70:23, 73:12, 74:6, 74:17, 75:20, 76:4
**involving** [5] - 6:20, 7:7, 77:7, 85:20, 85:25
**issue** [22] - 2:20, 5:19, 6:12, 7:14, 7:16, 7:19, 11:9, 11:22, 13:10, 14:4, 16:11, 17:15, 19:17, 19:23, 20:22, 21:14, 26:1, 38:15, 58:25, 61:4, 67:1, 68:2
**issues** [8] - 9:10, 11:11, 11:16, 16:2, 24:5, 32:15, 40:23, 56:2
**items** [1] - 87:2
**itself** [2] - 35:3, 71:4

**J**

**jail** [7] - 32:20, 32:21, 60:20, 81:20, 81:23, 82:24, 83:1
**job** [2] - 4:22, 64:8
**Johanna** [1] - 89:17
**Judge** [10] - 5:8, 7:13, 7:15, 20:24, 24:15, 26:19, 26:21, 33:22, 65:15, 89:4
**judge** [2] - 34:7, 40:2
**judgment** [1] - 87:21
**jump** [2] - 49:15, 50:4
**jumping** [1] - 35:20
**jumps** [1] - 50:6
**juror** [1] - 81:11
**jury** [17] - 9:19, 10:4, 11:23, 12:15, 13:6, 13:13, 13:16, 14:8, 36:25, 40:1, 40:2, 43:20, 45:10, 53:4, 55:16, 55:23, 67:16
**jury's** [2] - 27:11, 43:23
**justice** [19] - 4:5, 6:12, 8:7, 8:21, 11:25, 14:13, 16:10, 38:20, 39:7, 45:15, 45:21, 59:13, 67:11, 69:24, 71:5, 71:9, 74:24, 75:7, 76:14
**justify** [1] - 25:13

**K**

**Kaplan** [26] - 2:7, 3:8, 4:15, 4:21, 5:13, 6:23, 7:22, 10:24, 11:2, 11:7, 34:1, 34:7, 34:19, 35:4, 37:2, 37:7, 38:4, 44:20, 44:22, 46:4, 54:5, 54:22, 65:14, 88:2, 88:20, 89:1
**KAPLAN** [42] - 2:11, 5:8, 5:14, 5:24, 6:3, 7:2, 7:23, 11:8, 12:9, 13:9, 14:24, 15:12, 15:15, 16:21, 17:11, 17:15, 18:17, 19:8, 19:10, 19:22, 20:24, 21:1, 21:11, 22:1, 22:4, 22:20, 23:14, 23:24, 24:5, 24:10, 24:13, 26:19, 27:14, 29:3, 29:6, 32:1, 65:15, 88:4, 88:9, 88:13, 89:4, 89:6
**Kaplan's** [1] - 41:12
**Katrina** [3] - 14:25, 15:7, 15:10
**keen** [1] - 52:12
**keep** [5] - 9:22, 52:24, 54:16, 64:1, 84:6
**keeps** [1] - 33:12
**key** [2] - 25:2, 37:1
**kid** [4] - 48:25, 49:21, 50:3, 51:21
**kids** [1] - 48:16
**kill** [3] - 26:12, 27:1, 27:11
**killed** [1] - 27:18

**kind** [15] - 10:19, 14:5, 14:12, 17:7, 19:2, 23:10, 26:2, 26:17, 28:16, 50:5, 50:17, 56:16, 79:2, 79:5, 79:24
**knowing** [1] - 31:25
**knowingly** [1] - 2:18
**known** [3] - 7:14, 33:1, 57:10
**knows** [6] - 12:19, 41:21, 46:14, 53:14, 56:5, 60:13
**Kupersmith** [1] - 26:21

**L**

**labia** [3] - 50:25, 51:8, 69:7
**lack** [2] - 10:20, 75:8
**lady** [4] - 48:12, 49:4, 51:20, 52:18
**large** [2] - 31:6, 79:14
**larger** [1] - 45:18
**last** [4] - 10:23, 11:2, 38:8, 42:9
**lasted** [2] - 60:18, 63:19
**late** [1] - 28:7
**latter** [1] - 18:5
**launch** [1] - 55:20
**launched** [1] - 41:8
**law** [12] - 6:24, 10:7, 19:19, 22:17, 22:20, 22:21, 35:22, 42:25, 67:3, 73:21, 79:10, 86:22
**lawful** [1] - 87:1
**lay** [1] - 39:23
**least** [9] - 8:10, 29:24, 42:2, 48:11, 55:7, 64:22, 65:10, 66:12, 77:8
**leave** [1] - 87:15
**led** [2] - 45:11, 46:22
**left** [2] - 32:25, 47:22
**legal** [1] - 7:19
**lends** [1] - 7:24
**length** [1] - 24:2
**lengthy** [3] - 68:10, 82:6, 82:16
**lenient** [1] - 82:19
**less** [4] - 26:1, 27:5, 30:16, 76:22
**letter** [3] - 34:13, 37:4, 81:12
**level** [44] - 17:16, 18:1, 21:3, 21:6, 21:9, 27:1, 28:11, 30:20, 30:21, 30:22, 31:18, 32:6, 40:16, 41:17, 41:18, 41:22, 59:19, 63:3, 64:12, 73:16, 74:3, 74:13, 74:18, 75:10, 75:13, 75:17, 76:1, 76:8, 76:15, 76:17, 76:20, 76:22, 76:23, 76:24, 76:25, 78:3, 78:4, 78:9, 78:10, 78:11, 78:14
**levels** [15] - 15:20, 30:22, 32:3, 62:18, 62:22, 63:5,

63:9, 74:14, 74:19, 75:11, 76:2, 76:8, 76:15, 76:22, 78:3
**libido** [2] - 49:8, 49:11
**lie** [8] - 38:15, 39:8, 41:14, 44:11, 45:9, 55:25, 59:15, 60:6
**lied** [1] - 63:15
**lies** [1] - 45:16
**life** [16] - 28:16, 29:25, 32:9, 35:1, 35:7, 37:19, 52:1, 54:14, 57:13, 60:20, 64:3, 64:12, 64:13, 78:15, 78:18, 82:1
**lifetime** [6] - 65:5, 65:6, 65:7, 65:11, 80:16, 82:4
**light** [1] - 42:7
**like-minded** [1] - 9:7
**likely** [2] - 32:11, 86:11
**limited** [2] - 3:5, 16:1
**line** [3] - 9:14, 14:24, 20:6
**lines** [1] - 18:19
**link** [1] - 45:22
**lips** [2] - 50:24, 69:8
**list** [8] - 9:15, 21:20, 21:21, 22:8, 23:16, 44:7, 66:25, 88:18
**listen** [2] - 36:16, 65:22
**listened** [1] - 40:3
**listening** [1] - 37:7
**literally** [1] - 14:3
**live** [4] - 26:18, 40:13, 54:13
**lives** [1] - 57:13
**living** [1] - 33:20
**local** [1] - 83:12
**location** [2] - 3:25, 83:25
**locations** [2] - 86:11, 89:2
**lock** [1] - 25:2
**log** [1] - 85:13
**long-term** [2] - 29:10, 81:9
**look** [14] - 19:12, 25:17, 25:18, 27:4, 28:1, 28:2, 30:4, 31:3, 32:4, 32:12, 34:25, 36:9, 57:12, 69:4
**looked** [4] - 11:9, 27:22, 30:11, 61:14
**looking** [10] - 4:16, 19:15, 26:21, 27:24, 30:2, 31:2, 32:2, 32:7, 42:4, 47:18
**looks** [1] - 19:13
**loose** [1] - 61:2
**losing** [1] - 15:19
**lost** [2] - 32:23, 32:25
**lover** [1] - 50:11
**low** [5] - 28:12, 30:23, 55:9, 83:15, 88:11
**lowest** [1] - 88:24
**luck** [1] - 27:2
**lying** [3] - 13:14, 13:18, 38:21

**M**

**Maddie** [4] - 47:16, 53:23, 68:25, 69:3
**maintain** [2] - 41:17, 66:20
**major** [2] - 16:1, 88:19
**Man** [1] - 49:6
**man** [3] - 41:15, 50:3, 56:6
**management** [2] - 35:24, 81:10
**manager** [1] - 81:12
**mandatory** [5] - 25:5, 29:17, 55:3, 59:15, 66:15
**manipulated** [1] - 57:17
**manipulating** [2] - 54:1, 57:17
**manipulation** [2] - 53:19, 56:10
**manner** [3] - 7:1, 65:21, 79:22
**manslaughter** [1] - 29:22
**Manual** [2] - 73:19, 75:15
**manufacturing** [1] - 18:18
**March** [1] - 52:2
**Mark** [1] - 2:7
**marked** [1] - 14:25
**married** [1] - 53:17
**marshal** [1] - 4:2
**Massé** [1] - 89:17
**MASTERSON** [15] - 6:6, 7:4, 7:10, 39:5, 41:14, 43:3, 43:7, 44:6, 44:10, 61:14, 62:13, 62:15, 65:13, 88:1, 89:7
**Masterson** [3] - 2:6, 82:23, 87:24
**masturbate** [1] - 51:22
**material** [17] - 35:3, 35:10, 43:3, 43:4, 43:5, 43:20, 43:23, 44:11, 45:5, 45:11, 45:17, 45:23, 67:15, 67:22, 71:4, 75:6
**materially** [1] - 67:13
**materials** [2] - 35:1, 44:3
**math** [1] - 19:24
**matter** [7] - 2:3, 43:6, 52:25, 67:10, 67:15, 89:5, 89:14
**matters** [1] - 46:2
**maximum** [1] - 78:16
**mean** [37] - 11:24, 12:16, 13:9, 13:15, 15:10, 15:16, 17:8, 21:2, 22:4, 23:1, 25:16, 26:7, 27:16, 28:12, 31:5, 33:17, 38:23, 39:14, 41:16, 42:24, 46:8, 46:14, 50:17, 51:5, 53:16, 53:21, 55:4, 56:5, 56:6, 56:12, 56:14, 56:18, 56:21, 57:15, 57:19, 58:13, 59:1
**means** [1] - 9:1
**meant** [2] - 13:19, 15:5

**measure** [2] - 26:11, 79:23
**media** [4] - 84:20, 85:12, 85:16, 86:21
**medical** [2] - 67:8, 79:21
**meet** [13] - 17:22, 18:11, 44:12, 49:1, 49:16, 49:18, 49:22, 49:25, 50:4, 59:4, 75:25, 80:6
**meeting** [2] - 44:15, 79:25
**meets** [1] - 18:3
**Meg** [2] - 47:17, 47:20
**members** [1] - 61:25
**memo** [3] - 44:1, 49:1, 51:25
**memoranda** [3] - 4:8, 4:9, 44:9
**memorandum** [2] - 25:9, 44:18, 65:16
**memory** [1] - 67:20
**men** [1] - 49:13
**mental** [2] - 29:20, 79:19
**mention** [4] - 8:18, 8:19, 14:22, 70:5
**mentioned** [6] - 14:20, 27:25, 46:4, 56:18, 57:24, 70:24
**mentoring** [1] - 50:15
**mere** [1] - 47:3
**message** [1] - 75:23
**messages** [2] - 12:5, 27:12
**met** [10] - 18:5, 44:14, 44:25, 45:2, 51:3, 56:8, 63:16, 76:5, 77:23, 80:15
**method** [1] - 6:17
**methods** [1] - 84:24
**middle** [2] - 10:16, 55:7
**midnight** [1] - 49:14
**midst** [1] - 82:10
**might** [11] - 5:15, 13:22, 27:8, 31:3, 31:23, 33:10, 48:23, 49:10, 55:9, 59:23, 82:19
**mind** [4] - 12:16, 37:23, 46:13, 60:25
**mind-set** [2] - 46:13, 60:25
**minded** [1] - 9:7
**mine** [1] - 49:9
**minimize** [2] - 29:9, 66:6
**minimum** [6] - 25:6, 29:17, 59:15, 66:16, 84:5, 84:22
**minimums** [1] - 55:3
**minor** [24] - 4:21, 11:21, 13:13, 14:5, 14:7, 16:2, 16:5, 20:19, 26:1, 26:18, 62:19, 63:20, 66:15, 71:17, 73:3, 73:20, 73:25, 74:9, 74:11, 74:17, 75:22, 77:12, 77:21, 77:24
**minors** [2] - 77:2, 85:25
**minutes** [1] - 43:12
**mischaracterized** [1] - 65:24
**misconstrued** [2] - 39:24, 60:7

**misrepresentations** [1] - 40:6
**missed** [1] - 27:17
**mission** [2] - 37:11, 39:10
**misstatement** [1] - 66:14
**mistake** [1] - 67:19
**mistakenly** [1] - 81:17
**mistakes** [1] - 47:21
**mistook** [1] - 37:16
**mistruth** [1] - 8:14
**misunderstanding** [1] - 60:23
**misunderstood** [4] - 34:15, 37:6, 68:3, 68:4
**mitigate** [1] - 58:6
**mitigation** [1] - 54:18
**mitigator** [1] - 64:5
**mitigators** [2] - 64:5, 64:9
**modification** [1] - 7:21
**modified** [1] - 9:23
**modifying** [1] - 6:25
**moment** [2] - 52:13, 53:3
**Momma.mego** [3] - 47:17, 53:21, 56:19
**money** [1] - 46:20
**money-making** [1] - 46:20
**monitor** [1] - 85:2
**monitoring** [1] - 85:1
**Monroe** [1] - 46:8
**monthly** [1] - 85:13
**months** [16] - 28:11, 28:14, 28:18, 34:19, 38:8, 47:3, 55:7, 59:9, 63:1, 63:3, 64:22, 65:10, 78:15, 83:3, 83:8
**moreover** [1] - 55:18
**most** [11] - 14:15, 23:19, 25:1, 27:19, 32:11, 35:6, 53:1, 63:24, 79:15, 79:21, 79:24
**mostly** [1] - 65:20
**mother** [13] - 14:3, 28:9, 39:22, 47:18, 57:19, 63:17, 64:7, 66:8, 70:12, 70:13, 74:10, 74:12, 77:14
**mothers** [4] - 68:6, 69:20, 69:22
**motion** [2] - 34:13, 34:15
**motivated** [2] - 46:13, 79:13
**motive** [2] - 71:6, 75:8
**mouth** [2] - 68:25, 69:9
**move** [1] - 56:2
**MR** [42] - 2:11, 5:8, 5:14, 5:24, 6:3, 7:2, 7:23, 11:8, 12:9, 13:9, 14:24, 15:12, 15:15, 16:21, 17:11, 17:15, 18:17, 19:8, 19:10, 19:22, 20:24, 21:1, 21:11, 22:1, 22:4, 22:20, 23:14, 23:24, 24:5, 24:10, 24:13, 26:19, 27:14, 29:3, 29:6, 32:1, 65:15, 88:4, 88:9, 88:13,

89:4, 89:6
**MS** [15] - 6:6, 7:4, 7:10, 39:5, 41:14, 43:3, 43:7, 44:6, 44:10, 61:14, 62:13, 62:15, 65:13, 88:1, 89:7
**multiple** [4] - 55:1, 64:22, 72:6, 76:18
**multiple-count** [1] - 76:18
**Murtha** [2] - 7:13, 7:15
**must** [19] - 6:18, 7:5, 83:12, 83:14, 83:19, 83:21, 84:2, 84:9, 84:18, 84:25, 85:5, 85:9, 85:14, 85:19, 86:2, 86:10, 86:15, 86:19, 87:21

## N

**naive** [1] - 36:7
**naked** [1] - 70:15
**name** [1] - 68:11
**named** [1] - 68:1
**names** [1] - 84:23
**narrowed** [1] - 40:18
**nature** [5] - 15:8, 24:25, 40:20, 78:25, 86:6
**near** [2] - 61:18, 64:24
**necessarily** [4] - 12:13, 12:16, 16:4, 18:17
**necessary** [4] - 71:6, 78:22, 78:24, 83:5
**need** [20] - 8:22, 21:8, 25:17, 25:18, 50:11, 53:4, 53:7, 59:7, 59:25, 60:4, 63:13, 68:22, 69:16, 72:15, 79:1, 79:2, 79:8, 80:23, 80:25
**needed** [2] - 50:11, 84:6
**needlessly** [1] - 3:23
**needs** [8] - 8:1, 22:12, 42:21, 53:10, 53:11, 57:20, 60:24, 79:19
**negate** [4] - 71:6, 71:7, 75:8, 75:9
**negates** [1] - 66:9
**network** [1] - 41:5
**never** [10] - 9:18, 14:6, 32:20, 36:7, 36:13, 45:2, 45:8, 55:25, 61:20, 69:19
**new** [1] - 19:19
**next** [5] - 3:15, 49:18, 52:2, 63:3, 89:3
**nice** [1] - 81:13
**Nicholas** [7] - 28:5, 28:6, 28:17, 29:11, 32:4, 46:6, 47:7
**nickname** [1] - 15:13
**niece** [6] - 5:3, 19:23, 21:7, 21:9, 36:21, 56:2
**niece's** [1] - 9:14
**nightmare** [1] - 38:18
**nine** [2] - 31:15, 31:25

**nobody** [4] - 23:9, 37:8, 41:19, 41:21
**none** [1] - 50:12
**nonsense** [1] - 52:10
**normalize** [2] - 48:8, 48:22
**normalizing** [2] - 48:10, 48:19
**note** [1] - 78:8
**Note** [1] - 73:20
**notes** [1] - 43:1
**nothing** [4] - 27:21, 32:25, 33:4, 81:7
**notice** [2] - 87:19, 87:20
**Notification** [1] - 83:22
**notify** [1] - 11:5
**November** [4] - 2:1, 44:24, 73:19, 75:15
**nowhere** [1] - 64:24
**number** [9] - 2:4, 3:2, 6:10, 25:6, 29:20, 32:22, 41:8, 78:24, 85:10
**numerous** [1] - 29:18

## O

**oath** [4] - 63:15, 67:23, 75:1, 75:3
**object** [4] - 5:20, 51:4, 51:23, 51:25
**objected** [1] - 55:14
**objecting** [1] - 21:11
**objection** [7] - 4:25, 5:15, 5:22, 6:25, 7:17, 11:3, 55:21
**objections** [2] - 4:24, 55:13
**objective** [4] - 8:9, 11:11, 17:9, 73:13
**objectively** [1] - 43:14
**obsession** [1] - 63:19
**obsessively** [1] - 63:17
**obstruct** [6] - 11:25, 14:13, 71:5, 74:24, 75:7, 76:13
**obstructed** [4] - 39:7, 59:12, 74:23, 76:12
**obstruction** [21] - 6:11, 8:7, 8:21, 11:8, 11:12, 11:22, 12:23, 15:16, 15:18, 15:25, 16:1, 16:10, 42:23, 42:25, 45:15, 45:21, 45:25, 56:1, 67:11, 69:24, 71:9
**obstruction-of-justice** [3] - 45:15, 45:21, 71:9
**obtain** [2] - 24:22, 24:23
**obtained** [1] - 86:13
**obvious** [3] - 20:5, 49:23, 52:11
**obviously** [5] - 28:23, 44:14, 46:24, 59:7, 66:5
**occasion** [4] - 17:16, 25:13, 29:8, 65:19
**occasions** [3] - 28:10, 72:13,

77:8
**occur** [2] - 28:22, 79:16
**occurred** [7] - 10:8, 20:17, 21:4, 29:19, 67:7, 73:4, 73:8
**occurs** [2] - 27:7, 31:7
**October** [1] - 35:8
**offended** [1] - 41:20
**Offender** [1] - 83:21
**offender** [13] - 24:21, 54:6, 58:21, 59:20, 60:8, 61:2, 63:6, 77:2, 77:5, 83:24, 84:10, 88:7, 88:25
**offense** [41] - 9:2, 24:25, 54:10, 54:24, 56:4, 56:5, 64:21, 71:21, 72:5, 73:2, 73:6, 73:16, 74:1, 74:3, 74:5, 74:6, 74:13, 74:17, 74:18, 75:10, 75:13, 75:17, 75:19, 75:20, 76:1, 76:4, 76:8, 76:15, 76:17, 76:20, 76:21, 76:23, 76:25, 77:4, 77:13, 78:4, 78:9, 78:10, 78:11, 78:14, 84:1
**offenses** [4] - 21:4, 46:9, 79:9, 82:4
**offer** [3] - 23:12, 40:21, 74:8
**offered** [2] - 64:20, 89:1
**offering** [3] - 36:16, 39:19, 69:21
**Office** [3] - 16:13, 58:10, 86:14
**officer** [22] - 17:5, 25:25, 62:10, 70:10, 73:21, 73:25, 74:10, 77:14, 80:6, 83:20, 83:23, 84:11, 84:15, 84:22, 84:25, 85:5, 85:9, 86:7, 86:23, 86:25
**officer's** [1] - 87:1
**officers** [1] - 84:6
**often** [2] - 41:16, 80:16
**old** [5] - 10:10, 31:9, 31:10, 31:16, 47:25
**Older** [1] - 49:6
**older** [1] - 59:5
**once** [1] - 61:17
**one** [46] - 2:15, 6:10, 8:10, 8:22, 9:10, 12:3, 17:3, 19:12, 19:22, 20:1, 20:6, 21:5, 25:9, 25:20, 26:11, 26:13, 28:15, 29:8, 29:16, 31:3, 36:16, 46:5, 48:7, 51:7, 52:13, 53:18, 58:12, 58:25, 61:4, 62:20, 63:7, 63:9, 63:25, 64:17, 65:16, 65:19, 66:3, 66:14, 67:23, 76:20, 76:21, 76:24, 77:10, 81:11
**one's** [1] - 20:8
**one-half** [1] - 76:21

**ones** [1] - 45:18
**online** [5] - 41:13, 75:23, 79:16, 82:22, 84:23
**open** [1] - 2:2
**opportunities** [2] - 79:21, 88:19
**opportunity** [6] - 4:13, 20:8, 36:4, 41:25, 45:8, 89:2
**opposed** [3] - 16:23, 27:4, 28:3
**options** [1] - 38:15
**oral** [1] - 70:15
**Orange** [1] - 49:16
**oranges** [1] - 47:6
**order** [1] - 72:16
**ordinary** [1] - 42:3
**orgasm** [5] - 53:23, 53:24, 56:19, 56:20, 69:11
**ostracized** [1] - 62:3
**ought** [1] - 64:4
**outrageous** [1] - 57:22
**outstanding** [1] - 58:11
**overall** [1] - 45:12
**overstep** [1] - 50:9
**own** [10] - 10:6, 11:1, 12:16, 13:2, 13:3, 17:9, 33:24, 36:10, 52:23, 80:10

## P

**page** [2] - 44:23, 65:17
**paid** [1] - 28:8
**pandemic** [3] - 10:17, 10:20, 82:10
**pants** [1] - 76:7
**paper** [1] - 51:25
**papers** [1] - 86:20
**paperwork** [1] - 44:4
**paragraph** [3] - 9:23, 22:13, 61:6
**paragraphs** [3] - 5:2, 20:13, 66:19
**pardon** [1] - 3:18
**parks** [1] - 86:12
**Part** [1] - 78:8
**part** [8] - 23:7, 25:11, 34:4, 50:5, 50:15, 51:7, 52:20, 73:14
**partial** [1] - 8:14
**partially** [1] - 68:4
**participate** [2] - 83:18, 84:9
**particular** [7] - 8:1, 11:24, 12:15, 13:25, 14:4, 25:24, 67:21
**particularly** [10] - 13:21, 26:6, 31:12, 31:20, 32:9, 41:24, 42:8, 48:18, 55:9, 57:14
**parties** [3] - 9:9, 9:21, 11:5
**party** [3] - 86:3, 86:4, 86:16
**passwords** [1] - 84:24

**past** [2] - 35:8
**pattern** [2] - 72:11, 77:6
**pauperis** [1] - 87:16
**pay** [5] - 60:3, 84:14, 87:7, 87:8, 87:14
**peek** [1] - 62:4
**peer** [6] - 9:1, 41:5, 71:22
**peer-to-peer** [2] - 9:1, 41:5
**penalize** [1] - 81:3
**penis** [1] - 41:17
**people** [34] - 3:2, 3:12, 4:1, 14:10, 16:7, 25:1, 25:3, 25:19, 26:9, 26:11, 30:8, 30:13, 33:1, 33:18, 35:25, 41:6, 41:8, 42:18, 48:7, 48:11, 48:13, 48:15, 48:19, 48:22, 49:10, 51:17, 53:15, 57:14, 68:5, 72:1, 79:6, 80:10, 80:17, 82:23
**per** [1] - 78:18
**percent** [1] - 55:22
**perform** [2] - 70:13, 74:13
**performing** [1] - 70:15
**period** [5] - 10:15, 29:21, 65:4, 65:11, 82:16
**perjury** [8] - 39:1, 43:4, 54:25, 59:12, 64:21, 67:12, 67:13, 67:17
**persistent** [1] - 60:18
**persists** [1] - 53:16
**person** [50] - 2:15, 2:23, 3:16, 9:4, 9:6, 12:5, 12:11, 14:4, 17:4, 17:22, 17:23, 18:3, 18:6, 18:11, 18:22, 20:15, 21:20, 22:10, 23:15, 26:12, 26:13, 26:14, 27:14, 29:11, 35:15, 36:2, 37:7, 41:4, 41:13, 42:14, 50:13, 51:11, 51:18, 54:25, 56:16, 58:10, 63:19, 63:20, 71:22, 72:3, 72:4, 72:8, 74:8, 79:17, 80:2, 80:7, 86:19, 86:25
**Person** [1] - 44:15
**person's** [1] - 9:5
**personality** [2] - 9:12, 37:11
**personally** [1] - 39:20
**persons** [1] - 86:3
**perspective** [6] - 4:25, 5:7, 6:5, 9:18, 17:20, 62:9
**persuade** [1] - 75:21
**philosophy** [1] - 36:14
**phone** [6] - 8:11, 17:2, 58:14, 58:15, 69:15, 70:18
**photograph** [1] - 17:6
**photos** [3] - 26:2, 26:3, 51:2
**physical** [4] - 11:17, 29:20, 45:1, 47:15
**pick** [1] - 39:25
**picture** [4] - 41:16, 50:24, 50:25, 71:2

**pictures** [13] - 14:16, 14:22, 16:4, 16:23, 28:25, 29:4, 41:17, 43:21, 51:15, 67:25, 70:16, 70:20, 75:3
**place** [7] - 3:10, 18:23, 49:22, 61:1, 66:11, 71:17, 81:24
**placed** [2] - 76:6, 76:7
**places** [1] - 57:7
**plan** [2] - 73:14, 84:22
**Plan** [1] - 84:20
**planning** [1] - 21:10
**Plattsburgh** [9] - 37:8, 42:15, 48:3, 48:12, 49:4, 51:18, 51:20, 52:18, 63:20
**play** [2] - 37:17, 38:3
**playgrounds** [1] - 86:12
**plays** [1] - 37:1
**plea** [1] - 78:5
**plead** [2] - 59:14, 81:4
**pleaded** [1] - 46:14
**pleasurable** [2] - 53:25, 56:20
**pleasure** [3] - 68:25, 69:3, 69:10
**pled** [1] - 28:13
**plenty** [2] - 48:5, 54:13
**PM** [2] - 2:2, 89:9
**pod** [1] - 3:2
**point** [11] - 3:2, 10:22, 24:14, 25:15, 29:24, 32:14, 33:16, 35:7, 41:12, 56:24, 81:1
**pointed** [6] - 14:8, 16:13, 25:9, 42:13, 54:5, 81:10
**pointing** [1] - 17:1
**points** [4] - 8:20, 10:24, 78:12, 81:9
**police** [12] - 19:25, 22:5, 22:14, 23:17, 36:22, 39:21, 61:7, 61:12, 61:18, 62:1, 62:7, 62:11
**policy** [1] - 72:24
**polygraph** [2] - 58:20, 84:10
**poor** [1] - 54:12
**pops** [1] - 37:20
**pornography** [37] - 6:14, 6:21, 7:8, 7:12, 7:16, 8:2, 8:10, 8:24, 9:1, 9:5, 9:7, 17:2, 17:18, 17:19, 18:10, 18:11, 18:12, 18:18, 19:19, 26:3, 26:4, 41:1, 41:5, 55:2, 56:9, 66:2, 69:14, 70:1, 70:17, 71:8, 71:13, 71:19, 73:7, 75:10, 80:10, 85:22, 85:24
**portions** [1] - 20:20
**pose** [1] - 52:5
**poses** [4] - 52:5, 54:9, 54:16, 54:19
**posing** [1] - 14:2
**position** [3] - 10:2, 13:17, 69:6

**positions** [1] - 81:10
**positive** [1] - 3:3
**possess** [4] - 6:19, 7:6, 83:14, 85:19
**possessed** [1] - 85:12
**possessing** [1] - 18:9
**possession** [2] - 18:10, 55:2
**possibility** [1] - 22:24
**post** [1] - 49:6
**posts** [1] - 41:9
**potential** [3] - 3:24, 21:22, 46:5
**potentially** [1] - 56:20
**power** [1] - 53:18
**predated** [1] - 67:2
**predates** [1] - 21:24
**predator** [2] - 50:13, 58:1, 63:8
**predators** [1] - 82:23
**prefer** [1] - 3:11
**preferably** [1] - 45:22
**preference** [2] - 2:25, 3:1
**prepare** [1] - 87:19
**prepared** [1] - 23:12
**preponderance** [2] - 74:21, 76:11
**presence** [1] - 86:5
**present** [5] - 2:7, 2:8, 2:21, 2:23, 81:6
**presentation** [2] - 24:8, 24:9
**presented** [11] - 23:11, 36:12, 36:15, 47:7, 49:5, 59:12, 59:17, 60:15, 63:22, 64:11, 70:8
**presentence** [26] - 4:7, 4:10, 4:24, 5:20, 6:2, 6:5, 6:9, 9:25, 11:4, 18:13, 20:4, 20:11, 20:14, 21:16, 22:12, 23:5, 23:8, 23:10, 23:20, 55:14, 66:18, 66:20, 66:24, 67:9, 84:16, 88:22
**presenting** [1] - 36:3
**presents** [9] - 47:6, 49:10, 53:9, 54:7, 58:6, 64:1, 65:1, 65:3, 83:15
**pretended** [1] - 69:22
**pretending** [1] - 25:25
**pretrial** [1] - 87:13
**pretty** [5] - 15:3, 18:15, 55:17
**prevented** [1] - 6:13
**previous** [1] - 67:5
**previously** [1] - 76:11
**primary** [1] - 4:24
**Prisons** [2] - 83:7, 83:24
**proactive** [1] - 36:14
**probation** [15] - 62:10, 78:18, 83:20, 83:23, 84:6, 84:11, 84:15, 84:22, 84:25, 85:5, 85:9, 86:7, 86:23, 86:25

**Probation** [6] - 16:13, 21:3, 33:9, 58:10, 58:11, 86:14
**Probation's** [1] - 33:8
**problem** [6] - 54:2, 54:5, 55:15, 58:23, 70:2, 80:16
**problematic** [1] - 28:24
**Procedure** [1] - 87:23
**proceed** [2] - 4:6, 69:6
**proceeded** [1] - 78:5
**proceeding** [1] - 57:9
**proceedings** [1] - 89:14
**process** [4] - 38:5, 39:25, 56:13, 80:19
**production** [3] - 18:12, 18:18, 55:3
**program** [1] - 84:9
**programming** [3] - 10:18, 10:21, 82:12
**programs** [1] - 85:18
**prohibited** [12] - 72:13, 74:8, 75:22, 77:7, 77:9, 77:16, 77:17, 77:22, 78:1, 86:8, 86:10, 86:16
**prohibition** [1] - 16:7
**promote** [1] - 79:9
**proof** [2] - 13:1, 23:12
**property** [1] - 86:19
**proposed** [1] - 40:10
**prosecution** [1] - 36:13
**prosecution's** [1] - 35:20
**prosecutor** [1] - 39:4
**prosecutors** [1] - 40:2
**protect** [5] - 33:10, 79:10, 79:15, 80:21, 82:22
**protecting** [3] - 32:16, 33:6, 57:24
**protects** [1] - 33:14
**prove** [3] - 10:12, 20:3, 22:12
**proved** [3] - 16:16, 16:19, 66:23
**provide** [9] - 20:9, 33:12, 40:12, 46:16, 50:16, 59:10, 85:5, 85:9, 88:4
**provided** [7] - 20:18, 44:16, 47:2, 67:5, 73:23, 74:25, 76:14
**provider** [2] - 84:21, 85:8
**providers** [1] - 85:8
**prurient** [1] - 86:1
**PSR** [3] - 40:11, 40:18, 44:16
**psyche** [1] - 51:10
**psychological** [1] - 84:16
**psychosexual** [3] - 6:20, 7:7, 85:21
**public** [10] - 32:17, 33:6, 33:10, 33:14, 57:24, 58:3, 67:4, 79:10, 82:6, 82:22
**punish** [1] - 26:15
**punished** [2] - 32:22, 57:20

**punishment** [5] - 32:16, 33:5, 57:12, 59:3, 79:10
**puppies** [1] - 49:8
**purported** [1] - 68:10
**purpose** [8] - 9:15, 13:13, 13:25, 21:10, 73:23, 74:1, 86:1, 87:3
**purposeful** [1] - 41:2
**purposefully** [1] - 75:6
**purposely** [1] - 71:5
**purposes** [1] - 67:8
**pursuant** [17] - 72:18, 73:11, 73:14, 73:19, 74:3, 74:14, 74:19, 74:22, 75:11, 75:17, 76:2, 76:9, 76:16, 76:19, 77:2, 78:8, 87:22
**pursue** [3] - 9:11, 22:24, 41:19
**pursued** [1] - 21:18
**pursuing** [1] - 10:9
**pussy** [2] - 50:24, 69:10
**put** [4] - 3:10, 4:16, 36:9, 65:23

### Q

**qualifies** [3] - 77:1, 77:17, 78:1
**qualifying** [1] - 84:1
**quarantine** [2] - 2:16, 82:11
**quarantined** [1] - 3:7
**quarantining** [1] - 10:18
**quest** [1] - 47:16
**questioned** [1] - 62:6
**questioning** [1] - 10:4
**questions** [5] - 22:25, 42:9, 46:1, 50:23, 54:21
**quite** [3] - 9:20, 33:7, 40:25
**quivers** [1] - 69:10

### R

**raise** [2] - 6:12, 19:16
**raised** [5] - 14:4, 20:22, 23:4, 46:3, 55:13
**ran** [1] - 30:16
**random** [1] - 51:3
**Randy** [6] - 2:5, 41:15, 50:12, 50:20, 60:16, 68:14
**range** [7] - 20:19, 31:8, 66:13, 69:18, 78:13, 80:3, 87:6
**rape** [2] - 50:7, 56:19
**raped** [1] - 50:8
**rapist** [1] - 47:15
**rationale** [1] - 31:5
**raw** [2] - 43:15, 54:24
**reach** [2] - 53:24, 67:3
**reached** [2] - 10:6, 20:15
**react** [1] - 36:3
**reacting** [1] - 35:16

**reaction** [4] - 25:3, 36:18, 39:20
**reactionary** [1] - 36:13
**read** [8] - 4:7, 4:10, 7:3, 35:10, 37:17, 44:4, 81:12
**reading** [1] - 20:5
**ready** [1] - 49:15
**real** [5] - 15:21, 48:25, 57:18, 80:8, 80:25
**reality** [1] - 35:7
**realize** [2] - 42:8, 48:9
**really** [19] - 13:10, 16:2, 16:15, 19:22, 23:14, 24:1, 28:5, 31:20, 38:9, 38:24, 51:7, 53:7, 53:16, 54:23, 64:9, 64:10, 68:11, 68:15
**reason** [3] - 3:19, 10:9, 12:15, 13:12, 23:5, 31:15, 50:18, 54:18, 64:10
**reasonable** [8] - 19:15, 28:18, 29:12, 31:12, 32:8, 55:16, 63:10, 86:23
**reasonably** [1] - 4:3
**reasons** [4] - 2:16, 28:19, 83:2
**rebut** [2] - 9:13, 67:7
**rebuttal** [1] - 67:1
**receipt** [2] - 55:2, 73:6
**receive** [3] - 28:25, 38:17, 88:25
**received** [2] - 35:16, 79:6
**receiving** [1] - 48:20
**recently** [1] - 9:4
**receptive** [1] - 54:3
**recess** [1] - 89:9
**recipient** [1] - 72:8
**recognize** [2] - 41:4, 64:13
**recognizes** [1] - 72:12
**recommend** [1] - 88:25
**recommendation** [3] - 55:6, 88:11, 88:22
**recommendations** [1] - 88:3
**recommended** [1] - 46:17
**recommends** [1] - 30:1
**record** [4] - 28:8, 29:21, 84:23, 89:14
**records** [2] - 36:10, 85:6
**recover** [1] - 80:16
**recovery** [1] - 38:18
**red** [1] - 12:20
**reduced** [2] - 33:16, 76:2
**reduction** [1] - 78:6
**reference** [2] - 43:10, 71:1
**referenced** [1] - 66:3
**referring** [2] - 16:22, 18:17
**refers** [1] - 44:17
**reflect** [1] - 79:9
**reflecting** [1] - 66:24
**refusal** [1] - 84:12

**regard** [8] - 8:7, 8:23, 9:9, 15:17, 67:11, 70:19, 71:11, 72:11
**regarding** [1] - 69:3
**Registration** [1] - 83:22
**registration** [1] - 83:24
**regret** [2] - 37:15
**regular** [1] - 38:2
**rehab** [1] - 60:4
**rehabilitation** [1] - 79:19
**rejected** [5] - 55:23, 55:24, 55:25, 61:17, 61:25
**relate** [1] - 52:4
**related** [3] - 9:13, 71:3, 75:5
**relationship** [7] - 14:19, 16:5, 46:19, 51:6, 66:8, 70:22
**relationships** [1] - 80:17
**release** [15] - 6:14, 7:18, 33:7, 33:13, 53:17, 58:8, 78:17, 82:18, 82:21, 83:4, 83:10, 84:16, 86:24, 87:5
**released** [4] - 32:12, 33:2, 52:5, 64:25
**relevance** [3] - 46:6, 46:11, 52:3
**relevant** [7] - 10:5, 10:9, 23:21, 24:1, 24:3, 34:9, 53:13
**reliability** [2] - 22:25, 23:4
**reliable** [4] - 10:5, 21:15, 22:19, 22:21
**relieving** [1] - 35:7
**relying** [2] - 21:10, 62:10
**remain** [4] - 10:19, 20:14, 61:3, 66:24
**remember** [6] - 26:21, 26:22, 28:7, 49:4, 49:19, 88:6
**remembered** [1] - 61:5
**remembers** [2] - 44:14, 52:14
**remorse** [3] - 52:8, 52:10, 63:13
**removal** [1] - 87:2
**reoffend** [2] - 58:1, 58:12
**repair** [1] - 80:22
**repeat** [3] - 59:19, 63:6, 77:1
**repeated** [1] - 63:9
**report** [37] - 4:7, 4:10, 4:24, 5:6, 5:21, 6:2, 6:5, 6:9, 9:25, 11:4, 18:13, 20:4, 20:11, 20:14, 20:16, 20:21, 21:16, 21:18, 22:12, 23:5, 23:8, 23:10, 23:17, 23:20, 55:14, 61:18, 62:4, 62:7, 66:18, 66:20, 66:24, 67:4, 67:10, 84:6, 84:16, 88:22
**reported** [2] - 22:13, 62:11
**reports** [1] - 84:16
**representation** [2] - 45:13, 51:15
**represented** [2] - 25:10,

73:22
**representing** [1] - 2:5
**reputation** [1] - 32:23
**request** [6] - 2:22, 43:16, 43:18, 71:2, 75:9, 87:17
**requested** [2] - 71:8, 85:6
**requests** [2] - 51:9, 87:18
**require** [1] - 84:22
**required** [2] - 20:10, 84:14
**requirement** [1] - 83:17
**requirements** [1] - 83:21
**requires** [1] - 67:12
**reside** [1] - 83:25
**residence** [2] - 70:15, 86:20
**residents** [1] - 87:4
**resolution** [1] - 46:24
**resolved** [1] - 40:22
**respect** [22] - 10:1, 11:12, 11:25, 12:11, 15:17, 27:6, 32:25, 33:1, 40:9, 40:24, 42:23, 43:8, 45:15, 47:11, 54:20, 54:21, 55:13, 62:17, 63:11, 79:10, 81:5, 82:3
**respected** [3] - 33:18, 57:1, 57:11
**respects** [1] - 15:6
**responded** [2] - 49:15, 57:2
**responding** [2] - 39:10, 40:8
**responds** [1] - 49:6
**response** [2] - 4:17, 44:20
**responses** [2] - 14:9, 15:9
**responsibility** [7] - 15:18, 15:20, 16:9, 16:19, 46:15, 59:13, 78:7
**responsible** [2] - 81:9, 86:6
**rest** [3] - 37:19, 54:14, 82:3
**restrained** [1] - 39:13
**result** [2] - 18:8, 35:1
**resulting** [3] - 26:14, 26:23, 78:12
**results** [1] - 73:15
**revealed** [1] - 57:8
**review** [3] - 4:13, 4:19, 45:24
**reviewed** [2] - 44:3, 44:8
**reviewing** [1] - 44:11
**revocation** [1] - 87:5
**rights** [1] - 11:5
**risk** [11] - 15:19, 53:9, 54:8, 54:15, 54:19, 58:4, 61:3, 63:22, 63:25, 65:1, 83:15
**risky** [1] - 25:12
**RMR** [1] - 89:17
**road** [3] - 12:8, 12:19, 27:3
**Rodimon** [10] - 28:5, 28:17, 29:11, 32:5, 46:6, 46:10, 46:14, 46:18, 47:4, 47:7
**Rodimon's** [1] - 66:7
**role** [1] - 37:1
**Romania** [2] - 28:8, 46:17

**rooms** [1] - 9:6
**Rule** [1] - 87:22
**rule** [2] - 10:19, 11:2
**ruled** [2] - 6:16, 7:13
**Rules** [1] - 87:22
**rulings** [2] - 87:13, 87:14

## S

**safe** [2] - 54:16, 64:1
**safer** [1] - 45:20
**safety** [3] - 6:22, 7:9, 85:23
**said/she** [1] - 13:7
**sample** [1] - 30:10
**save** [1] - 45:4
**saw** [2] - 8:10, 12:20
**scary** [2] - 54:8, 61:22
**scenes** [1] - 34:3
**scheduled** [1] - 84:12
**scheme** [1] - 73:14
**schools** [1] - 86:12
**screen** [1] - 84:23
**screwed** [1] - 38:24
**search** [2] - 86:22, 87:5
**searches** [1] - 87:2
**second** [3] - 52:20, 77:10, 77:19
**Second** [6] - 6:15, 7:11, 19:5, 19:21, 71:11, 72:19
**Section** [34] - 63:23, 67:12, 72:25, 73:4, 73:7, 73:11, 73:15, 73:18, 74:2, 74:4, 74:15, 74:16, 74:19, 75:11, 75:14, 75:16, 75:18, 76:3, 76:9, 76:16, 76:19, 77:3, 77:5, 77:18, 78:2, 78:20, 83:16, 83:22, 84:19, 85:11, 85:15, 85:21, 85:24
**section** [1] - 73:20
**security** [2] - 88:11, 88:24
**see** [19] - 2:20, 3:19, 5:20, 5:21, 12:18, 14:12, 16:22, 17:17, 17:24, 18:21, 18:25, 19:23, 26:3, 27:12, 35:5, 37:21, 50:25, 64:10, 88:18
**Seeking** [1] - 49:7
**sees** [3] - 5:11, 18:3, 42:23
**segregation** [1] - 10:19
**send** [10] - 14:16, 41:16, 50:24, 51:1, 67:25, 70:20, 71:2, 75:3, 80:10, 80:11
**sense** [4] - 9:21, 23:2, 24:3, 63:6
**sensitivity** [1] - 34:24
**sent** [3] - 26:2, 51:21, 52:18
**sentence** [62] - 19:15, 23:6, 24:20, 25:6, 25:8, 27:15, 27:17, 27:23, 28:6, 28:16, 28:17, 28:18, 28:19, 29:23, 30:1, 30:2, 30:6, 30:12,

30:19, 32:3, 32:7, 32:9, 32:11, 32:13, 32:16, 32:18, 32:19, 33:12, 46:16, 47:3, 52:1, 53:11, 55:7, 57:23, 59:9, 63:11, 63:24, 64:14, 64:22, 65:2, 66:12, 67:17, 72:21, 78:21, 78:24, 79:1, 79:8, 82:1, 82:5, 82:7, 82:8, 82:15, 82:19, 82:20, 83:3, 83:5, 83:6, 87:12, 88:3
**sentenced** [1] - 26:23
**sentences** [2] - 79:2, 79:6
**Sentencing** [20] - 15:17, 19:16, 62:18, 71:13, 72:22, 73:9, 73:11, 73:15, 74:4, 74:14, 74:16, 74:19, 75:11, 75:18, 76:2, 76:9, 76:16, 76:19, 77:2, 78:19
**sentencing** [20] - 2:9, 2:19, 2:24, 3:16, 4:7, 4:9, 8:5, 21:15, 25:9, 27:22, 30:5, 44:1, 44:9, 44:18, 49:1, 51:25, 60:4, 65:16, 67:12, 79:3
**sentiment** [2] - 18:4, 18:6
**separate** [4] - 59:21, 72:13, 77:8, 80:19
**September** [1] - 73:5
**seq** [1] - 83:23
**serious** [12] - 25:10, 27:12, 27:15, 30:14, 30:15, 30:16, 65:18, 66:9, 76:22, 79:23, 82:5, 82:6
**seriously** [1] - 26:15
**seriousness** [2] - 56:4, 79:9
**served** [4] - 29:22, 83:3, 83:9, 83:10
**serves** [1] - 88:3
**service** [3] - 74:7, 75:21, 85:8
**services** [2] - 85:7, 85:8
**set** [6] - 10:16, 14:1, 46:13, 60:25, 64:3, 78:20
**setting** [2] - 88:12, 88:24
**several** [2] - 28:10, 28:11
**severity** [1] - 17:25
**sex** [68] - 8:18, 8:19, 12:7, 12:8, 13:13, 14:4, 14:7, 14:19, 14:20, 14:23, 17:2, 24:21, 28:9, 29:18, 39:17, 39:20, 39:22, 42:1, 42:10, 42:12, 42:14, 42:17, 43:8, 43:10, 44:13, 47:13, 47:16, 47:25, 48:3, 48:15, 49:13, 50:14, 51:4, 51:23, 53:16, 53:17, 54:6, 56:6, 57:5, 57:20, 57:25, 58:21, 59:2, 59:20, 59:25, 60:8, 61:2, 63:6, 63:16, 63:18, 63:20, 64:7, 66:15, 70:5, 70:15, 70:23, 70:24, 71:1, 72:1,

77:1, 77:4, 81:21, 81:25, 83:24, 84:9, 88:7, 88:25
**Sex** [1] - 83:21
**sexual** [69] - 11:20, 14:18, 16:5, 16:14, 16:21, 18:2, 18:20, 22:14, 29:19, 30:7, 36:17, 38:1, 39:21, 42:17, 45:7, 45:13, 45:19, 48:10, 49:16, 50:4, 50:12, 50:15, 52:11, 53:2, 53:15, 53:17, 56:7, 60:7, 60:17, 63:8, 65:7, 65:8, 66:1, 66:3, 67:24, 68:5, 69:16, 69:18, 70:1, 70:7, 70:11, 70:12, 70:16, 70:22, 72:11, 72:13, 73:3, 74:8, 74:12, 75:2, 75:22, 75:24, 76:1, 76:4, 77:7, 77:9, 77:12, 77:16, 77:17, 77:21, 77:22, 77:24, 78:1, 79:24, 80:3, 80:15, 80:24, 86:1
**sexually** [9] - 6:19, 7:6, 8:8, 8:13, 50:7, 50:20, 51:2, 73:23, 85:20
**shading** [1] - 62:22
**shall** [4] - 86:8, 86:17, 87:3, 87:19
**sharing** [1] - 9:1
**Sheltra** [54] - 2:5, 2:12, 4:11, 6:13, 8:17, 9:11, 10:10, 10:17, 10:25, 12:14, 14:25, 20:19, 21:19, 24:16, 26:2, 26:5, 29:15, 33:24, 39:7, 39:13, 39:18, 39:25, 41:15, 42:5, 43:20, 44:12, 47:1, 47:6, 47:19, 48:24, 49:9, 49:15, 50:12, 50:20, 53:6, 53:8, 53:19, 55:11, 58:7, 59:8, 59:17, 60:17, 61:6, 63:12, 64:2, 64:18, 67:23, 68:3, 79:12, 88:3, 88:5, 88:16, 88:24, 89:2
**Sheltra's** [14] - 12:22, 17:9, 20:16, 30:17, 40:20, 41:7, 48:19, 49:6, 52:2, 52:4, 56:23, 60:22, 65:18, 67:2
**shirt** [1] - 76:6
**shoot** [1] - 27:16
**short** [2] - 30:6, 32:19
**shot** [1] - 27:18
**show** [5] - 16:4, 20:19, 23:19, 57:19, 59:2
**showed** [7] - 15:4, 47:13, 50:14, 56:6, 63:15, 69:14, 80:6
**shows** [2] - 20:2, 62:23
**sic** [3] - 31:11, 47:14, 63:4
**sic]** [1] - 44:24
**side** [1] - 35:19
**significant** [7] - 33:4, 57:23,

59:3, 63:24, 64:14, 65:2, 65:4
**similar** [5] - 15:8, 34:3, 79:3, 79:4, 85:3
**similarly** [2] - 43:25, 50:23
**simply** [1] - 2:24
**sincere** [1] - 36:4
**sincerely** [1] - 37:15
**sit** [3] - 34:25, 36:16, 81:11
**sitting** [2] - 41:4, 60:20
**situation** [2] - 4:22, 36:15
**slap** [1] - 32:19
**slightly** [1] - 82:19
**slowly** [1] - 69:6
**society** [4] - 27:7, 27:21, 28:22, 47:11
**society's** [1] - 80:14
**software** [3] - 71:23, 85:2, 85:17
**solely** [1] - 21:21
**solicit** [5] - 17:20, 18:12, 18:20, 35:14, 74:8
**solicitation** [1] - 72:1
**soliciting** [3] - 9:5, 70:1, 79:24
**solidify** [1] - 55:10
**someone** [27] - 13:21, 14:2, 15:21, 17:21, 17:23, 18:1, 18:11, 18:20, 19:3, 22:8, 24:22, 25:21, 27:1, 27:4, 27:15, 27:16, 27:17, 27:18, 28:7, 31:7, 31:23, 32:20, 35:16, 36:5, 79:25
**someplace** [1] - 32:7
**sometime** [2] - 3:15, 22:14
**somewhat** [4] - 5:21, 16:1, 23:1, 66:6
**sorry** [5] - 7:12, 38:25, 42:25, 44:1, 60:10
**sort** [6] - 25:11, 29:24, 35:5, 51:10, 52:16, 59:4
**sought** [2] - 9:13, 34:9
**speaking** [2] - 70:6, 70:25
**special** [2] - 53:18, 87:10
**specific** [11] - 5:21, 6:1, 11:16, 40:9, 45:16, 55:20, 59:1, 59:7, 74:5, 75:19, 79:11
**specifically** [5] - 6:23, 70:9, 74:25, 77:11, 77:20
**spend** [1] - 29:13
**split** [1] - 26:17
**sponte** [1] - 6:12
**spring** [1] - 32:10
**squarely** [1] - 6:16
**staff** [1] - 4:2
**stand** [4] - 13:11, 16:17, 63:11
**standard** [1] - 84:2
**start** [4] - 10:24, 31:2, 40:8,

41:25
**started** [6] - 10:11, 11:11, 14:6, 39:15, 51:6, 60:19
**starting** [3] - 32:14, 33:15, 35:9
**startled** [1] - 41:20
**startling** [2] - 39:6, 41:19
**starts** [1] - 32:1
**state** [3] - 36:22, 83:12, 83:24
**statement** [13] - 4:9, 8:15, 10:4, 11:1, 12:22, 14:6, 22:9, 33:24, 40:17, 43:8, 44:16, 49:4, 61:15
**statements** [15] - 5:1, 5:2, 5:25, 9:9, 9:18, 9:20, 10:7, 13:1, 17:2, 17:3, 17:6, 45:23, 67:22, 68:25, 72:24
**States** [7] - 2:4, 2:6, 72:19, 72:20, 72:22, 74:22
**statistics** [4] - 27:23, 30:5, 54:20, 54:24
**statutory** [1] - 78:16
**stay** [1] - 20:10
**stayed** [1] - 12:2
**step** [1] - 88:19
**steps** [3] - 55:11, 55:12, 58:5
**still** [14] - 21:6, 31:23, 33:11, 34:16, 47:22, 50:6, 50:9, 52:7, 52:9, 53:5, 54:4, 59:15, 68:20
**stimulate** [1] - 69:7
**stopped** [1] - 81:14
**storage** [4] - 84:20, 85:12, 85:16, 86:21
**story** [2] - 30:6, 55:24
**straightforward** [1] - 8:24
**strangers** [1] - 80:11
**street** [2] - 18:22, 33:13
**strike** [2] - 66:19, 86:5
**strikes** [1] - 66:22
**stroke** [6] - 9:12, 9:13, 21:23, 21:24, 37:16, 67:2
**stroke-related** [1] - 9:13
**struggling** [1] - 37:18
**student** [1] - 83:25
**studying** [1] - 43:25
**stuff** [1] - 57:19
**stupid** [1] - 36:8
**sua** [1] - 6:12
**subject** [2] - 25:24, 40:13
**subjective** [2] - 8:9, 11:11
**subjects** [1] - 17:22
**submit** [9] - 46:5, 47:5, 52:3, 53:10, 59:8, 84:12, 84:23, 86:19, 87:4
**submits** [1] - 54:18
**subsection** [1] - 77:5
**substance** [3] - 79:20, 83:14, 83:16

**successful** [3] - 26:6, 26:8, 33:19
**successfully** [2] - 60:13, 75:25
**suck** [1] - 69:9
**sudden** [4] - 20:2, 30:23, 32:3, 32:21
**suffered** [2] - 22:14, 82:10
**sufficient** [6] - 8:22, 67:17, 78:21, 78:23, 82:22, 83:5
**suggest** [10] - 5:15, 21:2, 25:2, 25:16, 29:10, 30:6, 45:20, 81:8, 88:4, 89:2
**suggested** [3] - 20:13, 30:4, 55:15
**suggesting** [2] - 31:22, 49:14
**suggestion** [1] - 58:9
**summer** [1] - 61:18
**superhighway** [1] - 39:17
**superseding** [2] - 77:11, 77:19
**supervise** [1] - 58:10
**supervised** [12] - 6:14, 7:18, 33:7, 33:13, 58:8, 78:17, 82:18, 82:21, 83:4, 83:10, 86:24
**supervision** [12] - 10:15, 65:4, 65:11, 67:8, 82:16, 82:17, 83:11, 83:18, 84:3, 84:5, 84:13, 87:1
**supervisor** [1] - 33:18
**supplemental** [1] - 4:8
**support** [9] - 4:8, 8:12, 25:8, 34:1, 40:16, 40:18, 48:14, 62:3, 72:16
**supported** [1] - 40:5
**supportive** [1] - 20:18
**supports** [1] - 28:18
**suppose** [1] - 24:21
**Supreme** [1] - 72:18
**sur** [1] - 42:8
**surprised** [5] - 14:3, 14:9, 14:11, 42:13, 66:6
**suspends** [1] - 83:17
**suspicion** [1] - 86:23
**swayed** [1] - 48:8
**sworn** [3] - 9:18, 10:4, 75:5
**symptoms** [1] - 3:5
**system** [2] - 85:2, 85:2

## T

**talks** [1] - 42:10
**teaching** [1] - 51:4
**teasing** [1] - 56:16
**technology** [1] - 4:4
**teenager** [1] - 60:19
**telephone** [4] - 2:13, 85:7, 86:9, 86:17
**television** [1] - 85:7

**tenuous** [1] - 38:5
**term** [5] - 29:10, 78:17, 81:9, 83:4, 83:9
**terms** [8] - 7:17, 9:21, 17:25, 19:10, 26:9, 32:16, 33:6, 66:11
**terribly** [1] - 38:25
**territory** [1] - 81:20
**test** [3] - 2:15, 3:6, 58:18
**tested** [1] - 3:3
**testified** [16] - 9:18, 11:13, 14:16, 16:17, 45:18, 47:19, 50:1, 51:11, 67:18, 67:23, 67:24, 70:5, 70:19, 70:22, 75:1, 75:2
**testifies** [2] - 16:10, 67:15
**testify** [5] - 13:5, 15:24, 23:18, 40:12, 69:16
**testifying** [4] - 16:7, 45:7, 52:15, 52:25
**testimony** [36] - 5:22, 8:8, 8:16, 9:14, 9:19, 10:4, 11:10, 16:12, 16:24, 16:25, 23:18, 29:19, 40:13, 43:5, 43:9, 44:23, 45:6, 46:16, 47:2, 47:19, 53:2, 57:3, 67:14, 67:19, 69:19, 69:25, 70:2, 70:7, 70:25, 71:3, 71:6, 72:6, 74:25, 75:5, 75:7, 76:14
**testing** [1] - 83:18
**tests** [1] - 84:12
**text** [3] - 43:19, 75:23, 85:25
**textbook** [1] - 56:15
**texting** [1] - 64:7
**thankfully** [1] - 57:18
**THE** [83] - 2:10, 2:12, 3:1, 3:14, 3:17, 3:18, 3:19, 3:21, 4:12, 4:13, 4:15, 4:18, 4:20, 4:23, 5:4, 5:5, 5:9, 5:10, 5:12, 5:13, 5:20, 5:25, 6:4, 6:7, 7:3, 7:5, 7:22, 7:24, 12:2, 13:2, 14:14, 15:10, 15:13, 16:8, 17:1, 17:13, 18:5, 19:5, 19:9, 19:18, 20:12, 20:25, 21:8, 21:13, 22:3, 22:13, 23:3, 23:21, 24:4, 24:6, 24:12, 25:23, 27:9, 29:2, 29:5, 31:25, 33:23, 34:1, 38:11, 38:12, 38:13, 38:14, 38:22, 38:23, 39:3, 41:12, 43:2, 43:4, 44:5, 44:8, 61:4, 62:9, 62:14, 65:12, 65:14, 66:17, 88:2, 88:7, 88:10, 88:15, 88:17, 88:21, 89:5
**theme** [4] - 37:25, 38:1, 86:12
**themselves** [2] - 80:18, 80:21
**theory** [1] - 9:11
**therapy** [1] - 79:18

**therefore** [14] - 7:17, 73:24, 74:3, 74:13, 74:18, 75:10, 75:17, 76:1, 76:8, 76:15, 76:23, 78:3, 78:6, 78:11
**they've** [3] - 28:2, 28:4, 48:22
**thinking** [13] - 6:18, 8:4, 12:17, 19:10, 22:11, 26:9, 29:14, 31:21, 31:22, 41:1, 55:8, 64:19, 68:13
**thinks** [5] - 14:14, 15:21, 60:1, 66:21, 68:3
**third** [5] - 12:5, 12:11, 86:3, 86:4, 86:15
**thorough** [1] - 87:3
**thoughts** [2] - 10:1, 46:2
**threaten** [2] - 6:21, 7:8
**three** [10] - 15:20, 24:5, 29:21, 32:21, 41:10, 42:18, 46:7, 48:4, 48:7, 48:15
**throughout** [3] - 11:19, 16:25, 34:12
**throw** [1] - 25:2
**tickets** [1] - 71:16
**tiny** [1] - 47:24
**to-peer** [1] - 71:22
**today** [6] - 19:1, 55:10, 60:6, 63:15, 64:24, 65:1
**together** [7] - 38:8, 44:19, 46:7, 47:17, 47:23, 49:14, 73:10
**tongue** [2] - 69:7, 69:8
**took** [5] - 13:10, 16:17, 34:7, 39:16, 66:15
**tool** [1] - 58:20
**tools** [1] - 84:5
**top** [1] - 18:14
**topic** [2] - 61:5, 80:4
**total** [3] - 76:23, 78:11, 83:3
**totality** [1] - 64:20
**totally** [1] - 20:7
**touch** [2] - 49:2, 50:2
**touched** [6] - 29:7, 44:19, 45:2, 45:8, 55:25, 65:19
**touching** [1] - 44:17
**track** [1] - 81:14
**trafficking** [2] - 29:18, 66:15
**transactions** [1] - 73:13
**transcript** [2] - 5:18, 89:13
**transport** [1] - 3:23
**treated** [1] - 78:10
**treatment** [25] - 6:22, 7:8, 38:17, 54:3, 54:4, 58:2, 58:3, 58:21, 60:5, 60:8, 60:13, 60:21, 60:24, 63:14, 79:20, 79:21, 84:10, 84:14, 84:17, 84:21, 85:23, 88:8, 88:25
**Treena** [22] - 8:15, 8:16, 8:19, 14:15, 14:17, 14:21, 15:11, 16:15, 37:16, 37:22, 37:23,

38:1, 39:8, 42:23, 55:24, 68:1, 69:25, 70:19, 70:21, 70:23, 70:25, 75:4
**triable** [1] - 15:22
**trial** [38] - 5:18, 5:22, 11:19, 13:10, 15:19, 16:10, 16:17, 16:18, 17:14, 20:23, 21:21, 23:7, 23:11, 23:23, 24:16, 29:23, 35:9, 39:25, 42:9, 44:20, 44:23, 45:4, 47:1, 50:1, 52:13, 53:1, 54:25, 59:15, 65:19, 65:23, 67:16, 70:9, 74:25, 76:14, 78:6, 81:3, 81:6, 87:14
**tribe** [1] - 48:15
**tried** [1] - 82:17
**trigger** [1] - 43:8
**triggered** [1] - 43:9
**triggering** [2] - 43:12, 43:15
**trolling** [2] - 41:8, 63:19
**trouble** [2] - 36:7, 81:16
**troubled** [3] - 36:2, 49:11, 50:16
**true** [13] - 12:13, 12:16, 13:6, 16:19, 16:20, 20:6, 39:11, 43:14, 50:2, 52:19, 52:22
**truly** [1] - 36:5
**trust** [1] - 61:16
**truth** [12] - 12:1, 14:6, 20:22, 38:19, 50:20, 57:8, 57:11, 58:5, 60:16, 81:18
**truthful** [2] - 52:7, 53:2
**truths** [1] - 60:16
**try** [6] - 15:23, 23:24, 23:25, 43:17, 58:6, 61:20
**trying** [9] - 12:11, 25:13, 34:21, 35:13, 37:10, 45:4, 47:6, 48:8, 88:6
**Tuesday** [1] - 2:1
**turn** [2] - 5:10, 52:2
**turned** [2] - 34:13, 34:14
**two** [26] - 16:13, 17:16, 17:24, 18:1, 21:4, 25:19, 31:11, 34:20, 36:19, 38:15, 45:16, 47:24, 48:11, 59:20, 63:3, 63:7, 67:22, 68:21, 72:12, 73:12, 74:14, 75:11, 76:2, 76:8, 76:15, 77:8
**Two** [1] - 65:17
**two-level** [2] - 17:16, 18:1
**type** [2] - 20:7, 79:16
**types** [1] - 19:7
**typically** [2] - 26:3, 71:19

## U

**U.S** [13] - 73:11, 73:14, 74:4, 74:14, 74:16, 74:19, 75:11, 75:18, 76:2, 76:9, 76:16, 76:19, 77:2

**ultimately** [2] - 22:15, 61:8
**unable** [1] - 87:14
**unanswered** [1] - 54:21
**uncle** [1] - 61:19
**uncontestable** [1] - 20:15
**uncontested** [1] - 20:14
**uncool** [1] - 50:5
**under** [19] - 4:4, 19:16, 30:20, 38:20, 40:16, 47:4, 53:4, 56:20, 62:19, 63:15, 67:12, 67:23, 75:1, 75:2, 76:6, 82:16, 83:18, 85:4, 86:3
**undercover** [29] - 14:11, 17:5, 25:25, 31:16, 31:17, 35:15, 35:19, 36:1, 36:6, 39:9, 39:13, 42:10, 48:7, 52:9, 53:21, 57:4, 57:18, 57:22, 68:24, 70:10, 73:25, 74:10, 77:14, 80:6, 81:16, 81:18
**underlying** [4] - 72:14, 77:10, 77:19
**unfair** [3] - 31:20, 62:17, 62:19
**unfortunate** [2] - 12:23, 16:7
**unintentionally** [1] - 65:25
**unit** [2] - 76:20, 76:21
**United** [7] - 2:4, 2:6, 72:18, 72:19, 72:20, 72:22, 74:22
**units** [2] - 76:18, 76:23
**unjust** [1] - 82:4
**unknowns** [1] - 55:4
**unlawful** [1] - 86:25
**unlawfully** [1] - 83:14
**unless** [5] - 6:20, 7:7, 10:3, 85:21, 86:13
**unlike** [1] - 27:10
**unreasonable** [1] - 30:3
**unreliable** [1] - 82:3
**unremorseful** [1] - 57:25
**unrepentant** [4] - 52:11, 57:25, 61:2, 63:13
**unsolicited** [1] - 67:4
**unsubstantiated** [1] - 20:8
**unsupported** [1] - 19:23
**untreated** [4] - 24:21, 54:6, 57:25, 61:2
**unwarranted** [1] - 79:2
**up** [31] - 2:20, 10:12, 20:2, 23:20, 23:22, 25:2, 27:19, 36:17, 37:2, 38:24, 39:19, 41:25, 42:2, 43:25, 44:11, 47:13, 50:12, 50:14, 52:18, 56:6, 57:19, 59:2, 62:23, 63:16, 64:23, 65:16, 66:23, 69:21, 79:25, 80:6
**upsetting** [1] - 51:13
**USC** [15] - 72:25, 73:4, 73:7, 74:2, 75:16, 77:18, 78:2, 78:20, 83:16, 83:22, 84:18,

85:11, 85:15, 85:21, 85:24
**use-of-the-computer** [1] - 6:11
**uses** [2] - 18:20, 19:1
**utilize** [1] - 85:16
**utilized** [1] - 84:24

## V

**V1** [2] - 22:13, 66:24
**vacation** [1] - 40:4
**vaccinated** [2] - 3:3, 4:1
**vagina** [1] - 76:7
**vague** [2] - 12:5, 17:7
**value** [4] - 13:15, 13:19, 13:22, 17:12
**values** [1] - 80:14
**vary** [1] - 64:11
**vehicles** [1] - 86:20
**venture** [1] - 46:20
**verdict** [3] - 27:11, 40:4, 55:23
**Vermont** [8] - 3:23, 25:10, 29:25, 26:18, 64:15, 64:18, 71:18, 88:11, 88:23
**via** [2] - 2:8, 35:11
**victim** [16] - 4:9, 10:10, 21:19, 23:9, 26:18, 31:8, 31:15, 46:10, 47:12, 61:14, 62:21, 62:22, 67:5, 73:12, 73:25, 80:25
**Victim** [10] - 5:1, 6:1, 6:8, 9:9, 9:24, 10:2, 40:9, 60:19, 61:15, 72:15
**victimization** [1] - 56:10
**victimize** [1] - 61:21
**victimizes** [1] - 79:17
**victimizing** [2] - 51:1, 57:16
**victims** [11] - 9:6, 31:10, 41:10, 46:10, 53:20, 55:1, 64:22, 72:6, 80:9, 80:15, 86:16
**videoconference** [3] - 2:8, 4:3, 4:6
**videos** [3] - 6:19, 7:6, 85:19
**videotape** [1] - 28:9
**view** [7] - 6:18, 7:5, 8:20, 53:6, 55:10, 80:17, 85:19
**violate** [3] - 58:21, 58:24, 82:23
**violates** [2] - 77:18, 78:2
**violating** [3] - 58:22, 74:2, 75:16
**violation** [4] - 73:4, 73:7, 84:13, 86:24
**violent** [2] - 46:9, 86:1
**visceral** [1] - 25:3
**visual** [1] - 85:25
**vocational** [1] - 79:20
**volunteered** [1] - 37:9

**vs** [5] - 2:5, 72:19, 72:20, 74:22
**vulnerable** [2] - 50:13, 79:15

## W

**wah** [3] - 60:9
**wait** [2] - 68:16, 68:17
**waiting** [1] - 68:21
**waive** [1] - 87:16
**waived** [2] - 2:12, 87:9
**waiver** [1] - 3:22
**waiving** [1] - 2:18
**wants** [5] - 10:25, 17:10, 22:12, 37:8, 66:5
**warrant** [1] - 86:22
**warranted** [1] - 82:7
**waste** [1] - 35:13
**ways** [3] - 9:6, 32:22, 55:12
**wealth** [1] - 80:9
**week** [1] - 3:15
**weight** [2] - 21:1, 65:23
**whatsoever** [2] - 20:3, 52:8
**white** [1] - 13:4
**who've** [1] - 79:4
**whole** [4] - 34:13, 35:9, 35:19, 37:14
**wide** [3] - 69:18, 80:3, 80:24
**wildly** [1] - 47:4
**willful** [4] - 43:2, 43:17, 45:16
**willfully** [5] - 45:4, 67:13, 67:22, 74:23, 76:12
**willing** [10] - 24:22, 50:4, 50:22, 58:5, 60:14, 70:11, 72:8, 74:11, 77:15, 80:9
**winnows** [1] - 21:15
**wiping** [1] - 85:17
**wireless** [1] - 85:7
**wish** [1] - 38:5
**wished** [2] - 70:12, 74:13
**withdrew** [2] - 40:15, 62:4
**witness** [9] - 9:15, 10:2, 12:25, 21:20, 21:21, 22:8, 23:16, 66:25, 67:1
**Woman** [1] - 49:7
**woman** [13] - 10:6, 14:18, 21:16, 26:1, 28:8, 29:7, 46:17, 46:20, 48:3, 68:1, 68:10, 70:21
**women** [1] - 29:20
**wonder** [1] - 57:1
**wonderful** [1] - 32:23
**wondering** [3] - 9:20, 10:11, 15:15
**word** [4] - 11:2, 13:3, 37:21, 40:3
**words** [4] - 11:16, 11:23, 17:9, 17:11
**worker** [1] - 64:6
**works** [1] - 58:3

15

**world** [1] - 80:8
**worry** [1] - 53:23
**worse** [1] - 41:13
**wrap** [1] - 37:2
**wrath** [1] - 38:19
**wrist** [1] - 32:20
**written** [8] - 7:20, 13:3, 13:7, 40:17, 43:19, 49:3, 86:9, 86:18
**wrote** [8] - 40:19, 52:21, 52:22, 57:4, 61:16, 61:18, 70:10, 70:14

# Y

**year** [5] - 29:21, 31:11, 35:8, 47:22, 63:19
**years** [40] - 19:24, 21:17, 28:12, 28:19, 29:22, 29:23, 30:8, 30:9, 30:13, 30:24, 31:9, 31:10, 31:16, 32:5, 32:7, 32:8, 32:19, 32:22, 33:13, 33:15, 33:17, 34:7, 34:20, 35:24, 36:21, 40:25, 47:24, 55:6, 56:25, 58:8, 59:5, 59:24, 63:3, 66:13, 66:16, 73:22, 74:18, 78:17, 79:18
**yellow** [2] - 12:19
**yesterday** [1] - 2:13
**young** [7] - 28:9, 29:7, 29:10, 29:20, 61:21, 69:7, 79:25
**Younger** [1] - 49:7
**yourself** [5] - 41:21, 60:14, 60:16, 81:15, 82:10
**yup** [1] - 29:5

# Z

**zero** [2] - 78:12, 81:8